1  BREE BERNWANGER - # 331731
   bbernwanger@aclunc.org
2  MICHELLE (MINJU) Y. CHO - # 321939
   mcho@aclunc.org
3  LAUREN DAVIS - # 357292
   ldavis@aclunc.org
4  SHILPI AGARWAL - # 270749
   sagarwal@aclunc.org
5  AMERICAN CIVIL LIBERTIES UNION
   FOUNDATION OF NORTHERN CALIFORNIA
6  39 Drumm Street
   San Francisco, CA 94111
7  Telephone: (415) 621-2493

8  MAYRA JOACHIN - # 306065
   mjoachin@aclusocal.org
9  EVA BITRAN - # 302081
   ebitran@aclusocal.org
10 OLIVER MA - # 354266
   oma@aclusocal.org
11 AMERICAN CIVIL LIBERTIES UNION
   FOUNDATION OF SOUTHERN CALIFORNIA
12 1313 West 8th Street
   Los Angeles, CA 90017
13 Telephone: (213) 977-5000

BRISA VELAZQUEZ OATIS - # 339132
bvoatis@aclu-sdic.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SAN DIEGO & IMPERIAL
COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
Telephone: (619) 398-4199

*Attorneys for Plaintiffs*

AJAY S. KRISHNAN - # 222476
akrishnan@keker.com
FRANCO MUZZIO - # 310618
fmuzzio@keker.com
ZAINAB O. RAMAHI - # 332139
zramahi@keker.com
JULIA L. GREENBERG - # 333864
jgreenberg@keker.com
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111
Telephone: (415) 391-5400
Facsimile: (415) 397-7188

*Attorneys for Plaintiff Oscar Morales Cisneros*

14

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA
## FRESNO DIVISION

| | |
|---|---|
| UNITED FARM WORKERS; OSCAR MORALES CISNEROS; WILDER MUNGUIA ESQUIVEL; YOLANDA AGUILERA MARTINEZ; JUAN VARGAS MENDEZ; and MARIA GUADALUPE HERNANDEZ ESPINOSA, | CASE NO. _____ |
| Plaintiffs, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | |
| KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; PETE R. FLORES, in his official capacity as Acting Commissioner of U.S. Border Patrol; MICHAEL W. BANKS, in his official capacity as Chief of U.S. Border Patrol; and GREGORY K. BOVINO, in his official capacity as Chief Patrol Agent for El Centro Sector of the U.S. Border Patrol, | |
| Defendants. | |

**INTRODUCTION**

1.       In January 2025, Border Patrol agents based at the United States-Mexico border traveled over 300 miles north to Bakersfield to launch "Operation Return to Sender"—a nearly weeklong sweep through predominantly Latino areas of Kern County and the surrounding region to stop, detain, and arrest people of color who appeared to be farm workers or day laborers, regardless of their actual immigration status or individual circumstances. With no explanation of where they were being taken or why and no notice to their family members, Border Patrol agents bussed the people they arrested to the El Centro Border Patrol station ("El Centro Station"), detained them incommunicado, and coerced and deceived them into waiving their right to see an immigration judge and submitting to summary expulsion.

2.       "Operation Return to Sender" tore families apart and terrorized the community. It also violated the law. The Fourth Amendment prohibits Border Patrol agents from detaining a person, whether in a private vehicle or on foot, without reasonable suspicion that the person is in the country unlawfully. The person's perceived race, ethnic background, or occupation cannot justify a detentive stop. Nor can a person's refusal to answer voluntary questions. And Congress has prohibited immigration officers, including Border Patrol agents, from making indiscriminate arrests without a warrant. Prior to making a warrantless arrest, 8 U.S.C. § 1357(a)(2) requires agents to make a particularized finding that a person (1) is violating immigration law *and* (2) is a flight risk—a finding the Border Patrol does not train or instruct its agents to make. Moreover, the Fifth Amendment prohibits Border Patrol agents from subjecting people in their custody to "voluntary departure"—a form of summary expulsion—unless they knowingly and voluntarily waive their right to an immigration court hearing. The stakes are high: voluntary departure can result in a yearslong bar on reentry to the United States.

3.       "Operation Return to Sender" disregarded these legal mandates by design. Apparently expecting that people who appeared to be Latino or who work as farm workers or day laborers would lack immigration status, Border Patrol agents went on a fishing expedition, dispensing with reasonable suspicion and stopping people based on assumptions about their race or occupation instead. Border Patrol agents made warrantless arrests indiscriminately, without

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    1
CASE NO. _____

evaluating or considering flight risk. At the El Centro Station, agents pressured people in their custody to accept voluntary departure without providing any information about the serious consequences it carries.

4.      Border Patrol planned and executed these tactics at a large scale. Local reports suggest that Border Patrol swept close to 200 people into the operation's unlawful dragnet. Border Patrol said in a media statement that its agents made 78 arrests during the sweeps. On information and belief, at least 40 of the people Border Patrol arrested—the majority of whom had lived in the United States for years—were expelled to Mexico after being coerced to accept voluntary departure, leaving behind families, communities, homes, and livelihoods. Across the operation's entire scope, Border Patrol agents followed a clear pattern: stop regardless of reasonable suspicion, arrest regardless of flight risk, and expel without explanation.

5.      **Step One: Stop Regardless of Reasonable Suspicion.** To carry out "Operation Return to Sender," Border Patrol relied on a practice of conducting detentive stops regardless of reasonable suspicion that a person was in the country unlawfully. For example, on the morning of January 7, 2025, Border Patrol agents approached Plaintiff Wilder Munguia Esquivel while he was standing outside a Home Depot with a group of day laborers. The Border Patrol agents did not identify themselves. When Mr. Munguia Esquivel tried to walk away, an agent followed him and ordered him to turn around so he could be handcuffed. When Mr. Munguia Esquivel affirmatively exercised his right to remain silent, the agent grabbed him by the arm, searched him, and arrested him. Later that day, in a parking lot in a Latino neighborhood, Border Patrol agents surrounded and blocked in Plaintiff Oscar Morales Cisneros' car. When Mr. Morales Cisneros declined to answer the agents' questions about his immigration status, they arrested him.

6.      On the morning of January 8, 2025, a Border Patrol agent pulled over Ernesto Campos Gutierrez, a U.S. citizen who works as a gardener and was hauling a trailer full of gardening equipment. When Mr. Campos Gutierrez declined to surrender his truck keys to the agent who had pulled him over, the agent slashed his tires. When his passenger did not immediately open the passenger-side door, the agent threatened to break the window. When the

passenger lowered the window, the agent dragged his passenger from the vehicle. Border Patrol agents arrested both men.

7.      That same afternoon, Border Patrol agents pulled over Plaintiff Yolanda Aguilera Martinez, a lawful permanent resident, for no discernable reason. When Ms. Aguilera Martinez showed Border Patrol agents her valid California driver's license, they ordered her out of her car, threw her to the ground, and arrested her. On information and belief, in each of these stops—and across "Operation Return to Sender"—Border Patrol agents possessed no information about the person they seized, only an assumption that they fit a profile of an undocumented person based on their presumed race, ethnicity, or occupation.

8.      **Step Two: Arrest Regardless of Flight Risk.** Border Patrol agents also relied on a practice of escalating stops to warrantless arrests without evaluating whether the arrestee posed a flight risk. Border Patrol agents did not attempt to evaluate whether Plaintiff Munguia Esquivel Plaintiff Morales Cisneros, Mr. Campos Gutierrez, or Plaintiff Aguilera Martinez were likely to escape before a warrant could be obtained. If they had, they would have learned that each had lived in Bakersfield for years, had deep family and community ties, had histories of local employment, and presented no likelihood of escape—let alone probable cause. And when an arrestee affirmatively informed Border Patrol agents of facts showing they were *not* a flight risk, Border Patrol agents ignored them. For example, Border Patrol agents pulled over the van in which Plaintiff Juan Vargas Mendez was a passenger after a day of working in the fields. After Mr. Vargas Mendez and another passenger told agents they were not carrying IDs, agents arrested and taunted them, calling them "Mexican bitches." Plaintiff Vargas Mendez pleaded that he had lived in Kern County for 20 years and was married with four young children. The agent responded that he did not care and Mr. Vargas Mendez would be "going to Mexico" anyway.

9.      **Step Three: Expel Without Explanation.** Once Border Patrol agents transported the people they arrested to the El Centro Station—a Border Patrol station just north of the U.S.-Mexico border—the ultimate goal of "Operation Return to Sender" became clear: extract voluntary departure agreements from as many people as possible without explaining the consequences. Once at the El Centro Station, agents commenced a campaign of coercion that relied on consistent

tactics: detain people in frigid holding cells without access to sleeping quarters, showers, hygiene products, or sufficient food; deny requests to call attorneys or family members; fail to inform or misinform people in custody about the consequences of voluntary departure and the process of exercising their right to an immigration court hearing; and refuse to provide written information about voluntary departure to people in custody in any readable format.

10.     For example, Plaintiff Morales Cisneros, Plaintiff Vargas Mendez, and Plaintiff Maria Guadalupe Hernandez Espinoza were detained in cold, windowless cells lit 24 hours a day, with no bed, mattress, or blankets besides an aluminum sheet. Border Patrol agents denied their repeated requests to call a lawyer or their family. At no point did Border Patrol agents provide written information about voluntary departure in a language or format they could read.

11.     Instead, Border Patrol agents provided a slew of misinformation about voluntary departure. At different points, agents told Mr. Morales Cisneros that voluntary departure would allow him to "fix his status" or would not affect him in the future. Neither statement is true. Agents misleadingly told Plaintiffs they would be imprisoned for months or years if they chose to exercise their right to an immigration court hearing. After Ms. Hernandez Espinoza verbally suggested openness to voluntary departure, she changed her mind and for two days, insisted that she be permitted to see an immigration judge. Border Patrol agents incorrectly told her that she had no right to a hearing. Eventually, Border Patrol agents told Ms. Hernandez Espinoza they needed her signature on a digital pad. The agents refused to show her what she was signing and told her that her signature was needed to confirm her identity. The next day, Border Patrol agents dropped Ms. Hernandez Espinoza off in Mexicali, handing her a printout of a document she had never seen. To her shock, it was a voluntary departure form bearing her signature.

12.     Mr. Vargas Mendez and Ms. Hernandez Espinoza are now stranded in Mexico, far from their homes, communities, and livelihoods. They do not know when they will see their families again. Border Patrol's tactics appear to have been built to culminate in this swift expulsion, ripping families and communities apart in its wake.

13.     The tactics in the above-referenced examples and, on information and belief, in countless other stops, arrests, and expulsions, reflect Border Patrol's policies and practices, which

1  blatantly flout the Constitution, the restrictions on warrantless arrests Congress imposed on

2  immigration agents in 8 U.S.C. § 1357(a)(2), and federal regulations.

3      14.    The consequences of Border Patrol's unlawful practices have shaken the Central

4  Valley to its core. Media outlets reported that in the immediate aftermath of Border Patrol's raids,

5  agricultural fields were deserted and school attendance dipped, as farm workers and their families

6  feared being profiled by Border Patrol agents. Yet despite its unlawful tactics and devastating

7  impact on the community, Border Patrol flaunts "Operation Return to Sender" as a success. Border

8  Patrol has stated publicly that it plans to return to Bakersfield and replicate the operation in Fresno,

9  Sacramento, and throughout California.

10     15.    Individual Plaintiffs Oscar Morales Cisneros, Wilder Munguia Esquivel, Yolanda

11  Aguilera Martinez, Juan Vargas Mendez, and Maria Guadalupe Hernandez Espinosa ("Individual

12  Plaintiffs") are—or were, until Border Patrol's unlawful operation—Kern County residents with

13  deep ties to the community. Border Patrol agents subjected each of them to at least one of the three

14  unlawful practices that drove "Operation Return to Sender," and which Defendants maintain today:

15  (1) conducting detentive stops without regard to reasonable suspicion that a person is in the

16  country unlawfully, (2) effecting warrantless arrests without regard to probable cause that a person

17  is likely to escape, and (3) extracting expulsion through voluntary departure without a knowing,

18  voluntary, and intelligent waiver of rights.

19     16.    Organizational Plaintiff United Farm Workers ("UFW") is headquartered in Kern

20  County and counts among its members thousands of migrant and seasonal farm workers

21  throughout the country, with its greatest concentration of membership living and working in

22  California's Central Valley, including Kern County. During "Operation Return to Sender," Border

23  Patrol subjected at least some UFW members to the unlawful practices described above. UFW's

24  members across the state fear that they will be subjected to Defendants' unlawful practices in the

25  future.

26     17.    On their own and as representatives of three classes of similarly situated

27  individuals, Individual Plaintiffs, along with Plaintiff UFW on behalf of its members (collectively,

28  "Plaintiffs") seek injunctive and declaratory relief to compel Border Patrol and its parent agencies,

Customs and Border Protection ("CBP") and the Department of Homeland Security ("DHS"), to design and conduct its operations in compliance with the Constitution and federal law. Unless this Court intervenes to stop Defendants from continuing their unlawful practices, Plaintiffs, UFW's members, and countless other Central Valley residents—regardless of their immigration status—will continue to be subjected to Border Patrol's lawless sweeps, indiscriminate arrests, and coercive expulsions.

## JURISDICTION AND VENUE

18.     Jurisdiction is proper and relief is available pursuant to 28 U.S.C. § 1331 (federal question), 5 U.S.C. §§ 702 and 706 (Administrative Procedure Act), 28 U.S.C. § 1651 (All Writs Act), and 28 U.S.C. §§ 2201–02 (Declaratory Judgment Act).

19.     Defendants do not have immunity. *See, e.g.*, 5 U.S.C. § 702; *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689–90 (1949); *The Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 526 (9th Cir. 1989).

20.     Venue is proper under 28 U.S.C. § 1391(e)(1) because at least one Plaintiff resides in this district and/or a substantial part of the events or omissions giving rise to the claims occurred in this district.

## PARTIES

21.     **Plaintiff United Farm Workers ("UFW")**, founded in 1962 by Cesar Chavez, Dolores Huerta, Larry Itliong and other leaders, is the first and largest farm worker union in the country. UFW's mission is to improve the lives, wages, and working conditions of agricultural workers and their families. UFW is dedicated to the cause of eliminating discrimination against farm workers, immigrants, people of color, and any other groups that have been the target of unfair or unlawful treatment. As part of this work, UFW is a national leader in the movement for immigration reform and immigrants' rights.

22.     UFW has approximately 7,000 members. California is home to more UFW members than any other state, with the highest density in the Central Valley region. UFW membership is voluntary and consists of various categories of members. Among these, contributing or associate members are individuals who make a monthly or annual contribution of a

designated amount to UFW. Dues-paying members are those who benefit from a UFW collective bargaining agreement. Generally, individuals seeking to become contributing or associate members of UFW complete an official application, which is reviewed and processed by UFW staff for approval. Dues-paying members become members through the procedures set forth in the California Agricultural Labor Relations Act or other applicable laws, their collective bargaining agreements, and union rules.

23.    UFW members play an important role in deciding what activities UFW engages in as an organization. At the UFW's quadrennial Constitutional Convention, members introduce and vote on motions to govern and guide the union's work, and to elect the Union Executive Board. On an ongoing basis, UFW members respond to surveys, provide feedback, and participate in advisory meetings (known as "consejo de base" in Spanish) to actively participate in the Union's decisions. UFW has created various programs in response to members' feedback and requests.

24.    UFW membership comes with a variety of benefits. Dues-paying members receive protections from collective bargaining in which UFW engages on their behalf. Through an established negotiating committee comprised of workers, UFW members negotiate benefits such as medical insurance, pension, wages, paid time off, working conditions, seniority, right to recall, equipment provisions, and other terms of employment. Contributing or associate members (also called "direct" members) receive UFW photographic identification, accidental life insurance of $4,000, access to UFW discounts with private businesses, and other benefits. The UFW membership photo ID card can be used as identification when interacting with school systems, financial institutions, Covered California (state health insurance marketplace), towing and impound services, and other institutions or agencies requiring secondary ID. For services that prioritize agricultural workers, UFW direct membership establishes eligibility.

25.    UFW brings this action on behalf of its members. UFW's members have been harmed by Border Patrol's unlawful stop, arrest, and expulsion practices and fear being subjected to those practices in the future. At least four UFW members—"Alicia," "Benjamin," "Carlos," and "Fernando" have been subjected to Border Patrol's practice of conducting stops without regard to reasonable suspicion and effecting arrests without regard to probable cause of flight risk.

"Benjamin" and "Carlos" also were coerced into accepting expulsion via voluntary departure. They remain in Mexico, leaving behind, between them, seven children in the United States.

26.     Many UFW members, regardless of the stability or permanence of their immigration status, fear Border Patrol will continue to target farm workers with its unlawful practices, especially those who appear non-white. They are terrified that Border Patrol will— again—arrest people without warrants and without regard to how long someone has been living in the community or the family members they have waiting for them, including young children; that Border Patrol will—again—detain people for days in a detention facility without the ability to contact their family members or an attorney; and that Border Patrol will—again—summarily banish individuals from the U.S. against their will and without their consent, separating them from their family members, homes, and all they have worked for without even a chance to say goodbye or arrange their affairs. These members face irreparable harm from Border Patrol's unlawful stop, arrest, and expulsion practices.

27.     **Plaintiff Oscar Morales Cisneros** is a 51-year-old homeowner who has lived in Bakersfield since 2021 and works in maintenance and construction. Before moving to Kern County, he lived in Los Angeles County for about 15 years. On January 7, 2025, Border Patrol agents stopped him while he was in his parked vehicle without reasonable suspicion that he was in the country unlawfully, arrested him without a warrant and without evaluating his likelihood of escape before a warrant could be obtained, and transported him to the El Centro Station, where they pressured him to accept voluntary departure without explaining its consequences or obtaining a knowing and voluntary waiver of his rights.

28.     **Plaintiff Wilder Munguia Esquivel** is a 38-year-old resident of Bakersfield, California. He has lived there for about 12 years with his brother, sister-in-law, and niece, all of whom are U.S. citizens, in a home owned by his brother. He is a licensed handyman and a day laborer. On January 7, 2025, Border Patrol agents stopped and detained him without reasonable suspicion that he was in the country unlawfully, arrested him without a warrant and without evaluating his likelihood of escape before a warrant could be obtained, and transported him to the El Centro Station.

29.   **Plaintiff Yolanda Aguilera Martinez** is a 56-year-old a lawful permanent resident and resident of Bakersfield, California. She has been a lawful permanent resident since she was about 20 years old and has resided in Kern County for nearly 45 years. Her family, including her children and grandchildren, also reside in Kern County. She has worked as a farm worker in the Central Valley for most of her adult life. On January 8, 2025, Border Patrol agents stopped her in a vehicle stop without reasonable suspicion that she was in the country unlawfully and arrested her without a warrant and without evaluating her likelihood of escape before a warrant could be obtained.

30.   **Plaintiff Juan Vargas Mendez** is a 37-year-old husband to a U.S. citizen, father to three U.S.-citizen children, and caregiver and stepfather to a U.S.-citizen stepson who is diagnosed with epilepsy. Until Border Patrol expelled him from the United States pursuant to its unlawful voluntary departure practices, Plaintiff Vargas Mendez resided in Bakersfield, California. Prior to his expulsion, he had lived in Kern County for about 20 years. He had worked consistently as a farm worker picking oranges at the same local ranch for over 10 years. On January 8, 2025, Border Patrol agents stopped him in a vehicle stop without reasonable suspicion that he was in the country unlawfully, arrested him without a warrant and without evaluating his likelihood of escape before a warrant could be obtained, and transported him to the El Centro Station, where they deceived and coerced him into accepting voluntary departure without explaining its consequences or obtaining a knowing and voluntary waiver of his rights.

31.   **Plaintiff Maria Guadalupe Hernandez Espinoza** is a 46-year-old mother and grandmother who lived in Bakersfield, California for about 10 years. Until Border Patrol expelled her from the United States pursuant to its unlawful voluntary departure practices, Plaintiff Hernandez Espinoza had rented the same apartment in Bakersfield with her partner for about three years. She had consistently worked in the agricultural sector as a farm worker for nearly 20 years. Border Patrol agents stopped her in a vehicle stop without reasonable suspicion that she was in the country unlawfully, arrested her without a warrant and without evaluating her likelihood of escape before a warrant could be obtained, and transported her to the El Centro Station, where they

deceived and coerced her into voluntary departure without explaining its consequences or obtaining a knowing and voluntary waiver of her rights.

32.    **Defendant Kristi Noem** is the Secretary of the Department of Homeland Security, which oversees the component agencies responsible for enforcing U.S. immigration law, including CBP. Defendant Noem is sued in her official capacity.

33.    **Defendant Pete R. Flores** is the Acting Commissioner of CBP, the agency within DHS that is responsible for enforcing immigration laws at the U.S. border. In that capacity, Defendant Flores has direct authority over all CBP policies, procedures, and practices related to stops, arrest, and detention. Defendant Flores is sued in his official capacity.

34.    **Defendant Michael W. Banks** is Chief of U.S. Border Patrol. In that capacity, Defendant Banks has direct authority over all Border Patrol policies, procedures, and practices related to stops, arrest, and detention. Defendant Banks is sued in his official capacity.

35.    **Defendant Gregory K. Bovino** is the Chief Patrol Agent for El Centro Sector of the U.S. Border Patrol. In that capacity, Defendant Bovino has direct authority over all El Centro Sector policies, procedures, and practices related to stops, arrest, and detention. Defendant Bovino is sued in his official capacity.

## FACTUAL ALLEGATIONS

### A. Background on the Border Patrol's History of Unlawful Interior Raids and "Operation Return to Sender"

36.    When Congress dismantled the legacy Immigration and Naturalization Service ("INS") and replaced it with DHS, it divided immigration enforcement responsibilities between two sub-agencies: Immigration and Customs Enforcement ("ICE") and CBP. ICE inherited "the investigative and interior enforcement elements" of the INS,[1] while CBP became "the nation's first comprehensive border security agency with a focus on maintaining the integrity of the nation's boundaries and ports of entry."[2]

---

[1] *Who We Are*, U.S. Immigration and Customs Enforcement, https://www.ice.gov/about-ice (last visited Feb. 18, 2025).

[2] *CBP History Through the Years*, U.S. Customs and Border Protection, https://www.cbp.gov/about/history (last modified Dec. 05, 2024).

37. This division of responsibility remains. ICE's Enforcement and Removal Operations division operates out of 25 nationwide field offices that cover the whole of the United States and its territories and handles enforcement in the interior of the United States, "manag[ing] all aspects of the immigration enforcement process, including the identification, arrest, detention and removal of [noncitizens] who are subject to removal or are unlawfully present in the U.S."[3] ICE oversees all adult civil immigration detention operations in the United States.

38. In contrast, CBP focuses on immigration enforcement at the border. The Border Patrol is its "uniformed, law enforcement arm[,] . . . responsible for securing U.S. borders between ports of entry."[4] Border Patrol operates out of approximately 20 sectors. Border Patrol does not operate detention centers designed or intended for long-term detention. Instead, Border Patrol operates only short-term holding facilities. Border Patrol policy requires that agents make "[e]very effort . . . to hold detainees for the least amount of time required for their processing, transfer, release, or repatriation," and regardless of the circumstances, instructs that detention should not exceed 72 hours.[5] Border Patrol does not operate any stations or holding facilities in Kern County, which at its southernmost point is over 150 miles from a land border.

39. Despite its unique border-focused mission and design, Border Patrol has a history of making incursions deep in the interior of the United States, typically to conduct indiscriminate roving-patrol operations. When conducting such operations, Border Patrol is bound by the same statutory and constitutional restrictions on detentive stops and arrests that constrain all immigration officers. *See* 8 U.S.C. § 1357(a)(2); 8 C.F.R. § 287.5(c); *United States v. Brignoni-Ponce*, 422 U.S. 873, 882–83 (1975) (holding the Fourth Amendment prohibits Border Patrol from stopping private vehicles near the border absent reasonable suspicion that someone in the vehicle is unlawfully in the United States); *see also Perez Cruz v. Barr*, 926 F.3d 1128, 1137 (9th Cir. 2019) (regulations

---

[3] *Enforcement and Removal Operations*, U.S. Immigration and Customs Enforcement, https://www.ice.gov/about-ice/ero (last visited Feb. 18, 2025).

[4] *Along U.S. Borders*, U.S. Customs and Border Protection, https://www.cbp.gov/border-security/along-us-borders (last modified Feb. 12, 2025).

[5] U.S. Customs and Border Protection, National Standards on Transport, Escort, Detention, and Search § 4.1 (Oct. 2015), https://www.cbp.gov/sites/default/files/assets/documents/2020-Feb/cbp-teds-policy-october2015.pdf [hereinafter TEDS].

governing seizures by ICE and CBP are "at least as stringent as those imposed by the Fourth Amendment").

40.    Nevertheless, Border Patrol's interior sweeps demonstrate a pattern of noncompliance with the statutory and constitutional limits on its authority, including unlawfully relying on perceived race or ethnicity to justify stops,[6] stopping persons and vehicles without establishing reasonable suspicion of an immigration violation,[7] threatening property damage or physical abuse if a person refuses to consent to a search or voluntary questioning,[8] and detaining or arresting people who decline to consent to voluntary questioning.[9]

41.    On at least three occasions, the Ninth Circuit has upheld injunctions to remedy Border Patrol's pattern and practice of Fourth Amendment and statutory violations in its interior enforcement operations. *First*, in *LaDuke v. Nelson*, residents of farm worker housing in interior Washington, Montana, and Idaho challenged Border Patrol's practice of raiding their communities, seizing residents without reasonable suspicion, and searching their homes without probable cause.

---

[6] New York Civil Liberties Union, et al., *Justice Derailed: What Raids on New York's Trains and Buses Reveal About Border Patrol's Interior Enforcement Practices* (2011), https://assets.nyclu.org/publications/NYCLU_justicederailedweb_0.pdf (report describing pattern of disproportionate stops of people of color by Border Patrol in New York State); Letter from ACLU Border Litigation Project to U.S. Customs and Border Protection (Nov. 20, 2014), https://www.acluaz.org/sites/default/files/documents/100%20Mile%20Zone%20Updated%2011.20.2014.pdf (letter to Border Patrol describing concerns about racial profiling in New York State).
[7] Press Release, ACLU Washington, Settlement Reins in Border Patrol Stops on the Olympic Peninsula (Sept. 24, 2013), https://www.aclu-wa.org/news/settlement-reins-border-patrol-stops-olympic-peninsula (Washington lawsuit alleging Border Patrol conducted racially motivated stops without reasonable suspicion); Complaint to U.S. Dep't of Homeland Security Office for Civil Rights and Civil Liberties and Office of Inspector General from ACLU of Arizona and ACLU Border Litigation Project (Oct. 9, 2013), https://www.acluaz.org/sites/default/files/documents/ACLU%20AZ%20Complaint%20re%20CBP%20Roving%20Patrols%20Oct%209%202013.pdf [hereinafter ACLU AZ Complaint re CBP Roving Patrols].
[8] *See* ACLU AZ Complaint re CBP Roving Patrols, *supra* note 7 (describing threats to tase a woman and cut her out of her seatbelt with a retractable knife if she did not exit vehicle and consent to search; forcibly dragging U.S. citizens from their vehicles after vehicle stop, with no explanation and no basis for suspicion of unlawful activity).
[9] Press Release, Northwest Immigrant Rights Project & ACLU of Washington, U.S. Border Patrol Agrees to Two $35,000 Settlements in Racial Profiling, Unlawful Detention Cases (Apr. 29, 2021), https://www.nwirp.org/news-events/press-releases/posts/border-patro-agrees-to-two-35k-settlements/.

762 F.2d 1318, 1321 (9th Cir. 1985), *as amended*, 796 F.2d 309 (9th Cir. 1986). The Ninth Circuit upheld the district court's holding that Border Patrol engaged in a "standard pattern" of searches and seizures that likely violated farm workers' Fourth Amendment rights and upheld a classwide permanent injunction prohibiting its unlawful practices. *Id.*

42.    *Second*, in *International Molders' and Allied Workers' Local Union No. 164 v. Nelson*, a district court granted a preliminary injunction barring the now-defunct Livermore Border Patrol Sector from replicating the unlawful practices it had used in "Operation Jobs," a weeklong series of about 50 workplace raids across Northern California. 643 F. Supp. 884, 887–89 (N.D. Cal. 1986). The tactics Border Patrol employed in *International Molders'* are strikingly similar to the practices Plaintiffs challenge here: agents detained people before questioning them, arrested people who refused to answer questions, and detained and arrested workers regardless of their immigration status and likelihood of flight risk—including U.S. citizens. *See* 643 F. Supp. at 899–901. The Ninth Circuit affirmed the issuance of a classwide preliminary injunction because "the record support[ed] . . . [a] finding of an evident systematic policy and practice of [F]ourth [A]mendment violations by [Border Patrol]." *Int'l Molders' & Allied Workers' Loc. Union No. 164 v. Nelson*, 799 F.2d 547, 551 (9th Cir. 1986) (internal quotation marks omitted).

43.    *Third*, the Ninth Circuit upheld a permanent injunction enjoining Border Patrol from engaging in a pattern of vehicle stops based on the occupants' race and perceived occupation, rather than objective, particularized reasonable suspicion of unlawful presence in the United States. *Nicacio v. U.S. I.N.S.*, 797 F.2d 700, 701, 705 (9th Cir. 1985), *overruled in part on other grounds by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1045 (9th Cir. 1999) (en banc).[10]

_____

[10] Border Patrol and its parent agency CBP also have has settled numerous other lawsuits nationwide challenging similar unlawful practices during Border Patrol's interior incursions. *See, e.g.*, Settlement Agreement, *Elshieky v. United States*, No. 2:20-CV-00064-SAB (E.D. Wash. Apr. 23, 2021), https://www.aclu-wa.org/docs/elshieky-settlement-agreement (alleging Washington Border Patrol agents racially profiled plaintiff and arrested him despite his documentation of lawful status); Settlement Agreement, *Sosa Segura v. United States*, No. 2:19-CV-00219-SAB (E.D. Wash. Apr. 27, 2021), https://www.aclu-wa.org/docs/sosa-settlement-agreement (alleging Washington Border Patrol agents racially profiled plaintiff and conducted warrantless arrest when plaintiff refused to consent to voluntary questioning); Press Release, ACLU of New Hampshire, ACLU Settles Lawsuit Challenging Border Patrol Checkpoints (May

44.    Border Patrol also has a history of subjecting people it arrests to deceptive, coercive, and threatening tactics to pressure them to accept voluntary departure. In this context, too, courts have repeatedly intervened to stop unlawful Border Patrol practices.

45.    In *Orantes-Hernandez v. Thornburgh*, the Ninth Circuit upheld a permanent injunction based on a finding that Border Patrol "engage[d] in a pattern and practice of pressuring or intimidating Salvadorans . . . to recant their requests for a hearing and to return voluntarily to El Salvador." 919 F.2d 549, 556 (9th Cir. 1990). The court highlighted practices that Border Patrol continues to use today: telling people to sign a form without allowing them to read it or providing it only in a language they did not understand, telling people they had no choice but to accept voluntary departure, and telling them they would be imprisoned if they did not accept voluntary departure. *Id.* at 561–62.

46.    Nearly two decades later, a group of Mexican nationals challenged similar unlawful practices by Border Patrol agents in California, ultimately settling with Border Patrol to secure the return of nearly 100 people who Border Patrol had unlawfully expelled. *See Lopez-Venegas v. Beers*, No. LA CV13-03972-JAK (PLAx), 2013 WL 12474081, *14–15 (C.D. Cal. Dec. 27, 2013) (denying motion to dismiss claims that Border Patrol's coercive voluntary departure tactics violated the Fifth Amendment); *Lopez-Venegas v. Johnson*, No. LA CV13-03972-JAK (PLAx) Settlement Agreement, Dkt. 90-4 (C.D. Cal. Aug. 18, 2014).

**B. Border Patrol Relies on Practices of Conducting Suspicionless Stops, Effecting Warrantless Arrests, and Coercing Voluntary Departure in its Interior Enforcement Operations**

47.    The unlawful practices Border Patrol consistently used in "Operation Return to

---

18, 2023), https://www.aclu-nh.org/en/press-releases/aclu-settles-lawsuit-challenging-border-patrol-checkpoints (alleging Border Patrol's practice of stopping vehicles in New Hampshire without reasonable suspicion of unlawful presence violated the Fourth Amendment and federal law); Press Release, ACLU, Customs and Border Protection Settles Federal Lawsuit with American Citizens Racially Profiled and Unlawfully Detained for Speaking Spanish Settlement Agreement (Nov. , *Suda v. U.S. Customs & Border Protection*, No. 4:19-cv-0010-BMM (D. Mont. Nov. 24, 2020), https://www.aclu.org/press-releases/customs-and-border-protection-settles-federal-lawsuit-american-citizens-racially (alleging a Montana CBP agent unlawfully detained plaintiffs for speaking Spanish); Settlement Agreement, *Sanchez v. U.S. Border Patrol*, No. 3:12-cv-05378-BHS (W.D. Wash. Sept. 24, 2013), https://www.aclu-wa.org/docs/settlement-agreement-sanchez-v-homeland-security.

Sender" bear the hallmarks of Border Patrol's historically abusive enforcement operations and illustrate the agency's unlawful stop, arrest, and expulsion policies and practices. The following paragraphs describe examples of these policies and practices.

### *Stop, Arrest, and Attempted Expulsion of Plaintiff Oscar Morales Cisneros*

48.    Plaintiff Oscar Morales Cisneros is a 51-year-old resident of Bakersfield, California, where he owns his home. He has lived in Bakersfield since 2021; before then, he lived in Los Angeles County for about 15 years. He has been married for about 30 years. He has two daughters and three grandchildren. He is a maintenance worker and construction worker. He is a practicing Catholic and an active member of his church. He has no criminal record.

49.    On January 7, 2025, on his way home from work, Mr. Morales Cisneros stopped to fill empty water containers at a water filling station outside a liquor store. The water filling station was located in a predominantly Latino-populated neighborhood. He returned to his truck, which is registered under his name and has current license plates, and shifted into reverse to back out of the parking spot.

50.    Before Mr. Morales Cisneros could back out, an unmarked, grey Chevrolet Tahoe pulled up behind him and blocked him in. Mr. Morales Cisneros put his truck back in park and lowered his window. He saw two agents standing outside his truck. Both wore green uniforms with "Border Patrol" written on them.

51.    A Spanish-speaking agent asked Mr. Morales Cisneros if he had papers and was lawfully present. Mr. Morales Cisneros exercised his right to remain silent and did not answer his questions. The agents asked Mr. Morales Cisneros for his driver's license, which he provided. The agents did not explain why they had blocked in his truck nor why they needed his license. The agents took his license and walked back to their vehicle.

52.    Mr. Morales Cisneros called his daughter to tell her that Border Patrol had stopped him. The Spanish-speaking agent returned and asked him to put the phone on speakerphone so he could speak with Mr. Morales Cisneros' daughter. He identified himself to Mr. Morales Cisneros' daughter as "Officer Sanchez."

53.    Officer Sanchez told Mr. Morales Cisneros' daughter he was being detained by Border Patrol for being unlawfully present. Officer Sanchez ended the call and asked Mr. Morales Cisneros to step out of his truck. Mr. Morales Cisneros complied. Officer Sanchez handcuffed Mr. Morales Cisneros and placed him in the back of the Border Patrol agents' vehicle. The agents did not allow Mr. Morales Cisneros to call someone to pick up his truck.

54.    At no point did the agents produce a warrant, explain to Mr. Morales Cisneros why they had stopped him, or—aside from what Officer Sanchez told his daughter—explain why they arrested him. At no point did they ask Mr. Morales Cisneros about his family, employment, or community ties, or undertake any other evaluation of whether he posed a risk of flight.

55.    The Border Patrol agents drove Mr. Morales Cisneros around Bakersfield for about two hours. At one point, the Border Patrol agents stopped behind a vehicle at another gas station and got out to speak to the vehicle's occupants. Mr. Morales Cisneros overheard an agent saying, "We're doing our job."

56.    The agents took Mr. Morales Cisneros to a station where he saw other people were being detained and a bus was waiting. Border Patrol agents removed Mr. Morales Cisneros' personal belongings and placed them in a bag. They took his fingerprints and photographs.

57.    Mr. Morales Cisneros boarded the bus, which eventually filled with about 40 people. The bus departed in the late evening. Mr. Morales Cisneros had not eaten since lunch and was hungry. Border Patrol agents provided nothing to eat except some granola bars and some small water bottles.

58.    The bus arrived at El Centro Station in Imperial County in the pre-dawn hours of January 8, 2025. After being processed in, Mr. Morales Cisneros was taken to see an agent. The agent told Mr. Morales Cisneros he had two options: he could agree to voluntary departure, which the agent falsely claimed would make it easier to "fix" his papers in the future; or he could wait anywhere from two to six months to see a judge. Mr. Morales Cisneros replied he wanted to speak to a judge and repeatedly requested to speak to his attorney or make a phone call. The agent said he did not have a right to speak to an attorney or make a phone call and denied his requests.

59.     Mr. Morales Cisneros was detained in a very cold holding cell with about 10 to 12 other people. There was nowhere to lie down except the floor or a steel bench. To keep warm, Border Patrol agents provided him only a silver foil blanket, thin clothes, and a pair of sandals. He attempted to sleep but it was very difficult because the conditions were so cold and uncomfortable. Mr. Morales Cisneros, who experiences joint pain when he is cold, was in constant pain during his detention. There was no access to natural light and the electric lights were kept on all day and night, making it difficult to keep track of time.

60.     Later on January 8, 2025, Mr. Morales Cisneros was again taken to speak to a Border Patrol agent. The agent presented him with the same two options: if he accepted voluntary departure, he could be released the next day and it "wouldn't affect [him] in the future" if he submitted a new immigration application, or he could wait several months to speak to a judge. Mr. Morales Cisneros requested to speak to his attorney or make a phone call. The agent denied his requests.

61.     That night, Mr. Morales Cisneros was again taken to speak to a Border Patrol agent. Mr. Morales Cisneros again requested to speak to an attorney or make a phone call, and again he was denied. Mr. Morales Cisneros refused to agree to voluntary departure.

62.     None of the Border Patrol agents who interviewed Mr. Morales Cisneros ever explained the consequences and waivers of legal rights that would result from accepting voluntary departure, nor that he would have certain rights if he appeared before an immigration judge.

63.     On January 10, 2025, Mr. Morales Cisneros was taken out of his cell yet again to speak to another Border Patrol agent. The agent presented him with the same two options: voluntary departure or immigration court. Mr. Morales Cisneros repeated that he wanted to speak to a judge and speak to an attorney.

64.     To his surprise, the Border Patrol agent told him to sign his name on a small electronic pad to be released. Mr. Morales Cisneros feared the Border Patrol agent might be tricking him into agreeing to voluntary departure. The agent did not allow him to see or read the documents he was asking Mr. Morales Cisneros to sign, nor did the agent explain anything else about what the documents said. The agent only insisted Mr. Morales Cisneros had to sign the

documents to see a judge and be placed on a monitoring device.

65.    Mr. Morales Cisneros signed his name as directed. The small electronic screen where he signed his name had only a space for his signature. It did not display any of the documents he was signing.

66.    That evening, Mr. Morales Cisneros was released from the El Centro Station. Border Patrol agents dropped Mr. Morales Cisneros and several others at a shelter nearby and told them to figure out their transportation home.

67.    In the aftermath of this incident, Mr. Morales Cisneros feels scared whenever he leaves his home because he fears he will encounter Border Patrol and be arrested and detained again. He does his best to limit how much he leaves his home. He has a hard time sleeping.

68.    Since his arrest and detention, Mr. Morales Cisneros feels scared to return to the water filling station where he was arrested. When he has to run errands, he wears a sweater with a hood to cover his head to hide the color of his skin as much as possible, as he believes Border Patrol targeted him for arrest because of the color of his skin. Mr. Morales Cisneros feels afraid to call 911 if there is an emergency because he fears the local police will call Border Patrol.

69.    Upon information and belief, the Border Patrol agents who stopped and detained Mr. Morales Cisneros did not have reasonable suspicion that he was unlawfully present in the United States.

70.    Upon information and belief, the Border Patrol agents who arrested Mr. Morales Cisneros did not have probable cause to believe he was likely to escape before a warrant could be obtained for his arrest.

### *Stop and Arrest of Plaintiff Wilder Munguia Esquivel*

71.    Plaintiff Wilder Munguia Esquivel is a 38-year-old resident of Bakersfield, CA, where he has lived for about 12 years. His brother, sister-in-law, and niece, with whom he lives, are all U.S. citizens. He works as a day laborer and handyman. He has been a member of his church in Bakersfield for over ten years. He has no criminal record.

72.     On January 7, 2025, at approximately 12 p.m., Mr. Munguia Esquivel was outside the Home Depot at 4001 Ming Avenue in Bakersfield. He was standing in a group with other day laborers.

73.     Several unmarked vehicles pulled up and at least ten men got out of the vehicles and aggressively swarmed around the group Mr. Munguia Esquivel was standing with. The men were wearing masks covering their faces, with holes only for their eyes. Mr. Munguia Esquivel's first thought was they might be terrorists out to mug, kidnap, or even murder Mr. Munguia Esquivel and his friends. Upon information and belief, the men were Border Patrol agents. They started loudly demanding papers and asking individuals where they were from.

74.     Mr. Munguia Esquivel did not respond to the agents' questions. He began to slowly walk away. One of the agents followed him, yelling questions at him. Mr. Munguia Esquivel stayed silent. The agent ordered Mr. Munguia Esquivel to turn around so he could put Mr. Munguia Esquivel in handcuffs.

75.     The Border Patrol agent ordered Mr. Munguia Esquivel to take out his wallet. Before he could comply, the agent suddenly and forcefully yanked Mr. Munguia Esquivel's left arm and removed his wallet from his back pants pocket. The agent opened the wallet and looked through it. He searched Mr. Munguia Esquivel by patting him down and told Mr. Munguia Esquivel to call a family member to pick up his truck.

76.      At no point did the Border Patrol agent identify himself, explain to Mr. Munguia Esquivel why he had stopped him, explain why he had arrested him, or produce a warrant. At no point did he ask Mr. Munguia Esquivel about his family, employment, or community ties, or undertake any other evaluation of whether he posed a risk of flight. When he was arrested, Mr. Munguia Esquivel had a pending family-based immigration petition.

77.     The agent handcuffed Mr. Munguia Esquivel and forced him into a vehicle. The agent drove Mr. Munguia Esquivel behind Home Depot, where he saw many more Border Patrol vehicles and about 10 to 15 detained individuals, including some who were elderly.

78.     When Mr. Munguia Esquivel's family came to pick up his truck, they told Border Patrol agents that he was in the process of regularizing his immigration status. The agents responded that they were taking him anyway.

79.     Border Patrol agents transported Mr. Munguia Esquivel to a makeshift facility on 7th Standard Road in Bakersfield. Agents ordered him to place his belongings in a bag, including a gold chain with a gold cross he had been wearing around his neck. Border Patrol agents fingerprinted him and took his photograph. He remained at the processing station from midday until evening. He was not provided any food during this time except a small granola bar.

80.     Border Patrol agents placed Mr. Munguia Esquivel on a bus, which arrived at the El Centro Station in the pre-dawn hours. The facility was extremely cold. Mr. Munguia Esquivel was placed in a cell with about 20 other individuals, including some who were elderly. The agents provided Mr. Munguia Esquivel only a silver foil blanket, which was not sufficient to keep him warm. There was no natural light. The electric lights were kept on all day and night, so it was difficult to keep track of time. It was difficult to sleep because there was nowhere to lie down except the hard, concrete floor, which exacerbated pain in Mr. Munguia Esquivel's knee from a recent surgery. Mr. Munguia Esquivel received only a little food. He did not receive a toothbrush, toothpaste, or other personal hygiene products. He was not given an opportunity to shower.

81.     During Mr. Munguia Esquivel's time in the cell, another person detained there shared that Border Patrol agents had asked him to sign something, and when he refused, the agents got aggressive, yelling at him and slamming a door.

82.     On January 8, 2025, Mr. Munguia Esquivel was brought to an office where a Border Patrol agent sitting at a computer asked him questions. The agent asked him to sign a small device that had space for a signature but displayed nothing else. The agent did not tell Mr. Munguia Esquivel what he was signing, offer copies of any documents, or explain what she was asking him to sign. Mr. Munguia Esquivel stated he was not going to sign anything because he had a pending family-based immigration petition. The agent told Mr. Munguia Esquivel that he needed to provide his signature to see a judge. Mr. Munguia Esquivel told the agent that he could not see the document he was being asked to sign. The agent responded, "You can't, but I can." Feeling

1    afraid and that he had no choice, Mr. Munguia Esquivel provided his signature on the device. He

2    still does not know what he signed.

3       83.    On January 9, 2025, a different Border Patrol agent summoned Mr. Munguia

4    Esquivel and told him to again sign his name on a small screen that had space for a signature but

5    displayed nothing else. Mr. Munguia Esquivel asked what his signature was for. The Border Patrol

6    agent said that it was for his "fingerprints" and "record." The agent did not provide a copy of the

7    document he was signing or explain what it said. Mr. Munguia Esquivel felt nervous about signing

8    a document he had not been permitted to see or read. Again feeling he had no choice, he provided

9    his signature on the device. He still does not know what he signed.

10      84.    On January 10, 2025, Mr. Munguia Esquivel was again brought out of his cell. A

11   Border Patrol agent informed him that he would be permitted to leave that day, but only if he

12   agreed to conditions. By then, Mr. Munguia Esquivel had been detained for three days. Border

13   Patrol agents had not allowed him to call his family. He had no idea if his family knew where he

14   was. Feeling hungry, cold, exhausted, defeated, and unsafe, Mr. Munguia Esquivel agreed to be

15   released on conditions.

16      85.    The Border Patrol agent gave Mr. Munguia Esquivel an English-language document

17   to sign. He was not provided a copy of the document in Spanish. The agent never explained what

18   the document said, nor the conditions Border Patrol was imposing on him. Hoping it would lead to

19   his release, Mr. Munguia Esquivel signed the document.

20      86.    Border Patrol agents released Mr. Munguia Esquivel. His bag of belongings was

21   returned to him, but the gold chain and gold cross he had been wearing the day he had been

22   arrested was gone. It had been a birthday gift from a girlfriend and had religious and personal

23   significance to Mr. Munguia Esquivel. It is still missing.

24      87.    Mr. Munguia Esquivel feels traumatized by his experience with Border Patrol. He

25   believes Border Patrol agents targeted people at Home Depot, like him, because day laborers

26   gather there. He feels terrified and his heart starts pounding when he has to go near the Home

27   Depot where he was arrested. When he has to leave his home to run errands or go to appointments,

28   he fears immigration agents will stop and arrest him again.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    21
CASE NO. _____

88.     Upon information and belief, the Border Patrol agents who stopped and detained Mr. Munguia Esquivel did not have reasonable suspicion that he was unlawfully present in the United States.

89.     Upon information and belief, the Border Patrol agents who arrested Mr. Munguia Esquivel did not have probable cause to believe he was likely to escape before a warrant could be obtained for his arrest.

_Stop and Arrest of Plaintiff Yolanda Aguilera Martinez_

90.     Plaintiff Yolanda Aguilera Martinez is a 56-year-old mother and grandmother who lives in Bakersfield. She has been a lawful permanent resident for approximately 36 years. She has resided in Kern County for nearly 45 years, and most of her children and grandchildren also reside in Kern County. She has been a farm worker since she was about 16 years old. She has no criminal record.

91.     On January 8, 2025, at approximately 4:30 p.m., Ms. Aguilera Martinez was driving alone to a doctor's appointment in Bakersfield. She was driving her own car, which is lawfully registered in her name, and was driving within the speed limit. Ms. Aguilera Martinez saw two unmarked vehicles with flashing police lights and three men in plainclothes with guns on their waist motioning for her to pull over. Thinking the men might be police officers, Ms. Aguilera Martinez pulled over. Upon information and belief, the men were Border Patrol agents.

92.     One of the Border Patrol agents approached Ms. Aguilera Martinez's door. He did not identify himself or seem to know who she was. The agent told Ms. Aguilera Martinez that he needed to see her "papers." She presented her current, valid driver's license. The agent looked at the license, said, "This shit is fuckin' fake," and threw it back into her lap.

93.     In an aggressive voice, the Border Patrol agent told Ms. Aguilera Martinez to get out of her car. Ms. Aguilera Martinez did not feel free to leave. Feeling she had no choice, she complied. After Ms. Aguilera Martinez opened her door to get out, the Border Patrol agent grabbed her arm, pushed her to the ground, and handcuffed her. He took her to the back of one of the SUVs, made her sit in the back seat, and left her there. Ms. Aguilera Martinez was speechless with shock and fear.

94.     At no point did any of the agents identify themselves, explain to Ms. Aguilera Martinez why they had stopped the van, explain why they had arrested her, or produce a warrant. At no point did they ask Ms. Aguilera Martinez about her family, employment, or community ties, or undertake any other evaluation of whether she posed a risk of flight.

95.     From the backseat of the unmarked vehicle, Ms. Aguilera Martinez could see the three men standing and talking to each other, but she could not hear what they were saying.

96.     When the agent who had handcuffed her returned, Ms. Aguilera Martinez asked if she could call someone to send her a photo of her green card. He agreed. Ms. Aguilera Martinez obtained a photo of her green card and showed it to the agent. The agent quickly scanned it and said "get the fuck out of here." Ms. Aguilera Martinez returned to her car and drove away.

97.     Ms. Aguilera Martinez felt violated, stressed, and in shock. She did not attend her doctor's appointment. Ms. Aguilera Martinez suffered bruises on her wrists from the tight handcuffs, and bruises on her legs from when the Border Patrol agent pushed her to the ground.

98.     In the following days, Ms. Aguilera Martinez saw photos and videos of Border Patrol agents arresting people in Bakersfield. She then realized that the men who stopped and handcuffed her had been Border Patrol agents.

99.     Ms. Aguilera Martinez feels worried and anxious that Border Patrol will pull her over and handcuff her again. She cannot avoid driving in Bakersfield to run errands, go to doctor's appointments, and attend church. Although she tries to avoid the areas that she learned Border Patrol agents targeted during "Operation Return to Sender," it is not always possible to do so. She is terrified of being arrested again.

100.     Ms. Aguilera Martinez is now afraid of police officers. Seeing police officers has caused her to experience flashbacks of being stopped and violently handcuffed by Border Patrol agents.

101.     Upon information and belief, the Border Patrol agents who stopped and detained Ms. Aguilera Martinez did not have reasonable suspicion that she was unlawfully present in the United States.

102.    Upon information and belief, the Border Patrol agents who arrested Ms. Aguilera Martinez did not have probable cause to believe she was likely to escape before a warrant could be obtained for her arrest.

### *Stop, Arrest, and Expulsion of Plaintiff Juan Vargas Mendez*

103.    Plaintiff Juan Vargas Mendez is a 37-year-old husband and father who lived in Bakersfield with his family before Border Patrol expelled him to Mexico. Mr. Vargas Mendez is married to a U.S. citizen with whom he has four U.S. citizen children: a seven-year-old boy; a four-year-old boy; a three-year-old girl; and his wife's eight-year-old son, who has epilepsy, and whom Mr. Vargas Mendez raises as his own son.

104.    Mr. Vargas Mendez had been a Kern County resident for approximately 20 years before his expulsion. When Border Patrol arrested him, he had been working as a farm worker picking oranges at the same ranch for over 10 years. Mr. Vargas Mendez has no criminal history. Mr. Vargas Mendez has a medical problem with his nose that makes it difficult to breathe, and relies on a nasal spray to aid his breathing.

105.    On January 8, 2025, at about 5:00 p.m., Mr. Vargas Mendez was a passenger in a van driving home from working in the fields with several co-workers. They were driving on the Maricopa Highway in southwest Kern County, a common commuting route for many farm workers, especially those working on orange and almond fields. The van was driving well within the speed limit.

106.    Suddenly, Mr. Vargas Mendez heard loud sirens. One SUV with flashing lights and sirens pulled in front of the van and stopped, forcing the van to stop, while another SUV with flashing lights and sirens pulled up behind, blocking it in. The SUVs did not have identifiable markings.

107.    About four people in plain clothes exited the SUVs. Upon information and belief, the men were Border Patrol agents.

108.    One Border Patrol agent approached the driver's side window and demanded the driver and passenger in the front seat provide their licenses and proof of residency. They complied.

109.    While that agent was reviewing the IDs, two other Border Patrol agents, with guns on their waists, flung open the door on the right side of the van. The agents had not sought consent to enter or search the van, and no one in the van had provided such consent. One of the agents shouted in Spanish that the passengers of the van needed to show their IDs and "tell the truth."

110.    Mr. Vargas Mendez was not carrying an ID. Two Border Patrol agents grabbed him and one of his coworkers and dragged them both out of the van. The Border Patrol agents told Mr. Vargas Mendez to surrender his belongings. He gave them his phone, wallet, and his nasal spray. Mr. Vargas Mendez did not feel he was free to leave at any point during this encounter.

111.    The Border Patrol agents handcuffed Mr. Vargas Mendez, searched him, and put him and his coworker in the backseat of one of the SUVs. As he was being handcuffed, the Border Patrol agents mocked him and his co-passenger, calling them "Mexican bitches."

112.    At no point did the agents identify themselves, explain to Mr. Vargas Mendez why they had stopped the van, explain why they had arrested him, or produce a warrant. At no point did they ask Mr. Vargas Mendez about his family, employment, or community ties, or undertake any other evaluation of whether he posed a risk of flight.

113.    In the van, Mr. Vargas Mendez informed the Border Patrol agents that he had lived in the area for 20 years and had a family and four children. The agent responded that he did not care, and that Mr. Vargas Mendez was "going to Mexico."

114.    The Border Patrol agents transported Mr. Vargas Mendez to a warehouse that functioned as a makeshift processing center. There, agents photographed and fingerprinted him. Then, Border Patrol agents transported Mr. Vargas Mendez, along with several other people, to a detention center several hours away. Upon information and belief, the agents transported Mr. Vargas Mendez to the El Centro Station, where they arrived at around 1:00 a.m. on January 9, 2025.

115.    At the El Centro Station, an agent told Mr. Vargas Mendez that he was "illegal" and was going to be deported. Again, Mr. Vargas Mendez told the agent that he had been in the

area for 20 years, had a family in the United States, and had no criminal record. The agent told Mr. Vargas Mendez that he did not care, and Mr. Vargas Mendez would be deported anyway.

116.    Mr. Vargas Mendez was confined in a very cold holding cell. He was forced to remove his boots and received only an aluminum sheet for warmth. The only places to sit or lie down in the holding cell were two concrete benches. Mr. Vargas Mendez was given very little to eat and no hygiene products. Mr. Vargas Mendez had difficulty breathing and repeatedly requested his nasal spray, but Border Patrol agents ignored his requests.

117.    Around noon on January 9, 2025, a Border Patrol agent showed Mr. Vargas Mendez a packet of documents, in English, and told Mr. Vargas Mendez he needed to sign the paperwork. The agent told Mr. Vargas Mendez if he did not sign the documents, he would go to prison for a long time. Mr. Vargas does not speak English and could not read the documents. He asked repeatedly to call his wife, but the Border Patrol agent refused his requests.

118.    The agent presented Mr. Vargas Mendez with a small digital pad where they directed him to sign his name. The pad was about the size of a cell phone and did not display the documents they asked him to sign. Cold, in need of his breathing aid, and afraid of going to prison, Mr. Vargas Mendez signed the digital pad.

119.    Upon information and belief, the Border Patrol agent actually had Mr. Vargas Mendez sign Form I-826, a voluntary departure consent form. About two hours later, Border Patrol agents loaded Mr. Vargas Mendez onto a bus, drove him across the border, and dropped him off in Mexicali.

120.    After arriving in Mexico, a Border Patrol agent gave Mr. Vargas Mendez a copy of the documents he is purported to have signed. The document included another section signed by a person named "Esteban Echeverria," stating that Mr. Echeverria had read the document to Mr. Vargas Mendez in Spanish.

121.    No one read Form I-826 to Mr. Vargas Mendez in Spanish. Border Patrol did not provide any information, whether verbal or written, about the consequences of accepting voluntary departure or the legal rights Mr. Vargas Mendez would waive by accepting voluntary departure.

122.    At no point did Mr. Vargas Mendez understand the consequences of accepting voluntary departure, including that he would be subject to a period of inadmissibility, or the rights he was waiving.

123.    At no point did Mr. Vargas Mendez understand that the documents he was signing constituted an acceptance of voluntary departure or a waiver of his right to an immigration court hearing.

124.    If Border Patrol had permitted Mr. Vargas Mendez to exercise his right to an immigration hearing, he would have refused to sign the documents presented to him and would have insisted on his right to contest his removability and/or pursue relief from removal. Because he has no criminal history, he also would have been eligible for a bond hearing to seek release from immigration detention.

125.    As a result of Mr. Vargas Mendez's expulsion to Mexico, he is separated from his wife and children, who remain in Bakersfield. His wife has reported to Mr. Vargas Mendez that the children have become quiet and scared; they are not eating well and have lost weight. Mr. Vargas Mendez used to care for his stepson by administering medicine and helping him cope with seizures when Mr. Vargas Mendez's wife was working night shifts. Without Mr. Vargas Mendez at home to take care of his stepson, his stepson's seizures have worsened. Mr. Vargas Mendez is devastated to think his young children may not understand why he has not come home and may feel he has abandoned them. Mr. Vargas Mendez feels depressed and often cries while speaking on the phone with his wife.

126.    Upon information and belief, the Border Patrol agents who stopped and detained Mr. Vargas Mendez did not have reasonable suspicion that he or anyone else in the vehicle was unlawfully present in the United States.

127.    Upon information and belief, the Border Patrol agents who arrested Mr. Vargas Mendez did not have probable cause to believe he was likely to escape before a warrant could be obtained for his arrest.

*Stop, Arrest, and Expulsion of Plaintiff Maria Guadalupe Hernandez Espinoza*

128.    Plaintiff Maria Guadalupe Hernandez Espinoza is a 46-year-old mother and grandmother who lived in Bakersfield for about 10 years. Before Border Patrol expelled her to Mexico, she and her partner had been renting the same apartment for the past three years. Ms. Hernandez Espinoza worked as a farm worker in the agricultural sector for close to 20 years, including in and around Bakersfield for approximately the past 10 years.

129.    On January 7, 2025, Ms. Hernandez Espinoza, her partner, and a coworker were in a vehicle driven by her partner, driving home to Bakersfield on California Highway 58 after working in a tomato greenhouse plant in Tehachapi. The car had a current, valid registration in her partner's name, a current license plate, and no stickers or decals. Ms. Hernandez Espinoza's partner was not violating any traffic laws. As he prepared to exit the highway, an unmarked white Ford pickup truck pulled up behind the car, flashed its lights, and activated a siren. Ms. Hernandez Espinoza's partner pulled over.

130.    A man in a white shirt approached the driver and instructed him to turn off the car. When he complied, the doors automatically unlocked, and the man opened the driver's side door and instructed Ms. Hernandez Espinoza's partner to exit the car.

131.    The man did not identify himself, show a warrant, or ask any questions. The man escorted Ms. Hernandez Espinoza's partner to the Ford truck.

132.    About six white Chevrolet Malibus then pulled up behind the car Ms. Hernandez Espinoza was in. All were unmarked and each carried three to four men with guns at their waists. Upon information and belief, the men in the Chevy Malibus and Ford truck were all Border Patrol agents.

133.    Two agents approached the car and instructed Ms. Hernandez Espinoza and her coworker to exit the car. They complied. The agents walked Ms. Hernandez Espinoza and her coworker to the white Ford truck, where her partner was waiting with the first Border Patrol agent. The agents asked Ms. Hernandez Espinoza, her partner, and her coworker for their identification and whether they were lawfully present. Ms. Hernandez Espinoza did not answer their questions, and did not produce an ID because she was not carrying one with her.

134.     Without a warrant, and without obtaining consent from Ms. Hernandez Espinoza, her partner, or her coworker, the Border Patrol agents began searching their vehicle. They removed Ms. Hernandez Espinoza's partner's wallet from the car and removed his ID.

135.     The Border Patrol agents told Ms. Hernandez Espinoza, her partner, and her coworker that they were under arrest. Ms. Hernandez Espinoza still did not know who the agents were because they had not identified themselves. From their vehicles, sirens, handguns, and matching clothing, she believed they worked for a law enforcement agency, but she did not know they were affiliated with immigration. During this encounter, Ms. Hernandez Espinoza did not feel free to leave.

136.     At no point did the agents identify themselves, explain to Ms. Hernandez Espinoza why they had stopped the vehicle, explain why they had arrested her, or produce a warrant. At no point did they ask Ms. Hernandez Espinoza about her family, employment, or community ties, or undertake any other evaluation of whether she posed a risk of flight.

137.     The Border Patrol agents left Ms. Hernandez Espinoza's partner's car on the side of the highway and transported Ms. Hernandez Espinoza, her partner, and her coworker to a makeshift processing center on 7th Standard Road in Bakersfield. There, Ms. Hernandez Espinoza recognized a Border Patrol truck and realized that she had been arrested by Border Patrol agents.

138.     Ms. Hernandez Espinoza saw dozens of men and a few women at the makeshift processing center. Border Patrol agents took away her personal belongings. Ms. Hernandez Espinoza asked to make a phone call to a family member. Border Patrol agents denied her request.

139.     After about an hour wait, Border Patrol agents loaded Ms. Hernandez Espinoza and others into a bus, which left Bakersfield in the late evening and drove down California Highway 58 through Mojave. A few hours into the drive, one of the agents looked at the group of detained individuals, laughed, and said in Spanish, "Let's go for more wetbacks."

140.     Ms. Hernandez Espinoza did not know where she was being taken and experienced anxiety attacks on the bus.

141.    In the pre-dawn hours of January 8, 2025, the bus arrived at the El Centro Station. Ms. Hernandez Espinoza was exhausted, scared, and hungry.

142.    At the El Centro Station, Border Patrol agents searched Ms. Hernandez Espinoza in front of dozens of men by lifting her shirt and exposing her bra. She felt humiliated. Agents then took her photograph and fingerprints.

143.    Ms. Hernandez Espinoza was ordered into a freezing cold room where she met two other women and their children. They told Ms. Hernandez Espinoza they were asylum seekers and had been in the room for days.

144.    The room contained no bed. There was nowhere to sit or lie down except the floor or a metal bench. The room had no windows or exposure to sunlight. Ms. Hernandez Espinoza did not know what time it was unless she asked a Border Patrol agent.

145.    Ms. Hernandez Espinoza was brought to speak to a Border Patrol agent for an initial interview. A female agent told Ms. Hernandez Espinoza she could agree to voluntary departure or wait two to three years to see a judge. She told Ms. Hernandez Espinoza that either way, she would "likely end up deported."

146.    Ms. Hernandez Espinoza felt anxious, sleep deprived, and terrified at the prospect of being detained for years. In a knee-jerk reaction, she verbally said she would accept voluntary departure. She was not given any paperwork explaining voluntary departure or anything to sign.

147.    When the agent returned Ms. Hernandez Espinoza to her cell, Ms. Hernandez Espinoza thought more about the choice she had been offered. She realized she wanted to speak to a judge and have an opportunity to return to Bakersfield.

148.    When a different agent came to the cell to drop off diapers for one of the detained children, Ms. Hernandez Espinoza informed the agent that she had changed her mind and wanted to see a judge. Ms. Hernandez Espinoza said she would not sign anything agreeing to voluntary return. The agent told Ms. Hernandez Espinoza that she was not allowed to see a judge.

149.    Ms. Hernandez Espinoza felt extremely anxious. She had trouble sleeping because she kept waking up and crying. When a man entered the cell, Ms. Hernandez Espinoza told him she wanted to see a judge. The man told Ms. Hernandez Espinoza that he was a janitor and could

not help her. Ms. Hernandez Espinoza told every agent who passed by that she wanted to see a judge, but no one assisted her.

150.    Later, Ms. Hernandez Espinoza was pulled out of her cell and brought to a room where a different female agent was sitting before a computer. Ms. Hernandez Espinoza told the agent she wanted to see a judge. The Border Patrol agent said she could not see a judge. Ms. Hernandez Espinoza asked why, and reiterated that she had not signed any paperwork accepting voluntary departure. The agent told Ms. Hernandez Espinoza: "That doesn't matter, your signature doesn't matter, all of you are going to be deported."

151.    The Border Patrol agent told Ms. Hernandez Espinoza that she needed to sign documents related to her fingerprints and identification. Ms. Hernandez Espinoza tried to look at the documents on the agent's computer screen, but the agent did not allow her to see them.

152.    The Border Patrol agent directed Ms. Hernandez Espinoza to sign her initials on a small digital device which showed a line for her signature only. The device did not display the documents Ms. Hernandez Espinoza was being asked to sign. Based on the Border Patrol agent's representation that the documents were related to her fingerprints and identification, Ms. Hernandez Espinoza believed she had no choice, and she signed where told.

153.    Upon information and belief, the Border Patrol agent actually had Ms. Hernandez Espinoza sign Form I-826, a voluntary departure consent form.

154.    After signing her name, Ms. Hernandez Espinoza asked the Border Patrol agent if she could see a judge. The agent told her no, and that she had no right to see a judge.

155.    On January 9, 2025, Border Patrol returned Ms. Hernandez Espinoza's belongings to her and said she was being expelled to Mexico. Ms. Hernandez Espinoza felt horrified and shocked. Border Patrol transported her in a truck to Mexicali, Mexico, with a group of other individuals.

156.    When Border Patrol left Ms. Hernandez Espinoza in Mexicali, an agent gave her a copy of the document she had signed the day before. It was the first time Ms. Hernandez Espinoza saw that her signature was on a document purporting to agree to voluntary departure. She was in disbelief.

157.    The document included another section signed by a person named "Elisabeth Cota," stating that Ms. Cota had read the document to Ms. Hernandez Espinoza in Spanish.

158.    No one read Form I-826 to Ms. Hernandez Espinoza in the Spanish language. Border Patrol did not provide any information, whether verbal or written, about the consequences of accepting voluntary departure or the rights she would waive by accepting voluntary departure.

159.    At no point did Ms. Hernandez Espinoza understand the consequences of accepting voluntary departure, including that she would be subject to a period of inadmissibility, or the rights she was waiving.

160.    At no point did Ms. Hernandez Espinoza understand that the documents she was signing constituted an acceptance of voluntary departure or a waiver of her right to an immigration court hearing.

161.    If Border Patrol had permitted Ms. Hernandez Espinoza to exercise her right to an immigration hearing, she would have refused to sign the documents presented to her and would have insisted on her right to contest her removability and/or pursue relief from removal. Because she has no criminal history, she also would have been eligible for a bond hearing to seek release from immigration detention.

162.    Ms. Hernandez Espinoza is now stranded in Mexico, separated from her home, her job, her daughters and grandson, and her community. She feels traumatized and has trouble sleeping because she wakes up in the middle of the night to cry. She feels everything she has worked for in her life is gone.

163.    Upon information and belief, the Border Patrol agents who stopped and detained Ms. Hernandez Espinoza did not have reasonable suspicion that she or anyone else in the vehicle was unlawfully present in the United States.

164.    Upon information and belief, the Border Patrol agents who arrested Ms. Hernandez Espinoza did not have probable cause to believe she was likely to escape before a warrant could be obtained for her arrest.

1    *Stop, Arrest, and Expulsion of UFW Members*

2    165.    "Alicia" and her husband "Benjamin" are farm workers, UFW members, and

3    parents to four young children. Before Border Patrol expelled Benjamin to Mexico, Alicia and

4    Benjamin had lived in Kern County for about 10 years and worked in berry, table grape, almond,

5    and citrus agriculture.

6    166.    On January 7, 2025, at approximately 2:00 p.m., Alicia, Benjamin, and Alicia's

7    brother-in-law "Carlos," who is also a UFW member, were traveling in Carlos's car home from

8    the citrus orchards where they all worked together. As they drove down Highway 99, a common

9    route for farm workers to access rural roads where their worksites are located, they saw vehicles

10   parked on the shoulder with police-style lights on the grill. Carlos was driving within the speed

11   limit and obeying traffic laws. Several vehicles pulled up behind Carlos's car and signaled with

12   their lights for him to pull over.

13   167.    After Carlos pulled over, several men approached the car. The men asked Alicia,

14   Benjamin, and Carlos if they had "papers." Upon information and belief, the men were Border

15   Patrol agents.

16   168.    The Border Patrol agents did not appear to know who was in the car or have any

17   other information about the vehicle beyond its appearance. They indicated no other reason for

18   the stop than to ask for "papers." After asking for "papers," the Border Patrol agents arrested

19   Alicia, Benjamin, and Carlos. They did not present a warrant for arrest.

20   169.    After handcuffing her, the Border Patrol agents asked Alicia if she had family.

21   When she told them she had children, an agent said he could go pick up the children so they

22   could all be taken to Mexico together. The Border Patrol agents did not ask Benjamin or Carlos

23   about their family, employment, or community ties, or undertake any other evaluation of whether

24   either of them posed a risk of flight.

25   170.    The Border Patrol agents transported Alicia, Benjamin, and Carlos to a large tent

26   on the outskirts of Bakersfield, which appeared to be a mobile processing center. Agents told

27   Alicia, Benjamin, and Carlos they would be detained for many months.

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    33
CASE NO. _____

171.    Alicia begged the Border Patrol agents to release her, explaining that she had four young children who needed to be picked up from daycare. She told the agents the children had no one else to care for them. A Border Patrol agent called the daycare provider to confirm Alicia was telling the truth. After confirming it, the agent released her, hours after she had been arrested.

172.    Border Patrol agents transported Benjamin and Carlos to the El Centro Station, where they were detained in cold, windowless cells. Border Patrol agents did not provide Benjamin or Carlos with any hygiene items and gave them only a thin aluminum sheet for warmth. It was impossible for Benjamin or Carlos to sleep because the lights in the cell were on day and night and there was nothing to lie down on except hard, cold concrete.

173.    At the El Centro Station, Border Patrol agents used coercive tactics to extract signatures on voluntary departure forms from Benjamin and Carlos.

174.    Border Patrol agents did not inform Benjamin or Carlos that voluntary departure involved waiving their rights to an immigration court hearing. Nor did Border Patrol agents inform Benjamin or Carlos of the consequences of voluntary departure, including that it could subject them to a period of inadmissibility. Instead, Border Patrol agents told Benjamin and Carlos that accepting voluntary departure would make it easier for them to return to the United States.

175.    When Benjamin and Carlos indicated that they did not want to agree to voluntary departure, Border Patrol agents displayed their weapons as a show of intimidation. In fear, Benjamin and Carlos signed where they were told.

176.    Border Patrol agents presented Benjamin and Carlos with a small digital screen that had space only for their signature, which they entered. Border Patrol agents did not show Benjamin or Carlos the documents they were purportedly signing, read any documents to Benjamin or Carlos, or provide copies of any documents to Benjamin or Carlos.

177.    Border Patrol agents transported Benjamin and Carlos to Mexico.

178.    At no point did Benjamin or Carlos understand the consequences of accepting voluntary departure, including that they would be subject to a period of inadmissibility, or the rights they were waiving.

179.    At no point did Benjamin or Carlos understand that the documents they were signing constituted a waiver of their right to an immigration court hearing.

180.    If Border Patrol agents had provided Benjamin and Carlos information about their right to an immigration hearing and the consequences of voluntary departure, both Benjamin and Carlos would have refused to sign anything and would have insisted on their right to contest their removability and/or pursue relief from removal.

181.    Benjamin is stranded in Mexico, forcing Alicia to raise their four children alone. While she grieves her separation from her husband, she also must manage their household alone and care for her children without her husband's presence or support. Alicia does not know how she will provide for her children on a single income. Alicia and Benjamin still feel shocked by what happened to them. Both are experiencing profound sadness over their family's separation.

182.    Benjamin is worried for his children, two of whom are still in diapers. He is devastated that he is separated from and unable to support his wife and his children, as he knows they are struggling without him.

183.    Alicia continues to work as a farm worker in the Kern County area. She cannot avoid the locations Border Patrol targets in its immigration sweeps. She must travel through agricultural areas to get to and from work. She cannot avoid getting gas or running errands at stores in Bakersfield, including in locations where other farm workers shop and gather.

184.    Alicia feels stress and anxiety that because she cannot avoid these locations, Border Patrol agents will stop her again, regardless of whether they have the requisite reasonable suspicion to do so. Alicia fears Border Patrol agents will arrest her again regardless of whether she poses a flight risk. She fears Border Patrol agents will force her into voluntary departure, like they forced her husband and brother-in-law. If she is expelled from the country, her children will be left without a parent in the United States. Alicia cannot bear the thought of being separated from her children the way she has been separated from her husband.

185.    Upon information and belief, the Border Patrol agents who stopped and detained Alicia, Benjamin, and Carlos did not have reasonable suspicion that anyone in the vehicle was unlawfully present in the United States.

186.    Upon information and belief, the Border Patrol agents who arrested Alicia, Benjamin, and Carlos did not have probable cause to believe any of them was likely to escape before a warrant could be obtained for their arrest.

*Stop and Arrest of UFW Member "Fernando"*

187.    "Fernando" is a farm worker and UFW member who has lived in Kern County for approximately 20 years. Fernando has raised a family with his wife, supporting his family by working in the fields.

188.    On January 9, 2025, Fernando was in a car driving home after work on a public road between Bakersfield and Mettler, California. They were traveling within the speed limit and obeying traffic laws. On the highway, traveling on a route commonly taken by agricultural workers when traveling between orchard worksites and farm worker communities, a truck turned on flashing lights and signaled for their car to pull over.

189.    When Fernando's car came a stop, several men jumped out of their vehicles and approached the car, yelling in an intimidating manner. Upon information and belief, the men were Border Patrol agents. They grabbed the handles of the locked car doors and pounded on the closed windows. They warned Fernando and his companions that if they did not open the windows, they would smash the glass.

190.    The passengers, including Fernando, sat still and did not respond. In Spanish, the Border Patrol agents began counting down backwards from "five." When they reached "one," they smashed the windows using a black baton-like stick, causing shards of broken glass to fall all over the car's occupants. The time from approaching the vehicle to smashing the windows was approximately 15 seconds.

191.    The agents reached through the broken windows to unlock the car doors and forcefully dragged Fernando and other passengers out of the car and onto the side of the highway. The agents arrested Fernando. The vehicle was impounded.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                                    36
CASE NO. _____

192.    The agents did not identify themselves, did not appear to know who Fernando was, and did not appear to have any reason for pulling the car over, other than to target its passengers for federal immigration enforcement. The agents did not present a warrant for arrest or ask Fernando anything about his family, community ties, employment, or other factors related to his likelihood of flight risk.

193.    Upon information and belief, the Border Patrol agents who stopped and detained Fernando did not have reasonable suspicion that anyone in the vehicle was unlawfully present in the United States.

194.    Upon information and belief, the Border Patrol agents who arrested Fernando did not have probable cause to believe he was likely to escape before a warrant could be obtained for his arrest.

*Stop and Arrest of Jesus Ramirez*

195.    Jesus Ramirez is a 64-year-old Bakersfield resident and father to two children. Mr. Ramirez is the only living parent to both of his children and is the primary caregiver for his son. Mr. Ramirez works as a day laborer.

196.    On January 7, 2025, at approximately 11:00 a.m., Mr. Ramirez was standing with other day laborers in the parking lot of Home Depot at 4001 Ming Avenue in Bakersfield when Border Patrol agents surrounded them. The Border Patrol agents arrived in multiple vehicles, some with sirens on. The agents surrounded Mr. Ramirez such that he could not walk away.

197.    The Border Patrol agents demanded that the men, including Mr. Ramirez, show their "papers." Mr. Ramirez reached for his wallet to locate his ID. As Mr. Ramirez pulled his wallet from his pocket, an agent snatched the wallet out of his pocket and removed his ID. He looked at the ID but did not ask Mr. Ramirez any questions about it. The agent returned Mr. Ramirez's wallet but kept his ID.

198.    The agents loaded Mr. Ramirez into one of their vehicles and transported him behind the store, where they loaded him into a larger vehicle. The agents told Mr. Ramirez he would be going "home," which he believed meant he would be returned to his home in Bakersfield. But the agents did not drive Mr. Ramirez home; they took him to a makeshift

processing station, where they detained him for several hours before loading him onto a bus and transporting him to the El Centro Station.

199.    At no point did the Border Patrol agents explain to Mr. Ramirez why they had arrested him or produce a warrant. At no point did they ask Mr. Ramirez about his family, employment, or community ties, or undertake any other evaluation of whether he posed a risk of flight.

200.    At the El Centro Station, Border Patrol agents took Mr. Ramirez's fingerprints. An agent presented Mr. Ramirez with a document in English, a language Mr. Ramirez does not read, and told Mr. Ramirez to sign it. The agent said that the document was required for a judge to review Mr. Ramirez's case, but did not translate or explain the document to Mr. Ramirez. Mr. Ramirez asked the agents to allow him to call a family member, but they refused.

201.    On January 9, 2025, Mr. Ramirez was moved from the El Centro Station to Imperial Regional Detention Facility, an ICE detention center, where he is still detained. Mr. Ramirez feels devastated and heartbroken over his separation from his children.

202.    Upon information and belief, the Border Patrol agents who stopped and detained Mr. Ramirez did not have reasonable suspicion that he was unlawfully present in the United States.

203.    Upon information and belief, the Border Patrol agents who arrested Mr. Ramirez did not have probable cause to believe he was likely to escape before a warrant could be obtained for his arrest.

*Stop and Arrest of Ernesto Campos Gutierrez*

204.    Ernesto Campos Gutierrez is a 44-year-old homeowner and resident of Bakersfield, where he has lived for over 20 years. He owns his home, where he lives with his partner and children. He is a U.S. citizen. He owns a gardening business in Bakersfield and is an active member of his church.

205.    On January 8, 2025, at around 9:40 a.m., Mr. Campos Gutierrez was driving in Bakersfield on his way to a gardening job, with a passenger sitting in the front passenger seat. His truck is registered under his name, has current license plates and registration, and has no stickers or

1  decals. The truck was hauling a mini trailer containing gardening equipment. Mr. Campos

2  Gutierrez was driving within the speed limit.

3      206.    An unmarked, white Chevrolet Tahoe turned on flashing lights and signaled for Mr.

4  Campos Gutierrez to pull over, which he did. On information and belief, this was a Border Patrol

5  vehicle containing Border Patrol agents.

6      207.    A Black male Border Patrol agent wearing a vest with the words "POLICE" in large

7  letters approached Mr. Campos Gutierrez's vehicle. He tried to pull open the driver's side door,

8  which was locked. Through the closed car window, the agent asked for Mr. Campos Gutierrez's

9  and his passenger's IDs. The agent did not identify himself, show a warrant, or explained why he

10  had pulled Mr. Campos Gutierrez over.

11      208.    Mr. Campos Gutierrez lowered his window, asked the Border Patrol agent why he

12  had been pulled over, and handed the agent his REAL ID driver's license. The agent did not

13  respond to Mr. Campos Gutierrez's question. The agent instructed Mr. Campos Gutierrez to hand

14  over the keys to his truck. Mr. Campos Gutierrez declined because the agent had not identified

15  himself or explained why he had pulled Mr. Campos Gutierrez over. The Border Patrol agent

16  stated he needed the keys because Mr. Campos Gutierrez would drive away otherwise. Mr.

17  Campos Gutierrez stated he would not drive away. The agent still had Mr. Campos Gutierrez's

18  driver's license in his possession.

19      209.    The Border Patrol agent took out a knife and slashed two of the tires on Mr.

20  Campos Gutierrez's truck. Mr. Campos Gutierrez was in shock.

21      210.    A second Border Patrol truck arrived and blocked Mr. Campos Gutierrez's truck in

22  by parking directly in front of it. A white male agent got out of the second vehicle and stood by

23  Mr. Campos Gutierrez's truck while the Black agent returned to his vehicle to run Mr. Campos

24  Gutierrez's license.

25      211.    The Black Border Patrol agent returned to Mr. Campos Gutierrez's vehicle and

26  approached the passenger side. He ordered Mr. Campos Gutierrez's passenger to lower his window

27  and open the door. When Mr. Campos Gutierrez's passenger lowered the window a few inches, the

28  Border Patrol agent pulled out a handheld tool and threatened to break the window. Mr. Campos

Gutierrez's passenger lowered his window further and opened the door.

212.    The Black Border Patrol agent forcibly grabbed Mr. Campos Gutierrez's passenger out of the truck and handcuffed him. The agent never asked Mr. Campos Gutierrez's passenger about his community ties or otherwise undertake any other evaluation of whether he posed a risk of flight. Mr. Campos Gutierrez told the agent he should not have slashed the tires. The agent responded, "I'm not going to argue with you, bro. You did what you did, I did what I did."

213.    A third agent arrived and told Mr. Campos Gutierrez he was under arrest for "alien smuggling." The agent handcuffed Mr. Campos Gutierrez and took away his phone and wallet.

214.    At no point did the agents identify themselves, explain to Mr. Campos Gutierrez why they had stopped his vehicle, explain why they had arrested him, or produce a warrant. At no point did they ask Mr. Campos Gutierrez about his family, employment, or community ties, or undertake any other evaluation of whether he posed a risk of flight.

215.    Border Patrol agents placed Mr. Campos Gutierrez and his passenger in the back of a truck and began driving them away, leaving Mr. Campos Gutierrez's truck on the side of the road. Mr. Campos Gutierrez informed the agents he is a U.S. citizen, but they continued to detain him.

216.    Border Patrol agents transported Mr. Campos Gutierrez and his passenger to a facility about 20 minutes' drive away. Mr. Campos Gutierrez was detained there in handcuffs for about four hours. Mr. Campos Gutierrez requested a phone call to his partner. The agent who had handcuffed Mr. Campos Gutierrez said he did not have the right to a call.

217.    After about four hours, Border Patrol agents placed Mr. Campos Gutierrez in a truck and drove him home.

218.    During this ordeal, Mr. Campos Gutierrez felt scared for his life. When the Border Patrol agent pulled out a knife just before slashing his tires, Mr. Campos Gutierrez feared he would be attacked or that the agent might pull out a gun next. Mr. Campos Gutierrez has to travel often for work on the roads and highways in and around Bakersfield. When he thinks about how he was treated by Border Patrol during this encounter, he feels scared and in disbelief.

219.    Upon information and belief, the Border Patrol agent who stopped and detained Mr. Campos Gutierrez did not have reasonable suspicion that he, or anyone else in his vehicle, was unlawfully present in the United States.

220.    Upon information and belief, the Border Patrol agents who arrested Mr. Campos Gutierrez did not have probable cause to believe he was likely to escape before a warrant could be obtained for his arrest.

*Stop and Arrest of Luis Perez Cruz*

221.    Luis Perez Cruz is a 28-year-old resident of Bakersfield, where he has lived with his mother for over two years. Mr. Perez Cruz has other family members who live in Bakersfield. He works as a painter.

222.    On January 7, 2025, Mr. Perez Cruz stopped at Home Depot on his way to work. He ran into two of his cousins in the parking lot. While he chatted with them, two men in civilian clothes approached them and told them they were Border Patrol agents.

223.    The Border Patrol agents told Mr. Perez Cruz and his cousins to show them IDs demonstrating that they were in the United States lawfully. The agents also asked if Mr. Perez Cruz and his cousins if they had open immigration cases.

224.    Mr. Perez Cruz exercised his right to remain silent. One of the Border Patrol agents grabbed him and began to handcuff him. Mr. Perez Cruz did not feel free to leave.

225.    The agent told Mr. Perez Cruz that whether he and his cousins showed ID or not, the agents would arrest them. Feeling he had no choice, Mr. Perez Cruz showed the agent his ID.

226.    Agents loaded Mr. Perez Cruz into a truck with a group of other people they were arresting. The agents drove the truck behind the Home Depot. There, they loaded Mr. Perez Cruz and the others into a van. The agents drove the van to a processing station on 7th Standard Road.

227.    Before arresting Mr. Perez Cruz, Border Patrol agents did not ask him about his family, employment, or community ties, or undertake any other evaluation of whether he posed a risk of flight. The agents did not produce a warrant of any kind and did not appear to have any idea who Mr. Perez Cruz was before demanding his ID.

228. At the station on 7th Standard Road, Border Patrol agents took Mr. Perez Cruz's fingerprints and the names of some family members. The agents loaded him into a bus and transported him to a holding center in El Centro, California. On information and belief, the Border Patrol agents brought Mr. Perez Cruz to the El Centro Station.

229. At the El Centro Station, agents tried to make Mr. Perez Cruz sign documents. The agents refused to show Mr. Perez Cruz the documents they told him to sign. Instead, agents presented Mr. Perez Cruz with a screen with space for his signature and directed him to sign it. Mr. Perez Cruz refused to sign anything and insisted on seeing a judge.

230. After nearly four days, Border Patrol agents fitted Mr. Perez Cruz with an electronic monitor and released him to a shelter in Calexico.

231. Mr. Perez Cruz still lives in Bakersfield and fears Border Patrol agents will stop and arrest him again.

232. Upon information and belief, the Border Patrol agent who stopped and detained Mr. Perez Cruz did not have reasonable suspicion that he was unlawfully present in the United States.

233. Upon information and belief, the Border Patrol agents who arrested Mr. Perez Cruz did not have probable cause to believe he was likely to escape before a warrant could be obtained for his arrest.

_Border Patrol's Pattern of Seizing, Arresting, and Coercing Voluntary Departure of Similarly Situated Individuals_

234. The experiences of the Plaintiffs and community members in the preceding paragraphs are not unique. To the contrary, they reflect three unlawful policies and practices that Border Patrol relies on in its interior operations: (1) conducting detentive stops without regard to reasonable suspicion that a person is in the country unlawfully, (2) effecting warrantless arrests without regard to probable cause that a person is likely to escape, and (3) extracting expulsion through voluntary departure without a knowing and voluntary waiver of rights.

235. Border Patrol agents consistently adhered to these policies and practices throughout "Operation Return to Sender." In vehicle patrols and on foot, Border Patrol agents conducted detentive stops without regard to whether there was reasonable suspicion that a person was

unlawfully in the United States. In vehicle patrols, Border Patrol agents roved Highway 99, the central artery of the agricultural heart of the San Joaquin Valley, and other roads in predominantly Latino neighborhoods and agricultural areas. Border Patrol agents tailed cars, flashing their lights, or pulled cars over from the shoulder; targeted people of color, people who appeared to be farm workers, and people who appeared to be day laborers for stops; and did so without any basis to believe that anyone in the car was violating an immigration law.

236.    In vehicles and on foot patrol, Border Patrol agents went to businesses in predominantly Latino neighborhoods and areas where farm workers and day laborers gather. There, Border Patrol agents roved parking lots and blocked parked cars from behind with their own vehicles to stop and detain people inside the cars. Border Patrol agents targeted people of color parked in their cars without any basis to believe that anyone in the car was violating an immigration law. Border Patrol agents also approached people of color and people who appeared to be farm workers or day laborers to question them about their immigration status.

237.    Upon information and belief, if a person approached by Border Patrol on foot verbally exercised their right to remain silent, walked away, or otherwise declined to consent to questioning, Border Patrol agents escalated the interaction to a detentive stop or arrest, conducted warrantless searches without consent, and did so without any basis to believe the person was violating an immigration law.

238.    Upon information and belief, when a person in a vehicle declined to answer Border Patrol agents' questions or consent to the encounter, the agents similarly escalated the encounter by blocking the car in, smashing the car's windows, slashing the car's tires, and/or ordering or physically pulling people out of vehicles and handcuffing them.

239.    Border Patrol agents effected warrantless arrests regardless of whether the agents had probable cause to believe that the person posed a risk of escape. Border Patrol agents did not undertake an assessment of a person's flight risk or attempt to obtain a warrant before making an arrest. Instead, Border Patrol agents indiscriminately arrested people swept up in "Operation Return to Sender," including people with pending immigration applications, no criminal history,

1  established residences in the community, steady employment, family in the United States, or other

2  community ties mitigating any purported flight risk.

3       240.    Border Patrol appears to have designed "Operation Return to Sender" to

4  accommodate a high volume of warrantless arrests and detentions. Border Patrol set up at least one

5  makeshift processing center, on 7th Standard Road in Bakersfield, to conduct mobile processing

6  for people arrested in the raids, and coordinated transportation to that station from its points of

7  arrests throughout the community.

8       241.    In these temporary processing centers, Border Patrol generally photographed and

9  fingerprinted the people agents arrested before bussing them to the El Centro Station. Border

10 Patrol had no process or procedure for informing family members where their loved ones were or

11 why they had been taken. Individuals held at this makeshift facility were not provided phone calls,

12 access to attorneys, or meals. Border Patrol then transported these individuals over 300 miles south

13 to the El Centro Station in a coordinated effort involving buses, vans, and trucks.

14      242.    In the El Centro Station, for up to three days, Border Patrol agents detained

15 incommunicado the people they had arrested; held them in windowless, cold cells without beds or

16 warm blankets, access to showers, hygienic products, or sufficient food; deprived them of sleep,

17 without access to daylight or any way to tell time; and pressured them to waive their right to an

18 immigration hearing and accept voluntary departure, no matter how many times the people

19 detained asked to speak to an attorney or make a phone call.

20      243.    Border Patrol did not inform people in their custody of the penalties that voluntary

21 departure carries, including a three- or ten-year period of "inadmissibility" for reentry to the

22 United States, either verbally or in writing. *See* 8 U.S.C. § 1182(a)(9)(B)(i)(I)–(II). Instead, Border

23 Patrol agents merely directed people to sign their names on small electronic screens only large

24 enough to display a person's signature, refusing to allow people to read or review the documents

25 they were signing. Only after people had signed away their rights and were expelled to Mexico did

26 Border Patrol agents give them a copy of the form they had signed, containing language explaining

27 the stark consequences of accepting voluntary departure.

28

244.    To coerce people in their custody into purportedly agreeing to their summary expulsion, Border Patrol agents denied them phone calls to attorneys or loved ones and deliberately misinformed them about their options. Among other things, Border Patrol agents claimed people could be imprisoned for going before an immigration judge; that accepting voluntary departure would make it easier to secure immigration status in the future; and/or that people in custody had *no choice* but to accept voluntary departure.

245.    As a result of Border Patrol's coercive tactics, on information and belief, dozens of residents of Kern County and the surrounding region, many of whom had deep ties to the community, accepted voluntary departure without understanding its consequences and are now stranded in Mexico, far from their homes, families, jobs, and communities.

**C. Border Patrol Will Continue to Rely on Its Unlawful Practices Throughout the Region**

246.    Despite the patently unlawful practices it relied on, Border Patrol has claimed that "Operation Return to Sender was an overwhelming success from day one."[11]

247.    Border Patrol plans to replicate "Operation Return to Sender" across the state. Border Patrol has stated publicly that it is planning operations in Fresno and Sacramento,[12] as well as a return to Bakersfield.[13]

248.    After "Operation Return to Sender," the El Centro Sector's Chief Patrol Agent Gregory Bovino issued a press statement declaring that "[the El Centro Sector's] area of responsibility stretches from the U.S./Mexico Border, north, as mission and threat dictate, all the way to the Oregon line" and that Border Patrol "is no stranger to operations in places like Bakersfield, Stockton, Modesto, Fresno, and Sacramento."[14]

---

[11] US Border Patrol El Centro Sector, Facebook (Jan. 9, 2025, 8:21 AM), https://www.facebook.com/USBorderPatrolElCentroSector/posts/pfbid02WAdqbqXraaLavfpjMuh8kGtAE96Jqms9bWPQdXnikRJUakc9Xp2Z3uUcGKrHB3bql.

[12] Sergio Olmos, *A surprising immigration raid in Kern County foreshadows what awaits farm workers and businesses*, CalMatters, Jan. 10, 2025, https://calmatters.org/economy/2025/01/kern-county-immigration-sweep/.

[13] US Border Patrol El Centro Sector, Facebook (Jan. 12, 2025, 12:02 AM), https://www.facebook.com/USBorderPatrolElCentroSector/posts/pfbid0eqSVW9EQE5Q3GiNUBaipVp8wtzsSbG3VycZBfsnVtEDqLwqSFez8AdnNNUp64dcal.

[14] Jose Franco & Jenny Huh, *US CBP issues statement on ongoing 'Operation Return to Sender'*

249.    The unlawful practices Border Patrol relied on in "Operation Return to Sender," and continues to employ, are consistent with agency-wide policy. In particular, Border Patrol's policy and practice of conducting warrantless arrests without regard to flight risk conforms to a DHS-wide commitment to relying on broad sweeps to conduct immigration arrests in jurisdictions with laws intended to protect immigrants, often called "sanctuary" jurisdictions.

250.    Tom Homan, a former ICE director who now serves as President Trump's "Border Czar," has repeatedly explained the Trump administration's intent to rely on indiscriminate warrantless arrests in sanctuary jurisdictions.

251.    On January 21, 2025, Mr. Homan told Fox News: "There's not only public safety threats that will be arrested, because in sanctuary cities, we're not allowed to get that public safety threat in the jail, which means we got to go to the neighborhood and find him . . . . And when we find him, he may be with others. And unlike the last administration, we're not going to tell ICE officers not to arrest an illegal alien. *So if they find others, they'll be arrested.*"[15]

252.    On January 27, 2025, Mr. Homan told CNN: "Well, in sanctuary cities, you're going to see a higher number of collateral arrests. . . . More agents in the neighborhood, and more collateral arrests."[16]

253.    Later in the interview, the interviewer asked Mr. Homan to confirm that by "collateral arrests," he referred to people without criminal records who agents had not planned to encounter or arrest. Mr. Homan confirmed: "Yes, if they're in the country illegally, they're going to get arrested too."[17]

---

*in Bakersfield*, KGET, Jan. 10, 2025, https://www.kget.com/news/local-news/us-cbp-issues-statement-on-ongoing-operation-return-to-sender-in-bakersfield-area/.

[15] Adam Shaw, *Trump border czar Tom Homan reveals ICE teams are already arresting 'public safety threats'*, Fox News, Jan. 21, 2025, https://www.foxnews.com/politics/trump-border-czar-tom-homan-reveals-ice-teams-already-arresting-public-safety-threats (emphasis added).

[16] *The Source with Kaitlan Collins: Trump DOJ Fires Officials Who Prosecuted Him; Homan on Mass Deportation Effort: "There's No Safe Haven"; Trump Calls DeepSeek A.I. "Positive Development" But Also a "Wake-Up Call" For U.S. Tech Industry* (CNN broadcast Jan. 27, 2025), https://transcripts.cnn.com/show/skc/date/2025-01-27/segment/01.

[17] *Id.*

254.    In public statements, Border Patrol offered the same explanations when discussing its practices during "Operation Return to Sender." In a comment on its official Facebook account, the El Centro Border Patrol Sector stated: "Sanctuary jurisdictions, like all over CA, hinders [*sic*] local authorities from working with us to get those who are committing the worst crimes. That means we have to go out into the communities ourselves and find those people. This well and does lead to arrests of others who may not have serious crimes, but are still unlawfully present in the U.S."[18]

255.    In a post referencing "Operation Return to Sender" on the social media site X, Border Patrol Chief Patrol Agent Gregory Bovino, who oversees the El Centro Sector, stated: "Sanctuary policies hinder common sense approaches w/getting serious criminals off our streets; we have to go looking for them in the communities, leading to unintended arrests."[19]

256.    In response to a commenter on X who asked about Border Patrol's apparent strategy of "[s]tanding outside gas station stops at [H]ome [D]epots preying on any random person," Chief Bovino stated: "Undocumented means just that. I recommend returning to the country of origin, obtaining proper documents, and doing it the right way. If not, *we will arrest*."[20]

257.    In a similar comment on Facebook, the El Centro Border Patrol Sector stated its intent to continue to effect warrantless arrests regardless of individual circumstances, posting: "*anyone we encounter* who doesn't have the legal right to be in or remain in the U.S. will be arrested."[21]

258.    Border Patrol has also issued social media posts celebrating its practice of escalating a stop or retaliating when a person does not comply with their demands. On February

---

[18] US Border Patrol El Centro Sector, Facebook (Jan. 14, 2025, 7:52 PM), https://www.facebook.com/USBorderPatrolElCentroSector/posts/pfbid0U5CHPhAdfYcAFLHz8xn5aS4mRvehGZnFRRYWrPE5TnMGaYHeBbL3M9Bk8PwEP6A2l.

[19] @USBPChiefELC, X (Jan. 13, 2025, 5:53 PM), https://x.com/USBPChiefELC/status/1878983633073307860.

[20] @USBPChiefELC, X (Jan. 12, 2025, 7:58 AM) (emphasis added), https://x.com/USBPChiefELC/status/1878471709482737998 (emphasis added).

[21] US Border Patrol El Centro Sector, Facebook (Jan. 28, 2025, 9:53 AM) (emphasis added), https://www.facebook.com/USBorderPatrolElCentroSector/posts/pfbid02oBnaCzDoxG72oGXFjijJEJEtPWWixAqgZhkYbPtEqLnsLr1M8mcd7D3bi5koxWVvl.

23, 2025, the El Centro Border Patrol Sector's official Facebook account posted a photo of a vehicle's driver's seat covered with shattered glass. The accompanying post stated that a noncitizen had "[r]efused to open window during an immigration inspection," "[g]ot his window shattered for an extraction," was "[a]rrested by the #PremierSector," "[w]ent to jail," and "[g]ot deported" within the span of a week.[22]

259.    In response to a comment on the photo of the shattered window, the El Centro Border Patrol Sector posted: "FAFO in full effect."[23] On information and belief, "FAFO" means "fuck around and find out," and refers to Border Patrol's justification for its agents' decision to shatter a vehicle's window after the driver did not roll it down.

**D.  Border Patrol's Policy and Practice of Conducting Detentive Stops without Reasonable Suspicion of an Immigration Violation Violates the Fourth Amendment**

260.    Border Patrol does not have authority to indiscriminately stop and detain residents of the Central Valley to determine their immigration status, whether in vehicles or on foot. Such conduct violates the Fourth Amendment. *See Brignoni-Ponce*, 422 U.S. at 873 (vehicle stops); *Benitez-Mendez v. I.N.S.*, 752 F.2d 1309, 1311 (9th Cir. 1983), amended, 760 F.2d 907 (9th Cir. 1983) (all detentive stops).

261.    A vehicle stop by a law enforcement officer constitutes a seizure of the driver and all passengers. *Brendlin v. California*, 551 U.S. 249, 251 (2007). "Except at the border and its functional equivalents, officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain [noncitizens] who may be illegally in the country." *Brignoni-Ponce*, 422 U.S. at 884. A driver or passenger's perceived ethnicity or national origin, based on their physical characteristics, cannot justify a vehicle stop. *Id.* at 885–86. Nor may a

---

[22] US Border Patrol El Centro Sector, Facebook (Feb. 23, 2025, 5:09 PM), https://www.facebook.com/USBorderPatrolElCentroSector/posts/pfbid02Lbr9X3qedBrmHoZyTDi2K5zTNnwWtpZKP6kfoYiJ5NuTRULxhon7oRjCaqQMNGV8. Upon information and belief, "extraction" refers to the forcible physical removal of the occupant from the vehicle, and "Premier Sector" refers to the El Centro Border Patrol Sector.

[23] US Border Patrol El Centro Sector, Facebook (Feb. 23, 2025, 7:44 PM), https://www.facebook.com/USBorderPatrolElCentroSector/posts/pfbid0GaFS3Ee5x652GbbTWUsLPDhkxLToiaMui8nYbEZ6XYFTfoufzgAvSfos7gEH6Xsvl.

person's occupation, without more, give rise to reasonable suspicion. *United States v. Manzo-Jurado*, 457 F.3d 928, 935 (9th Cir. 2006) ("to establish reasonable suspicion, an officer cannot rely solely on generalizations that, if accepted, would cast suspicion on large segments of the lawabiding population")*.*

262.    On foot, a stop becomes detentive and constitutes a seizure when "a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). The Fourth Amendment prohibits Border Patrol from conducting a detentive stop without reasonable suspicion that a person is in the country unlawfully. *Benitez-Mendez*, 752 F.2d at 1311; *accord LaDuke*, 796 F.2d at 309.

263.    Refusal to answer questions does not establish reasonable suspicion and does not justify even a "momentar[y]" detention. *Florida v. Royer*, 460 U.S. 491, 498 (1983). Similarly, refusing to consent to a search cannot independently establish sufficient cause for a search. *Thomas v. Dillard*, 818 F.3d 864, 884 (9th Cir. 2016). If that were the case, "the Fourth Amendment would have no effect." *Id*.

264.    The patterns and practices of "Operation Return to Sender" stand in stark contrast to these longstanding Fourth Amendment protections. Instead of relying on "specific, articulable facts" to justify a seizure, Border Patrol agents stopped people of color who they perceived to be farm workers or day laborers to demand their "papers" and unlawfully treated a subject's refusal to consent as grounds for escalation.

**E. Border Patrol's Policy and Practice of Effecting Warrantless Arrests Without Making Individualized Determinations of Flight Risk Violates Federal Law**

265.    In the Immigration and Nationality Act ("INA"), Congress enacted a strong preference that immigration arrests be based on warrants. 8 U.S.C. § 1357(a)(2) sets forth Border Patrol agents' limited authority to conduct warrantless arrests, prescribing two conditions that must be met before the arrest: the agent must have "reason to believe" both that (1) the individual "is in

the United States in violation of any [immigration] law or regulation," *and* (2) the individual "is likely to escape before a warrant can be obtained for his arrest." *Id.*[24]

266.    "Reason to believe," as used in the statute, is equated with "the constitutional requirement of probable cause." *Tejeda-Mata v. INS*, 626 F.2d 721, 725 (9th Cir. 1980); *see also Au Yi Lau v. INS*, 445 F.2d 217, 222 (D.C. Cir. 1971) (interpreting 1357(a)(2)); *United States v. Cantu*, 519 F.2d 494, 496 (7th Cir. 1975) (in a statute, the words "'reason to believe' are properly taken to signify probable cause"); *Morales v. Chadbourne*, 793 F.3d 208, 216 (1st Cir. 2015) ("Courts have consistently held that the 'reason to believe' phrase in § 1357 'must be read in light of constitutional standards, so that "reason to believe" must be considered the equivalent of probable cause.'").

267.    Probable cause requires an individualized inquiry particular to the person at issue. *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979).

268.    Accordingly, Border Patrol agents may not execute warrantless arrests unless they have made an individualized determination that a person is likely to escape before a warrant can be obtained.

269.    Categorical assumptions about an individual's circumstances or behavior are insufficient to establish probable cause. *See, e.g.*, *United States v. $49,576.00 U.S. Currency*, 116 F.3d 425, 427–28 (9th Cir. 1997) (fitting a "drug courier profile . . . cannot establish probable cause").

270.    Border Patrol agents thus may not make categorical assumptions about likelihood of escape based on a person's apparent race and assumed immigration status. Instead, § 1357 requires Border Patrol agents to make an individualized determination of flight risk before they can lawfully conduct a warrantless arrest. *See Mountain High Knitting, Inc. v. Reno*, 51 F.3d 216, 218 (9th Cir. 1995) (immigration arrest was unauthorized by statute where agents did not make determination whether arrestee was "particularly likely to escape").

---

[24] Federal regulations track the prohibition on conducting a warrantless immigration arrest without establishing likelihood of escape. 8 C.F.R. § 287.8(c)(2)(ii). The regulations further require immigration officers to identify themselves and state the reason for the arrest. 8 C.F.R. § 287.8(c)(2)(ii)–(iii).

271.    The statutory prohibition on warrantless immigration arrests absent probable cause

that a noncitizen is likely to escape before a warrant can be obtained "is always seriously applied."

*Cantu*, 519 F.2d at 496–97. Courts routinely enjoin laws, policies, and practices that fail to adhere

to the statute's strict limitations. *See, e.g.*, *Arizona v. United States*, 567 U.S. 387, 408, 410 (2012)

(emphasizing that federal immigration officers' warrantless arrest authority is limited to situations

where there is a likelihood of flight before a warrant can be obtained); *Roy v. Cnty. of Los Angeles*,

No. CV 12-09012-AB (FFMx), 2018 WL 914773, at *21 (C.D. Cal. Feb. 7, 2018) (enjoining ICE

policy of issuing detainers without evaluating whether there is a likelihood of flight before a

warrant can be obtained); *Moreno v. Napolitano*, 213 F. Supp. 3d 999, 1008 (N.D. Ill. 2016)

(same).

## F. Border Patrol's Policy and Practice of Extracting Voluntary Departure Agreements Without a Knowing and Voluntary Waiver of Rights Violates the Fifth Amendment

272.    It is well settled that noncitizens present in the United States are entitled to due

process, including "all opportunity to be heard upon the questions involving [their] right to be and

remain in the United States" before they can be removed from the country. *Yamataya v. Fisher*,

189 U.S. 86, 101 (1903). Due Process affords noncitizens the right to apply for immigration relief

for which they may be eligible. *United States v. Melendez-Castro*, 671 F.3d 950, 954 (9th Cir.

2012). The INA contemplates they will apply for such relief at a removal hearing before an

immigration judge. *See generally* 8 U.S.C. § 1229a(c)(3)–(4).

273.    Voluntary departure is contingent on a waiver of those rights. 8 U.S.C.

§ 1229c(a)(1). The Due Process Clause requires such a waiver to be knowing and voluntary. *See,

e.g.*, *United States v. Ramos*, 623 F.3d 672, 682–83 (9th Cir. 2010) (because waiver of right to a

removal hearing must be "knowing and voluntary," "stipulated removal" process that failed to

provide rigorous waiver procedures violated due process); *Gete v. INS*, 121 F.3d 1285, 1293 (9th

Cir. 1997) (knowing and voluntary requirement "appl[ies] equally to criminal and civil cases,"

including in immigration context).

274.    In addition to waiving the fundamental right to a hearing and its attendant

opportunities to secure relief from removal, voluntary departure carries severe penalties. People

who have been unlawfully present in the United States for 180 days or more are subject to a three-or ten-year period of "inadmissibility" to the United States after accepting voluntary departure, regardless of any immigration relief for which they were otherwise eligible. *See* 8 U.S.C. § 1182(a)(9)(B)(i)(II). A waiver of the fundamental right to a removal hearing cannot be knowing and voluntary unless a person understands consequences and agrees without coercion. *See, e.g.*, *Ibarra-Flores v. Gonzales*, 439 F.3d 614, 620 (9th Cir. 2006).

275.    Border Patrol agents cannot lawfully rely on omission, deception, or coercion to secure voluntary departure agreements, as they have done here. Border Patrol's policy and practice of failing to explain to those in their custody their right to an immigration hearing and/or the consequences of voluntary departure, in coercive conditions of confinement, with no access to counsel, violates the Fifth Amendment.

**G.    Defendants Fail to Ensure that Border Patrol Agents Comply with Their Obligations under the Fourth Amendment and § 1357(a)(2)**

276.    CBP promulgates little to no guidance informing its agents of their obligations under the Fourth Amendment when conducting enforcement actions outside of the agency's traditional border context. On information and belief, any guidance CBP provides generally confines its application to CBP's unique border authority, which is not applicable in the interior of the United States. CBP has issued a handbook on "conducting searches of a person at the border by CBP officers using border search authority," but it "does not address personal searches undertaken away from the border."[25] CBP has issued policies governing transport and short-term detention in Border Patrol holding cells, but they have no application to field arrests.[26] And CBP's directive imposing requirements on vehicle stops explains that "Authorized Officers/Agents may only conduct vehicle stops when there is reasonable suspicion to believe a violation of law has occurred that the Authorized Officer/Agent has the authority to enforce"—but includes no guidance on what constitutes "a reasonable suspicion."[27]

---

[25] U.S. Customs and Border Protection Office of Field Operations, Personal Search Handbook CIS HB 3300-04C, 15, 17 (April 2021) (on file with authors).
[26] TEDS, *supra* note 5. TEDS "govern CBP's interaction with detained individuals." *Id.* at 3.
[27] U.S. Customs and Border Protection Directive No. 4510-026A, U.S. Customs and Border

277.    The same is true of 8 U.S.C. § 1357(a)(2): on information and belief, CBP does not provide guidance to its agents on how to make an individualized determination of likelihood of escape before a warrant can be obtained. In this vacuum, CBP allows its agents to make warrantless arrests *carte blanche*, in violation of the statute. As a result, Border Patrol has a policy and practice, in excess of its actual legal authority, of making warrantless arrests without assessing or considering a person's flight risk. This guarantees that Border Patrol agents ultimately will arrest people who are not flight risks, as they repeatedly did during "Operation Return to Sender."

**H.  CBP's Predecessor Agency and Sister Agency Promulgated Detailed Guidance on the Limits to Warrantless Immigration Enforcement Action**

278.    This vacuum was not always the case. The legacy INS, which covered the border and interior immigration enforcement functions now divided between CBP and ICE, respectively, historically promulgated a field manual containing detailed guidance explaining the constraints the Fourth Amendment and 8 U.S.C. § 1357(a)(2) impose on its agents and instructing them how to comply with their standards. For example, the manual provided a detailed explanation of the Fourth Amendment's requirement to establish reasonable suspicion for vehicle stops outside of the border and its functional equivalents.[28] And in its discussion of § 1357(a)(2), the manual recognized that "[t]he law strongly favors the use of an arrest warrant, even for a non-criminal arrest."[29] The manual offered guidance to agents evaluating likelihood of escape under § 1357(a)(2) before making a warrantless arrest, explaining that ties to the community such as family, home, or employment were probative factors weighing against probable cause for such arrests.[30]

279.    For decades after Congress disbanded the INS and created the current federal immigration system, ICE, like CBP, did not have any policy or guidance in place to ensure that the

---

Protection Emergency Driving and Vehicular Pursuits (June 1, 2023), https://www.cbp.gov/sites/default/files/assets/documents/2023-Jun/cbp-pursuits-dir-4510-026A-redacted-june-2023.pdf.

[28] U.S. Department of Justice Immigration and Naturalization Service, The Law of Arrest, Search, and Seizure for Immigration Officers at II-2 (Jan. 1993), https://www.scribd.com/document/21968268/ICE-M-69-Law-of-Arrest-January-1993.

[29] *Id.* at II-4.

[30] *Id.*

agency's personnel would comply with the statutory and regulatory restrictions on warrantless arrests.

280.    Around May 2018, ICE conducted sweeps in the greater Chicago area similar to "Operation Return to Sender," zeroing-in on day laborers and predominantly Latino neighborhoods for suspicionless vehicle stops and warrantless arrests without regard to flight risk. A class of individuals unlawfully arrested in the raids, along with immigrants' rights organizations, sued. After the plaintiffs' claims survived dismissal, the lawsuit settled.

281.    As part of the settlement agreement, defendants DHS and ICE developed and promulgated a nationwide policy—which remains in effect today—requiring ICE officers to (1) evaluate a person's likelihood of escape before making a warrantless arrest and (2) document the facts and circumstances surrounding the warrantless arrest in the person's immigration file as soon as practicable. To evaluate "likelihood of escape," officers must consider the totality of the circumstances, including community and family ties, as part of the flight risk evaluation: "Mere presence within the United States in violation of U.S. immigration law is not, by itself, sufficient to conclude that [a noncitizen] is likely to escape before a warrant for arrest can be *obtained*." Appendix A: Broadcast Statement of Policy, *Castanon Nava v. DHS*, No. 1:18-cv-03757 (N.D. Ill., Feb. 7, 2022), ECF No. 155-1 (emphasis in original). To document the arrest, officers must include, among other things, the "specific, particularized facts supporting the conclusion that the [noncitizen] was likely to escape before a warrant could be obtained." *Id.*

282.    While the *Castanon Nava* "Broadcast Statement of Policy" was directed toward ICE, the agency that conducted for the Chicago enforcement operation, DHS was a party to the case and settlement. Moreover, the Broadcast states that it is not merely a policy, but rather a restatement of "the underlying laws and policies applicable to all arrests effected under 8 U.S.C. § 1357(a)(2) / INA § 287(a)(2) and is to be interpreted consistent with all implementing regulations."

283.    Although Border Patrol agents are equally bound by § 1357(a)(2)'s restrictions, on information and belief, neither Border Patrol nor its parent agency, CBP, has promulgated any similar policy or guidance requiring compliance with the statute. Nor does Border Patrol follow the statement of policy issued by DHS and ICE following the *Castanon Nava* litigation. Instead,

Border Patrol has a policy and practice of conducting warrantless arrests without assessing flight risk, in violation of its statutory obligations.

**I.  Border Patrol's Illegal Practices Have Terrorized the Community, Sowed Distrust in Police, and Chilled Plaintiffs' Protected Speech**

284.    Because of Border Patrol's policy and practice of conducting suspicionless stops and warrantless arrests, Plaintiffs and community members feel scared to leave their homes, afraid that movement in the community could result in another Border Patrol encounter.

285.    Plaintiff Morales Cisneros feels nervous leaving his home. He feels scared to return to the store where he used to go regularly to refill his water jugs. He fears showing his face to his neighbors and tries to keep a low profile to avoid attracting attention. When he runs errands, he often wears a sweater with a hood to cover his head in an attempt to cover his skin color, as he believes Border Patrol targeted him due to the color of his skin.

286.    Similarly, Plaintiff Aguilera Martinez feels stressed running her daily errands. She feels scared when going near areas where Border Patrol arrested people, like Home Depot on Ming Avenue in Bakersfield.

287.    Plaintiffs and community members have developed a fear of law enforcement officials, including local police officers. Ms. Aguilera Martinez feels fear when she sees Bakersfield police officers drive by. On one occasion after Border Patrol arrested her, when she saw a police car was driving in the lane next to hers, she asked her sister to navigate away from the police car and covered her face with her hand so the officers could not see her. Mr. Morales Cisneros is not comfortable calling 911 because he fears the local police will call Border Patrol to arrest him.

288.    Plaintiffs and community members experienced physical injuries, pain, and/or hunger due to Border Patrol's unlawful arrests and/or the ensuing events. Ms. Aguilera Martinez developed bruises on her wrists and legs from the violent manner in which the Border Patrol agent effectuated her arrest. Mr. Morales Cisneros suffered from joint pain during his three-day detention at the El Centro Station because CBP kept his cell extremely cold and did not provide him with adequately warm clothes. Mr. Munguia Esquivel experienced ongoing pain in his left arm and

shoulder from where a Border Patrol agent yanked him at Home Depot as he attempted to exercise his right to remain silent.

289.    All Plaintiffs, and all those similarly situated, experienced emotional and dignitary harms because Border Patrol targeted them for enforcement based on their appearance, including their apparent race or ethnicity. Border Patrol discriminated against them, disparaged them, and made them feel they do not belong in their communities.

290.    Border Patrol's actions have also stoked intense anxiety and fear of future harm among UFW members. UFW members Benjamin and Carlos were coerced into accepting voluntary departure due to Border Patrol's illegal operation, abruptly separating those members from their small children without notice. UFW member Alicia must now raise the children she shares with Benjamin alone, while living in fear that she will be subjected to Border Patrol's illegal practices again.

291.    UFW member "Gabriela" is a farm worker who has lived in Fresno for 22 years. Gabriela has a daughter and eight grandchildren. Gabriela helps her daughter with childcare when her daughter has doctor's appointments or needs assistance picking up the children from school. Gabriela has worked as a farm worker in the stone fruit, table grape, and persimmon orchards, and the bell peppers and tomato fields in the San Joaquin Valley for over 20 years. Gabriela has legal authorization to work in the United States.

292.    Gabriela feels anxiety and fear that she will be subjected to Border Patrol's unlawful practices when Border Patrol follows through on its threat to bring "Operation Return to Sender" to her community in Fresno. Gabriela is an active member of her community and has heard other farm workers express the same fears.

293.    Gabriela cannot avoid traveling through and visiting the types of locations that Border Patrol targets. Gabriela must drive in and around the Fresno region, including on highways and in agricultural areas, to commute to and from work. She fills up her car with gas, purchases food, and runs errands at businesses frequented by other farm workers.

294.    Gabriela fears that Border Patrol agents will stop and detain her without reasonable suspicion to do so, simply because of where she is, her skin color, or her apparent occupation as a farm worker.

295.    Although Gabriela has a child and grandchildren who live in the community and has deep community ties, she fears that Border Patrol will arrest her without a warrant without regard to whether she is actually a flight risk. After arresting her, Gabriela fears that Border Patrol will coerce her into voluntary departure.

296.    Gabriela is fearful and anxious at the thought of being detained and separated from her child and grandchildren. She does not know who would care for the loved ones who depend on her, even if she were detained for a brief period. She cannot imagine the grief and pain of being expelled from the country and separated forever from her loved ones.

297.    Gabriela's panic and fear are shared across UFW's membership and felt by UFW members of diverse immigration statuses because Border Patrol's practices target non-white and/or Spanish-speaking farm workers broadly, with little regard to whether particular farm workers have lawful presence or deep ties to the local community. For instance, UFW members who are long-time lawful permanent residents are nevertheless anxious about being swept up in future raids because of confirmed reports that Border Patrol's operation indiscriminately arrested people even if they had U.S. citizenship or lawful permanent residence. UFW members with employment authorization documents, such as those with H-2A temporary agricultural visas, T-visas, Temporary Protected Status, Deferred Action for Labor Enforcement, or Deferred Action for Childhood Arrivals, similarly express fear that Border Patrol will seize, arrest, and/or detain them for removal without regard to their authorization to be in the U.S.

298.    Many UFW members no longer commute to and from work in the same vehicle as their spouse, and whenever possible, member spouses no longer run daily errands together. Some members used to work at the same worksite as their spouses; after the raids, either the member or their spouse changed jobs to reduce the likelihood of both spouses being arrested simultaneously during a workplace raid or Border Patrol roving patrol along their commute.

299.     Many UFW members with young children are terrified of being swept up in a raid and separated from their children, who may have no one else to take care of them. In the days after "Operation Return to Sender," many members kept their children home from school or daycare and avoided going to doctor's appointments, church, or the store, paralyzed by the fear of being arrested with no warning.

300.     UFW members with young children have arranged for a trusted community member to pick their children up from school or daycare to minimize the risk of being detained, arrested, or taken away by Border Patrol in front of their children. Members who are parents of school-aged children have expressed reluctance to attend school meetings in case of immigration enforcement activity, hindering them from being active participants in their children's education. These members leave for work each day scared they will not come home to their children because of another enforcement action by Border Patrol or other immigration authorities.

301.     Because of Border Patrol's unlawful actions, UFW members also feel chilled from exercising their right to speak up about workplace abuses or wage theft. They fear that speaking up will attract negative attention to themselves, and that a vengeful employer could report them for immigration enforcement. They feel the risks of being separated from their families and expelled from their homes are too great.

302.     Elected leaders have sounded the alarm about the widespread harmful effects of Border Patrol's practices. Republican Congressman David G. Valadao, representing California's 22nd congressional district, released a statement urging Border Patrol "to avoid causing any further alarm among our farm workers" and further avoid targeting "those responsible for producing our nation's food supply."[31]

303.     California State Senator Melissa Hurtado, representing District 16, stated Border Patrol's arrests had "broader impacts on our district's economy and workforce. These actions are

---

[31] Press Release, Congressman David Valadao, Congressman Valadao Releases Statement on Customs and Border Protection Operations in Kern County (Jan. 13, 2025), https://valadao.house.gov/news/documentsingle.aspx?DocumentID=1681.

not just affecting individuals—they're rippling through our entire community."[32]

304.    California State Senator Anna Caballero, representing District 14, described CBP's operation as "shocking."[33]

305.    California State Assemblymember Joaquin Arambula, representing District 31, expressed, "I am extremely concerned that these arrests may have taken place at random, or based on racial profiling. Everyone in our state and nation deserves to be treated with dignity and respect—everyone is entitled to due process and constitutional rights."[34]

306.    And Fresno County supervisor Luis Chavez reported that in the wake of Border Patrol's wave of arrests in Kern County, he had "received reports of food processing facilities [with] absences of 15 to 20 [percent] locally," representing "[o]rders that will not be able to be fulfilled."[35]

307.    Other government officials have also criticized Border Patrol's operation. For example, former CBP Commissioner Chris Magnus stated, "[M]ass roundups of day laborers and field workers through profiling do not improve public safety and waste law enforcement resources." He emphasized, "These roundups create widespread distrust of law enforcement and discourage many community members from reporting crimes as victims or witnesses."[36]

308.    While Border Patrol's unlawful arrests during "Operation Return to Sender" were largely concentrated in Kern County, they sent shockwaves of terror across the Central Valley. By one estimate, approximately half of California's agricultural workforce consists of immigrants

---

[32] Joshua Yeager, et al., *Border patrol agents make arrests in California's Central Valley as Trump's 'mass deportations' loom*, KVPR, Jan. 9, 2025, https://www.kvpr.org/community/2025-01-09/border-patrol-agents-make-arrests-in-californias-central-valley-as-trumps-mass-deportations-loom.

[33] Brisa Colón, *78 immigrants detained by Border Patrol throughout the Central Valley, officials say*, ABC 30 Action News, Jan. 12, 2025, https://abc30.com/post/78-immigrants-detained-ice-central-valley-officials-say/15790817/.

[34] Rachel Uranga & Andrea Castillo, *'They just got my uncle': Immigration arrests spark fear among farm workers in Central Valley*, L.A. Times, Jan. 11, 2025, https://www.latimes.com/politics/story/2025-01-11/they-just-got-my-uncle-mass-immigration-arrests-spark-fear-among-farmworkers-in-central-valley.

[35] Colón, *supra* note 33.

[36] Steve Eder & Miriam Jordan, 'La Migra!' A Glimpse of Trump's Promised Deportation Storm, N.Y. Times, Jan. 17, 2025, https://www.nytimes.com/2025/01/17/us/immigration-deportation-california.html.

with a precarious immigration status.[37] One farm worker described agricultural fields as "almost

solitary" after the raids, when ordinarily, at this time of year, "the orchards are usually full of

people."[38] Indeed, farms in Bakersfield "reported big dips in employee attendance, with droves of

fearful workers choosing to stay home."[39] Undocumented immigrants also comprise significant

proportions of California's manufacturing and construction workforce.[40]

309.    Immigration attorneys searched for their detained clients' whereabouts, not

knowing where their clients were being held, or by whom, for up to three days.[41]

310.    In the wake of the raids, teachers and community members reported widespread

anxiety among immigrant families about sending their children to school, some of whom opted to

keep their children at home in the immediate aftermath of the sweeps.[42]

311.    Associate Economics Professor Richard S. Gearhart of Cal State-Bakersfield

predicted that if Border Patrol continues its practice of indiscriminately sweeping up farm workers,

it would cause "a recession-level event" from the effects of food shortages that would result. He

warned such harms would be compounded by immigrants being afraid to leave their homes to go

shopping, go to school, and seek health care, resulting in potentially "catastrophic" losses in

education and health.[43]

## CLASS ACTION ALLEGATIONS

312.    Individual Plaintiffs seek to represent three classes of individuals who have been or

will be subjected to the three unlawful practices this lawsuit challenges: detentive stops regardless

---

[37] Yeager, et al., *supra* note 32.

[38] Brian Osgood, 'Fields were solitary': Migration raids send chill across rural California, Al Jazeera, Jan. 17, 2025, https://www.aljazeera.com/news/2025/1/17/fields-were-solitary-migration-raids-send-chill-across-rural-california.

[39] Yeager, et al., *supra* note 32; *see also* Eder & Jordan, *supra* note 36 (President of the Nisei Farmers League stated that 30 to 40 percent of the agricultural labor force did not report to fields on the days after the raids; a citrus farmer stated that about two-thirds of his harvesting crew did not show up for work on the days after the raids).

[40] Yeager, et al., *supra* note 32.

[41] Uranga & Castillo, *supra* note 34.

[42] Emma Gallegos, 'Students are scared': Border Patrol raids fuel fear in schools, EdSource, Jan. 14, 2025, https://edsource.org/2025/students-are-scared-border-patrol-raids-fuel-fear-in-schools/725105.

[43] Olmos, *supra* note 12.

of reasonable suspicion of unlawful presence, arrests regardless of probable cause of flight risk, and voluntary departure without a knowing and voluntary waiver of rights.

**A. The Suspicionless Stop Class**

313.    Plaintiffs Oscar Morales Cisneros, Wilder Munguia Esquivel, and Yolanda Aguilera Martinez seek to represent a class under Federal Rules of Civil Procedure 23(b)(2) consisting of:

> All persons who, since January 6, 2025, have been or will be subjected to a detentive stop by Border Patrol in this district pursuant to a practice of conducting stops without warrants and without an individualized assessment of reasonable suspicion whether the person (1) is engaged in an offense against the United States or (2) is a noncitizen unlawfully in the United States.

314.    The proposed class meets the commonality requirements of Rule 23(a)(2) because all members of the class are subject to Border Patrol's policies and practices regarding suspicionless, detentive stops, as well as the absence of policies relating to the Fourth Amendment's limitations on detentive stops outside of the border and the border's functional equivalent. There are questions of law and fact common to the class, including:

> a.    Whether Border Patrol has a policy, pattern, or practice of conducting stops without regard to whether reasonable suspicion exists that the person (1) is engaged in an offense against the United States or (2) is a noncitizen unlawfully in the United States; and
>
> b.    Whether Border Patrol's policy, pattern, or practice of conducting stops without regard to whether reasonable suspicion exists that the person (1) is engaged in an offense against the United States or (2) is a noncitizen unlawfully in the United States violates the Fourth Amendment.

315.    Plaintiffs Oscar Morales Cisneros, Wilder Munguia Esquivel, and Yolanda Aguilera Martinez and the class have been directly injured by Defendants' constitutional, statutory, and regulatory violations and are at risk of future harm from continuation of their acts and omissions in failing to adhere to their obligations under the Fourth Amendment.

**B. The Warrantless Arrest Class**

316.    Plaintiffs Oscar Morales Cisneros, Wilder Munguia Esquivel, and Yolanda Aguilera Martinez also seek to represent a class under Federal Rule of Civil Procedure 23(b)(2) consisting of:

All persons whom Border Patrol, since January 6, 2025, has arrested or will arrest without a warrant in this district.

317. The proposed class meets the commonality requirements of Rule 23(a)(2) because all members of the class are subject to Border Patrol's policies and practices regarding warrantless arrests, as well as the absence of policies relating to how an agent should make a probable cause determination of flight risk. There are questions of law and fact common to the class, including:

    a.    Whether Border Patrol has a policy, pattern, or practice of conducting warrantless arrests without probable cause that an individual is likely to escape before a warrant can be obtained for the arrest;

    b.    Whether Border Patrol's policy, pattern, or practice of conducting warrantless arrests without probable cause that an individual is likely to escape before a warrant can be obtained for the arrest violates 8 U.S.C. § 1357(a)(2); and

    c.    Whether Border Patrol's policy, pattern, or practice of conducting warrantless arrests without probable cause that an individual is likely to escape before a warrant can be obtained for the arrest violates 8 C.F.R. § 287.8(C)(2)(II).

318. Plaintiffs Oscar Morales Cisneros, Wilder Munguia Esquivel, and Yolanda Aguilera Martinez and the class have been directly injured by Defendants' statutory and regulatory violations and are at risk of future harm from continuation of their acts and omissions in failing to adhere to their obligations under the 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(C)(2)(II).

## C. The Voluntary Departure Class

319. Plaintiffs Maria Guadalupe Hernandez Espinoza and Juan Vargas Mendez also seek to represent a class under Federal Rule of Civil Procedure 23(b)(2) consisting of:

All persons, who, since January 6, 2025, have been physically present outside of the United States under color of administrative voluntary departure that occurred following an arrest by Border Patrol in this district, and who would have had a plausible basis to contest their removal from the United States under the immigration laws and programs of the Department of Homeland Security had they not been expelled under administrative voluntary departure.

320. The proposed class meets the commonality requirements of Rule 23(a)(2) because all members of the class are subject to Border Patrol's policies and practices regarding voluntary departure. There are questions of law and fact common to the class, including:

a. Whether Border Patrol has a policy, pattern, or practice of denying Class Members sufficient and accurate information so that they can make a knowing and voluntary election of voluntary departure;

b. Whether Border Patrol has a policy, pattern, or practice of providing Class Members with deceptive information, or making misstatements or omissions, about the immigration consequences of voluntary departure, and the rights Class Members waive by agreeing to it; and

c. Whether Border Patrol's policy, pattern, or practice related to voluntary departure violates the Fifth Amendment's Due Process Clause.

321. Plaintiffs Maria Guadalupe Hernandez Espinoza and Juan Vargas Mendez and the class have been directly injured by Defendants, and their injuries are ongoing as a result of Defendants' acts and omissions in failing to adhere to their obligations under the Fifth Amendment.

**D. Allegations Common to All Classes**

322. The proposed classes satisfy the requirements of Federal Rule of Civil Procedure 23(a)(1) because they are sufficiently numerous so as to make joinder impracticable. Border Patrol issued public statements that between January 7 and 10, 2025, its agents arrested at least 78 people within Kern County and the surrounding region as part of "Operation Return to Sender." Upon information and belief, Border Patrol agents subjected many additional community members to unlawful suspicionless stops that did not conclude in arrest. Indeed, local counts place the number of people impacted by "Operation Return to Sender" closer to 200. Upon information and belief, at least 40 people arrested during the raid accepted voluntary departure to Mexico. Border Patrol has publicly stated that it intends to replicate "Operation Return to Sender" in Fresno, Sacramento, and elsewhere in the state, and that it intends to continue making warrantless arrests regardless of an individual's circumstances.

323. The proposed classes meet the typicality requirement of Federal Rule of Civil Procedure 23(a)(3). Individual Plaintiffs' legal claims are typical to all members of the proposed classes. Individual Plaintiffs have no interests separate from those of the classes they seek to represent, and seek no relief other than the relief sought on behalf of each class. Defendants have acted and intend to act in a manner adverse to the rights of the members of the Suspicionless Stop

1  Class, the Warrantless Arrest Class, and the Voluntary Departure Class, making final injunctive

2  and declaratory relief appropriate with regard to each class as a whole.

3      324.    The proposed classes meet the adequacy requirements of Federal Rule of Civil

4  Procedure 23(a)(4). Each putative class representative has committed to fairly and adequately

5  representing the interests of the Suspicionless Search Class, the Warrantless Arrest Class, and the

6  Voluntary Departure Class.

7      325.    Plaintiffs' counsel are experienced in class action, civil rights, and immigrants'

8  rights litigation. Plaintiffs' counsel have the requisite level of expertise to adequately prosecute

9  this case on behalf of Plaintiffs and the proposed classes. Plaintiffs' counsel will fairly and

10  adequately represent the interests of each class.

11                          **FIRST CLAIM FOR RELIEF**
                            **Violation of 8 U.S.C. § 1357(a)(2):**
12            **Warrantless Arrests Without Probable Cause of Flight Risk**

13          **Warrantless Arrest Class and United Farm Workers**

14      326.    Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation

15  in the preceding paragraphs as if fully set forth herein.

16      327.    Defendants arrested Plaintiffs Oscar Morales Cisneros, Wilder Munguia Esquivel,

17  Yolanda Aguilera Martinez, Juan Vargas Mendez, and Maria Guadalupe Hernandez Espinoza, as

18  well as U.F.W. members "Alicia," "Benjamin," and "Carlos" without warrants. Before each arrest,

19  Defendants failed to make an individualized finding of flight risk.

20      328.    Defendants made these arrests without a warrant and without "reason to believe"

21  that they were "likely to escape before a warrant can be obtained for [their] arrest" in violation of 8

22  U.S.C. § 1357(a)(2). These arrests were part of Defendants' policy, pattern, and/or practice of

23  using warrantless arrests during sweeps of areas where people of Latino descent, farm workers,

24  and day laborers live, work, drive, and gather.

25      329.    Defendants do not have a policy or practice for ensuring compliance with the

26  statutory limits of CBP's warrantless arrest authority and do not provide guidance to CBP

27  personnel, including Border Patrol agents, on how to make an individualized determination of

28

likelihood of escape before a warrant can be obtained. Defendants permit Border Patrol agents to make warrantless arrests *carte blanche* in violation of law.

330.    Based on Border Patrol's public statements that it intends to replicate "Operation Return to Sender" elsewhere in California and make "unintended arrests" in sanctuary jurisdictions, along with statements from Tom Homan making clear that mass warrantless arrest operations are consistent with agency-wide policy, Defendants will continue to arrest individuals without regard to whether there is a reason to believe that they are likely to escape before a warrant can be obtained for the arrests, in violation of 8 U.S.C. § 1357(a)(2).

331.    Defendants' policy, pattern, and/or practice of making warrantless arrests without the required individualized flight risk analysis is "final agency action" that is "in excess of statutory jurisdiction, authority, or limitations" under 8 U.S.C. § 1357(a)(2). 5 U.S.C. §§ 704, 706(2)(C).

332.    Defendants' policy, pattern, and/or practice of making warrantless arrests without the required individualized flight risk analysis is *ultra vires* and in excess of statutory authority.

333.    Individual Plaintiffs, the Warrantless Arrest Class, and Plaintiff United Farm Workers have no plain, adequate, or complete remedy at law to address the wrongs described herein. The injunctive and declaratory relief sought by Plaintiffs is necessary to prevent continued and future irreparable injury.

### SECOND CLAIM FOR RELIEF
**Violation of 8 C.F.R. § 287.8(c)(2)(ii):**
**Warrantless Arrests Without Probable Cause of Flight Risk**
**Warrantless Arrest Class and United Farm Workers**

334.    Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

335.    Defendants arrested Plaintiffs Oscar Morales Cisneros, Wilder Munguia Esquivel, Yolanda Aguilera Martinez, Juan Vargas Mendez, and Maria Guadalupe Hernandez Espinoza, as well as U.F.W. members "Alicia," "Benjamin," and "Carlos" without a warrant and without "reason to believe" that they were "likely to escape before a warrant can be obtained" in violation of 8 C.F.R. § 287.8(c)(2)(ii). These arrests were part of Defendants' policy, pattern, and/or practice

of making warrantless arrests during sweeps of areas where people of Latino descent, farm workers, and day laborers live, work, drive, and gather.

336.    Defendants do not have a policy or practice for mandating compliance with the regulatory limits of their warrantless arrest authority and do not provide guidance on how to make an individualized determination of likelihood of escape before a warrant can be obtained. Defendants permit Border Patrol agents to make warrantless arrests *carte blanche* in violation of law.

337.    Based on Border Patrol's public statements that it intends to replicate "Operation Return to Sender" elsewhere in California and make "unintended arrests" in sanctuary jurisdictions, along with statements from Tom Homan making clear that mass warrantless arrest operations are consistent with agency-wide policy, Defendants' will continue to arrest individuals without reason to believe that they are likely to escape before a warrant can be obtained for the arrests, in violation of 8 C.F.R. § 287.8(c)(2)(ii).

338.    Defendants' policy, pattern, and/or practice of making warrantless arrests without the required individualized flight risk analysis is "final agency action" that is "in excess of statutory jurisdiction, authority, or limitations" under 8 C.F.R. § 287.8(c)(2)(ii). 5 U.S.C. §§ 704, 706(2)(C).

339.    Individual Plaintiffs, the Warrantless Arrest Class, and Plaintiff United Farm Workers have no plain, adequate, or complete remedy at law to address the wrongs described herein. The injunctive and declaratory relief sought by Plaintiffs is necessary to prevent continued and future irreparable injury.

### THIRD CLAIM FOR RELIEF
**Fourth Amendment Violation: Stops Without Reasonable Suspicion**

**Suspicionless Stop Class and United Farm Workers**

340.    Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

341.    Except at the border and its functional equivalents, the Fourth Amendment prohibits Defendants from conducting a detentive stop to investigate a person's immigration status without reasonable suspicion that a person is a noncitizen unlawfully in the United States.

342.    Defendants stopped Plaintiffs Oscar Morales Cisneros, Wilder Munguia Esquivel, and Yolanda Aguilera Martinez, Juan Vargas Mendez, and Maria Guadelupe Hernandez Espinoza, as well as U.F.W. members "Alicia," "Benjamin," and "Carlos" in Kern County without reasonable suspicion that any of them was a noncitizen unlawfully in the United States.

343.    Defendants have a policy, pattern, and/or practice of traveling outside the border and its functional equivalents and stopping individuals without regard to reasonable suspicion that they are unlawfully in the United States.

344.    Defendants' policy, pattern, and/or practice of traveling outside the border and its functional equivalents and stopping individuals without regard to reasonable suspicion that the individuals are unlawfully in the United States violates the Fourth Amendment to the United States Constitution.

345.    Individual Plaintiffs, the Suspicionless Stop Class, and Plaintiff United Farm Workers have no plain, adequate, or complete remedy at law to address the wrongs described herein. The injunctive and declaratory relief sought by Plaintiffs is necessary to prevent continued and future irreparable injury.

### FOURTH CLAIM FOR RELIEF
**Fifth Amendment Violation:**
**Voluntary Departure Without a Knowing and Voluntary Waiver of Rights**
**Voluntary Departure Class and United Farm Workers**

346.    Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

347.    Between January 7 and January 10, 2025, Defendants' agents expelled Plaintiffs Juan Vargas Mendez and Maria Guadalupe Hernandez Espinoza, as well as U.F.W. members "Benjamin" and "Carlos" to Mexico via voluntary departure without securing a knowing and voluntary waiver of their rights.

1       348.     Defendants have a policy, pattern, and/or practice of administering voluntary

2   departure without securing a knowing and voluntary waiver of a person's rights before expelling

3   the person via voluntary departure.

4       349.     Defendants' policy, pattern, and/or practice violates the Fifth Amendment, which

5   requires that an individual's waiver of rights in connection with his or her expulsion from the

6   United States be knowing and voluntary.

7       350.     Individual Plaintiffs, the Voluntary Departure Class, and Plaintiff United Farm

8   Workers have no plain, adequate, or complete remedy at law to address the wrongs described

9   herein. The injunctive and declaratory relief sought by Plaintiffs is necessary to redress their

10   ongoing injury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

1. Assume jurisdiction over this matter;

2. Certify this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2);

3. Appoint the undersigned counsel as class counsel pursuant to Federal Rule of Civil Procedure 23(g);

4. Declare that Defendants' actions violate the rights of Plaintiffs and the Suspicionless Stop Class under the Fourth Amendment of the United States Constitution;

5. Declare that Defendants' actions violate the rights of Plaintiffs and the Warrantless Arrest Class under 8 U.S.C. § 1357(a)(2) and the APA;

6. Declare that Defendants' actions violate the rights of Plaintiffs and the Voluntary Departure Class under the Fifth Amendment of the United States Constitution;

7. Declare that Defendants' actions will continue to violate the Fifth Amendment rights of Plaintiff United Farm Workers unless Defendants end their policy and practice of administering voluntary departure without securing a knowing and voluntary waiver of rights;

8.      Issue a preliminary and permanent injunction enjoining further violations of Plaintiffs' and the Suspicionless Stop Class's rights under the Fourth Amendment of the United States Constitution;

9.      Issue a preliminary and permanent injunction enjoining further violations of Plaintiffs' and the Warrantless Arrest Class's rights under 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii);

10.     Vacate Defendants' unlawful policies and practices that violate 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii);

11.     Order that Defendants return Plaintiffs Juan Vargas Mendez and Maria Hernandez Espinoza to the United States in a manner that restores them to the legal position that they held prior to their respective voluntary departures;

12.     Issue a permanent injunction redressing the ongoing violations of Plaintiff Juan Vargas Mendez's and Maria Hernandez Espinoza's rights under the Fifth Amendment of the United States Constitution;

13.     Award reasonable attorneys' fees, costs, and other disbursements permitted under the Equal Access to Justice Act, 28 U.S.C. § 2412, and any other applicable statute; and

14.     Order any and all such other relief as the Court deems just, equitable, and proper.


Date: February 26, 2025                    Respectfully Submitted,

                                           /s/Bree Bernwanger
                                           Bree Bernwanger (SBN 331731)
                                           Michelle (Minju) Y. Cho (SBN 321939)
                                           Lauren Davis (SBN 357292)
                                           Shilpi Agarwal (SBN 270749)
                                           AMERICAN CIVIL LIBERTIES UNION
                                           FOUNDATION OF NORTHERN CALIFORNIA

                                           /s/Mayra Joachin (as authorized Feb. 26, 2025)
                                           Mayra Joachin (SBN 306065)
                                           Eva Bitran (SBN 302081)
                                           Oliver Ma (SBN 354266)
                                           AMERICAN CIVIL LIBERTIES UNION
                                           FOUNDATION OF SOUTHERN CALIFORNIA

*/s/Brisa Velazquez Oatis* (as authorized Feb. 26, 2025)
Brisa Velazquez Oatis (SBN 339132)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SAN DIEGO & IMPERIAL
COUNTIES

*Attorneys for Plaintiffs*

*/s/Ajay S. Krishnan* (as authorized Feb. 26, 2025)
Ajay S. Krishnan (SBN 222476)
Franco Muzzio (SBN 310618)
Zainab O. Ramahi (SBN 332139)
Julia L. Greenberg (SBN 333864)
KEKER, VAN NEST & PETERS LLP

*Attorneys for Plaintiff Oscar Morales Cisneros*