BREE BERNWANGER - # 331731
bbernwanger@aclunc.org
MICHELLE (MINJU) Y. CHO - # 321939
mcho@aclunc.org
LAUREN DAVIS - # 357292
ldavis@aclunc.org
SHILPI AGARWAL - # 270749
sagarwal@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493

MAYRA JOACHIN - # 306065
mjoachin@aclusocal.org
EVA BITRAN - # 302081
ebitran@aclusocal.org
OLIVER MA - # 354266
oma@aclusocal.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SOUTHERN
CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5000

BRISA VELAZQUEZ OATIS - # 339132
bvoatis@aclu-sdic.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SAN DIEGO &
IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
Telephone: (619) 398-4199

*Attorneys for Plaintiffs*

AJAY S. KRISHNAN - # 222476
akrishnan@keker.com
FRANCO MUZZIO - # 310618
fmuzzio@keker.com
ZAINAB O. RAMAHI - # 332139
zramahi@keker.com
JULIA GREENBERG - # 333864
jgreenberg@keker.com
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    415 391 5400
Facsimile:    415 397 7188

*Attorneys For Plaintiff Oscar Morales Cisneros*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| UNITED FARM WORKERS, et al.,<br><br>                     Plaintiffs,<br><br>    v.<br><br>KRISTI NOEM, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF HOMELAND SECURITY; et al.,<br><br>                    Defendants. | Case No. 1:25-cv-00246-JLT-BAM<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:       April 11, 2025<br>Time:      9:00 a.m.<br>Dept.:     Courtroom 4, 7th Floor<br>Judge:    Hon. Jennifer L. Thurston<br><br>Date Filed:  February 26, 2025<br><br>Trial Date:  None set |

1

<h1 style="text-align:center">TABLE OF CONTENTS</h1>

2  I.    INTRODUCTION ............................................................................................1

3  II.   FACTS ..........................................................................................................2

4        A.    Border Patrol's Immigration Sweeps Rely on Unlawful Practices.........................2

5        B.    The Government Plans to Continue Suspicionless Stops and Mass Arrests. ..........6

6  III.  ARGUMENT ................................................................................................7

7        A.    Plaintiffs are Likely to Succeed on the Merits.........................................................7

8              1.    Border Patrol's Practice of Conducting Detentive Stops Without
                     Individualized Suspicion Violates the Fourth Amendment. ......................8

10                   a.    Border Patrol Conducts "Immigration Stops" Without
                           Individualized Reasonable Suspicion. ...............................9

11                         i.    Moving Vehicle Stops Without Reasonable
                                 Suspicion...................................................10

13                         ii.   Pedestrian and Parking Lot Stops Without
                                 Reasonable Suspicion. .......................................11

14                   b.    Border Patrol's Practice of Suspicionless Vehicle,
                           Pedestrian, and Parking Lot Stops Violates the Fourth
                           Amendment...................................................................12

16                   c.    Preliminary Injunctive Relief is Necessary to Protect the
                           Fourth Amendment Rights of Plaintiffs and the Putative
                           Class..........................................................................13

18             2.    Border Patrol's Practice of Effecting Warrantless Arrests Without
                     Evaluating Flight Risk Violates 8 U.S.C. § 1357(a)(2). ..........................15

20                   a.    8 U.S.C. § 1357(a)(2) Requires Agents to Evaluate and
                           Consider Flight Risk Based on Individualized Factors
                           Before Conducting a Warrantless Arrest. ....................15

22                   b.    Border Patrol Has a Practice of Effecting Warrantless
                           Arrests Without Evaluating or Considering a Person's Flight
                           Risk. .........................................................................17

24                   c.    Border Patrol's Practice of Warrantless Arrests Without
                           Assessing Flight Risk Exceeds its Statutory Authority
                           Under § 1357(a)(2). ........................................................19

26       B.    Plaintiffs Will Suffer Irreparable Harm from Border Patrol's Unlawful
               Policies and Practices in the Absence of Injunctive Relief....................................20

27       C.    The Balance of Hardships Weighs Heavily in Plaintiffs' Favor, and an
               Injunction Is in the Public Interest. .........................................................22

IV.    SECURITY ..................................................................................................................24

V.    CONCLUSION ............................................................................................................25

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION
Case No. 1:25-cv-00246-JLT-BAM

2883342

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ...........................................................................7

*Alsaada v. City of Columbus, Ohio*,
2021 WL 3375834 (S.D. Ohio June 25, 2021) ..................................................24

*Ariz. v. U.S.*,
567 U.S. 387 (2012)...........................................................................................15

*Au Yi Lau v. INS*,
445 F.2d 217 (D.C. Cir. 1971) ..........................................................................15

*Benitez-Mendez v. I.N.S.*,
752 F.2d 1309 (9th Cir.) ........................................................................8, 11, 13

*Bravo v. City of Santa Maria*,
665 F.3d 1076 (9th Cir. 2011) ..........................................................................16

*Brendlin v. Cal.*,
551 U.S. 249 (2007)...........................................................................................10

*Ill. v. Wardlow*,
528 U.S. 119 (2000)...........................................................................................13

*Chalk v. U.S. Dist. Court*,
840 F.2d 701 (9th Cir. 1988) ............................................................................21

*Creedle v. Miami-Dade County*,
349 F.Supp.3d 1276 (S.D. Fla. 2018) ...............................................................19

*E. Bay Sanctuary Covenant v. Trump*,
932 F.3d 742 (9th Cir. 2018) ............................................................................19

*Env'tl Prot. Info. Ctr. v. Carlson*,
968 F.3d 985 (9th Cir. 2020) ............................................................................22

*Fla. v. Bostick*,
501 U.S. 429 (1991).......................................................................................9, 12

*Fla. v. Royer*,
460 U.S. 491 (1983).............................................................................................9

*Floyd v. City of New York*,
959 F. Supp. 2d 668 (S.D.N.Y. 2013)...............................................................23

iii

*Haw. v. Trump,*
859 F.3d 741 (9th Cir. 2017) ...................................................................................22

*Hernandez v. Sessions,*
872 F.3d 976 (9th Cir. 2017) ...................................................................................20

*Hodgers–Durgin v. de la Vina,*
199 F.3d 1037 (9th Cir. 1999) (en banc) ...............................................................14

*Int'l Molders' & Allied Workers' Loc. Union No. 164 v. Nelson,*
643 F. Supp. 884 (N.D. Cal. 1986) ...................................................................13, 14

*Int'l Molders' & Allied Workers' Local Union No. 164 v. Nelson,*
799 F.2d 547 (9th Cir. 1986) ...............................................................8, 9, 14, 20

*Jorgenson v. Cassiday,*
320 F.3d 906 (9th Cir. 2003) ...................................................................................24

*LaDuke v. Nelson,*
762 F.2d 1318 (9th Cir. 1985) ..................................................................................9

*League of Wilderness Def. v. Connaughton*
752 F.3d 755 (9th Cir. 2014) ...................................................................................24

*Leiva-Perez v. Holder,*
640 F.3d 962 (9th Cir. 2011) ...................................................................................21

*McKenzie v. Lamb,*
738 F.2d 1005 (9th Cir. 1984) .................................................................................16

*Melendres v. Arpaio,*
695 F.3d 990 (9th Cir. 2012) .........................................................................9, 20, 24

*Melendres v. Arpaio,*
784 F.3d 1254 (9th Cir. 2015) .................................................................................23

*Morales v. Chadbourne,*
793 F.3d 208 (1st Cir. 2015) ...................................................................................15

*Moreno v. Napolitano,*
213 F. Supp. 3d 999 (N.D. Ill. 2016) ......................................................................19

*Mountain High Knitting, Inc. v. Reno,*
51 F.3d 216 (9th Cir. 1995) .....................................................................................15

*Nicacio v. U.S. I.N.S.,*
797 F.2d 700 (9th Cir. 1985) .............................................................................14, 23

*Norsworthy v. Beard,*
87 F. Supp. 3d 1164 (N.D. Cal. 2015) ....................................................................21

*Ramirez v. U.S. Immigr. & Customs Enf't*,
   568 F.Supp.3d 10 (D.D.C. 2021) ...........................................................15, 19

*Riverside All of US or None v. City of Riverside*,
   2023 WL 7751774 (C.D. Cal. Nov. 14, 2023).......................................23

*Roy v. Cnty. of Los Angeles*,
   2018 WL 914773 (C.D. Cal. Feb. 7, 2018) ...........................................19

*Tejeda-Mata v. INS*,
   626 F.2d 721 (9th Cir. 1980) ...............................................................15

*Thomas v. Dillard*,
   818 F.3d 864 (9th Cir. 2016) ............................................................9, 12

*U.S. v. Brignoni-Ponce*,
   422 U.S. 873 (1975)...........................................................2, 8, 10, 13

*U.S. v. Cantu*,
   519 F.2d 494 (7th Cir. 1975) ...............................................................15

*U.S. v. Mendenhall*,
   446 U.S. 544 (1980).............................................................................8

*U.S. v. Montero-Camargo*,
   208 F.3d 1122 (9th Cir. 2000) (en banc) .............................................13

*U.S. v. Rodriguez*,
   976 F.2d 592 (9th Cir. 1992) ...........................................................8, 10

*U.S. v. Rodriguez Sanchez*,
   23 F.3d 1488 (9th Cir. 1994) .........................................................2, 8, 10

*Unnamed Parties v. Johnson*,
   2016 WL 8188563 (D. Ariz. Jan. 3, 2017) ...........................................23

*Warsoldier v. Woodford*,
   418 F.3d 989 (9th Cir. 2005) ...............................................................20

*Wash. v. Trump*,
   847 F.3d 1151 (9th Cir. 2017) .............................................................21

*Westover v. Reno*,
   202 F.3d 475 (1st Cir. 2000) ...............................................................16

*Ybarra v. Ill.*,
   444 US 85 (1979).................................................................................16

*Zepeda v. I.N.S.*,
   753 F.2d 719 (9th Cir. 1983) ...............................................................24

**Federal Statutes**

8 U.S.C. § 1357(a)(2)................................................................................................ *passim*

**Regulations**

8 C.F.R. § 287.5(c)(1) ................................................................................................16

**Other Authorities**

*Castanon Nava v. DHS*, No. 1:18-cv-03757, (N.D. Ill., Feb. 7, 2022), Dkt. 155-1
    (Appendix A: Broadcast Statement of Policy)........................................................16

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
Case No. 1:25-cv-00246-JLT-BAM

2883342

## I.    INTRODUCTION

In January 2025, U.S. Border Patrol agents traveled hundreds of miles inland to Kern County and launched "Operation Return to Sender." Through a nearly weeklong series of raids on the region's highways, city streets, and local businesses, Border Patrol indiscriminately detained and arrested people of color they encountered in agricultural areas and Latino neighborhoods. They made these detentions and arrests on assumptions about the person's skin color or occupation, and without the individualized assessment that the Constitution and federal law require. When people asked why they were being detained or exercised their right to remain silent, Border Patrol agents became violent—slashing tires, smashing car windows, and physically assaulting people they stopped. These practices resulted in the unlawful stops and arrests of U.S. citizens, lawful permanent residents, and undocumented immigrants alike.

This case challenges Border Patrol's recently implemented practices of stopping Latinos *en masse* without reasonable suspicion, arresting them without probable cause, and coercing them into summary expulsion from the United States. The Fourth Amendment prohibits immigration agents from conducting a detentive stop without individualized reasonable suspicion that the person stopped is unlawfully in the country. And federal law limits immigration agents' authority to conduct warrantless immigration arrests, permitting them only when there is probable cause, based on an individualized inquiry, that the person is likely to escape before a warrant can be obtained.

Despite its flagrant violations of the Constitution and federal law, Border Patrol has described "Operation Return to Sender" as a "success from day one." Declaration of Reaghan Braun ("Braun Decl."), Ex. 11. Consistent with Trump Administration Border Czar Tom Homan's plan to "arrest as many as we can," *id.*, Ex. 15, Border Patrol has made its intentions clear: its agents will soon travel inland again and replicate "Operation Return to Sender" in Bakersfield, Fresno, Sacramento, and other areas throughout this District. *See id.*, Exs. 2, 3, 10, 17. And Border Patrol has promised to arrest "even more [people] next time." *Id.*, Ex. 4.

Plaintiffs request a preliminary injunction to ensure that, when Border Patrol conducts operations in this District, it complies with its constitutional and legal duties to refrain from

1

(1) detentive stops without reasonable suspicion that the person stopped is in the country unlawfully, and (2) warrantless arrests without regard to probable cause that the arrestee is likely to escape before a warrant can be obtained. Such an injunction will not disturb Border Patrol's traditional function at the border or its lawful operations in this District. But Border Patrol cannot be permitted to terrorize communities hundreds of miles from the border based on nothing more than race-based assumptions about immigration status.

The Court should grant the requested preliminary injunction in its entirety.

## II.    FACTS

### A.    Border Patrol's Immigration Sweeps Rely on Unlawful Practices.

Congress designed the modern immigration system with a clear division of responsibility: Immigration and Customs Enforcement ("ICE") enforces immigration law in the interior of the United States; Customs and Border Protection ("CBP") and its Border Patrol subdivision does so *at the border*. Braun Decl., Ex. 24 ("The United States Border Patrol is the mobile, uniformed law enforcement arm of U.S. Customs and Border Protection … responsible for securing U.S. borders between ports of entry.").

Outside of the border, the Fourth Amendment prohibits Border Patrol agents from stopping a person unless they have "reasonable suspicion" based on "specific, articulable facts" that the person is a noncitizen "illegally in the country." *U.S. v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975). In making these stops, agents may not rely on "broad profiles which cast suspicion on entire categories of people." *U.S. v. Rodriguez Sanchez*, 23 F.3d 1488, 1492 (9th Cir. 1994). Border Patrol agents are also barred from making warrantless arrests unless the agent has "reason to believe" that (a) the person being arrested "is in the United States in violation of any [immigration] law or regulation" and (b) the person "is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(2).

Border Patrol ignored these requirements in "Operation Return to Sender." Over sixty Border Patrol agents from the U.S. Border Patrol El Centro Sector ("El Centro Border Patrol") traveled hundreds of miles north of the border where they fanned out to raid the community. *See, e.g.*, Braun Decl., Exs. 17, 18; Declaration of Elizabeth Strater ("Strater Decl.") ¶ 15. In vehicle

stops and on foot patrols, Border Patrol agents had a common practice: stop without reasonable suspicion and arrest without assessing flight risk. *See, e.g.*, Strater Decl. ¶¶ 25-29.

In the attached declarations, Plaintiffs document nearly a dozen unlawful stops from "Operation Return to Sender." Each documented encounter began with a detentive stop where there was no lawful basis for reasonable suspicion that the person stopped was unlawfully in the country. As a result, Border Patrol agents stopped people who are lawfully in the country—such as Mr. Ernesto Campos Gutierrez, a U.S. citizen, and Plaintiff Yolanda Aguilera Martinez, a lawful permanent resident—and failed to provide justification for these stops, even when asked. Declaration of Ernesto Campos Gutierrez ("Campos Gutierrez Decl.") ¶¶ 2, 5-9; Declaration of Yolanda Aguilera Martinez ("Aguilera Martinez Decl.") ¶¶ 2, 6-7, 11. Likewise, each of Border Patrol's documented arrests were performed without the legally required probable cause that the person was likely to escape before a warrant could be obtained.

In conducting vehicle stops during the raids, Border Patrol targeted Latino neighborhoods and farm roads in agricultural areas and indiscriminately pulled over cars with non-white drivers and passengers. Declaration of Maria Hernandez Espinoza ("Hernandez Espinoza Decl.") ¶¶ 4, 22; Declaration of Juan Vargas Mendez ("Vargas Mendez Decl.") ¶ 4; Strater Decl. ¶¶ 26, 37-38; Campos Gutierrez Decl. ¶¶ 2, 15. In each instance, Border Patrol agents stopped vehicles that were properly registered, driving well within the speed limit, and obeying traffic laws. Campos Gutierrez Decl. ¶ 3; Vargas Mendez Decl. ¶ 5; Hernandez Espinoza Decl. ¶ 4; Aguilera Martinez Decl. ¶ 4; Strater Decl. ¶¶ 26, 38. For example, United Farm Workers ("UFW") members "Alicia," "Benjamin," and "Carlos" were stopped on their way home along a route commonly taken by farm workers to get to and from their worksites. Strater Decl. ¶ 26. They were traveling within the speed limit and obeying traffic laws. *Id.* Border Patrol agents did not appear to know who was in the car or have any other information about the vehicle beyond its appearance and indicated no other reason for the stop than to ask for "papers." *Id.* ¶ 27.

In parking lots, Border Patrol agents targeted businesses in Latino neighborhoods and businesses that serve farm workers and day laborers. There, they approached non-white drivers in parked cars, blocked them in, and interrogated them about their immigration status. Declaration

of Oscar Morales Cisneros ("Morales Cisneros Decl.") ¶¶ 5-6. Within the parking lots, Border Patrol agents approached non-white people who appeared to be day laborers and questioned them about their immigration status. Declaration of Jesus Ramirez ("Ramirez Decl.") ¶¶ 4, 7 (stopped while standing in Home Depot parking lot); Declaration of Wilder Munguia Esquivel ("Munguia Esquivel Decl.") ¶¶ 5-8 (same); Declaration of Luis Perez Cruz ("Perez Cruz Decl.") ¶¶ 3-4 (same). Border patrol agents conducted these stops with no warrants and provided no explanation for their stops except to demand "papers" or identification. Ramirez Decl. ¶ 5 ("papers"); Munguia Esquivel Decl. ¶ 5 ("papers"); Perez Cruz Decl. ¶ 3 (identification or immigration permits); Morales Cisneros Decl. ¶ 5 (driver's license).

If people declined to answer Border Patrol's questions or demanded to know the basis for their stop, Border Patrol agents turned to violence—smashing windows, slashing tires, and ripping passengers from the cars. Messrs. Perez Cruz and Munguia Esquivel were handcuffed because they declined to answer questions. Perez Cruz Decl. ¶ 3; Munguia Esquivel Decl. ¶¶ 5-8. Mr. Vargas Mendez and Ms. Hernandez Espinoza were both arrested when they did not have their identifications on them. Vargas Mendez Decl. ¶¶ 8, 9; Hernandez Espinoza Decl. ¶¶ 7, 9. Ms. Aguilera Martinez, even after providing her ID, was forced to the ground and handcuffed when she was slow to exit her vehicle—and was only released after she was able to produce an image of her green card, which no agent had asked her about before she was handcuffed. Aguilera Martinez Decl. ¶¶ 7, 10. Border Patrol agents repeatedly smashed car windows if passengers did not roll them down. Id. ¶ 8 (agents threatening to smash partly open window); see also Strater Decl. ¶¶ 39-40 (Border Patrol agents smashed windows in car carrying UFW member); Braun Decl., Exs. 5, 6 (Border Patrol post and comments describing practice of smashing windows). After Mr. Campos Gutierrez was pulled over and provided his identification, a Border Patrol agent demanded that he also turn over his car keys—and when he refused, the agent slashed his tires. Campos Gutierrez Decl. ¶¶ 5-6.

Border Patrol has publicly celebrated these violent escalations, posting pictures on social media of vehicles with glass shattered by agents because a person had "[r]efused to open window

4

1  during an immigration inspection." *Id.*, Ex. 5. El Centro Border Patrol described the image of

2  shattered glass as "FAFO"—meaning, "Fuck Around, Find Out"—"in full effect."[1] *Id.*, Ex. 6.

3        Following these unlawful stops, Border Patrol carried out warrantless arrests without

4  performing any individualized evaluation of flight risk pursuant to § 1357(a)(2). None of the

5  declarants conceivably posed a flight risk—each of them had families, jobs, and established

6  residences in the community for which they were financially responsible. Nevertheless, Border

7  Patrol failed to ask any questions to perform the requisite individualized inquiry. For example,

8  Border Patrol arrested Plaintiff Vargas Mendez, without a warrant and without asking about his

9  family or community ties, and kept him in custody even after he pled with the agents that he has

10  lived in the area for 20 years and his wife and children are U.S. citizens. Vargas Mendez Decl. ¶¶ 2,

11  3, 10-11. Likewise, Border Patrol arrested Mr. Jesus Ramirez, who is the primary caretaker of his

12  minor son, without any inquiry regarding his family and community ties or information to perform

13  an assessment of Mr. Ramirez's flight risk. Ramirez Decl. ¶¶ 6-7. Border Patrol also arrested

14  Plaintiff Wilder Munguia Esquivel without inquiring about his community ties, and even though

15  he had already affirmatively presented himself to immigration authorities through a family-based

16  immigration petition. Munguia Esquivel Dec. ¶ 8. These are not outliers. Border Patrol repeatedly

17  and consistently failed to assess flight risk when it made warrantless arrests. *See also* Perez Cruz

18  Delc. ¶ 4; Morales Cisneros Decl. ¶ 6; Campos Gutierrez Decl. ¶¶ 4, 9; Aguilera Martinez

19  Decl. ¶¶ 6-8; Hernandez Espinoza Decl. ¶ 7; Strater Decl. ¶¶ 29, 41.

20        These unlawful arrests had significant consequences. Border Patrol transported

21  individuals it arrested 300 miles south to the El Centro Border Patrol Station. At the El Centro

22  Station, Border Patrol agents held people in windowless, cold cells without beds or warm

23  blankets, access to showers, hygienic products, or sufficient food; deprived them of sleep, and

24  without access to daylight or any way to tell time—all while ignoring the person's requests to

25  make phone calls or speak to attorneys. *See, e.g.*, Vargas Mendez Decl. ¶¶ 16-19; Hernandez

26  Espinoza Decl. ¶¶ 12-19; Strater Decl. ¶¶ 31-32, *see also* Munguia Esquivel Decl. ¶¶ 14-18;

27

28

---

[1] *Id.*, Ex. 19 (defining "FAFO" after President Trump posted an image using the term).

Morales Cisneros Decl. ¶¶ 12-15. During the same period, Border Patrol agents pressured people in their custody to sign documents without providing the documents in a language or format they could view or read. *Id.* These documents were apparently voluntary departure agreements, which waived the individuals' rights to immigration hearings and facilitated their immediate removal from the country. *Id.* Dozens of residents of Kern County and the surrounding region, including Plaintiffs Vargas Mendez and Maria Guadalupe Hernandez Espinoza, are now stranded in Mexico after Border Patrol coerced them to accept voluntary departure, leaving behind their families, communities, homes, and livelihoods. Hernandez Espinoza Decl. ¶ 21; Vargas Mendez Decl. ¶ 21.

The Plaintiffs and putative class members that remain in the United States have also suffered severe, irreparable harm. This harm has not been limited to undocumented immigrants. Indeed, because Border Patrol's practices unlawfully targeted people based on the color of their skin and their perceived occupations, U.S. Citizens and lawful permanent residents have been stopped and detained. Campos Gutierrez Decl. ¶¶ 2, 5-9; Aguilera Martinez Decl. ¶¶ 2, 6-7, 11; *see also* Strater Decl. ¶¶ 17, 22. Community members are now afraid to leave their homes and send their children to school. Strater Decl. ¶¶ 20-21; Morales Cisneros Decl. ¶ 20; Munguia Esquivel Decl. ¶ 20; Aguilera Martinez Decl. ¶ 12. They have changed jobs and commutes, avoided going to doctor's appointments, and stopped running basic daily errands. Strater Decl. ¶¶ 20–21. Border Patrol's lawless raids have left communities throughout this District in states of perpetual terror.

**B.    The Government Plans to Continue Suspicionless Stops and Mass Arrests.**

Border Patrol has made clear it plans to replicate "Operation Return to Sender" across the state, including announcing plans to continue to conduct unlawful raids of Latino, farm worker, and day laborer communities. El Centro Border Patrol's Chief Patrol Agent Gregory Bovino issued a press statement concerning "Operation Return to Sender," declaring Border Patrol "is no stranger to operations in places like Bakersfield, Stockton, Modesto, Fresno, and Sacramento." Braun Decl., Ex. 17. El Centro Border Patrol has also announced: "We are planning operations for other locals [sic] such as Fresno and especially Sacramento," as well as a return to Bakerfield.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
Case No. 1:25-cv-00246-JLT-BAM

2883342

1    *Id.*, Exs. 3, 10. And in public social media posts promoting "Operation Return to Sender," El

2    Centro Border Patrol has likewise stated that there is "more to come," including ***"return to***

3    ***sender round 2."*** *Id.*, Exs. 1, 12 (emphasis added).

4        Border Patrol has also declared an intention to increase the scope of its unlawful stops and

5    arrests. In response to a Facebook post about "Operation Return to Sender," the El Centro Border

6    Patrol account stated that the agency "will try and catch even more people next time." Braun

7    Decl., Ex. 4. Chief Bovino has publicly committed to increasing the volume of arrests in Border

8    Patrol's sweeps, agreeing that "Operation Return to Sender['s]" arrests were "rookie numbers"

9    and that El Centro Border Patrol should "pump those numbers up." *Id.*, Ex. 14.

10       These comments illustrate Defendants' newly implemented practice to indiscriminately

11   arrest people of color without adhering to constitutional and statutory requirements. Indeed, all of

12   the above statements are consistent with Trump Administration Border Czar Tom Homan's recent

13   promise that undocumented immigrants, regardless of individual circumstances, are "going to get

14   arrested" "if they're in the country illegally." *Id.*, Ex. 15.

15   **III.    ARGUMENT**

16       Plaintiffs are entitled to a preliminary injunction if they can show (1) they are "likely to

17   succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of

18   preliminary relief," (3) "the balance of equities tips in [their] favor," and (4) "an injunction is in

19   the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)

20   (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Even if Plaintiffs raise

21   only "serious questions" as to the merits of their claims, the court can grant relief if the balance of

22   hardships tips "sharply" in Plaintiffs' favor, and the remaining equitable factors are satisfied. 632

23   F.3d at 1135. Here, both standards are satisfied as Plaintiffs are likely to succeed on the merits,

24   likely to suffer irreparable harm, and the equitable factors tip sharply in their favor. This Court

25   should grant the requested preliminary injunction.

26       **A.    Plaintiffs are Likely to Succeed on the Merits.**

27       An injunction is warranted here because Border Patrol's practices violate the Fourth

28   Amendment and federal law. *First,* Border Patrol's practice of conducting detentive stops without

7

1  reasonable suspicion that a person is in the country unlawfully violates the Fourth Amendment.

2  *Second*, Border Patrol's practice of effecting warrantless arrests without evaluating flight risk

3  violates the limit on warrantless arrests that Congress imposed in § 1357(a)(2).

4  **1.    Border Patrol's Practice of Conducting Detentive Stops Without Individualized Suspicion Violates the Fourth Amendment.**

5  The Fourth Amendment protects "[t]he right of the people to be secure in their

6  persons . . . against unreasonable searches and seizures." "Except at the border and its functional

7  equivalents," immigration agents may stop private vehicles and pedestrians traveling on foot only

8  after identifying "specific articulable facts, together with rational inferences from those facts, that

9  reasonably warrant suspicion that [the persons stopped are noncitizens] who may be illegally in

10  the country." *See U.S. v. Brignoni-Ponce*, 422 U.S. 873 (1975) (vehicle stops); *Benitez-Mendez v.*

11  *I.N.S.*, 752 F.2d 1309, 1311 (9th Cir.), *amended*, 760 F.2d 907 (9th Cir. 1983) (pedestrians). If "a

12  reasonable person would [believe] that he was not free to leave," even a brief stop to question a

13  person about their immigration status constitutes an unreasonable seizure absent reasonable

14  suspicion that the person is in the country unlawfully. *See U.S. v. Mendenhall*, 446 U.S. 544, 554

15  (1980).

16  Reasonable suspicion is an individualized inquiry that "must be founded upon a

17  particularized and objective basis for suspecting *the particular person* stopped." *U.S. v.*

18  *Rodriguez*, 976 F.2d 592, 595 (9th Cir. 1992), *opinion amended on denial of reh'g*, 997 F.2d

19  1306 (9th Cir. 1993) (emphasis in original). Reasonable suspicion cannot be based "on broad

20  profiles which cast suspicion on entire categories of people without any individualized suspicion

21  of the particular person to be stopped." *U.S. v. Rodriguez Sanchez*, 23 F.3d 1488, 1492 (9th Cir.

22  1994). Nor can reasonable suspicion be based on criteria "likely to sweep many ordinary citizens

23  into a generality of suspicious appearance." *Rodriguez*, 976 F.2d 592, 595–96.

24  When immigration agencies have engaged in a practice of violating these strictures

25  through suspicionless detentive stops or arrests, courts have enjoined them from continuing to do

26  so. In *Int'l Molders' & Allied Workers' Local Union No. 164 v. Nelson*, for example, the Ninth

27  Circuit upheld a preliminary injunction against Border Patrol for workplace raids that involved

28

8

1   detaining and arresting people without the threshold suspicion or cause. 799 F.2d 547, 551 (9th

2   Cir. 1986); *see also LaDuke v. Nelson*, 762 F.2d 1318, 1324 (9th Cir. 1985), *amended,* 796 F.2d

3   309 (9th Cir. 1986) (upholding permanent injunction against warrantless searches of workplace

4   housing); *cf. Melendres v. Arpaio*, 695 F.3d 990, 1000 (9th Cir. 2012) (upholding injunction

5   against state detention practice for civil immigration offenses).

6          Plaintiffs are likely to succeed in demonstrating that Border Patrol violated the Fourth

7   Amendment through its practice of carrying out suspicionless stops.

8                  a.      **Border Patrol Conducts "Immigration Stops" Without
                           Individualized Reasonable Suspicion.**

9          Border Patrol's unlawful practice of conducting detentive stops based on categorical race-

10  and occupation-based assumptions rather than individualized reasonable suspicion in violation of

11  the Fourth Amendment is evidenced by its conduct in "Operation Return to Sender." During the

12  operation, Border Patrol agents stopped and detained people of color who were standing, walking,

13  or driving through agricultural areas, Latino neighborhoods, and businesses to ask for their

14  "papers" without reasonable suspicion that the person was violating an immigration law.

15         Plaintiffs document nearly a dozen stops during "Operation Return to Sender," all of which

16  were made without reasonable suspicion. Border Patrol often stopped vehicles without knowledge

17  about their occupants and stopped pedestrians without questioning them at all. In other instances,

18  Board Patrol escalated stops by smashing windows, slashing tires, or arresting individuals when

19  they exercised their right to remain silent. In both the vehicle and foot patrol context, longstanding

20  precedent makes clear that a person's refusal to consent to questioning "does not furnish the

21  minimal level of objective justification needed for a detention or seizure," *Fla. v. Bostick*, 501 U.S.

22  429, 437 (1991), and thus cannot justify even a "momentar[y]" detention, *Fla. v. Royer*, 460 U.S.

23  491, 498 (1983). *See also Thomas v. Dillard*, 818 F.3d 864, 884 (9th Cir. 2016).

24         As detailed further below, Border Patrol's "Operation Return to Sender" illustrates an

25  unlawful practice that systematically dispenses with the Fourth Amendment's requirement of

26  individualized suspicion and engages instead in "the wholesale seizure of miscellaneous persons."

27

28

1  *U.S. v. Rodriguez*, 976 F.2d 592, 596 (9th Cir. 1992), *opinion amended on denial of reh'g*, 997

2  F.2d 1306 (9th Cir. 1993).

3             **i.      Moving Vehicle Stops Without Reasonable Suspicion.**

4             Any vehicle stop initiated by a law enforcement officer constitutes a seizure of the driver

5  and all passengers. *Brendlin v. Cal.*, 551 U.S. 249, 251 (2007). The Fourth Amendment forbids

6  "stopping vehicles at random to inquire if they are carrying [noncitizens] who are illegally in the

7  country," *Brignoni–Ponce*, 422 U.S. at 884, and stops based on categorical assumptions rather

8  than individualized suspicion, *Rodriguez Sanchez*, 23 F.3d at 1492.

9             Plaintiff and witness declarations submitted with this motion show how, during

10 "Operation Return to Sender," Border Patrol repeatedly and consistently targeted moving vehicles

11 driven by people of color in agricultural areas and Latino neighborhoods. *See* Hernandez

12 Espinoza Decl. ¶¶ 4, 22 (Latino farm workers driving home from work); Campos Gutierrez Decl.

13 ¶¶ 2, 15 (man of color hauling gardening equipment); Morales Cisneros Decl. ¶¶ 3-4, 22

14 (construction worker of color in Latino neighborhood); Vargas Mendez Decl. ¶ 4 (farm workers

15 driving home from work); Strater Decl. ¶¶ 26, 37-38 (farm workers driving home from work).

16            The Border Patrol agents conducting these stops did not know who was in the car, and

17 stated no reason for the stops other than to demand "papers" from vehicle occupants. *See*

18 Hernandez Espinoza Decl. ¶ 7 (asking passengers for identification and whether they had

19 "papers"); Aguilera Martinez Decl. ¶ 6 ("I need to see your papers"); Morales Cisneros Decl. ¶¶

20 5-6 (asking if driver had "papers" and was here legally); Vargas Mendez Decl. ¶ 8 (demanding

21 identification); Campos Gutierrez Dec. ¶ 4 (demanding identification); Strater Decl. ¶ 27 (asking

22 for "papers"). Border Patrol agents did not appear to have any other reason for their stops. Agents

23 stopped vehicles that were properly registered, driving well within the speed limit, obeying traffic

24 laws, and driven by U.S. citizens and lawful permanent residents, among others. Campos

25 Gutierrez Decl. ¶ 3; Vargas Mendez Dec. ¶ 5; Hernandez Espinoza Decl. ¶ 4; Aguilera Martinez

26 Decl. ¶ 4; Strater Decl. ¶¶ 17, 26, 38; Campos Gutierrez Decl. ¶ 2; Aguilera Martinez Decl. ¶ 2.

27            Border Patrol agents also demonstrated a pattern of escalating stops needlessly and

28 without justification. For example, when Ms. Aguilera Martinez presented a valid California

10

driver's license, an agent incorrectly declared that it was "fuckin' fake" and demanded that she exit her vehicle, again with no explanation. Aguilera Martinez Decl. ¶ 6. As she moved slowly out of the vehicle, the agent grabbed her, forced her to the ground, handcuffed her, and placed her in the back of an SUV—and the agent only released her significantly later after she produced an image of her green card. *Id.* ¶¶ 7, 10. Similarly, when Mr. Vargas Mendez—who had been a passenger, not a driver—was not carrying an ID he could produce, agents grabbed him, dragged him out of the vehicle, and handcuffed him. Vargas Mendez Decl. ¶¶ 8, 9. Likewise, Border Patrol agents approached the car of UFW member "Fernando," pounded on the doors and windows, and within seconds, smashed its windows with baton-like sticks. Strater Dec. ¶ 39. After Mr. Campos Gutierrez presented agents with a REAL-ID compliant driver's license, an agent demanded that he turn over his car keys, and when he refused, the agent slashed the car's tires. Campos Gutierrez Decl. ¶¶ 5-6; *see also* Strater Decl. ¶¶ 39-40 (Border Patrol agents smashing car window); Braun Decl., Ex. 5 (Border Patrol describing practice of smashing car windows). In all of these instances, Border Patrol demonstrated an unlawful practice of stopping vehicles and violently engaging with passengers despite not having any reasonable suspicion.

### ii.    Pedestrian and Parking Lot Stops Without Reasonable Suspicion.

During "Operation Return to Sender," Border Patrol agents repeatedly performed pedestrian and parking lot stops without reasonable suspicion. *Benitez-Mendez*, 752 F.2d at 1311. These stops consistently targeted people of color in Latino neighborhoods and at businesses where farm workers and day laborers shop and eat. Morales Cisneros Decl. ¶ 4 (construction worker using water filling station at liquor store in Latino neighborhood); Ramirez Decl. ¶ 4 (day laborer at Home Depot); Munguia Esquivel Decl. ¶ 4 (same); Perez Cruz Decl. ¶ 3 (painter at Home Depot). At a Chevron gas station where farm workers often stop for breakfast on their way to pick oranges, the store manager who witnessed Border Patrol agents during "Operation Return to Sender" observed: "[I]t was only Hispanics and field workers that [Border Patrol agents] were putting aside. … It's just random people that are walking in that work in the field." Braun Decl., Ex. 16; *see also id.*, Ex. 23.

11

These warrantless pedestrian and parking lot stops had no individualized basis to support them. For example, before even speaking to him, Border Patrol agents blocked Mr. Morales Cisneros's parked car from behind and approached him from the drivers' side door. Morales Cisneros Decl. ¶ 4. Likewise, before speaking with him, Border Patrol agents surrounded Mr. Ramirez in the Home Depot parking lot with their vehicles, such that it was not possible for Mr. Ramirez to leave. Ramirez Decl. ¶ 4. Border Patrol agents provided no explanation for these stops except to demand people's "papers" or IDs. Ramirez Decl. ¶ 5 (demanding "papers"); Munguia Esquivel Decl. ¶ 5 (asking if he had "papers"); Perez Cruz Decl. ¶ 3 (demanding ID or immigration permits); Morales Cisneros Decl. ¶ 5 (demanding driver's license).[2]

Border Patrol agents also demonstrated a practice of unlawfully escalating stops when individuals exercised their right to remain silent in response to questioning. For example, Border Patrol agents began handcuffing Mr. Perez Cruz solely for remaining silent during voluntary questioning, telling him they would arrest him regardless of whether he provided identification. Perez Cruz Decl. ¶ 3. When Mr. Munguia Esquivel refused to consent to voluntary questioning and stated he was exercising his right to remain silent, an agent grabbed him, forcibly removed Mr. Munguia Esquivel's wallet from his pants pocket, and handcuffed him. Munguia Esquivel Decl. ¶¶ 5-8. And when Mr. Morales Cisneros—who had provided Border Patrol agents with a valid California driver's license when asked for his ID—refused to answer their question of whether he had "papers," Border Patrol agents arrested him. Morales Cisneros Decl. ¶¶ 5-6. Refusal to answer an agent's question, without more, does not create reasonable suspicion justifying an arrest. *See Bostick*, 501 U.S. at 437; *Thomas*, 818 F.3d at 884.

> **b.** **Border Patrol's Practice of Suspicionless Vehicle, Pedestrian, and Parking Lot Stops Violates the Fourth Amendment.**

Common across each of these examples is the utter lack of any objective basis for individualized suspicion before conducting a stop for the purpose of investigating immigration status. This practice violates well-established Fourth Amendment law forbidding government

---

[2] In some cases, Border Patrol agents used face coverings and did not identify themselves. When Border Patrol agents surrounded Mr. Munguia Esquivel, for example, he feared the Border Patrol agents were criminals who intended to mug or kidnap him. Munguia Esquivel Decl. ¶ 5.

12

1   agents from "stopping vehicles at random to inquire if they are carrying [noncitizens] who are

2   illegally in the country," *Brignoni–Ponce*, 422 U.S. at 884, and from performing suspicionless

3   detentive stops outside of vehicles, *Benitez-Mendez*, 752 F.2d at 1311. Such stops—which are at

4   best random, and at worst, motivated by the perceived race or ethnicity of the people stopped—

5   have been adopted wholesale by Border Patrol in "Operation Return to Sender."

6          In its statements on social media, Border Patrol has purported to justify its indiscriminate

7   sweeps by claiming categorically that, just as "every U.S. city [is] a border town," Braun Decl.,

8   Ex. 9, "Bakersfield is now a dyed in the wool border town," *id.*, Ex. 7. But the Ninth Circuit has

9   warned against geographic justifications for stops that apply "to entire neighborhoods or

10  communities in which members of minority groups regularly go about their daily business"—as

11  Border Patrol has done here. *U.S. v. Montero-Camargo*, 208 F.3d 1122, 1138 (9th Cir. 2000) (en

12  banc); *c.f. Ill. v. Wardlow*, 528 U.S. 119, 123–24 (2000) ("presence in an area of expected

13  criminal activity" insufficient for reasonable suspicion).

14         Indeed, in a community like Kern County, where over half of the population are "Hispanic

15  or Latino," Braun Decl, Ex. 25, "Hispanic appearance is … of such little probative value that it

16  may not be considered as a relevant factor where particularized or individualized suspicion is

17  required." *U.S. v. Montero-Camargo*, 208 F.3d 1122, 1135 (9th Cir. 2000). Even in cities along

18  the U.S.-Mexico Border, the Supreme Court held that suspicionless stops violate the Fourth

19  Amendment because it was "confident" that even in those cities, "substantially all of the

20  traffic . . . is lawful and that relatively few . . . residents have any connection with the illegal entry

21  and transportation of aliens." *Brignoni–Ponce*, 422 U.S. at 882. This logic applies with even

22  greater force hundreds of miles from the land border in Kern County and other Central Valley

23  counties where Border Patrol has announced plans to continue its "Operation Return to Sender."

24  *See* Braun Decl., Exs. 10, 17 (stating intent to carry out further operations in Bakersfield, Fresno,

25  and Sacramento).

26                    **c.      Preliminary Injunctive Relief is Necessary to Protect the Fourth
                               Amendment Rights of Plaintiffs and the Putative Class.**

27         Border Patrol's unlawful violations here are systemic practices that warrant preliminary

28  injunctive relief to protect Plaintiffs and the putative class. In *Int'l Molders' & Allied Workers'*

1  *Loc. Union No. 164 v. Nelson*, the Ninth Circuit upheld a preliminary injunction issued against

2  the now-defunct Livermore Border Patrol Sector based on strikingly similar facts. 799 F.2d 547,

3  551 (9th Cir. 1986). *International Molders'* arose out of "Project Jobs," a weeklong series of

4  workplace raids that Border Patrol conducted in Northern California. *Int'l Molders' & Allied*

5  *Workers' Loc. Union No. 164 v. Nelson*, 643 F. Supp. 884, 899 (N.D. Cal. 1986). The tactics of

6  "Project Jobs" mirror those used in "Operation Return to Sender": agents detained people before

7  questioning them; arrested people who refused to answer questions; and detained and arrested

8  workers—including U.S. citizens—without first developing the threshold level of suspicion. *See*

9  *id.* at 899–901. The Ninth Circuit affirmed the issuance of a classwide preliminary injunction

10  because "the record support[ed] . . . a finding of an evident systematic policy and practice of

11  Fourth Amendment violations by [Border Patrol]" rather than "[a]n ambiguous, isolated incident

12  [not warranting] injunctive relief." *Int'l Molders'*, 799 F.2d at 551 (internal quotation marks and

13  citations omitted).

14  Similarly, in *Nicacio v. U.S. I.N.S.*, the Ninth Circuit affirmed an injunction requiring

15  Border Patrol to document in writing the "particularized reasonable suspicion" for traffic stops of

16  "persons of Hispanic appearance" after the court determined Border Patrol had "engaged in a

17  pattern of unlawful stops to interrogate persons of Hispanic appearance traveling by automobile

18  on Washington highways." 797 F.2d 700, 701, 706 (9th Cir. 1985), *overruled in part on other*

19  *grounds by Hodgers–Durgin v. de la Vina*, 199 F.3d 1037, 1045 (9th Cir. 1999) (en banc).

20  Here, just as in the above cases, Border Patrol's pattern of immigration stops without

21  regard to the Fourth Amendment's threshold standard is not an "ambiguous, isolated incident,"

22  but rather constitutes a "systemic policy and practice of Fourth Amendment Violations." *Int'l*

23  *Molders'*, 799 F.2d at 551. Just as the Border Patrol's actions in the *International Molders'* raids

24  showed a "systemic" practice based on evidence of consistent constitutional violations, Plaintiffs

25  here have provided declarations showing Border Patrol's practice across a dozen illegal

26  suspicionless stops and arrests in "Operation Return to Sender." And Border Patrol's own

27  statements attempting to justify their conduct and touting the tactics used in "Operation Return to

28  Sender" further cement the systemic nature of these illegal practices. Braun Decl., Ex. 7

14

1  (justifying interior sweeps by calling Bakersfield a "dyed in the wool border town" despite its

2  location hundreds of miles from the border), Exs. 4, 11 (touting the success of Operation Return

3  to Sender as a "success from day one" and stating they "will try and catch even more people next

4  time"). Injunctive relief is necessary to prevent Border Patrol from continuing these unlawful

5  practices.

6  **2.    Border Patrol's Practice of Effecting Warrantless Arrests Without Evaluating Flight Risk Violates 8 U.S.C. § 1357(a)(2).**

7  Congress has codified a strong preference that immigration arrests be based on warrants in

8  the Immigration and Nationality Act. *See Ariz. v. U.S.*, 567 U.S. 387, 407–08 (2012). Congress

9  afforded immigration agents with limited authority to conduct warrantless arrests under 8 U.S.C.

10  § 1357(a)(2). The statute does not authorize indiscriminate round-ups, even where an immigration

11  agent has established probable cause that a noncitizen is unlawfully in the country. Under the

12  statute, an immigration agent can conduct a warrantless arrest **only if** he or she has "reason to

13  believe" that the noncitizen is "likely to escape before a warrant can be obtained for his arrest."

14  *Id*. "Reason to believe," as used in the statute, is equated with "the constitutional requirement of

15  probable cause." *Tejeda-Mata v. INS*, 626 F.2d 721, 725 (9th Cir. 1980); *see also Morales v.*

16  *Chadbourne*, 793 F.3d 208, 216 (1st Cir. 2015) ("Courts have consistently held that the 'reason to

17  believe' phrase in § 1357 … must be considered the equivalent of probable cause."); *U.S. v.*

18  *Cantu*, 519 F.2d 494, 496 (7th Cir. 1975) (same); *Au Yi Lau v. INS*, 445 F.2d 217, 222 (D.C. Cir.

19  1971) (same). As with constitutional violations, widespread refusal to follow statutory

20  responsibilities warrants injunctive relief. *See, e.g.*, *Ramirez v. U.S. Immigr. & Customs Enf't*,

21  568 F.Supp.3d 10, 35 (D.D.C. 2021) (issuing classwide permanent injunction for ICE's

22  widespread failure to comply with statutory obligation).

23  **a.    8 U.S.C. § 1357(a)(2) Requires Agents to Evaluate and Consider Flight Risk Based on Individualized Factors Before Conducting a Warrantless Arrest.**

24

25  Section 1357(a)(2)'s requirement that Border Patrol agents establish probable cause of

26  flight risk before conducting a warrantless arrest "is always seriously applied." *Cantu*, 519 F.2d at

27  496–97; *see also Mountain High Knitting, Inc. v. Reno*, 51 F.3d 216, 218 (9th Cir. 1995) (holding

28  § 1357(a)(2) requires particularized finding of likelihood of escape before a warrantless

1  immigration arrest); *Westover v. Reno*, 202 F.3d 475, 479–80 (1st Cir. 2000) (holding

2  immigration agent was in "direct violation" of § 1357(a)(2) where no evidence existed that

3  noncitizen was likely to escape before a warrant could be obtained).

4      "Mere suspicion, common rumor, or even strong reason to suspect are not enough" to

5  establish probable cause. *McKenzie v. Lamb*, 738 F.2d 1005, 1008 (9th Cir. 1984) (citing *Henry v.*

6  *U.S.*, 361 US 98, 101 (1959)). Rather, the facts an officer relies on to establish probable cause

7  must be "particularized with respect to that person." *Ybarra v. Ill.*, 444 US 85, 91 (1979).

8  Categorical assumptions based on a person's demographic characteristics or the conclusion that a

9  person fits a certain "profile" are insufficient. *See Bravo v. City of Santa Maria*, 665 F.3d 1076,

10 1085 (9th Cir. 2011) (assumptions about gang members insufficient to establish probable cause).

11     Consistent with these longstanding precedents, DHS has adopted explicit requirements for

12 agents in the field when they conduct warrantless arrests. In 2022, as part of a lawsuit settlement,

13 DHS issued a "Broadcast Statement of Policy" setting forth requirements for evaluation and

14 documentation of flight risk that constitute "the underlying laws and policies applicable to all

15 arrests effected under 8 U.S.C. § 1357(a)(2)." Braun Decl., Ex. 26 ("Broadcast Statement of

16 Policy"); *see also Castanon Nava v. DHS*, No. 1:18-cv-03757, Appendix A: Broadcast Statement

17 of Policy, Dkt. 155-1, (N.D. Ill., Feb. 7, 2022). That statement concerns "all arrests effected under

18 8 U.S.C. § 1357(a)(2)," including those made by Border Patrol. *See* 8 C.F.R. § 287.5(c)(1) (listing

19 Border patrol agents as subject to § 1357(a)(2)).

20     Under this "Broadcast Statement of Policy"—***DHS's own interpretation of § 1357(a)(2)'s***

21 ***warrantless arrest requirements***—immigration officers must consider the totality of the

22 circumstances in evaluating an individual's "likelihood of escape," including an individual's

23 community ties (such as their family, home, or employment), an individual's prior escapes or

24 evasions of immigration authorities, and the immigration officer's ability to determine the

25 individual's name. *See* Braun Decl., Ex. 26 (Broadcast Statement of Policy) at 1. The policy is

26 clear that "[m]ere presence within the United States in violation of U.S. immigration law is not,

27 by itself, sufficient to conclude that [a noncitizen] is likely to escape before a warrant for arrest

28 can be *obtained*." *Id.* (emphasis in original).

16

The policy further requires that immigration officers who have made a warrantless arrest document the facts and circumstances surrounding the warrantless arrest "as soon as practicable." *Id.* at 2. The documentation must include, among other things, "the specific, particularized facts supporting the conclusion that the alien was likely to escape before a warrant could be obtained." *Id.* For warrantless arrests that occur after a vehicle stop, the immigration agent must also document the "specific, articulable facts that formed the basis for the … reasonable suspicion that an alien in the vehicle stopped was [unlawfully] present within the United States." *Id.* at 3.

> **b.    Border Patrol Has a Practice of Effecting Warrantless Arrests Without Evaluating or Considering a Person's Flight Risk.**

The circumstances surrounding the arrests of the Plaintiffs, UFW members, and members of the putative class described in the declarations accompanying this motion are the product of Border Patrol's highly coordinated practice to arrest as many undocumented immigrants as possible, regardless of their individual circumstances. As illustrated in the numerous declarations Plaintiffs have submitted, Border Patrol made no individualized assessment of flight risk when conducting warrantless arrests during "Operation Return to Sender."

For example, Plaintiff Juan Vargas Mendez was arrested following a traffic stop during which he was a passenger in a car driving under the speed limit. Vargas Mendez Decl. ¶¶ 5-12. After he did not produce his identification, agents dragged him out of the van; took his phone, wallet, and medication; handcuffed him, and called him a "Mexican bitch[]." *Id.* ¶ 10. Without questioning him on his ties to Kern County, the agents then placed him in the back of an SUV and drove him to a Border Patrol detention center. *Id.* ¶¶ 10-12. As the agents drove him away, Mr. Vargas Mendez pleaded with the agents that he had lived in the area for 20 years, had a wife and four children who are all citizens, and that he had no criminal record. *Id.* ¶ 11. An agent responded that he "did not care" and that Mr. Vargas Mendez "was going to Mexico." *Id.*

This experience was not unique to Mr. Vargas Mendez. Plaintiff Wilder Munguia Esquivel was arrested midday outside a Home Depot after he exercised his right to remain silent. Munguia Esquivel Decl. ¶¶ 5-10. After Mr. Munguia Esquivel declined to answer the agent's questions, the agent began to yell at him, forcefully grabbed him, patted him down, and

17

1    handcuffed him. *Id.* Another agent then placed him in the backseat of a vehicle. *Id.* ¶ 9. At no

2    point did either agent ask about Mr. Munguia Esquivel's community ties, such as his family,

3    work history, or length of residency. *Id.* ¶ 8. Had they, Mr. Munguia Esquivel would have told

4    them that his brother is a U.S. citizen and he has a pending family-based immigration petition. *Id.*

5        Similarly, Mr. Ernesto Campos Gutierrez—who is a U.S. citizen—was arrested following

6    a traffic stop in which the agent slashed his truck's tires because, after he had provided his

7    driver's license, he refused to immediately turn over his keys as well. Campos Gutierrez

8    Decl. ¶¶ 3-9. At no point prior to his arrest did any Border Patrol agent present a warrant or ask

9    Mr. Campos Gutierrez about his community ties. *Id.* ¶¶ 4, 9; *see also* Perez Cruz Decl. ¶ 4

10   (arrested without any questioning concerning community ties); Ramirez Decl. ¶¶ 6-7 (same);

11   Morales Cisneros Decl. ¶ 6 (same); Hernandez Espinoza Decl. ¶¶ 5, 7 (same); Strater Decl. ¶¶ 29

12   (Border Patrol agents asked "Alicia" if she had children only to offer to remove the children to

13   Mexico with her and arrested "Benjamin" and "Carlos" without any questioning concerning

14   community ties), 41 (arrested "Fernando" without any questioning about community ties).

15       Border Patrol's arrests without probable cause of flight risk swept up decades-long

16   community residents with no criminal history, including parents, grandparents, and homeowners.

17   *See* Aguilera Martinez Decl. ¶¶ 2-3 (45-year Kern County resident, mother, and grandmother with

18   no criminal history); Munguia Esquivel Decl. ¶ 2 (12-year Kern County resident with no criminal

19   history); Hernandez Espinoza Decl. ¶¶ 2-3 (10-year Kern County resident, mother, and

20   grandmother, with no criminal history); Morales Cisneros Decl. ¶¶ 2-3 (Bakersfield homeowner,

21   father, and grandfather, with no criminal history).

22       These indiscriminate arrest practices, executed without assessment of community ties or

23   flight risk, are consistent with policy statements made by federal government leadership. For

24   example, Trump Administration Border Czar Tom Homan recently declared that undocumented

25   immigrants, regardless of individual circumstances, are "going to get arrested" "if they're in the

26   country illegally." Braun Decl., Ex. 15. Similarly, Chief Bovino has stated that, if Border Patrol

27   encounters "undocumented" immigrants "we will arrest." *Id.*, Ex. 13; *see also id.*, Ex. 8. And El

28   Centro Border Patrol stated its intent to continue to effect warrantless arrests regardless of

18

1  individual circumstances, posting on Facebook: "[A]nyone we encounter who doesn't have the

2  legal right to be in or remain in the U.S. will be arrested." *Id*., Ex. 1. In light of these statements,

3  there is no doubt Border Patrol will continue its unlawful practices absent Court intervention.

      **c.**      **Border Patrol's Practice of Warrantless Arrests Without**
4                     **Assessing Flight Risk Exceeds its Statutory Authority Under**
5                     **§ 1357(a)(2).**

6       DHS has clearly stated in its "Broadcast Statement of Policy" that § 1357(a)(2) requires

7  immigration officers executing warrantless arrests to evaluate an individual's "likelihood of

8  escape" by considering the totality of the circumstances. Border Patrol "may not rewrite clear

9  statutory terms"—or DHS directives—"to suit its own sense of how the statute should operate."

10  *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 774 (9th Cir. 2018), quoting *Util. Air*

11  *Regulatory Grp. v. EPA*, 573 U.S. 302, 328 (2014).

12       Courts have uniformly applied this maxim to invalidate agency practices that disregard

13  § 1357(a)(2)'s flight risk provision. Where, as here, an immigration agency "make[s] no

14  determination whatsoever that the subject of [an arrest] is likely to escape … before a warrant can

15  be obtained, … [the agency] goes beyond its statutory authority to make warrantless arrests."

16  *Moreno v. Napolitano*, 213 F. Supp. 3d 999, 1008 (N.D. Ill. 2016) (granting summary judgment

17  on plaintiffs' claim that ICE policy of issuing detainers without regard to flight risk violated

18  § 1357(a)(2)).[3] And where, as here, there is evidence of an agency's ongoing systemic violations

19  of a statute, an injunction is appropriate to prevent ongoing violations. *See Ramirez v. U.S.*

20  *Immigr. & Customs Enf't*, 568 F.Supp.3d 10, 35 (D.D.C. 2021) (issuing classwide permanent

21  injunction forcing ICE to comply with statute requiring its officers to consider less-restrictive

22  placement alternative before transferring detained children to adult detention centers when they

23  turned 18). Injunctive relief is necessary to prevent Border Patrol from continuing to violate

24  § 1357(a)(2) through its practice of conducting warrantless arrests without assessing flight risk.

25

26

27  _____

[3] *See also Roy v. Cnty. of Los Angeles*, 2018 WL 914773, at *21 (C.D. Cal. Feb. 7, 2018) (same);
28  *Creedle v. Miami-Dade County*, 349 F.Supp.3d 1276, 1295 (S.D. Fla. 2018) (same).

**B.    Plaintiffs Will Suffer Irreparable Harm from Border Patrol's Unlawful Policies and Practices in the Absence of Injunctive Relief.**

Border Patrol's illegal policies and practices are causing and will continue to cause irreparable harm to Plaintiffs and the putative class—regardless of their immigration status. "[T]he deprivation of constitutional rights unquestionably constitutes irreparable injury." *Melendres*, 695 F.3d at 1002. "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Warsoldier v. Woodford*, 418 F.3d 989, 1001–02 (9th Cir. 2005) (quotations and citation omitted). A practice of conducting detentive stops without regard to reasonable suspicion in violation of the Fourth Amendment constitutes such a constitutional violation warranting preliminary relief. *See Int'l Molders'*, 799 F.2d at 553; *see also Melendres*, 695 F.3d at 1002 (irreparable harm exists where plaintiffs face "a real possibility" that they will "again be stopped or detained and subjected to unlawful detention"); *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017) (irreparable harm where plaintiffs were detained and highlighting the "irreparable harms imposed on anyone subject to immigration detention").

As a result of "Operation Return to Sender," Plaintiffs and members of the putative class have experienced significant harm. Following their detentions and arrests, Plaintiffs and putative class members are scared to leave their homes, go to work, accompany or send their children to school, go to the doctor, and run even the basic errands. Morales Cisneros Decl. ¶¶ 20, 22; Munguia Esquivel Decl. ¶ 20; Aguilera Martinez Decl. ¶ 12; Strater Decl. ¶¶ 35, 43; Perez Cruz Decl. ¶ 7; Campos Gutierrez Decl. ¶ 15. Although she is a lawful permanent resident, Ms. Aguilera Martinez experiences fear and anxiety when she drives near the place of her arrest and areas where Border Patrol has arrested other people, and she is terrified at the thought of being arrested again. Aguilera Martinez Decl. ¶ 12. Similarly, Mr. Morales Cisneros feels nervous leaving his home, fears showing his face, and often wears a sweater with a hood in an attempt to cover his skin color when he runs errands. Morales Cisneros Decl. ¶ 22; *see also* Munguia Esquivel Decl. ¶ 20 (terrified to go near the Home Depot where he was arrested); Strater Decl. Decl. ¶¶ 35, 42, 44 (UFW members report experiencing enormous stress and anxiety when

2883342

traveling to and from work and fear being separated from family members). Courts regularly hold that such emotional distress constitutes irreparable injury. *See, e.g.*, *Chalk v. U.S. Dist. Court*, 840 F.2d 701, 709–10 (9th Cir. 1988); *Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1192 (N.D. Cal. 2015).

Many members of the putative class have young children, and they are terrified of being swept up by Border Patrol and separated from their families. *See, e.g.*, *Wash. v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017) (identifying "separated families" as irreparable harm); *Leiva-Perez v. Holder*, 640 F.3d 962, 969–70 (9th Cir. 2011). This fear is consistent regardless of immigration status. The indiscriminate nature of Border Patrol's unlawful stop and arrest practices means that a person with lawful status or a pending immigration application—like Plaintiff Aguilera Martinez or Plaintiff Munguia Esquivel—still risks being stopped and detained with no notice to their children or family. For example, UFW members with employment authorization documents, such as H-2A agricultural visas, T-visas, or deferred action status, fear that Border Patrol will seize them for removal without regard to their authorized status. Strater Decl. ¶ 17. UFW member "Gabriela," who has legal authorization to work in the United States, has a daughter and eight grandchildren. *Id.* ¶ 42. She provides care to her grandchildren, and her daughter often relies on her to take them to appointments or pick them up from school. *Id.* She does not know who would care for her loved ones if she were detained—even for a brief period. *Id.* ¶ 44. Yet as a farm worker, she has to commute through the agricultural areas Border Patrol targets with its unlawful stop and arrest practices. *Id.*; *see also id.* ¶¶ 30, 34 (UFW member Benjamin abruptly separated from his four small children; UFW member Alicia must now raise her four children alone, living in fear that she will be subjected to Border Patrol's illegal policies and practices again); Ramirez Decl. ¶ 15 (sole living parent separated from children); Morales Cisneros Decl. ¶¶ 2, 4-6, 17-19 (separated from children for four days while detained incommunicado); Vargas Mendez Decl. Decl. ¶ 22 (separated from his four children, including his stepson who has epilepsy and for whom he is a caretaker).

Border Patrol's policies and practices also erode trust in local law enforcement. As former CBP Commissioner Chris Magnus recognized, "[t]hese roundups create widespread distrust of

21

law enforcement and discourage many community members from reporting crimes as victims or witnesses." Braun Decl., Ex. 20. This is true for Plaintiffs, who have developed ongoing fear of law enforcement officials, including local police officers. For example, Ms. Aguilera Martinez has experienced fear and flashbacks of her violent arrest when she has seen Bakersfield police officers drive by. Aguilera Martinez Decl. ¶ 13. Mr. Morales Cisneros no longer feels comfortable calling 911 if there is an emergency because he fears the local police will call Border Patrol to arrest him. Morales Cisneros Decl. ¶ 22.

Across party lines, elected officials have spoken out about the harm Border Patrol's practices continue to cause across the Central Valley. Fresno County supervisor Luis Chavez reported that in the wake of Border Patrol's wave of arrests in Kern County, he had "received reports of food processing facilities [with] absences of 15 to 20 [percent] locally." Braun Decl., Ex. 22. Republican Congressman David G. Valadao, representing California's 22nd Congressional District, released a statement urging Border Patrol "to avoid causing any further alarm among our farm workers" and avoid targeting "those responsible for producing our nation's food supply." *Id.*, Ex. 21.

In the face of these criticisms, Border Patrol has doubled down on its commitment to "Operation Return to Sender." Days after the raids, El Centro Border Patrol posted on social media that there is "more to come," including **"return to sender round 2."** *Id.*, Exs. 1, 12 (emphasis added). According to El Centro Border Patrol, the next round of "Operation Return to Sender" raids will take place in "Fresno and especially Sacramento," as well as a return to Bakerfield. *Id.*, Exs. 3, 10. Chief Bovino and El Centro Border Patrol have promised to "try and catch even more people next time" and "pump those numbers up." *Id.*, Exs. 4, 14. Plaintiffs and the putative class members will continue to suffer irreparable harm absent court intervention.

C.   **The Balance of Hardships Weighs Heavily in Plaintiffs' Favor, and an Injunction Is in the Public Interest.**

When, as here, the government is a party, courts consider the balance of equities and the public interest together. *Env'tl Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 991 (9th Cir. 2020). In doing so, courts consider the effect of granting or denying the injunction on each party. *Haw. v.*

*Trump*, 859 F.3d 741, 783 (9th Cir. 2017).

Plaintiffs' proposed injunctive relief is narrowly tailored to address the unlawful practices at issue. Plaintiffs are not asking that the Court enjoin Border Patrol from enforcing federal immigration laws. Plaintiffs merely ask the Court to order that Border Patrol take the minimal steps necessary to ensure that its stop and arrest practices comply with the Fourth Amendment and § 1357(a)(2). To that end, Plaintiffs request an injunction that requires: (i) Border Patrol in this District to: (i) refrain from detentive stops without reasonable suspicion that the person stopped is unlawfully present and warrantless arrests without probable cause that the person is likely to escape before a warrant can be obtained; (ii) timely document the reasonable suspicion that underlies detentive stops they make; (iii) comply with DHS's "Broadcast Statement of Policy" concerning § 1357(a)(2) when making warrantless arrests, including documenting the probable cause that underlies those arrests; (iv) provide that reasonable suspicion and probable cause documentation to Plaintiffs' counsel on a regular schedule; (v) develop guidance concerning how Border Patrol agents should determine whether "reasonable suspicion" exists when conducting detentive stops; and (vi) train agents on these requirements.

Such injunctive relief is standard in cases where there is a practice of widespread constitutional violations by a government agency. *See, e.g.*, *Nicacio*, 797 F.2d 700, at 706 (affirming injunction requiring Border Patrol to document the "particularized reasonable suspicion" for traffic stops of "persons of Hispanic appearance"); *Melendres v. Arpaio*, 784 F.3d 1254, 1266 (9th Cir. 2015) (affirming injunction requiring, among other things, additional training on racial profiling for local law enforcement and the development of a system that collected traffic stop data, including audio and video recordings); *Floyd v. City of New York*, 959 F. Supp. 2d 668, 682, 689 (S.D.N.Y. 2013) (ordering preliminary injunction requiring NYPD to begin documenting the bases for stops in narrative form and develop "a formal written policy specifying the limited circumstances in which it is legally permissible to stop a person outside a [Trespass Affidavit Program] building on a suspicion of trespass"); *Unnamed Parties v. Johnson*, 2016 WL 8188563 (D. Ariz. Jan. 3, 2017) (granting preliminary injunction requiring quarterly production of Border Patrol data related to injunction's terms), *aff'd sub nom. Doe v. Kelly*, 878

23

F.3d 710 (9th Cir. 2017); *Riverside All of US or None v. City of Riverside*, No. 5:23-CV-01536-SPG-SP, 2023 WL 7751774, at *7 (C.D. Cal. Nov. 14, 2023) (granting preliminary injunction requiring the City of Riverside to refrain from any practices that are not in compliance with the city's stated policies); *Alsaada v. City of Columbus, Ohio*, No. 2:20-CV-3431, 2021 WL 3375834, at *2 (S.D. Ohio June 25, 2021) (granting preliminary injunction requiring, among other things, that the City of Columbus ensure that body and vehicle cameras are in good working order and used during every interaction with nonviolent protesters). The requested injunctive relief is both standard in cases like this one and necessary to prevent further irreparable harm to Plaintiffs.

Unlike Plaintiffs, Defendants will suffer no material harm, let alone any threat of permanent harm, should this Court grant Plaintiffs' injunction. *See League of Wilderness Def. v. Connaughton* 752 F.3d 755, 761 (9th Cir. 2014) (concluding the balance of harms tips towards plaintiffs "because the harms they face are permanent" whereas the opposing party faced only temporary delay). The requested injunctive relief does not prevent Defendants from lawfully carrying out their duties; it merely requires them to document their compliance with the law. *Cf. Zepeda v. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983) (explaining that an agency "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations").

As "it is always in the public interest to prevent the violation of a party's constitutional rights," *Melendres*, 695 F.3d at 1002, the balance of harms and the public interest support preliminary injunctive relief in this case.

## IV.    SECURITY

No security is necessary here. "Courts may dispense with the filing of a bond when … there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Jorgenson v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003). Such is the case here. Defendants will incur no harm from complying with Plaintiffs' proposed preliminary injunction.

1    **V.    CONCLUSION**

2         For the foregoing reasons, the Court should grant Plaintiffs' motion and issue the

3    requested preliminary injunction in its entirety.

4

5    Dated: March 7, 2025                    AMERICAN CIVIL LIBERTIES UNION
                                             FOUNDATION OF NORTHERN
6                                            CALIFORNIA

7                                    By:    */s/ Bree Bernwanger*
8                                           BREE BERNWANGER
                                            MICHELLE (MINJU) Y. CHO
9                                           LAUREN DAVIS
                                            SHILPI AGARWAL
10

11   Dated: March 7, 2025            By:    AMERICAN CIVIL LIBERTIES UNION
                                            FOUNDATION OF SOUTHERN
12                                           CALIFORNIA

13                                          */s/ Mayra Joachin* (as authorized March 7,
                                            2025)
14                                          MAYRA JOACHIN
                                            EVA BITRAN
15                                          OLIVER MA

16   Dated: March 7, 2025            By:    AMERICAN CIVIL LIBERTIES UNION
17                                           FOUNDATION OF SAN DIEGO &
                                            IMPERIAL COUNTIES

18                                          */s/ Brisa Velazquez Oatis* (as authorized
19                                          March 7, 2025)
                                            BRISA VELAZQUEZ OATIS
20
                                            *Attorneys for Plaintiffs*
21

22   Dated: March 7, 2025                    KEKER, VAN NEST & PETERS LLP

23

24                                   By:    */s/ Ajay S. Krishnan* (as authorized March
                                            7, 2025)
25                                          AJAY S. KRISHNAN
                                            FRANCO MUZZIO
26                                          ZAINAB O. RAMAHI
                                            JULIA GREENBERG
27
                                            *Attorneys For Plaintiff Oscar Morales*
28                                          *Cisneros*

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION
Case No. 1:25-cv-00246-JLT-BAM

2883342