| | |
|---|---|
| BREE BERNWANGER - # 331731<br>bbernwanger@aclunc.org<br>MICHELLE (MINJU) Y. CHO - # 321939<br>mcho@aclunc.org<br>LAUREN DAVIS - # 357292<br>ldavis@aclunc.org<br>SHILPI AGARWAL - # 270749<br>sagarwal@aclunc.org<br>AMERICAN CIVIL LIBERTIES UNION<br>FOUNDATION OF NORTHERN<br>CALIFORNIA<br>39 Drumm Street<br>San Francisco, CA 94111<br>Telephone: (415) 621-2493<br><br>MAYRA JOACHIN - # 306065<br>mjoachin@aclusocal.org<br>EVA BITRAN - # 302081<br>ebitran@aclusocal.org<br>OLIVER MA - # 354266<br>oma@aclusocal.org<br>AMERICAN CIVIL LIBERTIES UNION<br>FOUNDATION OF SOUTHERN<br>CALIFORNIA<br>1313 West 8th Street<br>Los Angeles, CA 90017<br>Telephone: (213) 977-5000 | BRISA VELAZQUEZ OATIS - # 339132<br>bvoatis@aclu-sdic.org<br>AMERICAN CIVIL LIBERTIES UNION<br>FOUNDATION OF SAN DIEGO &<br>IMPERIAL COUNTIES<br>P.O. Box 87131<br>San Diego, CA 92138-7131<br>Telephone: (619) 398-4199<br><br>*Attorneys for Plaintiffs*<br><br>AJAY S. KRISHNAN - # 222476<br>akrishnan@keker.com<br>FRANCO MUZZIO - # 310618<br>fmuzzio@keker.com<br>ZAINAB O. RAMAHI - # 332139<br>zramahi@keker.com<br>JULIA GREENBERG - # 333864<br>jgreenberg@keker.com<br>Keker, Van Nest & Peters LLP<br>633 Battery Street<br>San Francisco, CA 94111-1809<br>Telephone:    415 391 5400<br>Facsimile:     415 397 7188<br><br>*Attorneys For Plaintiff Oscar Morales Cisneros* |

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| UNITED FARM WORKERS, et al.,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>KRISTI NOEM, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF HOMELAND SECURITY; et al.,<br><br>　　　　　Defendants. | Case No. 1:25-cv-00246-JLT-BAM<br><br>**DECLARATION OF ELIZABETH STRATER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:　　　April 11, 2025<br>Time:　　　9:00 a.m.<br>Dept.:　　　Courtroom 4, 7th Floor<br>Judge:　　　Hon. Jennifer L. Thurston<br><br>Date Filed: February 26, 2025<br><br>Trial Date:  None set |

DECLARATION OF ELIZABETH STRATER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 1:25-cv-00246-JLT-BAM

2884265

I, Elizabeth Strater, declare:

1. I serve as Director of Strategic Campaigns and National Vice President of the United Farm Workers of America ("UFW"). I have worked for UFW since 2017 and have been National Vice President since I was elected by a Convention of farm worker union members in September 2024. As a member of the elected Union Executive Board, I help direct the union's work in organizing, negotiating, public campaigns, rulemaking, legislative campaigns and wide-reaching advocacy on behalf of farm workers.

2. As Director of Strategic Campaigns, I direct campaigns on behalf of farm workers to empower them to improve their safety, wages, working conditions and to underscore their basic human dignity. An important part of my role is to humanize the essential contributions of farm workers and to protect the rights of UFW's membership, the majority of whom are immigrants. I have detailed knowledge about UFW's membership demographics, membership criteria, member needs and priorities, and how members direct UFW's mission and advocacy. As part of my role as Director of Strategic Campaigns and National Vice President, I regularly hear from UFW members about their safety, wages, working conditions, immigration issues, and other concerns members face in their communities. I also hear these concerns communicated through UFW organizers who speak directly with members and report to the Board. In recent weeks, I have heard from numerous members about the impact of Operation Return to Sender.

3. I make this statement based upon personal knowledge, files, and documents of UFW that I have reviewed, as well as information supplied to me by employees of UFW whom I believe to be reliable. These files, documents, and information are of a type that is generated in the ordinary course of our business and that I would customarily rely upon in conducting UFW's business. If called as a witness, I could testify truthfully to these facts.

**Background on UFW**

4. UFW is the first and largest farm worker union in the country. It represents thousands of migrant and seasonal farm workers in various agricultural occupations throughout the United States. It is headquartered in Kern County in Keene, California.

5. As of February 2025, UFW has approximately 7,000 members.

6. UFW members reside throughout the country. California is home to more UFW members than any other state. In California, UFW members reside across the entire state: as far south as San Diego County and as far north as Sonoma County, with the highest density in the Central Valley region. UFW members also live in counties across the Eastern District of California, including Fresno County, Kern County, Madera County, Merced County, San Joaquin County, Solano County, Stanislaus County, and Tulare County.

7. UFW membership is voluntary and consists of various categories of members. Among these, contributing or associate members are individuals who make a monthly or annual contribution of a designated amount to UFW. Dues-paying members are those who benefit from a UFW collective bargaining agreement. In addition to these categories, UFW recognizes other forms of membership, including full-time employees who have been employed for at least two years, individuals recognized as martyred members due to their sacrifice in the struggle for social justice, honorary members who are family members of martyred members, and retired members who contribute voluntarily after leaving active employment.

8. Generally, individuals seeking to become contributing or associate members of UFW complete an official application, which is reviewed and processed by UFW staff for approval. Dues-paying members become members through the procedures set forth in the California Agricultural Labor Relations Act or other applicable laws, their collective bargaining agreements, and union rules.

9. UFW members play an important role in deciding what activities UFW engages in as an organization. At the UFW's quadrennial Constitutional Convention, members introduce and vote on motions to govern and guide the union's work, and to elect the Union Executive Board. On an ongoing basis, UFW members respond to surveys, provide feedback, and participate in advisory meetings (known as "consejo de base" in Spanish) to actively participate in the Union's decisions. UFW has created various programs in response to members' feedback and requests. For example, in 2008, in response to requests from our members, we created educational scholarships for students who are working toward an undergraduate degree and are either eligible UFW members or their dependents in California, Oregon, and Washington state.

10. UFW membership comes with a variety of benefits. Dues-paying members receive protections from collective bargaining in which UFW engages on their behalf. Through an established negotiating committee comprised of workers, UFW members negotiate benefits such as medical insurance, pension, wages, paid time off, working conditions, seniority, right to recall, equipment provisions and other terms of employment. Contributing or associate members (also called "direct" members) receive accidental life insurance of $4000, access to UFW discounts with private businesses, and other benefits. In addition, for services that prioritize agricultural workers, UFW direct membership establishes eligibility.

11. Founded in 1962 by Cesar Chavez, Dolores Huerta, Larry Itliong and other leaders, UFW was created from the merger of workers' rights organizations to form one union. Our mission is to improve the lives, wages, and working conditions of agricultural workers and their families.

12. To fulfill our mission, UFW engages in collective bargaining, worker education, advocacy, state and federal legislation, and public campaigns. Our stated values are integrity, "Sí se puede" attitude, dignity, and innovation. We promote total nonviolence as a core tenet. As a result of UFW's work, thousands of agricultural workers are protected under UFW contracts. UFW has also sponsored and advocated for legal reforms to protect all farm workers at the state and federal level, including related to overtime pay, heat safety, pesticides safety, COVID-19 protections, and other policies to protect farmworkers and advance their rights.

13. As part of this work, UFW is a national leader in the movement for immigration reform and immigrants' rights. For example, in 2022, UFW's President Teresa Romero participated in the House Education and Labor Subcommittee on Workforce Protections hearing titled "Second Class Workers: Assessing H2 Visa Program Impact on Workers." The H2-A visa applies to seasonal farm workers. At this hearing, President Romero advocated for legislation that would provide such farm workers with a path to citizenship and called on the federal government and Congress to establish heat standards to protect farm workers from preventable heat deaths. We have also spearheaded national public campaigns and congressional lobbying efforts to raise

public awareness of the critical role migrant farm workers play in our communities and economy and advocate for immigration reform, including a path to citizenship for farm workers.

14. UFW members reach out to us to seek assistance, advocacy, advice, and information. My team is in constant contact with its membership through in-person meetings, emails, phone calls, text messages, and social media, among other platforms. Members guide the organization at Conventions and quarterly consejo de base (advisory) meetings and will reach out to union staff, including me and my direct reports, on a daily basis via text message, phone, social media, email or at a UFW office.

**UFW Members Were Harmed by "Operation Return to Sender" and Fear Harm from Future Border Patrol Operations**

15. Based on my reports from members about their experiences with "Operation Return to Sender," I understand that during the week of January 6, 2025, Border Patrol agents based in El Centro, Imperial County, fanned across Kern County and the surrounding region and arrested dozens of individuals as part an operation they dubbed "Return to Sender." They appeared to target certain populations for federal immigration enforcement, including farm workers commuting to and from work on highways and roads near agricultural operations. As described below, at least two UFW members were pulled over, arrested, detained, forced to accept "voluntary" departure, and expelled to Mexico within days, leaving behind, between them, seven young children in the U.S.

16. Based on my reports from members and their families, I understand that Border Patrol's operation has caused widespread panic among UFW members across California, and even in Oregon and Washington. On the days of the raids, many UFW members were already at work and heard about Border Patrol's activities through word-of-mouth. Fearing they could be targeted, many of them remained in the fields until late at night, afraid to drive home on highways where Border Patrol might indiscriminately pull them over, arrest and detain them, and seek to expel them from the country.

17. I also understand that the panic and fear described above were, and are, felt by UFW members of diverse immigration statuses because, based on UFW's institutional and direct

4

DECLARATION OF ELIZABETH STRATER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 1:25-cv-00246-JLT-BAM

2884265

understanding with such raids, Border Patrol's practices target non-white and/or Spanish-speaking farm workers broadly, with little regard to whether particular farm workers have lawful presence or deep ties to the local community. For instance, UFW members who are long-time lawful permanent residents nevertheless feel anxious about being swept up in future raids because of reports that Border Patrol's operation indiscriminately arrested people even if they had U.S. citizenship or lawful permanent residence. UFW members with employment authorization documents, such as those with H-2A temporary agricultural visas, T-visas, Temporary Protected Status, Deferred Action for Labor Enforcement, or Deferred Action for Childhood Arrivals, similarly express fear to me and my team that Border Patrol will seize, arrest, and/or detain them for removal without regard to their authorization to be in the U.S.

18.     In response to "Operation Return to Sender" and the harms it inflicted on UFW members, we mobilized quickly to support our members. We connected members with immigration attorneys and helped them identify where their loved ones were being detained. We aided farm workers by helping to arrange travel between their homes and Border Patrol's detention centers, often hundreds of miles away. When breadwinners were detained or summarily expelled from the country, we assisted affected families in locating emergency food, diapers, and infant formula supplies needed for survival.

19.     In the aftermath of "Operation Return to Sender," many UFW members read news reports that leaders in the El Centro Border Patrol Sector expressed their plans to execute future operations in the interior of the country, including as far north as the California-Oregon state border line.

20.     I also understand based on my reports from members and their families that the fear of future immigration enforcement operations similar to "Operation Return to Sender" has deeply affected UFW members and has prompted many of them to change how they arrange their lives. For example, many UFW members no longer commute to and from work in the same vehicle as their spouses, and whenever possible, no longer run daily errands together. Some members used to work at the same worksite as their spouses; after the raids, either the member or

their spouse changed jobs to reduce the likelihood of both spouses being arrested simultaneously during a workplace raid or Border Patrol roving patrol along their commute.

21. Many UFW members have young children. They are terrified of being swept up in a raid and separated from their children, who may have no one to take care of them. In the days after the raids, many members kept their children home from school or daycare and avoided going to doctor's appointments, church, or the store, paralyzed by the fear of being arrested with no notice. Members with young children have arranged for a trusted community member to pick their children up from school or daycare to minimize the risk of being detained, arrested, or taken away by Border Patrol in front of their children. Members who are parents of school aged children are reluctant to attend school meetings in case of an indiscriminate raid, hindering them from being an active participant in their child's education. These members leave for work each day scared they will not come home to their children because of another enforcement action by Border Patrol or other immigration authorities.

22. As a result of Border Patrol's January operation, and Border Patrol's statements that they will replicate their operations elsewhere in California, many UFW members, regardless of the stability or permanence of their immigration status, fear that future operations will again target farm workers, especially those who appear non-white. They are terrified that Border Patrol will—again—arrest people without warrants and without regard to how long someone has been living in the community or the family members they have waiting for them, including young children; that Border Patrol will—again—detain people, regardless of immigration status, in a detention facility without the ability to contact their family members or an attorney; and that Border Patrol will pressure or deceive individuals to agree to voluntary departure unknowingly and involuntarily, separating them from their family members, homes, and all they have worked for without even a chance to say goodbye or arrange their affairs.

23. I also understand based on my reports from members and their families, of Border Patrol's tactics during "Operation Return to Sender" quickly circulated among the UFW community. These reports and videos left many UFW members feeling deeply fearful, regardless of the stability or permanence of their immigration status. Our members have expressed their

alarm that, like during "Operation Return to Sender," Border Patrol agents conducting any future operation will run roughshod over their constitutional rights if they attempt to assert them during a stop, seizure, arrest, and/or detention.

24. Because of "Operation Return to Sender" and the deep harms it inflicted on farm worker families and communities, UFW members feel chilled from exercising their right to speak up about workplace abuses or wage theft. They are scared that speaking up will attract negative attention to themselves, and that a vengeful employer could call immigration enforcement to report them. They feel the risks of being separated from their families and expelled from their homes are too great.

**Stories of UFW Members Harmed By "Operation Return to Sender" and Who Fear Harm From Future Operations**

*Alicia, Benjamin, and Carlos*

25. Through my role as National Vice President in the ordinary course of UFW's business, I received reports of UFW members impacted by "Operation Return to Sender," including "Alicia,"[1] who is a farmworker and UFW member who lives in Kern County, California with her four school-age children, her husband, UFW member "Benjamin," and her brother-in-law, UFW member "Carlos." Alicia had lived with "Benjamin," until Border Patrol agents coerced him into "voluntary" departure and expelled him to Mexico as part of "Operation Return to Sender." Alicia and Benjamin have lived and worked in Kern County for the past 10 years working in berry, table grape, almond, and citrus agriculture.

26. On January 7, 2025 at about 2:00 p.m., Alicia was in a car with Benjamin and "Carlos," on their way home from the citrus orchards where they all worked together. They were on Highway 99, a common route for farm workers to get to rural roads where their worksites are located. They were traveling within the speed limit and obeying traffic laws.

27. Alicia, Benjamin, and Carlos all noticed one marked and two unmarked vehicles were parked on the shoulder with police-style lights on the grill. When Alicia, Benjamin, and

---

[1] To protect the privacy and security of our members, I am using fictitious names to identify them.

Carlos's car passed these vehicles, the vehicles left the shoulder, pulled up behind them, and signaled with their lights for them to pull over. They complied. Several men approached the car and asked Alicia, Benjamin, and Carlos if they had "papers." Upon information and belief, these were Border Patrol agents. The agents did not appear to know who was in the car, and did not appear to have any reason for pulling the car over, other than to ask for "papers." In light of the police-style lights that the agents used, Alicia, Benjamin, and Carlos did not feel like they were free to leave.

28. After asking for "papers," the Border Patrol agents arrested Alicia, Benjamin, and Carlos. They did not present a warrant for arrest. They did not ask any further questions.

29. After they had handcuffed her, the agents asked Alicia if she had family. When she told them she had children, an agent "offered" to go pick up the children so they could all be taken to Mexico together. The men did not ask Benjamin or Carlos about their ties to the community or otherwise conduct an assessment of flight risk.

30. The men transported Alicia, Benjamin, and Carlos to a large tent on the outskirts of Bakersfield, which appeared to have been set up as a mobile processing center. The Border Patrol agents said they would be detained for many months. Alicia begged the agents to release her, explaining that she had four young children that needed to be picked up from daycare and no one else to care for them. An agent called the daycare to speak to a teacher and confirm Alicia was telling the truth. After confirming it, the agent released her, hours after she had been arrested.

31. Border Patrol agents transported Benjamin and Carlos to the El Centro Border Patrol Station, where they were detained in cold, windowless cells. Border Patrol agents did not provide Benjamin or Carlos with any hygiene items and gave them only a thin aluminum sheet for warmth. It was impossible for Benjamin or Carlos to sleep because the lights in the cell were on day and night and there was nothing to lie down on except hard, cold concrete.

32. Border Patrol agents forced Benjamin and Carlos into accepting voluntary departure. When Benjamin and Carlos indicated they did not want to agree to voluntary departure, Border Patrol agents deliberately displayed their weapons as a show of intimidation. Scared, Benjamin and Carlos signed where they were told. Border Patrol agents never informed

Benjamin or Carlos that taking "voluntary" departure involved waiving their right to a hearing in immigration court, nor did they inform them of the consequences of voluntary departure, including that it could result in a 3-year or 10-year period of inadmissibility. Instead, Border Patrol agents also lied to Benjamin and Carlos before they signed, and claimed that "voluntary" departure would make it easier for them to return to the U.S. Benjamin and Carlos signed their names on a small screen that had space only for their signature. Border Patrol did not show them the documents they were signing nor provide them any documents in English or Spanish.

33. Neither Benjamin nor Carlos understood what voluntary departure was. No one explained to them that voluntary departure meant they could be barred from returning to the U.S. for years. No one explained the rights they would have had in an immigration court hearing. If they had understood their rights, and the consequences of voluntary departure, neither Benjamin nor Carlos would have signed the documents. They would have insisted on an opportunity to see a judge.

34. Border Patrol's actions tore Alicia's, Benjamin's, and Carlos's lives apart. Benjamin is stranded in Mexico, forcing Alicia to raise their four children alone. While she grieves her separation from her husband, she also must manage their household alone and care for her children without her husband's presence or support. Alicia does not know how she will provide for her children on a single income. Alicia and Benjamin still feel shocked by what happened to them. Both are experiencing profound sadness over their family's separation.

35. Alicia continues to work as a farm worker in the Kern County area. She cannot avoid the locations Border Patrol targets in its immigration sweeps. She must travel through agricultural areas to get to and from work. She cannot avoid getting gas or running errands at stores in Bakersfield, including in locations where other farm workers shop and gather. She feels enormous stress and anxiety that because she cannot avoid these locations, Border Patrol agents will seize her again, regardless of whether they have the requisite reasonable suspicion to do so, and will arrest her again regardless of whether she poses a flight risk. She fears Border Patrol agents will force her into voluntary departure, like they forced her husband and brother-in-law. If she is expelled from the country, her children will be left without a parent in the United States.

Alicia cannot bear the thought of being separated from her children the way she has been separated from her husband.

36. Benjamin is worried for his children, two of whom are still in diapers. He is devastated that he is separated from and unable to support his wife and his children, as he knows they are struggling without him.

*Fernando*

37. Through my role as National Vice President in the ordinary course of UFW's business, I also received a report of how "Operation Return to Sender" impacted "Fernando," a farm worker and UFW member who has lived in Kern County for around 20 years. Fernando has raised a family with his wife, supporting his family by working in the fields.

38. On January 9, 2025, Fernando was in a car driving home after work on a public road between Bakersfield and Mettler, California. They were traveling within the speed limit and obeying traffic laws. On the highway, traveling on a route commonly taken by agricultural workers when traveling between orchard worksites and farm worker communities, a truck turned on flashing lights and signaled for their car to pull over.

39. When Fernando's car came a stop, several men jumped out of their vehicles and approached the car, yelling in an intimidating manner. Upon information and belief, these were Border Patrol agents. They grabbed the handles of the locked car doors and pounded on the closed windows. They warned Fernando and his companions that if they did not open the windows, they would smash the glass. The passengers, including Fernando, sat still and did not respond. In Spanish, the Border Patrol agents began counting down backwards from "five." When they reached "one," they smashed the windows using a black baton-like stick, causing shards of broken glass to fall all over the car's occupants. The time from approaching the vehicle to smashing the windows was approximately 15 seconds.

40. The agents reached through the broken windows to unlock the car doors and forcefully dragged Fernando and other passengers out of the car and onto the side of the highway. The agents arrested Fernando. The vehicle was impounded.

41.     The agents did not identify themselves, did not appear to know Fernando was, and did not appear to have any reason for pulling the car over, other than to target its passengers for federal immigration enforcement. The agents did not present a warrant for arrest or ask Fernando anything about his family, community ties, employment, or other factors related to his likelihood of flight risk.

*Gabriela*

42.     Through my role as National Vice President in the ordinary course of UFW's business, I also understand how "Operation Return to Sender" impacted "Gabriela" is a farm worker and UFW member who has lived in Fresno for 22 years. Gabriela has a daughter and eight grandchildren. Gabriela helps her daughter with childcare when her daughter had doctor's appointments or needs assistance picking up the children from school. Gabriela has worked as a farm worker in the stone fruit, table grape, and persimmon orchards, and the bell peppers and tomato fields in the San Joaquin Valley for over 20 years. Gabriela has legal authorization to work in the United States. Gabriela feels anxiety and fear that she will be subjected to Border Patrol's unlawful practices when Border Patrol follows through on its threat to bring "Operation Return to Sender" to her community in Fresno. Gabriela is an active member of her community and has heard other farm workers express the same fears.

43.     Gabriela cannot avoid traveling through and visiting the types of locations that Border Patrol targeted in "Operation Return to Sender." Gabriela must drive in and around the Fresno region, including on highways and in agricultural areas, to commute to and from work. She fills up her car with gas, purchases food, and runs errands at businesses frequented by other farm workers. Gabriela fears that Border Patrol agents will seize her without reasonable suspicion to do so, simply because of where she is, her skin color, or her apparent occupation as a farm worker. Although she has a child and grandchildren who live in the community and deep community ties, she fears that Border Patrol will arrest her without a warrant without regard to whether she is actually a flight risk. After arresting her, Gabriela fears that Border Patrol will coerce her into voluntary departure.

44. Gabriela is fearful and anxious at the thought of being detained and separated from her child and grandchildren. She does not know who would care for the loved ones who depend on her, even if she were detained for a brief period. She cannot imagine the grief and pain of being expelled from the country and separated forever from her loved ones.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 7, 2025

_____
Elizabeth Strater

12
DECLARATION OF ELIZABETH STRATER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 1:25-cv-00246-JLT-BAM

2884265