| | |
|---|---|
| BREE BERNWANGER - # 331731<br>bbernwanger@aclunc.org<br>MICHELLE (MINJU) Y. CHO - # 321939<br>mcho@aclunc.org<br>LAUREN DAVIS - # 357292<br>ldavis@aclunc.org<br>SHILPI AGARWAL - # 270749<br>sagarwal@aclunc.org<br>AMERICAN CIVIL LIBERTIES UNION<br>FOUNDATION OF NORTHERN<br>CALIFORNIA<br>39 Drumm Street<br>San Francisco, CA 94111<br>Telephone: (415) 621-2493<br><br>MAYRA JOACHIN - # 306065<br>mjoachin@aclusocal.org<br>EVA BITRAN - # 302081<br>ebitran@aclusocal.org<br>OLIVER MA - # 354266<br>oma@aclusocal.org<br>AMERICAN CIVIL LIBERTIES UNION<br>FOUNDATION OF SOUTHERN<br>CALIFORNIA<br>1313 West 8th Street<br>Los Angeles, CA 90017<br>Telephone: (213) 977-5000 | BRISA VELAZQUEZ OATIS - # 339132<br>bvoatis@aclu-sdic.org<br>AMERICAN CIVIL LIBERTIES UNION<br>FOUNDATION OF SAN DIEGO &<br>IMPERIAL COUNTIES<br>P.O. Box 87131<br>San Diego, CA 92138-7131<br>Telephone: (619) 398-4199<br><br>*Attorneys for Plaintiffs*<br><br>AJAY S. KRISHNAN - # 222476<br>akrishnan@keker.com<br>FRANCO MUZZIO - # 310618<br>fmuzzio@keker.com<br>ZAINAB O. RAMAHI - # 332139<br>zramahi@keker.com<br>JULIA GREENBERG - # 333864<br>jgreenberg@keker.com<br>Keker, Van Nest & Peters LLP<br>633 Battery Street<br>San Francisco, CA 94111-1809<br>Telephone:    415 391 5400<br>Facsimile:     415 397 7188<br><br>*Attorneys For Plaintiff Oscar Morales Cisneros* |

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| UNITED FARM WORKERS, et al.,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>KRISTI NOEM, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF HOMELAND SECURITY; et al.,<br><br>　　　　　Defendants. | Case No. 1:25-cv-00246-JLT-BAM<br><br>**DECLARATION OF JUAN VARGAS MENDEZ IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:　　April 11, 2025<br>Time:　　9:00 a.m.<br>Dept.:　　Courtroom 4, 7th Floor<br>Judge:　　Hon. Jennifer L. Thurston<br><br>Date Filed: February 26, 2025<br><br>Trial Date: None set |

DECLARATION OF JUAN VARGAS MENDEZ IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 1:25-cv-00246-JLT-BAM

2884288

I, Juan Vargas Mendez, declare:

1. I have personal knowledge of the facts stated in this declaration and, if called as a witness, could testify truthfully to those facts.

2. My name is Juan Vargas Mendez. I am 37 years old. I am currently living in Mexico because Border Patrol expelled me from the U.S. by "voluntary departure" without my knowing and voluntary consent. Until I was arrested by Border Patrol, I lived in Bakersfield, California with my U.S.-citizen wife and our family. We have been married since 2013 and have three U.S.-citizen children together: a seven-year-old boy, a four-year-old boy, and a three-year-old girl. My wife's eight-year-old son, also a U.S. citizen, is also part of our family. I am proud to be his stepfather and I consider him my son. He has been diagnosed with epilepsy and suffers from seizures, and he depends on me as a caregiver. I have no criminal history.

3. I lived in Kern County for about 20 years. I worked as a farmworker at the same ranch for more than 10 years, picking oranges. I also sometimes worked as a gardener with my friends.

4. On January 8, 2025 at around 5:00 p.m., five of my coworkers and I were driving home in a van after working in the fields. The van had large windows. We were traveling on Maricopa Highway, which is a central highway for farmworkers in southwest Kern County, especially to get to many orange and almond fields. I often got off work and went home via Maricopa highway around this time.

5. As we approached the David Road exit, we heard loud sirens. I looked at the speedometer and saw we were driving under 40 miles an hour, well within the speed limit. A gray SUV with lights flashing on its roof pulled in front of us on the road and stopped, forcing our car to quickly stop on the road. Through the window, I saw a second SUV, also with flashing lights and sirens, come to a stop immediately behind us. Both cars surrounded us very quickly and aggressively, blocking us in so it was impossible to drive away. I could not see any identifiable logos or markings on the vehicles.

6. I watched four people exit from the SUVs, two from each car. They were all wearing regular clothing, not uniforms. I did not know who they were, but thought they might be

1

the police because their vehicles had sirens and flashing lights.

7. One of the men approached our van, and our driver rolled down his window. The man demanded the driver and front passenger show their license and proof of residency. The driver and front passenger showed him their IDs. The man sounded so angry and aggressive that I felt afraid he might hurt us. He did not explain why we had been stopped.

8. As the agent was reviewing the IDs, two other agents flung open the door on the right side of the van. The agents did not ask for consent to open the van door or search the van, and no one in the car had provided such consent. Of the two agents who opened the van doors, one appeared to be Latino while the other appeared white. The Latino agent shouted in Spanish that we needed to show him our IDs, and warned us that we had better "tell the truth." I saw both agents had guns on their waists. They kept yelling at us, "Hurry up and tell me the truth," over and over again.

9. I felt very intimidated by the agents and was afraid they would hurt me. I did not produce an ID because I was not carrying one with me. Two agents grabbed me and dragged me out of the van. They grabbed one of my coworkers and dragged him out, too. They demanded we hand over our personal belongings. I gave them my phone, wallet, and a medical spray I use to help me breathe. I did not feel I had any choice and I did not feel free to leave.

10. The agents put my hands behind my back and handcuffed me. They did not identify themselves or explain why my coworker and I were being arrested. They did not show us any warrants. They never asked about my community ties to Kern County, such as how long I had lived there, my family, or my employment. The agents mocked us, calling us "Mexican bitches." They searched me and put me and my coworker in the backseat of an SUV.

11. They took off our handcuffs and drove us away. The agents continued mocking us and calling us names. I was really afraid, but after a little while I tried talking to one of the agents. At this point, I suspected they were immigration agents. I asked him, "Why are you trying to take me?" I told him I have lived in the area for 20 years; I have a wife and four kids who are all citizens; I have no criminal record. He responded he did not care and that I was "going to Mexico."

2

12. After about a half hour, we arrived at a large white warehouse with barbed wire. There were about eight other arrested people gathered there, and about 15 armed agents. They told us they were Border Patrol. They took our temperatures, our fingerprints, and photos.

13. They forced us onto a bus. After driving for about another half hour, they ordered us off the bus and into the back of a truck. It was very tight and uncomfortable. There were no seats or seatbelts, so we all sat or squatted on the floor and tried to keep our balance. The back of the truck was completely covered, with no windows. The truck drove for a very long time. It felt like about four or five hours. We did not stop even once for people to use the bathroom.

14. When we finally stopped, they squeezed us into a larger van, which drove for a few more hours. Finally, we arrived at a detention facility at around 1:00 a.m. No one told us where we were.

15. Agents spoke to us individually. An agent told me I had been arrested because I am "illegal" here, and said I would be deported. I told the agent I had been in the area for 20 years, I have a family, I am a hardworking man, and I have no criminal record. The agent told me he didn't care; that I would be deported anyway. Then he directed me to a holding room.

16. As soon as I stepped into the holding room, I started to shiver because it was freezing cold. An agent told me to take off my work boots and gave me thin slippers which did not keep out the cold. There were about 20 to 25 of us detained in the room. Some people who were already detained here told us we were at El Centro. For warmth, we received only a thin aluminum sheet, which helped very little against the cold. There were two concrete benches in the room, but no beds. I did not receive a toothbrush, toothpaste, soap, or other hygiene products. They gave us each juice, a stale hot dog, and an apple. I did not eat the hot dog because someone else said it had made them sick.

17. I have a medical problem with my nose that makes it difficult for me to breathe. I need to use a nasal spray to help me breathe. My spray had been confiscated by the agents when they arrested me and they had not returned it to me. I asked for my spray repeatedly, but no one helped me. I had trouble breathing during the whole time I was detained because I was not allowed to access my medicine.

18. On January 9, at around noon, an agent took me to a room. He showed me a 7- or 8-page packet and said I needed to sign the documents. The papers were in English, a language I do not read. The agent did not explain to me what the documents said. He only said if I didn't sign, I would go to prison for months or years. I did not want to sign anything I could not understand. I asked the agent three or four times to please allow me to call my wife. Each time, the agent said no.

19. Finally, after about fifteen minutes of this standoff, my resolve crumbled. I was freezing cold, I had trouble breathing without my medicine, and I was terrified of the prospect of going to prison for a long time. I was scared my family would never know where I was if I refused to sign and was taken to prison. The agents had a small digital pad ready. I signed my name on it. The digital pad was about the size of a cell phone, had a space for my signature and nothing else, and did not display the documents I was apparently signing. I suspected the documents might be about my deportation, but I was not certain. No one helped me understand what I was signing, gave me any copies of the documents in English or Spanish, or explained what voluntary departure was. No one explained that voluntary departure meant I could be barred from returning to the U.S. for years. No one explained I had the option to go before an immigration judge, or the rights I would have in an immigration court hearing. If I had understood my rights, and the consequences of voluntary departure, I would never have agreed to sign those documents. I would have insisted on an opportunity to speak to a judge, no matter how much pressure they put on me.

20. Only about two hours later, at about 2 pm on January 9, Border Patrol agents placed me onto a bus and told me they were taking me to Mexico. They drove me to the border across from Mexicali, Mexico and dropped me off. When we arrived, a Border Patrol agent gave me a copy of the documents they claim I signed and a list of pro bono legal services. After my wife translated one of the documents for me, I realized that my signature was on an English-language document apparently agreeing to voluntary departure. I also learned that the document says, "Notice read to subject by Esteban Echeverria, in the Spanish language." This is false. If someone had read the document to me in Spanish, I would not have signed it because I did not

want to agree to be deported. Border Patrol agents returned my wallet, phone, shoelaces, nasal spray, and work boots. I had nothing else besides the clothes on my back.

21. Being away from my wife and children has been the most devastating experience of my life. After my expulsion, my wife and children came to Mexico to visit me for two days, but I have not seen them since. I am depressed and often cry while on the phone with my wife. I never wanted to be deported from the U.S. My family means everything to me. I am so worried my kids will think I abandoned them. They are too young to understand why I haven't come home. I am in disbelief that I have no idea when I will be able to live with them again.

22. My eight-year-old stepson, who has epilepsy, depends on me at nights when my wife is at work. We do not have other relatives nearby to help. I used to administer his medicine and help him cope with his seizures. My wife tells me that since my expulsion, his seizures have become worse. She says all the children have become quiet and scared. They are not eating well and are losing weight. I feel my heart is breaking when I think about how they are suffering because of what happened to me.

23. I understand that, as a class representative, I represent the interests of everyone in the class, and not just myself. I understand I need to stay informed about what is happening with my case and stay in touch with my attorney to give them information they need. I am committed to being a class representative because I do not want other people in the community to be harmed by Border Patrol's unlawful practices the way I was. I have never served as a class representative in any prior action.

24. This declaration was read to me in full in Spanish on February 18, 2025 by Angelina Alas. I completely understand the content of this declaration.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 18, 2025.

*Juan Carlos Vargas Mendez*
Juan Vargas Mendez

5

**CERTIFICATE OF INTERPRETATION**

I, Angelina Alas, certify that I am fluent in Spanish and English and that I am competent to interpret between these languages. I further certify that I have read the foregoing to Juan Vargas Mendez in Spanish. I further declare that I am competent to render this interpretation and that I would testify to the same under the penalty of perjury if I were called upon to do so.

Date: February 18, 2025             /s/ Angelina Alas
                                    Angelina Alas