BREE BERNWANGER - # 331731
bbernwanger@aclunc.org
MICHELLE (MINJU) Y. CHO - # 321939
mcho@aclunc.org
LAUREN DAVIS - # 357292
ldavis@aclunc.org
SHILPI AGARWAL - # 270749
sagarwal@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493

MAYRA JOACHIN - # 306065
mjoachin@aclusocal.org
EVA BITRAN - # 302081
ebitran@aclusocal.org
OLIVER MA - # 354266
oma@aclusocal.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SOUTHERN
CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5000

BRISA VELAZQUEZ OATIS - # 339132
bvoatis@aclu-sdic.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SAN DIEGO &
IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
Telephone: (619) 398-4199

*Attorneys for Plaintiffs*

AJAY S. KRISHNAN - # 222476
akrishnan@keker.com
FRANCO MUZZIO - # 310618
fmuzzio@keker.com
ZAINAB O. RAMAHI - # 332139
zramahi@keker.com
JULIA GREENBERG - # 333864
jgreenberg@keker.com
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    415 391 5400
Facsimile:    415 397 7188

*Attorneys For Plaintiff Oscar Morales Cisneros*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| UNITED FARM WORKERS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>KRISTI NOEM, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF HOMELAND SECURITY; et al.,<br><br>Defendants. | Case No. 1:25-cv-00246-JLT-BAM<br><br>**DECLARATION OF MARIA GUADALUPE HERNANDEZ ESPINOZA IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:     April 11, 2025<br>Time:    9:00 a.m.<br>Dept.:    Courtroom 4, 7th Floor<br>Judge:   Hon. Jennifer L. Thurston<br><br>Date Filed: February 26, 2025<br><br>Trial Date: None set |

DECLARATION OF MARIA GUADALUPE HERNANDEZ ESPINOZA IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 1:25-cv-00246-JLT-BAM

2884312

I, Maria Guadalupe Hernandez Espinoza, declare:

1. I have personal knowledge of the facts stated in this declaration and, if called as a witness, could testify truthfully to those facts.

2. My name is Maria Guadalupe Hernandez Espinoza, and I am 46 years old. I am currently living in Mexico because Border Patrol expelled me from the U.S. by "voluntary departure" without my knowing and voluntary consent. Until I was arrested by Border Patrol, I lived in Bakersfield for about 10 years. My partner and I have rented the same apartment in Bakersfield for the past three years. I have no criminal history.

3. I have worked in the agricultural sector for close to 20 years. I picked and packed a variety of different fruits and vegetables, including broccoli, onions, cabbage, lettuce, apples, and tomatoes. I raised my three daughters with my ex-husband. I am very proud of my daughters because they're hardworking like me. My two eldest daughters are married, and I have a grandson. My youngest daughter is attending university. Everything I worked for is in Bakersfield.

4. On January 7, 2025, around 5:30 p.m., my partner, a coworker, and I were driving on CA-58, heading home to Bakersfield after working at a tomato greenhouse plant in Tehachapi. My partner was driving us in his black Nissan Sentra, which is registered under his name. His car has no stickers or decals, and the license plate and registration were current. My partner was not breaking any traffic laws. He was getting ready to exit when we were approached from behind by an unmarked white Ford pickup truck. The truck followed us and flashed its lights at us, and I heard something that sounded like a police siren. My partner pulled over.

5. A man in a white shirt came to the driver's side door and asked my partner to turn off the car. My partner complied. This caused the car doors to unlock, and the man pulled open the driver's side door and ordered my partner to step out of the car. The man did not identify himself, show a warrant, or ask us any questions. The man took my partner toward his truck while my coworker and I stayed in the car. I was very nervous, and my coworker began to cry. I noticed six or so white Chevrolet Malibus pull up behind us. They were all unmarked. Each car had three to four men inside, most of whom wore white shirts and civilian clothing. I did not see any of

them with a badge, but I could see they had guns on their waists.

6. Two more agents approached our car and asked me and my coworker to get out, which we did. They wore green pants and white shirts. They did not have badges or other identifying information on their clothing. They walked us over to the white Ford truck where my partner and the first agent were.

7. The agents asked us for our IDs, if we had papers, and if we were here legally. I did not answer their questions, and I did not produce an ID because I was not carrying one with me. The agents did not explain why they had pulled us over. The agents never asked me questions about my community ties, such as the many years I lived here, my work history, or my children and grandson.

8. The agents began searching my partner's car. They never asked if they could search the car and my partner never consented to a search. They took my partner's wallet from the car and pulled out his ID.

9. The agents said we were under arrest and took all three of us into the backseat of the white Ford truck. I was not handcuffed, but since they said we were arrested, I did not feel free to go. The agents did not explain why they had arrested us. I was still unsure who the agents worked for, but I could tell from their vehicles, sirens, handguns, and matching clothing that they worked for some type of law enforcement agency. I had no inkling they were affiliated with immigration.

10. The agents left my partner's car on the side of the road and transported us to a makeshift processing area on 7th Standard Road in Bakersfield. When we arrived at the makeshift processing area, I saw a white truck with a green stripe on it and recognized it as a Border Patrol truck. That was the moment I realized we were in Border Patrol custody. They had brought many people to this makeshift processing station, dozens of men and just one other woman besides me and my coworker. The Border Patrol agents took away my personal belongings including my inhaler, reading glasses, and 80 dollars cash. I asked an agent if I could make a phone call to my family, but they said no. We remained at the makeshift processing center for about an hour before we were loaded onto a bus.

11. The bus left Bakersfield in the late evening and drove on CA-58 through Mojave. About three hours into the drive, the bus stopped to switch drivers. One of the drivers looked at us, laughed, and said, "Vamos por mas mojados," which means "Let's go for more wetbacks." I was so nervous that I suffered from several anxiety attacks while on the bus.

12. The bus continued driving and arrived at El Centro Border Patrol station in the early morning hours of January 8. I was exhausted, scared, and hungry. The agents ordered us off the bus and searched us. To my horror, they searched me in front of dozens of men, lifting my shirt and exposing my bra. I felt humiliated; it was so indecent. They took away my sweater and scarf. The agents then took my photograph and fingerprints.

13. The agents locked me in a frigid room where I met two other women and their children. They said they were asylum seekers and had been in the room for days.

14. The agents began calling in people for an initial interview. A Latina agent said I could either agree to voluntary departure or see a judge. She said, "If you choose to see a judge, it will take around two to three years to see a judge and either way, you'll likely end up deported." Feeling extremely anxious, sleep deprived, and terrified at the thought of being detained for years, I impulsively said I would agree to voluntary departure. The agent did not have us sign anything. After this quick conversation, I was sent back to the room where I thought about my decision. I realized I wanted to see a judge and have an opportunity to return to Bakersfield. I knew I had to quickly tell an agent I had changed my mind.

15. When a different agent came by to drop off diapers for one of the children, I told her I had changed my mind about voluntary departure and that I wanted to see a judge. I reiterated I wanted to see a judge and that I would not sign anything agreeing to my deportation. She told me I was not allowed to see a judge.

16. I was overcome with anxiety; I felt so stressed and did not know what to do. When I tried to sleep, I kept waking up and crying. I still had not been able to contact my family. I could not tell what time it was since we were kept indoors and not exposed to any windows or sunlight. I had to repeatedly ask the agents for the time to keep track of the time. There was no bed and nowhere to sleep or rest except the floor or a metal bench. At one point, a man came to the room

3

and I thought he was another agent. I told him I wanted to see a judge, but he told me he was a janitor. I made sure to tell every agent who passed by our room that I wanted to see a judge, but no one listened or cared.

17. Eventually, I was brought to a large room where a female agent I had not met before was sitting in front of a computer. I told her I wanted to see a judge. She told me I could not. I said why not, if I haven't signed any documents? She said, "That doesn't matter, your signature doesn't matter, all of you are going to be deported." She told me I needed to sign some documents. I was skeptical and asked what I was signing. I tried to look at the documents on her computer screen, but she did not let me.

18. The agent claimed the documents were related to my fingerprints and would prove my identity. She directed me to write my initials on a small digital device. The screen on the device showed an "X" and a line for my signature and nothing else. Based on the agent's words, I believed I had no choice but to sign. I never got to see the documents I was signing, despite asking. After signing, I asked one more time, "Is there any way I can see a judge?" She said no, and said I did not have the right to see a judge.

19. The agent never explained I was signing documents related to voluntary departure. If I had known they were documents accepting voluntary departure, I never would have signed them. No one ever told me I could be barred from reentering the U.S. if I accepted voluntary departure, and no one gave me a document explaining that. No one ever told me anything about what rights I would have had before an immigration judge, only that I had no right to see one. I was never given an opportunity to speak to a lawyer or call a family member.

20. The next day, January 9, 2025, at around 1:00 p.m., the agents called me from my room. The agents gave me the belongings they had taken away from me when I arrived at El Centro station and said they were sending me to Mexico. All my hopes and dreams of returning to Bakersfield were shattered. I felt horrified. I couldn't believe what was happening. It is incredibly difficult for me to remember this moment and relive the emotions I felt. I was loaded onto a truck with a group of other people and taken to Mexicali, Mexico.

21. When we arrived in Mexicali, I had no money and no cell phone. A Border Patrol

agent gave me a copy of the document I signed and a list of pro bono legal services providers in southern California. This was the first time I was able to see that my signature was on a document purporting to agree to voluntary departure. Most of the document is in Spanish, but at the bottom, it says in English, "Notice read to subject by Elisabeth Cota, in the Spanish language." A friend in Mexicali read this and translated it for me. I was in shock. This statement is false. If anyone had read the form to me in Spanish, I would not have signed it because I did not want to accept voluntary departure. My whole life was left in Bakersfield.

22.	I feel like my life has been turned upside down. I feel traumatized. I have trouble sleeping. I wake up in the middle of the night and cry. The life I built in the United States is gone; everything I worked for is gone. I believe Border Patrol stopped us because we were Latinos, and we looked like farmworkers who had just gotten off from work. I have a lot of trouble processing the injustice of what happened to me and others like me.

23.	I understand that, as a class representative, I represent the interests of everyone in the class, and not just myself. I understand I need to stay informed about what is happening with my case and stay in touch with my attorneys to give them information they need. I am committed to being a class representative because I do not want other people in the community to be harmed by Border Patrol's unlawful practices the way I was. I have never served as a class representative in any prior action.

24.	This declaration was read to me in full English and Spanish on February 13, 2025 by Maricela Sanchez. I completely understand the content of this declaration.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 13, 2025.

_Ma. Guadalupe H._
Maria Guadalupe Hernandez Espinoza

**CERTIFICATE OF INTERPRETATION**

I, Maricela Sanchez, certify that I am fluent in Spanish and English and that I am competent to interpret between these languages. I further certify that I have read the foregoing to Maria Guadalupe Hernandez Espinoza in Spanish. I further declare that I am competent to render this interpretation and that I would testify to the same under the penalty of perjury if I were called upon to do so.

Date: February 13, 2025

/s/ Maricela Sanchez