BREE BERNWANGER - # 331731
bbernwanger@aclunc.org
MICHELLE (MINJU) Y. CHO - # 321939
mcho@aclunc.org
LAUREN DAVIS - # 357292
ldavis@aclunc.org
SHILPI AGARWAL - # 270749
sagarwal@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493

MAYRA JOACHIN - # 306065
mjoachin@aclusocal.org
EVA BITRAN - # 302081
ebitran@aclusocal.org
OLIVER MA - # 354266
oma@aclusocal.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SOUTHERN
CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5000

BRISA VELAZQUEZ OATIS - # 339132
bvoatis@aclu-sdic.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SAN DIEGO &
IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
Telephone: (619) 398-4199

*Attorneys for Plaintiffs*

AJAY S. KRISHNAN - # 222476
akrishnan@keker.com
FRANCO MUZZIO - # 310618
fmuzzio@keker.com
ZAINAB O. RAMAHI - # 332139
zramahi@keker.com
JULIA GREENBERG - # 333864
jgreenberg@keker.com
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    415 391 5400
Facsimile:    415 397 7188

*Attorneys For Plaintiff Oscar Morales Cisneros*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| UNITED FARM WORKERS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> KRISTI NOEM, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF HOMELAND SECURITY; et al., <br><br> Defendants. | Case No. 1:25-cv-00246-JLT-BAM <br><br> **DECLARATION OF OSCAR MORALES CISNEROS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> Date:    April 11, 2025 <br> Time:    9:00 a.m. <br> Dept.:   Courtroom 4, 7th Floor <br> Judge:   Hon. Jennifer L. Thurston <br><br> Date Filed: February 26, 2025 <br><br> Trial Date: None set |

DECLARATION OF OSCAR MORALES CISNEROS IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
Case No. 1:25-cv-00246-JLT-BAM

2884329

I, Oscar Morales Cisneros, declare:

1. I have personal knowledge of the facts stated in this declaration and, if called as a witness, could testify truthfully to those facts.

2. My name is Oscar Morales Cisneros, and I am 51 years old. I currently reside in Bakersfield, where I own my home. I have lived in Bakersfield since 2021. Before moving to Kern County, I worked and lived in Los Angeles County for about 15 years. I have been married to my wife for around 30 years now and we have two daughters together. I also have two grandsons and one granddaughter.

3. I am a maintenance worker and a construction worker. I am a practicing Catholic and attend mass every Sunday in Bakersfield. I also support our local church by donating money to local causes organized by the church and church members. I do not have any criminal history.

4. On January 7, 2025, after leaving work to head home, I stopped at a water refill station outside a liquor store to fill up my empty water jugs. The liquor store is located in a predominantly Latino-populated neighborhood. After refilling my jugs with water, I got in my truck. My truck is registered to me, my license plates and registration are up-to-date, and it does not have any stickers or decals. I shifted my truck into reverse and was about to back out when a grey Chevrolet Tahoe pulled up behind me and blocked me in the parking lot. It was unmarked and looked like a regular civilian vehicle. I put the truck back in park and lowered my driver's side window. I saw two agents standing outside my truck. One was a white man, and the other was a Latino man. They both wore green uniforms with "Border Patrol" written on them.

5. In Spanish, the Latino agent asked me if I had papers and was here legally. I exercised my right to remain silent and did not answer his questions. The white agent asked me for my driver's license, which I provided. The agents did not explain why they had blocked my truck in, nor why they needed my license. The agents took my license and walked back to the Chevy Tahoe. I called my daughter on my cell phone to tell her what was going on. The Latino agent returned and asked who I was calling, and I said I was calling my daughter. When my daughter answered, I told her Border Patrol had stopped me. The Latino agent asked me to put my phone on speakerphone and asked to speak with my daughter. I heard him identify himself to her

1 | as Officer Sanchez.

2 |       6.      Officer Sanchez told my daughter in Spanish I was being detained by Border Patrol for being here illegally without documents, and that I would be able to call her in two hours. My daughter asked, "But what did he do?" Officer Sanchez told my daughter I was here illegally and that he had to end the call. He asked me to step out of my vehicle. I complied. He handcuffed me and placed me in the back of the Chevy Tahoe. I asked Officer Sanchez if I could call someone to pick up my truck, and he said no. The agents never presented me with a warrant or, aside from what Officer Sanchez said to my daughter, explained why they arrested me. They did not ask about my ties to the community, such as my family members, my work history, or how long I have lived in the neighborhood.

      7.      We drove around Bakersfield. I was in handcuffs the entire time. I did not know where they were taking me, and I was not sure exactly where we were because they made many turns. At one point, the agents stopped at a gas station and pulled up behind a vehicle to block it in, like they had done to me. The agents got out and spoke to a person in the vehicle, and I overheard one of the agents say in English, "We're doing our job." Eventually, they were let go and the agents returned to the Chevy Tahoe.

      8.      After about two hours of driving around like this, the agents took me to a station where Border Patrol was holding other people and a bus was waiting. I was not sure where we were. The agents took my personal belongings and put them in a bag. I was fingerprinted and my photo was taken. I asked the agent who took my fingerprints if I could call my daughter since Officer Sanchez had said I could do so after two hours. He allowed me to call her, and I told my daughter I was going to be taken away. The agent then took my phone, turned it off, and placed it in the bag with my other belongings. He placed the bag under the bus in the storage compartment.

      9.      I felt very anxious and asked for water. I was given a bottle of water and waited on the bus until it filled up with other detained people. When it was full, there were about 40 people on the bus. We left the station late in the evening, I believe around 10 or 11 p.m., and drove for about three hours. I did not know where we were going, and the agents did not tell us. The bus stopped at a gas station to switch drivers. By this point, everyone on the bus was saying they were

hungry. I was also hungry because I had not eaten since lunch. The agents passed around some granola bars and some small water bottles. We continued driving until we arrived at a detention center in El Centro in the early morning hours.

10. At the detention center, the agents made everyone remove their clothing. It was very cold. They made me remove my undergarments as well as my vest and thermal pants, which I wore to keep warm. They made us take off our shoes and gave us each a pair of sandals. I experience joint pain whenever I am cold, so I was in pain the entire time I was detained.

11. When they finished processing me, I was taken to see an agent. The agent said I had two options: I could agree to voluntary departure, or I could wait to see a judge. He said voluntary departure would make it easier for me in the future if I decided to "fix" my papers, but if I wanted to see a judge, I would have to wait for two to six months. I told him I wanted to speak to a judge, and I wanted to speak to my attorney or make a phone call. He told me I did not have the right to an attorney or a phone call. I repeated that I needed to speak with my attorney or make a phone call. The agent said no.

12. After this conversation, I was placed in a very cold cell for the night. The cell had about 10 to 12 other people. The only places to lie down were the floor or a steel bench. I was given only a silver foil blanket to keep warm. I tried to sleep, but it was very difficult because it was so cold and uncomfortable, and I would wake up every time an agent shouted for someone else to leave the cell.

13. Later that day, on January 8, I was called to the office area again. An agent presented me with the same two options as the day before. This time, I was told if I agreed to voluntary departure, I would be released the next day, and it "wouldn't affect me in the future" if I wanted to submit a new immigration application. The agent said if I wanted to wait to speak to a judge, I would have to wait many months. Again, I asked to speak to my attorney and to make a phone call. Again, I was told I did not have a right to an attorney or a phone call. I was sent back to the freezing cell.

14. That night, I was called to the counter office area again for more questioning. Again, I asked for a phone call and to speak to my attorney, and again I was denied. The agent

seemed angry because I refused to agree to voluntary departure. None of the agents I spoke to during my detention ever told me that taking voluntary departure included consequences, like being barred from reentering the U.S. for years. None of them explained that if I chose to speak to a judge, I would have certain legal rights. The agent ordered me back to my cell.

15. The cell was still freezing cold. I noticed that every time I came back to the cell, the temperature felt colder than before. My silver foil blanket shook from the force of the cold air blowing in the room. Again, I had a very hard time sleeping because it was so cold and uncomfortable. I also noticed the days began to blur into one another. It was hard for me to keep track of time since there was no natural sunlight and the lights were kept on all day and night.

16. On January 9, the agents loaded me onto a bus with around 18 other people and took us to Imperial Regional Detention Center, about 10 or 15 minutes' drive away. No one explained why we were being moved. At Imperial, they took my temperature and put me in a holding cell. Agents called people out of the holding cell a few at a time, but I was not one of them. An hour later, five people from the group, including me, were loaded back on a bus and taken back to El Centro. I do not know why this happened.

17. On January 10, I was taken out of my cell again, to speak with another agent. The agent gave me the same two options: I could agree to voluntary departure or see a judge. I said I wanted to see a judge and I wanted to speak to an attorney.

18. To my surprise, the agent told me to sign my name on a small electronic pad to be released. I was scared to sign because I thought he was tricking me into agreeing to voluntary departure. I asked the agent why I needed to sign. He said I had to sign to see a judge and be put on a monitoring device. I repeated I did not want to sign anything agreeing to voluntary departure. The agent said that was not what I was signing. The agent did not allow me to see or read the documents, and he did not explain anything else about what the documents said. Since I wanted to see a judge, and I worried I would not be allowed to unless I signed my name, I signed, even though I felt scared to sign documents without an opportunity to read them. The small electronic screen where I signed my name only had space for my signature. It did not display any of the documents I was signing. I was fitted with a monitoring device on my wrist.

19. I was released from El Centro that evening. Border Patrol dropped a group of us off at a shelter nearby and told us to figure out our transportation home. I was able to get a ride back to Bakersfield with a person I had met while detained.

20. Since my ordeal with Border Patrol, I have felt stress, desperation, and a lot of uncertainty. I feel scared whenever I leave my house, because I'm nervous I will encounter Border Patrol and be arrested and detained again. I try to limit how much I have to go out, though that is not always possible. I have a hard time sleeping now. I wake up in the middle of night, my heart racing, thinking about the possibility Border Patrol will arrest and detain me again. Sometimes, I look out my window to see if Border Patrol is there. I feel traumatized and scared.

21. The way I was treated was frustrating and frightening. I tried to exercise my right to remain silent, and my right to a phone call and attorney, but no one respected my rights. This incident made me feel like I do not have rights at all, even though I know I do. I worry that something like this could happen to my family members.

22. Since my arrest and detention, I feel too scared to go to the store where I was arrested. I also feel nervous just walking around in my neighborhood. I try to keep a low profile because I fear my neighbors might call Border Patrol or ICE on me. I never felt this way before Border Patrol arrested me. Now, when I go out to run errands, I wear a thick sweater with a hood. I cover my head with the hood to hide the color of my skin as much as possible. I believe I was arrested by Border Patrol because of the color of my skin, so if I can hide the color of my skin, maybe it will reduce the chances Border Patrol will arrest me again. I no longer feel comfortable calling 911 if there is an emergency because I am afraid the local police will call Border Patrol to arrest me.

23. I understand that, as a class representative, I represent the interests of everyone in the class, and not just myself. I understand I need to stay informed about what is happening with my case and stay in touch with my attorneys to give them information they need. I am committed to being a class representative because I do not want other people in the community to be harmed by Border Patrol's unlawful practices the way I was. I have never served as a class representative in any prior action.

24. This declaration was read to me in full English and Spanish on February 20, 2025 by Maricela Sanchez. I completely understand the content of this declaration.

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 20, 2025 at Bakersfield, California.



Oscar Morales Cisneros

**CERTIFICATE OF INTERPRETATION**

I, Maricela Sanchez, certify that I am fluent in Spanish and English and that I am competent to interpret between these languages. I further certify that I have read the foregoing to Oscar Morales Cisneros in Spanish. I further declare that I am competent to render this interpretation and that I would testify to the same under the penalty of perjury if I were called upon to do so.

Date: February 20, 2025        /s/ Maricela Sanchez