| | |
|---|---|
| BREE BERNWANGER - # 331731<br>bbernwanger@aclunc.org<br>MICHELLE (MINJU) Y. CHO - # 321939<br>mcho@aclunc.org<br>LAUREN DAVIS - # 357292<br>ldavis@aclunc.org<br>SHILPI AGARWAL - # 270749<br>sagarwal@aclunc.org<br>AMERICAN CIVIL LIBERTIES UNION<br>FOUNDATION OF NORTHERN<br>CALIFORNIA<br>39 Drumm Street<br>San Francisco, CA 94111<br>Telephone: (415) 621-2493<br><br>MAYRA JOACHIN - # 306065<br>mjoachin@aclusocal.org<br>EVA BITRAN - # 302081<br>ebitran@aclusocal.org<br>OLIVER MA - # 354266<br>oma@aclusocal.org<br>AMERICAN CIVIL LIBERTIES UNION<br>FOUNDATION OF SOUTHERN<br>CALIFORNIA<br>1313 West 8th Street<br>Los Angeles, CA 90017<br>Telephone: (213) 977-5000 | BRISA VELAZQUEZ OATIS - # 339132<br>bvoatis@aclu-sdic.org<br>AMERICAN CIVIL LIBERTIES UNION<br>FOUNDATION OF SAN DIEGO &<br>IMPERIAL COUNTIES<br>P.O. Box 87131<br>San Diego, CA 92138-7131<br>Telephone: (619) 398-4199<br><br>*Attorneys for Plaintiffs*<br><br>AJAY S. KRISHNAN - # 222476<br>akrishnan@keker.com<br>FRANCO MUZZIO - # 310618<br>fmuzzio@keker.com<br>ZAINAB O. RAMAHI - # 332139<br>zramahi@keker.com<br>JULIA GREENBERG - # 333864<br>jgreenberg@keker.com<br>Keker, Van Nest & Peters LLP<br>633 Battery Street<br>San Francisco, CA 94111-1809<br>Telephone:     415 391 5400<br>Facsimile:      415 397 7188<br><br>*Attorneys For Plaintiff Oscar Morales Cisneros* |

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| UNITED FARM WORKERS, et al.,<br><br>       Plaintiffs,<br><br>   v.<br><br>KRISTI NOEM, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF HOMELAND SECURITY; et al.,<br><br>       Defendants. | Case No. 1:25-cv-00246-JLT-BAM<br><br>**DECLARATION OF WILDER MUNGUIA ESQUIVEL IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:     April 11, 2025<br>Time:    9:00 a.m.<br>Dept.:    Courtroom 4, 7th Floor<br>Judge:   Hon. Jennifer L. Thurston<br><br>Date Filed: February 26, 2025<br><br>Trial Date: None set |

DECLARATION OF WILDER MUNGUIA ESQUIVEL IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 1:25-cv-00246-JLT-BAM

2884330

I, Wilder Munguia Esquivel, declare:

1. I have personal knowledge of the facts stated in this declaration and, if called as a witness, could testify truthfully to those facts.

2. My name is Wilder Munguia Esquivel, and I am 38 years old. I live in Bakersfield, California, with my brother, my sister-in-law, and their daughter, all of whom are U.S. citizens. I have lived in Kern County with them for about 12 years. My brother owns our home. Before living in Bakersfield, I lived in Los Angeles, California.

3. I have worked as a day laborer for about 12 years. I am also a licensed handyman. I am a Christian and I attend services about twice a week at Iglesia Casa de Fe in Bakersfield, where I have been a church member for over ten years. I have no criminal history.

4. On January 7, 2025, at around 12 p.m., I was outside Home Depot at 4001 Ming Avenue in Bakersfield. I was standing in a group with other day laborers when several unmarked vehicles pulled up. At least ten men got out of the vehicles and aggressively swarmed around us.

5. They immediately demanded our "papers". One of them asked me directly in Spanish, "Do you have papers? Do you have identification? Where are you from?" I did not respond. I had no idea who he or any of the other men were. They wore civilian clothing and I did not see any badges. Most of them were wearing masks covering their faces, with holes only for their eyes. Some of them wore large sunglasses. My first thought was they might be terrorists mugging or kidnapping us. I even wondered if my friends and I could be murdered. The man questioning me was not only wearing a mask covering his entire face, he was also wearing a hat and thick sunglasses. I felt terrified. The man kept yelling at me, louder and louder, asking me again and again if I had papers and where I was from. I began to slowly walk away. The man followed, continuing to yell questions at me. I stayed silent. In Spanish, he ordered me to "turn around" and said, "I'm going to put you in handcuffs." It was around this time that I realized the men were federal immigration agents.

6. I tried to exercise my rights and said, "I have the right to remain silent." The agent ignored me and asked again if I had documents and identification. He ordered me to take out my wallet.

1

7. Before I could comply, the agent suddenly and forcefully yanked my left arm toward him and removed my wallet from my back pants pocket. He yanked my arm with so much force that I instantly felt excruciating pain and to this day continue to experience pain in my arm and shoulder. He opened the wallet and looked through it. He spread my legs in a wider stance and conducted a pat-down search. He told me to call a family member to come pick up my truck, which was parked at Home Depot. He said if they did not come within 20 minutes, my truck would be towed.

8. The agent never identified himself or explained why he was arresting me. Nor did he ask me about my community ties, such as my family, work history, or how long I have been living here. Had he asked me, I would have told him that my brother is a U.S. citizen and I have a pending family petition. I would have told him I have a strong community here in my family, friends, and church, and Bakersfield is my home.

9. After the agent handcuffed me, he and another agent put me in the backseat of a silver vehicle with metal bars between the front seats and the back seats. My sister-in-law and niece came to Home Depot to collect my truck. They spoke to the agents detaining me and told them I was in the process of regularizing my immigration status. The agents did not care and said they were taking me anyway.

10. The agents drove me to the back lot of Home Depot where I saw several vehicles and over ten people who had been detained, including some who were elderly. I believe we were targeted at Home Depot because many day laborers gather to get work there. The immigration agents did not seem to be targeting specific individuals. The agent who arrested me did not seem to know who I am.

11. After a 15- or 20-minute wait, the agents drove us to a makeshift facility on 7th Standard Road. One bus was already full of people who had been detained. A second bus arrived.

12. The agents ordered me to place my belongings in a bag, including a gold chain with a gold cross I was wearing around my neck. They took my fingerprints and photos. I asked for food and only received a small granola bar. I had not yet eaten lunch when the agents detained me at Home Depot. I was very hungry and it was difficult to go so long without eating.

13. In the evening, around 7 or 8 p.m., I was placed on a bus that took us to Imperial County. We drove for many hours. We arrived at a detention facility in Imperial County in the early morning hours. When we got off the bus, the agents made us sit on a cold, concrete floor. I was very cold because the agents had taken my jacket. The agents kicked the bags containing our belongings with their feet.

14. The agents detained me in an extremely cold cell with about 20 other men, including some who were elderly. I was only given a thin, silver blanket, which did not keep me warm. There were no beds. The only place to sit or lie down was the cold, hard concrete floor. Having to sit or lie down on this floor for three days caused severe pain in my knee, where I'd recently had surgery after having been hit and injured by a large truck. The lights were kept on all day and night, and there was no natural light, so I lost track of the time. It was extremely difficult to sleep because the lights were so bright and people were constantly moving into and out of the cell. I was given only a little food: a small juice, fruit, a granola bar, and a piece of tortilla or bread with a little protein on it. After eating it I was still hungry. I was not provided a toothbrush, toothpaste, or other personal hygiene products. There was nowhere to shower.

15. On January 8, I was brought to an office where an agent asked me several questions in Spanish. She asked me to sign a small device which had a space for a signature but displayed nothing else. She did not tell me why she needed me to sign my name, nor offer copies of the documents she was asking me to sign. She had a computer screen in front of her, but I could not see the screen. I told the agent my brother had petitioned for me, and that I would not sign anything because I had a pending application. She said I needed to sign if I wanted to see a judge and go to court. I told the agent I could not see the document she was asking me to sign. She said, "You can't, but I can." I did not know what to do. I was scared to sign something I was not allowed to read; I was just as scared of what could happen if I refused to sign. Another person in my cell had just shared that he had refused to sign something and the agents had treated him terribly, yelling at him and slamming the door. I feared agents would be similarly aggressive and possibly violent with me if I refused to sign. Feeling I had no choice, I signed my name on the small device. I returned to my cell, feeling terrified I had unwittingly made a terrible mistake. To

this day I am not certain what I signed.

16. On January 9, I was again brought into an office to speak to a different agent. He told me to sign my name on a small screen, which again had space for a signature but displayed nothing else. He did not provide me a copy of the document or tell me what it said. I asked the agent why he needed my signature, and all he said was that it was for my "fingerprints" and "record." I felt nervous about signing my name to a document I could not see. But I did not feel comfortable asking further questions and felt I had no choice. I chose to believe the agent when he said it was for my "fingerprints" and "record," and I signed. To this day I am not certain what I signed.

17. On January 10, I was brought out of my cell. An agent said in Spanish, "You can leave today but you will have conditions. If you agree, you can leave today. If not, it's up to you." By then, I had been detained for three days. I was hungry because I had been given so little food, and the cold was unbearable. I had not had an opportunity to shower, brush my teeth, or wash my face. I had not been able to contact any family members and I wondered if they knew where I was. I felt defeated and unsafe. I did not want to remain in custody and agreed to be released that day.

18. The agent gave me a physical document to sign. It was written in English. I was not provided a copy in Spanish. The agent did not explain what the document said or the conditions Border Patrol was imposing on me. Despite not knowing what it said, I signed the document because I was suffering from the conditions of my confinement. I decided to trust that the agent was being honest and would release me. I believe Border Patrol kept me, and other people like me, uncomfortable and hungry to pressure us to give up on our immigration cases. Even though I have a family petition application pending, it was very difficult to endure those circumstances and not give in to their demands.

19. Upon my release, I received a bag containing most of my belongings. However, the gold chain with a gold cross I had been wearing the day I was arrested was gone. It had been a birthday gift from a girlfriend and had religious and personal significance to me. I wore it every day because it was so special to me. It is still missing.

20. My experience with Border Patrol was deeply traumatizing. When I have to go near the Home Depot where I was arrested, I feel terrified. I get nervous and my heart starts pounding. Though it has been over a month since my arrest, I continue to have pain in my left arm and shoulder from when the Border Patrol agent yanked me hard by the arm. Every time I leave my house to run errands or go to appointments, I ask myself if it is really necessary. I fear that immigration agents will stop, arrest, and detain me again. I am scared of being detained in those inhumane conditions again. I fear they will try again to pressure me to agree to deportation. I have trouble concentrating on anything because I experience persistent flashbacks of my experience being arrested and detained.

21. I understand that, as a class representative, I represent the interests of everyone in the class, and not just myself. I understand I need to stay informed about what is happening with my case and stay in touch with my attorneys to give them information they need. I am committed to being a class representative because I do not want other people in the community to be harmed by Border Patrol's unlawful practices the way I was. I have never served as a class representative in any prior action.

22. This declaration was read to me in full English and Spanish on February 21, 2025 by Brisa Velazquez Oatis. I completely understand the content of this declaration.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 24, 2025 at Bakersfield, California.

_____
Wilder Munguia Esquivel

**CERTIFICATE OF INTERPRETATION**

I, Brisa Velazquez Oatis, certify that I am fluent in Spanish and English and that I am competent to interpret between these languages. I further certify that I have read the foregoing to Wilder Munguia Esquivel in Spanish. I further declare that I am competent to render this interpretation and that I would testify to the same under the penalty of perjury if I were called upon to do so.

Date: Feb. 24, 2025

_____
Brisa Velazquez Oatis