1

2

3

4

5

6

7

8                          **UNITED STATES DISTRICT COURT**

9                          **EASTERN DISTRICT OF CALIFORNIA**

10

11 | UNITED FARM WORKERS, OSCAR              ) | Case No.: 1:25-cv-00246 JLT CDB
   | MORALES CISNEROS, WILDER MUNGUIA        )
12 | ESQUIVEL, YOLANDA AGUILERA              ) | ORDER GRANTING PLAINTIFFS' MOTION
   | MARTINEZ, JUAN VARGAS MENDEZ, and       ) | FOR PROVISIONAL CLASS CERTIFICATION
13 | MARIA GUADALUPE HERNANDEZ               ) | AND GRANTING PLAINTIFFS' MOTION FOR
   | ESPINOSA,                               ) | A PRELIMINARY INJUNCTION
14 |                                         )
   |                    Plaintiffs,          ) | (Docs. 14, 15)
15 |                                         )
   |        v.                               )
16 |                                         )
   | KRISTI NOEM, as Secretary of the Department )
17 | of Homeland Security; PETE R. FLORES, as )
   | Acting Commissioner of U.S. Border Patrol; )
18 | MICHAEL W. BANKS, as Chief of U.S. Border )
   | Patrol; and GREGORY K. BOVINO, as Chief )
19 | Patrol Agent for El Centro Sector of the U.S. )
   | Border Patrol,                           )
20 |                                         )
   |                    Defendants.          )
21 |_____)

22          United Farm Workers, Oscar Morales Cisneros, Wilder Munguia Esquivel, Yolanda Aguilera

23 Martinez, Juan Vargas Mendez, and Maria Guadalupe Hernandez filed a complaint for declaratory and

24 injunctive relief related to detentive stops and arrests by Border Patrol.  Plaintiffs state claims against

25 the defendants—including Kristi Noem, in her official capacity as Secretary of the Department of

26 Homeland Security; Pete R. Flores, in his official capacity as Acting Commissioner of U.S. Border

27 Patrol; Michael W. Banks, in his official capacity as Chief of U.S. Border Patrol; and Gregory Bovino,

28 in his official capacity as Chief Patrol Agent for the El Centro Sector of the U.S. Border Patrol—for

                                              1

violations of 8 U.S.C. § 1357(a)(2), 8 C.F.R. § 287.8(c)(2)(ii), the Fourth Amendment, and the Fifth Amendment.  (*See generally* Doc. 1.)

Oscar Morales Cisneros, Wilder Munguia Esquivel, and Yolanda Aguilera Martinez seek provisional class certification.  (Doc. 14.)  Plaintiffs also seek a preliminary injunction, "preliminarily enjoining Defendants from continuing their practices of (1) detentive stops without regard to reasonable suspicion that the person stopped is in the country unlawfully, and (2) warrantless arrests without regard to probable cause that the person arrested is likely to escape before a warrant can be obtained." (*See* Doc. 15 at 2.)  Defendants oppose both motions.  (Docs. 31, 32.)  The Court held a hearing on the pending motions on April 28, 2025.  For the reasons set forth below, the motion for provisional class certification is **GRANTED**, and the motion for a preliminary injunction is **GRANTED**.

## BACKGROUND[1]

### I.    "Operation Return to Sender"

The U.S. Border Patrol is "responsible for securing U.S. borders between ports of entry," and "is the mobile, uniformed law enforcement arm of U.S. Customs and Border Protection."  (Doc. 1 at 12, ¶ 38; *see also* Doc. 15-2 at 103.)  Border Patrol agents launched "Operation Return to Sender" in early January 2025, sending approximately 60 agents to the Central Valley region, which lies within the Eastern District of California.  (*See* Doc. 1 at 2, ¶ 1; *see also* Doc. 15-2 at 72.)  Border Patrol indicated to local news media that the Operation focused on alleged drug and human traffickers.  (*See* Doc. 15-2 at 72.)

Plaintiffs contend the Operation was "a nearly weeklong sweep through predominantly Latino areas of Kern County and the surrounding region to stop, detain, and arrest people of color who appeared to be farm workers or day laborers, regardless of their actual immigration status or individual circumstances."  (Doc. 1 at 2, ¶ 1; *see also id.* at 43-44, ¶¶ 235-236.)  Plaintiffs allege Border Patrol took the following steps as part of "Operation Return to Sender":

> **Step One: "Stop Regardless of Reasonable Suspicion."**  Plaintiffs allege
> that "Border Patrol relied on a practice of conducting detentive stops

---

[1] Defendants do not object to the declarations or exhibits submitted by Plaintiffs in support of the motions for provisional class certification and a preliminary injunction nor do they deny the factual allegations made in Plaintiffs' evidence. The Court accepts this evidence as true for purposes of the motions now pending.

regardless of reasonable suspicion that a person was in the country unlawfully." (Doc. 1 at 3, ¶ 5.)

**Step Two: "Arrest Regardless of Flight Risk."** Plaintiffs assert that "Border Patrol agents also relied on a practice of escalating stops to warrantless arrests without evaluating whether the arrestee posed a flight risk." (Doc. 1 at 3, ¶ 8.) In addition, Plaintiffs contend that "when an arrestee affirmatively informed Border Patrol agents of facts showing they were *not* a flight risk, Border Patrol agents ignored them." (*Id.*, emphasis in original).

**Step Three: "Expel Without Explanation."** Plaintiffs contend, "Once Border Patrol agents transported the people they arrested to the El Centro Station… [they would] extract voluntary departure agreements from as many people as possible without explaining the consequences." (Doc. 1 at 4, ¶ 9.) Plaintiffs also contend "agents provided a slew of misinformation about voluntary departure." (*Id.* at 5, ¶ 11.)

(*See* Doc. 1 at 3-6, ¶¶ 5-15; *see also id.* at 43, ¶ 234.)

Plaintiffs observe that under the Fourth Amendment, Border Patrol agents are prohibited "from detaining a person, whether in a private vehicle or on foot, without reasonable suspicion that the person is in the country unlawfully." (Doc. 1 at 2, ¶ 2.) Plaintiffs note a detentive stop cannot be justified by "person's perceived race, ethnic background, or occupation" or "refusal to answer voluntary questions." (*Id.*) Plaintiffs assert that immigration officers— including Border Patrol agents—are prohibited "from making indiscriminate arrests without a warrant" without making a "finding that a person (1) is violating immigration law and (2) is a flight risk…." (*Id.*, citing 8 U.S.C. § 1357(a)(2) [emphasis omitted].) Plaintiffs claim also that "the Fifth Amendment prohibits Border Patrol agents from subjecting people in their custody to "voluntary departure"—a form of summary expulsion—unless they knowingly and voluntarily waive their right to an immigration court hearing." (*Id.*) According to Plaintiffs, "Operation Return to Sender" disregarded these legal rights "by design." (*Id.*, ¶ 3.)

Plaintiffs contend that during the Operation, Border Patrol agents from the United States/Mexico Border traveled approximately 300 miles north to the Bakersfield region. (Doc. 1 at 2, ¶ 1.) "Border Patrol agents roved Highway 99, the central artery of the agricultural heart of the San Joaquin Valley, and other roads in predominantly Latino neighborhoods and agricultural areas." (*Id.* at 44, ¶ 235.) The "agents tailed cars, flashing their lights, or pulled cars over from the shoulder; targeted people of color, people who appeared to be farm workers, and people who appeared to be day

laborers for stops; and did so without any basis to believe that anyone in the car was violating an immigration law." (*Id.*)

Plaintiffs allege that during the Operation, "Border Patrol agents went to businesses in predominantly Latino neighborhoods and areas where farm workers and day laborers gather." (Doc. 1 at 44, ¶ 236.) The "agents roved parking lots and blocked parked cars from behind with their own vehicles to stop and detain people inside the cars." (*Id.*) "Border Patrol agents targeted people of color parked in their cars without any basis to believe that anyone in the car was violating an immigration law." (*Id.*) According to Plaintiffs, if a person on foot "verbally exercised their right to remain silent, walked away, or otherwise declined to consent to questioning, Border Patrol agents escalated the interaction to a detentive stop or arrest, conducted warrantless searches without consent, and did so without any basis to believe the person was violating an immigration law." (*Id.*, ¶ 237.) "[W]hen a person in a vehicle declined to answer Border Patrol agents' questions or consent to the encounter, the agents similarly escalated the encounter by blocking the car in, smashing the car's windows, slashing the car's tires, and/or ordering or physically pulling people out of vehicles and handcuffing them." (*Id.*, ¶ 238.)

Plaintiffs allege Border Patrol agents arrested individuals without "probable cause to believe that the person posed a risk of escape." (Doc. 1 at 44, ¶ 239.) Border Patrol agents did not "assess[] … a person's flight risk or attempt to obtain a warrant before making an arrest." (*Id.*) Rather, the "agents indiscriminately arrested people…, including people with pending immigration applications, no criminal history, established residences in the community, steady employment, family in the United States, or other community ties mitigating any purported flight risk." (*Id.* at 44-45, ¶ 239.)

## II.    Experiences of Named Plaintiffs

The named plaintiffs contend they were each targeted as part of "Operation Return to Sender." Plaintiffs allege that "Border Patrol targeted them"— and similarly situated individuals— "based on their appearance, including their apparent race or ethnicity." (Doc. 1 at 57, ¶ 289.) Plaintiffs allege that the Border Patrol agents lacked reasonable suspicion for the executed stops (*id.* ¶¶ 69, 88, 101, 126, 163) and that the agents lacked probable cause to believe the plaintiffs were likely to escape before warrants could be obtained. (*Id.*, ¶¶ 70, 89, 102, 127, 164.)

4

### A.    Oscar Morales Cisneros

Oscar Morales Cisneros is 51 years old and works in maintenance and construction.  (Doc. 15-9 at 2, Decl. ¶¶ 2-3.)  He lived in Los Angeles County for approximately 15 years before moving to Bakersfield in 2021.  (*Id.*, ¶ 2.)  He has no criminal history.  (*Id.*)

Morales Cisneros asserts "Border Patrol agents stopped him" on January 7, 2025.  (Doc. 1 at 9, ¶ 27.)  He states that "after leaving work to head home," he stopped at a water filling station outside a liquor store "located in a predominantly Latino-populated neighborhood."  (Doc. 15-9 at 2, ¶ 4; *see also* Doc. 1 at 16, ¶ 49.)  While in the cab of his truck—which was registered under his name, had current registration, and no stickers or decals—an unmarked Chevy Tahoe pulled in behind his truck and "blocked him in the parking spot."  (*Id.*)  He "put the truck back in park and lowered [the] driver's side window."  (*Id.*)  Two agents wearing green "Border Patrol" uniforms stood outside his truck.  (*Id.*)

According to Morales Cisneros, a Spanish-speaking agent, later identified as "Officer Sanchez," asked if he "had papers and was here legally."  (Doc 15-9 at 2, ¶ 5.)  Morales Cisneros "exercised [his] right to remain silent and did not answer [the] questions."  (*Id.*)  However, he provided his driver's license upon the agents' request, which the agents took to their vehicle.  (*Id.*)  Morales Cisneros states that he called his daughter to tell her that Border Patrol agents stopped him.  (*Id.*)  Officer Sanchez asked for the call to be put on speaker, identified himself to Morales Cisneros' daughter, and informed her that Morales Cisneros "was being detained by Border Patrol for being here illegally without documents."  (*Id.* at 2-3, ¶¶ 5-6; *see also* Doc. 1 at 16-17, ¶¶ 52-53.)  Officer Sanchez then ended the call and asked Morales Cisneros to step out of the truck.  (*Id.* at 3, ¶ 6.)  Officer Sanchez handcuffed him and placed him in the Border Patrol vehicle.  (*Id.*)  The agents did not produce a warrant or explain why they stopped him, other than while on the phone with his daughter.  (*Id.*)  The agents did not ask about his "ties to the community," including his family members, work history, or how long he "lived in the neighborhood."  (*Id.*)  Thus, Plaintiffs contend the Border Patrol agents did not "undertake any other evaluation of whether [Morales Cisneros] posed a risk of flight."  (Doc. 1 at 17, ¶ 54.)

The Border Patrol agents drove around Bakersfield, with him handcuffed, for about two hours.  (Doc. 15-9 at 3, ¶ 6.)  "At one point, the agents stopped at a gas station and pulled up behind a vehicle

to block it in, like they had done to [him]." (*Id.*, ¶ 7.) Morales Cisneros "overheard one of the agents say in English, 'We're doing our job.'" (*Id.*) The people "were let go and the agents returned to the Chevy Tahoe." (*Id.*)

Morales Cisneros asserts the agents took him "to a station where he saw other people were being detained and a bus was waiting." (Doc. 1 at 18, ¶ 56.) He was fingerprinted, photographed, and his personal belongings were placed in a bag. (Doc. 15-9 at 3, ¶ 8.) He asked an agent if he could call his daughter, and the request was granted, after which agents also took his cell phone. (*Id.*) Morales Cisneros estimates there were "about 40 people on the bus" when it "left the station late in the evening." (*Id.*, ¶ 9.) His bus arrived at the El Centro Station, a detention center in Imperial County, "in the early morning hours" of January 8, 2025." (*Id.*; *see also* Doc. 1 at 17, ¶ 58.)

After processing, Morales Cisneros saw an agent who presented two options: (1) "agree to voluntary departure" or (2) "wait to see a judge." (Doc. 15-9 at 4, ¶ 11.) Through the next two days, Morales Cisneros maintained he wished to see a judge and speak to a lawyer. (*Id.* at 5, ¶ 17; *see also id.* at 4-5 ¶¶ 13-14.) On January 10, 2025, an agent instructed Morales Cisneros "to sign [his] name on a small electronic pad to be released." (*Id.*, ¶ 18.) He alleges the agent also indicated the signature was required "to see a judge and be put on a monitoring device." (*Id.*) Morales Cisneros signed as directed. (*Id.*) Morales Cisneros "was fitted with a monitoring device on [his] wrist," and released by Border Patrol that evening. (*Id.* at 5-6, ¶¶ 18-19.)

According to Plaintiffs, "the Border Patrol agents who stopped and detained [] Morales Cisneros did not have reasonable suspicion that he was unlawfully present in the United States." (Doc. 1 at 19, ¶ 69.) Plaintiffs also contend that Border Patrol "did not have probable cause to believe he was likely to escape before a warrant could be obtained for his arrest." (*Id.*, ¶ 70.)

### B.    Wilder Munguia Esquivel

Wilder Munguia Esquivel is 38 years old. (Doc. 15-10 at 2, Decl. ¶ 2.) He has lived in Bakersfield for about 12 years with his brother and his family, all of whom are U.S. citizens. (*Id.*) He is a licensed handyman and works as a day laborer. (*Id.*, ¶ 3.) Munguia Esquivel had "a pending family petition" at the time of the relevant events. (*Id.*, ¶ 8.) He has no criminal history. (*Id.*)

He reports that on January 7, 2025, around 12:00 p.m., he was standing with a group of other

day laborers outside Home Depot on Ming Avenue in Bakersfield when "[s]everal unmarked vehicles pulled up." (Doc. 15-10 at 2, ¶ 4.) At least 10 men—most of whom had "masks covering their faces, with holes only for their eyes"—got out of the vehicles and "aggressively swarmed" around the day laborers. (*Id.*, ¶¶ 4-5.) The men "wore civilian clothing and [he] did not see any badges." (*Id.*) Munguia Esquivel "first thought … [the men] might be terrorists mugging or kidnapping [the day laborers]." (*Id.*, ¶ 5.) He also wondered if he would be murdered. (*Id.*) He reports the men "wore civilian clothing and [he] did not see any badges." (*Id.*)

The unidentified agents demanded the day laborers' "papers." (Doc. 15-10 at 2, ¶ 5.) The agents "did not seem to be targeting specific individuals." (*Id.* at 3, ¶ 10.) An agent asked Munguia Esquivel, "directly in Spanish, 'Do you have papers? Do you have identification? Where are you from?'" (*Id.* at 2, ¶ 5.) The agent questioning him wore a mask covering his face, hat, and thick sunglasses. (*Id.*) Munguia Esquivel had no idea who the man was, and he did not respond to the questioning. (*Id.*) They "kept yelling … louder and louder," asking if Munguia Esquivel had papers and where he was from. (*Id.*) Munguia Esquivel "began to slowly walk away," but the agent followed and continued yelling. (*Id.*) Munguia Esquivel "stayed quiet." (*Id.*) In Spanish, the agent then ordered him to "turn around" to be handcuffed. (*Id.*) According to Munguia Esquivel, "[i]t was around this time that [he] realized the men were federal immigration agents." (*Id.*)

He told the agent, "I have the right to remain silent," but the agent ignored him. (Doc. 15-10 at 2, ¶ 6.) The agent directed Munguia Esquivel to pull out his wallet but, before he could comply, the agent "forcefully yanked [his] left arm" and removed the wallet from Munguia Esquivel's back pocket. (*Id.* at 2-3, ¶¶ 6-7.) Munguia Esquivel believes that "[t]he agent who arrested [him] did not know" who he was. (*Id.* at 3, ¶ 10.) The agent did not ask about his "community ties, such as [his] family, work history, or how long" Munguia Esquivel had been living in Bakersfield. (*Id.*, ¶ 8.)

Munguia Esquivel was warned to call a family member to pick up his truck within 20 minutes from Home Depot, or the truck would be towed. (Doc. 15-10 at 3, ¶ 7.) He reports that when his sister-in-law and niece came to get the truck, they told Border Patrol agents that he "was in the process of regularizing [his] immigration status." (*Id.*, ¶ 9.) However, "[t]he agents did not care and said they were taking [him] anyway." (*Id.*)

Border Patrol agents first drove Munguia Esquivel to the back lot of Home Depot, where he "saw several vehicles and over ten people who had been detained, including some who were elderly." (Doc. 15-10 at 3, Decl. ¶ 10.) He estimates that after about 15 to 20 minutes, the agents transported him "to a makeshift facility on 7th Standard Road in Bakersfield." (*Id.*) He saw "[o]ne bus … already full of people who had been detained," and "[a] second bus arrived." (*Id.*, ¶ 11.) While at the facility, agents fingerprinted and photographed Munguia Esquivel and ordered him to place belongings in a bag. (*Id.*, ¶ 12.) He remained at the 7th Standard Road facility until the evening, at which time Border Patrol agents placed him on a bus to "a detention facility in Imperial County." (*Id.* at 4, ¶ 13.)

Munguia Esquivel reports that on January 10, an agent informed him that he could leave that day, but he would "have conditions." (Doc. 15-10 at 5, ¶ 17.) However, he is unsure of the conditions imposed. (*Id.*, ¶¶ 17-18.) He was released and returned to Bakersfield. (*See id.*, ¶ 19; Doc. 1 at 22, ¶ 86.) This experience "was deeply traumatizing." (*Id.* at 6, ¶ 20.) He states that he feels terrified when he goes near the Home Depot. (*Id.*) He asks himself "if it is really necessary" when he leaves the house because he "fear[s] that immigration agents will stop, arrest, and detain [him] again." (*Id.*) He also fears Border Patrol "will try again to pressure [him] to agree to deportation." (*Id.*)

According to Plaintiffs, "the Border Patrol agents who stopped and detained [] Munguia Esquivel did not have reasonable suspicion that he was unlawfully present in the United States." (Doc. 1 at 23, ¶ 88.) Plaintiffs also contend the agents "did not have probable cause to believe he was likely to escape before a warrant could be obtained for his arrest." (*Id.*, ¶ 89.)

### C.    Yolanda Aguilera Martinez

Yolanda Aguilera Martinez is 56 years old and has "lived in Kern County for close to 45 years." (Doc. 15-11 at 2, Decl. ¶¶ 2-3.) She immigrated to the United States "when [she] was around six years old and became a lawful permanent resident at around 20 years old." (*Id.*, ¶ 2.) She has no criminal history. (*Id.*)

On January 8, 2025, around 4:30 p.m., Aguilera Martinez was driving when she saw two unmarked vehicles pulled over to the right side of the road, with lights flashing, and "three men standing near the vehicles." (Doc. 15-11 at 2, ¶ 4.) The license plate on her vehicle was current and she "was not speeding" when a "man raised his hand to flag [her] down" and signaled for her to pull

over.  (*Id.*)  She "thought [the men] might be police officers," and pulled over.  (*Id.*, ¶¶ 4-5.)

When "[t]he man who flagged [her] down walked over … "[h]e did not identify himself or seem to know who she was."  (Doc. 15-11 at 2, ¶ 6; *see also* Doc. 1 at 23, ¶ 92.)  The agent said, "I need to see your papers."  (*Id.*)  Aguilera Martinez handed him a "valid, current, California driver's license." (*Id.*)  The agent looked at the license and said, "This shit is fuckin' fake."  (*Id.*)  The agent threw her license to her lap and ordered her to get out of the vehicle.  (*Id.*, ¶¶ 6-7.)  She "still did not know who these men were," but compiled because she "felt [she] had no choice."  (*Id.* at 2-3, ¶ 7.)  After she opened the door, the agent grabbed her arm, "pushed [her] down to the ground," and placed her in handcuffs.  (*Id.* at 3, ¶ 7.)  The agent then took her to an SUV and sat her in the backseat.  (*Id.* ¶¶ 7-9.)

When the agent returned to the SUV, Aguilera Martinez asked if she could contact someone to send a photo of her green card, and the agent agreed.  (Doc. 15-11 at 3, ¶ 10.)  He removed the handcuffs and Aguilera Martinez called a friend who sent a photo of the green card via text message. (*Id.*)  The agent "quickly scanned" the photo before telling her: "Get the fuck out of here."  (*Id.*)  She "got in [her] car and drove away."  (*Id.*)

Aguilera Martinez was "very stressed and in shock," and "did not know why [she] had been stopped, nor who those men were."  (Doc. 15-11 at 4, ¶ 11.)  She later saw "multiple videos and photos on social media of Border Patrol agents arresting people, including at Home Depot and along Highway 99."  (*Id.*)  She believes the men who stopped her, and the vehicles they used, "looked just like some of the Border Patrol agents and vehicles [she] saw on social media."  (*Id.*)  Thus, Plaintiffs contend that "[u]pon information and belief, the men were Border Patrol agents."  (Doc. 1 at 23, ¶ 91.)

Aguilera Martinez had bruises on her wrists from the handcuffs and bruises on her legs from being "shoved … to the ground."  (Doc. 15-11 at 4, ¶ 14.)  She now feels "extremely worried and nervous this could happen to [her] again," and when driving near where the location of the encounter, she feels queasy and her heart beats faster.  (*Id.* at 3-4, ¶ 12.)  She is unable to avoid driving to run errands, go to appointments, and attend church," but she tries to avoid the "areas where other people were arrested by Border Patrol" during the operation.  (*Id.*)

### D.    Juan Vargas Mendez

Juan Vargas Mendez is 37 years old and was a Kern County resident for approximately 20

1   years.  (Doc. 15-6 at 2, ¶ 2.)  He lived in Bakersfield with his wife and children, who are U.S. citizens.

2   (*Id.*)  Vargas Mendez reports he "worked as a farmworker at the same ranch for more than 10 years"

3   and "sometimes worked as a gardener."  (*Id.*, ¶ 3.)  He has no criminal history.  (*Id.*, ¶ 2.)

4           On the evening of January 8, 2025, Vargas Mendez left work as a passenger in a van with five

5   co-workers.  (Doc. 15-6 at 2, ¶ 4.)  They traveled along Maricopa Highway, which he describes as "a

6   central highway for farmworkers in southwest Kern County, especially to get to many orange and

7   almond fields."  (*Id.*)  While traveling toward home, he heard sirens.  (*Id.*, ¶ 5.)  He looked at the

8   speedometer and saw the vehicle was going "under 40 miles an hour, well within the speed limit."

9   (*Id.*, ¶ 5.)  An unmarked SUV forced the van to stop by stopping in front of the van, while another

10  SUV stopped behind it.  (*Id.*)  Vargas Mendez believed the people who stopped them "might be the

11  police because their vehicles had sirens and flashing lights."  (*Id.* at 2-3, ¶ 6.)  However, he now

12  knows they were Border Patrol agents.  (*Id.* at 4, ¶ 12.)

13          He states an agent approached the driver's window and "demanded the driver and front

14  passenger show their license and proof of residency."  (Doc. 15-6 at 3, ¶ 7.)  He reports that as an

15  agent reviewed the identification produced by the driver and front passenger, "two other agents flung

16  open the door on the right side of the van" without consent.  (*Id.*, ¶ 8.)  The agents shouted in Spanish

17  that they all needed to show their identification and to "tell the truth."  (*Id.*)

18          Vargas Mendez was not carrying any identification.  (Doc. 15-6 at 3, ¶ 9.)  Border Patrol

19  agents "dragged [him] out of the van" and demanded that he hand over personal belongings before

20  handcuffing him.  (*Id.*)  One of his coworkers was also dragged out of the van.  (*Id.*)  The agents

21  mocked them, calling them "Mexican bitches."  (*Id.*, ¶ 10.)  The Border Patrol agents did not explain

22  why they were being arrested or show them any warrants.  (*Id.*)  The agents did not ask about his ties

23  to Kern County, such as his family, employment, or how long he had lived there.  (*Id.*)  Vargas

24  Mendez reports: "I told him I have lived in the area for 20 years; I have a wife and four kids who are

25  all citizens; I have no criminal record."  (*Id.*, ¶ 11.)  However, he reports the agent "responded he did

26  not care and that [Vargas Mendez] was 'going to Mexico.'"  (*Id.*)

27          The agents drove them to "a large white warehouse with barbed wire."  (Doc. 15-6 at 4, ¶ 12.)

28  Agents photographed and fingerprinted him, and then transported him to a detention facility, where

they arrived around 1:00 a.m. on January 9.  (*Id.*, ¶¶ 12-14.)  The agents did not tell them where they were, but other detainees later informed him it was the El Centro Station.  (*Id.*, ¶¶ 14, 16.)

Vargas Mendez reports an agent at El Centro said he was arrested because he was "illegal" and would be deported.  (Doc. 15-6 at 4, ¶ 14.)  Vargas Mendez responded that he had been in the area for 20 years, had a family, was hardworking, and had no criminal record.  (*Id.*, ¶ 15.)  This agent said that "he didn't care" and that Vargas Mendez "would be deported anyway."  (*Id.*)  Later that day, Vargas Mendez electronically signed a document, but he did not know what he signed.  (*Id.* at 5, ¶¶ 18-19.)  About two hours after Vargas Mendez signed the tablet, Border Patrol drove him "to the border across from Mexicali, Mexico."  (*Id.*, ¶ 20.)  At the time the complaint was filed, Vargas Mendez was still in Mexico.  (*Id.* at 2, ¶ 2; Doc. 1 at 28, ¶ 125.)

Plaintiffs contend the Border Patrol agents "did not have reasonable suspicion that [Vargas Mendez] or anyone else in the vehicle was unlawfully present in the United States."  (Doc. 1 at 28, ¶ 126.)  Plaintiffs allege "the Border Patrol agents who arrested [him] did not have probable cause to believe he was likely to escape before a warrant could be obtained for his arrest."  (*Id.*, ¶ 127.)

### E.    Maria Guadalupe Hernandez Espinoza

Maria Guadalupe Hernandez Espinoza is 46 years old and "lived in Bakersfield for about 10 years."  (Doc. 15-8 at 2, Decl. ¶ 2.)  She has "worked in the agricultural sector for close to 20 years."  (*Id.*, ¶ 3.)  She has no criminal history.  (*Id.*, ¶ 2.)

On January 7, 2025, Hernandez Espinoza was a passenger in a car driven by her partner.  (Doc. 15-8 at 2, ¶ 4.)  The car was registered under her partner's name, "ha[d] no stickers or decals, and the license plate and registration were current."  (*Id.*)  At about 5:30 p.m., they were on Highway 58, heading toward Bakersfield with a coworker after working in Tehachapi.  (*Id.*)  Her partner did not violate any traffic laws as he drove on the highway.  (*Id.*)  As they prepared to exit the highway, they "were approached from behind by an unmarked white Ford pickup truck," which flashed its lights at the car and activated a siren.  (*Id.*)

After her partner pulled over, "[a] man in a white shirt approached and instructed him to turn off the car."  (Doc. 15-8 at 2, ¶¶ 4-5.)  Turing off the car automatically unlocked the doors, after which the man opened the door and instructed the driver to exit the car.  (*Id.*, ¶ 5.)  "The man did not identify

11

himself, show a warrant, or ask [them] any questions" before escorting her partner to the truck. (*Id.*) Six unmarked vehicles pulled up behind the car, each with 3-4 armed individuals. (*Id.*) Hernandez Espinoza and her coworker complied with a request to exit the car, after which they were asked to produce identification and were asked "if [they] had papers, and if [they] were here legally." (*Id.* at 3, ¶ 7.) Hernandez Espinoza "did not answer their questions," and she did not produce any identification. (*Id.*) At this point, Hernandez Espinoza believed the individuals who stopped the vehicle were law enforcement, but she "had no inkling they were affiliated with immigration." (*Id.*, ¶ 9.)

The agents informed the trio that they "were under arrest," and transported them "to a makeshift processing area on 7th Standard Road in Bakersfield." (Doc. 15-8 at 3, ¶ 10.) Hernandez Espinoza first realized they were in Border Patrol custody while at the processing center. (*Id.*) She saw "dozens of men and just one other woman," aside from her and her coworker. (*Id.*) She estimates they were at the processing center for about an hour before boarding a bus, which "left Bakersfield in the late evening." (*Id.* at 4, ¶ 11.) "About three hours into the drive, the bus stopped to switch drivers," and she heard one of the drivers laugh and say, "'Vamos por mas mojados,' which means 'Let's go for more wetbacks.'" (*Id.*)

Hernandez Espinoza reports their bus arrived at the El Centro Station early the next morning. (Doc. 15 at 4, ¶ 11.) She had "an initial interview" with a Latina Border Patrol agent, who informed her that she "could either agree to voluntary departure or see a judge." (*Id.*, ¶ 14.) Hernandez Espinoza "impulsively" agreed to a voluntary departure, though she later changed her mind and attempted to convey this to Border Patrol agents. (*Id.*, ¶¶ 14-15.) On January 9, 2025, Border Patrol informed Hernandez Espinoza that "they were sending [her] to Mexico." (*Id.* at 5, ¶ 20.) Border Patrol transported her via a truck to Mexicali, Mexico. (*Id.*)

### III.    Community Members

Plaintiffs also identify several other members of the community, including UWF members, who they assert were stopped and/or arrested by Border Patrol during "Operation Return to Sender."

#### A.    Jesus Ramirez

Jesus Ramirez is 64 years old and reports he recently moved to Bakersfield, California, where he rents a home. (Doc. 15-5 at 2, ¶ 2.) He is "the only living parent" to his daughter and son, and he

1    is the primary caretaker for his minor son.  (*Id.*)  Ramirez reports that he worked "as a day laborer,

2    fixing roofs and sprinklers and mowing grass" in Bakersfield and San Mateo, where he previously

3    lived.  (*Id.*, ¶ 3.)

4        Ramirez reports that on January 7, 2025, he "was standing with some other day laborers in the

5    Home Depot parking lot when [they] were surrounded by Border Patrol agents."  (Doc. 15-5 at 2, ¶ 4.)

6    The "agents arrived in multiple vehicles, some of which had sirens," around 11:00 a.m.  (*Id.*)  Ramirez

7    "knew they were Border Patrol agents because they had badges on their vests."  (*Id.*)  He reports he

8    "was not doing anything unlawful" when the agents surrounded them, and they "could not go anywhere

9    because there were many agents all around…."  (*Id.*)

10       The "Border Patrol agents repeatedly demanded" the day laborers "show [their] 'papers'."

11   (Doc. 15-5 at 2, ¶ 5.)  Ramirez reports he pulled out his wallet, after which "an agent snatched" it from

12   him and removed his ID.  (*Id.*)  Ramirez states the agent returned his wallet but kept the identification.

13   (*Id.*)  It was "clear… the agents did not know [who] he was."  (*Id.*, ¶ 7.)  The agents "did not show

14   [him] any document or have a warrant."  (*Id.*)  They "did not ask… any questions about [his] family or

15   ties to the community."  (*Id.*, ¶ 6.)

16       Ramirez reports he "was loaded into a vehicle in the parking lot of Home Depot and transported

17   behind the store, where [he] was loaded into a bigger vehicle" that "was full of other people."  (Doc.

18   15-5 at 2, ¶ 8.)  A Border Patrol agent said he "was going to be taken 'home,'" and Ramirez believed

19   that meant he was "going to be taken to [his] own home in Bakersfield."  (*Id.* at 2-3, ¶ 8.)  It was not

20   until they arrived at a processing station that he realized "immigration was formally arresting [him]."

21   (*Id.* at 3, ¶ 9.)  He was at the processing station "for about 7 or 8 hours with about 12 other individuals."

22   (*Id*, ¶ 10.)  Ramirez was then loaded onto a bus "filled with people," which transported him to El

23   Centro.  (*Id.*, ¶ 12.)

24       He reports that at El Centro, "[a]n agent ordered [him] to sign a document and said it was

25   required for a judge to review [his] case."  (Doc. 15-5 at 3, ¶ 12.)  This document was in English,

26   which he does not read, and it "was not translated or explained."  (*Id.*)  Ramirez states he "requested

27   an opportunity to make a phone call to a family member but was denied."  (*Id.*)  Border Patrol moved

28   him from El Centro to Imperial Regional Detention Facility on January 9, 2025.  (*Id.*, ¶ 13.)  As of the

1    declaration date of February 13, 2025, Ramirez remained detained and had "one court date with an

2    immigration judge." (*Id.*, ¶¶ 13-14.)

3    **B.    Luis Perez Cruz**

4        Luis Perez Cruz is 28 years old and has lived in Bakersfield with his mother for two years.

5    (Doc. 15-7 at 2, ¶ 2.)  His cousins also live in Bakersfield, and Perez Cruz ran into two of them on

6    January 7, 2025, when he stopped by Home Depot on his way to work.  (*Id.*, ¶ 3.)

7        Perez Cruz reports that he "was chatting" with his two cousins in the parking lot when "[t]wo

8    men wearing civilian clothes walked up," announced they were with Border Patrol, and directed them

9    "to show … IDs saying that [they] were in the United States legally or had permits to be here." (Doc.

10    15-7 at 2, ¶ 3.)  The agents "also asked … if [they] had open immigration cases." (*Id.*)  After Perez

11    Cruz "remained silent," he states an agent then grabbed him, and said "whether or not" he showed

12    identification, he would be arrested.  (*Id.*)  Perez Cruz "felt that [he] had no choice," and showed the

13    agent his identification.  (*Id.*)  The agents "did not appear to have any idea who [he] was before they

14    demanded [his] ID," and reports they did not present any warrant.  (*Id.*)  The agents did not ask any

15    questions about his "family, community ties, work, or life in Bakersfield." (*Id.*)

16        The agents drove Perez Cruz, "along with other people they were arresting, in a truck and

17    drove … behind the Home Depot." (Doc. 15-7 at 2, ¶ 5.)  Behind the store, he was placed into a van,

18    and then transported to a station at 7th Standard Road.  (*Id.*)  At the 7th Standard station, agents took

19    his fingerprints and noted the names of his wife and children.  (*Id.*)  He was then forced to travel in "a

20    large bus that looked like a Greyhound bus," to the El Centro holding center.  (*Id.*)

21        Perez Cruz reports that at El Centro, he "refused to sign anything until [he] saw a judge."

22    (Doc. 15-7 at 2, ¶ 6.)  "After nearly four days, the agents … fitted [him] with a wrist monitor," gave

23    him information about immigration court, and released him.  (*Id.*)  He returned to Bakersfield and now

24    has "an immigration case" pending.  (*Id.* at 2-3, ¶¶ 7-8.)  He is afraid Border Patrol "will pick [him]

25    again and treat [him] even worse" with the immigration case pending.  (*Id.* at 2, ¶ 7.)

26    **C.    Ernesto Campos Gutierrez**

27        Ernesto Campos Gutierrez is 44 years old, and he is a citizen of the United States.  (Doc. 15-4

28    at 2, ¶ 2.)  He owns a home in Bakersfield, where he lives with his partner and children.  (*Id.*)  He

owns a "gardening and landscaping business," for which he "haul[s] a mini trailer containing gardening equipment" behind his truck.  (*Id.*, ¶¶ 2-3.)

On January 8, 2025, Campos Gutierrez was driving, with a passenger, on the way to a gardening job around 9:40 a.m.  (Doc. 15-4 at 3, ¶ 3.)  The truck he was driving was registered under his name, "had current license plates and registration, and had no stickers or decals."  (*Id.*)  He "was driving within the speed limits" and pulling the mini trailer.  (*Id.*)  Campos Gutierrez noticed "[a]n unmarked, white Chevrolet Tahoe follow … [him] for a couple minutes," after which it flashed lights, signaling for him to pull over.  (*Id.*, ¶ 4.)

The Tahoe pulled over behind him, and "[a] black male agent … wearing a vest that said the word[] 'POLICE' in large letters" approached the driver's side door.  (Doc. 15-4, ¶ 4.)  The agent "tried to pull open driver's side door, but the door was locked."  (*Id.*)  Through the closed window, the agent asked for their IDs, and "called to another person and said he 'had two bodies.'"  (*Id.*)  The agent "did not identify himself," show a warrant, or explain why the truck was pulled over.  (*Id.*)  Campos Gutierrez lowered his window and asked the agent why he was pulled over, while handing over his REAL ID driver's license.  (*Id.*, ¶ 5.)  The agent glanced at the identification and directed Campos Gutierrez "to hand him the keys to [the] truck."  (*Id.*)  Campos Gutierrez refused, because the agent had not said "who he was" or why the truck was pulled over.  (*Id.*)  The agent responded that he needed the keys because Campos Gutierrez "was going to drive away." (*Id.*)  However, the truck was turned off and he "had no intention of driving away and leaving [his] driver's license behind."  (*Id.*)  "The agent pulled out a knife and proceeded to slash both tires on the driver's side of [the] truck."  (*Id.*, ¶ 6.)

Another truck arrived and blocked him in by parking right in front of the truck.  (Doc. 15-4 at 3, ¶ 7.)  He states that "[a] white male agent" stood next to his truck, "while the first agent returned to his vehicle to check [his] license."  (*Id.*)  Campos Gutierrez reports:

> The Black agent came back to the passenger side of my vehicle and ordered my passenger to lower his window and open the door.  My passenger lowered the window a few inches.  The agent pulled out a handheld tool and threatened to break the window.  He ordered my passenger to open the window and open the door.  My passenger complied.  The agent forcibly grabbed my passenger out of the truck and handcuffed him.  The agent never asked my passenger any questions about his community ties.  I told the agent he should not have slashed my tires.  The agent said, "I'm not going to argue with you, bro.  You did what you did, I did what I did."

(*Id.*, ¶ 8.)  "A Hispanic agent arrived," who informed Campos Gutierrez that he "was under arrest for 'alien smuggling.'"  (*Id.*, ¶ 9.)  Campos Gutierrez reports he "tried to explain to the agent that [his] passenger had an open immigration case," but the agent did not respond.  (*Id.*)  Campos Gutierrez "videorecorded part of these interactions using [his] cell phone," which the agents took away and handcuffed him.  (*Id.*, ¶ 9-10.)

Campos Gutierrez and his passenger were transported "in the back of a truck that said 'Immigration'" on it "to a facility about 20 minutes away."  (Doc. 15-4 at 11, ¶ 11.)  Campos Gutierrez asked why he was arrested when he is a United States citizen, and the agents "said it was because [he] had been transporting someone without documents."  (*Id.*)  While at the facility, he asked for a phone to call his partner, and "[t]he Hispanic agent said [he] did not have the right to make a call."  (*Id.*, ¶ 12.)  "At one point, the Black agent told the Hispanic agent that he had slashed [the] tires because [Campos Gutierrez] had become aggressive and 'flipped' him off."  (*Id.*)  Campos Gutierrez "told the Hispanic agent that was a lie, and if he wanted to find out the truth he should review the body camera footage."  (*Id.*)  He was detained for about four hours, after which the agents drove him home and dropped him off.  (*Id.* at 3-4, ¶ 13.)

He reports that his partner "spent about $350 on the two tow trucks that towed [his] tuck and mini trailer home."  (Doc. 15-4 at 4, ¶ 14.)  He also spent about $500 to replace the two tires on his truck.  (*Id.*)  Campos Gutierrez believes Border Patrol stopped him "solely because of the color of [his] skin and [his] appearance."  (*Id.*, ¶ 15.)

### D.     UFW Members

Elizabeth Strater, National Vice President of the UFW, also provided a declaration reporting that "UFW members were harmed by 'Operation Return to Sender' and fear harm from future Border Patrol Operations."  (Doc. 15-3 at 5, emphasis omitted.)  She reports that through her role, "and in the ordinary course of UFW's business," she received reports of several UFW members who were impacted in different ways by the Operation, including "Alicia," "Benjamin," "Carlos," "Fernando" and "Gabriela."[2]  (*See id.* at 8, 11-12, Strater Decl. ¶¶ 25, 37, 42.)  Strater reports the following

---

[2] Ms. Strater indicated she used fictitious names "[t]o protect the privacy and security" of the UFW members. (Doc. 15-3 at 9, n.1.)

information—regarding Alicia, Benjamin, Carlos, Fernando, and Gabriela— from these reports.  (*See id.* at 8-13, ¶¶ 24-44.)

Alicia and her husband Benjamin "lived and worked in Kern County for the past 10 years working in berry, table grape, almond, and citrus agriculture."  (Doc. 15-3 at 8, Strater Decl. ¶ 25.)  On January 7, 2025, around 2:00 p.m., Alicia and Benjamin were in a car with Carlos, her brother-in-law, after leaving "the citrus orchards where they all worked together."  (*Id.*, ¶¶ 25-26.)  They traveled on Highway 99, and "were traveling within the speed limit and obeying traffic laws."  (*Id.*, ¶ 26.)  "Alicia, Benjamin, and Carlos all noticed one marked and two unmarked vehicles were parked on the shoulder with police-style lights on the grill."  (*Id.*, ¶ 27.)  When their car passed the three vehicles, "the vehicles left the shoulder, pulled up behind them, and signaled with their lights for them to pull over."  (*Id.* at 8-9, ¶ 27.)  After the driver complied, "[s]everal men approached the car and asked Alicia, Benjamin, and Carlos if they had 'papers.'"  (*Id.* at 9, ¶ 27.)  The Border Patrol "agents did not appear to know who was in the car, and did not appear to have any reason for pulling the car over, other than to ask for 'papers.'"  (*Id.*)  The agents arrested Alicia, Benjamin, and Carlos; they did not present warrants for their arrest and "did not ask any further questions."  (*Id.*, ¶ 28.)  After handcuffing Alicia, "agents asked [her] if she had family."  (*Id.*, ¶ 29.)  "When she told them she had children, an agent 'offered' to go pick up the children so they could all be taken to Mexico together."  (*Id.*)  The agents "did not ask Benjamin or Carlos about their ties to the community or otherwise conduct an assessment of flight risk."  (*Id.*)  The agents transported the trio to a mobile processing center, but later released Alicia after confirming with a daycare that her children were there.  (*Id.*, ¶ 30.)  Border Patrol agents transported Benjamin and Carlos to El Centro, and ultimately deported them to Mexico.  (*See id.* at 9-10, ¶¶ 31-34.)  Alicia continues to work in Kern County and "feels enormous stress and anxiety that … Border Patrol agents will seize her again."  (*Id.* at 10, ¶ 35.)

Fernando is also a "farm worker and UFW member," and he "has lived in Kern County for around 20 years."  (Doc. 15-3 at 11, Strater Decl. ¶ 37.)  On January 9, 2025, Fernando was a passenger in a car that was "traveling within the speed limit and obeying traffic laws" while on a highway "between Bakersfield and Mettler, California."  (*Id.*, ¶¶ 38-39.)  While on the route—which is "commonly taken by agricultural workers when traveling between orchard worksites and farm

worker communities"— "a truck turned on flashing lights and signaled for their car to pull over." (*Id.*, ¶ 38.) After the car stopped, Border Patrol agents approached the vehicle, "grabbed the handles of the locked car doors and pounded on the closed windows." (*Id.*, ¶ 39.) The agents warned that if they did not open the windows, the agents would smash the glass. (*Id.*) "The passengers, including Fernando, sat still and did not respond. In Spanish, the Border Patrol agents began counting down backwards from 'five.' When they reached 'one,' they smashed the windows using a black baton-like stick, causing shards of broken glass to fall all over the car's occupants." (*Id.*) "The agents reached through the broken windows to unlock the car doors and forcefully dragged Fernando and other passengers out of the car and onto the side of the highway." (*Id.*, ¶ 40.) Border Patrol arrested Fernando, and "did not present a warrant for arrest or ask Fernando anything about his family, community ties, employment, or other factors related to his likelihood of flight risk." (*Id.* at 11-12, ¶¶ 40-41.)

Gabriela is a farmworker "who has lived in Fresno for 22 years." (Doc. 15-3 at 12, Strater Decl. ¶ 42.) She "has legal authorization to work in the United States," and "has worked as a farm worker in the stone fruit, table grape, and persimmon orchards, and the bell peppers and tomato fields in the San Joaquin Valley for over 20 years." (*Id.*) She "cannot avoid traveling through and visiting the types of locations that Border Patrol targeted," such as "agricultural areas, to commute to and from work," and "businesses frequented by other farm workers." (*Id.*, ¶ 43.) Gabriela feels anxiety and fear that she will be subjected to Border Patrol's unlawful practices when Border Patrol follows through on its threat to bring 'Operation Return to Sender' to her community in Fresno." (*Id.*, ¶ 42.)

## IV.    U.S. Customs and Border Protection Statistics

The U.S. Customs and Border Protection publishes data and statistics for Border Patrol. A spreadsheet titled "USBP Operation Return to Sender Arrests in January 2025"—from the official website of the agency—indicates that 78 individuals were arrested during the Operation, including 62 on January 7, 2025; 12 on January 8, 2025; and 4 on January 9, 2025. (Doc. 38-1 at 5-6.) The spreadsheet contains a column labeled "criminal history." (*Id.*) For 77 of the 78 arrested individuals, the entry in this column reads "Criminal and/or immigration history was not known prior to the encounter." (*Id.*) For one person, the criminal history indicates: "he had a final order of removal since 03/05/2024." (*Id.* at 5.)

1    **V.**      **Border Patrol's Media Statements and Social Media**

2         Following the Operation, U.S. Customs and Border Protection issued a media statement

3    regarding the results.  (Braun Decl. Exh. 17; *see also* Braun Decl. Exh. 18 [Doc. 15-2 at 72, 74].)  The

4    full statement was as follows:

5              Border Patrol Agents with the El Centro Sector Border Patrol conducted
              an operation in and around the Bakersfield area in Kern County. Our
6              operation focused on interdicting those who have broken U.S. federal law,
              trafficking of dangerous substances, non-citizen criminals, and disrupting
7              the transportation routes used by Transnational Criminal Organizations.
              The U.S. Border Patrol is no stranger to operations in places like
8              Bakersfield, Stockton, Modesto, Fresno, and Sacramento, as the now
              closed Livermore Border Patrol Sector regularly conducted enforcement
9              operations over this area up to the mid 2000s. "The El Centro Sector takes
              all border threats seriously," said Chief Patrol Agent Gregory Bovino.
10             "Our area of responsibility stretches from the U.S./Mexico Border, north,
              as mission and threat dictate, all the way to the Oregon line."
11
              During this three day operation we had over 60 agents on the ground,
12             using both marked and unmarked vehicles. The results of our operation,
              named "Return to Sender" are as follows:
13
              78 arrests (all subjects unlawfully present in the U.S.) The
14             nationality/citizenship of those arrested were from Peru, Guatemala, El
              Salvador, Honduras, Ecuador, Mexico, and China.
15
              One subject arrested was a convicted sex offender convicted of raping an 8
16             year old girl.

17             Another subject had an active warrant from the Visalia Sheriff's
              Department for a sex offense against a child.
18
              One subject had a warrant for being a felon in possession of a weapon out
19             of Tulare County. He was turned over to the Kern County Sheriff's
              Department for extradition to Tulare County. A detainer was placed on
20             this subject so we can take him back into custody on pending federal
              charges.
21
              Three separate Marijuana seizures: 33.01 lbs., 3.1 lbs., and 30.7 grams of
22             personal use.

23             Four separate methamphetamine seizures totaling 7.1 grams.

24             Multiple DUI convictions among those arrested, including some that
              included hit and run and injury enhancements.
25
              Other criminal histories of those arrested included: failure to appear,
26             tampering with a vehicle, petty theft, felony drug possession, vandalism,
              burglary, inflicting injury on spouse, and child abuse convictions amongst
27             others.

28    (Doc. 15-2 at 72.)

The U.S. Border Patrol El Centro Sector ("the Sector") maintains a social media account on Facebook. (*See* Braun Decl., Exhs. 1-11 [Doc. 15-2 at 11-32].)  In January 2025, the Sector commented that "what crosses the border doesn't stay at the border, making every U.S. city a border town." (*Id.* at 28 [Exh. 9].)  Later in January, the Sector commented: "What happens on the border, doesn't stay on the border. Bakersfield is now a dyed in the wool a border town." (*Id.* at 24 [Exh. 7].)

The Sector also made Facebook posts and comments regarding "Operation Return to Sender." (*See* Doc. 15-2 at 11-32.)  On January 9, 2025, the Sector called the Operation "an overwhelming success from day one," and indicated the Sector "continue[s] to field dozens of Border Patrol Agents in Kern County and surrounding area…" (*Id.* at 32 [Exh. 11].)  In another comment on the same date, the Sector stated: "We are planning operations for other locals such as Fresno and especially Sacramento." (*Id.* at 30 [Exh. 10].)  On January 12, 2025, in response to a comment stating, "Here in Bakersfield, you guys forgot to raid some people," the Sector stated: "We plan on coming back!!" (*Id.* at 16 [Exh. 3].)  In a comment thread later in January 2025, the Sector stated: "Although serious criminals will be the first to be tracked down and removed, anyone we encounter who doesn't have the legal right to be in or remain in the U.S. will be arrested." (*Id.* at 12 [Exh. 1].)  An individual then commented "Return to sender round 2," to which the Sector replied, "You bet!" (*Id.*)

In February 2025, the Sector made a Facebook post—with accompanying photos— indicating that an "illegal alien … [r]efused to open [his] window during an immigration inspection" and "[g]ot his window shattered for an extraction." (Doc. 15-2 at 20 [Exh. 5].)  The Sector indicated the immigrant was then arrested and deported. (*Id.*)  In a responsive comment, the Sector stated this was "[fuck around, find out] in full effect." (*Id.* at 22 [Exh. 6].)

**VI.    Procedural History**

Plaintiffs initiated this action by filing a complaint on February 26, 2025. (Doc. 1.)  They contend their experiences, and those of community members, were "not unique." (*Id.* at 43, ¶ 234.)  Plaintiffs "seek to represent three classes of individuals who have been or will be subjected to the three unlawful practices this lawsuit alleges: "detentive stops regardless of reasonable suspicion of unlawful presence, arrests regardless of probable cause of flight risk, and voluntary departure without a knowing and voluntary waiver of rights." (*Id.* at 61-62, ¶ 312.)  Specifically, Plaintiffs identify the

following claims for relief: (1) warrantless arrests without probable cause of flight risk in violation of 8 U.S.C. § 1357(a)(2); (2) warrantless arrests without probable cause of flight risk in violation 8 C.F.R. § 287.8(c)(2)(ii); (3) stops without reasonable suspicion in violation of the Fourth Amendment; and (4) "voluntary departure without a knowing and voluntary waiver of rights" in violation of the Fifth Amendment. (*Id.* at 65-69.) In the prayer for relief, Plaintiffs seek declaratory and injunctive relief, enjoining further violations of their rights under the applicable statutes and amendments. (*Id.* at 69-70.)

On March 7, 2025, Plaintiffs filed the pending motion for provisional class certification (Doc. 14) and a preliminary injunction (Doc. 15). On April 7, 2025, Defendants filed briefs in opposition to provisional class certification and a preliminary injunction. (Docs. 31, 32.) Immigration Reform Law Institute filed an amicus curiae brief in support of Defendants' opposition to the preliminary injunction. (Doc. 33-1.) Plaintiffs filed their reply briefs on April 17, 2025. (Docs. 38, 39.) Each side filed supplemental evidence on April 25, 2025.[3] (Docs. 42-43, 45.)

## VII.   Border Patrol's Muster

On April 4, 2025, Border Patrol's El Centro Sector issued a "Muster" that identifies "the underlying laws and policies applicable to all arrests effected by El Centro Sector Border Patrol Agents under 8 U.S.C. § 1357(a)(2) /INA § 287(a)(2) in the Eastern District of California." (Doc. 31 at 15; Doc. 31-1 at 2.) The Muster indicates it "is to be interpreted consistent with all implementing regulations and controlling Supreme Court and Ninth Circuit case law." (*Id.*)

Border Patrol agents are informed that "[w]hen conducting enforcement actions," they "shall at the time of arrest or as soon as it is practical and safe to do so, identify themselves as immigration officers in accordance with 8 C.F.R. § 287.8(c)(2)(iii)." (Doc. 31-1 at 3.) The Muster also includes provisions regarding warrantless arrests and vehicle stops. (*Id.* at 2-4.)

For warrantless arrests, the Muster indicates Border Patrol agents may conduct an arrest without a warrant under 8 U.S.C. § 1357(a)(2) / INA § 287(a)(2), "if there is reason to believe that the

---

[3] At the hearing, the Court inquired whether there were any objections to the additional evidence. Neither party opposed the supplemental evidentiary submissions. Accordingly, the respective motions to file supplemental evidence (Docs. 42, 45) are **GRANTED**.

1   alien to be arrested is present in the United States in violation of any U.S. immigration law and is

2   likely to escape before a warrant can be obtained for the arrest." (Doc. 31-1 at 3 [modifications

3   adopted].) The Muster indicates, "The 'reason to believe' standard requires USBP Agents to have

4   probable cause that an individual is in the United States in violation of U.S. immigration laws and

5   probable cause that the individual is likely to escape before a warrant can be obtained for the arrest."

6   (*Id.*) In addition, the Muster provides that in evaluating "likelihood of escape," factors may include an

7   agent's "ability to determine the individual's identity, knowledge of that individual's prior escapes or

8   evasions of immigration authorities, attempted flight from a USBP Agent, ties to the community (such

9   as a family, home, or employment) or lack thereof, or other specific circumstances that weigh in favor

10  or against a reasonable belief that the subject is likely to abscond." (*Id.* at 2-3.) The Muster also

11  indicates that "mere presence within the United States in violation of U.S. immigration law is not, by

12  itself, sufficient to conclude that an alien is likely to escape before a warrant for arrest can be

13  *obtained.*" (*Id.* at 3 [emphasis in original].)

14          Agents are informed that after making a warrantless arrest, they "should document the facts

15  and circumstances surrounding that warrantless arrest in the narrative section of the alien's I-213 as

16  soon as practicable." (Doc. 31-1 at 3.) The documentation should state:

17                  (1) that the alien was arrested without a warrant; (2) the location of the
                    arrest and whether this location was a place of business, residence,
18                  vehicle, or a public area; (3) whether the alien is an employee of the
                    business, if arrested at a place of business, or whether the alien is a
19                  resident of the residence, if arrested at a residential location; (4) the alien's
                    ties to the community, if known at the time of arrest, including family,
20                  home, or employment …; (5) the specific, particularized facts supporting
                    the conclusion that the alien was likely to escape before a warrant could be
21                  obtained; and (6) a statement of how "at the time of arrest, the designated
                    immigration officer did, as soon as it was practical and safe to do so,
22                  identify himself or herself as an immigration officer who is authorized to
                    execute an arrest; and stated that the person is under arrest and the reason
23                  for the arrest."

24  (*Id.* [modifications adopted].) Agents are also instructed that "[i]nformation learned post-arrest

25  relevant to custody determination should be documented separately from the information relevant to

26  likelihood of escape known at the time of the warrantless arrest." (*Id.*)

27          The provision regarding vehicle stops applies to "all warrantless arrests under 8 U.S.C. §

28  1357(a) (2) / INA § 287(a)(2), including warrantless arrests resulting from vehicle stops." (Doc. 31-1

1  at 4.)  The Muster indicates Border Patrol "agents may stop a vehicle to enforce civil immigration laws

2  only if they are aware of specific, articulable facts that reasonably warrant suspicion that the vehicle

3  contains an alien(s) who may be illegally in the country."  (*Id.*)  In addition to the documentation

4  required for a warrantless arrest, an "agent also must document the facts and circumstances

5  surrounding the vehicle stop that resulted in a warrantless arrest in the narrative section of the alien's

6  I-213."  (*Id.*)  The documentation by Border Patrol agents "should include the specific, articulable

7  facts that formed the basis for the USBP Agent's reasonable suspicion that an alien in the vehicle

8  stopped was present within the United States in violation of U.S. immigration law."  (*Id.*)

9         Sergio Guzman, the Acting Executive Officer for the El Centro Sector of U.S. Border Patrol,

10  reports that he "was involved with the various phases (planning, execution, and after action) of

11  Operation Return to Sender."  (Doc. 31-2 at 2, ¶¶ 1, 3.)  Guzman reports the Sector "is committed to

12  conducting enforcement operations within the Eastern District of California in compliance with the

13  Fourth Amendment, 8 U.S.C. § 1357, and Supreme Court and Ninth Circuit case law."  (*Id.* at 3, ¶ 8.)

14  He states that the Sector was issued "[i]n furtherance of this commitment."  (*Id.*, ¶ 9.)  Guzman

15  indicates that the El Centro Sector "will endeavor to conduct refresher training sessions to ensure

16  compliance with the muster within 60 Days for all ELC Border Patrol Agents (BPAs), supervisors, and

17  Command Staff."  (*Id.*)  Guzman indicates the training topics will include:

18          a.   Agents' authority to effect warrantless arrests within the Eastern
19               District of California pursuant to 8 U.S.C. § 1357 including factors
                 relevant to determining "reason to believe" an alien is in the United
20               States in violation of law or regulation and the alien's likelihood of
                 escape before a warrant can be obtained.

21          b.   Agents' authority to effect vehicle stops within the Eastern District
22               of California upon establishment of reasonable suspicion of a violation
                 of law or regulation in compliance with the Fourth Amendment,
23               Supreme Court, and Ninth Circuit case law.

24          c.   Agents' authority to effect consensual encounters within the Eastern
                 District of California in compliance with the Fourth Amendment,
25               Supreme Court, and Ninth Circuit case law.

26          d.   Report writing requirements including documentation of the facts
                 and circumstances pertaining to warrantless arrests in the narrative
27               section of an alien arrestee's Record of Deportable/Inadmissible Alien
                 ("Form I-213").

28

23

e.  Report writing requirements including documentation of the facts and circumstances pertaining to vehicle stops resulting in warrantless arrests in the narrative section of the alien arrestee's Form I-213.

(*Id.* at 4, ¶ 11.)

## JURISDICTION

The federal courts "are courts of limited jurisdiction." *Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22 (2025) (quoting *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U. S. 375, 377 (1994)).  District courts are limited not only by the Constitution, but as well as by statute.  *Id.*  As the Supreme Court explained, "Congress determines, through its grants of jurisdiction, which suits [district] courts can resolve."  *Id.*

As an initial matter, Defendants assert the district court lacks jurisdiction over the claims in issue for the pending motions for provisional class certification and preliminary injunction.  (Doc. 31 at 11-15.)  Specifically, Defendants argue, "the Court lacks jurisdiction to review Plaintiffs' claims under 8 U.S.C. §§ 1252(a)(5) and (b)(9)."[4]  (*Id.* at 11 [emphasis omitted].)  Defendants also contend "this Court lacks jurisdiction to issue an injunction to anyone other than the named plaintiffs" pursuant to 8 U.S.C. § 1252(f)(1).  (*Id.* at 14 [emphasis omitted].)  Because jurisdiction is "a threshold matter," the Court first must determine whether it has jurisdiction over the claims in issue for the two pending motions.  *See Steel Co. v. Citizens for Better Environment,* 523 U.S. 83, 94-95 (1998) ("The requirement that jurisdiction be established as a threshold matter springs from the nature and limits of the judicial power of the United States") (cleaned up); *see also Garland v. Gonzalez*, 596 U.S. 543, 548 (2022) (the "threshold question" was "whether the District Courts had jurisdiction to entertain respondents' requests for class-wide injunctive relief").

## I.    Jurisdiction under Sections 1252(a)(5) and 1252(b)(9)

The Immigration and Nationality Act provides limitations to the jurisdiction of the federal courts, including review of removal proceedings and orders of removal.  Removal proceedings occur before an immigration judge, and "are confined to determining whether a particular alien should be deported."  *See Pereida v. Wilkinson*, 592 U.S. 224, 227 (2021); *Aguilar v. U.S. Immigration &*

---

[4] The Immigration Reform Law Institute also contends in its amicus brief that the "Court lacks jurisdiction over Plaintiffs (sic) claims" pursuant to 8 U.S.C. §§ 1252(a)(5) and 1252(b)(9). (Doc. 33-1 at 3.)

1  *Customs Enforcement Div. of the Dep't of Homeland Sec.*, 510 F.3d 1, 11 (1st Cir. 2007); *see also* 8

2  U.S.C. § 1229a(c)(1)(A) (an "immigration judge shall decide whether an alien is removable from the

3  United States").  Removal proceedings commence when the government files a charge, a "Notice to

4  Appear" in immigration court is served upon the alien, or the alien is served with a "Notice of Intent."

5  *See Pereida*, 592 U.S. at 227 ("Removal proceedings begin when the government files a charge against

6  an individual, and they occur before a hearing officer at the Department of Justice, someone the agency

7  refers to as an immigration judge"); *Cantor v. Garland*, 17 F.4th 869, 874 (9th Cir. 2021) (a notice to

8  appear in the immigration court may be used to initiate removal proceedings); *see also* 8 C.F.R. §

9  238.1(b)(1)-(2) (expedited removal proceedings "commence" when an Issuing Service Officer

10 determines that sufficient evidence supports removal and serves the alien with a "Notice of Intent to

11 Issue a Final Administrative Deportation Order").

12        The INA sets forth jurisdictional limitations in Section 1252, entitled "Judicial review of orders

13 of removal."  *See* 8 U.S.C. § 1252.  Pursuant to Section 1252(a)(5), "a petition for review filed with an

14 appropriate court of appeals in accordance with this section shall be the sole and exclusive means for

15 judicial review of an order of removal entered or issued under any provision of [the] Act…"  8 U.S.C.

16 § 1252(a)(5).  In addition, Section 1252(b)(9) indicates: "Judicial review of all questions of law and

17 fact, including interpretation and application of constitutional and statutory provisions, arising from

18 any action taken or proceeding brought to remove an alien from the United States under this

19 subchapter shall be available only in judicial review of a final [removal] order under this section." 8

20 U.S.C. § 1252(b)(9).  Defendants assert that under these provisions, "the Court lacks jurisdiction to

21 review Plaintiffs' claims," and as a result the Suspicionless Stop Class and Warrantless Arrest Class

22 are unable "to establish a likelihood of success on the merits," as required for a preliminary injunction.

23 (Doc. 31 at 11 [emphasis omitted].)

24        Defendants contend that "if a claim challenges a 'decision to detain an alien in the first place or

25 seek removal,' a district court lacks jurisdiction to consider that claim and it instead must be reviewed

26 through the administrative process."  (Doc. 31 at 11, quoting *Jennings v. Rodriguez*, 138 S. Ct. 830,

27 841 (2018) [modification adopted].)  Defendants argue, "The stops and detentions that Plaintiffs

28 challenge were actions taken to remove them from the United States, that is, to detain them in the first

1   place and seek their removal." (*Id.* at 12 [citation omitted, modification adopted].) According to

2   Defendants, "Plaintiffs challenge questions of law and fact behind these actions, specifically, whether

3   USBP had reasonable suspicion for the stops and probable cause for the arrests." (*Id.*) Defendants

4   argue, "Because Plaintiffs challenge questions of law and fact arising from these actions taken to

5   remove them, 8 U.S.C. § 1252(a)(5) & (b)(9) require that they bring these claims in petitions for

6   review in the court of appeals." (*Id.*)

7        Defendants assert also the district courts are barred "from reviewing legal questions 'routinely

8   raised in petitions for review.'" (Doc. 31 at 12, quoting *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1033 (9th

9   Cir. 2016).) Defendants contend that "petitions for review commonly consider challenges related to

10  whether immigration authorities had reasonable suspicion to stop, or probable cause to arrest, an

11  alien." (*Id.*, citing *Sanchez v. Sessions*, 904 F.3d 643 (9th Cir. 2018); *J.E.F.M.*, 737 F.3d at 1033;

12  *Leal-Burboa v. Garland*, 2022 WL 17547799 (9th Cir. 2022).) Defendants argue, "If the legal remedy

13  for unlawful stops and arrests is provided in removal proceedings, ipso facto these challenges are part

14  of the decision to remove an alien." (*Id.*)

15       Plaintiffs argue that the "Court should reject Defendants' jurisdictional arguments." (Doc. 38

16  at 11.) Plaintiffs assert their "claims have nothing to do with class members' removal proceedings or

17  what immigration relief they may be eligible for." (Doc. 37 at 12.) As such, Plaintiffs indicate they

18  are not challenging "actions taken to remove them, but instead "challenge Defendants' unlawful stop

19  and arrest practices … [and] *Jennings* did not hold that the INA bars review of such practices." (*Id.* at

20  11-12 [emphasis omitted].) Plaintiffs also contend the Supreme Court later "resolved any …

21  ambiguity about § 1252(b)(9)'s ambit, holding that it 'certainly' 'does not present a jurisdictional bar'

22  to claims that 'are not challenging any removal proceedings.'" (*Id.*, quoting *Dep't of Homeland Sec. v.*

23  *Regents of the Univ. of Cal.*, 591 U.S. 1, 19 (2020).) Plaintiffs note the decision in *J.E.F.M.* predated

24  *Jennings* and *Regents* and argue Defendants' reliance upon *J.E.F.M.* is misplaced for this reason. (*Id.*)

25  Further, Plaintiffs contend: "Many courts have held that claims like those asserted by Plaintiffs, which

26  challenge Defendants' conduct before removal proceedings begin, are collateral to the removal process

27  and reviewable in district court." (*Id.* at 13 [emphasis omitted], citing *Nava v. Dep't of Homeland*

28  *Sec.*, 435 F. Supp. 3d 892 (N.D. Ill. 2020); *Roy v. Cnty. of L.A.*, 2018 WL 914773, at *18 (C.D. Cal.

1  Feb. 7, 2018); *Medina v. U.S. Dep't of Homeland Sec.*, 2017 WL 2954719, at *11 (W.D. Wash. Mar.

2  14, 2017).)

3      The legal issues implicated by the pending request for a preliminary injunction are narrow.

4  Plaintiffs do not petition the Court for review of— or make any argument related to—any removal

5  order entered under Title 8 on behalf of the proposed Suspicionless Stop and Warrantless Arrest

6  Classes.  Thus, Defendants' arguments related to the jurisdictional bar of Section 1252(a)(5) are

7  unavailing.  In addition, the authorities cited by Defendants do not indicate the Court lacks jurisdiction

8  over the claims of the proposed Suspicionless Stop Class and Warrantless Arrest Class pursuant to

9  Section 1252(b)(9).

10     Defendants rely upon *Sanchez v. Sessions* to argue that this Court lacks jurisdiction over the

11  claims of the proposed classes because these claims are commonly raised in final removal

12  proceedings.  In *Sanchez*, the appellant argued the Coast Guard violated his rights under the Fourth

13  Amendment and under 8 C.F.R. § 287.8(b)(2).  *Id.*, 904 F.3d at 648-649.  He sought review of the

14  immigration judge's denial of an evidentiary motion made during his removal proceedings, which

15  ultimately resulted in a removal order.  *Id.*  The Ninth Circuit reviewed the final order of removal

16  pursuant to 8 U.S.C. § 1252.  *See id.* at 646-649.  The Ninth Circuit did not hold that an immigration

17  court was the *exclusive* forum for claims such as those raised by Sanchez, and the Court did not

18  address Section 1252(b)(9) or the jurisdiction of a district court over similar claims in a civil action.

19  *Sanchez* in no way suggests that a plaintiff is precluded from raising constitutional claims in the

20  district court when the claim does not arise from removal proceedings.  The Court declines to expand

21  the reach of the decision in *Sanchez* as Defendants would have it do.

22     Likewise, *J.E.F.M.* does not support Defendants' contention that the district court lacks

23  jurisdiction over the claims of the two proposed classes.  In *J.E.F.M.*, the Ninth Circuit addressed

24  whether "a district court [has] jurisdiction over a claim that indigent minor immigrants without counsel

25  have a right to government-appointed counsel in removal proceedings."  *Id.*, 837 F.3d at 1029.  The

26  Court described Section 1252(b)(9) as "vice-like in grip" over issues "arising from any removal related

27  activity."  *Id.* at 1032.  The Court observed that Section 1252(b)(9) "has built in limits," which

28  "exclude[] … any claim that does not arise from removal proceedings."  *Id.* Defendants contend that

27

1    jurisdiction is lacking under §1252(b)(9) whenever the claims at issue are "routinely raised in petitions

2    for review." (Doc. 31 at 13.)  *J.E.F.M.*, however, makes clear that "claims that are independent of or

3    collateral to the removal process do not fall within the scope of §1252(b)(9)."  *Id.,* 837 F.3d at 1032.

4    (citing *Torres-Tristan v. Holder*, 656 F.3d 653, 658 (7th Cir. 2011); *Aguilar* 510 F.3d at 11).  In doing

5    so, the Ninth Circuit "distinguished between claims that 'arise from' removal proceedings under §

6    1252(b)(9)—which must be channeled through the PFR process—and claims that are collateral to, or

7    independent of, the removal process."  *Id.* at 1032.  The Court explained that because "immigration

8    judges have an obligation to ask whether a petitioner wants counsel," the right to counsel claims were

9    "bound up in and an inextricable part of the administrative process."  *Id.* at 1033.  Unlike the claims

10   considered in *J.E.F.M.*, the claims of the proposed classes here do not "arise from" removal

11   proceedings, but instead relate to issues which ripened before removal proceedings began. For example,

12   the proposed classes include the claims of members who are citizens and legal residents of the United

13   States, against whom there are no removal proceedings.  To the extent the classes include individuals

14   against whom proceedings have since commenced[5], the claims of the Suspicionless Class and

15   Warrantless Arrest Class are collateral to such removal proceedings and excluded from the

16   jurisdictional limits imposed by Section 1252(b)(9).

17          After *J.E.F.M.*, the Supreme Court considered the limits of Section 1252(b)(9) as a "potential

18   obstacle[]" to jurisdiction.  *Jennings*, 583 U.S. at 292.  In *Jennings,* the Court addressed the prolonged

19   detention of individuals in custody while their removal proceedings were pending.  *Id.*  The Court

20   observed that an "expansive interpretation" of Section 1252(b)(9) to actions not directly arising from

21   removal proceedings "would lead to staggering results."  *Id.* at 293.  The Court explained:

22              Suppose, for example, that a detained alien wishes to assert a claim under
                *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U. S. 388, 91 S. Ct.
23              1999, 29 L. Ed. 2d 619 (1971), based on allegedly inhumane conditions of
                confinement. *See, e.g., Ziglar v. Abbasi*, 582 U. S. 120, 146-149, 137 S. Ct.
24              1843, 198 L. Ed. 2d 290 (2017) (slip op., at 23-29). Or suppose that a
                detained alien brings a state-law claim for assault against a guard or fellow
25              detainee. Or suppose that an alien is injured when a truck hits the bus
                transporting aliens to a detention facility, and the alien sues the driver or
26

27   _____
     [5] The U.S. Customs and Border Protection data indicates that 77 of the 78 individuals arrested did not have any
28   known immigration history before their encounters with Border Patrol described in the complaint.  (*See* Doc. 38-
     1 at 5-6.) Thus, nearly all—if not all—had no removal proceedings started before Operation Return to Sender.

> owner of the truck. The "questions of law and fact" in all those cases could be said to "aris[e] from" actions taken to remove the aliens in the sense that the aliens' injuries would never have occurred if they had not been placed in detention. But cramming judicial review of those questions into the review of final removal orders would be absurd.

*Id.* The Court found that an interpretation of the phrase "arising from" in this manner "would also make claims of prolonged detention effectively unreviewable." *Id.* Having reviewed the statutory language[6], the Court then observed that the respondents were: (1) "not asking for review of an order of removal," (2) not challenging their detention during the course of immigration proceedings, and (3) "not even challenging any part of the process by which their removability will be determined." *Jennings*, 583 U.S. at 294. The Supreme Court concluded, "Under these circumstances, §1252(b)(9) does not present a jurisdictional bar." *Id.* Similarly, here, the Suspicionless Stop Class and Warrantless Arrest Class do not seek review of final orders of removal, do not challenge detention by the Attorney General pending removal proceedings, or challenge a part of the process by which removability of putative class members may be determined.[7] Thus, as the Supreme Court found in *Jennings*, Section 1252(b)(9) is not a jurisdictional bar to these claims.

Defendants do not address—or even acknowledge—the Supreme Court's decision in *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 140 S. Ct 1891 (2020), in which the Supreme Court revisited the scope of Section 1252(b)(9) and reiterated that it contained narrow, "targeted language." *Id.*, 591 U.S. at 19. In *Regents*, the parties disputed the decision to rescind Deferred Action for Childhood Arrivals (DACA) and the procedures taken to do so. *See id.* at 12-16. Individual DACA recipients, states, and several organizations challenged the rescission, arguing that the action "was arbitrary and capricious in violation of the [Administrative Procedure Act] and that it infringed on the equal protection guarantee of the Fifth Amendment's Due Process Clause." *Id.* at 13.

---

[6] The Court also observed that "[a] neighboring provision of the Immigration and Nationality Act refers to 'any cause or claim by or on behalf of any alien *arising from* the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute or execute removal orders against any alien under this chapter.'" *Id.* (quoting 8 U.S.C. §1252(g) [emphasis adopted].) The Court declined to "sweep any claim that can technically be said to 'arise from' the three listed actions," but instead "read the language to refer to just those three specific actions themselves." *Id.* (citing *American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482-483 (1998)).

[7] Indeed, the putative classes include individuals—including United States citizens, such as Campos Gutierrez, and immigrants with green cards, such as Aguilera Martinez—against whom there are not any removal proceedings.

Three district courts "rejected the Government's threshold argument[] … that the INA deprived the court of jurisdiction." *Id.* at 13-14. Before the Supreme Court, the Government again sought to invoke Section 1252(b)(9), arguing it was "an independent bar[]" to review by the Court. *Id.* at 19. The Supreme Court rejected the Government's argument, stating: "As we have said before, §1252(b)(9) does not present a jurisdictional bar where those bringing suit are not asking for review of an order of removal, the decision to seek removal, or the process by which removability will be determined." *Id.* (quoting *Jennings* 583 U.S. at 294) (modifications adopted). The Court held that Section 1252(b)(9) "is certainly not a bar where … the parties are not challenging any removal proceedings." *Id.*

After *Jennings* and *Regents*, the Ninth Circuit considered whether the district court had jurisdiction over the claims of a class that sought injunctive relief for Fourth Amendment violations in *Gonzalez v. U.S. Immigration & Customs Enf't*, 975 F.3d 788, 810-811 (9th Cir. 2020). The Government argued that "the district court lacked subject matter jurisdiction pursuant to 8 U.S.C. § 1252(b)(9)." *Id.* at 810. The Court rejected this assertion. *Id.* at 810-811. The Ninth Circuit acknowledged: "The Supreme Court has since [*J.E.F.M.*] instructed that § 1252(b)(9) is a 'targeted' and 'narrow' provision that "is certainly not a bar where … the parties are not challenging any removal proceedings." *Id.* at 811 (quoting *Regents*, 140 S. Ct. at 1907). The Ninth Circuit followed *Regents* and found Section 1252(b)(9) was "not a bar to jurisdiction over the claims of any class members— noncitizen or U.S. citizens—because none asks for review of an order of removal, the decision to seek removal, or the process by which removability will be determined." *Id.* (cleaned up). The Ninth Circuit also determined "Section 1252(b)(9) is also not a bar to jurisdiction over noncitizen class members' claims because claims challenging the legality of detention pursuant to an immigration detainer are independent of the removal process." *Id.* (citing *Aguilar*, 510 F.3d at 11). Thus, the Ninth Circuit adopted the test identified by the Supreme Court and found Section 1252(b)(9) does not bar district court jurisdiction over class claims where the claims do not challenge removal proceedings. *Id.*

The decision of the Ninth Circuit in *Gonzalez* is consistent with those of other circuit courts, which have also declined to find Section 1252(b)(9) barred district court jurisdiction over claims that were tangential to removal proceedings following *Regents*. *See, e.g., Mukantagara v. United States*

1  *Dep't of Homeland Sec.*, 67 F.4th 1113, 1116 (10th Cir. 2023) (rejecting an "expansive interpretation"

2  of Section 1252(b)(9) and finding the district court erred in finding it lacked jurisdiction where the

3  "[p]laintiffs do not challenge their removal proceedings"); *Canal A Media Holding, LLC v. United*

4  *States Citizenship & Immigration Servs.*, 964 F.3d 1250, 1257 (11th Cir. 2020) (noting the "narrow

5  scope" of Section 1252(b)(9) under *Regents*, and finding the provision "is not intended to cut off claims

6  that have a tangential relationship with pending removal proceedings").

7        As Plaintiffs argue, the issues before the Court are like those addressed in *Nava v. Dep't of*

8  *Homeland Sec.*, 435 F. Supp. 3d 880 (N.D. Ill. 2020). In *Nava*, the claims of the plaintiffs—including

9  individuals and two organizations— arose from "Operation Keep Safe," which was "a large-scale ICE

10  enforcement action that occurred in the Chicago area during a week-long period in May 2018." *Id.* at

11  885. ICE reported the operation resulted in 156 arrests, including 106 people "for whom ICE lacked

12  an arrest warrant." *Id.* at 885 (modification adopted). The plaintiffs alleged that "ICE arrested and

13  detained each [of them] 'without a warrant or an individualized determination that he is a flight risk,'

14  in violation of 8 U.S.C. § 1357(a)(2)." *Id.* The plaintiffs stated a claim under the Fourth Amendment,

15  which was "based on ICE's traffic stops of four Individual Plaintiffs, which ultimately led to their

16  arrests and detention." *Id.* at 886. The court observed:

17            According to [Plaintiffs], ICE officers stopped the Individual Plaintiffs
             without reasonable suspicion that they, or any other individuals in the
18            vehicles, had violated an immigration law. [Citation.] Plaintiffs allege,
             further, that the ICE officers stopped the Individual Plaintiffs' vehicles
19            merely because the drivers and passengers therein appeared to be
             Hispanic. [Citation.] And Plaintiffs allege that ICE's actions reflect a
20            policy and practice of violating the Fourth Amendment while conducting
             traffic stops. [Citation.]
21            …
             Plaintiffs seek declaratory relief, including an order stating that the
22            challenged conduct violates the INA and the Fourth Amendment;
             injunctive relief, including orders prohibiting Defendants from engaging
23            in the challenged conduct and requiring them to adopt policies that will
             ensure they follow the relevant laws; and attorneys' fees and costs.
24

25  *Id.* at 886, 887-88 (citations omitted). The defendants moved to dismiss, arguing that the district court

26  lacked jurisdiction. The court determined that "an illegal stop conducted before the government has

27  any legitimate reason to believe that the subject is removable cannot be an 'action taken to remove an

28  alien under' the INA." *Id.* at 890-91 (cleaned up). The court also found: "The prescribed particularized

determination of a detainee's flight risk is not substantively related to the question whether a non-citizen can lawfully be removed from the United States. Rather, Plaintiffs' INA-based claim raises questions of law and fact that are quite remote from the issue of the Individual Plaintiffs' removability." *Id.* at 891-92. Finally, the court noted the ICE practices "cause at least some U.S. citizens (or lawful permanent residents) to be stopped and/or detained … and the government would not commence removal proceedings against them." *Id.* at 894. Thus, the court rejected the defendants' arguments and concluded Sections 1252(a)(5) and 1252(b)(9) did not deprive the district court of jurisdiction. *Id.* at 895, 904.

In *Bogomazov v. United States Dep't of Homeland Sec.*, the district court found it had jurisdiction over claims related to alleged unlawful conduct prior to the commencement of removal proceedings. *Id.*, 2022 WL 769801 (S.D. Fl. Feb. 27, 2022). Vitaly Bogomazov filed the action "to challenge his unlawful seizure and related treatment by ICE and DHS agents." *Id.*, 2022 WL 769801 at *4 (modifications adopted). Bogomazov was lawfully admitted to the United States on a visitor's visa and filed an asylum application. *Id.* at *1. He later appeared at a U.S. Citizenship and Immigration Services office with his wife and daughter for "adjustment of status interviews." *Id.* at *2. After the interview, ICE officers "entered the interview room and arrested [Bogomazov] without a warrant." *Id.* Bogomazov alleged his removal proceedings began after the arrest. *Id.* He was released after his first appearance before an immigration judge. *Id.* However, Bogomazov was arrested a second time on his way to another interview with the USCIS. *Id.* at *3. Bogomazov sought to hold ICE and DHS liable for violations of his rights, including unconstitutional seizure under the Fourth Amendment. *Id.* at *4. The defendants argued the court lacked jurisdiction under 8 U.S.C. §§ 1252(g) and 1252(b)(9). *Id.* at *5. The district court rejected these contentions to the extent Bogomazov based his claims on the *first* arrest. *Id.* at *9. The court observed: "the alleged wrongful conduct here stemming from the first arrest occurred *before* [Bogomazov] was served the Notice to Appear and, therefore, *before* removal proceedings were initiated." *Id.* at *10 (emphasis in original). The court also noted that Section 1252(b)(9) "should be narrowly construed," and found the provision was inapplicable to the "claims stemming from the first arrest because [Bogomazov] does not seek review of an order of removal, the decision to seek removal or the process by which removability is determined." *Id.* at *11 (citing

1  *Regents*, 140 S. Ct. at 1907).  Consequently, the court found Sections 1252(g) and 1252(b)(9) did not

2  bar the claims concerning the first arrest, which occurred prior to the removal proceedings, although

3  claims concerning the second arrest—after removal proceedings commenced— were barred.  *Id.*, 2022

4  WL 769801, at **8-11, *adopted in full*, 2022 WL 767104 (S.D. Fl. Mar. 14, 2022).

5         As in *Nava* and *Bogomazov*, Plaintiffs seek to hold the defendants liable for violations of their

6  Fourth Amendment rights and failure to comply with obligations under 8 U.S.C. § 1357(a)(2).  The

7  claims of the Suspicionless Stop Class and Warrantless Arrest Class relate to conduct *before* any

8  removal proceedings were commenced against putative class members as a result of "Operation

9  Return to Sender."[8]  The claims of the two proposed classes—who assert that Border Patrol did not

10  have reasonable suspicion to perform investigative stops and did not perform required flight risk

11  evaluations during the Operation— are "not substantively related to the question of whether [putative

12  class members] can lawfully be removed from the United States."  *See Nava*, 435 F. Supp. 3d at 891-

13  892.  Moreover, the putative classes include individuals against whom there can be no removal

14  proceedings, including U.S. citizens and legal residents who have been or will be subjected to

15  unlawful practices.  Ultimately, the two proposed classes "are not asking for review of an order of

16  removal, the decision to seek removal, or the process by which removability will be determined."  *See*

17  *Regents*, 591 U.S. at 19 (modifications adopted); *see also Jennings*, 583 U.S. at 294.  Consequently,

18  Section 1252(a)(5) and Section 1252(b)(9) do not bar district court jurisdiction over Plaintiffs' claims

19  on behalf of the Suspicionless Stop and Warrantless Arrest Classes.  *Regents*, 591 U.S. at 19 (holding

20  Section 1252(b)(9) "is certainly not a bar where, as here, the parties are not challenging any removal

21  proceedings"); *see also Nava*, 435 F. Supp. 3d at 890-895; *Bogomazov*, 2022 WL 769801, at *11.

22  **II.     Limitations to Injunctive Relief under Section 1252(f)(1)**

23         The Court has limits upon its jurisdiction and authority to grant injunctive relief for classes

24  imposed by 8 U.S.C. § 1252(f)(1). Section 1252(f)(1) provides:

25                 Regardless of the nature of the action or claim or of the identity of the party
                   or parties bringing the action, no court (other than the Supreme Court) shall
26                 have jurisdiction or authority to enjoin or restrain the operation of the

27  _____

28  [8] As noted above, government records indicate 77 of the 78 individuals arrested did not have any immigration
proceedings prior to "Operation Return to Sender."  (Doc. 38-1 at 5-6.)

1
2

> provisions of part IV of this subchapter, as amended by the Illegal
> Immigration Reform and Immigrant Responsibility Act of 1996, other than
> with respect to the application of such provisions to an individual alien
> against whom proceedings under such part have been initiated.

3  *Id.*  The identified "provisions of part IV of [the] subchapter" include §§ 1221-1232, which "charge

4  the Federal Government with the implementation and enforcement of the immigration laws governing

5  the inspection, apprehension, examination, and removal of aliens."  *Garland v. Gonzalez,* 596 U.S.

6  543, 549-50 (2022).  The Supreme Court explained that Section 1252(f)(1) "prohibits lower courts

7  from entering injunctions that order federal officials to take or to refrain from taking actions to

8  enforce, implement, or otherwise carry out the specified statutory provisions."  *Id.* at 550.

9       Defendants contend that Section 1252(f)(1) "bars the court from granting Plaintiffs' request to

10 preliminarily enjoin USBP's detention and removal operations."  (Doc. 31 at 14.)  Defendants observe,

11 "8 U.S.C. § 1226, a covered statute, concerns the apprehension and detention of aliens" and "8 U.S.C.

12 § 1229, another covered statute, concerns the initiation of removal proceedings against an alien."  (*Id.*)

13 According to Defendants, "To the extent Plaintiffs allege they are seeking to enjoin 8 U.S.C. § 1357,

14 the actions under this statute cannot be untangled from apprehension and removal operations."  (*Id.* at

15 14-15.)  Therefore, Defendants argue that "Plaintiffs' request to restrain USBP's allegedly unlawful

16 detention and removal operations necessarily seeks to enjoin operation of provisions covered by 8

17 U.S.C. § 1252(f)(1)."  (*Id.* at 15.)

18      As Defendants acknowledge, the provision of the INA at issue—Section 1357(a)(2), which is

19 contained in Part IX—is not one of the specified provisions in Section 1252(f)(1).  *See* 8 U.S.C. §

20 1252(f)(1); *Garland,* 596 U.S. at 549-50.  Consequently, the limiting language of Section 1252(f)(1)

21 does not apply to the pending request for injunctive relief.  *Gonzalez,* 975 F.3d at 814 ("§ 1357(d) is

22 not located in Part IV, and thus § 1252(f)(1)'s limitations do not apply"); *see also State of Texas v.*

23 *U.S. Dept. of Homeland Sec.*, 123 F.4th 186, 209-210 (5th Cir. 2024) ("because § 1357(a)(3) is not

24 one of the statutes referenced in § 1252(f)(1), the injunction [sought] is not barred"); *Reno v.*

25 *American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481 (1999) ("By its plain terms… [Section

26 1252(f)] prohibits federal courts from granting classwide injunctive relief against the operation of §§

27 1221-1231").  The Ninth Circuit explained, "by specifying only 'the provisions of Part IV' and

28 reinforcing its focus on only '*such* provisions,' … the statute's plain text makes clear that its

34

1    limitations on injunctive relief do *not* apply to *other* provisions of the INA." *Gonzalez*, 975 F.3d at 813

2    (emphasis in original, citation omitted).

3        Notably, the "detention" statutes on which Defendants rely relate to custodial detentions in a

4    facility and not to the detention of individuals for investigative stops on the streets, such as those at

5    issue here. *See* 8 U.S.C. § 1226(a) (indicating that "[o]n a warrant issued by the Attorney General, an

6    alien may be arrested and detained pending a decision on whether the alien is to be removed"); 8

7    U.S.C. § 1226(c) (addressing "detention of criminal aliens" and when the Attorney General shall take

8    an alien into custody); 8 U.S.C. § 1226(d) (directing the Attorney General to "devise an implement a

9    system" to identify criminal aliens after arrests). The obligations under Section 1226 are distinct from

10   the authority of immigration officers to perform investigative, detentive stops and the obligation to

11   evaluate flight risk prior to a warrantless arrest. *See Kidd v. Mayorkas*, 734 F. Supp. 3d 967, 986

12   (C.D. Cal. 2024) ("There is a clear distinction between the authority to issue warrants under § 1226(a)

13   and the one to execute arrests under § 1357"). Furthermore, as discussed above, the Suspicionless

14   Class and Warrantless Arrest Class do not seek to challenge removal proceedings, such that the

15   provisions of 8 U.S.C. § 1229 are implicated. Thus, Defendants' argument that an injunction related

16   to Section 1357 would necessarily enjoin obligations under the covered statutes is frivolous.

17       Courts maintain authority to enter injunctions addressing other provisions of the INA *even if*

18   there may be collateral effects upon a provision covered by Section 1252(f)(1). *See, e.g., Gonzales v.*

19   *DHS,* 508 F.3d 1227, 1233 (9th Cir. 2007) (holding that Section 1252(f)(1) did not prohibit an

20   injunction directly implicating adjustment of status—which is not among the statutory provisions

21   specified in Section 1252(f)(1)—despite a collateral effect on removal); *State of Texas*, 123 F.4th at

22   210 (where injunctive relief related to conduct under Section 1357 would "at most have only a

23   collateral effect on the operation of the covered statutes, (specifically §§ 1225 and 1226)" the

24   injunction was not barred); *Kidd*, 734 F. Supp. 3d at 985 ("Section 1252(f) … does not directly impede

25   the Court's authority to issue injunctive relief to ensure that ICE executes warrants in a manner

26   consistent with the United States Constitution"). Even in *Al Otro Lado v. Exec. Office of Immigr.*

27   *Rev.*, 120 F.4th 606 (9th Cir. 2024)—a case cited by Defendants (Doc. 31 at 14)—the Ninth Circuit

28   recognized that it "has repeatedly held that § 1252(f)(1) does not prohibit an injunction simply because

1  of collateral effects on a covered provision." *Al Otro Lado*, 120 F.4th at 627.  Thus, even if an

2  injunction could have a collateral effect on the provisions identified by Defendants, the Court has the

3  jurisdiction and the authority to issue an injunction.

4  **III.    Conclusion**

5         Based upon the foregoing, 8 USC §§ 1252(a)(5), 1252(b)(9), and 1252(f) do not bar this

6  Court's jurisdiction over the claims of the proposed Suspicionless Stop Class and Warrantless Arrest

7  Class— for violations of the Fourth Amendment, 8 U.S.C. § 1357(a)(2), and 8 C.F.R. § 287.8(c)(2)(ii)

8  —or its authority to enter class-wide injunctive relief.[9]

9                         **EVIDENCE BEFORE THE COURT**

10        The "Federal Rules of Evidence do not strictly apply in the preliminary injunction context."

11 *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1189-90 (9th Cir. 2024); *see*

12 *also Herb Reed Enters., LLC v. Florida Entm't Mgmt., Inc.,* 736 F.3d 1239, 1250 n.5 (9th Cir. 2013)

13 ("Due to the urgency of obtaining a preliminary injunction at a point when there has been limited

14 factual development, the rules of evidence do not apply strictly to preliminary injunction proceedings").

15 As the Supreme Court observed, "a preliminary injunction is customarily granted on the basis of

16 procedures that are less formal and evidence that is less complete than in a trial on the merits."  *Univ. of*

17 *Tex. v. Camenisch,* 451 U.S. 390, 395 (1981).  The Court "may give even inadmissible evidence some

18 weight, when to do so serves the purpose of preventing irreparable harm before trial."  *Flynt v. Distrib.*

19 *Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984).  For example, the Court may consider declarations

20 that include hearsay statements or information in news articles.  *See, e.g., Flathead*, 98 F.4th at 1190

21 (finding "no error in the district court's consideration of [a] news article" in addressing a motion for a

22 preliminary injunction); *Fellowship of Christian Athletes v. San Jose Unifed Sch. Dist. Bd. of Educ.*, 82

23 F.4th 664, 682 (9th Cir. 2023) ("a court may exercise its discretion to accept hearsay and make

24 inferences in ruling on a preliminary injunction").

25        The Ninth Circuit determined that inadmissibility "is not a proper basis to reject evidence

26 submitted in support of class certification."  *Sali v. Corona Regional Med. Ctr.*, 909 F.3d 996, 1004

27

28 ─────────────────────
   [9] The Court makes no findings regarding its jurisdiction over other claims raised in the complaint.

1    (9th Cir. 2018).  Instead, "[o]n a motion for class certification, the court may consider evidence that

2    may not be admissible at trial."  *Mazza v. Am. Honda Motor Co.,* 254 F.R.D. 610 (C.D. Cal. 2008)

3    (citing *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974) (describing a court's determination of

4    class certification as based on "tentative findings, made in the absence of established safeguards" and

5    indicating certification is "not accompanied by the traditional rules and procedures applicable to civil

6    trials"); *see also Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580, 599 (C.D. Cal. 2008) ("courts

7    have held that on a motion for class certification, the evidentiary rules are not strictly applied and

8    courts can consider evidence that may not be admissible at trial") (citation omitted).

9         Even still, Defendants do not object to the evidence submitted by Plaintiffs.  For purposes of

10    the motions now at issue, the Court will consider Plaintiffs' anecdotal evidence and exhibits to

11    evaluate the pending requests for provisional class certification and injunctive relief.

12    **MOTION FOR PROVISIONAL CLASS CERTIFICATION**

13         A "class action is 'an exception to the usual rule that litigation is conducted by and on behalf of

14    the individual named parties only.'"  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting

15    *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)).  Class certification is governed by the Federal

16    Rules of Civil Procedure, which provide: "One or more members of a class may sue or be sued as

17    representative parties on behalf of all members" under certain circumstances.  Fed. R. Civ. P. 23(a).

18    Pursuant to Rule 23, a court must determine whether to certify a class "[a]t an early practicable time

19    after a person sues … as a class representative."  Fed. R. Civ. P. 23(c)(1)(A).  As such, nothing

20    precludes class certification at an early stage in the proceedings.

21    **I.    Legal Standards**

22         Plaintiffs seek "provisional class certification," which applies only to the related motion for a

23    preliminary injunction.  *See Ger Chong Ze Chang v. Count of Siskiyou*, 2024 WL 4581687, at *9 (E.D.

24    Cal. Oct. 24, 2024) ("provisional class certification" may be for the purpose of "an order that applies

25    to a preliminary injunction, as opposed to a final injunction or judgment").  The Ninth Circuit

26    expressly indicated the Court has discretion to grant provisional class certification while considering a

27    preliminary injunction.  *Meyer v. Portfolio Recovery Assocs., LLC*, 708 F.3d 1036, 1041 (9th Cir.

28    2012) (finding the district court "did not abuse its discretion by granting provisional class

certification" in an order also addressing a request for a preliminary injunction); *see also Al Otro Lado v. Wolf*, 952 F.3d 999, 1005 n.4 (9th Cir. 2020) ("We have approved provisional class certification for purposes of preliminary injunction proceedings.").

### A.     Rule 23(a) Prerequisites

A party seeking provisional certification "has the burden of meeting the threshold requirements" of Rule 23(a).  *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1041 (2012) (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 131 S. Ct. 2541, 2551 (2011)).  Pursuant to Rule 23(a), a class action is proper if:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class; (3) the claims
> or defenses of the representative parties are typical of the claims or
> defenses of the class; and (4) the representative parties will fairly and
> adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  These prerequisites are often referred to as numerosity, commonality, typicality, and adequacy of representation, and "effectively limit the class claims to those fairly encompassed by the named plaintiff's claims."  *General Telephone Co. of the Southwest v. Falcon*, 457 U.S. 147, 155-56 (1982) (citing *General Telephone Co. v. EEOC*, 446 U.S. 318, 330 (1980)).

### B.     Rule 23(b) Certification

When a proposed class satisfies the prerequisites of Rule 23(a), the Court must determine whether the class is maintainable under Rule 23(b).  *DZ Reserve v. Meta Platforms, Inc.*, 96 F.4th 1223, 1232 (9th Cir. 2024) (noting if the Court finds a class satisfies the requirements of Rule 23(a), it must next determine the class "fit[s] into at least one of three categories outlined in Rule 23(b)").  Under Rule 23(b)(1), a class is maintainable if there is a risk of inconsistent or varying adjudications from "prosecuting separate actions by or against individual class members."  *Id.*  The Court may certify a class if "adjudications with respect to individual class members … would be dispositive of the interests of other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests."  Fed. R. Civ. P. 23(b)(1)(B).

A class is maintainable under Rule 23(b)(2) if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding

declaratory relief is appropriate responding the class as a whole." Fed. R. Civ. P. 23(b)(2). The Supreme Court explained, "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual member would be entitled to a *different* injunction or declaratory judgment against the defendant." *Wal-Mart*, 564 U.S. at 360.

Class certification under Rule 23(b)(3) allows for class certification in cases "in which class-action treatment is not clearly called for as it is in Rule 23(b)(1) and (b)(2) situations." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997). Thus, a class is maintainable under Rule 23(b)(3) where "questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and where "a class action is superior to other available methods for fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

### C.    Burden of Proof

The Supreme Court explained, "Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart*, 564 U.S. at 350 (emphasis in original). Consequently, is not enough for the Court to assume the Rule 23 factors can be satisfied.

The Court must conduct a "rigorous analysis," which may require the Court "to probe behind the pleadings before coming to rest on the certification question." *Wal-Mart*, 564 U.S. at 350-51 (quoting *Falcon*, 457 U.S. at 160-61). Parties seeking certification bear the burden of demonstrating "by a preponderance of the evidence" that Rule 23 is satisfied. *White v. Symetra Assigned Benefits Serv.*, 104 F.4th 1182, 1192 (9th Cir. 2024) (citing *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022)). In other words, the district court must "find that the evidence more likely than not establishes each fact necessary to meet the requirements of Rule 23." *Wolff v. AETNA Life Ins. Co.*, 77 F.4th 164, 174 (3rd Cir. 2023) (citation omitted).

### II.    Standing

Before evaluating Plaintiffs' proposed provisional classes under Rule 23, the Court must determine whether Plaintiffs have standing to assert their claims. As the Ninth Circuit explained,

standing "is a jurisdictional element that must be satisfied prior to class certification." *LaDuke v. Nelson*, 762 F.2d 1318, 1325 (9th Cir. 1985). Consequently, the Court should address the issue of standing prior to certifying any class. *See Easter v. Am. West Fin.*, 381 F.3d 948, 962 (9th Cir. 2004).

"[T]hose who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Article III of the Constitution by alleging an actual case or controversy." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983). To satisfy the "case or controversy" requirement, a plaintiff must establish standing under Article III to bring suit. *Human Life of Wash., Inc. v. Brumsickle*, 624 F.3d 990, 1000 (9th Cir. 2010); *see also Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 938 (2007) ("standing is an essential and unchanging part of the case-or-controversy requirement of Article III"). In a proposed class action, "if none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class." *Lierboe v. State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018, 1022 (9th Cir. 2003). To establish standing—and thus that there is an actual case or controversy—a plaintiff "must demonstrate (1) an injury-in-fact, (2) causation, and (3) a likelihood that the injury will be redressed by a decision in the plaintiff's favor." *Human Life*, 624 F.3d at 1000 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

"[J]urisdiction is to be assessed under the facts existing when the complaint is filed." *Lujan*, 504 U.S at 570 n. 4 (1992). Consequently, "[t]he requisite personal interest"—standing— "must exist at the commencement of the litigation." *Friends of the Earth, Inc. v. Laidlaw Environmental Servs., Inc.*, 528 U.S. 167, 214 (2000) (citation omitted); *Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 850 (9th Cir. 2007) ("Standing is determined at the time of the lawsuit's commencement, and we must consider the facts as they existed at that time the complaint was filed"); *see also Perry v. Village of Arlington Heights*, 186 F.3d 826, 830 (7th Cir. 1999) ("Because standing goes to the jurisdiction of a federal court to hear a particular case, it must exist at the commencement of the suit").

Defendants note that the El Centro Sector issued a "Muster" on April 4, 2025. (Doc. 32 at 14, citing Exh. A [Doc. 31-1; Doc. 32-1].) They report that the Border Patrol is "taking steps to implement training on the Muster," and "endeavor to conduct training sessions to ensure compliance with the Muster[,] … compliance with the Fourth Amendment and 8 U.S.C. § 1357, and compliance

40

1    with Supreme Court and Ninth Circuit law on conducting vehicle stops, consensual encounters, and

2    warrantless arrests." (*Id.* at 15, citing Ex. B at ¶¶ 13-19[10] [Doc. 31-2 at 3-4; Doc. 32-2 at 3-4].)

3    According to Defendants, "in light of these actions and commitments," Plaintiffs lack standing for

4    injunctive relief. (*Id.* at 15.)

5        Defendants do not argue that Plaintiffs failed to show an injury-in-fact and causation, as

6    required to establish Article III standing. (*See* Doc. 32 at 11, 14-15.) Thus, Defendants concede the

7    individual plaintiffs allege facts sufficient to support a conclusion that each suffered violations of their

8    rights under the Fourth Amendment during "Operation Return to Sender," and that Defendants did not

9    perform required flight risk assessments prior to arresting the proposed class representatives.

10   Defendants also do not dispute that a clear causal connection exists between the alleged injuries and the

11   challenged conduct by Border Patrol. The injuries of the three proposed class representatives—Oscar

12   Morales Cisneros, Wilder Munguia Esquivel, and Yolanda Aguilera Martinez— who seek declaratory

13   and injunctive relief in the complaint for the claims in issue related to the proposed Suspicionless Stop

14   and Warrantless Arrest Classes, would likely be "redressed by a decision in … [their] favor." *See*

15   *Human Life*, 624 F.3d at 1000. Towards this end, the proposed class representatives establish Article

16   III standing for their claims, sufficient for the Court to proceed with its analysis under Rule 23.[11]

17   **III.    Class Definitions**

18       In evaluating whether classes are suitable for certification, the Court must consider the proposed

19   class definitions. *See Wolph v. Acer Am. Corp.*, 272 F.R.D. 477, 482 (N.D. Cal. 2011) ("[a]lthough

20   there is no explicit requirement concerning the class definition in FRCP 23, courts have held that the

21   class must be adequately defined … before a class action may proceed") (citation omitted). Plaintiffs

22   seek provisional certification of two classes to challenge the actions of Border Patrol as a

23   "discriminatory and unlawful campaign against people of color in Kern County." (Doc. 14-1 at 7.)

24

25   [10] Although Defendants cite to Exhibit B ¶¶ 13-19, the exhibit—a declaration from Sergio Guzman, the Acting
     Executive Officer of El Centro Sector—includes only 12 paragraphs. (*See* Docs. 31-2, 32-2.) Based upon the
26   information provided, it appears the relevant paragraphs are correctly identified as numbers 8 through 11. (*See
     id.* at 3-4; *see also* Doc. 31-2 at 3-4, ¶¶ 8-11.)

27   [11] To the extent Defendants assert that Plaintiffs "lack standing" "because the issues raised in their Complaint
28   have been resolved" (Doc. 32 at 14), the Court addresses the mootness argument in its analysis regarding the
     motion for a preliminary injunction.

Plaintiffs defined the provisional classes as:

    1.   **Suspicionless Stop Class**: All persons who, since January 6, 2025, have been or will be subjected to a detentive stop by Border Patrol in this district pursuant to a practice of conducting stops without warrants and without an individualized assessment of reasonable suspicion whether the person (1) is engaged in an offense against the United States or (2) is a noncitizen unlawfully in the United States.

    2.   **Warrantless Arrest Class**: All persons whom Border Patrol, since January 6, 2025, has arrested or will arrest without a warrant in this district.

(*Id.* at 8; *see also* Doc. 1 at 62-63, ¶¶ 313, 316.)

Defendants contend these two class definitions are fatally flawed. (Doc. 32 at 15-16.) According to Defendants, "the proposed classes cannot be certified because they are impermissibly defined as 'fail-safe' classes and the Warrantless Arrest Class is impermissibly overbroad." (*Id.* at 15 [emphasis omitted, cleaned up].) Plaintiffs dispute these assertions but propose modifying the Warrantless Arrest Class if the Court agrees the original definition is overbroad. (Doc. 37 at 13-14.)

        1.    "Fail-safe" Classes

"A fail-safe class is commonly defined as limiting membership to plaintiffs described by their theory of liability in the class definition such that the definition presupposes success on the merits." *Melgar v. CSK Auto, Inc.*, 681 Fed. Appx. 605, 607 (9th Cir. 2017) (citing William B. Rubenstein, *Newberg on Class Actions* § 3:6 (5th ed. 2016)). A class definition does "not presuppose its success" when the plaintiffs will be "required … to prove more facts to establish liability than are referenced in the class definition." *Id.* Consequently, the Ninth Circuit explained that a fail-safe definition is one where the class "is defined in a way that precludes membership *unless* the liability of the defendant is established." *Kamar v. RadioShack Corp.*, 375 Fed. Appx. 734, 736 (9th Cir. 2010) (emphasis added).

Defendants argue the proposed Suspicionless Arrest and Warrantless Arrest Classes "are prime examples of impermissible 'fail-safe' classes because they can only be certified upon a determination of the merits." (Doc. 32 at 15.) Defendants assert the Suspicionless Stop Class membership "depends on whether Plaintiffs can prove the Defendants had a practice of conducting stops without warrants and without an individualized assessment of reasonable suspicion for an individual," and the Warrantless Arrest Class membership "depends on whether Plaintiffs can prove that Defendants

1    [have] arrested or will arrest an individual without a warrant in this district." (*Id.*)  Therefore,

2    Defendants assert that liability "is necessary in order to have membership in either [class]," and

3    certification must be denied. (*Id.*, citing *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1138 n.7

4    (9th Cir. 2016).)

5         Plaintiffs argue the two proposed definitions do not result in fail-safe classes, because "class

6    membership relies on 'factual questions and requires no impermissible preliminary determination of

7    liability.'" (Doc. 37 at 13, quoting *Pena v. Taylor Farms Pacific, Inc.*, 305 F.R.D. 197, 213 (E.D. Cal.

8    2015) [modification adopted].)  Plaintiffs also contend this Court's decision in "*Willis v. Enterprise*

9    *Drilling Fluids, Inc.* is instructive." (*Id.*, citing *Willis*, 2015 WL 6689637 (E.D. Cal. Oct. 28, 2015).)

10   Plaintiffs observe:

11              [*Willis*] involved a subclass of members who were not timely paid their
               wages, and where the defendant allegedly "had a 'policy and practice' of
12             failing to pay … the wages due." *Id.* at *6–7.  The Court held the proposed
               subclass was not fail-safe because "[i]f Plaintiff succeeds in establishing
13             *the existence of unlawful policies or practices common to all the class*
               *members*, the Court would not be required to determine the legal merits of
14             each class members' claims…." *Id.* at *7 (emphasis added).

15   (*Id.*)  Plaintiffs contend the same is true here, because membership in the proposed classes requires

16   answering factual questions regarding the Border Patrol's patterns and practices. (*Id.* at 13-14.)  They

17   assert, "Ascertaining membership in the Suspicionless Stop Class[] involves answering … (1) whether

18   Border Patrol stopped the person in this District since January 6, 2025, and (2) whether Border Patrol

19   has a pattern or practice of not conducting an individualized assessment of reasonable suspicion prior

20   to a stop." (*Id.* at 13 [footnote omitted].)  Plaintiffs contend "ascertaining membership in the

21   Warrantless Arrest Class[] requires answering only factual questions: (1) whether Border Patrol

22   arrested the person without a warrant in this District since January 6, 2025, and (2) whether Border

23   Patrol has a pattern or practice of not conducting an individualized assessment of flight risk prior to an

24   arrest." (*Id.* at 13-14.)  Plaintiffs argue that after the classes are ascertained, "the Court may consider

25   the legality of the challenged pattern or practice, and class members will be bound by that judgment

26   whether they win or lose." (*Id.* at 13, citing *Willis*, 2015 WL 6689637, at *7; *see also id.* at 14.)

27        The Court finds the proposed class definitions for the Suspicionless Stop and Warrantless

28   Arrest classes do not preclude membership unless liability is established.  For example, membership in

1    the Suspicionless Stop Class is not precluded unless Defendants are liable for violating the Fourth

2    Amendment.  Instead, as Plaintiffs argue, membership in the proposed class requires: (1) the person be

3    subjected to an investigatory, detentive stop by Border Patrol during the relevant period; and (2) the

4    Court's finding that Border Patrol had a pattern or practice of conducting stops without warrants and

5    without assessments of reasonable suspicion.  Similarly, membership in the Warrantless Arrest Class

6    is not precluded unless Defendants are liable for violations of 8 U.S.C. § 1357(a)(2) and 8 C.F.R. §

7    287.8(C)(2)(ii).  Put another way, membership for both the classes may be known *without* a

8    determination of Defendants' liability on the claims in issue, and liability is not presupposed with the

9    proposed definitions.  Accordingly, the two proposed Suspicionless Stop and Warrantless Arrest

10   Classes are not "fail-safe" classes.

11                      2.      Scope of the Warrantless Arrest Class Definition

12          When a proposed class definition "include[s] a great number of members who for some reason

13   could not have been harmed by the defendant's allegedly unlawful conduct, the class is defined too

14   broadly to permit certification."  *Olean*, 31 F.4th at 669 n.14 (quoting *Messner v. Northshore Univ.*

15   *HealthSystem*, 669 F.3d 802, 826 n.15 (7th Cir. 2012)).  The Ninth Circuit determined "a court must

16   consider whether the possible presence of uninjured class members means that the class definition is

17   fatally overbroad." *Id.*; *see also Mazur v. eBay, Inc.,* 257 F.R.D. 563, 567 (N.D. Cal. 2009) (rejecting a

18   class definition as imprecise and overbroad where it included individuals who were not harmed);

19   *Wolph*, 272 F.R.D. at 482-83 (finding a class definition was overbroad where the proposed class

20   included individuals who had already received a remedy and were not damaged).

21          The Court has discretion to cure defects of a proposed class definition, including modifying a

22   definition when the class is overbroad.  *See Ruiz Torres*, 835 F.3d at 1139 (indicating the district court

23   may narrow a class definition); *see also Powers v. Hamilton County Public Defender Comm'n*, 501

24   F.3d 592, 619 (6th Cir. 2007) ("district courts have broad discretion to modify class definitions"); *In re*

25   *Monumental Life Ins.* Co., 365 F.3d 408, 414 (5th Cir. 2004) ("district courts are permitted to limit or

26   modify class definitions to provide the necessary precision"); *Victorino v. FCA US LLC*, 326 F.R.D.

27   282, 301-02 (S.D. Cal. 2018) ("district courts have the inherent power to modify overbroad class

28   definitions"). The Court may also consider proposals to change a class definition first raised in a reply

                                                    44

1   brief on a motion for class certification. *See, e.g., Cruz v. MM 879, Inc.*, 329 F.R.D. 639, 649-50 (E.D.

2   Cal. 2019) (where the defendants identified class definition flaws, the plaintiffs proposed amended

3   class definitions in their reply brief and "the Court exercise[d] its discretion to adopt [the] proposed

4   amendments"); *Guzman v. Polaris Inds. Inc.*, 345 F.R.D. 174, 182, 184 (C.D. Cal. 2023) (observing the

5   plaintiffs narrowed the proposed class definition in their reply brief and considering whether the

6   modified class satisfied the Rule 23 requirements); *see also Conant v. McCaffrey*, 172 F.R.D. 681, 683

7   (N.D. Cal. 1997) (finding the plaintiffs "substantially alleviated" the problem resulting from an overly

8   broad class definition by "revising the class definition in their reply brief").

9       Defendants contend the definition of the Warrantless Arrest Class "is impermissibly overly

10  broad." (Doc. 32 at 16.) Defendants argue that a class must not be "defined so broadly as to include a

11  great number of members who for some reason could not have been harmed by the defendant's

12  allegedly unlawful conduct." (*Id.*, quoting *Ruiz Torres*, 835 F.3d at 1138.) Defendants note that

13  "[a]rresting someone without a warrant is not necessarily unlawful conduct," and the proposed class

14  may encompass individuals who were lawfully arrested "and could not have been harmed." (*Id.*,

15  citing *Gonzales v. Comcast Corp.*, 2012 WL 10621, at *20 (E.D. Cal. Jan. 3, 2012).) Defendants

16  contend that the class "should … not be certified" given the overly broad definition. (Doc. 32 at 16.)

17  However, the Ninth Circuit indicated that when a class definition is overly broad, the problem "can

18  and often should be solved by refining the class definition rather than by flatly denying class

19  certification on that basis." *Olean*, 31 F.4th at 669, n.14 (quoting *Messner*, 669 F.3d at 825 (when

20  there are "minor overbreadth problems …, the better course is *not* to deny class certification entirely

21  but to amend the class definition as needed to correct for the overbreadth" [emphasis added]).

22      If the Court agrees that the definition is overly broad, Plaintiffs request that "the Court narrow

23  its definition … to clarify the intended scope" of the Warrantless Arrest Class. (Doc. 37 at 14 n.10,

24  citation omitted.) Plaintiffs propose that the definition could be modified to indicate the arrests were

25  "pursuant to a practice of conducting arrests without warrants and without an individualized assessment

26  of probable cause that the person is likely to flee before a warrant can be obtained." (*Id.*) Plaintiffs

27  contend this modification "would address Defendants' overbreadth concern but would not create a fail-

28  safe class for the reasons addressed in *Willis*." (*Id.*)

3.    Final Class Definitions

The Court finds it is necessary to modify the definitions, both for clarity and to ensure the scope of the classes are sufficiently narrowed to the theories of liability raised in the complaint. *See Ruiz Torres*, 835 F.3d at 1139 (indicating "the district court may construe the class definition more narrowly, or otherwise conform its interpretation of the class definition with the prevailing theory of liability"). For purposes of the pending motion for provisional class certification, the Court considers the following definitions:

> **Suspicionless Stop Class**: All persons since January 6, 2025, who have been or will be subjected to a detentive stop by Border Patrol in this district without a pre-stop, individualized assessment of reasonable suspicion whether the person (1) is engaged in an offense against the United States or (2) is a noncitizen unlawfully in the United States.

> **Warrantless Arrest Class**: All persons since January 6, 2025, who have been arrested or will be arrested in this district by Border Patrol without a warrant and without a pre-arrest, individualized assessment of probable cause that the person poses a flight risk.

These modified definitions do not create fail-safe classes, because Plaintiffs retain the burden to prove that Border Patrol had (1) a pattern or practice of performing detentive stops without warrants and without reasonable suspicion assessments, and (2) a pattern or practice of placing individuals under arrest without a warrant, without first performing a flight risk assessment to find probable cause.

## IV.    Analysis of Rule 23 Requirements

Plaintiffs contend the requirements of Rule 23(a) and Rule 23(b) are satisfied for the provisional Suspicionless Stop and Warrantless Arrest Classes. (Doc. 14-1 at 15-22.) Defendants argue the Court should deny certification because "the Proposed Classes are not sufficiently numerous, encompass dissimilarly situated individuals whose claims are not common, whose injuries are not typical, and who differ in their ability to challenge their claims through the administrative process." (Doc. 32 at 1.)

### A.    Numerosity

This prerequisite requires the Court to consider "specific facts of each case and imposes no absolute limitations." *General Telephone Co. v. EEOC*, 446 U.S. 318, 330 (1980). Although there is not a specific threshold, generally "courts find the numerosity requirement satisfied when a class

includes at least 40 members." *Rannis v. Recchia*, 380 Fed. Appx. 646, 651 (9th Cir. 2010); *see also Water v. Leprino Foods Co.*, 670 F. Supp. 3d 1035, 1047 (E.D. Cal. 2023) (same).  Even a class of 20 members—though a "jurisprudential rarity"—may satisfy the numerosity requirement where joinder of all is impracticable.  *See Rannis*, 380 Fed. Appx. at 651-52.  Importantly, "Plaintiffs need not state the exact number of potential members nor identify all the members of the class so long as the putative class is not amorphous." *Foon v. Centene Mgmt. Co., LLC*, 2023 WL 1447922, at *4 (E.D. Cal. Feb. 1, 2023) (quoting *Arnold v. United Artists Theater Cir., Inc.*, 158 F.R.D. 439, 449 (N.D. Cal. 1994)).

Plaintiffs contend that "where only declaratory or injunctive relief is sought, 'the numerosity requirement is relaxed and plaintiffs may rely on reasonable inferences arising from plaintiffs' other evidence that the number of unknown and future members' makes joinder impracticable." (Doc. 14-1 at 15, quoting *C.R. Educ. & Enf't Center. v. Hosp. Props. Tr.*, 317 F.R.D. 91, 100 (N.D. Cal. 2016) [alterations adopted].)  In finding there was a relaxed standard, the Northern District court cited *Arnott v. U.S. Citizenship & Immigration Servs.*, 290 F.R.D. 579, 586 (C.D. Cal. 2012), which, in turn, relied upon *Sueoka v. United States*, 101 Fed. Appx. 649, 653 (9th Cir. 2004).  In *Sueoka*, the Ninth Circuit observed: "where 'only injunctive or declaratory relief is sought, some courts have held that the numerosity requirement is relaxed so that even speculative or conclusory allegations regarding numerosity are sufficient to permit class certification.'" *Id.*, 101 Fed. Appx. at 653 (quoting 5 Moore's Federal Practice § 23.22[3][b] (3d ed. 2003)).  After the Ninth Circuit issued *Sueoka,* the Supreme Court decided *Wal-Mart*, which expressly held that a party seeking certification cannot rely simply on the pleadings, but "must be prepared to prove that there are *in fact* sufficiently numerous parties…." *Wal-Mart*, 564 U.S. at 350 (emphasis in original).  The Supreme Court later reiterated that a party seeking certification "must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S 258, 275 (2014) (emphasis in original).  It does not appear the Ninth Circuit has applied the relaxed standard for the numerosity requirement after the decisions in *Wal-Mart* and *Halliburton*.  Consequently, the Court declines to follow *Sueoka* and its progeny and finds that Plaintiffs must prove by a preponderance of the evidence that they have satisfied the numerosity requirement.

Plaintiffs argue that "the numerosity requirement is easily met" because both proposed classes

are "currently comprised of at least dozens of people." (Doc. 14-1 at 16 [emphasis omitted].)

Plaintiffs observe that "Border Patrol claims its agents arrested 78 people in Kern or Tulare counties

between January 7 and 10, 2025." (*Id.*, citing Braun Decl. Exhs. 17, 18, 22 [Doc. 15-2 at 72, 74, 94-

95].) Plaintiffs also allege that "local reports estimate the number of arrested individuals may have

been higher." (*Id.*, citing Doc. 1 ¶¶ 4, 322.) Plaintiffs argue, "Even if Border Patrol's number is

correct, the Warrantless Arrest Class is currently comprised of approximately 78 people, and the

Suspicionless Stops Class is even larger, as not all suspicionless stops were escalated to arrests." (*Id.*)

Defendants argue the proposed classes "are not so numerous that they render joinder of all

members impracticable." (Doc. 32 at 16, cleaned up.) Defendants contend that "Plaintiffs do not

attempt to even estimate the number of aliens who will prospectively be 'subjected to [Border Patrol's]

challenged practices or patterns.'" (*Id.* at 16-17, quoting Doc. 14-1 at 10.) Defendants also assert that

"Plaintiffs point to only a dozen[] examples" to support the numerosity requirement. (*Id.* at 17.)

However, Defendants do not address—or even acknowledge—any other evidence related to the

number of putative class members, such as information contained in the media statements from Border

Patrol or the Sector's social media. (*See id.* at 16-17.)

Evidence before the Court shows Border Patrol itself reported the Operation "led to 78 arrests."

(Doc. 15-2 at 72; *see also id.* at 74.) The U.S. Customs and Border Protection later indicated that for

77 of the 78 individuals arrested, Border Patrol did not have any information on their criminal history

before their arrests. (Doc. 38-1 at 5-6.) Thus, it appears that for at least 77 individuals, Border Patrol

did not have warrants authorizing arrest.

Munguia Esquivel reports that when Border Patrol transported him behind the Home Depot, he

saw "over ten people who had been detained." (Doc. 15-10 at 3, ¶ 10.) Upon transport to the 7th

Standard Road facility in the afternoon of January 7, 2025, Munguia Esquivel saw a "bus… already

full of people who had been detained," and a second bus arrived. (*Id.* at 11.) Morales Cisneros, who

was detained after work, estimated that his bus was filled with "about 40 people" when departing the

7th Standard Road facility around 10 or 11 p.m. on January 7, 2025. (Doc. 15-9 at 3, ¶ 9.) This

undisputed evidence supports a conclusion that Border Patrol arrested enough people to fill two buses

on January 7, 2025 alone, and the Operation continued for two more days. Plaintiffs also present

evidence that Border Patrol did not make required flight risk assessments before making these arrests during the Operation.

As Plaintiffs argue, "not all suspicionless stops were escalated to arrests" for which flight risk assessments would be required.  For example, Morales Cisneros reports while he was handcuffed in a Border Patrol vehicle, agents pulled behind another vehicle at a gas station and blocked it in, as they had done to him.  (Doc. 15-9 at 3, Morales Cisneros Decl. ¶ 7.)  He observed the agents get out, talk to a person in the vehicle, and say, "We're doing our job."  (*Id.*)  Morales Cisneros reports the agents returned to the vehicle and did not arrest the unidentified individual.  (*Id.*)  Vargas Mendez reports that although he was in a van with five other individuals when Border Patrol stopped the van, the driver and front passenger produced identification when an agent "demanded … their license[s] and proof of residency."  (Doc. 15-6 at 3, Vargas Mendez Decl. ¶ 7.)  Vargas Mendez states that Border Patrol arrested him and "one of [his] coworkers."  (*See id.*, ¶¶ 9-10.)  There is no indication the other four individuals in the van were arrested.  (*See id.*)  This evidence supports the conclusion that the Suspicionless Stop Class also includes individuals who were not arrested following the stop.

Harmonizing Border Patrol's media report with the undisputed anecdotal evidence, the Court finds Plaintiffs have met their burden of establishing by a preponderance of the evidence that joinder of all members is impracticable, and both the Suspicionless Stop and Warrantless Arrest Classes satisfy the numerosity requirement.[12]

## B.    Commonality

Rule 23(a) requires "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  To satisfy the commonality requirement, the class representatives must "demonstrate that the class members have suffered the same injury."  *Wal-Mart*, 564 U.S. at 350.  Thus, "commonality requires that the class members' claims depend upon a common contention such that determination of its truth or falsity will resolve an issue that is central to the validity of each claim in one stroke," and the

---

[12] Both the proposed Suspicionless Stop and Warrantless Arrest Classes include "future" members.  (*See* Doc. 14-1 at 8; Doc. 37 at 14, n.10.)  The inclusion of future members supports the Court's finding that both classes satisfy the requirement of Rule 23(a)(1).  *See A.B. v. Hawaii State Dep't of Educ.*, 30 F.4th 828, 838 (9th Cir. 2022) (explaining that when a class includes future members—which "is not itself unusual or objectionable"— this "makes joinder of every class member all the more impracticable").

"plaintiff must demonstrate the capacity of classwide proceedings to generate common answers to common questions of law or fact that are apt to drive the resolution of the litigation." *Mazza*, 666 F.3d at 588 (internal quotation marks, citations omitted); *see also Parsons v. Ryan*, 754 F.3d 657, 684 (9th Cir. 2014) (finding commonality satisfied where "[t]he factual and legal questions that [plaintiffs] present can be answered 'yes' or 'no' in one stroke as to the entire class, dissimilarities among class members do not impede the generation of common answers to those questions, and the capacity of classwide proceedings to drive the resolution of this litigation cannot be doubted").

Plaintiffs observe, "In the Ninth Circuit, commonality is satisfied where … Plaintiffs are 'challeng[ing] a system-wide practice or policy that affects all of the putative class members.'" (Doc. 14-1 at 17, quoting *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001).) Plaintiffs also note the Ninth Circuit "held that 'Fourth Amendment claims concerning government policies, practices or procedures for probable cause determinations are plainly suitable for classwide resolution.'" (*Id.*, quoting *Gonzalez*, 975 F.3d at 812.) According to Plaintiffs, "This logic applies with equal force to reasonable suspicion determinations, which are also governed by the Fourth Amendment." (*Id.*) Plaintiffs argue their two proposed classes meet the commonality requirement "because they present common questions of law and fact for all class members." (*Id.*) Plaintiffs assert "each class member has, or will be, subjected to the same practices that Border Patrol employs, which has affected each class member." (*Id.* at 17-18.) Plaintiffs contend a "determination as to the legality of those common policies will resolve-class wide claims 'in one stroke.'" (*Id.* at 18, quoting *Cruz v. MM 879, Inc.*, 329 F.R.D. 639 (E.D. Cal. 2019).)

Defendants argue the Suspicionless Stop and Warrantless Arrest classes "lack commonality for three reasons": (1) "the evidence belies Plaintiffs' argument that a systemic policy, pattern, or practice in violation of the Fourth Amendment and 8 U.S.C. § 1357 exists, or that such pattern or practice occurred during 'Operation Return to Sender;'" (2) the proposed classes "simply cannot address the many factors that are involved in making an assessment of probable cause and flight risk;" and (3) "there are various facts and circumstances concerning each alleged detention," and "some of the individuals who were detained allege that they were being detained for being in the United States without any legal status where at least one individual was told he was being detained because of a

crime." (*See* Doc. 32 at 18-19.)

Defendants contend: "Plaintiffs aver that 'all class members in each Proposed Class are bound together by common questions of fact and law focused on the nature of Border Patrol's policies or practices and whether those policies or practices are unlawful.' However, this justification is an insufficient basis for establishing commonality under Fed. R. Civ. P. 23(a)(2)." (Doc. 32 at 18, quoting Doc. 14-1 at 8.) For example, Defendants note the Supreme Court held in *Falcon* that "a class action 'may only be certified if the trial court is satisfied, after rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.'" (*Id.*, quoting *Falcon*, 457 U.S. at 161 [emphasis omitted].) Defendants observe:

> In *Falcon*, a district court certified a class in a plaintiff-employee's Title VII action against his employer where the plaintiff claimed, without offering any evidence, that the company had a policy of racial discrimination. *Id.* at 149-52. The Court of Appeals for the Fifth Circuit affirmed the class certification. *Id.* at 147. The Supreme Court, however, reversed the Court of Appeals order affirming the class certification and held that there was "a wide gap" between (1) an individual claim of discrimination and an unsupported allegation that a company had a policy of discrimination, and "(2) the existence of a class of persons who have suffered the same injury as that individual, such that the individual's claim and the class claims will share common questions of law or fact." *Id.* at 157.

(Doc. 32 at 18, citing *Falcon*, 457 U.S. at 147, 149-152, 157.) Defendants contend the "[s]ame [is true] here." (*Id.*) According to Defendants, "As in *Falcon*, Plaintiffs' unsupported allegations of Border Patrol's unlawful policies or practices are insufficient absent a rigorous analysis of those claims, particularly because … whether Border Patrol agents have reasonable suspicion to effectuate investigative stops and probable cause to effectuate arrests is an inherently fact-specific and individualized inquiry." (*Id.*)

Defendants observe that in *U.S. v. Rodriguez*, 975 F.2d 592 (9th Cir. 1992)*,* the Ninth Circuit held: "Reasonable suspicion is an individualized inquiry that must be founded upon a particularized and objective basis for suspecting the particular person stopped." (Doc. 32 at 19, citing *Rodriguez*, 975 F.2d at 595.) Defendants argue there are "various facts and circumstances concerning each alleged detention":

> For instance, some Border Patrol agents were wearing plain clothes and some were wearing uniform. *E.g., compare* Mendez Decl. ¶ 6 stating that the Border Patrol agents were wearing plain clothing *with* Gutierrez Decl.,

¶ 4, which states the Border patrol agent was wearing a vest that said
"POLICE." Another example is that some of the individuals who were
detained presented the Border Patrol agents with identification whereas
some individuals did not. *E.g., compare* Mendez Decl. ¶ 9 (where
Mendez states he did not present his identification) *with* Ramirez Decl. ¶ 7
(where Ramirez asserts the Border Patrol agent took his identification).
Furthermore, some of the individuals were detained for several hours or
days whereas other individuals were released at the site of the alleged
detention. *E.g., compare* Ramirez Decl. ¶ 10 (where he asserts he was
detained for seven or eight hours) *with* Martinez Decl. ¶ 10 (where
Martinez states she was released after she presented her green card to the
agents). [S]ome of the individuals who were detained allege that they
were being detained for being in the United States without any legal status
where at least one individual was told he was being detained because of a
crime. *Compare* Cisneros Decl. ¶¶ 5-6 (where Cisneros asserts the agent
stated the agent arrested him after telling him that he was in the United
States illegally) *with* Gutierrez Decl., ¶ 9 (where Gutierrez states the agent
detained him for "alien smuggling"). Similarly, some of the individuals
were stopped while driving in a vehicle while other individuals were
stopped while at a Home Depot. *Compare* Cisneros Decl., ¶ 5-6 (where he
states he was stopped while in a vehicle) *with* Esquivel Decl., ¶¶ 4-5
(where he states he was stopped at a Home Depot).

(*Id.* at 19-20.) Defendants contend this shows a "lack of commonality between the investigative

stops," and "undermine[s] Plaintiffs' claim that USBP engaged in a pattern or practice of unlawful

stops." (*Id.* at 20, citing *Wal-Mart*, 546 U.S. at 348.) Defendants argue the class members will also

have "widely varying" personal facts that "are important to the flight risk determination," such as

"familial ties, employment status, and other community connections." (*Id.* at 20-21.) They argue

these differences "defeat[] class certification." (*Id.* at 21.) Ultimately, Defendants maintain the two

classes "encompass a broad range of individuals with differing unique set of circumstances as bases

for their claims." (*Id.*)

Defendants' reliance upon *Falcon* to show the proposed classes "lack commonality" is

misplaced. Falcon filed suit against his employer and sought to represent a class of similarly situated

individuals who suffered discrimination by the employer. The Supreme Court considered whether

Falcon, "who complained that petitioner did not promote him because he is a Mexican-American, was

properly permitted to maintain a class action on behalf of Mexican-American applicants for

employment whom petitioner did not hire." *Id.*, 457 U.S. at 149. The district court found the

employer "had not discriminated against [Falcon] in hiring, but that it did discriminate against him in

its promotion practices." *Id.* at 152. The Supreme Court noted it "repeatedly held that a class

representative must be part of the class and possess the same interest and suffer the same injury as the

class members." *Id*. (quotation marks, citation omitted).  The Court observed also:

> Conceptually, there is a wide gap between (a) an individual's claim that he
> has been denied a promotion on discriminatory grounds, and his otherwise
> unsupported allegation that the company has a policy of discrimination,
> and (b) the existence of a class of persons who have suffered the same
> injury as that individual, such that the individual's claim and the class
> claims will share common questions of law or fact and that the individual's
> claim will be typical of the class claims. For [Falcon] to bridge that gap,
> he must prove much more than the validity of his own claim.

*Id*. at 157.  The Court explained that although Falcon presented evidence of discrimination when he

was passed over for a promotion, such evidence did "not necessarily justify … additional inferences,"

including that discriminatory treatment was typical of the employer's "promotion practices," or that

discrimination was "reflected in … other employment practices, such as hiring, in the same way it is

manifested in the promotion practices." *Id.* at 158.  The Supreme Court concluded, "The District

Court's error in [the] case… is the failure to evaluate carefully the legitimacy of the named plaintiffs'

plea that he is a proper class representative under Rule 23(a)." *Id.* at 160.  Therefore, the Supreme

Court remanded the action for further proceedings. *Id.* at 161.

 The matter now pending before the Court is distinguishable from *Falcon.*  That action involved

only one plaintiff who had a claim for discrimination in *promotion* practices but sought to represent a

class who suffered discrimination in *hiring* practices.  Falcon was not a proper class representative for

such a class, because he was not even a member of the class.  In contrast, here, Individual Plaintiffs are

members of the two proposed classes.  Plaintiffs do not rely *only* on evidence of their own claims—in

contrast to Falcon—but instead present additional anecdotal evidence regarding the experiences of

putative class members during "Operation Return to Sender."  Nevertheless, the Court must determine

whether Plaintiffs carry the burden to show by a preponderance of the evidence that each proposed

class has a common question of law or fact.  *See* Fed. R. Civ. P. 23(a)(2); *Wal-Mart*, 564 U.S. at 350;

*Wolff*, 77 F.4th at 174.  Anecdotal evidence from class members that bridges the gap between the

claims of the representatives and the claims of the class members may constitute a sufficient form of

proof.  *Wal-Mart*, 564 U.S. at 358.

   1. <u>Suspicionless Stop Class</u>

 Plaintiffs contend, "Except at the border and its functional equivalents, the Fourth Amendment

prohibits Defendants from conducting a detentive stop to investigate a person's immigration status without reasonable suspicion that a person is a noncitizen unlawfully in the United States." (Doc. 1 at 68, ¶ 341.) Plaintiffs allege that "Defendants have a policy, pattern, and/or practice of traveling outside the border and its functional equivalents and stopping individuals without regard to reasonable suspicion that they are unlawfully in the United States." (*Id.*, ¶ 343.)  Morales Cisneros, Munguia Esquivel, and Aguilera Martinez—the three proposed class representatives—assert they were stopped "without reasonable suspicion that any of them was a noncitizen unlawfully in the United States." (*Id.*, ¶ 342.)  Plaintiffs identify putative class members who they assert suffered violations of their Fourth Amendment rights.  (*See id.*)  Plaintiffs explain that "[t]he Suspicionless Stop Class does not challenge *whether every stop* was justified by reasonable suspicion, but rather whether Defendants' *practice* of conducting stops without conducting *any individualized assessment* of reasonable suspicion violates the law." (Doc. 37 at 7 [emphasis in original].)

Plaintiffs assert the following are "common questions of law and fact" for the proposed Suspicionless Stop Class:

- Whether Border Patrol has a pattern or practice of conducting stops without regard to whether reasonable suspicion exists that the person (1) is engaged in an offense against the United States or (2) is a noncitizen unlawfully in the United States; and

- Whether Border Patrol's pattern or practice of conducting stops without regard to whether reasonable suspicion exists that the person (1) is engaged in an offense against the United States or (2) is a noncitizen unlawfully in the United States violates the Fourth Amendment.

(Doc. 14-1 at 18.)  The first question identified goes to the burden associated with the pending motion. *See Ellis*, 657 F.3d at 983 ("If there is no evidence that the entire class was subject to the same [unlawful] practice, there is no question common to the class"); *see also Black Lives Matter L.A. v. City of Los Angeles*, 113 F.4th 1249, 1264 (9th Cir. 2024) ("plaintiffs cannot simply allege that a policy applies class-wide—they have to present evidence that it does"); *Gonzalez v. Millard Mall Service, Inc.*, 281 F.R.D. 455, 462 (N.D. Cal. 2012) (observing courts have denied class certification where "a plaintiff failed to show common proof" of a practice).  Thus, the Court must determine whether Plaintiffs have shown by a preponderance of the evidence that Border Patrol had a "pattern or

1  practice" of conducting detective stops without reasonable suspicion.

2        Proposed class representative Wilder Munguia Esquivel reports that he was standing with a

3  group of day laborers outside Home Depot when several unmarked vehicles arrived, and agents

4  "aggressively swarmed" around the day laborers.  (Doc. 15-10 at 2, ¶¶ 4-5.)  Munguia Esquivel states

5  the agents "did not seem to be targeting specific individuals," but demanded "papers" from the group.

6  (*Id.*, ¶ 4.)  He states that an agent directly asked him in Spanish: "Do you have papers? Do you have

7  identification? Where are you from?"  (*Id.*, ¶ 5.)  When Munguia Esquivel did not respond, the agents

8  "kept yelling … louder and louder," asking if Munguia Esquivel had papers and where he was from.

9  (*Id.*)  When he did not respond and attempted to walk away, the agent followed and then ordered him

10  to "turn around" to be handcuffed.  (*Id.*)  Munguia Esquivel believes the agent who arrested him did

11  not know who he was, and that they were "targeted at Home Depot because many day laborers gather

12  to get work there.  (*Id.*, ¶ 10.)

13        Putative class members Jesus Ramirez and Luis Perez Cruz—who were also detained by

14  Border Patrol agents in the parking lot of Home Depot—echo the claims of Munguia Esquivel.  (*See*

15  Doc. 15-5 at 2, Ramirez Decl. ¶ 3; Doc. 15-7 at 2, Perez Cruz Decl. ¶ 3.)  Ramirez asserts that he "was

16  not doing anything unlawful" when the agents arrived and surrounded the group of day laborers.

17  (Doc. 15-5 at 2, ¶ 4.)  Ramirez also asserts the Border Patrol agents demanded they show "papers,"

18  and Ramirez pulled out his identification from his wallet.  (*Id.*, ¶ 5.)  Ramirez reports the agent took

19  his identification and believes "[i]t was clear … the agents did not know who [he] was."  (*Id.*, ¶¶ 5-6.)

20  Perez Cruz reports that he was talking to his cousins in the Home Depot parking lot when two agents

21  walked up to them, said they were from Border Patrol, and directed the group "to show … IDs saying

22  that [they] were in the United States legally or had permits to be here."  (Doc. 15-7 at 2, ¶ 3.)  Perez

23  Cruz also believes the agents "did not appear to have any idea who [he] was before they demanded

24  [his] ID."  (*Id.*, ¶ 4.)

25        Yolanda Aguilera Martinez, a proposed class representative, reports she was driving in her car

26  when she "saw two vehicles pulled over to the right side of the road and three men standing near the

27  vehicles."  (Doc. 15-11 at 2, Aguilera Martinez Decl. ¶ 4.)  She states that one of the men "raised his

28  hand to flag [her] down and signaled for [her] to pull over," which she did.  (*Id.*)  Aguilera Martinez

1  reports that she "was not speeding," and her car's registration and license plate were current.  (*Id.*)

2  She asserts the Border Patrol agent who approached her vehicle "did not seem to know who [she]

3  was," and said, "I need to see your papers."  (*Id.*, ¶ 6.)

4          Named plaintiffs, and putative class members, Juan Vargas Mendez and Maria Guadalupe

5  Hernandez Espinoza each report they were passengers in vehicles that Border Patrol stopped while

6  they were driving home after work.  Like Aguilera Martinez, they report the drivers of the vehicles

7  were not speeding or breaking traffic laws.  (Doc. 15-6 at 2, Vargas Mendez Decl. ¶ 4; Doc. 15-8 at 2,

8  Hernandez Espinoza Decl. ¶ 4.)  Hernandez Espinoza states her partner was driving his vehicle and

9  "not breaking any traffic laws" when Border Patrol pulled them over.  (Doc. 15-8 at 2, ¶ 4.)  She

10  reports agents approached the car and directed the occupants to get out.  (*Id.*, ¶¶ 5-6.)  Hernandez

11  Espinoza reports, "The agents asked us for our IDs, if we had papers, and if we were here legally.  I

12  did not answer their questions, and I did not produce an ID because I was not carrying one with me.

13  The agents did not explain why they had pulled us over."  (*Id.* at 3, ¶ 7.)  Similarly, Vargas Mendez

14  reports he was a passenger in a van that Border Patrol stopped.  (Doc. 15-6 at 2, ¶ 4.)  He reports that

15  when he heard sirens, he "looked at the speedometer and saw [they] were driving under 40 miles an

16  hour, well below the speed limit."  (*Id.*, ¶ 5.)  Vargas Mendez states agents opened the van door, and

17  "shouted in Spanish that [they] needed to show him [their] IDs, and warned [the passengers] had better

18  'tell the truth.'"  (*Id.*, ¶ 8.)  Vargas Mendez states he did not produce identification because he was not

19  carrying it, and the agents "dragged" him out of the van and handcuffed him.  (*Id.*, ¶¶ 9-10.)

20          Ernesto Campos Gutierrez was driving his truck—with a passenger in the front seat—and

21  towing a mini trailer with gardening equipment when Border Patrol stopped him on January 8, 2025.

22  (Doc. 15-4 at 3, ¶ 3.)  He reports he was driving the speed limit and his truck "had current license

23  plates and registration, and had no stickers or decals."  (*Id.*)  Campos Gutierrez pulled over when

24  directed, and a Border Patrol agent asked for his identification through the window, which remained

25  closed.  (*Id.*, ¶ 4.)  Campos Gutierrez heard the agent tell another person that that he "had two bodies"

26  before Campos Gutierrez lowered the window and provided his REAL ID driver's license.  (*Id.*)

27          UFW members also reported being pulled over in a vehicle "traveling within the speed limit

28  and obeying traffic laws."  (Doc. 15-3 at 8, ¶ 26.)  Alicia, Benjamin, and Carlos passed Border Patrol

vehicles that were parked on the shoulder of a road, after which Border Patrol left the shoulder and signaled for them to pull over.  (*Id.*, ¶¶ 26-27.)  Agents "approached the car and asked Alicia, Benjamin, and Carlos if they had 'papers.'"  (*Id.* at 9, ¶ 27.)  They believe that "[t]he agents did not appear to know who was in the car, and did not appear to have any reason for pulling the car over, other than to ask for 'papers.'"  (*Id.*)

Oscar Morales Cisneros, also one of the three proposed representatives, reports that while in his truck outside a liquor store "located in a predominantly Latino-populated neighborhood," Border Patrol agents pulled behind his vehicle—which had current registration and no stickers or decals on it—and blocked him in.  (Doc. 15-9 at 2, ¶ 4.)  The agents approached his truck and asked if he "had papers and was here legally."  (*Id.*, ¶ 5.)  He did not answer the questions but provided his driver's license when asked.  (*Id.*)  After the agents arrested Morales Cisneros, they drove around Bakersfield.  (*Id.* at 3, ¶ 7.)  He reports that at one point, the agents stopped at a gas station where they "pulled up behind a vehicle to block it in," as they had done to him, and spoke to a person in the vehicle.  (*Id.*)  Morales Cisneros heard an agent say "We're doing our job" before they let the unidentified person go.  (*Id.*)

Plaintiffs provide news articles regarding the Operation, which include statements by Sara Fuentes.  (Doc. 15-2 at 68, 98.)  Fuentes is not a putative class member, but she witnessed Border Patrol agents in action during the Operation, as manager of a gas station where Border Patrol agents detained the station's customers.  (*Id.*)  She saw agents arrive in civilian clothes and unmarked vehicles.  (*Id.* at 98.)  At first, Fuentes thought the agents were serving a warrant, but then she noticed "it was only Hispanics and field workers that they were putting aside."  (*Id.* at 68.)  Fuentes saw that the agents "didn't stop people with FedEx uniforms, they were stopping people who looked like they worked in the fields."  (*Id.* at 98.)  Fuentes witnessed the agents approach customers, ask about their immigration status, and arrest individuals.  (*Id.*; *see also id.* at 7, ¶ 17.)  Fuentes saw Border Patrol agents parked behind a woman's car to block her in, but the agents "allowed the woman to leave" when a local news entity arrived at the gas station.  (*Id.*; *see also id.* at 69.)

Plaintiffs and putative class members report facts indicating they were engaged in ordinary activities—such as talking with family members and others or driving home from work in vehicles that were not violating traffic laws—when Border Patrol stopped them, demanded their "papers" and

questioned them about whether they were in the country legally.  Collectively, Plaintiffs present evidence that is "more likely than not" Border Patrol agents engaged in a practice of performing detentive stops without knowledge of who they were stopping, and without reasonable suspicion to perform the stop.  Although Defendants contend there were "various facts and circumstances concerning each detention" (Doc. 32 at 19), the circumstances identified by Defendants constitute a distinction without a difference. Whether Border Patrol agents wore uniforms or plain clothes does not change whether the agents had reasonable suspicion to perform the stops.  Whether a person handed over identification while being detained does not address whether the Border Patrol agents engaged in a practice of performing stops without reasonable suspicion.  Ultimately, there is no substantive conflict in the evidence regarding the alleged practice.

With the anecdotal evidence—from named Plaintiffs, putative class members, and a third party—Plaintiffs have met their burden of establishing by a preponderance of the evidence that putative class members "suffered the same injury" imposed by Border Patrol, which engaged in a practice of performing detentive stops without individualized assessments of reasonable suspicion during "Operation Return to Sender."  Furthermore, whether the practice violated the rights of the class members under the Fourth Amendment is a question that "can be answered 'yes' or 'no' in one stroke as to the entire class."  *See Parsons*, 754 F.3d at 684; *see also Kidd*, 343 F.R.D. at 438-439 (finding the commonality requirement was satisfied where the plaintiffs challenged practices of ICE in conducting home arrests, noting "[t]hese practices and policies affect all putative class members because the classes themselves are defined as those who have experienced or will experience the effects of these practices and policies").  Therefore, the Court finds Plaintiffs have satisfied the commonality requirement for the Suspicionless Stop Class.

### 2. Warrantless Arrest Class

Plaintiffs contend that Defendants had a "policy, pattern, and/or practice of using warrantless arrests during sweeps of areas where people of Latino descent, farm workers, and day laborers live, work, drive, and gather."  (Doc. 1 at 65, ¶ 328.)  According to Plaintiffs, "Defendants' policy, pattern, and/or practice of making warrantless arrests without the required individualized flight risk analysis is 'final agency action' that is 'in excess of statutory jurisdiction, authority, or limitations' under 8 U.S.C.

58

§ 1357(a)(2) … [and] 8 C.F.R. § 287.8(c)(2)(ii)."  (*Id.* at 66-67, ¶¶ 331, 338.)  Specifically, 8 U.S.C. § 1357(a)(2) provides that an immigration officer has the power, without a warrant:

> to arrest any alien who in his presence or view is entering or attempting to enter the United States in violation of any law or regulation made in pursuance of law regulating the admission, exclusion, expulsion, or removal of aliens, or to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest… .

*Id.*  Similarly, 8 C.F.R. § 287.8(c)(2)(ii) indicates that an immigration officer "shall" obtain a warrant of arrest "except when the designated immigration officer has reason to believe that the person is likely to escape before a warrant can be obtained."  *Id.*

Plaintiffs assert the following are "the common questions of law and fact" for the proposed Warrantless Arrest Class:

- Whether Border Patrol has a pattern or practice of conducting warrantless arrests without probable cause that an individual is likely to escape before a warrant can be obtained for the arrest;

- Whether Border Patrol's pattern or practice of conducting warrantless arrests without probable cause that an individual is likely to escape before a warrant can be obtained for the arrest violates 8 U.S.C. § 1357(a)(2); and

- Whether Border Patrol's pattern or practice of conducting warrantless arrests without probable cause that an individual is likely to escape before a warrant can be obtained for the arrest violates 8 C.F.R. § 287.8(C)(2)(ii).

(Doc. 14-1 at 18.)  Again, the first question identified by Plaintiffs implicates their burden associated with the pending motion.  *See Ellis*, 657 F.3d at 983; *Black Lives Matter L.A.*, 113 F.4th at 1264. Consequently, the Court must evaluate whether Plaintiffs demonstrate by a preponderance of the evidence that Border Patrol had a pattern or practice of conducting warrantless arrests without probable cause that an individual is likely to escape before a warrant can be obtained.  Put another way, Plaintiffs must present evidence Defendants had a pattern or practice of not performing flight risk assessments to find probable cause prior to their arrests without a warrant.  *See Mountain High Knitting, Inc. v. Reno*, 51 F.3d 216, 218 (9th Cir. 1995) (holding that an arrest under § 1357(a)(2) requires an individualized determination of flight risk).

The three proposed class representatives report they were placed under arrest, without a warrant,

and without Border Patrol agents asking any information to assess their flight risk.  (Doc. 15-9 at 3, Morales Cisneros Decl. ¶ 6; Doc. 15-10 at 2-3, Munguia Esquivel Decl. ¶¶ 6-8; Doc. 15-11 at 3, Aguilera Martinez Decl. ¶ 8.) Morales Cisneros reports the agents told his daughter that he "was detained by Border Patrol for being here illegally without documents."  (Doc. 15-9 at 3, ¶ 6.)  He states, "[Agents] did not ask about my ties to the community, such as my family members, my work history, or how long I have lived in the neighborhood."  (*Id.*)  Munguia Esquivel also asserts the Border Patrol agent did not "ask me about my community ties, such as my family, work history, or how long I have been living here."  (Doc. 15-10 at 3, ¶ 8.)  Likewise, Aguilera Martinez reports, "The agent never asked me about my community ties to Kern County, like how long I have lived and worked here and all the family members I have who live here."  (Doc. 15-11 at 3, ¶ 8.)

Elizabeth Strater reports that when UFW Members Alicia, Benjamin, and Carlos were arrested, Border Patrol agents asked for their "papers" and "did not present a warrant for arrest … [or] ask any further questions."  (Doc. 15-3 at 9, Strater Decl. ¶ 28.)  Strater reports, "After they had handcuffed [Alicia], the agents asked Alicia if she had family.  When she told them she had children, an agent 'offered' to go pick up the children so they could all be taken to Mexico together.  The men did not ask Benjamin or Carlos about their ties to the community or otherwise conduct an assessment of flight risk."  (*Id.*)  Strater also reports that when UFW Member Fernando was arrested, "The agents did not present a warrant for arrest or ask Fernando anything about his family, community ties, employment, or other factors related to his likelihood of flight risk."  (*Id.* at 12, ¶ 41.)

The other putative class members uniformly report that Border Patrol agents arrested them without warrants and without asking any questions to assess their individual flight risk.  (Doc. 15-6 at 3, Vargas Mendez Decl. ¶ 10 ["They did not show us any warrants. They never asked about my community ties to Kern County, such as how long I had lived there, my family, or my employment."]; Doc. 15-7 at 2, Perez Cruz Decl. ¶ 4 ["None of the agents asked me anything about my family, community ties, work, or life in Bakersfield. The agents did not present me with a warrant of any kind and did not appear to have any idea who I was before they demanded by ID."]; Doc. 15-8 at 3, Hernandez Espinoza Decl. ¶ 7 ["The agents never asked me questions about my community ties, such as the many years I lived here, my work history, or my children and grandson."]; Doc. 15-5 at 2,

Ramirez Decl. ¶¶ 6-7 [reporting the agent did not have a warrant and "[t]he agent did not ask me any questions about my family or ties to the community. If he had asked, I would have told him I have family in Bakersfield and elsewhere in California. I would have told him my children live in California, and my son is still a minor."].)

Even when information regarding family and community ties was volunteered to Border Patrol agents following arrests of putative class members, the agents expressly disregarded it.  For example, Munguia Esquivel reports that his family members spoke to Border Patrol when they came to get his truck and said Munguia Esquivel "was in the process of regularizing [his] immigration status."  (Doc. 15-10 at 3, ¶ 9.)  He states, "The agents did not care and said they were taking me anyway."  (*Id.*)  Similarly, Vargas Mendez reports what while in the Border Patrol vehicle after his arrest: "I told [an agent] I have lived in the area for 20 years; I have a wife and four kids who are all citizens; I have no criminal record."  (Doc. 15-6 at 3, ¶ 11.)  The agent "responded he did not care and that [Vargas Mendez] was 'going to Mexico.'"  (*Id.*)

Although Defendants contend "the determination[s] of whether an alien is a flight risk … are inherently individualized determinations" (Doc. 32 at 20), this argument misses the mark.  Plaintiffs do not contend Border Patrol erred in assessing flight risks; they contend that the probable cause determinations were not performed *at all*.  (*See* Doc. 1 at 65-76; Doc. 37 at 7.)  Towards this end, Defendants' assertions regarding the differences in circumstances, including the length of detentions by Border Patrol, are unavailing.

Plaintiffs present evidence regarding 11 arrests during "Operation Return to Sender"— including the arrests of proposed class members and putative class members— where the individuals report Border Patrol arrested them without performing an assessment of whether the individuals were likely to escape before a warrant could be obtained.  This number is not insignificant given the fact that Border Patrol reported a total of 78 arrests during the Operation.  (Doc. 38-1 at 5-6, *see also* Doc. 15-2 at 72.)  Indeed, the Supreme Court has held that anecdotal evidence that included "roughly one account for every eight members of the class" was a "significant" support for a "pattern and practice" claim.  *See Wal-Mart*, 56 U.S at 358 (comparing the evidence before the Court in *Wal-Mart* with the evidence presented in *Teamsters v. United States*, 431 U.S. 324 (1977)).  Because Plaintiffs present

significant anecdotal evidence—comparable to the amount presented in *Teamsters*—Plaintiffs have met their burden of establishing that the class members suffered "the same injury" from the alleged Border Patrol practice. Whether this practice was unlawful or violated the class members' rights may be answered at one time. Therefore, the commonality requirement is satisfied for the Warrantless Arrest Class.

### C.    Typicality

This requirement demands that the "claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality ensures "the interest[s] of the named representative align[] with the interests of the class." *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1141 (9th Cir. 2016) (citation omitted). A claim or defense is not required to be identical, but rather "reasonably coextensive" with those of the absent class members. *Hanlon*, 150 F.3d at 1020. "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (internal quotation marks, citation omitted); *see also Torres*, 835 F.3d at 1020 (identifying the same as "[m]easures of typicality").

Individual Plaintiffs contend their claims "are typical of those of the members of the Proposed Classes, because they all arise from Border Patrol's illegal immigration policies, practices, or patterns pertaining to suspicionless stops and warrantless arrests in this District." (Doc. 14-1 at 19.) Plaintiffs assert the immigration policies and practices they challenge "are 'not unique' to the Individual Plaintiffs." (*Id.*, quoting *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014).) They indicate that "[a]ll members of the Proposed Classes they seek to represent have been, or will be, injured by the same course of conduct." (*Id.*, internal quotation marks omitted.) Plaintiffs argue, "The fact that some putative class members experienced different *outcomes* flowing from Border Patrol's unlawful actions because of their differing immigration status does not defeat typicality because *all* class members have suffered, or will suffer, the same harms." (*Id.* [emphasis in original].)

Defendants argue Plaintiffs do not show "the claims of the proposed class representatives or other named Plaintiffs are typical of the members of the Proposed Classes." (Doc. 32 at 22.)

Defendants contend there are "wildly differing underlying factual circumstances necessary to the determination of probable cause and flight risk" for the putative class members. (*Id.*) For example, Defendants observe:

> [A]ll three proposed class representatives provided the agents with their identification. *See* Cisneros Decl. at ¶ 5, Esquivel Decl. at ¶¶ 7-9, Martinez Decl. at ¶¶ 6,12. In contrast, the other Plaintiffs did not provide their identification to the agents. Mendez Decl. at ¶ 9, Espinoza Decl. at ¶ 7.

(*Id.*) According to Defendants, "This alone shows that the proposed putative class representatives' claims or defenses cannot be typical of the members of the Proposed Classes." (*Id.*) Defendants also argue individualized assessments are necessary for the Court to determine "whether class members have the same or similar injury: unlawful stop and arrest." (*Id.* at 22 [emphasis omitted].) Defendants contend that "a flight risk determination may include factors such as whether individuals are eligible for relief from removal, have criminal convictions which bar them from relief, or have final removal orders or have been previously removed, in addition to the circumstances of their warrantless arrests." (*Id.* at 22-23.) Defendants conclude, "Because these individualized circumstances are relevant to a court's consideration of whether class members share similar injury—because they are necessary to the probable cause and flight risk analysis—Plaintiffs proposed putative classes fail to meet the typicality requirement." (*Id.* at 23.)

Once again, Plaintiffs are not asserting Border Patrol made *incorrect* reasonable suspicion findings or *incorrectly* considered factors related to flight risk. Plaintiffs are asserting that Border Patrol agents did not make reasonable suspicion determinations related to the detentive stops and did not make flight risk assessments before effecting the warrantless arrests. Factual differences related to the circumstances of the detentive stops and arrests—such as whether the proposed class representatives and putative class members provided agents with identification—do not preclude a finding of typicality, because the proposed representatives and putative class members were subjected to the same practices of Border Patrol. *See Boley v. Universal Health Servs.*, 36 F.4th 124, 134 (3rd Cir. 2022) (explaining that "even relatively pronounced factual differences will generally not preclude a finding of typicality" when the "cause of the injury remains the same").

The evidence shows the proposed class representatives were subjected to the same practices of

1  Border Patrol as the putative class members and suffered the same injuries: detentive stops without

2  reasonable suspicion and arrests without the agents performing individual assessments of flight risk to

3  find probable cause to find they were likely to escape before a warrant could be obtained.  Because the

4  class representatives were subject to the same practices, their claims are typical of the putative class

5  members.  *See Hanon*, 976 F.2d at 508; *see also Torres*, 835 F.3d at 1020.  Therefore, Plaintiffs have

6  met their burden of satisfying the typicality requirement for both the Suspicionless Stop and

7  Warrantless Arrest Classes.

8     **D.    Adequacy of Representation**

9     Absentee class members must be adequately represented for judgment to be binding upon them.

10  *Hansberry v. Lee*, 311 U.S. 32, 42-43 (1940).  This prerequisite is satisfied if the representative party

11  "will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  The Supreme

12  Court explained, "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest

13  between named parties and the class they seek to represent."  *Amchem*, 521 U.S. at 625.  Resolution of

14  the adequacy issue requires the Court to address two questions: "(1) do the named plaintiffs and their

15  counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and

16  their counsel prosecute the action vigorously on behalf of the class?"  *Kim v. Allison*, 87 F.4th 994,

17  1000 (9th Cir. 2023) (quoting *Hanlon*, 150 F.3d at 1020).

18     1.    Proposed class representatives

19     Plaintiffs seek the appointment of Oscar Morales Cisneros, Wilder Munguia Esquivel, and

20  Yolanda Aguilera Martinez as the class representatives for both the Suspicionless Stop and

21  Warrantless Arrest Classes.  (Doc. 14-11 at 8.)  Defendants argue that "the named plaintiffs are not

22  shown to be adequate representatives."  (Doc. 32 at 23 [emphasis omitted].)  Defendants contend that

23  "[t]he three proposed class representatives and other named Plaintiffs here will fail to fairly and

24  adequately protect the class interests because, like the discussion in the commonality and typicality

25  requirements, the Proposed Classes encompass a broad range of individuals with different factual

26  bases for their claims, different avenues of possible relief, etc."  (*Id.*)  This assertion ignores the proper

27  test for evaluating adequacy.  *See Kim*, 87 F.4th at 1000.  Moreover, as discussed above, the proposed

28  class representatives were subjected to the same Border Patrol practices and suffered the same injuries

as the putative class members, and different circumstances regarding their detentive stops and arrests do not defeat certification.

There is no evidence that Morales Cisneros, Munguia Esquivel, or Aguilera Martinez have any conflict of interests with the two proposed classes. To the contrary, their interests are aligned with those of putative class members: to obtain declaratory and injunctive relief.  Morales Cisneros, Munguia Esquivel, and Aguilera Martinez all attest to their understanding that as class representatives, they "represent the interests of everyone in the class," not only themselves.  (Doc. 15-9 at 6, Morales Cisneros Decl. ¶ 23; Doc. 15-10 at 6, Munguia Esquivel Decl. ¶ 21; Doc. 15-11 at 15, Aguilera Martinez Decl. ¶ 15.)  Each also states: "I am committed to being a class representative because I do not want other people in the community to be harmed by Border Patrol's unlawful practices the way I was."  (*Id.*)  Morales Cisneros, Munguia Esquivel, and Aguilera Martinez commit to staying informed regarding what is happening in this case, remaining in contact with counsel, and providing the attorneys with "information they need."  (*Id.*)  Thus, each committed to vigorously prosecuting the action on behalf of the class.  (*See id.*; *see also* Doc. 14-1 at 20.)  Plaintiffs carry the burden to show the proposed class representatives satisfy the adequacy requirement of Rule 23(a)(4).  *See Kim*, 87 F.4th at 1000; *Hanlon*, 150 F.3d at 1020.

### 2.   Proposed class counsel

Plaintiffs request the appointment of 12 attorneys as class counsel: (i) from the ACLU Foundation of Northern California- Bree Bernwanger, Michelle (Minju) Y. Cho, Lauren Davis, and Shilpi Agarwal; (ii) from the ACLU Foundation of Southern California- Mayra Joachin, Eva Bitran, and Oliver Ma; (iii) from the ACLU Foundation of San Diego and Imperial Counties- Brisa Velazquez Oatis; and (iv) from the law firm of Keker, Van Nest & Peters LLP- Ajay S. Krishnan, Franco Muzzio, Zainab O. Ramahi, and Julia L. Greenberg.  (*See* Doc. 1 at 69, ¶ 3; *see also id.* at 70-71.)

Plaintiffs assert the proposed class counsel satisfy the adequacy requirement, because they are "experienced civil rights attorneys and practitioners in federal constitutional litigation, class actions, and complex litigation involving immigrants' rights."  (Doc. 14-1 at 20, citing Bernwanger Decl. ¶¶ 2, 4-13 [Doc. 14-3 at 2-9], Krishnan Decl. ¶¶ 3-5, 7-13 [Doc. 14-2 at 2-5].)  Plaintiffs also assert "counsel have adequately and thoroughly investigated the claims prior to bringing this suit, and they will

vigorously prosecute this action on behalf of the Proposed Classes." (*Id.*)  Defendants do not dispute these assertions or argue that the proposed class counsel fail to satisfy the adequacy requirement. (*See generally* Doc. 32 at 12-24.)

Bree Berwanger reports that she is a senior staff attorney at the ACLU Foundation of Northern California (ACLUF-NC) and has "been involved in all aspects of this case." (Doc. 14-3 at 2, ¶ 2.)  She states that the ACLUF-NC, the ACLU Foundation of Southern California (ACLUF-SC), the ACLU Foundation of San Diego and Imperial Counties (ACLUF-SDIC) all "have extensive experience in class litigation and immigrants' rights litigation and, collectively, have served as lead counsel in dozens of civil rights class actions, including before this Court." (*Id.*, ¶ 3.)  Bernwanger notes that she personally has "extensive experience litigating complex civil litigation to defend and advance the rights of immigrants in the United States," and with representing "noncitizen plaintiffs or petitioners in a several non- class cases raising complex issues." (*Id.*, ¶¶ 5-6.)  She also describes the litigation experience and bar admission status for each of the identified attorneys from ACLUF-NC, ACLUF-SC, and ACLUF-SDIC. (*Id.* at 4-9, ¶¶ 7-13.)  Bernwanger reports that counsel intend to "zealously represent the interests of the class to the best of [their] collective ability." (*Id.* at 10, ¶ 14.)  Finally, Bernwanger reports that she is "not aware of any conflicts between ACLUF-NC, ACLUF-SC, ACLUF-SDIC, and any members of the potential class." (*Id.*, ¶ 16.)

Ajay Krishnan, from the law firm of Keker, Van Nest & Peters LLP, also provides a declaration in support of the motion for provisional class certification. (Doc. 14-2.)  He indicates the law firm "has significant experience handling civil rights cases and litigation to vindicate the rights of underserved populations." (*Id.* at 2, ¶ 3.)  Krishnan reports that "[i]n partnership with the American Civil Liberties Union offices, [his] law firm has conducted extensive identification and investigation of potential class claims, both prior and subsequent to filing the present action." (*Id.* at 3, ¶ 5.)  Krishnan describes his personal litigation experience, as well as those of the other attorneys at the firm who will be assisting on the matter. (*Id.* at 3-5, ¶¶ 7-13.)  Krishnan reports that "Keker, Van Nest & Peters has no conflict with the proposed class members that would compromise its ability to represent the class." (*Id.* at 3, ¶ 6.)

Based upon the declaratory evidence provided, proposed class counsel have significant

experience and are dedicated to vigorously prosecuting this action on behalf of the class. There are also no known conflicts between proposed class counsel and class members that would preclude or impede representation of the classes in this action. Accordingly, the Court finds the identified attorneys satisfy the adequacy requirement.

### E.    Certification under Rule 23(b)(2)

Once the requirements of Rule 23(a) are satisfied, the Court must consider whether the class is maintainable under one or more of the three alternatives set forth in Rule 23(b). *Amchem Prods*, 521 U.S. at 614; *Narouz v. Charter Communs., LLC*, 591 F.3d 1261, 1266 (9th Cir. 2010). Plaintiffs assert certification of the provisional classes is appropriate under Rule 23(b)(2), under which a class may be maintained if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). The Ninth Circuit observed that "the primary role" of Rule 23(b)(2) "has always been the certification of civil rights class actions." *Parsons*, 754 F.3d at 686; *see also Multi-Ethnic Immigrant Workers Org. Network v. City of Los Angeles*, 246 F.R.D. 621, 632 (C.D. Cal. 2007) ("[o]riginally designed for civil rights cases, Rule 23(b)(2) class actions are limited to those class actions seeking primarily injunctive or corresponding relief") (citation omitted).

Plaintiffs observe that under Rule 23(b)(2), certification is appropriate "when members of a putative class seek uniform injunctive or declaratory relief from policies or practices that are generally applicable to the class as a whole." (Doc. 14-1 at 21, quoting *Parsons*, 754 F.3d at 688.) According to Plaintiffs, the Suspicionless Stop and Warrantless Arrest Classes "are quintessential Rule 23(b)(2) classes" for two reasons:

> *First*, Border Patrol has acted on grounds generally applicable to each class because they have subjected, or will subject, all members of the Proposed Classes to the same unlawful policies or practices— namely, the ways in which Border Patrol conducts suspicionless stops and warrantless arrests. [Citation.] *Second*, the prospective forms of relief Plaintiffs request for each Proposed Class for the preliminary injunction are appropriate for each class as a whole, because they all target Border Patrol's central and systemic failures.

(*Id.* at 21 [emphasis in original].) Therefore, Individual Plaintiffs request the Court provisionally certify the Suspicionless Stop and Warrantless Arrest Classes under Rule 23(b)(2).

1    Defendants argue that "Plaintiffs cannot satisfy the requirements for an injunctive-relief class

2  under Rule 23(b)(2)." (Doc. 32 at 23 [emphasis omitted].)  Defendants maintain that "[c]lasswide relief

3  would not be appropriate" because "each alien detained by USBP has a unique set of circumstances and

4  unique avenues for seeking relief." (*Id.* at 24.)  Defendants argue that "because there is no pattern and

5  practice of failure to comply with the Fourth Amendment's probable cause requirements and 8 U.S.C. §

6  1357 flight risk assessment, Plaintiffs cannot show that the government has "acted or refused to act on

7  grounds that apply generally to the class." (*Id.*)  According to Defendants, "classwide relief is not

8  suitable for making Plaintiffs whole." (*Id.*)  The evidence contradicts Defendants' assertions, because it

9  shows agents engaged in a "pattern and practice" of violating Fourth Amendment rights and failing to

10  perform flight risk assessments.

11    The Ninth Circuit observed that the inquiry under Rule 23(b)(2) "does not require an

12  examination of the viability or bases of the class members' claims for relief, does not require that the

13  issues common to the class satisfy a Rule 23(b)(3)-like predominance test, and does not require a

14  finding that all members of the class have suffered identical injuries." *Parsons*, 754 F.3d at 688

15  (citing *Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2010)).  The Court found that Rule 23(b)(2)

16  is "unquestionably satisfied" when "members of a putative class seek uniform injunctive or

17  declaratory relief from policies or practices that are generally applicable to the class as a whole." *B.K.*

18  *ex rel. Tinsley v. Snyder,* 922 F.3d 957, 971 (9th Cir. 2019).  For example, the Court certified a class of

19  immigrant detainees under Rule 23(b)(2) because "relief from a single practice [was] requested by all

20  class members." *Rodriguez*, 591 F.3d at 1126.  Similarly, the Court found certification under Rule

21  23(b)(2) was appropriate in *Parsons* where the members of the putative class were exposed to

22  centralized "policies and practices" that violated their constitutional rights, even if the putative class

23  members were not all affected "in exactly the same way." *Id.*, 754 F.3d at 688.

24    As discussed above, Plaintiffs contend that Defendants' practices of conducting detentive stops

25  without reasonable suspicion and warrantless arrests without flight risk assessments detrimentally

26  affected the named plaintiffs and putative class members, and they seek injunctive relief to enjoin these

27  practices. (*See* Doc. 1 at 70, Prayer ¶¶ 8-9.)  Plaintiffs do not seek relief related to immigration relief or

28  removal proceedings on behalf of the Suspicionless Stop and Warrantless Arrest Classes.  Instead, the

class-wide injuries relate to "the harm of being subjected to the unconstitutional or unlawful practice[s]." (*See* Doc. 37 at 12.) Even if the class members were not all affected by Border Patrol practices in the same manner—because some were not taken into custody following the detentive stops, while others were arrested and then released—Plaintiffs identify Border Patrol's practices that they contend violated their constitutional rights. This is sufficient to satisfy Rule 23(b)(2), because relief from these practices "is requested by all class members." *See Rodriguez*, 591 F.3d at 1126; *see also Gonzalez*, 975 F.3d at 812 (affirming certification under Rule 23(b)(2) because "a determination about the lawfulness of [a] policy under the Fourth Amendment and corresponding injunctive or declaratory relief would provide relief to the entire class").

Injunctive relief would apply to all members of the Suspicionless Stop and Warrantless Arrest Classes, because Defendants' practices "apply generally to the class[es]." *See* Fed. R. Civ. P. 23(b)(2). Defendants' assertions to the contrary are undermined by their argument that the "claims have been resolved" because the El Centro Sector of Border Patrol issued its "Muster" with guidance on reasonable suspicion, flight risk assessments, and documenting facts and circumstances on warrantless arrests. (*See* Doc. 31 at 15; *see also id.* at 9.) In making this argument, Defendants implicitly acknowledge that injunctive and declaratory relief *can* apply to the claims of the two proposed classes. The Court finds certification is appropriate under Rule 23(b)(2) for both the Suspicionless Stop Class and the Warrantless Arrest Class. *See Parsons*, 754 F.3d at 688; *Gonzalez*, 975 F.3d at 812.

## F.  Appointment of Class Counsel

Pursuant to the Federal Rules of Civil Procedure, any "order that certifies a class action…must appoint class counsel under Rule 23(g). Fed. R. Civ. P. 23(c)(1)(B). Under Rule 23(g), the Court is directed to consider:

> (i) the work counsel has done in identifying or investigating potential claims in the action;
>
> (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
>
> (iii) counsel's knowledge of the applicable law; and
>
> (iv) the resources that counsel will commit to representing the class.

Fed. R. Civ. P 23(g)(1)(A).

69

1   Based upon the information provided from Bree Bernwanger and Ajay Krishnan—and the

2   evidence submitted with the pending matters—it is clear that proposed counsel engaged in significant

3   investigation regarding the claims in this action, including identifying and investigating the

4   circumstances of the detentive stops and arrests for not only the class representatives but also many

5   class members.  Proposed counsel describe extensive experience with class actions and complex

6   litigation.  (*See* Doc. 14-2 at 2-5, Krishnan Decl. ¶¶ 3-4, 7-13; Doc. 14-3 at 2-9, Bernwanger Decl. ¶¶

7   4-13.)  Proposed counsel also exhibit the requisite knowledge of constitutional law and the relevant

8   provisions of the INA.  Finally, counsel have the necessary resources to represent the claims of the two

9   classes and are committed to expending such resources on this matter.  (*See* Doc. 14-2 at 3, Krishnan

10  Decl. ¶ 5; Doc. 14-3 at 10, Bernwanger Decl. ¶ 14.)  Accordingly, the factors identified under Rule

11  23(g) weigh in favor appointment of the proposed class counsel for the provisional classes.

12  **V.     Conclusion**

13  Plaintiffs have met the burden to show by a preponderance of the evidence that the

14  Suspicionless Stop and Warrantless Arrest Classes satisfy the requirements of Rule 23(a) and Rule

15  23(b)(2) of the Federal Rules of Civil Procedure.  Accordingly, class certification is appropriate, and

16  the motion for provisional class certification is **GRANTED**.

17  **MOTION FOR PRELIMINARY INJUNCTION**

18  Plaintiffs move for a preliminary injunction pursuant to Rule 65(a) of the Federal Rules of

19  Civil Procedure and Local Rule 231, seeking an order to ensure that Border Patrol agents comply with

20  the Fourth Amendment and their statutory obligations when performing operations within the Eastern

21  District.  (*See* Doc. 15.)

22  **I.     Governing Legal Standards**

23  "A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v.*

24  *Natural Res. Def. Council*, 555 U.S. 7, 24 (2008).  In general, preliminary injunctions are intended to

25  "merely to preserve the relative positions of the parties until a trial on the merits can be held, and to

26  balance the equities at the litigation moves forward."  *Lackey v. Stinnie*, 604 U.S. --, 145 S.Ct. 659,

27  667 (2025) (citations omitted).

28  When seeking a preliminary injunction, plaintiffs must establish: (1) they are "likely to succeed

on the merits" of their claims, (2) they are "likely to suffer irreparable harm in the absence of a preliminary injunction," (3) "the balance of equities tips in [their] favor" and (4) "an injunction is in the public interest." *Winter*, 555 U.S. at 20; *see also Starbucks Corp. v. McKinney*, 602 U.S. 339, 339-40 (2024) (reiterating the court must consider the *Winter* test with a request for a preliminary injunction). The moving party has the burden to "make a showing on all four prongs" of the *Winter* test to obtain a preliminary injunction. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). Thus, the moving party has "the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *Hecox v. Little*, 104 F.4th 1061, 1073 (9th Cir. 2023).

The Court may weigh the request for a preliminary injunction with a sliding-scale approach. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011); *see also Flathead*, 98 F.4th at 1190 (indicating the sliding scale test remains viable after *Winter*, and the district court did not err in applying it). Accordingly, a stronger showing on the balance of hardships may support the issuance of a preliminary injunction where there are "serious questions on the merits … so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.*; *see also Global Horizons, Inc. v. U.S. Dep't of Labor*, 510 F.3d 1054, 1057-58 (9th Cir. 2007) (explaining "the relationship between success on the merits and irreparable harm [is] a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases," but that "a moving party must, at an 'irreducible minimum' demonstrate some chance of success on the merits").

## II.    Nature of the Requested Injunction

Preliminary injunctions may be mandatory or prohibitory. *N.D. v. Reykdal*, 102 F.4th 982, 992 (9th Cir. 2024). A mandatory injunction is one that orders a party to "take action," while a prohibitory injunction is one that "restrains" a party from further action and "aims at simply maintaining the status quo." *N.D.*, 102 F.4th at 992; *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 484 (1996). The Ninth Circuit observed that "courts should be extremely cautious about issuing a preliminary injunction" when the requested mandatory relief "goes well beyond maintaining the status quo." *Stanley v. University of S. Cal.*, 13 F.3d 1313, 1319 (9th Cir. 1994) (citation omitted). Thus, parties seeking a mandatory injunction must establish "the law and facts *clearly favor* [their] position, not simply that

1  [they are] likely to succeed." *Garcia v. Google, Inc.*, 786 F.3d 733, 739 (9th Cir. 2015) (emphasis in

2  original).  Given the "heightened standard" upon a party seeking a mandatory injunction, the Court

3  must first determine the nature of the preliminary injunction requested by Plaintiffs.  *See Master Tax*

4  *LLC v. Ultimate Software Grp.*, 770 Fed. Appx. 386, 387 (9th Cir. 2019); *see also Stanley*, 13 F.3d at

5  1320 (indicating the Court's "first task is to determine whether [the moving party] requested a

6  prohibitory injunction or a mandatory injunction").

7         In their prayer, Plaintiffs indicate they seek a preliminary injunction enjoining violations of the

8  Suspicionless Stop Class's rights under the Fourth Amendment of the Constitution and the

9  Warrantless Arrest Class's rights under 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii).  (Doc. 1

10  at 70, Prayer for Relief ¶¶ 8-9.)  Plaintiffs now indicate:

> Plaintiffs request a preliminary injunction to ensure that, when Border
> Patrol conducts operations in this District, it complies with its
> constitutional and legal duties to refrain from (1) detentive stops without
> reasonable suspicion that the person stopped is in the country unlawfully,
> and (2) warrantless arrests without regard to probable cause that the
> arrestee is likely to escape before a warrant can be obtained.

15  (Doc. 15-1 at 8-9.)  Thus, Plaintiffs request injunctive relief preventing Defendants from future

16  violations of established constitutional and statutory rights.  (*Id.*; Doc. 1 at 70, ¶¶ 8-9.)  Notably, the

17  Ninth Circuit determined that an injunction that "prevents future constitutional violations [is] a classic

18  form of prohibitory injunction."  *Hernandez v. Sessions*, 872 F.3d 976, 998 (9th Cir. 2017); *see also*

19  42 Am. Jur. 2d *Injunctions* § 5 (2017) ("An injunction is considered prohibitory when the thing

20  complained of results from present and continuing affirmative acts and the injunction merely orders

21  the defendant to refrain from doing those acts").  Consequently, the Court finds the requested relief—

22  which maintains the status quo—is prohibitory.

23  **III.    Discussion and Analysis**

24         Plaintiffs seek to: (1) enjoin Border Patrol agents "from conducting detentive stops in this

25  district unless there is reasonable suspicion that the person stopped is a noncitizen present within the

26  United States in violation of U.S. immigration law, as required by the Fourth Amendment of the

27  United States Constitution"; (2) enjoin Border Patrol agents "from effecting warrantless arrests in this

28  district unless there is probable cause that the noncitizen being arrested is likely to escape before a

warrant can be obtained, as required by 8 U.S.C. § 1357(a)(2)"; (3) direct compliance with DHS's "Broadcast Statement of Policy" when making warrantless arrests in this district, "including documenting the probable cause that underlies those arrests"; (4) direct agents to "document the facts and circumstances surrounding the stop in narrative form," including the facts supporting reasonable suspicion for vehicle stops and stops on foot; (5) direct "Defendants to provide that reasonable suspicion and probable cause documentation to Plaintiffs' counsel on a regular schedule"; (6) direct Defendants to develop "a directive setting forth guidance to Border Patrol agents concerning how they should determine whether 'reasonable suspicion' exists when conducting detentive stops, including vehicle stops, in this District"; and (7) direct training of "Border patrol agents who have performed or will perform … operations in this District."  (*See* Doc. 15-1 at 2-3; Doc. 14-1 at 21-22.)

Defendants note that "on April 4, 2025, the El Centro Sector USBP issued a 'Muster' to all Sector employees that is in all material respects identical to the Broadcast…".  (Doc. 31 at 15, *comparing* Exh. A [Doc. 31-1 at 2-4] *with* Appendix A [Doc. 15-2 at 111-113].)  Defendants argue that "Plaintiffs' claims are moot in light of new guidance issued by USBP," which Defendants contend provides "nearly all the relief Plaintiffs seek in their injunction."  (*Id*.)  As a result, Defendants contend Plaintiffs are unable to show a likelihood of success on the merits (*id.* at 15-16) and "cannot demonstrate that they will be irreparable harmed absent a preliminary injunction."  (*Id.* at 17.)

### A.    Likelihood of Success on the Merits

This first factor "is the most important" under *Winter*, and "is especially important when a plaintiff alleges a constitutional violation and injury."  *Baird v. Bonta*, 81 F.4th 1036, 1041 (9th Cir. 2023); *see also N.D.*, 102 F.4th at 992.  Plaintiffs bring three claims on behalf of the Suspicionless Stop Class and Warrantless Arrest Class: (1) warrantless arrests without probable cause of flight risk in violation of 8 U.S.C. § 1357(a)(2); (2) warrantless arrests without probable cause of flight risk in violation of 8 C.F.R. § 287.8(c)(2)(ii); and (3) stops without reasonable suspicion in violation of the Fourth Amendment.  (Doc. 1 at 65-68.)  Plaintiffs seeking a preliminary injunction need only show that success on the merits is likely for one claim, not all claims, to satisfy this requirement for injunctive relief.  *See Fin. Express LLC v. Nowcow Corp.*, 546 F. Supp. 2d 1160, 1169 (C.D. Cal. 2008).  If a moving party fails to meet this "threshold inquiry," the Court need not reach the other

73

1  factors.  *Baird*, 81 F.4th at 1041; *Disney Enters. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017).

2      1.    Unlawful detentive stops and arrests

3        The Fourth Amendment provides: "The right of the people to be secure in their persons…

4  against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but

5  upon probable cause, supported by Oath or affirmation, and particularly describing … the persons or

6  things to be seized."  *U.S. Constitution, amend. IV*.  A person is seized when an officer, "by means of

7  physical force or show of authority, terminates or restrains his freedom of movement," *Brendlin v.*

8  *California*, 551 U.S. 249, 254 (2007), such that "a reasonable person would have believed that he was

9  not free to leave."  *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).  The Supreme Court

10  explained that a person's liberty is restrained when "taking into account all of the circumstances

11  surrounding the encounter, the police conduct would 'have communicated to a reasonable person that

12  he was not at liberty to ignore the police presence and go about his business.'"  *Florida v. Bostick*, 501

13  U.S. 429, 437 (1991) (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569 (1988)).  There are

14  generally two kinds of seizures: investigative stops and arrests.  *Allen v. City of Portland*, 73 F.3d 232,

15  235 (9th Cir. 1995).

16        An investigative stop occurs when a police officer detains a person for a limited duration to ask

17  questions.  *Terry v. Ohio*, 392 U.S. 1, 27 (1968). To make such a stop, the officer must have reasonable

18  suspicion that the person is engaged in criminal activity.  *Id.*; *see also Navarette v. California*, 572 U.S.

19  393, 396 (2014).  To constitute reasonable suspicion, the officer's belief that "criminal activity is afoot"

20  must be supported by "specific and articulable facts which, taken together with rational inferences from

21  those facts, reasonably warrant the intrusion."  *Id.* at 21, 30; *see also Navarette*, 572 U.S. at 396 (an

22  officer must have "a particularized and objective basis for suspecting the particular person stopped of

23  criminal activity").  An officer cannot rely only upon generalizations that "would cast suspicion on

24  large segments of the law abiding population." *United States v. Manzo-Jurado*, 457 F.3d 928, 935 (9th

25  Cir. 2006).  The Supreme Court has long held—about 50 years ago now—that these requirements apply

26  in the immigration context, when officers seek to enforce the INA.  *United States v. Brignoni-Ponce*,

27  422 U.S. 873, 884 (1975) ("[T]he Fourth Amendment forbids stopping vehicles at random to inquire if

28  they are carrying aliens who are illegally in the country, it also forbids stopping or detaining persons for

74

1    questioning about their citizenship on less than a reasonable suspicion that they may be aliens.").

2    *Brignoni-Ponce* held also that mere belief that a person is of Mexican descent, is sufficient to "justify

3    neither a reasonable belief that they were aliens, nor a reasonable belief that the car concealed other

4    aliens who were illegally in the country. Large numbers of native-born and naturalized citizens have the

5    physical characteristics identified with Mexican ancestry, and even in the border area a relatively small

6    proportion of them are aliens. [Footnote.] The likelihood that any given person of Mexican ancestry is

7    an alien is high enough to make Mexican appearance a relevant factor, but standing alone it does not

8    justify stopping all Mexican-Americans to ask if they are aliens." *Brignoni-Ponce* at 886–887. The

9    Ninth Circuit has held for 25 years that "Hispanic appearance is of little or no use in determining which

10   particular individuals among the vast Hispanic populace should be stopped by law enforcement

11   officials on the lookout for illegal aliens." *United States v. Montero-Camargo*, 208 F.3d 1122, 1134

12   (9th Cir. 2000).

13           An arrest is a more significant intrusion on liberty than a detentive stop.  To determine whether

14   a seizure is an arrest, the Court examines whether a reasonable person under the circumstances would

15   feel free to leave after questioning.  *Allen*, 73 F.3d at 235 (citing *United States v. Delgadillo-*

16   *Velasquez*, 856 F.2d 1292, 1295 (9th Cir. 1988)).  "Under the Fourth Amendment, a warrantless arrest

17   requires probable cause." *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007).  Under this

18   objective standard, "officers must have knowledge or reasonably trustworthy information sufficient to

19   lead a person of reasonable caution to believe that an offense has been or is being committed by the

20   person being arrested." *Id.* (citation omitted).  "[M]ere suspicion, common rumor, or even [a] strong

21   reason to suspect" are insufficient to establish probable cause. *Id.* (quoting *McKenzie v. Lamb*, 738

22   F.2d 1005, 1008 (9th Cir. 1984).)

23           In the immigration context, 8 C.F.R § 287.8(b)(2) also requires an immigration officer to have

24   reasonable suspicion to perform a detentive stop:

25           If the immigration officer has a reasonable suspicion, based on specific
             articulable facts, that the person being questioned is, or is attempting to
26           be, engaged in an offense against the United States or is an alien illegally
             in the United States, the immigration officer may briefly detain the
27           person for questioning.

28   *Id.* The Ninth Circuit observed that 8 C.F.R. § 287.8(b) "was intended to reflect constitutional

75

restrictions on the ability of immigration officials" and, given the reasonable suspicion requirement, offers "at least as much protection as the Fourth Amendment." *Perez Cruz v. Barr*, 926 F.3d 1128, 1137 (9th Cir. 2019). If placing someone under arrest without a warrant, an immigration officer must have probable cause that a person is "likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(2); *Mountain High Knitting, Inc. v. Reno,* 51 F.3d 216, 218 (9th Cir. 1995). Put another way, a warrantless arrest requires an individualized assessment of the person's flight risk. *See id.*; *see also Nava*, 435 F. Supp. 3d at 891-92.

As discussed above, Plaintiffs' anecdotal evidence establishes a pattern and practice of agents performing detentive stops without reasonable suspicion in this District. In addition, the evidence shows a pattern and practice of warrantless arrests without Border Patrol agents performing individualized flight risk assessments to have probable cause for the arrest as required. This evidence of the identified patterns and practices also shows a likelihood of success on the merits for the claims of the Suspicionless Stop Class and Warrantless Arrest Class. *See Zepeda v. United States Immigration & Naturalization Service*, 753 F.2d 719, 727 (9th Cir. 1983) (finding the plaintiffs "demonstrated probable success on the merits by providing evidence of a pattern of INS violations of the fourth amendment" under the court's prior test for preliminary injunctions).

### 2. Whether the matter is moot

Defendants do not challenge the sufficiency of Plaintiffs' evidence to show a likelihood of success on the merits. (*See generally* Doc. 31 at 11-17.) Instead, Defendants argue that Plaintiffs fail to show a likelihood of success for three reasons: (1) the Court lacks jurisdiction under 8 U.S.C. § 1252(a)(5) and (b)(9); (2) the Court lacks jurisdiction to issue a class-wide injunction pursuant to 8 U.S.C. § 1252(f)(1); and (3) the claims are moot. As discussed above, the jurisdictional arguments are without merit. Accordingly, the Court turns to whether the matter is moot.

A case is rendered moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.'" *Already, LLC v. Nike, Inc*., 568 U.S. 85, 91 (2013) (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982)). However, the Supreme Court has repeatedly indicated that "a defendant cannot automatically moot a case simply by ending its unlawful conduct once sued." *Id.* (citing *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)); *see also*

76

*Friends of the Earth, Inc. v. Laidlaw Envt'l. Services (TOC), Inc.,* 528 U.S. 167, 189 (2000) ("It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.") (internal quotation marks omitted).  The Court explained that if voluntary cessation could simply render a matter moot, a defendant would be free to "resum[e] … the challenged conduct."  *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012).

The party asserting mootness has a "'heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again.'" *Fikre v. FBI*, 904 F.3d 1033, 1037 (9th Cir. 2018) (quoting *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 222 (2000)).  The Supreme Court explained: "Voluntary cessation of challenged conduct moots a case … only if it is *absolutely* clear that the allegedly wrongful behavior could not reasonably be expected to recur."  *Adarand*, 528 U.S. at 222 (emphasis in original, citation omitted); *see also Trinity Lutheran Church of Columbia, Inc. v. Comer,* 582 U.S. 449, 457 n.1 (2017) ("voluntary cessation of a challenged practice does not moot a case unless subsequent events make it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur") (cleaned up).

When the government asserts mootness because of a policy change, the court will "presume that it acts in good faith."  *Fikre*, 904 F.3d at 1033 (citing *Am. Cargo Transp., Inc. v. United States*, 625 F.3d 1176, 1180 (9th Cir. 2010)).  Nevertheless, "the government must still demonstrate that the change in its behavior is 'entrenched' or 'permanent.'"  *Id.* (quoting *McCormack v. Herzog*, 788 F.3d 1017, 1025 (9th Cir. 2015)); *see also Rosebrock v. Mathis,* 745 F.3d 963, 971 (9th Cir. 2014).  The Ninth Circuit determined that a government "policy change not reflected in statutory changes or even in changes in ordinances or regulations will not *necessarily* render a case moot."  *Rosebrock*, 745 F.3d at 971 (citation omitted, emphasis added).  The Court indicated:

> [M]ootness is more likely if (1) the policy change is evidenced by language that is broad in scope and unequivocal in tone; (2) the policy change fully addresses all of the objectionable measures that the Government officials took against the plaintiffs in the case; (3) the case in question was the catalyst for the agency's adoption of the new policy; (4) the policy has been in place for a long time when we consider mootness; and (5) since the policy's implementation the agency's officials have not engaged in conduct similar to that challenged by the plaintiff.

*Id.* (cleaned up, citations omitted).  On the other hand, the court is "less inclined to find mootness where the 'new policy … could be easily abandoned or altered in the future.'"  *Id.* (quoting *Bell v. City of Boise*, 709 F.3d 890, 901 (9th Cir. 2013)).

Defendants argue the claims are moot based upon the Muster, which includes guidance on: (1) "the requirement for reasonable suspicion for traffic stops conducted throughout the Eastern District of California," (2) "assessing flight risk using factors such as 'family, home, or employment' (that is, community ties);" and (3) "documenting the facts and circumstances surrounding a warrantless arrest in an alien's Form I-213 as soon as practicable."  (Doc. 31 at 15.)  Defendants also contend the El Centro Sector is "taking steps to implement training using on the Muster."  (*Id.* at 16, citing Exh. B [Doc. 31-2].)  According to Defendants, Border Patrol's "issuance of guidance and commitment to training thereon constitutes a change in circumstances forestalling a 'substantial controversy of sufficient immediacy and reality.'"  (*Id.*, quoting *Preiser v. Newkirk*, 422 U.S. 395, 402 (1975) [cleaned up].)  Defendants contend the Muster and training are "more than a mere voluntary cessation of allegedly illegal conduct where USBP is free to return to their old ways."  (*Id.* [citation omitted, cleaned up].)  Defendants assert the "prompt and responsive actions in light of Plaintiffs' complaint forcefully demonstrates its commitment to forestall similar alleged violations in the future."  (*Id.* at 17.)  They contend "this is the relief Plaintiffs requested," and as a result "[t]here is now no reasonable expectation that the alleged wrong will be repeated."  (*Id.*, quoting *Preiser*, 422 U.S. at 402 [as modified].)

Plaintiffs dispute that their claims are moot based upon Defendants' actions.  (Doc. 38 at 7, emphasis omitted.)  Plaintiffs contend, "[T]he Muster does not address most of the unlawful conduct on which Plaintiffs seek relief.  For example, by its own terms, the Muster addresses only 'arrests effected by' Border Patrol agents and 'Vehicle Stops.'"  (*Id.* at 8, quoting Doc. 31-1 at 2.)  Plaintiffs report Defendants also declined to "commit[] to keep the Muster in place … until Plaintiffs' detentive stop and warrantless arrest claims are finally resolved," which Plaintiffs believe "suggest[s] the Muster is not long term."  (*Id.*, citing Greenberg Decl. ¶¶ 3-4 [Doc. 38-1 at 2].)  Plaintiffs also argue that the timing of the Muster—which was issued "just one business day before Defendants filed their opposition"— "merits skepticism from the Court."  (*Id.* at 8, citing *R.W. v. Columbia Basin Coll.*, 77 F.4th 1214, 1226 (9th Cir. 2023).)  Plaintiffs contend there is "no evidence the Muster will cause a

change in conduct," because the practices in "Operation Return to Sender" were contrary to "well-defined legal requirements" and "prior trainings on the same issues apparently failed to prevent El Centro Border Patrol from engaging in these blatantly unlawful practices." (*Id.*) Finally, Plaintiffs assert that "Defendants have done nothing to explicitly recognize 'the wrongful nature' of their practices," and the lack of recognition weighs against finding Border Patrol made a "bona fide change in policy." (*Id.* at 9-10, citing *U.S. v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953); *S.E.C. v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980).)

Reviewing the language of the Muster, the Court is unable to find it is "broad in scope." *See Rosebrock*, 745 F.3d at 971 (quoting *White v. Lee*, 227 F.3d 1214, 1243 (9th Cir. 2000).) Sergio Guzman reports the area of responsibility for the El Centro Sector includes the "70 linear miles along the U.S. and Mexico border from the Jacumba Mountains in the west to the Imperial Sand Dunes in the east," and "inland areas of California extending all the way to the Oregon State Line, including Bakersfield, California." (Doc. 31-2 at 3, Guzman Decl. ¶ 6.) This encompasses the Northern, Central, Southern, and Eastern Districts of California. However, the Muster indicates that it is applicable only to "arrests effected by El Centro Sector Border Patrol Agents … *in the Eastern District of California*." (Doc. 31-1 at 2 [emphasis added].) The Muster is clearly narrow in scope and designed to address only the local district. In contrast, the DHS Broadcast indicates that it was "applicable to all arrests effected under 8 U.S.C. § 1357(a)(2) / INA § 287(a)(2)," without any geographical limitations. (Doc. 15-2 at 111.) The Muster does not mention detentive stops by foot patrols, or the necessary reasonable suspicion for such stops, which are encompassed in the claims of the Suspicionless Stop Class. The language used in the Muster is permissive, indicating that an agent "*should* document the facts and circumstances surrounding that warrantless arrest in the narrative section of the alien's I-213 as soon as practicable" and what information the document "*should* include." (Doc. 31-1 at 3 [emphasis added].) Thus, the language of the Muster is neither broad in scope nor unequivocal in tone,[13] and does not

---

[13] This differs from the DHS Broadcast, which contains mandatory language and provides that agents "*must* document the facts and circumstances surrounding that warrantless arrest in the narrative section of the alien's I-213 as soon as practicable" and identifies what information that the documentation "*must* include." (Doc. 15-2 at 112 [emphasis added].)

1  support a finding of mootness.[14]

2      The timing of the Muster does not support a finding of mootness.  Border Patrol issued the

3  Muster a single business day before the deadline for Defendants to oppose the pending request for a

4  preliminary injunction.  The exceedingly short duration between the Muster issuance and the hearing

5  renders it impossible for the Court to find the terms of the Muster are now "entrenched" in the practices

6  of Border Patrol's El Centro Sector.  *See Fikre*, 904 F.3d at 1033.  Even policies in existence for

7  *months* do not support a finding of mootness.  *See, e.g., A.O. v. Cuccinelli*, 457 F.Supp.3d 777, 7889

8  (N.D. Cal. 2020) (where a policy was implemented for six months, this duration "weigh[ed] against a

9  finding of mootness"); *Irvine Community News & Views, LLC v. City of Irvine*, 2016 WL 11744976, at

10  *5 (C.D. Cal. June 15, 2016) (finding a policy in place for "only about four months" did not support a

11  conclusion that the plaintiffs' claims were rendered moot).

12      The Court also considers Defendants' ability to withdraw the Muster to evaluate whether the

13  matter is moot.  *See Rosebrock*, 745 F.3d at 971; *Bell*, 709 F.3d at 900.  For example, in *Bell*, the

14  Court considered whether a "Special Order" issued to a police department mooted the plaintiffs'

15  claims concerning constitutional violations.  The Court observed that the Special Order was an

16  "internal policy" issued by the chief of police "that purported to curb the discretion of officers."  *Id.*

17  The Court observed: "Even assuming Defendants have no intention to alter or abandon the Special

18  Order, the ease with which the Chief of Police could do so counsels against a finding of mootness."

19  *Id.* (citing *Coral Constr. Co. v. King Cnty.*, 941 F.2d 910, 928 (9th Cir. 1991)).  As in *Bell*, the Muster

20  appears to be an "internal policy" issued to the El Centro agents.  Sergio Guzman reports that the El

21  Centro Sector "intends to keep this muster in place without revision."  (Doc. 45-1 at 3, ¶ 6.)  However,

22  there is nothing to show the Muster could not be withdrawn or altered in the future.  There is also

23  nothing to suggest that the training could not be abandoned before completion.[15]  Consequently, "the

---

[14] Defendants fail to explain why the Muster is needed at all. The law on the topics encompassed by the Muster is clear and has been for more than 50 years.  The Court is stymied by the apparent position of the government that until the Muster issued, the El Centro officers were unaware of their obligations under the Fourth Amendment, the Supreme Court's decisions, including *Brignoni-Ponce*, and the Ninth Circuit authorities dating back decades.

[15] The El Centro Sector includes "975 agents and 149 support personnel."  (Doc. 31-2 at 3, Guzman Decl. ¶ 7.)  At the hearing, Defendants' counsel reported that 207 agents received training on Wednesday, April 23, 2025.

ease with which" the Muster could be withdrawn or revised at any time weighs against mootness. *See*

*Bell*, 709 F.3d at 900.

Notably, the Ninth Circuit explained that "the government's unambiguous renunciation of its

past actions can compensate for the ease with which it may relapse into them." *Fikre*, 904 F.3d at 1039

(finding the plaintiff's due process claims were not moot where there the government could easily re-

take the same alleged wrongful action and there was not "any renouncement by the government of its

prerogative and authority to do so"). In *W.T. Grant*, the Supreme Court also indicated that to evaluate

mootness, one factor may be a defendant's profession to discontinue the wrongful conduct. *Id.*, 345

U.S at 633. The Court later explained that "[w]hat matters is not whether a defendant repudiates its

past actions, but what repudiation can prove about its future conduct." *FBI v. Fikre*, 601 U.S. 234

(2022). Here, Defendants *do not* repudiate the alleged wrongful actions. At the hearing, Defendants

indicated that they were not focused on addressing the allegations—or the past conduct of Border

Patrol agents— but instead repeatedly stated they were focused on the *remedy* requested by Plaintiffs.

Defendants did not make any "unambiguous renunciation" of the actions taken during "Operation

Return to Sender." To the contrary, they continued to repeat that The statements by Defendants do not

compensate for the ease for which the Muster may be withdrawn, and there is no showing that future

violations of the well-established laws are unlikely based upon the issuance of the Muster.

Consequently, this factor weighs against finding the matter is moot.

Finally, by Defendants' own admission, the Muster does not "*fully* address[] *all* of the

objectionable measures" alleged by Plaintiffs. *See Rosebrock*, 745 F.3d at 971 (emphasis added).

Though Defendants repeatedly indicate the guidance provides "nearly all the relief Plaintiffs seek"

(Doc. 31 at 15, 17), "nearly all" is not *all*. *Compare with White*, 227 F.3d at 1243. As discussed above,

there is nothing to address Plaintiffs' concerns regarding detentive stops by Border Patrol agents on

foot patrols—or the reasonable suspicion requirement for such stops—because the Muster focuses upon

"vehicle stops." This also weighs against mootness determination. *See Bell*, 709 F.3d at 900 (finding a

policy did not moot the plaintiffs' claims where it "fail[ed] to fully address" the plaintiffs' allegations

in their amended complaint).

Ultimately, Defendants fail to meet their "heavy burden" to establish "it is *absolutely* clear that

1  the allegedly wrongful behavior could not reasonably be expected to recur." *Fikre*, 904 F.3d at 1037;

2  *Adarand*, 528 U.S. at 222 (emphasis in original).  The training of Border Patrol agents regarding the

3  terms of the Muster also offers little support to find mootness.  Indeed, the evidence before the Court

4  is that Border Patrol agents under DHS authority engaged in conduct that violated well-established

5  constitutional rights *despite* the DHS Broadcast containing similar language as the Muster.  On this

6  record, the Court is unable to find the request for a preliminary injunction is moot.  *See Rosebrock*,

7  745 F.3d at 971; *Bell*, 709 F.3d at 901.

8              3.      Conclusion

9          Plaintiffs demonstrate a likelihood of success on the merits for the claims of the Suspicionless

10  Stop and Warrantless Arrest Classes given the significant anecdotal evidence —which Defendants do

11  not dispute or rebut—regarding the detentive stop and arrest practices of Border Patrol.  Defendants'

12  arguments regarding the lack of jurisdiction and mootness are without merit.  Accordingly, this factor

13  supports granting a preliminary injunction.

14      **B.      Imminent, Irreparable Harm**

15          The Ninth Circuit observed that if a plaintiff who brings a claim for a constitutional violation

16  shows a likelihood of success on the merits, "that showing will almost always demonstrate he is

17  suffering irreparable harm as well." *Baird*, 81 F.4th at 1040.  Indeed, "it is well-established that the

18  deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *de Jesus Ortega*

19  *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373

20  (1976)).  Consequently, violations of the Fourth Amendment show an irreparable harm that supports a

21  request for injunctive relief.  *Melendres*, 695 F.3d at 1002 (affirming the district court's finding that, in

22  the absence of an injunction, the plaintiffs faced irreparable harm where it was likely they would be

23  unlawfully detained in violation of the Fourth Amendment); *see also Brown v. Greene Cty.*, 717 F.

24  Supp. 3d 689, 696 (S.D. Oh. 2024) ("courts have found that violations of the Fourth Amendment

25  constitute irreparable harm sufficient to justify injunctive relief" [cleaned up]).

26          A preliminary injunction will not remedy past harms.  Instead, a preliminary injunction is "to

27  protect … from irreparable injury that will surely result without their issuance." *Schrier v. Univ. Of*

28  *Co.*, 427 F.3d 1253, 1267 (10th Cir. 2005).  Nevertheless, "[p]ast harms can tend to show the threat of a

1  repeated injury." *Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1173 (9th Cir. 2011).  The threat of

2  injury "must be imminent, not remote or speculative" to support a request for a preliminary injunction.

3  *FDIC v. Garner*, 125 F.3d 1272, 1279 (9th Cir. 1997) *cert. denied*, 523 U.S. 1020 (1998); *see also*

4  *Boardman v. Pac. Seafood Grp.,* 822 F.3d 1011, 1022 (9th Cir. 2016).

5      The uncontroverted evidence shows the El Centro Sector repeatedly expressed an intent to

6  perform additional operations in the Eastern District of California, including Bakersfield, Fresno, and

7  Sacramento.  On January 9, 2025, the El Centro Sector indicated it "continue[s] to field dozens of

8  Border Patrol Agents in Kern County and surrounding area…"  (Doc. 15-2 at 32.)  The same date, the

9  Sector stated: "We are planning operations for other locals such as Fresno and especially Sacramento."

10  (*Id.* at 30.)  On January 10, 2025, the Sector stated, "we will try and catch even more next time."  (*Id.*

11  at 18.)  On January 12, 2025, in response to a comment stating, "Here in Bakersfield, you guys forgot

12  to raid some people," the Sector stated, "We plan on coming back!!"  (*Id.* at 16.)  Later in January

13  2025, an individual commented "Return to sender round 2," to which the Sector replied, "You bet!"

14  (*Id.* at 12.)  Again, on January 29, 2025, the Sector expressed that the Border Patrol agents would go

15  "wherever the threats and crime take us, whether that's #SanBernardino #LosAngeles #Riverside

16  #Barstow *#Bakersfield or beyond*."[16]  (*Id.* at 14 [emphasis added].)  The evidence of the practices

17  employed by Border Patrol agents during "Operation Return to Sender"— including detentive stops on

18  foot patrols and vehicular stops without reasonable suspicion—the plans of Border Patrol to perform

19  additional, similar operations in this District and the seeming position of the government that Border

20  patrol agents are not currently trained on their obligations under the Fourth Amendment, demonstrates

21  imminent, irreparable harm to the Suspicionless Stop Class.

22      Furthermore, in expressing the intent to perform future operations, the Sector stated: "*anyone*

23  *we encounter who doesn't have the legal right to be in or remain in the U.S. will be arrested.*"  (Doc.

24

25  _____

[16] Plaintiffs' supplemental evidence discusses an operation performed by Border Patrol in Pomona, California, on Tuesday, April 22, 2025.  Reports on the Pomona operation indicate that agents went to a Home Depot parking lot where day laborers were gathered and arrested 9 individuals.  (*See* Doc. 43-1 at 4-5.)  Though recognizing the lack of detail as to the reasons for the detentive stops and arrests, on its face, the Pomona operation bears a striking similarity to "Operation Return to Sender" with the Home Depot detentive stops described by Plaintiff Wilder Munguia Esquivel and Class Members Jesus Ramirez and Luis Perez Cruz. Although the Pomona operation occurred beyond the relevant geographical area, the fact that the operation occurred reinforces the expressed intent of Border Patrol to perform additional operations in this district.

15-2 at 12 [emphasis added].)  Similarly, Gregory Bovino, Chief Patrol Agent for the El Centro Sector, stated in a social media post: "Undocumented means just that.  I recommend returning to the country of origin, obtaining proper documents, and doing it the right way.  If not, *we will arrest*."  (*Id.* at 36 [emphasis added].)  These statements show Border Patrol agents from the El Centro Sector do not intend to comply with the requirements to perform flight risk assessments for probable cause in the forthcoming operations—including in this District— but to perform warrantless arrests without probable cause.  Consequently, Plaintiffs have shown imminent, irreparable harm to the Warrantless Arrest Class.

### C.    Balancing of Equities and Public Interest

Plaintiffs must demonstrate that "the balance of equities tips in [its] favor" and a preliminary injunction "is in the public interest."  *Stormans, Inc. v. Selecky*, 586 F.3d at 1127 (quoting *Winter*, 555 U.S. at 20).  Because the government is a party, the Court considers these two factors together.  *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Baird*, 81 F.4th at 1040.  In weighing equities, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Winter*, 555 U.S. at 24 (citation omitted).  When determining the public interest, the Court "primarily addresses impact on non-parties rather than parties."  *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014).  When the alleged action by the government violates federal law, the public interest factor generally weighs in favor of the plaintiffs.  *See Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013).

The Ninth Circuit observed: "A plaintiff's likelihood of success on the merits of a constitutional claim also tips the merged third and fourth factors decisively in his favor."  *Baird*, 81 F.4th at 1036.  The Court explained, "public interest concerns are implicated when a constitutional right has been violated, ... all citizens have a stake in upholding the Constitution."  *Id.* (quoting *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005)).  In other words, "it is always in the public interest to prevent the violation of a party's constitutional rights."  *Id.* (quoting *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 732 (9th Cir. 2022)).  The government also "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations."

1    *Zepeda*, 753 F.2d at 727.

2          Because Plaintiffs show a likelihood of success on the merits of the claims for the

3 Suspicionless Stop and Warrantless Arrest Classes, the balance of equities tip in their favor and an

4 injunction is in the public interest.  As the Ninth Circuit explained, it is within the public interest to

5 uphold the Fourth Amendment rights in issue.  *See Baird*, 81 F.4th at 1036; *see also Fellowship of*

6 *Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664 (2023) ("it is always in the

7 public interest to prevent the violation of a party's constitutional rights") (citation omitted).  Finally,

8 the government will not be harmed by being enjoined from engaging in practices that violate the

9 Constitution and which fail to comply with decisional and statutory responsibilities.  *See Zepeda*, 753

10 F.2d at 727.  Consequently, the third and fourth *Winter* factors support Plaintiffs' request for a

11 preliminary injunction.

12        **D.**     **Posting of a Bond**

13          Plaintiffs carry the burden to show the *Winter* factors support the issuance of a preliminary

14 injunction.  Pursuant to the Federal Rules of Civil Procedure, "the court may issue a preliminary

15 injunction … only if the movant gives security in an amount that the court considers proper to pay the

16 costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed.

17 R. Civ. P. 65(c).  The Ninth Circuit observed that "[d]espite the seemingly mandatory language, 'Rule

18 65(c) invests the district court with discretion as to the amount of security required, *if any*.'" *Johnson*

19 *v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (quoting *Jorgensen v. Cassiday*, 320 F.3d 906, 919

20 (9th Cir. 2003) [emphasis in original]).  Therefore, the court "may dispense with the filing of a bond

21 when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her

22 conduct."  *Id.*

23          Defendants face "no realistic likelihood of harm" from the injunctive relief ordered, which

24 directs compliance with constitutional provisions and the statutory obligations of Border Patrol agents.

25 *See Zepeda*, 753 F.2d at 727.  Therefore, the Court will not require Plaintiffs to post a bond.

26 ///

27 ///

28 ///

1

## ORDER

2  Based upon the foregoing, the Court **ORDERS**:

3  1.  Plaintiffs' motion for provisional class certification (Doc. 14) is **GRANTED**, and the

4  classes are defined as:

5  **Suspicionless Stop Class**: All persons since January 6, 2025, who
have been or will be subjected to a detentive stop by Border Patrol

6  in this district without a pre-stop, individualized assessment of
reasonable suspicion whether the person (1) is engaged in an

7  offense against the United States or (2) is a noncitizen unlawfully
in the United States.

8

9  **Warrantless Arrest Class**: All persons since January 6, 2025,
who have been arrested or will be arrested in this district by Border

10  Patrol without a warrant and without a pre-arrest, individualized
assessment of probable cause that the person poses a flight risk.

11  2.  Oscar Morales Cisneros, Wilder Munguia Esquivel, and Yolanda Aguilera Martinez are

12  **APPOINTED** as class representatives for both the Suspicionless Stop and Warrantless

13  Arrest Classes.

14  3.  Bree Bernwanger, Michelle (Minju) Y. Cho, Lauren Davis, and Shilpi Agarwal, Mayra

15  Joachin, Eva Bitran, and Oliver Ma, Brisa Velazquez Oatis, Ajay S. Krishnan, Franco

16  Muzzio, Zainab O. Ramahi, and Julia L. Greenberg are **APPOINTED** as Class Counsel

17  for the provisional classes.

18  4.  Plaintiffs' motion for a preliminary injunction (Doc. 15) is **GRANTED**, as follows:

19  a.  Border Patrol is enjoined from conducting detentive stops in this District unless,

20  pre-stop, the detaining agent has reasonable suspicion that the person to be stopped is a

21  noncitizen who is present within the United States in violation of U.S. immigration law,

22  as required by the Fourth Amendment of the United States Constitution.

23  b.  Border Patrol is enjoined from effecting warrantless arrests in this District

24  unless, pre-arrest, the arresting agent has probable cause to believe that the noncitizen

25  being arrested is likely to escape before a warrant can be obtained, as required by 8

26  U.S.C. § 1357(a)(2).

27  c.  Any Border Patrol agent who conducts a detentive stop in this District **SHALL**,

28  as soon as practicable, document the facts and circumstances surrounding the stop in a

narrative form. This documentation **SHALL** include the specific, particularized facts that supported the agent's reasonable suspicion, which was formed in advance of the stop, that: (i) for vehicle stops, the vehicle contained a noncitizen present within the United States in violation of U.S. immigration law; and (ii) for stops on foot, the person stopped was a noncitizen within the United States in violation of U.S. immigration law. The documentation **SHALL** include the date and time that the agent completed the detentive stop and the date and time the agent completed the documentation.

d.    Any Border Patrol agent who conducts a warrantless arrest in this District **SHALL** comply with all requirements set forth in DHS's "Broadcast Statement of Policy" on compliance with 8 U.S.C. § 1357(a)(2), including but not limited to the requirement that as soon as practicable after an arrest, agents **SHALL** document in writing "the facts and circumstances surrounding the warrantless arrest" and the "specific, particularized facts supporting the conclusion that the [individual] was likely to escape before a warrant could be obtained."

**Within 60 days and every 60 days thereafter** until this litigation is terminated or the Court rules otherwise, Border Patrol **SHALL** release to Plaintiffs' counsel the documentation describing Border Patrol's detentive stops and warrantless arrests within this District, or if requested by Plaintiffs' counsel concerning specific individual detentive stops or warrantless arrests, no later than seven days after the request.

e.    **Within 60 days of this order**, Defendants **SHALL** serve to Plaintiffs' counsel a directive setting forth the guidance given to Border Patrol agents concerning how they should determine whether "reasonable suspicion" exists when conducting detentive stops, including vehicle stops, in this District.  This guidance shall include, among other things, that refusal to answer questions does not, without more, constitute a basis for reasonable suspicion to justify a detentive stop.

f.    **Within 90 days of this order and every 30 days thereafter** until all agents associated with the El Centro Sector and those who are charged with making detentive stops and warrantless arrests in this District have been trained, Defendants **SHALL**

serve to Plaintiffs' counsel documentation showing that they have trained the Border Patrol agents who have performed, or will perform, operations in this District on the requirements articulated above.

IT IS SO ORDERED.

Dated:   **April 29, 2025**

UNITED STATES DISTRICT JUDGE