UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. JENNIFER L. THURSTON


| | | |
|---|---|---|
| UNITED FARM WORKERS, et al., | ) | |
| | ) | 1:25-cv-00246-JLT-CDB |
|        Plaintiffs, | ) | |
| | ) | MOTION TO CERTIFY CLASS |
|    vs. | ) | AND |
| | ) | MOTION FOR PRELIMINARY |
| KRISTI NOEM, IN HER OFFICIAL | ) | INJUNCTION HEARING |
| CAPACITY AS SECRETARY OF THE | ) | |
| DEPARTMENT OF HOMELAND | ) | |
| SECURITY, et al., | ) | |
| | ) | |
|       Defendants. | ) | |

Fresno, California                    Monday, April 28, 2025


REPORTER'S TRANSCRIPT OF PROCEEDINGS


REPORTED BY:  RACHAEL LUNDY, CSR, RMR, Official Reporter

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

<u>**APPEARANCES OF COUNSEL**</u>:

For the Plaintiffs:          ACLU Foundation of
                             Northern California
                             39 Drumm Street
                             San Francisco, CA 94111
                             BY: **BREE BERNWANGER, ESQ.**
                                 **& MICHELLE MINJU CHO, ESQ.**

                             Keker, Van Nest & Peters LLP
                             633 Battery Street
                             San Francisco, CA 94111
                             BY:  **FRANCO E. MUZZIO, ESQ.**

For the Defendants:          Department of Justice
                             Civil Division, OIL-GLA
                             P.O. Box 878
                             Ben Franklin Station
                             Washington, DC  20044
                             BY:  **OLGA KUCHINS, ESQ.**

                             Department of Justice - Civil
                             Poc Agostinho, Jean
                             1100 L Street, N.W.
                             8142
                             Washington, D.C. 20530
                             BY:  **TIM RAMNITZ, ESQ.**

3

1    Monday, April 28, 2025                    Fresno, California

2    2:19 p.m.

3        (The following proceedings were held in open court:)

4            THE CLERK:  The Court calls United Farm Workers,

5    et al. versus Kristi Noem, et al., case Number 1:25-cv-246,

6    scheduled for a motion to certify the class and motion for a

7    preliminary injunction, document 14 and document 15.

8            THE COURT:  All right.  May I have the appearances,

9    please.  Let's begin with plaintiff.

10            MR. MUZZIO:  Good afternoon, Your Honor.

11    Franco Muzzio from Keker, Van Nest & Peters on behalf of

12    plaintiffs.

13            MS. BERNWANGER:  Good afternoon, Your Honor.

14    Bree Bernwanger from the ACLU of Northern California on behalf

15    of plaintiffs.

16            THE COURT:  All right.

17            MS. CHO:  Good afternoon, Your Honor.  Minju Cho from

18    ACLU of Northern California for the plaintiffs.

19            THE COURT:  All right.  And for the defense.

20            MR. RAMNITZ:  Tim Ramnitz for the defense, please.

21            MS. KUCHINS:  Good afternoon, Your Honor.  Olga

22    Kuchins for the government.

23            THE COURT:  All right.  First thing it seems like we

24    need to take care of, there has been a request by the

25    plaintiff -- plaintiffs to file supplemental evidence, as well

4

1    as from the defense.  Let's hear the plaintiffs, your comments

2    about the defense motion.

3         MR. MUZZIO:  We don't oppose, Your Honor.

4         THE COURT:  All right.  And then for the defense?

5         MR. RAMNITZ:  We don't oppose, Your Honor.

6         THE COURT:  All right.  Then we will consider those

7    documents as well.

8         It seems to me that, in starting on those motions,

9    there's no dispute of fact.  There's no evidence contradictory

10   to what the plaintiffs have submitted.  So we're just dealing

11   really with the legal questions.

12        I have considered all of the documents.  I read the

13   new filings as well.  So let me start with the plaintiffs.

14        Do you have comments at this time?

15        MR. MUZZIO:  We do, Your Honor.  Should I approach

16   the lectern?

17        THE COURT:  Whatever's comfortable.

18        MR. MUZZIO:  I'll approach.

19        THE COURT:  Okay.

20        MR. MUZZIO:  Thank you.

21        So we have divided up the arguments between the three

22   of us, because there are several issues here.  Ms. Bernwanger

23   is going to handle anything related to the defense's

24   jurisdictional arguments under immigration law, and Ms. Cho

25   would handle anything related to the class certification

1  motion.  And I will do my very best to handle the remainder of

2  the issues and any questions Your Honor may have.

3  Given, as you said, there's no dispute on the factual

4  record, I am planning to largely begin with the mootness

5  arguments, but if there's any other issue you'd like me to

6  address first, I'll do so.

7  THE COURT:  I'll let you take it.

8  MR. MUZZIO:  Okay.  So, in January, Border Patrol

9  conducted a series of raids that they have referred to as

10 Operation Return to Sender.  Those raids ripped through Kern

11 County, and they resulted in at least, by their own

12 numbers, 78 arrests.

13 The plaintiffs, as Your Honor said, we submitted

14 detailed declarations, and they show that the operation was

15 grounded in stop-and-arrest practices that were impermissibly

16 based on skin color and assumptions about people based on

17 their occupation.  These indiscriminate practices led to the

18 arrests and stops of residents of this district regardless of

19 their immigration status.  There were U.S. citizens that were

20 stopped.  There were legal permanent residents that were

21 stopped.  And despite this, Border Patrol declared the

22 operation a success.

23 They promised to do further raids consistent with it

24 throughout this district in the future, including here in

25 Fresno.  And it's remarkable that Border Patrol hasn't

6

1    actually disputed these facts in its opposition.  What they

2    have done is, they appear to be trying to evade judicial

3    review through this mootness argument.

4         As we've briefed, Your Honor, mootness has a heavy,

5    heavy burden.  And what they have to show is that there's no

6    effective relief that the Court could provide.

7         And the way they do it is by making absolutely

8    clear -- according to the Ninth Circuit, under the *Bell* case

9    and the *Thackery* case, they have to make absolutely clear that

10   the wrongful conduct cannot occur because the change is now

11   entrenched and permanent.  There's nothing in defendant's

12   submissions making absolutely clear that whatever change this

13   muster may be is entrenched and permanent.

14        So they've submitted two declarations on the muster.

15   In their supplemental declaration, the best that they can do

16   to get towards this is say that they "intend to keep it in

17   place."

18        But they don't say that there's anything that

19   requires them to keep it in place.  And they also don't say

20   that there's anything that requires them to ensure compliance

21   of their agents with the muster.  And it's telling,

22   Your Honor, that after they filed the muster, we asked them if

23   they would stipulate to an order requiring compliance with it

24   during the pendency of our unlawful arrest-and-stop claims,

25   and they declined to do so.

1        So where there is no mechanism for enforcement, and

2    there's nothing that is going to stop them from reversing or

3    changing or just issuing a new interpretation of the law

4    tomorrow, which we won't know about because we don't have

5    access into their emails at this time, I believe that the *Bell*

6    *versus City of Boise* case from the Ninth Circuit controls in

7    this instance.

8        So, in that case, the Boise chief of police issued a

9    similar policy statement that purported to require police

10   officers to begin operating in a way that, essentially, mooted

11   the issue, according to the defense, and it stopped them from

12   engaging in the unlawful conduct that was alleged in that

13   case.

14       But the Ninth Circuit said that this sort of policy

15   statement, it cannot moot plaintiff's claims because -- this

16   is a quote from the case itself.  It's page 900:  "Even

17   assuming defendants had no intention to alter or abandon the

18   special order" -- a policy statement in that case -- "the ease

19   with which the chief of police could do so counsels against

20   the finding of mootness."  Similarly, this muster appears to

21   be an interpretation of what the legal requirements are under

22   the Ninth Circuit.

23       And in the *AO versus Cussa -- Cusanelli* case in the

24   Northern District of California, that case also rejected this

25   sort of a policy statement on what the law requires.  It said:

1    It's difficult to conceive of a new policy that could be more

2    easily abandoned or altered in the future than one resting

3    upon a recent legal reinterpretation.  That's what we have

4    here.  It's an interpretation of what the law requires.

5            We largely agree with that interpretation, but

6    there's nothing that's stopping them from changing it

7    tomorrow.  And so what we're seeking -- one of the things

8    we're seeking here is an order from the Court that has some

9    degree of enforceability and some degree of guarantee that

10   they're not just going to change their policy in a week or in

11   a month or even a few days.

12           Given that the muster itself doesn't appear to be

13   enforceable, doesn't appear to be a significant directive from

14   Border Patrol, it's not surprising then that we saw last

15   Tuesday reports from Pomona, which appear to show that Border

16   Patrol is continuing to engage in these sort of raids, which

17   target communities of color, in specific areas, where they

18   believe that there will be day laborers or farmers, and they

19   stop them en masse and begin to detain them and question them

20   without reasonable suspicion.

21           Set aside that issue, though.  Muster doesn't even

22   address everything that plaintiffs have put forward.  The

23   muster is focused on warrantless arrests, but it says nothing

24   about the detentive stops that make up the basis of our Fourth

25   Amendment claim.  There's no guidance what can serve as the

1    basis for reasonable suspicion.  And it doesn't require any

2    documentation of defendants stops that don't end in arrests.

3    So if they pull over a vehicle but they don't actually arrest

4    anyone in it, but they pull over the vehicle improperly, they

5    slash the tires, they smash the windows, they don't have to do

6    anything.

7         So the muster just -- it just does not address the

8    conduct in its entirety that we've put at issue here.  It's

9    not permanent, it's not binding, and so it does not moot our

10   claims.

11        On irreparable harm, the standard that we have to

12   satisfy is that it -- there's a real possibility that the

13   plaintiffs are going to again be subjected to unlawful

14   detention.  That's under the *Melendres* case in the

15   Ninth Circuit.  And *Melendres*, I think, is instructive because

16   that was also a policy or practice case.  In *Melendres*, what

17   the Court found was where there was a practice of targeting

18   communities of color, in a way similar to what we're dealing

19   with here, it was reasonable for the Court to conclude that

20   the plaintiffs, who were residents of the area where that

21   practice was being carried out, would again be stopped or

22   detained in the future.

23        The practice evidence, I think, is largely, if not

24   entirely, unrebutted in this case as well.  Because aside from

25   the muster, the defendants haven't done anything to address

1   the comments that were made by the El Centro Sector

2   immediately after this operation happened in January.

3           So shortly after the operation's carried out,

4   El Centro publicly declares it a success from day one, and

5   they start to say they're planning operations in other areas,

6   including here in Fresno, especially in Sacramento.  They

7   announced that they're planning on coming back to Bakersfield

8   for further raids, and they even confirmed that these

9   additional operations were going to be "Return to Sender

10  round 2."

11          So they do the unlawful raids, they say they are a

12  success, and then they say they're going to continue to carry

13  them out throughout this district.  That's sufficient evidence

14  of a practice.

15          And the only thing that the defendants do to try to

16  rebutt that evidence is they, again, point to the muster.  In

17  this context, when assessing irreparable harm, there's three

18  considerations.  This is under the *W.T. Grant* case, which is

19  from the U.S. Supreme Court.  Both parties rely on it in their

20  briefing.

21          The first consideration is the effectiveness of the

22  discontinuance.  I think I covered that when I was addressing

23  the merits.  I just don't think this is an effective

24  discontinuance given that there's no enforceability and

25  there's no guarantees.

1       The second factor is the character of the past

2  violations -- excuse me.  The violations here were planned,

3  they were repeated over the course of several days, and they

4  were egregious, Your Honor.  They were so egregious that

5  defendants haven't bothered to dispute them factually in their

6  opposition.

7       The car stops, people were pulled over for no reason,

8  the windows were smashed, the tires were slashed, people were

9  ripped from their cars, handcuffed, put into the back of vans.

10      The foot stops, people were targeted at places where

11  they were gathering simply to look for work, and they were

12  forced to answer questions.  And if they chose to remain

13  silent, they were taken into custody.

14      So these are not controversial legal principles here.

15  So much so that defendants have offered up the muster in

16  response.  The character suggests that when -- when it's this

17  sort of egregious violation of the law, that weighs in favor

18  of not -- or, excuse me, of not finding that a muster or a

19  voluntary cessation somehow limits the irreparable harm.

20      The last point I want to make on this is the

21  bona fides of the express intent to imply.  This is, again,

22  from the *W.T. Grant* case.  And the way that I have seen courts

23  interpret this one is, how clear is the statement that the

24  defense is offering to moot an issue that they're not going to

25  do it again?  And us -- in addition to not addressing all the

1   conduct at issue here, the muster also doesn't actually

2   acknowledge the wrong that happened in the first case.

3         And several courts, when there's no acknowledgement

4   of the wrong from the past, have found that it -- the new

5   voluntary cessation cannot cut against a showing of

6   irreparable harm.

7         So an example of this is the *SEC versus Murphy* case.

8   There the Court rejected a defendant's testimony that he

9   wouldn't commit the illegal conduct in the future because, at

10   the same time, the defendant was insisting that he had done

11   nothing wrong in the first place.  And that makes sense.  And

12   so, when there's no acknowledgement of the past conduct being

13   harmful or wrong or somehow unlawful, you can't at the same

14   time argue "this proves that we won't do it again."

15         So, I think the last issue here that we have a burden

16   of showing is the equities and the balance of hardships.  And

17   so I think the analysis on the equities is quite simple in

18   this case.  The hardships for plaintiffs are significant.

19   These practices are interfering with their day-to-day lives.

20   They are subjecting them to constitutional violations, which

21   black letter law says is an irreparable injury.

22         And on the flip side for defendants, they're saying,

23   "It's our intent to comply with the law.  We want to comply

24   with the law."  And so under the *Melendres* case, again, the

25   Ninth Circuit aptly said that the defendants cannot be harmed

1   by an order enjoining an action that they will not take.  And

2   so I think when you balance the hardships here, it weighs

3   heavily in plaintiffs' favor again, and we would ask that the

4   requested injunction be entered in its entirety.

5           THE COURT:  All right.  Does it make sense for the

6   defense to respond to this before we move to the other topics?

7           MR. RAMNITZ:  Yes.

8           THE COURT:  Okay.

9           MR. RAMNITZ:  The way we divided it up, I was going

10  to argue -- plan to argue mootness and irreparable harm and

11  jurisdictional arguments.  So I can do all of those together.

12          THE COURT:  Why don't we just talk about the issues

13  raised already, and then you can respond.

14          MR. RAMNITZ:  If it pleases the Court, Your Honor,

15  Tim Ramnitz on behalf of the government.

16          Petitioner has not met the heavy burden in this case

17  of showing they warrant a preliminary injunction.  It's a

18  relief to be used sparingly by the Court and only when relief

19  is certain.  But the government recognizes it bears a burden

20  in this case because we claim mootness, and that's a heavy

21  burden of our own.  But we believe we've met that burden.  And

22  this is because we have tailored the remedy here to what

23  plaintiffs requested.  And this is because we dispute the

24  facts, but we recognize the seriousness of the allegations.

25          And they are very serious allegations, that they are

1   saying that CBP came into Bakersfield, came into Kern County,

2   and, essentially, planned ahead of time to not honor

3   anyone's Fourth Amendment rights, not honor 1357, just roll

4   over them and arrest people based on race, based on their

5   occupation.  We dispute that.  That's not what CBP did.  We

6   realize that this raises specter of impropriety about the

7   government.

8          The plaintiff has a narrative that they have taken to

9   the media as well, where CBP has done these allegations, they

10  are guilty before they've even had a chance to dispute them.

11  But --

12         THE COURT:  Well, there was an opportunity, and we

13  didn't get any dispute, though, right?

14         MR. RAMNITZ:  We don't dispute, basically we just

15  want to give the remedy.  We want to say, "This is what you

16  want.  You wanted this muster," which is similar to a *Nava*

17  broadcast.  "You wanted these training and guidance.  That's

18  easy.  We can" -- "we can do that," and we're happy to do that

19  just because we don't --

20         THE COURT:  Doesn't FLETC already do that?

21         MR. RAMNITZ:  Do what?

22         THE COURT:  Doesn't FLETC already do that?  Doesn't

23  the Border Patrol agents, when they go to their academy, they

24  go to FLETC, and they're taught about the Fourth Amendment --

25         MR. RAMNITZ:  Yeah.

1          THE COURT:  -- and taught about what's required?  I

2     guess I'm kind of wondering, you know, why is the muster even

3     necessary?

4          MR. RAMNITZ:  Well, the muster is necessary here

5     because that's what plaintiffs requested, one; but, two, when

6     you're alleging there's this practice or policy of

7     violating Fourth Amendment, the government acknowledges that

8     there's always chances where there's an individualized case

9     where procedure hasn't been followed.

10          THE COURT:  Well, I don't think that's what they're

11     saying.

12          MR. RAMNITZ:  That's not what they're saying, but

13     that's what the government says.

14          THE COURT:  So you're saying that everyone needs to

15     be trained despite the training that they received in the

16     academy, and I assume there's ongoing training because I know

17     federal law enforcement, but -- I mean, I would be a little

18     shocked to say that there's someone in Border Patrol who don't

19     know the requirements of the Fourth Amendment.

20          MR. RAMNITZ:  I would be shocked as well.

21          THE COURT:  And yet the allegations that are brought

22     here -- I mean, factual circumstances that I have is that this

23     happened, and that there is evidence that it's going to happen

24     again.  And the new evidence is that it has happened again, at

25     least not in this district, but that conduct by the same

1 people has happened --

2    MR. RAMNITZ:  Well, I read that media article, and I

3 didn't see allegations that there is race-based stops in that

4 case.  I see the same kind of specters there.  That that's --

5 that is what's happening, but I don't think that's even

6 alleged in that media article.

7    But what we're focusing on here is what plaintiffs

8 requested out of this lawsuit.  So when -- that's what they

9 said would remedy what they fear is going to happen in the

10 future.

11    We wanted to provide that, because we do see they are

12 very serious allegations.  And when they requested for more

13 training -- they do the training at the academy.  The

14 plaintiffs requested to have more training on this; we're

15 going to provide that.  When they wanted a proposed order that

16 talked about consensual encounters, reasonable suspicion,

17 we're going to provide that.  When they wanted training on

18 probable cause for arrests and under 1357 and flight risk,

19 we're going to provide that.

20    THE COURT:  How much has been done in the months

21 since that muster was issued?

22    MR. RAMNITZ:  Training started on Wednesday.

23    THE COURT:  How many?

24    MR. RAMNITZ:  There were over 900 agents, and they've

25 started training them as of Wednesday.

1          THE COURT:  How many on Wednesday received training?

2          MR. RAMNITZ:  I would have to check with the agency.

3     I can't recall exactly what they told me.

4          THE COURT:  Are they doing it shift by shift?  I

5     mean, what's the priority in how the training is going?

6          MR. RAMNITZ:  I'm not sure, actually.  We spoke with

7     Counsel very recently, and they just started -- training has

8     started.  We're trying to do as many agents as possible as

9     quickly as possible.

10          THE COURT:  Okay.

11          MR. RAMNITZ:  So when you're focused on the remedy

12     here, there's nothing that the government didn't provide,

13     except for the 60-day reporting requirement.  And that's

14     because when -- there's a hopeful citation from amicus in this

15     case, under the *Hodgers* case:  When there's no -- when they've

16     been provided with pretty much everything they asked for, and

17     when they are --

18          THE COURT:  Isn't that pretty much part, though, what

19     we're talking about?  I mean, "pretty much" isn't all.

20          MR. RAMNITZ:  Not all.  We agree with that.  But --

21     but, in that case, *Hodgers*, it talks about how when there is

22     no ongoing threat anymore, then plaintiffs can't request a

23     court to take system-wide action against Border Patrol where

24     there's ongoing supervision of what they do.

25          THE COURT:  You and I agree, though, that for 50

1   years there's been authority that you can't stop people based

2   upon the color of their skin and inquire about their -- their

3   status, outside the border; and you and I also agree that at

4   FLETC they're taught what's required by the Fourth Amendment

5   to conduct these stops.

6          And so I guess I'm kind of troubled by your saying,

7   "Well, we're going to run everybody through this training and

8   somehow that's going to fix it."  Because what suggested to me

9   by this state of the evidence here is that, despite having had

10  that training, they are receiving other instruction that says,

11  You know what that requires, you know what you were trained,

12  you know the Fourth Amendment, but what we're going to do

13  instead is this.

14         So help me to understand how this additional

15  training, which I assume is the same as what they've received

16  in the academy, is going to remedy this situation.  Because it

17  seems like if someone is telling them -- and I know the

18  operations, they get together, they decide how they're going

19  to deploy, they have a meeting, and they talk about who's

20  going where, what's going to happen, who's going to back up

21  who.  There has to be instruction.  And I have to assume -- I

22  can't have this factual circumstance along with the training

23  that they have received in order to become agents and have

24  this outcome.  So help me to understand how the muster

25  addresses that.

1      MR. RAMNITZ:  That was plaintiffs' remedy.  I mean,

2  they believe that remedies this.  They believe that this

3  additional training and guidance will assist Customs and

4  Border Patrol.

5      THE COURT:  I guess my point is that it doesn't,

6  though, right?  Because if there is, at their -- I forget what

7  they call them, in their little organizing meetings before

8  they deploy, someone says, "You go to Home Depot.  Anyone with

9  brown skin standing there, you're going to stop them, you're

10  going to demand their IDs, you're going to" -- you know,

11  whatever, "You're going to stop cars on roads that lead to

12  farms, and we're not going to ask anybody about any details to

13  find out if they're a flight risk."  If that's happening, then

14  the muster doesn't address that.

15      MR. RAMNITZ:  But we don't -- we dispute that.

16      THE COURT:  You don't though.  Because I have a set

17  of evidence here, and I would be -- I was looking for opposing

18  evidence.  And I didn't see any.  So I have only what the

19  evidence is here, and that is that that's what happened.  And

20  so I'm trying to figure out, if the muster is going to cure

21  it, it has to be bigger than just training because I know

22  they've had training.  I mean, there couldn't be agents

23  without that training, right?

24      MR. RAMNITZ:  Right.

25      THE COURT:  I mean, I know FLETC.  You know FLETC,

1  right?

2       MR. RAMNITZ:  Yes.

3       THE COURT:  And a component of the training of all

4  federal law enforcement is an understanding of the Fourth

5  Amendment and how to execute detentions and arrests.

6       And then I assume they have the particularized

7  training related to what the INA allows, right?  I mean, you

8  can't dispute that at all.

9       MR. RAMNITZ:  They received training at -- at the

10  academy, of course.  But -- so what's left to -- to fashion a

11  remedy for plaintiffs then I suppose?

12       Because that's what the government was looking at.

13  When we see the serious allegations, we just say, "This is the

14  remedy.  We can easily provide that.  We can give them a

15  refresher on this."  Because we always acknowledge there can

16  be individualized cases where an agent does not follow proper

17  procedure.  That's been the case since the Fourth Amendment

18  has existed, and it's been mitigated for decades and decades.

19  But a pattern of practice like this, that's a serious

20  allegation.  So plaintiffs request in their injunction that we

21  follow a Nava broadcast.  If we provide guidance and training

22  on this, then that's what we're happy to provide.  All that's

23  left is that reporting requirement.  And under *Hodgers Durgin*,

24  that's not something that the Court should order when the

25  government has taken on these actions and, we think, removed

1  the threat of ongoing injury in this case.

2         THE COURT:  All right.

3         MR. RAMNITZ:  So that's our burden.  That's our

4  burden of mootness.

5         If the Court disagrees with our burden of mootness,

6  then plaintiffs certainly haven't shown their burden for a

7  preliminary injunction, which would have to show irreparable

8  harm.  By issuing the remedy the plaintiffs requested, there

9  is no longer a cognizable danger of an ongoing violation here.

10 So we've certainly met that remedy.

11        That's when plaintiffs are saying we're trying to

12 evade judicial review.  That's not at all what we're trying to

13 do.  We saw -- and I'm beating a dead horse at this point.

14 But we saw the remedy they wanted, this guidance and training.

15 And specter of these -- getting together and violating

16 the Fourth Amendment, and we provided that remedy quickly and

17 responsibly.  That's not evading judicial review based on the

18 Fifth Amendment claim, we just wanted to provide that remedy.

19        I'd also like to address briefly the cases that

20 they've described about voluntary cessation.  So they're not

21 really a good fit for this case because they cite *Bell* and

22 *Ficker*, these Ninth Circuit cases.  But in those cases, there

23 was a prior policy, an official policy, in place.  So for

24 example, in *Bell*, it was in Idaho.  There was a city ordinance

25 on homeless encampments, and that was enforceable.  Then the

1   local police, once the lawsuit started, slapped a Band-Aid on

2   top of it, and they said we have this memorandum, called a

3   special policy I believe, and they said, "We're just not going

4   to enforce it sometimes."  So what the court said is they can

5   remove that Band-Aid and go back to the law because the law is

6   still on the books.

7          Here there's no prior law.  This is about knowledge

8   of the law.  As we said, like, do they know the requirements

9   of the Fourth Amendment?  And see, there's nothing to go back

10  to.  If they've had this training and guidance, you can't

11  claim that they are -- don't know the law and they are going

12  to revert back to ignorance of the law.  And --

13         THE COURT:  That's what you are saying, aren't you?

14  Because we agree -- we went through this -- that they had the

15  training already, they know what's required to make a

16  detention --

17         MR. RAMNITZ:  And I do believe they know what's

18  required, and there's sometimes an individualized -- sorry.

19         THE COURT:  -- to make an arrest, and then this

20  happened.  And so -- I don't know what happened.  I don't know

21  why it happened, but the evidence is that it happened.  And

22  there's no counter evidence to that.  So if you're saying that

23  the muster cures that, then -- and I'm beating the dead horse

24  now.  I'm having trouble with the fact that the law required

25  them already to do certain things, and the evidence says they

1    didn't do that.

2            Putting them through training and then 78 arrests

3    later, I'm still having trouble how that's going to cure a

4    situation when the Supreme Court has, for more than 50 years,

5    said in this circumstance, "This is what you can do."

6            It's not a matter of some, you know, opacity of the

7    law.  It's absolutely clear, and the Ninth Circuit's law is at

8    least 25 years old, so I can't believe the Border Patrol is 50

9    years behind in its training.  I mean, some of these people

10   enforcing these weren't even alive, probably; maybe their

11   parents weren't even alive at the time.

12           So this isn't new.  So if you're saying the muster

13   cures it all, where was the breakdown then?  Because they were

14   trained, giving them more training, there's still a breakdown.

15   Something went wrong.  What's going to cure that breakdown?

16           MR. RAMNITZ:  That's a question for plaintiffs.  We

17   saw what they thought would cure it, and that's what we

18   provided.  And all that -- I said we did not provide a 60-day

19   reporting requirement, but we believe that's not necessary

20   under Ninth Circuit precedent.

21           THE COURT:  Wouldn't that be necessary to make sure

22   we don't have whatever this phantom breakdown is, is so that

23   we see that it's not happening.  You know, they had training

24   before it happened.  Now that they have training, we want to

25   make sure it's effective because we can't have it happening

1 | again.

2 | MR. RAMNITZ:  I think you also have to just -- and we

3 | can get to balancing the equities.  When the government has

4 | reached out and provided this remedy, I don't think it's fair

5 | to also impose upon them a 60-day -- that's pretty burdensome

6 | to the agency.  Every 60 days, they have to report --

7 | THE COURT:  They have to report every time they

8 | arrest somebody, right?  You don't just do that in a vacuum.

9 | There is a document created somewhere.  Probably first in

10 | writing, then it goes into a computer system, and, probably,

11 | that could have been printed out already.  So I'm not sure

12 | what the burden is.  They're asking for that documentation.

13 | MR. RAMNITZ:  Well, the burden is -- it'd be the

14 | ongoing judicial supervision.  That whenever they perceive

15 | something is wrong, BP has to be called into court again.  And

16 | we always recognize there's going to be individualized --

17 | again, I've said that, individualized cases of improper

18 | procedure.

19 | THE COURT:  Maybe.  But that's not the evidence at

20 | this point.  The evidence -- the only evidence I have is that

21 | it was widescale, and that it wasn't limited to one or two

22 | officers; that, you know, at least of the anecdotal evidence I

23 | have here, which represents a pretty significant portion of

24 | those 78, that it was happening in each of those times, right?

25 | That's what the evidence is.

1        MR. RAMNITZ:  I submitted evidence of our own.

2        THE COURT:  I'm sorry.  What?

3        MR. RAMNITZ:  I submitted evidence of our own.

4        THE COURT:  And that's what the evidence of the

5   plaintiff shows.

6        MR. RAMNITZ:  We do dispute the allegations.  I think

7   that's something I said before.

8        THE COURT:  You say that, but there isn't a dispute

9   of the evidence that is before the Court at this time.

10       MR. RAMNITZ:  We did not submit evidence; we instead

11  submitted the remedy plaintiffs' requesting.

12       THE COURT:  We're splitting hairs, but I get what

13  you're saying.  Anything else then on this topic?

14       MR. RAMNITZ:  I would like to address jurisdiction,

15  but I'll wait.

16       THE COURT:  Let's let the plaintiffs talk to that

17  first, or whatever next topic we're going to talk about.

18       Jurisdiction seems to make sense.

19       MR. MUZZIO:  Your Honor, if I may briefly respond

20  to --

21       THE COURT:  All right.

22       MR. MUZZIO:  -- just a couple things, and then

23  Ms. Bernwanger is going to address jurisdiction.

24       THE COURT:  Okay.

25       MR. MUZZIO:  I didn't hear the government address at

1    any point in time that the muster doesn't cover the detentive

2    stops at all.  And so I think they've conceded that issue at

3    this point, and I think the injunction should be granted in

4    its entirety to the detentive stops.

5           That leaves only the warrantless arrests and whether

6    the muster covers them at all.  And the refrain that the

7    government kept making was that they gave us the remedy we

8    asked for with respect to the warrantless arrests, and they

9    didn't.

10          The warrants we were seeking is a court order that

11   ensures enforceability on their compliance with a policy

12   statement that's analogous and very similar to the muster,

13   though the language is stronger in a few places because it

14   says -- the muster they have written says "should" instead of

15   "must."

16          But setting that aside, what we're seeking is, yes, a

17   court order that ensures that they're going to have compliance

18   through reporting, and then also through the Court itself

19   enjoining them from continuing to conduct these practices and

20   then requiring them to give us the documentation and provide

21   the trainings.  And so I think at this point, on the record

22   currently before the Court, in the absence of that injunction,

23   it seems very likely that they are going to continue with

24   these practices.

25          THE COURT:  All right.

1          Mr. Ramnitz, anything further on that topic?

2          MR. RAMNITZ:  We believe the muster and the

3     declaration do provide that training on -- the declarations at

4     least provides training on consensual encounters, reasonable

5     suspicion, and vehicular stops.  And that is what they

6     requested.

7          MS. BERNWANGER:  May I approach, Your Honor?

8          THE COURT:  Sure.  Just one second, though.  I think

9     I might have follow-up questions for Mr. Ramnitz.

10          And you're defining consensual contacts to include

11     the circumstances described where people are stopped on the

12     street?  Is that what you mean by "consensual"?

13          MR. RAMNITZ:  Yes.

14          THE COURT:  All right.  Anything else then?

15          MR. MUZZIO:  Nothing further on these issues.

16          THE COURT:  All right.  Then we can move to the

17     jurisdiction question.

18          MR. RAMNITZ:  Excuse me, Your Honor.

19          THE COURT:  Yeah?

20          MR. RAMNITZ:  Co-counsel reminded me there were 207

21     agents trained this last week.

22          THE COURT:  And who are those agents?  What -- how

23     were they selected to do this?

24          MR. RAMNITZ:  I'm not --

25          THE COURT:  Do you know?

1          MR. RAMNITZ:  I don't know that part.

2          THE COURT:  Okay.

3          MS. BERNWANGER:  Good afternoon, Your Honor.

4    Bree Bernwanger for the plaintiffs.  I'll be addressing

5    defendants jurisdictional arguments beginning with 1252(a)(5)

6    and (b)(9) and continuing to (f)(1), though I'm happy to

7    answer any questions Your Honor has or start wherever Your

8    Honor would prefer if you have specific questions.

9          THE COURT:  No.  Go ahead.

10          MS. BERNWANGER:  Great.  So 1252(a)(5) and 1252(b)(9)

11    do not bar jurisdiction here.  Those statutes channel

12    challenges to removal orders that arise from removal

13    proceedings through the administration immigration courts to

14    the Court of Appeals in a petition for review.

15          But the Supreme Court has been very clear

16    that 1252(b)(9) in particular, which is the channeling

17    provision, is a targeted, I'm quoting, "and narrow provision

18    that is," and I'm quoting again, "certainly not a bar,"

19    whereas here the parties are not challenging any removal

20    proceedings.

21          That's the Supreme Court in the *Department of*

22    *Homeland Security versus Regents of the University of*

23    *California*, a 2020 case that is controlling, that the

24    defendants do not cite.  *Regents* answers the question

25    here.  1252(b)(9) and its companion provision at (a)(5), which

1  only covers orders of removal, cannot apply to a case that

2  does not challenge removal proceedings at all.

3      I will briefly address the two arguments that the

4  government -- the two core arguments the government made in

5  their briefing.  First, in citing to *Jennings versus*

6  *Rodriguez*, a case that predates *Regents*, the government argues

7  that because the stops -- or that in their view, the stops and

8  arrests at issue here arise from actions taken to remove

9  noncitizens.

10     But *Jennings* says not to interpret the statutory

11  language that narrowly.  What *Jennings* says, and *Regents* makes

12  even more clear, is that where removal proceedings and orders

13  of removal are not at issue, the statutes do not apply.  And I

14  also want to be really clear about some of the language in

15  *Jennings* that the defendants latch onto.  Language about a

16  decision whether to detain a noncitizen and seek their removal

17  in the first place.  *Jennings* is a case about immigration

18  detention in ICE custody after removal proceedings have begun.

19     So when the court in *Jennings* is talking about

20  detention, it's talking about detention pending removal

21  proceedings.  That is not at issue in this case.  Even so, the

22  court in *Jennings* found that it had jurisdiction.  And again,

23  *Regents* cleared up any uncertainty that might have lingered

24  after *Jennings*:  Where removal proceedings are not at issue,

25  1252(b)(9) does not bar jurisdiction.

1          The second argument that the government makes boils

2     down to an argument that the Fourth Amendment issues come up

3     in petitions for review.  So that means that if there

4     are Fourth Amendment issues here, they must be resolvable

5     through a petition for review.  Courts have also considered

6     and rejected that argument in cases concerning the type of

7     pre-removal process stops and arrests the plaintiffs are

8     challenging here.

9          I would point the Court to the *Nava* and *Medina* cases

10    that we cite in our papers.  The government discusses *Nava*

11    quite a bit in its briefing, but it doesn't discuss the core

12    distinction between *Nava* and a case in which issues arise

13    during removal proceedings, which is also present here.  The

14    stops and arrests at issue here happened before removal

15    proceedings commenced.  And they happened regardless of

16    whether removal proceedings would ultimately ever follow.

17         As the Court is well aware, one of our plaintiffs and

18    proposed class representatives, Yolanda Aguilera Martinez, is

19    a lawful permanent resident.  No removal proceedings followed

20    from her unlawful stop and arrest.  Her claim is identical to

21    those of the class -- proposed class representatives who may

22    be in removal proceedings.  The claim cannot be addressed in

23    removal proceedings.  She's not ever going to be in them as a

24    result of this stop or arrest.

25         In *Medina*, the court -- excuse me.  The government

1    also faulted the court in *Nava* for not examining the Ninth

2    Circuit's holding in *J.E.F.M.*.  obviously, *Jennings* and

3    *Regents* have made clear that 1252(b)(9) should be viewed much

4    more narrowly than the Ninth Circuit viewed it in *J.E.F.M.*, an

5    earlier case.  But the court in Medina, which also concerns a

6    challenge to a seizure and arrest made based on

7    unconstitutional information -- based on unconstitutional

8    practices, the court there engaged the *J.E.F.M.* and recognized

9    that it's completely distinguishable when a claim is arising

10   through removal proceedings as opposed to a stop or arrest

11   that is independent from those proceedings, and even the

12   resulting detention, which is independent from those

13   proceedings.

14         I'll move on to -- well, ultimately, again, *Regents*

15   controls and none of the cases the government's -- the

16   government cites here can be reconciled with *Regents* and even

17   with the prior precedent within the circuit.

18         Unless the -- unless Your Honor has questions, I'll

19   move on to 8 U.S.C. 1252(f)(1).

20         THE COURT:  Just the only other thing I was expecting

21   you to say, which you didn't, is that Mr. Gutierrez was a

22   United States citizen.

23         MS. BERNWANGER:  That's correct.

24         THE COURT:  Yup.  You can go ahead.

25         MS. BERNWANGER:  1252 -- 8 U.S.C. 1252(f)(1) is not a

jurisdictional bar per se, but it does cover a good type of

relief that courts can order in certain cases.

However, 1252(f)(1) applies only to a small subset of

statutory -- excuse me -- statutes within the INA.  This case

does not challenge any of them.  Plaintiffs do not seek to

enjoin a covered statute.  Plaintiffs' claims focus

on 8 U.S.C. 1357.  It is not a covered provision.  1252(f)(1)

generally covers 8 U.S.C. 1221 to 1232, and the Gonzalez case

in the Ninth Circuit, which we cite in our papers, is on all

fours here.

There the Ninth Circuit made clear that that case

concerned 8 U.S.C. 1357 as well, a different provision of the

statute, but concerned 8 U.S.C. 1357.  The Ninth Circuit

affirmed that class-wide relief was available

because 1252(f)(1) does not cover 1357.  It cannot be

stretched beyond the specific language that Congress wrote in

that statute, and the court also rejected the argument that

the government resurrects here, which is that it can't be

untangled from the other immigration enforcement statutes or

that the same conduct in 1357 is implied in other statutes.

The government raises that argument here, and the

Ninth Circuit rejected it.

Congress was clear about which statutes are covered

by this bar on injunctive relief, and Congress chose not to

include 1357 in that subset of statutes.  Even if there were

1    some collateral effect on a covered statute, which the

2    government has not seriously advanced with any explanation, it

3    wouldn't matter because the Supreme Court and the

4    Ninth Circuit has said even if there's some collateral effect

5    on a covered statute, as long as the injunction does not act

6    upon the statute that is listed in 1252(f)(1), class-wide

7    relief may ensue.

8         And here the only statutes the government cites in

9    its papers is a statute covering arrests with warrants, which

10   are explicitly excluded from plaintiffs' claims, and a statute

11   covering the execution and detention upon removal orders,

12   which also are not at issue here, and there's no credible

13   argument that seeking to enforce and ensure accountability

14   with a statute that covers only arrests without a warrant that

15   falls outside of the covered provision.  There's no credible

16   argument that it impacts these covered statutes.

17        Thank you, Your Honor.

18        THE COURT:  All right.  The defense.

19        MR. RAMNITZ:  The Court lacks jurisdiction pursuant

20   to 1252(b)(9) and (a)(5).  This is because those statutes

21   together require exclusive demand of Court of Appeal over

22   individuals who challenge parts of their removal proceedings.

23   This is what *Jennings* describes.  So we have a disagreement

24   over what *Jennings* meant, but I think *Jennings* is pretty clear

25   that it talked about the long detention.  That was the issue

1    in that case.  But the reason why they addressed it in

2    District Court, was permissible to address in District Court,

3    is because it was arising at removal proceedings, but it was

4    something that evaded review, as Justice Alito says in that

5    case.  He says that --

6            THE COURT:  Let's talk about *Regents*, though, truly,

7    is that --

8            MR. RAMNITZ:  I think -- sorry.

9            THE COURT:  Go ahead.

10           Doesn't that seem to address this issue more --

11           MR. RAMNITZ:  I think if -- I don't see how *Regents*

12    is even applicable.  They said there's ambiguity in *Jennings*.

13    *Regents* addressed that, but that's a pretty strange way for

14    *Regents* to do that without even acknowledging ambiguity in

15    *Jennings*.  They don't purport to address any ambiguity in

16    *Jennings*.  I think they're really trying to read more out of

17    *Regents* than is actually there.  It doesn't say that *Jennings*

18    was incorrect or left something open that we're going to

19    address.  You'd expect to see language like that if *Regents*

20    was really purporting to redefine what *Jennings* meant.

21           THE COURT:  Doesn't it say, I mean, 1252(b)(9) is

22    certainly not a bar where the parties are not challenging any

23    removal proceedings?

24           MR. RAMNITZ:  That is correct.  It does say that.  It

25    doesn't go on to analyze *Jennings* any further --

1          THE COURT:  They don't have to.  It's the Supreme

2    Court.  They can say what they say.  And then we go, yes, sir,

3    we're going to do that.

4          MR. RAMNITZ:  Well, if they're alleging any ambiguity

5    and putting it to rest, you'd expect to see that conversation.

6    And so what we're saying *Jennings* says and that *Regents* does

7    not challenge -- so *Regents* doesn't challenge or impact what

8    *Jennings* says in this regard.  *Jennings* says if it evades

9    review, like prolonged detention -- because by the time it got

10   to the Court of Appeals, someone could be released from

11   detention.  So that's a review in District Court, otherwise

12   the only things that are not reviewable in the Court of

13   Appeals for someone making a claim that comes out of removal

14   proceedings are something that is completely tangential, has

15   nothing to do with removal proceedings.  And these are these

16   simple torts, like assault from a guard says, it says, being

17   transported from one detention facility to the other where

18   you're hit by a car.  Obviously, this could happen to anybody.

19   Those aren't anything to do with the removal process.

20         So that's what the majority is saying that those

21   types of claims that aren't raised in PFRs but, otherwise, if

22   you have someone challenging part of the removal process,

23   this -- 1252 is very clear.

24         THE COURT:  Yeah.  Except what is a removal process?

25   I mean, there wasn't any removal processes.  The evidence

1    suggests that Border Patrol agents didn't even know -- they

2    weren't looking for anyone in particular.  They were looking

3    for people with brown skin, who seem to be in areas that they

4    thought may give rise to where people who are undocumented

5    are.  So what removal proceedings are we talking about?  And

6    some of them, Mr. Gutierrez in particular, is a United States

7    citizen.

8         MR. RAMNITZ:  We're talking about removal proceedings

9    that represented plaintiffs Cisneros and Esquivel are in right

10    now.

11         THE COURT:  So what you're saying is it's the

12    government's ability to determine jurisdiction because if

13    someone is going to make a claim, all of a sudden you can slap

14    on removal proceedings and all of a sudden the Court is

15    divested of jurisdiction for an unlawful stop when there

16    wasn't any removal proceedings at this time?

17         MR. RAMNITZ:  It's not the government.  This is how

18    Congress set it up.

19         THE COURT:  Well, I don't think so.  I think that's

20    what you're saying, but when -- I mean, when the Supreme Court

21    says "certainly not a bar," I don't know how to interpret that

22    any way except it's certainly not a bar.

23         MR. RAMNITZ:  It's certainly not a bar for those

24    types of claims evade review.  And we cited --

25         THE COURT:  It doesn't say that.  It doesn't say

1 | evade review.

2 |       MR. RAMNITZ:  That's why they addressed prolonged

3 | detention.  It does say that that's the kind of claim that

4 | evades review.

5 |       THE COURT:  That was the conduct at issue, right?

6 |       MR. RAMNITZ:  Yes.

7 |       THE COURT:  You're saying, then, if you have overt

8 | detention, which clearly could be addressed with a removal

9 | proceeding, that goes to the District Court, but if you have

10 | an issue of a detention that was not authorized by law that

11 | gives rise -- but, you know, you don't get to raise a

12 | suppression motion in -- in nationality proceedings, right?

13 | So if you are stopped improperly, that does not give rise to a

14 | defense in the removal action.  You can't say, "Hey, you

15 | couldn't stop me."  So -- which is what you could do in a

16 | criminal action, but in that situation, you can't.

17 |       So why does that make sense that an ALJ is going

18 | to -- or an immigration judge is going to determine a Fourth

19 | Amendment issue has nothing to do with the proceedings itself?

20 |       MR. RAMNITZ:  Your Honor, respectfully, that's

21 | incorrect.

22 |       THE COURT:  Which part?

23 |       MR. RAMNITZ:  Immigration judges can address Fourth

24 | Amendment violations.

25 |       THE COURT:  As a defense to the removal proceedings?

1          MR. RAMNITZ:  Yes.

2          THE COURT:  Or are we just talking about right to

3     counsel or searches?

4          MR. RAMNITZ:  As to removal proceedings.

5          THE COURT:  What?

6          MR. RAMNITZ:  As to a removal proceeding.

7          THE COURT:  So that means because they can, that the

8     Court is divested of jurisdiction because certainly not a bar.

9     What does that mean, if it doesn't mean that the District

10    Court has jurisdiction in those situations that do not relate

11    to the removal proceeding?  What does that mean then?

12         MR. RAMNITZ:  It means what *Jennings* says it means.

13         THE COURT:  It means in only overt detention.

14    Because those people who sit up in Washington, they're pretty

15    smart, and I think if they meant only in detention, only in

16    overdetention, they would have said that.

17         MR. RAMNITZ:  Not only that.  They listen to other

18    examples that also would not be in a PFR.  Those are those

19    tort claims that have nothing to do with removal proceedings.

20         THE COURT:  How does this have anything to do with

21    the removal proceeding?  Are you saying if they demonstrate

22    that they were stopped improperly on the street or in the car,

23    that the removal proceeding's going to be --

24         MR. RAMNITZ:  Yes.

25         THE COURT:  -- dismissed?

1          MR. RAMNITZ:  Yes.

2          THE COURT:  And yet what about the people who have

3     already been deported?  They can just raise that, and you're

4     going to dismiss them?

5          MR. RAMNITZ:  That's not part of this class.  It's

6     not subject of disciplinary injunction.

7          THE COURT:  Right.  I mean, I'm going far afield, but

8     the fact that it can be addressed, according to you, does not

9     mean that the Court doesn't have jurisdiction.

10          MR. RAMNITZ:  I would say respectfully, not according

11     to me.  We cited precedence, Ninth Circuit precedence, *U.S.*

12     *versus Sanchez*, where someone brought a Fourth Amendment.  I

13     mean, I litigated that case.  And I lost that case.  And it is

14     because they were able to prove to the immigration judge that

15     they had a race-based stop.  And that, as the Ninth Circuit

16     suggested, could terminate their removal proceedings.  And

17     that's what they said in the Second Circuit in *Rajah* as well.

18     They said if you can prove a race-based Fourth Amendment

19     violation, then that can resolve in termination of your

20     removal proceedings.

21          THE COURT:  Okay.  Does that mean the Court --

22     District Court doesn't have jurisdiction?

23          And when I read what the Supreme Court says,

24     "certainly not a bar."  I'm troubled by you saying it's just

25     the examples that they put forth would be the reason that it's

1   not a bar, too.

2          MR. RAMNITZ:  I think --

3          THE COURT:  Where do you -- there's not a holding

4   that says that, right?  It says what their holding is, is if

5   it's unrelated to the removal proceeding, right?

6          MR. RAMNITZ:  I think *Jennings* is really where you

7   need to look for what defines --

8          THE COURT:  I'm sure you do.  But *Regents* says

9   "certainly not a bar," and I'm looking at that.  I guess I

10  would -- I'd be more happy to hear your comments other than,

11  "Well, they give us some examples, so that" -- "those are" --

12  "that's the" -- "that's the entirety of the Court's

13  jurisdiction," is those limited circumstances without them

14  ever saying that.  So I'm wondering where that comes from.

15  Just because *Jennings*?

16         MR. RAMNITZ:  1252(a)(5) says it should be

17  exclusively in the Courts of Appeals.  So when you accompany

18  the -- couple that with *Jennings*, it says, "Here is what

19  should be in a PFR."  And that statute says the PFRs are

20  exclusively in the Courts of Appeals; that that is what makes

21  some of these claims have to be in the Courts of Appeals.

22         So, Ms. Martinez, for example, perhaps this is the

23  right forum.  But this is not the proper forum for some of

24  these plaintiffs like Morales or like Cisneros and Esquivel.

25  Congress has said their claims are elsewhere in the Court of

1  Appeals.

2        And that's -- *J.E.F.M.* also explains that while

3  plaintiffs may prefer a class-wide remedy in the District

4  Court, that's just not how Congress set it up.

5        THE COURT:  All right.  Anything else?

6        MR. RAMNITZ:  And we think 1252(f)(1) ties into that

7  as well.  We acknowledge there's lots of precedent out there

8  that says that it -- and chapter 4, subchapter 4, has to

9  impact something in that.

10        Well, we looked at *Hanlon, Gonzalez*, and we say that

11  there's language in that case, and assistant general's being

12  quoted in that case, it says that things that impact how

13  chapter 4 -- the enforcement operations under chapter 4.  So

14  it's -- we say it's not -- it's a credible argument to say

15  that if you say -- if you sometimes -- if you curb the arrest

16  and enforcement of immigration violations, it's certainly

17  impacting covered provisions in chapter 4 that are about

18  arrest-and-removal proceedings for immigration violations.

19        THE COURT:  Okay.

20        MR. RAMNITZ:  That would be the end of my argument.

21        THE COURT:  All right.

22        Any further comments on that topic, Ms. Bernwanger?

23        MS. BERNWANGER:  Very briefly, Your Honor, if I may.

24        Your Honor, I'd just very briefly like to address the

25  government's argument that there's some distinction between

Ms. Aguilera Martinez's claims here and her co-plaintiffs'

claims.    All of the -- all of the proposed class

representative plaintiffs are here seeking an injunction on

future stops and arrests in violation of the constitution

and 1357.

As the -- as Your Honor is well aware, removal

proceedings cannot provide the remedy that the plaintiffs seek

here.  For that reason, they do fall into this category in

*Jennings* that their claims would be effectively unreviewable.

Removal proceedings, as all the cases the government

cite make clear, can result either in a removal order or a

termination.  Plaintiffs here do not challenge the

removability, they do not challenge the issuance of removal

orders, they do not ask this Court to opine on what evidence

can or should be issued in removal proceedings.  And this is

what the Court in *Medina* addressed looking at Ninth Circuit

precedent.  There, because plaintiffs' constitutional claims

related to actions before removal proceedings were filed and

don't seek to disrupt the outcome of those proceedings,

1252(b)(9) did not apply.

The same is true here.  And I'll also just note that

the *Regents* case is not a prolonged detention case.  The

*Regents* case was a challenge to the widespread termination of

the Deferred Action For Childhood Arrivals program, which

conferred protection from removal on a huge number of young

1  people.  The Supreme Court, as Your Honor has noted, found

2  that because -- although challenging a broad policy that may

3  have resulted in some removability, because the case didn't

4  challenge removal proceedings, (b)(9) was not a bar.

5          THE COURT:  All right.  Thank you.

6          MS. BERNWANGER:  Thank you.

7          THE COURT:  Mr. Ramnitz, any further comments?

8          I will say, she has probably better redirected us;

9  and that is, to future conduct, not the past.  Do you disagree

10  that future conduct could be raised in removal proceedings?  I

11  mean, that doesn't even seem --

12          MR. RAMNITZ:  Well --

13          THE COURT:  -- to make sense.

14          MR. RAMNITZ:  I guess a good citation we have in our

15  brief to *Rajah versus Mukasey*.  So where there's this idea

16  that there's no way to challenge a broader policy, for

17  example, instead of these individualized cases.  In *Rajah*

18  *versus Mukasey* -- the reason why we cited that was for

19  multiple reasons.  But for one reason is because, in that

20  case, there was multiple PFRs in that case.  And they claim

21  that there was a policy of Fourth Amendment violations, and

22  they requested the court hear their cases in tandem.

23          So there is a way, even in petitions for review,

24  which Congress has mandated for some of these plaintiffs in

25  this case, that they can challenge a policy in that way.  In

1    that case, it was NSEERS, and they were claiming there was

2    religious and racial motivations for the NSEERS program

3    because it targeted predominantly Muslim countries.  And they,

4    in tandem, had four PFRs together in the Court of Appeals on

5    the Second Circuit to say that every time we were integrated,

6    the same thing happened, our rights were violated in

7    the Fourth Amendment.

8          And so that's what we would respond with, saying the

9    Court of Appeals is mandated to the proper forum for some of

10    these plaintiffs.  They don't belong here.  And that that's

11    also okay because *Rajah* says even if they want to make this

12    broader policy argument, that's what they did in *Rajah*.

13          THE COURT:  Broader policy isn't the same thing as

14    being stopped in the future.  You are picked up in this sweep

15    in January and then released.  You have a pending removal

16    proceeding.  And then again, you're -- the risk is and the

17    concern is that you're going to be stopped again without

18    compliance with what the Constitution requires.

19          How do you raise that issue in your removal

20    proceeding?

21          MR. RAMNITZ:  I suppose that is also what *Rajah* does.

22    It's saying that there is this practice going on.  Going

23    forward, they are not -- that all these interrogations are

24    ongoing, that they are always violating the Fourth Amendment

25    rights of these people that come in for these registration

1   requirements under NSEERS.

2          THE COURT:  That has to be raised after you're

3   arrested again, right, or your -- using your words, contacted

4   again.

5          MR. RAMNITZ:  And to stop the NSEERS program.

6          THE COURT:  Right.  And here we're talking about

7   trying to require compliance with the Constitution that says

8   you just can't walk up to people with brown skin and say,

9   "Give me your papers," right?

10         MR. RAMNITZ:  Well, it's the same.  They are trying

11  to get plaintiffs together to say that, here, there's this

12  practice that's happening, and -- but we want to be in

13  District Court here, and --

14         THE COURT:  We're also talking about people that have

15  never been contacted yet by the Border Patrol, right, people

16  in this district?

17         MR. RAMNITZ:  But purposes for the preliminary

18  injunction.  But ongoing harm, jurisdictionally, we're saying

19  that some of these plaintiffs just don't belong here.  That's

20  what Congress has said.

21         THE COURT:  How does that give rise to a

22  jurisdictional issue as to, though, those who have not yet

23  been contacted by Border Patrol?

24         MR. RAMNITZ:  Well, it just says that they have to

25  redefine the class.  It's just it -- what their claims is --

1          THE COURT:  We're talking about jurisdiction, not

2  class definition.

3          MR. RAMNITZ:  Yes.  Jurisdiction does prevent the way

4  they're pleading the case, I would say.

5          THE COURT:  In what way?

6          MR. RAMNITZ:  That they have these plaintiffs, and

7  they want future plaintiffs like Ms. --

8          THE COURT:  We're talking about jurisdiction, not

9  class definition or class --

10          MR. RAMNITZ:  Right.

11          THE COURT:  -- at this point.  So as to the

12  jurisdictional question, we're talking about people who don't

13  have removal proceedings but who are at risk of being subject

14  to these unconstitutional practices.

15          MR. RAMNITZ:  Well, if --

16          THE COURT:  Where's the jurisdiction there?  Is it --

17          MR. RAMNITZ:  If they are placed in removal

18  proceedings they also have to go into the Court of Appeals.

19          THE COURT:  So you're saying they have to be

20  contacted by Border Patrol before they can seek this

21  class-wide action.  But that doesn't speak to my jurisdiction

22  here, right, because do I have jurisdiction about those

23  people?  Let's say we've got whatever plaintiffs you're happy

24  with, do I have jurisdiction?

25          MR. RAMNITZ:  Perhaps you do.  But you certainly

1    don't have jurisdiction over the two representative plaintiffs

2    then.

3            THE COURT:  But then you're saying if, in fact, these

4    people are contacted, then all of a sudden I lose jurisdiction

5    because now they have to raise that in the removal proceeding.

6            MR. RAMNITZ:  I think we can see how jurisdiction is

7    a problem then, because we have people in the class who don't

8    belong in a District Court.  In the future, maybe there will

9    be other people that belong here, but that's just the problem

10   with having this be a class action as currently described in

11   this court.  Because there'll be people that the Court has no

12   jurisdiction over.  There currently is.

13           THE COURT:  Maybe, but the question of jurisdiction

14   isn't that fluid, right?

15           MR. RAMNITZ:  I'm not saying it's fluid.  I'm just

16   saying that --

17           THE COURT:  But I think you are because you're saying

18   that -- I'm talking about these people who have not been

19   contacted but who are at risk of the contact, inconsistent

20   with the law, inconsistent with the Constitution.  You're

21   saying I might have jurisdiction over those people, but if, in

22   fact, then they ever are contacted, then I lose jurisdiction?

23           MR. RAMNITZ:  I'm saying you can -- let's assume

24   there is jurisdiction over them going forward.

25           THE COURT:  Okay.

1          MR. RAMNITZ:  There's still a problem with

2    jurisdiction for the two representative plaintiffs here.

3          THE COURT:  All right.  Anything else?

4          MR. RAMNITZ:  No, Your Honor.

5          THE COURT:  Okay.  Next topic, unless you have

6    additional comments on that.

7          MS. BERNWANGER:  No, Your Honor.

8          THE COURT:  Okay.

9          MS. CHO:  Good afternoon, Your Honor.  Minju Cho for

10   the plaintiffs.

11         This Court can grant the motion for a preliminary

12   injunction regardless of class certification because of

13   plaintiff United Farm Workers' membership throughout this

14   district.  But I would be happy to address any questions about

15   provisional class certification that Your Honor may have.

16         THE COURT:  Maybe we should talk about your class

17   definitions.

18         MS. CHO:  Yes, Your Honor.

19         THE COURT:  Let's go with that.

20         MS. CHO:  The government argues that the classes here

21   are fail-safe or overbroad.  They are incorrect on both

22   counts.  A fail-safe class is one that is defined so narrowly

23   that it precludes membership unless the liability of the

24   defendant is established.  In other words, you cannot

25   ascertain class membership before you determine the

1  defendant's question of liability.

2        Here, the questions driving class membership are

3  purely factual.  Was someone stopped or arrested by Border

4  Patrol in the Eastern District since January 6th of this year?

5  Once you answer that question, you can ascertain the class,

6  and then this Court can address the legal merits.

7        Does Border Patrol have a policy of stopping and

8  arresting individuals without an assessment; that is, based on

9  their appearance?

10        If the answer is "yes," then the policy is unlawful.

11 If the answer is "no," then the plaintiffs in the class are

12 bound by that adverse judgment.

13        Thus, this case is just like this Court's case in

14 *Willis versus Enterprise Drilling Fluids*, from 2015.

15        There a class of plaintiffs alleged that the

16 defendants had a policy and practice of failing to pay the

17 wages due.  This Court held that that class was not fail-safe

18 because:  "If the plaintiffs succeed in establishing the

19 existence of unlawful policies or practices common to all the

20 class members, the Court would not be required to determine

21 the legal merits of each class member's claims."

22        The class was populated by people that were not paid

23 their wages and the policy challenged was defendant's alleged

24 policy of not paying wages.  Thus, the question of whether

25 such a policy existed was a question of fact, and whether that

1  policy was lawful was the question of law.

2          But *Willis* aside, the Ninth Circuit has also held

3  that government could have a policy of determining probable

4  cause without an individualized assessment and that policy

5  could be lawful.

6          So, for example, if the government had a procedure to

7  determine reasonable suspicion or probable cause other than by

8  an individualized assessment, and the Court found that that

9  procedure was reliable enough for reasonable suspicion and

10 probable cause, then plaintiffs' claims could fail.

11         This was what the Ninth Circuit clarified in -- or

12 held in *Gonzalez*.  In *Gonzalez vs. ICE,* a Ninth Circuit case

13 from 2020, the plaintiffs there argued that ICE's policy of

14 using electronic database checks to issue immigration

15 detainers were an insufficient basis for probable cause to

16 arrest.

17         The Ninth Circuit held that if the plaintiffs could

18 show that the databases that ICE was relying on for their

19 checks were unreliable, then such a policy for probable cause

20 checks could violate the Fourth Amendment.  But they remanded

21 to the District Court for fact finding on the reliability of

22 the databases.

23         This is because they held that if the databases on

24 which ICE relied for immigration detainers were reliable, then

25 that could be sufficient to satisfy probable cause even

1   without any individualized assessment.

2          So there you would populate the class by people who

3   were issued detainers based on electronic checks alone.  And

4   if the databases were sufficiently reliable, then the Court

5   could issue an adverse judgment against them under their

6   Fourth Amendment claims, and the class would not be fail-safe.

7   That is exactly what we have here as well --

8          THE COURT:  Okay.

9          MS. CHO:  -- as to overbreadth and the warrantless

10  arrest class.  The defendants first speculate that the class

11  may include uninjuried class members.  But as Your Honor

12  noted, they do not contest any of the facts in the record, nor

13  do they identify any allegedly uninjuried class members.

14         But second, the presence of uninjuried class members

15  is permissible in a 23(b)(2) action that seeks solely

16  injunctive or declaratory relief and does not seek damages.

17  That is Ninth Circuit en banc law from *Olean Grocery*

18  *Cooperative vs. Bumble Bee Foods*.  It is permissible because a

19  (b)(2) class that seeks injunctive relief only seeks to enjoin

20  unlawful action.  Therefore, there's no unjust windfall to an

21  injured class member the way there might be in a damages case.

22         The government cites *Gonzales vs. Comcast* from this

23  district, but that case is irrelevant.  The evidence there

24  showed that the class definition included people who were:

25  "Never injured by defendant's conduct" and they sought

1 | certification under both (b)(2) and (b)(3), seeking damages
2 | under both.

3 |     That is not the case here.  As plaintiffs have
4 | written in our papers, the class may also -- the Court,
5 | rather, excuse me, may cure if the class is overbroad.  And
6 | we've proposed some language to do so.  But Your Honor, for
7 | the reasons that I've explained, plaintiffs do stand on our
8 | class definitions as we've proposed them.  And I'd be happy to
9 | answer any questions that Your Honor may have.

10 |     THE COURT:  All right.  Thank you.  I don't have any
11 | at this time.

12 |     MS. CHO:  Thank you.

13 |     THE COURT:  Comments related to what we've been
14 | talking about, Ms. Kuchins?

15 |     MS. KUCHINS:  Good afternoon, Your Honor.  May it
16 | please the Court.  Olga Kuchins for the government.

17 |     Just to address plaintiffs' points.  First of all,
18 | plaintiffs lack standing to seek injunctive relief here.  And
19 | the reason that they do lack standing is, as my co-counsel has
20 | expressed, the muster and the trainings that Border Patrol has
21 | begun to provide really make their -- the future injury
22 | speculative.

23 |     Moreover, the class is fail-safe as defined, which is
24 | not permissible.  The defendants are aware of this Court's
25 | case law and this Court's skeptical view of classes being

1  fail-safe.  But those cases are distinguishable.

2        There, it was -- it dealt with wage-and-hour issues

3  which were much more easily ascertainable than what is at

4  stake here.  Here we're talking about whether or not Border

5  Patrol had reasonable suspicion to stop and arrest somebody.

6  The concept of reasonable suspicion, as is probable cause, is

7  very fluid.  It's very fact-specific and facts-intensive.  And

8  I understand Your Honor tends -- to the extent that Your Honor

9  tends to agree with plaintiff that Border Patrol does have

10 policy or practice of violating the law in the manner that the

11 plaintiffs have alleged, nonetheless, the muster moots any

12 future injury.

13       And moreover, the -- whether or not Border Patrol has

14 a policy is -- a very rigorous standard should be applied to

15 that.  And the evidence that plaintiffs have submitted here do

16 not meet the significant proof standard that the Supreme Court

17 has discussed in the *Wal-Mart* case.  And there, the issue was

18 discrimination, but it was discrimination/discriminatory

19 decisions based on individual managers of Walmart stores.  And

20 here it is plaintiffs' burden to prove up that Border Patrol

21 has a policy and practice of violating the law.  And they

22 haven't done so.

23       They cite *Gonzales; they cite Ortega Melendres*.  But

24 in those cases there's significant evidence and there was a

25 myriad of evidence.  In the *Ortega Melendez*, for instance,

1    there were statements from Sheriff Arpaio to the extent you

2    know, "Let's go get those brown people."  And there was also,

3    he kept newspaper clippings as to some of this racial, you

4    know, language.

5         And also defendants in that case actually conceded

6    and acknowledged and authorized a practice of stopping

7    individuals based on reasonable suspicion that they were in

8    the country unlawfully.  Here there is no such proof.

9         And also, in terms of --

10   THE COURT:  Let me stop you.  Can I just interrupt

11   you and ask what you mean by that, that there's no proof?

12   Because they did submit anecdotal evidence what they said

13   happened.  There is evidence about what the BOP posted about

14   what happened.  And I guess what you're saying is whether

15   there's an actual policy or not certainly is something that

16   discovery would yield.  But based upon the showing here, what

17   do you see as defective in the evidence presented thus far?

18   MS. KUCHINS:  So it's plaintiffs' burden to submit

19   significant proof.  And what we have is just case law and --

20   that we can pull from.

21        In other cases, for instance the *Gonzalez* case versus

22   ICE that plaintiffs rely on there, there was concrete evidence

23   that 70 percent of ICE detainers that were issued relied on

24   databases for probable cause determinations.  That formed the

25   court's finding that there was a policy in place.  And --

1     THE COURT:  But here don't we have people saying over

2 and over and over --

3     MS. KUCHINS:  That's true, Your Honor.

4     THE COURT:  -- "I wasn't doing anything.  They just

5 came up, got me," or whatever, but --

6     MS. KUCHINS:  Those are allegations that are in the

7 record --

8     THE COURT:  It's not just allegations.  It's sworn

9 declarations.  It's evidence, right?

10     The fact that -- I don't have an admission from

11 Border Patrol, "Yes, we did it."  But the plaintiffs don't

12 have access to that, so I don't know how they can present it.

13     But what they have presented is these people who

14 said, "This is what happened to me," and there's a commonality

15 in what they've said.  And that is the evidence, right?

16     So I guess I'm wondering what you think about that

17 evidence is insufficient to meet the standard set forth by

18 *Wal-mart vs. Dukes*.

19     MS. KUCHINS:  We believe it's insufficient because it

20 is allegations, right.  And right now --

21     THE COURT:  Sworn testimony, that's right.  It's

22 sworn testimony.  I mean, right?  You've seen the declarations

23 in which they said, "This is what happened.  I swear under

24 penalty of perjury that this is what happened."  That's

25 evidence.  That's not allegations --

1          MS. KUCHINS:  I have.

2          THE COURT:   -- those are evidence.

3          Now, that doesn't mean that you may come back and

4   depose them and they will completely roll over.  I don't know

5   that.  But what I know right now is, that's the only evidence

6   I have, right?

7          MS. KUCHINS:  So what else could plaintiffs provide,

8   I don't know.  But the government's position is what is in the

9   record right now is insufficient.

10         THE COURT:  Right.  I'm trying to ask you, why do you

11  think that's insufficient?  What is wrong with the evidence

12  presented here that you think doesn't meet the *Wal-mart*

13  standard?

14         MS. KUCHINS:  We don't think it's enough.  We

15  don't --

16         THE COURT:  In number, or in quality, what are we

17  talking about?

18         MS. KUCHINS:  We don't think -- our position is that

19  those are just disparate examples of disparate and individual

20  Border Patrol agents conducting operations in the way that

21  that encounter proceeded and by -- between an individual

22  person by an individual Border Patrol agent.

23         We don't believe that the evidence that they have

24  provided meets the high burden of significant proof that the

25  *Walmart* case requests -- requires.

1          THE COURT:  I am wondering.  I mean, so what you're

2    saying is, if they had said Border Patrol Agent A did this to

3    me, B did this to this other person, C, D, E, F, up to, you

4    know, I don't know, quadruple Z, all these officers did this,

5    we would be talking about something else.  We would be talking

6    about maybe that is sufficient.

7          I guess my question to you is, who has that

8    information?  It's the defense, right?  The plaintiffs only

9    could report on what they saw what happened to them, but it's

10   not like they received a report afterward that said, Officer

11   James whatever said this to you, did this to you; and this was

12   a different officer over here.  They weren't given that kind

13   of information.  So all they could do is provide what they

14   knew to happen to them.

15         And then I would have thought, at least in my

16   experience with class certification motions, the defense would

17   come up and go, Look, you know, here's these 78 people we're

18   talking about.  When you look at this, there was one guy.  One

19   guy did this -- or there was two guys or maybe there was three

20   guys and they came up in this situation in which that's why

21   they did it.  But I didn't get that.

22         So what I have to deal with is what I did get, and

23   what I did get is all these situations in which similar

24   conduct seems to be happening and there's no showing it's not

25   by everyone who was involved in the operation, right?  I mean,

1    how else can I deal with that?  Because you're not going to

2    give them access to that information to file this motion.  So

3    they can only provide the anecdotal evidence of what they

4    have.

5         And I don't think *Walmart* said that a plaintiff has

6    to somehow get the defense's information that they are not

7    willing to share outside of discovery in order to do this.  I

8    mean, discovery hasn't even opened in this case.  So I'm just

9    trying to figure out your interpretation of what is wrong with

10   this evidence related to the Walmart standard.

11        MS. KUCHINS:  Your Honor, with all due respect, it is

12   plaintiffs' burden, and I'm not going to stand here and give

13   plaintiffs ideas for what they can provide.  However --

14        THE COURT:  I'm not saying that either.

15        What I'm saying is you said the evidence is

16   insufficient.  That's your argument.  And I'm saying, how?

17        MS. KUCHINS:  It is insufficient because it's just 12

18   disparate examples of what had occurred over a two-day

19   operation.  There's -- this does not show the two-day

20   operation.  Two-day disparate conduct does not a practice

21   make.

22        In the *Walmart* case and in other cases, there were

23   for instance, expert opinions, you know, in the *Walmart* case.

24   There was a so-called expert that opined on biases across the

25   culture of Walmart.

1    So here we just have 12 examples of disparate

2  encounters.  Reasonable suspicion is highly, highly

3  particularized.  And defendants -- excuse me, plaintiffs' own

4  declarations really show that they -- they show that there are

5  meaningful differences.

6    THE COURT:  What are those meaningful differences?

7    MS. KUCHINS:  The meaningful differences of whether

8  or not somebody had shown an ID to a Border Patrol.

9    THE COURT:  When you say "person contacted" --

10    MS. KUCHINS:  Correct.  And so the reason that's

11  meaningful is because that really could go to flight risk

12  assessment, right?  If a Border Patrol officer is able to

13  confirm someone's identity and then, you know, go to their

14  vehicle, pull up information about them; there we have it.

15    Another example is plaintiffs themselves alleged some

16  of them were stopped because they were told they had committed

17  a crime.  Others were stopped because -- you know, because

18  they -- they were here unlawfully.  And so while all these

19  differences may seem minute, in a vacuum, we must not forget

20  that we're talking about reasonable suspicion here.  And that

21  is the a-very-fluid concept.

22    And what we have here is plaintiffs' allegations and

23  plaintiffs' declarations, but we don't know what happened.  We

24  don't know.  So how can we certify a class?  How can we know

25  whether the classes are common and typical?

1      In terms of typicality, I will echo my co-counsel's

2    argument, you know, there are two plaintiffs here that

3    plaintiffs themselves have said have -- you know, have --

4    notices to appear have been issued to them.  That means that

5    they do have an avenue to seek relief in the petition for

6    review in the Court of Appeals.

7         THE COURT:  Can I stop you?  When you said that two

8    days of conduct doesn't establish a pattern of practice,

9    what's your authority for that?  Because my recollection of

10   the evidence law is that, in fact, you can have much less than

11   two days and establish a pattern of practice, right?  It's

12   kind of fact-driven.  But are you finding there's some

13   authority out there that says an operation like that, if it

14   lasts for two days, is not a policy or practice, but if it

15   lasts for five days it is?  Because I didn't see that

16   authority.  Is there something out there that I'm missing?

17        MS. KUCHINS:  Your Honor, I'm not able to provide

18   that authority for you right now, but if you would like --

19        THE COURT:  Let me ask, though, do you know of that

20   authority or are you just assuming?

21        MS. KUCHINS:  I don't know of that authority.

22        THE COURT:  Okay.

23        Okay.  Go ahead.

24        MS. KUCHINS:  And I think just generally, our

25   arguments about why plaintiffs have not met their burden to

1  show class certification really hinge on our arguments that

2  this was a two-day encounter with Border Patrol agents that

3  have the ability to enforce the law.  Plaintiffs present

4  evidence that another enforcement operation has happened.

5  Enforcement operations are going to continue, and they are

6  going to happen.  So the fact that they provided evidence that

7  another one occurred does not mean that it was unlawful.  We

8  don't know that yet.

9          And so it's really, really -- this -- the fact that

10 we're talking about reasonable suspicion and probable cause

11 really defeats class certification.

12         THE COURT:  Well, it could, right?  It definitely

13 could.  But if there's a practice of not formulating that

14 suspicion in advance of making contact, then aren't those the

15 questions that we have to engage in for purposes of the common

16 questions?

17         MS. KUCHINS:  Yes.  And plaintiffs do have a higher

18 burden on this.  This is not just, you know -- we have to --

19 motion to dismiss stage where we have to take their

20 allegations as facts.

21         THE COURT:  Right.  I just have to hear evidence,

22 right?

23         MS. KUCHINS:  Uh, right, but they have to show

24 affirmative proof.  And, well, our position is that they

25 haven't proven that a two-day operation a policy make.

1      THE COURT:  Okay.

2      MS. KUCHINS:  That is it, Your Honor.

3      THE COURT:  All right.  Thank you.

4      MS. KUCHINS:  Thank you.

5      THE COURT:  Other comments on that, Ms. Cho?

6      MS. CHO:  Yes, Your Honor.  Thank you.

7      A District Court affirmed by the Ninth Circuit held

8  that a policy, practice, or custom may be inferred from

9  widespread practices or evidence of repeated constitutional

10  violations.  That's *Parsons vs. Ryan*.  And that's exactly what

11  plaintiffs have put into the record here.

12      Plaintiffs challenge a system-wide practice giving

13  rise to shared legal issues challenged under the Fourth

14  Amendment and related federal law.  Challenge -- plaintiffs

15  challenge defendants uniform pattern of practice amounting to

16  a policy and stopping and arresting individuals based on their

17  appearance and challenge that policy as unlawful not any

18  individual stop or arrest.

19      And because the challenge is to the adequacy of

20  defendants procedures for determining reasonable suspicion and

21  probable cause and not those reasonable suspicion or probable

22  cause determinations themselves for purposes of class

23  certification, this case is exactly like *Gonzalez vs. ICE*, a

24  case which also raised Fourth Amendment claims challenging

25  government procedures, which the Ninth Circuit held were

1    plainly suitable to classified treatment.  In that case,

2    because the plaintiffs challenged a system-wide practice and

3    not individual probable cause determinations, the court was

4    clear that despite divergent factual predicates, shared legal

5    issues gave rise to class-wide claims.

6            In that case, the named plaintiff was himself a U.S.

7    citizen, and despite the government's arguments that because

8    of his citizenship there was no commonality, there was no

9    typicality, there was no adequacy, the Ninth Circuit ejected

10   every one of those arguments.

11           The government argues because there was more evidence

12   in *Gonzalez*, this case does not rise to that showing that the

13   Ninth Circuit found sufficient.  But *Gonzalez* was a case that

14   the Ninth Circuit heard after a full trial, after discovery

15   and evidence, after the weighing of the evidence of the

16   factfinder and after the issuing a permanent injunction.  That

17   is not the standard that plaintiffs have to meet here.

18           As to the standing arguments and fail-safe arguments,

19   I believe my co-counsel and I have sufficiently addressed

20   those -- those arguments.

21           THE COURT:  All right.

22           MS. CHO:  Thank you, Your Honor.

23           THE COURT:  Anything else for the plaintiffs then?

24           Any other arguments, topics you want to address?

25           MR. MUZZIO:  Nothing further, Your Honor.

1          THE COURT:  For the defense, you've been kind of

2     railroaded into what you want to talk about.  Is there

3     anything else you want to raise at this point?

4          MS. KUCHINS:  Yes, Your Honor, I would like to

5     quickly address the last two cases.

6          THE COURT:  Okay.  You can do it from the table, if

7     you would like.  You just need to get closer to the

8     microphone, or you can come to the lectern.  It's up to you.

9          MS. KUCHINS:  So plaintiffs are relying heavily on

10    *Gonzalez*.  There the court found that there was a glue holding

11    together class claims, and that glue was a database that was

12    concrete, a bank of information.

13         Here we're talking about reasonable suspicion, right,

14    which is so fluid.  All we know now is what the plaintiffs

15    have alleged.  We don't know what happened.  We don't know

16    what the Border Patrol agents observed.  So that's --

17         THE COURT:  But we do.  You just didn't give me any

18    evidence on it.  I was hoping to see what they say, but I

19    don't have any evidence.  I guess -- and that's where I keep

20    coming back to is, you can't say, "We don't know," because I

21    have two motions here with evidence presented.  I don't get to

22    go, "Well, you know, I wonder what they would have said," and,

23    "I think they might have said something," because you didn't.

24    So I'm bound by the evidence I have, right?  What else can I

25    do?  I can't just go, "Well, I think it's possible that they

1    might contradict this."  I have to -- and you could have

2    submitted declarations.

3         Again, I know there's written documentation on every

4    arrest that occurs or every stop, or there should have been.

5    So I don't know why that wasn't done, but it wasn't.  So I

6    can't just go -- that we don't know what happened.  We do know

7    what happened, because we have the evidence that -- that I am

8    to consider for this.  Am I wrong on this?  I keep -- I keep

9    saying this, and I keep getting back that that's wrong.  So I

10   want to know why that's wrong.  Am I wrong?

11        MS. KUCHINS:  Our position is that it's plaintiffs'

12   burden to show that a practice exists.

13        THE COURT:  Okay.  So then they presented what they

14   have.  You chose not to counter it.  So the evidence I am to

15   consider is the evidence that has been submitted.  We agree on

16   that?

17        MS. KUCHINS:  Yes, you are to consider the evidence

18   before the Court now.

19        THE COURT:  Okay.

20        MS. KUCHINS:  And our position is that it doesn't

21   meet the --

22        THE COURT:  Right.

23        MS. KUCHINS:  -- the significant proof.

24        Also just very quickly, parsons V Ryan is

25   distinguishable there.  The evidence that plaintiffs have

1  provided in terms of the deficiencies in healthcare facilities

2  in the prisons, I mean it is -- it is vast.  And there was

3  deficiencies notices that -- that both defendants acknowledged

4  and were aware of, you know, deficiencies in dental health and

5  dental care and medical services.  There was a lot of evidence

6  there to really form the Court's glue to the analysis of a

7  policy and practice, and this is just not present here.

8          Thank you, Your Honor.

9          THE COURT:  All right.  Anything else on that topic

10 Ms. Cho?

11         MS. CHO:  No, Your Honor.  Thank you.

12         THE COURT:  Okay.  Anything else for the defense then

13 on any topic?

14         MR. RAMNITZ:  No, Your Honor.

15         THE COURT:  All right, then.

16         I will take the matter under submission.  I do hope

17 to issue a ruling by tomorrow.

18         Thank you very much.

19     (Proceedings were concluded at 3:42 p.m.)

20

21         I, RACHAEL LUNDY, Official Reporter, do hereby
       certify the foregoing transcript as true and correct.

22

   Dated:  May 13, 2025              /s/ Rachael Lundy_____

23                                   RACHAEL LUNDY, CSR-RMR
                                     CSR No. 13815

24

25