1  BREE BERNWANGER - # 331731
   bbernwanger@aclunc.org
2  MICHELLE (MINJU) Y. CHO - # 321939
   mcho@aclunc.org
3  LAUREN DAVIS - # 357292
   ldavis@aclunc.org
4  SHILPI AGARWAL - # 270749
   sagarwal@aclunc.org
5  AMERICAN CIVIL LIBERTIES UNION
   FOUNDATION OF NORTHERN
6  CALIFORNIA
   39 Drumm Street
7  San Francisco, CA 94111
   Telephone: (415) 621-2493
8
   MAYRA JOACHIN - # 306065
9  mjoachin@aclusocal.org
   EVA BITRAN - # 302081
10 ebitran@aclusocal.org
   AMERICAN CIVIL LIBERTIES UNION
11 FOUNDATION OF SOUTHERN
   CALIFORNIA
12 1313 West 8th Street
   Los Angeles, CA 90017
13 Telephone: (213) 977-5000

BRISA VELAZQUEZ OATIS - # 339132
bvoatis@aclu-sdic.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SAN DIEGO &
IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
Telephone: (619) 398-4199

AJAY S. KRISHNAN - # 222476
akrishnan@keker.com
JASON GEORGE - # 307707
jgeorge@keker.com
JULIA L. GREENBERG - # 333864
jgreenberg@keker.com
REAGHAN E. BRAUN - # 340526
rbraun@keker.com
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    415 391 5400
Facsimile:    415 397 7188

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| UNITED FARM WORKERS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> KRISTI NOEM, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF HOMELAND SECURITY; et al., <br><br> Defendants. | Case No. 1:25-cv-00246-JLT-CDB <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO ENFORCE PRELIMINARY INJUNCTION** <br><br> Date:　　October 7, 2025 <br> Time:　　9:00 a.m. <br> Dept.:　　Courtroom 4, 7th Floor <br> Judge:　　Hon. Jennifer L. Thurston <br><br> Date Filed: February 26, 2025 <br><br> Trial Date:  None set |

PUBLIC REDACTED VERSION

## Table of Contents

Page(s)

I. INTRODUCTION ...........................................................................................................1

II. BACKGROUND ............................................................................................................2

    A.    El Centro Border Patrol conducts immigration raids in Kern County pursuant to an unlawful pattern and practice. ...........................................2

    B.    The Court granted the motion for preliminary injunction. ......................3

    C.    Defendants issue a Muster regarding reasonable suspicion that fails to comply with the Court's order. ...............................................................4

    D.    Border Patrol's unlawful conduct in a raid on a Home Depot in Sacramento...........................................................................................6

        1.    Defendants produce boilerplate documentation of arrests..........7

        2.    Plaintiffs' investigation reveals multiple falsehoods in Defendants' documentation. .........................................................9

III. LEGAL STANDARD ..................................................................................................11

IV. ARGUMENT ...............................................................................................................12

    A.    Defendants violated the Court's preliminary injunction.......................12

        1.    Border Patrol's Reasonable Suspicion Muster violates the Court's preliminary injunction...............................................12

        2.    Border Patrol has violated the preliminary injunction by continuing to engage in unlawful stops and arrests. .................16

            a.    The Sacramento stops violated the Fourth Amendment. ...............16

            b.    Border Patrol agents conducted warrantless arrests without probable cause of flight risk in violation of 8 U.S.C. § 1357. .......20

        3.    Defendants have failed to comply with the preliminary injunction's requirement for documenting stops and arrests. .........................21

    B.    The Court should require Defendants to remedy their breach and follow the Court's preliminary injunction order. ......................................23

V. CONCLUSION.............................................................................................................25

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**Federal Cases**

4

*A&M Recs. Inc. v. Napster, Inc.*,
5
    284 F.3d 1091 (9th Cir. 2002) ...................................................................................12

6

*Alaniz v. City of L.A.*,
    2014 WL 12694157 (C.D. Cal. May 21, 2014) ......................................................19
7

*Armstrong v. Brown*,
8
    857 F. Supp. 2d 919 (N.D. Cal. 2012) .............................................................11, 19

9

*Barker v. U.S. Bancorp*,
10
    2017 WL 4358116 (S.D. Cal. Oct. 2, 2017) .........................................................19

11

*California v. U.S. Dep't of the Interior*,
    2020 WL 1496278 (N.D. Cal. Mar. 16, 2020)......................................................12

12

*City & Cnty. of S.F. v. Trump*,
13
    2025 WL 1358492 (N.D. Cal. May 9, 2025) ........................................................12

14

*Dep't, AFL-CIO v. Wright*,
15
    364 U.S. 642 (1961)................................................................................................11

16

*Fraihat v. U.S. Immigr. & Customs Enf't*,
    2020 WL 2758553 (C.D. Cal. May 15, 2020) ......................................................11
17

*Illinois v. Wardlow*,
18
    528 U.S. 119 (2000)..........................................................................................15, 16

19

*Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*,
20
    774 F.3d 935 (9th Cir. 2014) ...........................................................................12, 13

21

*Nat'l Org. For Reform of Marijuana L. (NORML) v. Mullen*,
    608 F. Supp. 945 (N.D. Cal. 1985) .......................................................................24
22

*Nat'l Org. For Reform of Marijuana L. (NORML) v. Mullen*,
23
    796 F.2d.276 (9th Cir. 1986) ................................................................................24

24

*Nava v. Dep't of Homeland Sec.*,
25
    435 F. Supp. 3d 880 (N.D. Ill. 2020) ....................................................................20

26

*Nicacio v. U.S. I.N.S.*,
    797 F.2d 700 (9th Cir. 1985) ................................................................................16
27

*Shaw v. Jones*,
28
    683 F. Supp. 3d 1205 (D. Kan. 2023) ...................................................................25

*Smagin v. Yegiazaryan*,
    2020 WL 1652347 (C.D. Cal. Apr. 1, 2020) .......................................................................12

*United States v. Brignoni-Ponce*,
    422 U.S. 873 (1975) ................................................................................................................14

*United States v. Brown*,
    925 F.3d 1150 (9th Cir. 2019) ...........................................................................................15, 19

*United States v. Christie Indus., Inc.*,
    465 F.2d 1002 (3d Cir. 1972) ...................................................................................................12

*United States v. Manzo-Jurado*,
    457 F.3d 928 (9th Cir. 2006) ..............................................................................................13, 14

*United States v. Mendenhall*,
    446 U.S. 544 (1980) ............................................................................................................5, 15

*United States v. Montero-Camargo*,
    208 F.3d 1122 (9th Cir. 2000) ............................................................................................13, 17

*United States v. Rodriguez*,
    976 F.2d 592 (9th Cir. 1992) ...................................................................................................17

*United States v. Rodriguez Sanchez*,
    23 F.3d 1488 (9th Cir. 1994) ..............................................................................................17, 18

*United States v. Sigmond-Ballesteros*,
    285 F.3d 1117 (9th Cir. 2002) ...................................................................................................14

*United States v. United Shoe Mach. Corp.*,
    391 U.S. 244 (1968) .................................................................................................................12

*Vasquez Perdomo v. Noem*,
    2025 WL 2181709 (9th Cir. Aug. 1, 2025)................................................................. *passim*

**Federal Statutes**

8 U.S.C. § 1357.................................................................................................................16, 20

8 U.S.C. § 1357(a)(2)........................................................................................................20, 21

8 U.S.C. §§ 1357(a)(4), (a)(5)...................................................................................................16

**Rules**

Fed. R. Civ. P. 62(c)(1)................................................................................................................12

**Constitutional Provisions**

Fourth Amendment .........................................................................................................5, 6, 16

iii

## I.    INTRODUCTION

In "Operation Return to Sender" earlier this year, more than sixty Border Patrol agents traveled northward, where they indiscriminately detained and arrested people of color in and around Kern County. Border Patrol made these detentions and arrests—including of U.S. citizens and lawful permanent residents—on assumptions about skin color or occupation and without the individualized assessments that the Constitution and federal law require. To address these unlawful practices, this Court issued a preliminary injunction prohibiting Border Patrol from conducting detentive stops without reasonable suspicion and from making warrantless arrests without probable cause that the individual is likely to escape before a warrant can be obtained. Dkt. 47 at 86-87. The Court further ordered Defendants to issue new guidance to Border Patrol agents on the legal standards for reasonable suspicion, required Border Patrol agents to document all stops and arrests, and required training of Border Patrol agents on the legal requirements set forth in the Court's order. *Id.*

Border Patrol has violated the Court's preliminary injunction in at least three ways. *First,* Defendants' guidance to Border Patrol agents is wholly deficient: it does not stop agents from targeting individuals based on "broad profiles," like skin color and occupation, and encourages reliance on factors only relevant at or near the border, which this District is not. *Second*, Border Patrol agents unlawfully stopped and arrested people *en masse* in July in a raid of a Sacramento Home Depot parking lot without particularized reasonable suspicion and without adequately assessing flight risk in violation of the Constitution, federal law, and the Court's order. This raid occurred mere days after a court in the Central District issued an injunction barring these tactics in that district. *Vasquez Perdomo v. Noem*, --- F. Supp. 3d ---, 2025 WL 1915964, at *1 (C.D. Cal. 2025). *Third*, the incomplete, inaccurate, and boilerplate documentation Border Patrol agents used to describe the Sacramento stops and arrests violate the preliminary injunction's documentation requirements.

Border Patrol's actions require this Court's intervention. The Court can and should exercise its inherent authority to enforce its preliminary injunction and issue a further order to enforce, clarify, or modify it to ensure that its purpose is carried out.

## II.    BACKGROUND

### A.    El Centro Border Patrol conducts immigration raids in Kern County pursuant to an unlawful pattern and practice.

This lawsuit challenges the unlawful policies, patterns, and practices of U.S. Border Patrol in the Eastern District of California as shown by the El Centro Border Patrol Sector ("El Centro Border Patrol") raid referred to as "Operation Return to Sender." In that operation in January 2025, over sixty El Centro Border Patrol agents traveled hundreds of miles north of the border to conduct mass stops and arrests of people in Kern County. Dkt. 15-2, Exs. 17, 18; Dkt. 15-3 ¶ 15. Border Patrol's unlawful practices, as shown by that operation, are to stop people without reasonable suspicion that they are unlawfully in the country; to conduct warrantless arrests without probable cause that the person arrested was likely to escape before a warrant could be obtained; and to coerce people into accepting voluntary departure without a knowing and voluntary waiver of their right to a removal hearing. *See* Dkts. 15-2 to 15-12.

Plaintiffs moved for a preliminary injunction of the first two unlawful practices, and submitted nearly a dozen accounts of conduct during "Operation Return to Sender" demonstrating Border Patrol's pattern and practice of performing unlawful stops without reasonable suspicion and warrantless arrests without probable cause of flight risk. *See* Dkts. 15-2 to 15-12.

Unlawful Stops: The evidence Plaintiffs submitted demonstrated that Border Patrol's practice is to stop people based on categorical race- and occupation-based assumptions rather than individualized reasonable suspicion. For stops on foot, Border Patrol consistently targeted people of color in Latino neighborhoods and at businesses where farm workers and day laborers shop and eat, including multiple people in Home Depot parking lots. Dkt. 15-1 at 11-12; Dkt. 47 at 5-17, 55-58. Patrol agents surrounded people of color with multiple agents or blocked them in with cars, such that it was not possible to leave. Dkt. 15-1 at 11-12; Dkt. 47 at 5-17, 55-58. Each of these stops occurred without prior knowledge of who was being stopped, nor reasonable suspicion particularized to the individual, as agents blocked them in, grabbed them, or aggressively demanded papers based on nothing but their appearance. Dkt. 15-1 at 9-12; Dkt. 47 at 5-17, 55-58. And when people did not respond or attempted to go about their business by walking away, Border Patrol escalated the stop by grabbing, handcuffing, or arresting them. Dkt.

47 at 7. In vehicle stops, Border Patrol repeatedly and consistently targeted moving vehicles driven by people of color in agricultural areas and Latino neighborhoods. *See* Dkt. 15-1 at 10-11; Dkt. 47 at 5-17, 55-58. The Border Patrol agents conducting these stops did not know who was in the vehicles when the agents stopped them, and stated no reason for the stops other than to demand "papers" from vehicle occupants. *See* Dkt. 47 at 5-17.

Unlawful Warrantless Arrests: The evidence submitted also showed that Border Patrol made no individualized assessments of flight risk when conducting warrantless arrests during "Operation Return to Sender." Dkt. 15-1 at 17-19; Dkt. 47 at 59-61. For example, agents arrested Plaintiff Juan Vargas Mendez without asking any questions about his ties to Kern County. Dkt 15-6 ¶ 11; Dkt. 47 at 61. When Mr. Vargas Mendez pleaded that he had lived in the area for twenty years, had a wife and four children who are all citizens, and that he had no criminal record, an agent responded that he "did not care" and that Mr. Vargas Mendez "was going to Mexico." Dkt 15-6 ¶ 11; Dkt. 47 at 61. Border Patrol agents repeatedly failed to ask people questions about their community ties, such as family, work history, and length of residency, or disregarded any such ties without consideration. Dkt. 15-1 at 17-19; Dkt. 47 at 59-61. These indiscriminate arrest practices aligned with El Centro Border Patrol's statement: "[A]nyone we encounter who doesn't have legal right to be in or remain in the U.S. will be arrested." Dkt. 15-2, Ex. 1.

**B.    The Court granted the motion for preliminary injunction.**

On April 29, 2025, the Court granted Plaintiffs' motion and issued a preliminary injunction. Dkt. 47.[1] The Court found that "there is no substantive conflict in the evidence regarding the alleged practice" of stopping people without reasonable suspicion. *Id.* at 58. That finding relied on the submitted evidence showing that Border Patrol targeted "Hispanics and field workers," including by stopping vehicles carrying Hispanic people, "aggressively swarm[ing]" people standing in Home Depot and other parking lots, and escalating stops to arrests when people walked away or refused to answer questions. *Id.* at 54-58. The Court likewise found a pattern and practice of warrantless arrests without an individualized assessment of flight risk

---

[1] The Court also granted Plaintiffs' motion for provisional class certification. *See* Dkt. 47.

based on Border Patrol agents' failure to ask questions about community ties or consider any of the factors relevant to flight risk. *Id.* at 59-61.

Based on this evidence, the Court issued a preliminary injunction enjoining Border Patrol in the Eastern District of California from conducting detentive stops without reasonable suspicion that the person is unlawfully in the country and from effecting warrantless arrests without probable cause that the noncitizen being arrested is likely to escape before a warrant can be issued. Dkt. 47 at 86. The Court's injunction imposed additional specific remedies, requiring

- That any Border Patrol agent who conducts a detentive stop in the Eastern District to "document the facts and circumstances surrounding the stop in a narrative form" as soon as practicable, and "include the specific, particularized facts that supported the agent's reasonable suspicion" and "the date and time of both the stop and when the agent completed the documentation," i*d.* at 86-87;

- That any Border Patrol agent who conducts a warrantless arrest to document that arrest as soon as practicable, including "the facts and circumstances surrounding the warrantless arrest and the specific, particularized facts supporting the conclusion that the [individual] was likely to escape before a warrant could be obtained," *id.*;

- That Defendants provide this documentation to Plaintiffs' counsel every 60 days or upon request, within seven days after the request, i*d.*;

- That Border Patrol, within 60 days, issue guidance for "Border Patrol agents concerning how they should determine whether 'reasonable suspicion' exists when conducting detentive stops, including vehicle stops, in this District," *id.*; and

- That El Centro Border Patrol carry out training until every agent is trained on the principles of law set forth in the Court's order, and to provide Plaintiffs documentation proving that training occurred, *id.*

### C. Defendants issue a Muster regarding reasonable suspicion that fails to comply with the Court's order.

As purported compliance with the Court's order requiring that Defendants issue guidance to Border Patrol agents "concerning how they should determine whether 'reasonable suspicion' exists when conducting detentive stops . . . in this district," Defendants issued a "Muster" on June

4

27, 2025 (the "Reasonable Suspicion Muster" or the "Muster"). Dkt. 64-2. The Muster states that it provides the "underlying laws and policies applicable to investigative detentions initiated by El Centro Sector Border Patrol Agents pursuant to the Fourth Amendment in the Eastern District of California." *Id.* The Muster indicates that "investigative detentions" are also known as "detentive stops, *Terry* stops, or roving patrol stops," but does not state the standard for when such a stop has occurred, that is, when a "reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554-55 (1980).

The Muster states that these (undefined) investigative detentions require reasonable suspicion, and that Border Patrol agents "must identify specific, articulable facts, that when taken together with rational inferences from those facts, would lead a reasonable, objective [Border Patrol agent] to believe that the person stopped is, was, or is about to be, engaged in a violation of a law the [Border Patrol agent] has the authority to enforce." Dkt. 64-2 at 2. The Muster does not define what "violations" Border Patrol agents have the authority to enforce, and provides no guidance specific to the civil immigration violations at issue in this case. *Id.* The Muster does not explain how the training of even a "reasonable, objective [Border Patrol agent]" is the appropriate standard, when such agents' training and experience presumably is oriented toward the border. *Id.*

Although the Muster correctly states that reasonable suspicion requires an analysis of the totality of the circumstances, it then provides a skewed list of factors with no guidance for their application in this District. As discussed in detail below, the Muster encourages Border Patrol agents to rely on factors, such as "proximity to the border," "recent . . . border crossings in the area," and whether a particular "type of vehicle" could be used for smuggling without any explanation about how such factors would apply in the interior of the country. *See* Dkt. 64-2 at 2-3. And the Muster encourages reliance on factors, such as characteristics indicating that a person is a "foreign national," without explaining that such factors have minimal or zero probative value when shared with a significant number of people lawfully in the country. *Id.*

Soon after the issuance of the Muster, Plaintiffs contacted Defendants' counsel and identified the Musters' deficiencies by email on July 11, 2025. Declaration of Jason George ("George Decl."). ¶ 4 & Ex. C. On July 14, 2025, Defendants filed their motion to dismiss and

argued that this case has been mooted in its entirety based on the issuance of the Reasonable

Suspicion Muster and other musters. *See* Dkt. 64. On July 17, 2024, in a meet-and-confer over

videoconference, Defendants did not agree that the Muster violated the Court's preliminary

injunction order. George Decl. ¶ 4. Defendants maintained the same position regarding the

Muster in a meet-and-confer regarding this Motion held on August 26, 2025. *Id.* ¶ 10.

### D.    Border Patrol's unlawful conduct in a raid on a Home Depot in Sacramento.

Before and after the issuance of the Reasonable Suspicion Muster, Border Patrol's

unlawful pattern and practice of unlawful stops and warrantless arrests continued. Starting in

June, Border Patrol, along with ICE and other federal agencies, conducted a series of immigration

raids across Central California which federal officials described as "the largest Mass Deportation

Operation . . . in History." *Vasquez Perdomo v. Noem*, --- F.4th ---, No. 25-4312, 2025 WL

2181709, at *3 (9th Cir. Aug. 1, 2025). As part of the operation (dubbed "Operation at Large"),

federal agents in "roving patrols"—with El Centro Sector's Chief Gregory K. Bovino apparently

"in charge," George Decl. Ex. F—unlawfully stopped, detained, and arrested Latinos, including

U.S. citizens, throughout Los Angeles and the surrounding region. *See Vasquez Perdomo*, 2025

WL 2181709, at *4-6. These incidents follow the same patterns as "Operation Return to Sender,"

as Border Patrol agents admitted that they targeted certain types of businesses, like Home Depot

and car washes, "because past experiences have demonstrated that [noncitizens] utilize or seek

work at these locations." *Id.* at *16.

After a lawsuit was filed in the Central District of California, the district court, on July 11,

2025, held that Border Patrol and ICE engaged in rampant violations of the Fourth Amendment

by stopping people without individualized reasonable suspicion, and instead relying on a "broad

profile." *Vasquez Perdomo*, 2025 WL 1915964, at *25. The district court issued a temporary

restraining order against such conduct, *id.* at *28,[2] and the Ninth Circuit has denied the

defendants' request to stay that injunction, *see Vasquez Perdomo*, 2025 WL 2181709, at *1.[3]

---

[2] It appears that this unlawful conduct by federal agents in the Central District is ongoing, as demonstrated in a recent filing in that matter. *See* George Decl. Ex. I.

[3] The government has applied for a stay to the Supreme Court, which remains pending. *See Noem v. Vasquez Perdomo*, No. 25A169, Application to Stay (U.S. Sup. Ct., filed Aug. 7, 2025).

1   Upon being enjoined from this conduct in the Central District on July 11, 2025,

2   Defendants expanded "Operation at Large" to this District a few days later with the same

3   unlawful conduct. On July 17, 2025, Border Patrol targeted Latinos in and around a Home Depot

4   parking lot in Sacramento. *See* Dkts. 74-3, 74-4. As in prior operations, Border Patrol agents

5   targeted individuals based on their apparent ethnicity, apparent occupation, and presence at or

6   near a Home Depot with no reason to believe the specific individuals they stopped were in the

7   country unlawfully, and arrested them without assessing flight risk.

8          **1.     Defendants produce boilerplate documentation of arrests.**

9   Upon learning of this raid, Plaintiffs immediately requested documentation of the stops

10  and arrests pursuant to the preliminary injunction. George Decl. ¶ 6 & Ex. D. In response,

11  Defendants served Form I-213s (the standard form for Border Patrol immigration arrests) for

12  eleven arrestees on July 25, 2025. *Id.* Ex. E. The I-213s revealed that the raids were carried out by

13  Border Patrol agents from at least the El Centro and El Paso Border Patrol Sectors. *Id.* at 0003,

14  0009, 0013, 0018, 0023, 0029, 0038, 0043, 0048, 0053. Defendants did not serve any record

15  reflecting people who were detained, but not arrested. *See generally id.* Ex. E; Dkt. 74-9,

16  Declaration of Filiberto de Jesus Rivera-Molina ("Rivera-Molina Decl.") ¶ 2 (discussing people

17  who were detained, but then released once they provided their papers).[4]

18         The Form I-213s Defendants provided appear to be made-for-litigation documents

19  composed almost entirely of boilerplate copy-and-pasted descriptions. The boilerplate nature is

20  clear, not only from the identical language used in many of the I-213s, but also the occasional use

21  of "X" as a placeholder for the names of locations or detained individuals, which were not filled

22  in. *See* George Decl. Ex. E at 0003 ("I … was conducting immigration enforcement operations in

23  the city of X, CA"), 0040 ("I determined that X was likely to escape…"), 0055 ("I determined

24  that X was likely to escape…"). Each of the I-213s includes an identical preamble, which

---

25  [4] When asked, Defendants' counsel stated that the documents "reflect all immigration-related

26  stops and warrantless arrests on July 17, 2025, at or around the Home Depot located at 4641
    Florin Road, Sacramento, CA 95823, including the parking lot." George Decl. ¶ 7 & Ex. D.

27  Although media outlets widely reported a U.S. citizen had been arrested, Defendants' counsel
    claimed that his arrest "did not involve a stop or an arrest for an immigration violation," and

28  asserted that the preliminary injunction did not require disclosure of information about that arrest.
    *Id.*

purports to justify the stops of people at the Home Depot parking lot because, supposedly:



, George Decl. Ex. E at 0003, 0010, 0014, 0018, 0024, 0029, 0039, 0044, 0049, 0054;

*id.* at 0004, 0010, 0014, 0018, 0024, 0029, 0039, 0044, 0049, 0054;

*id.* at 0004, 0010, 0014, 0019, 0024, 0029, 0039, 0044, 0049, 0054;

, *id.*

The I-213s also repeatedly adopt boilerplate language assuming that day laborers are—by definition—undocumented, stating that it is "common knowledge to Border Patrol agents that [undocumented noncitizens] congregate at locations such as Home Depot to solicit cash paying day labor jobs," and that undocumented noncitizens "work these jobs . . . to avoid paying taxes and to avoid detection by law enforcement." *Id.* at 0004, 0010, 0014, 0019, 0024, 0039, 0044, 0054. In the I-213s, Border Patrol agents also described "loitering in stationary locations" and not being a "shopp[er]" as "indicative of day laborers and possible [undocumented noncitizens]." *Id.* at 0004, 0011, 0015, 0019, 0030, 0039, 0045, 0055.

Then, almost every I-213 includes an identical or near-identical statement that the arrestee ran away from the Border Patrol agents, that Border Patrol agents chased and immediately apprehended them, and that Border Patrol agents did not learn the identities of the people they arrested until after the arrest. *Id.* at 0011, 0013, 0019, 0030, 0034, 0040, 0045, 0050, 0055.[5] In nearly every I-213, a Border Patrol agent states (sometimes twice) that "this unprovoked flight from law enforcement led me to believe that these individuals were involved in an active crime or

_____

[5] Only one of the eleven I-213s includes any information about the purported flight other than these boilerplate statements. George Decl. Ex. E at 0005-0006.

were likely present in the United States without authorization." *Id.* at 0004, 0011, 0015, 0019, 0030, 0034, 0040, 0045, 0050, 0055.

As with the accounts of stops, the accounts of arrests in the I-213s include identical or near-identical statements that the person being arrested was likely to escape before a warrant could be obtained based on "flight from law enforcement," "ignor[ing] agent commands," and "illegal presence in the United States." *Id.* at 0011, 0015, 0020, 0030, 0040, 0045, 0050, 0055. In some instances, the Border Patrol agent appears to have justified a warrantless arrest because the person arrested "was located in California, which is a sanctuary state." *Id.* at 0006, 0025, 0035.

In general, the I-213s do not document any inquiries made by Border Patrol agents to determine whether, based on the factors required by this Court, the people being arrested posed a flight risk from immigration authorities. Instead, the I-213s generally state that the person being arrested "made no claims" to having a "domicile" or "owning a home." *Id.* at 0020, 0025, 0030, 0035, 0055. No I-213 includes any discussion of community or family ties.

### 2. Plaintiffs' investigation reveals multiple falsehoods in Defendants' documentation.

Immediately after receiving the I-213s on July 25, Plaintiffs' counsel searched for witnesses, including the arrested class members in ICE's custodial databases. George Decl. ¶ 7. Although they had been arrested less than two weeks prior, only two of the eleven persons were still in ICE custody on July 29, suggesting that they had already been deported. *Id.*

All three of the class members Plaintiffs' counsel located have submitted declarations. *See* Dkt. 74-9, Rivera-Molina Decl.; Dkt. 74-8, Declaration of Isael Lopez Mazariegos ("Mazariegos Decl."); Declaration of Selvin Osbeli Mejia Diaz ("Diaz Decl.").[6] Their experiences contradict the cookie-cutter accounts of the Sacramento raid that Border Patrol agents wrote in their I-213s. *See* George Decl. Ex. E at 0008 (Rivera-Molina), 0016 (Diaz), 0027 (Mazariegos). Their declarations describe how armed, masked Border Patrol agents corralled a group of people at the entrance to the Home Depot with about 10 unmarked cars. Dkt. 74-9, Rivera-Molina Decl. ¶ 2.

---

[6] One of the three has already been removed to Guatemala. Dkt. 74-8, Mazariegos Decl. ¶ 6. Defendants' I-213s make clear that at least some arrestees were immediately processed for voluntary departure. George Decl. Ex. E at 0041, 0051.

The agents yelled in Spanish, saying not to move, making it clear that no one was free to leave. *Id.* ¶ 2. After surrounding the group and ordering people not to leave, agents began asking for "papers." *Id.* Some of the people the agents surrounded showed documentation and were permitted to leave. *Id.* Agents grabbed Filiberto de Jesus Rivera-Molina, asked him if he had "papers," and when he answered no, immediately arrested him. *Id.* Masked agents also grabbed Isael Lopez Mazariegos before knowing who he was. Dkt. 74-8, Mazariegos Decl. ¶ 3. When the agent demanded Mr. Mazariegos' ID, Mr. Mazariegos inquired why he was being asked to show ID, and the agent responded that he "must be an immigrant," took his wallet from his pocket, and handcuffed him. Dkt. 74-8, Mazariegos Decl. ¶¶ 3-4. Agents did not ask any questions about family, work, or community ties. *Id.* ¶ 4; Dkt. 74-9, Rivera-Molina Decl. ¶¶ 2-3. Yet they were longtime Sacramento residents: Mr. Rivera-Molina has lived in the Sacramento area for eight years and has close relatives there, Dkt 74-9, Rivera-Molina Decl. ¶ 2, and Mr. Mazariegos has lived and worked in Sacramento for 12 years, Dkt. 74-8, Mazariegos Decl. ¶¶ 1-2.

Border Patrol agents also arrested Selvin Osbeli Mejia Diaz, an 18-year-old rising senior at Valley High School. Declaration of Francisca Delfina Mejia Castanon ("Castanon Decl.") ¶¶ 2-5, Ex. A (high school registration); Diaz Decl. ¶¶ 1-2. He had entered the United States the prior year after fleeing violence in his home country and was processed as an unaccompanied minor. Castanon Decl. ¶¶ 2-3; Diaz Decl. ¶ 1. After an initial detention, immigration officials released Selvin to his aunt, Francisca Delfina Mejia Castanon, as his sponsor. Castanon Decl. ¶ 3; Diaz Decl. ¶ 1. Selvin has lived with Ms. Castanon and her family ever since. *Id.* He enrolled in school and was active in his church. *See* Diaz Decl. ¶ 2; Castanon Decl. ¶ 5, Ex. A (high school registration), Ex. B (church certificate). He was in full compliance with ongoing immigration court proceedings. Castanon Decl. ¶ 4.

In their account in the I-213, Border Patrol agents describe Selvin using identical language as other arrestees, stating that he was a day laborer in the Home Depot parking lot who ran away. *Compare* George Decl. Ex. E at 0016 ("Occupation": "Laborer"), 0019, *with id.* at 0011, 0025, 0030, 0034, 0055. But Selvin does not work as a day laborer. Diaz Decl. ¶ 2; Castanon Decl. ¶ 5. He was not at Home Depot; he was on his way to a Ross clothing store in a different shopping

complex near the Home Depot to buy a shirt for a family event. Diaz Decl. ¶ 3; Castanon Decl. ¶ 6. An unmarked Chevy truck passed Selvin as he was walking from a residential area toward a bridge that crosses a creek behind the Ross shopping area. Diaz Decl. ¶ 3; George Decl. ¶ 12 & Ex. G (map showing bridge with red arrow). The truck turned around, and a masked agent dressed like a soldier jumped out of the truck and began to chase Selvin. Diaz Decl. ¶ 3. The agent tackled Selvin and handcuffed him. *Id.* He did not have a warrant and did not ask any questions until after he handcuffed Selvin, brought him into the truck, and began to transfer him to a processing center. *Id.* ¶ 4. Agents refused to allow Selvin to call his aunt for days. *Id.* ¶ 5. The I-213 describing Selvin's arrest states—as does nearly every I-213—that he was likely to escape "based on his flight from law enforcement, the fact that he ignored agent commands, [and] his illegal presence in the United States." George Decl. Ex. E at 0020. The I-213 also states—as does nearly every I-213—that Selvin "made no claims to owning a home, owning other assets, or having a steady and legal income." *Id.* But no agent asked Selvin questions about his family or community ties before arresting him, such as that he lived with his aunt and cousins, not even when he asked to call his aunt. Diaz Decl. ¶¶ 2-4, 6. The I-213 includes further boilerplate language that Selvin is a flight risk "due to his illegal presence in the United States, his willful disregard for . . . immigration and criminal laws, [and] his ability to disappear into the millions of people living in the Sacramento County area." George Decl. Ex. E at 0020. But Selvin was in compliance with his immigration court obligations and has no criminal history. Castanon Decl. ¶ 6; Diaz Decl. ¶ 6; *see also* George Decl. Ex. E at 0017 (noting no criminal history).

## III.    LEGAL STANDARD

"Courts have inherent authority to monitor and enforce their prior orders." *Fraihat v. U.S. Immigr. & Customs Enf't*, 2020 WL 2758553, at *3 (C.D. Cal. May 15, 2020). If a defendant fails to comply with the terms of an injunction, the plaintiff may move for an order mandating compliance. *See Armstrong v. Brown*, 857 F. Supp. 2d 919, 951 (N.D. Cal. 2012) (holding that "a further enforcement order is necessary to ensure compliance with the terms of" prior order); *see also Sys. Fed'n No. 91, Ry. Emps.' Dep't, AFL-CIO v. Wright*, 364 U.S. 642, 647 (1961) ("[A]n injunction often requires continuing supervision by the issuing court and always a continuing

willingness to apply its powers and processes on behalf of the party who obtained that equitable relief."). The Court has the power to "construe and interpret the language" of its prior order. *California v. U.S. Dep't of the Interior*, 2020 WL 1496278, at *3 (N.D. Cal. Mar. 16, 2020). "In deciding whether an injunction has been violated it is proper to observe the objects for which the relief was granted." *Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 949 (9th Cir. 2014); *see also United States v. Christie Indus., Inc.*, 465 F.2d 1002, 1007 (3d Cir. 1972) ("The language of an injunction must be read in the light of the circumstances surrounding its entry: the relief sought by the moving party . . . and the mischief that the injunction seeks to prevent."). A party thus cannot evade a finding of noncompliance by "hewing to the narrow letter of the injunction" while "simultaneously ignoring its spirit[.]" *City & Cnty. of S.F. v. Trump*, 2025 WL 1358492, at *3 (N.D. Cal. May 9, 2025).

"A district court has discretion to clarify the scope of an injunction" in response to a motion to enforce. *Smagin v. Yegiazaryan*, 2020 WL 1652347, at *3 (C.D. Cal. Apr. 1, 2020); *see also City & Cnty. of S.F.*, 2025 WL 1358492, at *3 (clarifying injunction). A district court likewise has discretion to modify a previously issued injunction if it is necessary to "achieve the purposes" of the injunction, *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 249, 251 (1968), or if there has been an intervening change in fact or law, *A&M Recs. Inc. v. Napster, Inc.*, 284 F.3d 1091, 1098 (9th Cir. 2002). The Court retains jurisdiction to enforce and modify its injunctions during the pendency of an interlocutory appeal. *Id.* at 1099; Fed. R. Civ. P. 62(c)(1).

## IV.    ARGUMENT

### A.    Defendants violated the Court's preliminary injunction.

#### 1.    Border Patrol's Reasonable Suspicion Muster violates the Court's preliminary injunction.

The Court's preliminary injunction order required Defendants to issue a "a directive setting forth the guidance given to Border Patrol agents concerning how they should determine whether 'reasonable suspicion' exists when conducting detentive stops, including vehicle stops, in this District." Dkt. 47 at 73. The Reasonable Suspicion Muster issued by El Centro Border Patrol on June 27, 2025, however, violates this requirement because it does not accurately reflect the law and fails to provide guidance that would remedy the violations at issue in this case. The

1    Muster thus violates both the letter of the preliminary injunction and undermines its purpose, by

2    failing to provide guidance that would correct the unlawful Border Patrol patterns and practices

3    that this Court enjoined. *Inst. of Cetacean Rsch.*, 774 F.3d at 949.

4        ***First***, the Muster provides no guidance that Border Patrol agents regarding improper use

5    of broad profiles to stop people. As this Court previously held, relying on Ninth Circuit authority,

6    "an officer cannot rely solely on generalizations that 'would cast suspicion on large segments of

7    the law-abiding population.'" Dkt. 47 at 75 (quoting *United States v. Manzo-Jurado*, 457 F.3d

8    928, 935 (9th Cir. 2006)). This means that if a "substantial number of people" who are lawfully in

9    the country share a characteristic, "that characteristic is of ***little or no probative value*** in such a

10   particularized and context-specific [reasonable suspicion] analysis." *United States v. Montero-*

11   *Camargo*, 208 F.3d 1122, 1131 (9th Cir. 2000) (emphasis added); *see also Vasquez Perdomo*,

12   2025 WL 2181709, at *17 (holding that it is improper to stop people based solely on factors that

13   "describe only a broad profile").

14       Despite the fact that "Operation Return to Sender" involved this exact kind of unlawful

15   profiling, the Muster says nothing about the bar on use of generalizations or characteristics that

16   would apply to "large segments" or a "substantial number" of law-abiding people. The Muster,

17   instead, improperly encourages use of such factors. The Muster states that "indicators that an

18   individual is a foreign national based on mode of dress or haircut may be considered" with "other

19   relevant factors." Dkt. 64-2 at 2. But the Muster does not explain that such "indicators" are "of

20   little or no probative value" if common to people lawfully in the country. *Manzo-Jurado*, 457

21   F.3d at 935. The Muster correctly states that "in areas where Hispanic individuals are

22   common, . . . apparent Hispanic race or ethnicity is not a relevant factor," Dkt. 64-2 at 2, but the

23   Muster offers no guidance on the fact that much of the Eastern District of California ***is such an***

24   ***area***. *See, e.g.*, Dkt. 15-2 Ex. 25 at 108 (census showing that over the majority of Kern County

25   residents are "Hispanic or Latino"). The Muster's failure to provide clear and unambiguous

26   guidance on these issues is inappropriate, and has had real-world consequences, as Border Patrol

27   has continued the same "Operation Return to Sender" playbook in "Operation At Large," relying

28   solely on "broad profile" characteristics such as a person's "occupation" and "location" to stop

13

them. *Vasquez Perdomo*, 2025 WL 2181709, at *18; *see infra* Section IV.A.2.a.

      **Second**, the Muster inappropriately treats this District as if it were on the border. It is not. For example, the Muster states that reasonable suspicion must be judged by a "reasonable, objective [Border Patrol agent]." Dkt. 64-2 at 2. But the judgment of an agent with training and experience primarily aimed at the **border** should not be the litmus in this District, where the implications of a person's conduct may completely differ. *See* George Decl. Ex. E at 0035 (Border Patrol agent invoking experience "at and near the border" for why running from masked men with guns justified a stop in Sacramento). The Muster also emphasizes factors that are developed for use "**in the border area**," *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975) (emphasis added), with no explanation that they are irrelevant or weigh against reasonable suspicion in this District. The Muster does not explain, for example, that because this District is "within this country's interior," *Manzo-Jurado*, 457 F.3d at 936, and far from any border, the "proximity to the border" factor weighs **against** reasonable suspicion here. Nor does it explain that "recent border crossings in the area" are irrelevant because the Eastern District shares no border with a foreign country—a factor that is likely to be given improper weight when El Centro Border Patrol has designated towns like Bakersfield "dyed in the wool border town[s]." Dkt. 15-2 Ex. 7 at 24. And the Muster offers no guidance on how "characteristics of the area," "previous travel patterns of the area," and the "time of day" could contribute to reasonable suspicion in the interior of the country. Similarly, whether a "type of vehicle" is "frequently used to transport contraband or illegal aliens" or whether the vehicle is "heavily loaded with passengers," Dkt. 64-2 at 2-3, has no probative value in this District, where many types of vehicles are driven and where a heavily loaded vehicle is unlikely to connote an immigration violation. *United States v. Sigmond-Ballesteros*, 285 F.3d 1117, 1125 (9th Cir. 2002) (identifying vehicle as a truck with a camper "not particularly probative" in an area where driving trucks was common). The Muster must explain or omit these border-centric factors.

      **Third**, the Muster provides inadequate guidance on the import of "flight" in the reasonable suspicion analysis. The Muster states that an agent may consider "evad[ing] law enforcement" through "flight on foot" when developing reasonable suspicion. Dkt. 64-2 at 2. But

the Muster does not explain that a person has "a right to ignore the police and go about his business," *Illinois v. Wardlow*, 528 U.S. 119, 120 (2000) (citing *Florida v. Royer,* 460 U.S. 491, 498 (1983))—a factor especially relevant where "Operation Return to Sender" involved the unlawful stop of someone who "slowly walk[ed] away" from Border Patrol agents. Dkt. 15-10 ¶¶ 5-8. Nor does the Muster address the fact that Border Patrol agents' common use of aggressive tactics, unmarked vehicles, masks, and violent weapons undermines any inference that "flight" supports a finding of reasonable suspicion. *Vasquez Perdomo*, 2025 WL 1915964, at *23 n.30 (finding no showing of reasonable suspicion based on flight from "unidentified masked men with guns exiting from tinted cars without license plates"). Indeed, as the Ninth Circuit has observed, the "racial dynamics in our society—along with a simple desire not to interact with police—offer an 'innocent' explanation of flight." *United States v. Brown*, 925 F.3d 1150, 1157 (9th Cir. 2019). These limitations on "flight" from law enforcement are not addressed in the Muster.

**Fourth**, the Muster does not provide sufficient guidance to Border Patrol agents on when its requirements apply. It states that it applies to "all investigative detentions," alternatively defined as a detentive, *Terry*, or roving patrol stop, but offers no guidance on how to identify that an interaction is or will be a stop or detention. Dkt. 64-2 at 2-3. Clear precedent states that a stop occurs when "a reasonable person would have believed that he was not free to leave," including due to "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. at 554-55. In light of Border Patrol agents' practice in "Operation Return to Sender"—and repeated in the Sacramento raid—of seizing groups of people *en masse* in parking lots by surrounding them without individualized suspicion, Defendants must provide their agents much clearer guidance about when the Fourth Amendment's reasonable suspicion requirements apply. *See, e.g.*, Dkt. 15-5 ¶ 5-6; Dkt. 15-10 ¶¶ 4-6.

**Fifth**, the Muster fails to address the reasonable suspicion requirement for the civil immigration violations at issue in this case. For such violations, as this Court held in its preliminary injunction order, Border Patrol agents must have reasonable suspicion that the person

1  stopped is unlawfully in the country. Dkt. 47 at 87. Yet the Muster does not mention that standard

2  at all. Instead, it states that it is sufficient to have reasonable suspicion "that the person stopped is,

3  was, or is about to be, engaged in a violation of a law the BPA has the authority to enforce"

4  without defining the scope of that "authority." Dkt. 64-2 at 2. The Muster does not explain, for

5  example, that such authority only includes felonies under federal law, not state traffic or criminal

6  laws. *See* 8 U.S.C. §§ 1357(a)(4), (a)(5). This overbreadth adds ambiguity to the reasonable

7  suspicion analysis—for example, the Muster lists "association of an area with criminal activity"

8  as a factor relevant to reasonable suspicion, perhaps because certain crimes are within Border

9  Patrol's authority to enforce. *See id.* But an area's association with "criminal activity" does not

10  increase the likelihood that someone is in the country without authorization.[7]

11       Overall, the Muster is insufficient because it does not accurately portray the well-

12  established Fourth Amendment reasonable suspicion analysis necessary in this District and fails

13  to provide guidance that would remedy the unlawful practices alleged in the complaint. Border

14  Patrol's failure to issue accurate "guidance" on these principles violates the Court's preliminary

15  injunction order and, as discussed in Section IV.B, below, requires the issuance of a new Muster.

16       **2.    Border Patrol has violated the preliminary injunction by continuing to engage in unlawful stops and arrests.**

17

18       Border Patrol has also violated the Court's preliminary injunction order by continuing its

19  unlawful conduct in this District. On July 17, 2025, as part of Border Patrol's raid on a

20  Sacramento Home Depot parking lot, Border Patrol violated the Fourth Amendment and 8 U.S.C.

21  § 1357—and in violation of this Court's preliminary injunction order—by stopping people

22  without reasonable suspicion and conducting warrantless arrests without any individualized

23  assessment of flight risk.

24       **a.    The Sacramento stops violated the Fourth Amendment.**

25       The Court's preliminary injunction order forbids detentive stops in this District "unless,

26

27  ───────────────
[7] The Muster also fails to explain that "presence in an area of expected criminal activity, standing alone, is not enough to support" reasonable suspicion. *Illinois*, 528 U.S. at 124. Likewise, for civil immigration enforcement, a person's "presence in an area where illegal aliens frequently travel

28  [is] not enough to justify a stop to interrogate the occupants of a vehicle. More is required." *Nicacio v. U.S. I.N.S.*, 797 F.2d 700, 703 (9th Cir. 1985).

1   pre-stop, the detaining agent has reasonable suspicion that the person to be stopped is a noncitizen

2   who is present within the United States in violation of U.S. immigration law." Dkt. 47 at 86. As

3   discussed above, such stops cannot be based "on broad profiles which cast suspicion on entire

4   categories of people without any individualized suspicion of the particular person to be stopped."

5   *United States v. Rodriguez Sanchez*, 23 F.3d 1488, 1492 (9th Cir. 1994). Nor can reasonable

6   suspicion be based on criteria "likely to sweep many ordinary citizens into a generality of

7   suspicious appearance." *United States v. Rodriguez*, 976 F.2d 592, 595-96 (9th Cir. 1992).

8          During the July operation at the Sacramento Home Depot, Border Patrol agents violated

9   these requirements by indiscriminately stopping people without individualized, reasonable

10  suspicion. For example, Messrs. Rivera-Molina and Mazariegos were standing in the Home

11  Depot parking lot when approximately twenty masked Border Patrol agents arrived in unmarked

12  vehicles and surrounded them, and demanded that day laborers provide their papers. Dkt. 74-9,

13  Rivera-Molina Decl. ¶ 2. Mr. Rivera-Molina did not feel free to leave. *Id.* A few day laborers

14  were able to show the agents their documents after the demand for papers, and were allowed to

15  leave once they did so. *Id.* Two agents then grabbed Mr. Rivera-Molina and asked if he had

16  papers, and arrested him when he answered. *Id.* Mr. Mazariegos was similarly grabbed by Border

17  Patrol agents, who snatched his wallet out of his pocket when he asked why they were asking for

18  his ID, and handcuffed him. Dkt. 74-8, Mazariegos Decl. ¶¶ 3-4. Far from the Home Depot

19  parking lot, while Selvin Osbeli Mejia Diaz was walking to a clothing store in a different

20  shopping center, a "masked man dressed like a soldier" jumped out of a Chevy truck and began

21  chasing him. Diaz Decl. ¶ 3; George Decl. ¶ 12 & Ex. G (red arrow showing bridge Selvin was

22  approaching). Selvin turned to flee from this unknown assailant and was tackled. Diaz Decl. ¶ 3.

23         These stops were based on an indiscriminate policy, pattern, and practice of conducting

24  group stops and arrests of "day laborers" in Home Depot parking lots—in other words, the

25  "wholesale seizure of miscellaneous persons." *Montero-Camargo*, 208 F.3d at 1132. Border

26  Patrol agents told Mr. Rivera-Molina that they had been ordered to do raids on Home Depot and

27  Walmart stores. Dkt. 74-9, Rivera-Molina Decl. ¶ 3. The I-213s produced by Defendants support

28  that account. *See* George Decl. Ex. E. After making general statements that Sacramento is "a city

17

1    where many illegal aliens are known to stay, live and work" and that ████████████

2    ███████████████████████████████████████, *see id.* at 0003, 0010, 0014, 0018,

3    0024, 0029, 0039, 0044, 0049, 0054, the I-213s focus on a "broad profile" for day laborers who

4    wait for work in Home Depot parking lots based on pure generalizations. For example, the I-213s

5    state that it is "common knowledge" that "illegal aliens congregate at locations such as Home

6    Depot" and "work cash paying jobs to avoid paying taxes and to avoid detection by law

7    enforcement," and that unlike shoppers who move "with an identified purpose" in Home Depot

8    parking lots, people who "loiter[] in stationary locations" are "day laborers and possible illegal

9    aliens." George Decl. Ex. E at 0004, 0010-0011, 0014-0015, 0019, 0024, 0030, 0039, 0044-0045,

10   0054-0055. But these broad statements are insufficient for reasonable suspicion—they reflect a

11   "broad profile" that cast suspicion on ***any*** person standing in a Home Depot parking lot.

12   *Rodriguez Sanchez*, 23 F.3d at 1492. Indeed, Defendants stopped people during the operation

13   based on this broad profile but released them when they produced their "papers," Dkt. 74-9,

14   Rivera-Molina Decl. ¶ 2, presumably because they were not subject to immigration arrest.[8]

15         The I-213s provide little to no information specific to the individuals apprehended.

16   Rather, the I-213s include identical, vague assertions that each person was "loitering" in the

17   Home Depot parking lot and that the person then "ran away" from the Border Patrol agents in

18   "unprovoked flight."[9] George Decl. Ex. E at 0004, 0011, 0013, 0019, 0030, 0034, 0040, 0045,

19   0050, 0055. But these statements lack credibility and the required particularity, and should be

20   rejected. Mr. Rivera-Molina, for example, said he stood frozen when Border Patrol agents piled

21

---

22   [8] Defendants have not provided any record of these stops, despite the preliminary injunction's
     requirement that such stops be documented. Dkt. 47 at 86-87. Border Patrol agents also stopped

23   and arrested a U.S. citizen, Jose Castillo, but Defendants refused to provide the record for that
     arrest, claiming that it "did not involve a stop or an arrest for an immigration violation" and

24   asserting, as a result, that the Court's preliminary injunction did not require disclosure of
     information about that stop and arrest. George Decl. ¶ 8 & Ex. D; *see also* Dkt. 74-3 at 4-5

25   (article addressing Castillo's arrest). Plaintiffs seek relief, as discussed below, for the failure to
     provide documentation regarding purported non-immigration stops and arrests.

26   ████████████████████████████████████████████████████████████████████

27   ██████████████████████████████████ George Decl. Ex. E at 0004, 0010, 0014, 0018, 0024,

28   0029, 0039, 0044, 0049, 0054. But there is no indication that ████████████████████████

1    out of unmarked vans and surrounded him and others. Dkt. 74-9, Rivera-Molina Decl. ¶ 2. And

2    Mr. Mazariegos was grabbed by Border Patrol agents as soon as he saw them, and had no chance

3    to run. Dkt. 74-8, Mazariegos Decl. ¶¶ 3-4. And though Selvin stated he ran from the masked man

4    in soldier gear who jumped out of truck and chased him, his I-213 is false in multiple ways,

5    casting doubt on the accounts in the other I-213s. For example, Selvin's I-213 asserts that he is a

6    "laborer" who was "loitering" in the Home Depot parking lot. George Decl. Ex. E at 0016, 0019.

7    But Selvin, an 18-year-old high school student, was walking to a clothing store, not in the vicinity

8    of the Home Depot parking lot, when agents grabbed him. *See* Diaz Decl. ¶ 3; George Decl. ¶ 12

9    & Ex. G. Even absent the contradicting evidence, the descriptions of people "loitering" and

10   "unprovoked flight" are not credible because they are in almost every case copy-and-pasted

11   boilerplate descriptions. *See Alaniz v. City of L.A.*, 2014 WL 12694157, at *5 (C.D. Cal. May 21,

12   2014) (finding that use of "boilerplate" calls into question the credibility of declarations); *Barker*

13   *v. U.S. Bancorp*, 2017 WL 4358116, at *4 (S.D. Cal. Oct. 2, 2017) (same). These non-credible

14   accounts cannot justify reasonable suspicion.

15          Even if a person ran from Border Patrol agents, that is inadequate for reasonable suspicion

16   here. While flight might be suggestive of wrongdoing in certain circumstances, "racial dynamics

17   in our society—along with a simple desire not to interact with police—offer an 'innocent'

18   explanation of flight." *Brown*, 925 F.3d at 1157. And where other claimed bases for reasonable

19   suspicion are weak (such as in *Brown*, where there was an anonymous tip and no clear inference

20   of wrongdoing), flight does not provide a basis for finding reasonable suspicion. *Id.* Based on this

21   authority, another district court found that running from immigration agents did not create

22   reasonable suspicion because there was no showing that "fleeing upon seeing unidentified

23   masked men with guns exiting from tinted cars without license plates raises suspicion." *Vasquez*

24   *Perdomo*, 2025 WL 1915964, at *23 n.30. The same is true here. For Selvin, it was reasonable

25   and not suspicious to start running when a masked man jumped out of an unmarked Chevy truck

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO ENFORCE
Case No. 1:25-cv-00246-JLT-CDB
3016066

and started to chase him. Diaz Decl. ¶ 3.[10] Likewise, even if Messrs. Mazariegos and Rivera-Molina ran away from officers (they did not), it would have been reasonable for them to react with fear (whether by freezing or running) when twenty masked men with guns exited unmarked SUVs and vans to surround them. As Border Patrol's entire basis for its mass arrests at the Sacramento Home Depot was based on an insufficient "broad profile," Border Patrol cannot rely on fear-based flight inspired by its own aggressive tactics to manufacture reasonable suspicion.

        **b.**       **Border Patrol agents conducted warrantless arrests without probable cause of flight risk in violation of 8 U.S.C. § 1357.**

        The Court's order forbids "warrantless arrests in this District unless, pre-arrest, the arresting agent has probable cause to believe that the noncitizen being arrested is likely to escape before a warrant can be obtained." Dkt. 47 at 86; *see also* 8 U.S.C. § 1357(a)(2). To develop probable cause, there must be an "individualized assessment of the person's flight risk," Dkt. 47 at 76, based on the totality of the circumstances, including an individual's community ties (such as their family, home, or employment), an individual's prior escapes or evasions of immigration authorities, and the immigration officer's ability to determine the individual's identity, *Nava v. Dep't of Homeland Sec.*, 435 F. Supp. 3d 880, 891-92 (N.D. Ill. 2020); Dkt. 64-1 at 2-4 (Border Patrol muster); Dkt. 15-2 at 111-13 (*Nava* Broadcast Statement of Policy).

        In the Sacramento raid, however, Border Patrol agents arrested people without conducting the necessary individualized analysis prior to the arrest. Border Patrol agents did not, for example, ask any of the people arrested about their community ties. Selvin was tackled, handcuffed, and placed in a truck, and only asked to provide his name and date of birth—they thus arrested him without knowing that he is a rising senior at local high school, lives with his aunt, uncle, and cousins, attends a local church, and had complied with all the conditions required of him in his pending immigration case. Diaz Decl. ¶¶ 1-2, 4, 6; Castanon Decl. ¶¶ 3-5 & Exs. A, B. Border Patrol agents likewise did not ask about the community ties of Messrs. Lopez Mazariegos and

---

[10] The fact that Selvin did not match the "broad profile" of suspected day laborers loitering near Home Depot further demonstrates that he was targeted based solely on race and physical appearance, and undermines the credibility of any claim that the basis of the stop was based on reasonable reaction. Notably, Selvin had no reason to run from Border Patrol agents for any "suspicious" reason as he was released to his aunt's custody pending his immigration case and was complying with the requirements of his immigration case. Castanon Decl. ¶ 6.

1    Rivera-Molina, both of whom had worked in Sacramento around a decade (12 years and 8 years,

2    respectively) and have family in the United States. Dkt. 74-8, Mazariegos Decl. ¶ 1; Dkt. 74-9,

3    Rivera-Molina Decl. ¶ 1.

4         The I-213s also demonstrate that the required analysis of flight risk did not occur. The

5    flight risk "findings" are composed of copy-and-pasted boilerplate, often word-for-word,

6    undermining any claim that they were based on an individualized assessment. *See, e.g.* George

7    Decl. Ex. E at 0011, 0015, 0020, 0030, 0040, 0045, 0050, 0055. Two separate I-213s even

8    includes an "X" placeholder for the person's name in the boilerplate flight risk finding. *Id.* at

9    0040, 00055 (stating that "that X was likely to escape before a warrant could be obtained"). There

10   is *no mention* of community or family ties in the records, underscoring that Border Patrol agents

11   never asked about such ties. *See, e.g.*, *id.* at 0019-0020. And many of the I-213s say that the

12   people arrested "made no claims" to owning a home, other assets, or steady income, *see, e.g.*, *id.*,

13   but notably do *not* claim that the agents affirmatively asked about these topics, an omission

14   further confirmed by the accounts of those arrested, *see* Diaz Decl. ¶¶ 3-4; Dkt. 74-8, Mazariegos

15   Decl. ¶¶ 3-5; Dkt. 74-9, Rivera-Molina Decl. ¶¶ 2-3. Each of the documents rely on generic

16   statements about the "flight" by the person, the purported "willful disregard" of immigration

17   laws, and the purported ability to "disappear into the millions of people living in the Sacramento

18   County area." *See, e.g.*, George Decl. Ex. E at 0020. But as already discussed above, claims of

19   "flight" in these documents lack credibility and "mere presence within the United States in

20   violation of U.S. immigration law is not, by itself, sufficient." Dkt. 64-1 at 2. These boilerplate

21   documents offer no evidence that an individualized assessment of flight risk occurred.

22        The Border Patrol agents' failure to ask basic questions of the people arrested and to

23   engage in an actual individualized assessment of flight risk violates § 1357(a)(2) and the Court's

24   order. *See* Dkt. 47 at 86.

25        **3.    Defendants have failed to comply with the preliminary injunction's requirement for documenting stops and arrests.**

26

27        Lastly, Defendants have also failed to comply with the preliminary injunction's

     requirement for documenting detentive stops and warrantless arrests. The Court's order requires

28   Border Patrol agents to "document the facts and circumstances surrounding" each stop in this

21

1    District "in a narrative form," and to describe the factual basis for reasonable suspicion for that

2    stop. Dkt. 47 at 86-87. It also requires Border Patrol agents to "document in writing the facts and

3    circumstances surrounding [each] warrantless arrest and the specific, particularized facts

4    supporting the conclusion that the [individual] was likely to escape before a warrant could be

5    obtained." *Id.* at 87. Defendants must provide Plaintiffs this documentation upon request. *Id.*

6    Border Patrol agents, however, have violated these requirements.

7        ***First***, Border Patrol agents' use of boilerplate language results in violations of the

8    preliminary injunction. Rather than provide an account of the stop or arrest at issue, Border Patrol

9    agents have instead used copy-and-pasted language that does not accurately describe each

10   individual's stop and arrest or the individualized bases justifying reasonable suspicion and

11   probable cause of flight risk. As noted above, there are myriad falsehoods in the I-213s, including

12   claims that Selvin was a laborer in a Home Depot parking lot when he is in fact a high school

13   student who was walking to a clothing store, and claims that Messrs. Rivera-Molina and

14   Mazariegos ran away when they did not. Diaz Decl. ¶¶ 1-3; Dkt. 74-8, Mazariegos Decl. ¶¶ 3-4;

15   Dkt. 74-9, Rivera-Molina Decl. ¶ 2. The boilerplate process used to generate these documents

16   results in unreliable accounts that thus violate the letter and the spirit of the Court's preliminary

17   injunction.

18       ***Second***, Defendants assert that they are not required to create or provide documentation of

19   stops and warrantless arrests in this District that are not based on "immigration violations."

20   George Decl. ¶ 8 & Ex. D. As a result, Defendants have refused to provide documentation of a

21   U.S. citizen arrested during the Sacramento Home Depot raid. *Id.* But the Court's order does not

22   limit itself to alleged immigration violations, but encompasses all detentive stops and warrantless

23   arrests conducted by Border Patrol in this District. *See* Dkt. 47 at 86-87. Indeed, Plaintiffs'

24   motion for preliminary injunction sought relief in part based on evidence that Border Patrol

25   arrested a U.S. citizen on the pretextual basis that he was "alien smuggling" for driving with a

26   passenger who allegedly was in the United States without authorization. Dkt. 15-4 ¶ 9.

27   Defendants cannot evade reporting of stops and arrests based solely on their say-so that an

28   immigration violation was not at issue, as such a rule would undermine the reporting requirement

and incentivize agents to classify any stop or arrest of U.S. citizens, legal permanent residents, or others authorized to be in the United States as not involving an immigration violation. The preliminary injunction avoids such issues by requiring documentation of all Border Patrol stops and warrantless arrests in this District. Defendants' refusal to provide documentation of the arrest of a U.S. Citizen in the Sacramento Home Depot raid violates this requirement.

      **B.**      **The Court should require Defendants to remedy their breach and follow the Court's preliminary injunction order.**

Border Patrol's ongoing violations of law and failure to comply with the Court's preliminary injunction warrants this Court's intervention. As set forth in the concurrently filed proposed order, Plaintiffs respectfully request the Court provide the following relief:

*First*, the Court should order Border Patrol to issue a new Muster or directive providing adequate guidance on the standard for reasonable suspicion. That Muster should correct the deficiencies identified above, including by providing guidance that (1) characteristics, profiles, or generalizations that are shared with a substantial number of people who are lawfully in the country have minimal probative value and are insufficient alone or in combination to create reasonable suspicion; (2) the reasonable suspicion analysis differs between the border and the Eastern District, including by removing a "reasonable Border Patrol agent" as the standard for formation of reasonable suspicion, and explaining that many factors are relevant only at or near the border and, in fact, weigh against a finding of reasonable suspicion in this District; (3) "flight" is not a relevant reasonable suspicion factor based on current Border Patrol tactics and exercising the right to walk away from agents is never a relevant factor; (4) detail the analysis for when an interaction is a detentive stop, that is, when "a reasonable person would have believed that he was not free to leave"; and (5) explain the limitations on the "violations" Border Patrol agents are allowed to enforce and how they limit the development of reasonable suspicion, and expressly state the standard for reasonable suspicion for civil immigration stops. Plaintiffs respectfully request that the Court order Defendants to serve the new Muster or directive on Plaintiffs within 14 days of the Court's order, for the parties to meet and confer, and for objections to be raised and resolved, as necessary, within 21 days of service of the Muster or directive.

*Second*, the Court should require additional procedures regarding training for reasonable

suspicion and warrantless arrests in light of the ongoing issues identified above. Defendants have asserted, including in discovery responses, that the unlawful conduct in Operation Return to Sender and in the July 17, 2025 raid on the Sacramento Home Depot occurred despite over 100 hours of legal training and "periodic refreshers," George Decl. Ex. H, showing the ineffectiveness of current training. The Court should order Defendants to provide training on the new reasonable suspicion Muster or directive, and require that training include examples of the unlawful conduct addressed by the Court's preliminary injunction order and an explanation why that conduct was unlawful. The Court should require Defendants to serve on Plaintiffs the training materials that they plan on using regarding the new Muster or directive within 14 days of the Court's order. The Court should also order Defendants to serve on Plaintiffs the training materials they have been using, or will use, for warrantless arrests on the same timeframe. The parties should then meet and confer, and raise objections as necessary within 21 days of service of the training materials.

The Court should require training of all Border Patrol agents who have or will participate in operations in this District within 60 days after the resolution of objections regarding the new Muster or directive and the training materials. *See* Dkt. 31-2 ¶ 10 (Border Patrol declaration claiming that training could occur within 60 days). Thereafter, the Court should require that any Border Patrol agent receive the same training prior to participating in any operation in this District.

For the specific Border Patrol personnel who planned and carried out the Sacramento operation on July 17, due to their failure to follow the Court's preliminary injunction order, the Court should (1) require Defendants to produce a list of those personnel to Plaintiffs within seven days of the Court's order and (2) bar such personnel from participating in operations in this District until those agents and personnel are provided the above-referenced training. If those agents have already received training on reasonable suspicion and warrantless arrests, the Court should require that they be re-trained prior to carrying out any operations in this District. Courts have held that bars on actions by personnel pending such training are appropriate to ensure compliance with a preliminary injunction. *Nat'l Org. For Reform of Marijuana L. (NORML) v. Mullen*, 608 F. Supp. 945, 966 (N.D. Cal. 1985) (barring additional activities until training on

preliminary injunction was completed), *aff'd in part and remanded in part on other grounds at* 796 F.2d 276, 276 (9th Cir. 1986). The Court should provide that same relief here.

*Third*, the Court should bar Border Patrol agents from using boilerplate or copy-and-pasted language when describing (1) the factual basis for individualized reasonable suspicion for a detentive stop; and (2) the individualized assessment of flight risk required for warrantless arrests, as required under the Court's preliminary injunction order. *Compare Shaw v. Jones*, 683 F. Supp. 3d 1205, 1261 (D. Kan. 2023) (requiring state troopers to "use accurate and specific descriptive language and not rely on boilerplate or 'pat' language"). To the extent other factual material is included in a document, the Court should require that the bases for individualized reasonable suspicion and individualized assessment of flight risk be demarcated in the document and easily identified.

*Fourth*, the Court should require Border Patrol agents to document all detentive stops and warrantless arrests they conduct in this District, regardless of whether the stop or warrantless arrest was based on an alleged "immigration violation." As discussed above, the preliminary injunction already requires this relief, and allowing Defendants to avoid reporting because they decide that the stop or arrest did not involve an immigration violation would undermine the reporting requirement and leave Plaintiffs with incomplete information.

*Finally*, while the preliminary injunction currently requires Defendants to serve documentation of stops and warrantless arrests within 7 days of a request, Dkt. 47 at 87, Plaintiffs respectfully request the Court require service within 4 days of a request. For the Sacramento Home Depot raids, by the time Plaintiffs received the I-213s from Defendants and were able to investigate the facts, Plaintiffs could not locate most of the people arrested (8 out of 11 people) because they were not in immigration custody and presumably had already been deported. George Decl. ¶ 7. For effective access to witnesses and enforcement of the preliminary injunction, Plaintiffs respectfully request documentation of stops and arrests on a faster timeframe.

## V.    CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion, and order further relief as set forth above, and in the concurrently filed proposed order.

Dated: August 29, 2025                                    AMERICAN CIVIL LIBERTIES UNION
                                                         FOUNDATION OF NORTHERN
                                                         CALIFORNIA

                                                         /s/ Bree Bernwanger (as authorized August
                                          By:            29, 2025)
                                                         BREE BERNWANGER
                                                         MICHELLE (MINJU) Y. CHO
                                                         LAUREN DAVIS
                                                         SHILPI AGARWAL


Dated: August 29, 2025                    By:            AMERICAN CIVIL LIBERTIES UNION
                                                         FOUNDATION OF SOUTHERN
                                                         CALIFORNIA

                                                         /s/ Mayra Joachin (as authorized August
                                                         29, 2025)
                                                         MAYRA JOACHIN
                                                         EVA BITRAN


Dated: August 29, 2025                    By:            AMERICAN CIVIL LIBERTIES UNION
                                                         FOUNDATION OF SAN DIEGO &
                                                         IMPERIAL COUNTIES

                                                         /s/ Brisa Velazquez Oatis (as authorized
                                                         August 29, 2025)
                                                         BRISA VELAZQUEZ OATIS

                                                         Attorneys for Plaintiffs


Dated: August 29, 2025                                   KEKER, VAN NEST & PETERS LLP

                                          By:            /s/ Ajay S. Krishnan
                                                         AJAY S. KRISHNAN
                                                         JASON GEORGE
                                                         JULIA GREENBERG
                                                         REAGHAN E. BRAUN

                                                         Attorneys for Plaintiffs

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO ENFORCE
Case No. 1:25-cv-00246-JLT-CDB
3016066