BREE BERNWANGER - # 331731
bbernwanger@aclunc.org
MICHELLE (MINJU) Y. CHO - # 321939
mcho@aclunc.org
LAUREN DAVIS - # 357292
ldavis@aclunc.org
SHILPI AGARWAL - # 270749
sagarwal@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493

MAYRA JOACHIN - # 306065
mjoachin@aclusocal.org
EVA BITRAN - # 302081
ebitran@aclusocal.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SOUTHERN
CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5000

BRISA VELAZQUEZ OATIS - # 339132
bvoatis@aclu-sdic.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SAN DIEGO &
IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
Telephone: (619) 398-4199

*Attorneys for Plaintiffs*

AJAY S. KRISHNAN - # 222476
akrishnan@keker.com
JASON GEORGE - # 307707
jgeorge@keker.com
JULIA L. GREENBERG - # 333864
jgreenberg@keker.com
REAGHAN E. BRAUN - # 340526
rbraun@keker.com
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    415 391 5400
Facsimile:     415 397 7188

*Attorneys for Plaintiffs*

MARIO MARTINEZ - # 200721
mmartinez@farmworkerlaw.com
EDGAR IVÁN AGUILASOCHO - # 285567
eaguilasocho@farmworkerlaw.com
MARTINEZ AGUILASOCHO LAW, INC.
900 Truxtun Avenue, Suite 300
Bakersfield, CA 93301
Telephone: (661) 859-1174
Facsimile: (661) 840-6154

*Attorneys for Plaintiff United Farm Workers*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION

| | |
|---|---|
| UNITED FARM WORKERS, et al.,<br><br>         Plaintiffs,<br><br>     v.<br><br>KRISTI NOEM, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF HOMELAND SECURITY; et al.,<br><br>         Defendants. | Case No. 1:25-cv-00246-JLT-CDB<br><br>**JOINT DISCOVERY LETTER BRIEF RE ISSUANCE OF PROTECTIVE ORDER**<br><br>Judge:      Hon. Christopher D. Baker<br><br>Trial Date: None set |

November 25, 2025

**Via ECF & Email**

The Honorable Christopher D. Baker
United States District Court, Eastern District of California
United States Courthouse
510 19th Street, Suite 200
Bakersfield, California 93301
CBoren@caed.uscourts.gov

Re:    *United Farm Workers, et al. v. Noem, et al.*, 1:25-cv-00246-JLT-CDB

Dear Magistrate Judge Baker:

      Plaintiffs United Farm Workers, Oscar Morales Cisneros, Wilder Munguia Esquivel, Yolanda Aguilera Martinez, Juan Vargas Mendez, and Maria Guadalupe Hernandez Espinoza ("Plaintiffs") and Defendants Kristi Noem, Pete R. Flores, Michael W. Banks, and Gregory K. Bovino ("Defendants") (collectively, the "Parties") hereby jointly submit, pursuant to Paragraph 3 of the Court's Standing Order, this letter regarding disputed provisions of a proposed case protective order. The Parties last met and conferred by video conference on November 13, 2025, as well as several times over email. The Parties were unable to resolve the disputed issues described below.

      Respectfully submitted,

| | |
|---|---|
| */s/ Julia L. Greenberg* | BRETT A. SHUMATE<br>Assistant Attorney General |
| Julia L. Greenberg<br>KEKER, VAN NEST & PETERS LLP<br>*Attorney for Plaintiffs* | SAMUEL P. GO<br>Assistant Director |
| */s/ Michelle (Minju) Cho* | MARY L. LARAKERS<br>Senior Litigation Counsel |
| Michelle (Minju) Cho<br>AMERICAN CIVIL LIBERTIES UNION<br>FOUNDATION OF NORTHERN<br>CALIFORNIA<br>*Attorney for Plaintiffs* | TIM RAMNITZ<br>Senior Litigation Counsel |
| | OLGA Y. KUCHINS<br>Trial Attorney |

**Error! Unknown document property name.**

CAROLYN D. DILLARD
Trial Attorney

*/s/ Aysha T. Iqbal*
AYSHA T. IQBAL
Trial Attorney
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(771) 202-1392
Tel.: (202) 451-7672
Fax: (202) 305-7000
Email: Aysha.T.Iqbal@usdoj.gov
DC Bar No. 241424

*Attorneys for Defendants*

**Error! Unknown document property name.**

November 25, 2025
Page 2

## I.   PROTECTIVE ORDER

The Parties have reached agreement on most of the terms of the Protective Order, but were unable to reach agreement on a few issues outlined below. The Disputed Protective Order is attached as **Exhibit A** and includes the Parties' competing proposals presented to the Court in context. The Parties respectfully request resolution of these disputes and entry of a Protective Order reflecting the Court's ruling.

### a.  Paragraph 12: Senior Leadership Names & Titles

#### i.  Plaintiffs' Position

Defendants propose that information about federal employees "below the level of Executive Assistant Commissioner" be kept confidential. As a threshold clarification, Plaintiffs do not dispute that Defendants may designate as confidential the personally identifiable information of officials *below* the senior level of "Chief Patrol Agent," which should resolve the majority of Defendants' concerns. Rather, Defendants have not provided good cause for why, on produced government records, the names of highly visible senior officials, like Chief Patrol Agent Gregory Bovino (a named Defendant), should be hidden from the public, effectively shielding their activities from public scrutiny. As such, the Court should deny Defendants' request and instead adopt Plaintiffs' proposal.

Defendants fail to show good cause for their request. *See In re Roman Cath. Archbishop of Portland in Oregon*, 661 F.3d 417, 424 (9th Cir. 2011) ("The party opposing disclosure [of information] has the burden of proving 'good cause,' which requires a showing 'that specific prejudice or harm will result' if the protective order is not granted."). **First**, the involvement of senior-level officials, like Defendant Bovino, in planning and executing raids like the one at issue here, is a matter of public interest. *See Gordon v. FBI*, 388 F. Supp. 2d 1028, 1044 (N.D. Cal. 2005) (There is a strong public interest "in knowing who is making the policies that have such a profound effect on the . . . public."). Defendant Bovino planned and led Operation Return to Sender, which prompted this litigation. *See, e.g.*, Complaint ¶¶ 35, 248, 255, 256; Dkt. 15-2, Exs. 12, 13, 14. Maintaining the default presumption of disclosure for materials naming Bovino will allow the public to understand the full extent of the agency's practices at issue, and may promote accountability of the agency (and Defendants) to the public, which they serve. *See Est. of Neil v. Cnty. of Colusa*, No. 2:19-CV-02441-TLN-DB, 2020 WL 5535448, at *3 (E.D. Cal. Sept. 15, 2020) (Although Defendants may "argue public disclosure will hinder [agents'] willingness to participate openly and effectively in investigations, the threat of scrutiny likely motivates police officers to conduct investigations that are 'thorough, more accurate and better reasoned.'").

**Second**, senior officials, like Defendant Bovino, generally have a reduced interest in their personal privacy as compared to lower-level officials. *See Forest Serv. Emps. for Env't Ethics v. U.S. Forest Serv.*, 524 F.3d 1021, 1025 (9th Cir. 2008); *see, e.g. Lahr v. Nat'l Transp. Safety Bd.*, 569 F.3d 964, 977 (9th Cir. 2009) (by becoming public officials, "their privacy interests are somewhat reduced"); *Lane v. DOI*, 523 F.3d 1128, 1137-38 (9th Cir. 2008) (finding "public interest is heightened" where individual is "high level employee").

November 25, 2025
Page 3

Here, Defendant Bovino is not only a senior official with a lower expectation of privacy, but he has also made himself the ***public face*** of the at-issue practice of unlawfully detaining and arresting Latinos and other community members without the necessary individualized assessment of reasonable suspicion or flight risk. Defendant Bovino regularly issues public statements about the raids, including Operation Return to Sender, publicizes his leadership role in them on social media, and has spoken to numerous local and national media outlets to defend Border Patrol's actions.[1] There is no plausible new risk of harm or embarrassment to Defendant Bovino by being publicly associated with these issues through the discovery process, because, as noted above, he has squarely announced his involvement in the media. *Cf. Forest Serv. Emps.*, 524 F.3d at 1026 (in contrast, weighing risk of embarrassment and shame for "'low and mid-level' employees" whose association with an incident was *not* publicly known).

Thus, the Court should adopt Plaintiffs' proposal which appropriately balances the Court's interest in protecting the names and information of lower-level federal employees against the significant public interest in providing information to the public about senior officials' practices.

## ii. Defendants' Position

Plaintiffs' request that confidential government personnel information, including identifying information ("PII") of supervisory and non-supervisory federal and non-federal employees and contractors below the level of Executive Assistant Commissioner (or in the case of U.S. Border Patrol ("USBP") "Chief") remain public is unnecessary to litigate the issues presented in this case. Plaintiffs bring a programmatic challenge to agency policies and operational practices. The question before the Court is whether DHS and its components lawfully conduct immigration enforcement within "Kern County and the surrounding region," ECF No. 1 at ¶1. Releasing the identifying information of individuals who work for the Department of Homeland Security ("DHS") to the public is not necessary to their claim because Plaintiffs' claims concern policy and systemic conduct. The discovery most relevant to this litigation involves agency memoranda, operational directives, and communications reflecting government decision-making processes—not the personal identifiers of all DHS employees, and especially not those below the level of Executive Assistant Commissioner (or in the case of USBP, "Chief"). Rule 26(b)(1) requires discovery to be both relevant and proportional to the needs of the case, considering the importance of the issues, the burden of production, and the potential harm to individuals. *See Belcher v. Bassett Furniture Indus., Inc.*, 588 F.2d 904, 908 (4th Cir. 1978). Here, the minimal probative value of DHS employee identifying information, especially for those at or below Chief Executive Assistant Commissioner (or in the case of USBP, "Chief"), is outweighed by the serious and well documented safety and privacy risks posed by disclosure.

---

[1] *See, e.g.*, *New York Times*, "An Interview With the Man Behind Trump's Current Immigration Crackdown" (Nov. 12, 2025), https://www.nytimes.com/2025/11/12/podcasts/the-daily/interview-gregory-bovino-deportations.html (Bovino discussing, among other things, Operation Return to Sender); CBP Gov (@CBPGov), Instagram (June 12, 2025), https://www.instagram.com/reel/DK0MP4hvhhr/ (Bovino stating "We're here and we're not going away" in video on Fox News).

Those risks are not theoretical. Publicly available data reflects a "significant increase in reported assaults on officers and agents within the past fiscal year, with 290 reported assaults on officers and agents in FY2025 compared to 76 assaults in FY2024." Affidavit of Michele James, Acting Assistant Commissioner, Customs and Border Patrol ("CBP") Office of Office of Professional Responsibility ("OPR"), November 25, 2025, **Exhibit B** at ¶ 5 & n.1, citing CBP Assault and Use of Force Dashboards. There is an escalating pattern of targeted attacks designed to intimidate and endanger immigration-enforcement personnel. Doxing, or public disclosure of PII, threatens employee safety, as it often leads to harassment, intimidation, and harm to government employees. *Id.* USBP agents operating in Los Angeles report that individuals wait outside the secure location where USBP operates, seeking to identify agents and, at times, following their vehicles. Once these individuals uncover any PII, today's technology makes it easy for them to find and widely distribute *all* personal information about officers, agents, and other CBP employees conducting their assigned duties. Social media sites like ICEList.is, post photos of CBP personnel, sometimes with the individuals' PII. They often use the information or encourage others to use it to target CBP employees. This intimidates CBP employees and interferes with their ability to carry out CBP's mission. The attached affidavit lists several instances of substantiated doxing events from across CBP. *Id.* at ¶¶ 8-9.

There is credible intelligence that Mexican drug cartels have placed "tiered" bounties on ICE and CBP officers, using "spotters armed with firearms and radio communications to track the real-time movements of CBP and ICE agents."[2] *See also* Ex. B at ¶ 10 (averring that cartels are offering $2,000 for gathering intelligence or doxing officers/agents (including photos and family details), $5,000–$10,000 for kidnapping or non-lethal assaults on standard ICE/CBP officers/agents; and up to $50,000 for the assassination of higher-ranking officials, including a Chief Patrol Agent.).

Executive Assistant Commissioners oversee their respective components within CBP, and their names are published in relation to their position on CBP's public-facing website. The components overseen by an official at the level of Executive Assistant Commissioner include Air and Marine Operations ("AMO"), Office of Field Operations ("OFO"), and USBP. The Chief of USBP oversees USBP and is the equivalent of an EAC. Chief Patrol Agents are positioned three levels below the Chief of USBP. Chief Patrol Agents lead Border Patrol sectors at a local, regional level, and report to a chain of command at USBP Headquarters. Anyone below an Executive Assistant Commissioner is not on CBP's public-facing website and thus Defendants seek to protect their PII.

Importantly, while Plaintiffs assert that the identities of employees at the level of Chief Patrol Agent should not be protected from public release, the position of Chief Patrol Agent is not public facing nor of sufficiently high rank to merit public disclosure. While employees in positions of leadership within CBP are identified on the agency's public-facing website at the level of Executive Assistant Commissioner and above, Chief Patrol Agents are not. Chief Patrol Agents lead Border Patrol sectors at a local, regional level. Moreover, employees at the level of Chief

---

[2] *See* Luke Barr, "Cartels issuing bounties, $50,000 hits on ICE, CBP agents," *ABC News* (Oct. 14 2025), https://abcnews.go.com/US/cartels-issuing-bounties-50000-hits-ice-cbpagents/story?id=126521867 (last visited: Nov. 25, 2025).

November 25, 2025
Page 5

Patrol Agent have faced significant doxing and other threats in the context of CBP's ongoing enforcement operations. Ex. B at ¶8(d), ¶ 10.

Earlier this year, hackers also published personal data belonging to ICE, DHS, DOJ, and FBI employees, with "names, email addresses and phone numbers, and addresses—in some cases of officials' homes rather than the location of their work."[3] And just last month in Los Angeles, a foreign national "rammed law enforcement vehicles in an attempt to dislodge his car during an immigration arrest," injuring a U.S. Marshal and prompting a large-scale tactical response.[4]

These incidents underscore why disclosing officers' identities poses unacceptable risks. Once personal identifiers are revealed, they cannot be effectively contained. Redactions and pseudonyms are proportional, well-recognized mechanisms to protect sensitive information and ensure discovery proceeds without compromising safety. Both serve the same function: preventing unnecessary exposure of identifying details where disclosure could invite harassment or retaliation.

The Ninth Circuit has long recognized that nondisclosure is appropriate in "unusual" cases where revealing an identity would expose a person to "harassment, injury, ridicule, or personal embarrassment." *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1068 (9th Cir. 2000). Although *Advanced Textile* involved party plaintiffs, its reasoning applies with equal force to non-party law-enforcement officers whose identification could subject them and their families to danger. Courts applying Rule 26(b)(1) likewise consider safety and privacy interests when assessing proportionality and scope.

Congress has similarly recognized the sensitivity of this information. Under FOIA Exemption 7(C), agencies routinely redact the names and identifying details of law-enforcement officers, support staff, and contractors to prevent harassment or retaliation. *See Schrecker v. DOJ*, 349 F.3d 657, 661 (D.C. Cir. 2003); *Concepcion v. FBI*, 606 F. Supp. 2d 14, 39 (D.D.C. 2009) (collecting cases); *Halpern v. FBI*, 181 F.3d 279, 296-98 (2d Cir. 1999); *Lesar v. DOJ*, 636 F.2d 472, 487 (D.C. Cir. 1987). The same principle applies here: disclosure of employees' identifying information could subject them to harassment or physical harm in both their professional and personal lives. Plaintiffs have not met their burden to show that these identifiers are relevant or proportional to their claims. Even if the Court were to consider specific stops or detentions, the relevant question would be whether those encounters complied with constitutional standards—not the officers' names or duty stations. Plaintiffs' position is also internally inconsistent: they insist that voluntary non-party information should remain confidential, yet contend that federal law enforcement officers' names—whose disclosure poses well-documented risks—should be freely available. That inconsistency underscores the overreach of their proposal.

The government's approach strikes the appropriate balance. Maintaining employee PII below the Executive Assistant Commissioner (or in the case of USBP, "Chief") position within

---

[3] *See* Lily Hay Newman, "Hackers Dox ICE, DHS, DOJ, and FBI Officials," *Wired* (Oct. 18 2025), https://www.wired.com/story/security-news-this-week-hackers-dox-ice-dhs-doj-and-fbi-officials.

[4] *See* Ray Sanchez, "US marshal and undocumented immigrant - a popular TikTok streamer - injured in shooting during ICE stop in Los Angeles," *CNN* (Oct. 22, 2025), https://www.cnn.com/2025/10/21/us/los-angeles-immigration-us-marshal-injured.

**Error! Unknown document property name.**

the definition of Case Material designated "CONFIDENTIAL," and permitting law enforcement personnel and contractors to proceed under pseudonym or with PII redacted in public filings or open court, ensures discovery can proceed efficiently while protecting privacy, operational integrity, and personal safety.

Plaintiffs claim that keeping the PII of "highly visible senior officials like Chief Patrol Agent Gregory Agent Bovino" confidential "would effectively serve to shield the activities of Defendant Bovino (and others) from public scrutiny." Yet, the Protective Order simply requires Plaintiffs to protect these employees' identities from public disclosure during discovery, and to confer with Defendants before releasing identities via a public court filing or in open court. If Defendants want to protect the identities of employees that Plaintiffs want to disclose, the Protective Order provides that the parties can bring that issue to the court. So, to the extent Plaintiffs have concerns about individual names, the Protective Order does not preclude them from addressing that with Defendants and the court. There is no reason to fail to provide protection against public disclosure generally, particularly in light of the doxing threats addressed in the declaration. Ex. B at ¶¶ 8d, 10, 11. Chief Bovino is just one CPA, there are others whose safety should not be denied.

### b. Paragraph 16: Limitations on Use of Designated Materials

#### i. Plaintiffs' Position

Plaintiffs seek basic protections to limit Defendants from using Designated Materials produced in this litigation for any purposes outside of this action, including for immigration enforcement purposes. This should be noncontroversial. But Defendants not only refused to agree: they specifically drafted a carve-out to the limitation-on-use provision, seeking to be able to use such material for law enforcement purposes. Now, Defendants have doubled down, contending it is their right to use information obtained through litigation for civil immigration enforcement purposes unrelated to this action.

As such, Plaintiffs have good cause for seeking this protection. Designated Material in this case may provide information about immigration status about parties or nonparties, which "is a very sensitive area of inquiry." *E.E.O.C. v. First Wireless Group, Inc.*, 2007 WL 586720, at *3 (E.D.N.Y. Feb. 20, 2007). Given this sensitivity, courts regularly issue protective orders restricting defendants from obtaining information about immigration status, or limiting the use of such discovered information. *See, e.g.*, *Zepeda Rivas v. Jennings*, Case No. 20-cv-02731-VC, Dkt. 161 (N.D. Cal. May 13, 2020) (issuing a protective order prohibiting ICE "from using information it obtains about proposed custodians or members of their households through . . . litigation in enforcement actions"); *Aguilar v. ICE,* 2009 WL 1789336, at *5 (S.D.N.Y. 2009) (permitting "all immigration information" to be designated "attorneys' eyes only" and emphasizing that such information "may not be used by ICE for immigration prosecutions"); *Barrera v. Boughton*, 2010 WL 1240904, at *2 (D. Conn. Mar. 19, 2010) (granting protective order to prevent defendants from compelling information "bearing on immigration status").

This Court has good reason for limiting the use of discovered materials here: a person's immigration status not only lacks any probative value as to the parties' claims or

November 25, 2025
Page 7

defenses, but also may chill putative class members from coming forward for fear of jeopardizing family members or friends. *See Barrera*, 2010 WL 1240904, at *4-5 (noting immigration status "is not probative of facts the defendants knew at the time of detention or arrest and therefore . . . is not relevant to whether the defendants had reasonable suspicion or probable cause"); *see, e.g., Uroza v. Salt Lake Cnty., et al.*, 2014 WL 670236, at *4-5 (D. Utah Feb. 20, 2014) (finding good cause to issue a protective order "preventing Defendants from asking questions about . . . immigration status" to avoid "intimidation and chilling effect"); *Lopez Venegas v. Johnson et al.*, No. 2:13-cv-03972-JAK-PLA, Dkt. 66 at 4 (C.D. Cal. Feb. 6, 2014) (issuing a protective order to limit the use of confidential information outside of the litigation, given the potential "fear of deportation or other negative immigration consequences").

Here, Defendants appear to reserve the right to do more than chill litigation against them: they threaten to take advantage of confidential information they may receive in this litigation to detain or deport individuals (or their family members) who bring or participate in this suit, raising the specter of retaliation. *See AAUP v. Rubio*, No. 1:25-cv-10685-WGY, Dkt. 124 (D. Mass. June 10, 2025) (granting protective order to bar federal defendants from using immigration enforcement to retaliate against noncitizen plaintiffs and witnesses in civil litigation).

Finally, these provisions do not provide a "backdoor injunction" or otherwise regulate how DHS may carry out its functions.[5] Pursuant to Federal Rule of Civil Procedure 26(c), parties regularly seek protective orders to protect parties and nonparties from harassment, oppression, and undue burden—and courts commonly issue protective orders to limit disclosure of certain information.[6] *See, e.g., Fox Broad. Co. v. Dish Network, LLC*, 2015 WL 12765545, at *3 (C.D. Cal. Jan. 12, 2015) ("The court has broad authority to control discovery and fashion protective orders. . . . Ultimately, the grant and nature of protection is singularly within the discretion of the court."). These provisions will not stop Defendants from carrying out their purported duties; the provisions simply limit the sharing of sensitive information, which the parties and any nonparties may have an obligation to produce in this litigation under the Federal Rules, but otherwise might not have an obligation to disclose to governmental agencies for purposes unrelated to this action. To the extent necessary, Defendants can challenge confidentiality designations. But

---

[5] Defendants' argument about jurisdiction is nonsensical. The Court clearly has jurisdiction to issue a protective order, restricting disclosure of certain information designated confidential. *See* Fed. R. Civ. Proc. 26(c). Nothing in 1252(g) limits that authority. *See Ibarra-Perez v. United States,* 154 F.4th 989, 996 (9th Cir. 2025) (1252(g)) limits jurisdiction only over "three discrete actions," not including information disclosure). To the extent Defendants contend that the Court does not have jurisdiction generally, the Court already found that it does. *See* Dkt. 47 at 33, 35-36. And, Section 1252(g) of Title 8 is irrelevant here. *Ibarra-Perez*, 154 F.4th at 996, 998.

[6] Whether the Privacy Act and/or the Intelligence Reform and Terrorism Protection Act of 2004 permit information sharing for law enforcement purposes has no bearing on this Court's ability to issue a protective order.

it would be an abuse of litigation process for Defendants to use Plaintiffs' civil litigation as a tool to investigate, threaten, and punish current and potential litigants.

Thus, Plaintiffs respectfully request that the Court provide these reasonable protections.

### ii. Defendants' Position

Plaintiffs' request to restrict DHS' use of Designated Material obtained through discovery in this action remains beyond the scope of Federal Rule of Civil Procedure 26 and beyond the authority of this Court.

Protective orders cannot be used to supervise, influence, or limit how the Executive uses information when carrying out its statutory duties, even in a period of heightened enforcement. Immigration enforcement priorities are policy choices made within the Executive Branch. They may make action more likely, but they do not create judicial power that Congress has not given.

Section 1252(g) of Title 8 eliminates jurisdiction over claims that arise from the decision to commence or pursue removal proceedings, clearly indicating Congress' intent to limit district courts' ability to review immigration enforcement decisions. A protective order cannot be used to enter a backdoor injunction through which a district court can regulate DHS's ability to make enforcement decisions when Congress has expressly placed those decisions beyond judicial oversight.

Additionally, when the Executive is under a statutory obligation or policy choice to investigate, charge, or remove noncitizens who are inadmissible or removable, the government must retain the ability to rely on information it lawfully obtained. *See generally Carlson v. Landon*, 342 U.S. 524 (1952) (confirming that the Executive's authority in immigration matters is broad). Plaintiffs' request to include a specific limitation on Defendants' use of any information for immigration enforcement purposes places an unacceptable burden on the government to prove a negative--that operators did not receive information from this litigation--if a class member's relative is arrested. Plaintiffs cannot use a protective order to place conditions on how the government meets its responsibilities under the Immigration and Nationality Act.

Nor can courts override Congressional intent by prohibiting the sharing of information where Congress has expressly allowed or even commanded it. The Privacy Act, which generally places strict limits on federal agencies' abilities to disclose information about individuals, allows law-enforcement related disclosures to other agencies under certain circumstances, such as when disclosure of the record is "to those officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties" (5 U.S.C. § 552a(b)(1)); "for a routine use" (meaning "the use of such record for a purpose which is compatible with the purpose for which it was created") (5 U.S.C. §§ 552a(b)(3), (a)(7)); or "for a civil or criminal law enforcement activity if the activity is authorized by law, and if the head of the agency or instrumentality has made a written request to the agency which maintains the record specifying the particular portion desired and the law enforcement activity for which the record is sought" (5 U.S.C. § 552(b)(7)).

Further, the Intelligence Reform and Terrorism Protection Act of 2004 ("IRTPA"), mandates that "[t]he head of each department or agency . . . shall," inter alia, "ensure full department or agency compliance with information sharing policies, procedures, guidelines, rules,

November 25, 2025
Page 9

and standards." Pub. L. No. 108-458, § 1016(i), 118 Stat. 3638, 3670 (2004) (codified at 6 U.S.C. § 485(i)), Exec. Order No. 13,388, "Further Strengthening the Sharing of Terrorism Information to Protect Americans," § 2(a), 70 Fed. Reg. 62,023, 2005 WL 2777052 (Oct. 25, 2005) ("the head of each agency that possesses or acquires terrorism information shall promptly give access to the terrorism information to the head of each other agency that has counterterrorism functions, and provide the terrorism information to each such agency"); Homeland Security Act of 2002, Pub. L. No. 107-296, § 202(d)(2), 116 Stat. 2135, 2149–50 (2002) (codified at 6 U.S.C. § 122(d)(2)) ("The Secretary . . . shall work to ensure that intelligence or other information relating to terrorism to which the Department has access is appropriately shared with the elements of the Federal Government.").

A protective order simply cannot expand judicial authority where Congress has withdrawn it and cannot prevent the government from using information to carry out its statutory duties. Thus, Rule 26 is not a vehicle to prevent government action where it has been expressly authorized by Congress.

### c. Paragraph 18(c): Exception for Recordings Designated AEO

#### i. Plaintiffs' Position

Plaintiffs respectfully request that the parties be permitted to show "a recording of an enforcement or immigration operation" designated "HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY" ("AEO") to "a person that Counsel has a good faith belief was recorded" "for purposes of obtaining sworn testimony regarding the events" recorded. Plaintiffs have good cause for requesting this provision: it is crucial for Plaintiffs to identify witnesses and understand events, like Defendants' July 2025 raid in Sacramento, CA, to protect Plaintiffs' and provisional class members' civil and constitutional rights.

This is not a hypothetical concern. As an example, Plaintiffs have filed a motion to enforce the preliminary injunction, *see* Dkt. 81, including declarations from witnesses who were affected by Defendants' raid in Sacramento. In support of their opposition, Defendants then filed a declaration from a government employee who contends that he "observed the [Sacramento] operation unfold via a live video feed." Dkt. 112-2 at ¶ 6. Defendants used this declaration as support that they did not violate the Court's preliminary injunction in July. *See* Dkt. 112 at 26 (relying on agent who claimed to have reviewed video feed to oppose motion).

Without this provision, Plaintiffs would not be permitted to show this video[7] to potential witnesses to investigate facts or determine who, if anyone, to call to testify about the Sacramento raids in the February 2026 hearing on the motion to enforce the Court's preliminary injunction. *See* Dkts. 124, 125. It would be fundamentally unfair for Defendants to be able to rely on characterizations of recordings designated AEO in motions and hearings, whereas Plaintiffs have little ability to challenge them as they're foreclosed from showing those AEO materials to

---

[7] Defendants contend that, when they produce the video, they will only do so under an AEO designation, even though the video allegedly depicts activity in a Home Depot parking lot.

potential witnesses. And, in the future, Plaintiffs need to be able to ***show***[8] recordings to potential class members who were present during a recorded event to confirm their understanding of the event, which may differ from that of the government. Thus, Plaintiffs respectfully request that the Court order the inclusion of Plaintiffs' provision.

### ii. Defendants' Position

To the extent video footage contains case material designated as "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" Defendants object to it being shown to an individual who Plaintiffs believe was recorded. If Defendants designated video footage as "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" then it is because Defendants have formed a good faith belief that the information contained in the video is "so highly sensitive that its disclosure to certain individuals would create a substantial risk of harm that could not be avoided by any less restrictive means."

For instance, video footage may reveal sensitive law enforcement information, including law enforcement tactics, techniques, and procedures about CBP's non-public Small Unmanned Aircraft Systems ("SUAS") Program operations and capabilities. Information gleaned from such videos could enable bad actors to contravene DHS's law enforcement activity. Further, it is not necessary to Plaintiffs' case to prove specific individuals appear in the videos, and if it is, there are other means of identifying who the individuals are that appear in videos. Plaintiffs could, for example, show the video footage to the court in camera and then ask the witness questions about the recorded incident without the individual having to view the footage. This would balance Plaintiffs' need to prove their case with Defendants' need to protect sensitive law enforcement information that reveals information about its tactics, techniques, and procedures.

---

[8] Plaintiffs emphasize that they request merely the ability to "show," not distribute, recordings.

**Error! Unknown document property name.**