1
2
3
4
5
6
7
8
9
10

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

11
12
13
14
15
16

| | |
|---|---|
| UNITED FARM WORKERS, et al., | Case No. 1:25-cv-00246 JLT CDB |
| Plaintiffs, | ORDER RE DEFENDANTS' MOTION TO STAY |
| v. | |
| NOEM, et al., | (Doc. 115) |
| Defendants. | |

17

## I.    INTRODUCTION

18    Plaintiffs United Farm Workers, Oscar Morales Cisneros, Wilder Munguia Esquivel,

19  Yolanda Aguilera Martinez, Juan Vargas Mendez, and Maria Guadalupe Hernandez brought the

20  instant action against Defendants—including the Secretary of Homeland Security and the Chief

21  of U.S. Border Patrol (USBP), among others—seeking declaratory and injunctive relief related to

22  detentive stops and arrests by U.S. Border Patrol Agents in the Eastern District of California. (*See*

23  *generally* Doc. 1.)

24    In early January 2025, USBP launched "Operation Return to Sender," which targeted the

25  Central Valley of California, located within the Eastern District of California, in efforts to stop,

26  detain, and arrest people suspected of being in the country unlawfully. (*See* Doc. 1 at ¶¶ 1–2;

27  Doc. 15-2 at 72.) In response, Plaintiffs filed the instant action alleging violations of

28  8 U.S.C. § 1357(a)(2), 8 C.F.R. § 287.8(c)(2)(ii), as well as the Fourth and Fifth Amendments to

1

1    the U.S. Constitution, seeking declaratory and injunctive relief. (Doc. 1 at 65–69.)

2         Plaintiffs subsequently filed a motion for provisional class certification, (Doc. 14), and a

3    motion for preliminary injunction. (Doc. 15.) Defendants opposed both motions, arguing, among

4    other things, that Plaintiffs lacked standing to pursue injunctive relief because "they cannot

5    demonstrate any sufficient likelihood that they will be wronged again in a similar way because

6    the issues raised in their Complaint have been resolved," (Doc. 32 at 14), and relatedly, that

7    Plaintiffs claims had been rendered moot by guidance (a "Muster") issued by USBP on April 4,

8    2025.

9         On April 29, 2025, the Court provisionally certified the Plaintiff classes and entered a

10   preliminary injunction. (Doc. 47) (hereinafter, the "PI Order"). The Court enjoined Border Patrol

11   from conducting detentive stops in this District unless, pre-stop, the detaining agent has

12   reasonable suspicion that the person to be stopped is a noncitizen who is present within the

13   United States in violation of U.S. immigration law. (*Id*. at 86.) Border Patrol was also enjoined

14   from effecting warrantless arrests in this District unless, pre-arrest, the arresting agent has

15   probable cause to believe that the noncitizen being arrested is likely to escape before a warrant

16   can be obtained. (*Id*.) The Court further required Border Patrol to (1) submit documentation with

17   articulable facts to support every immigration-related detentive stop; (2) comply with all

18   requirements in DHS's "Broadcast Statement of Policy" including documentation with articulable

19   facts of flight risk; (3) issue guidance on how agents should determine the existence of reasonable

20   suspicion; and (4) submit documentation showing that border patrol agents have been adequately

21   trained. (*Id*. at 86–88.) On June 26, 2025, Defendants appealed from the PI Order. (Doc. 59.)[1]

22        On July 14, 2025, Defendants filed a motion to dismiss in this Court, arguing, among

23   other things, that "Plaintiffs lack standing to pursue prospective equitable relief because they have

24   not demonstrated that their isolated encounters with USBP are likely to recur or that they will

25   again be subjected to any unlawful conduct[,]" (Doc. 64 at 20); that Plaintiff "UFW cannot

26   establish associational standing because its members lack standing themselves," (*id*. at 24); and

27

28   _____

[1] As of the date of this order, briefing of the appeal is largely complete and the Ninth Circuit has indicated an intent to hear oral argument in April or May 2026. *See Docket*, *United Farm Workers of Am., et al. v. Noem*, et al., No. 25-4047 (9th Cir.)

1    that "Plaintiffs' claims I-III concerning stops and arrests are moot," (*id*. at 28).

2         On July 17, 2025, El Centro Border Patrol engaged in another immigration raid within this

3    District, at a Home Depot in Sacramento, California. (Doc. 94 at 10–11; Doc. 112 at 9–10.) On

4    August 29, 2025, Plaintiffs filed a motion to enforce the PI Order, arguing in part that Defendants

5    failed to comply with the PI when it carried out the Sacramento raid. (*See* Doc. 81.)

6         Meanwhile, on September 25, 2025, the Supreme Court stayed pending appeal a similar,

7    but not identical, preliminary injunction order entered in the Central District of California

8    addressing an alleged pattern of USBP agents engaging in detentive stops without reasonable

9    suspicion in that jurisdiction. *Noem v. Perdomo*, 606 U.S. __, 2025 WL 2585637 (Sept. 8, 2025).

10   The Ninth Circuit had denied a stay, rejecting the Government's argument that *Los Angeles v.*

11   *Lyons*, 461 U.S. 95 (1983), precluded the *Perdomo* plaintiffs from establishing standing for

12   prospective injunctive relief because they failed to show a substantial likelihood that they were

13   likely to be stopped again, instead finding that the plaintiffs had established a "pattern of

14   officially sanctioned" unlawful stops and that this was sufficient to establish likelihood of

15   recurring injury. *Perdomo v. Noem*, 148 F.4th 656, 674-75 (9th Cir. 2025). Writing in

16   concurrence and only for himself, Justice Kavanaugh reasoned that under *Lyons*, "plaintiffs likely

17   lack Article III standing to seek a broad injunction restricting immigration officers from making

18   . . . investigative stops," because they had "no good basis to believe that law enforcement will

19   unlawfully stop them in the future . . . and certainly no good basis for believing that any stop of

20   the plaintiffs is imminent." *Id*. Alternatively, "even if plaintiffs had standing" Justice Kavanaugh

21   reasoned that the Government has a "fair prospect" of succeeding on the Fourth Amendment

22   issue. *Id*. at *3.

23         Defendants' opening brief on appeal in this case, filed September 26, 2025, invoked

24   Justice Kavanaugh's concurrence in *Perdomo* to argue that Plaintiffs cannot establish standing for

25   prospective injunctive relief because they cannot show that they "would likely be stopped or

26   arrested in the unlawful manner relevant to their requested relief—i.e., stopped without

27   reasonable suspicion or arrested without consideration of flight risk" given that "Plaintiffs' single

28   interactions with Border Patrol, all of which occurred over the same 3-day period, months before

3

1    the injunction issued, established neither." Brief of Defendants-Appellants at 23, *United Farm*

2    *Workers v. Noem*, No. 25-4047, (9th Cir. Sept. 26, 2025), Dkt. 12.1 ("Def. Opening Appellate

3    Br."). Defendants also argue that intervening steps taken by USBP have rendered Plaintiffs'

4    claims moot, pointing again to the April 4, 2025 Muster, as well as a second Muster issued after

5    the PI Order. *Id*. at 35–36. Assuming Plaintiffs have Article III standing and that their claims are

6    not technically moot, Defendants also argue that Plaintiffs "failed to show a sufficient likelihood

7    of imminent irreparable injury to warrant a preliminary injunction," such that the injunction

8    should be vacated even if the Ninth Circuit finds the case is justiciable. *Id*. at 42–43; *see also id*.

9    at 44 ("There is not a single instance in the record of an individual being stopped more than once

10   by Border Patrol."). Additionally, Defendants argue on appeal that the PI Order is an

11   impermissible "follow the law" injunction and that 8 U.S.C. § 1252(f)(1) prohibits the kind of

12   class-wide injunctive relief ordered by this Court. *See id*. at 35–44.

13          On October 17, 2025, Defendants moved to stay the litigation pending the outcome of the

14   appeal. (Doc. 115.) The motion to stay is fully briefed and ripe for review. (Docs. 118, 123.) As

15   indicated, (Doc. 122), the Court took the matter under submission without oral argument. For the

16   reasons set forth below, the Court **DENIES** the motion to stay but finds it necessary *sua sponte* to

17   stay certain aspects of the motion to dismiss.

18                              **II.    DISCUSSION**

19   **A.    Compulsory Stay of All Proceedings Pending Appeal**

20          It is well established that the filing of a notice of appeal, including interlocutory appeal,

21   automatically "divests the district court of its control over those aspects of the case involved in

22   the appeal." *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982). This is a judge-

23   made rule that is intended to "promote judicial economy and avoid the confusion that would

24   ensue from having the same issues before two courts simultaneously." *Nat. Res. Def. Council,*

25   *Inc. v. Sw. Marine Inc.*, 242 F.3d 1163, 1166 (9th Cir. 2001). In *Coinbase, Inc. v. Bielski*, 599

26   U.S. 736 (2023), the Supreme Court applied *Griggs* to find "that a district court is 'require[d]' to

27   enter an 'automatic stay' pending appeal when a party exercises its statutory right under 9 U.S.C.

28   § 16(a) ('The Federal Arbitration Act' or 'FAA') to an interlocutory appeal of the denial of a

4

1  motion to compel arbitration." *California by & through Harrison v. Express Scripts, Inc.*, 139

2  F.4th 763, 767 (9th Cir. 2025) (quoting *Coinbase*, 599 U.S. at 742–44 (2023)). This represents a

3  departure from the general rule that because "the merits are not matters 'involved in the

4  appeal[]'" of a preliminary injunction, *G & M, Inc. v. Newbern*, 488 F.2d 742, 746 (9th Cir. 1973)

5  (citation omitted), a district court has the power to proceed to other stages of the litigation,

6  including a trial on the merits while an interlocutory appeal from a preliminary injunction is

7  pending. *Big Country Foods, Inc. v. Bd. of Educ. of Anchorage Sch. Dist., Anchorage, Alaska*,

8  868 F.2d 1085, 1087 (9th Cir. 1989) ("The purpose of a preliminary injunction is to preserve

9  rights pending resolution of the merits of the case by the trial. It ordinarily does not obviate the

10  need to proceed with preparation for trial and trial."); *Am. Dev. Corp. v. Strack*, 81 F.3d 167 (9th

11  Cir. 1996) ("Therefore, even though the appeal of the denial of the injunction was pending in the

12  case at bar, the district court had jurisdiction to enter summary judgment [on the substantive

13  merits].").

14      Defendants urge "this Court [to] conclude that because the preliminary injunction appeal

15  challenges this Court's subject matter jurisdiction, a decision which will impact the entirety of the

16  litigation, *Coinbase* and *Griggs* require the Court to stay litigation pending the appeal." (Doc. 123

17  at 9.)[2] Plaintiffs, on the other hand, argue that *Coinbase*'s holding is limited to the arbitration

18  context, and *Griggs* only requires a stay where a district court is adjudicating the same issue that

19  is pending before a court of appeals. (Doc. 118 at 6.)

20      In *Coinbase*, the question on appeal was "whether the case belongs in arbitration or

21  instead in the district court" such that "the entire case [was] essentially 'involved in the appeal.'"

22  *Coinbase*, 599 U.S. at 741 (quoting *Griggs*, 459 U.S. at 58). The Supreme Court therefore held

23  that an automatic "stay of lower court proceedings pending appeal is required when a district

24  court denies a motion to compel arbitration." *California*, 139 F.4th at 767 (citing *Coinbase*, 599

25  U.S. at 741). The Fourth Circuit provided a helpful summary of *Coinbase*'s procedural history

26  ──────────────

27  [2] Defendants argue that this "Court should stay proceedings entirely pending the appeal." (Doc. 115 at 9 (citation omitted).) This request, however, does not appear to encompass staying the enforcement of the PI

28  Order. *See* Doc. 115 at 10 ("Plaintiffs would not suffer hardship as a result of a stay of proceedings, because they are currently protected by a preliminary injunction.").

and reasoning:

> Coinbase, a cryptocurrency platform operator, was sued by some of its users. *Id*. at 739. In reply, Coinbase sought to enforce a mandatory arbitration provision in its user agreement against the plaintiff users. *Id*. at 738. But the district court denied its motion. *Id*. Coinbase noted an interlocutory appeal of the district court's denial under the Federal Arbitration Act, 9 U.S.C. § 16(a), and it simultaneously moved in the district court to stay proceedings pending that appeal. *Coinbase*, 599 U.S. at 739. Despite the appeal, the district court denied Coinbase's motion, and the Ninth Circuit affirmed. *Id*.

The Supreme Court reversed. *Id*. at 747. Its conclusion flowed from an application of the "*Griggs* principle," which states that an appeal "divests the district court of its control over those aspects of the case involved in the appeal." *Id*. at 740 (quoting *Griggs*, 459 U.S. at 58,). It then added three important clarifications to the *Griggs* principle . . .

First, it explained that when the question on appeal just is "whether the litigation may go forward in the district court," then "the entire case is essentially 'involved in the appeal.'" *Id*. at 741 (quotations omitted). That's the question an arbitrability appeal presents. It asks whether the district court, rather than an arbitrator, had any power to be the factfinder in the case at all. Because that question was the whole ballgame, the district court was divested of control over more or less the whole case. Any other rule would undercut the entire point of the appeal. *Id*. at 743 ("Absent an automatic stay of district court proceedings, Congress's decision . . . to afford a right to an interlocutory appeal [of arbitrability] would be largely nullified" because "many of the asserted benefits of arbitration . . . would be irretrievably lost.").

Second, the Court explained that this "automatic stay" is, well, automatic. As the name implies, and as other contexts confirm, an automatic stay is self-executing. *See* 11 U.S.C. § 362 (automatic stay in bankruptcy); Fed. R. Civ. P. 62(a) (automatic 30-day stay after orders); *see also In re Gruntz*, 202 F.3d 1074, 1081 (9th Cir. 2000) (discussing the self-executing nature of bankruptcy automatic stays). A district court is therefore immediately required to halt all proceedings covered by the *Griggs* principle when a proper notice of appeal is docketed, whether or not the parties ask it to. Rather than determine whether a discretionary stay is appropriate under the usual four-factor standard, *see Nken v. Holder*, 556 U.S. 418, 434 (2009), "the background *Griggs* principle applies regardless." *Coinbase*, 599 U.S. at 747.

Last, the Court made clear that because *Griggs* identifies a background principle, it applies even without congressional action. "When Congress wants to authorize an interlocutory appeal and to automatically stay the district court proceedings during that appeal, Congress need not say anything about a stay. At least absent contrary indications, the background *Griggs* principle already requires an automatic stay." *Id*. at 743–44. Congress can, of course, make an exception to this rule. *See, e.g.*, 38 U.S.C. § 7292(b)(1) ("Neither the

1

2

3

4

> application for, nor the granting of, an appeal under this paragraph shall stay proceedings in the Court of Appeals for Veterans Claims."). But while Congress can specify when it doesn't want an appeal to come with a stay, the default rule is that an appeal automatically stays all aspects of the case involved in the appeal. *See Coinbase*, 599 U.S. at 744, n.6 (listing statutes).

5    *Id*. at 269–70.

6    Defendants argue here that like *Coinbase*, their appeal of the PI Order implicates

7    "threshold legal, jurisdictional issues"—such as Article III standing and mootness—which will

8    determine whether the entire case may proceed in this Court at all; therefore, "the entire case is

9    essentially involved in the appeal." (Doc. 123 at 3 (citation and quotation marks omitted).)

10   Accordingly, Defendants argue that the entire case must be automatically stayed pending the

11   outcome of the appeal. (Doc. 123 at 9.) As support, Defendants extensively discussed the Fourth

12   Circuit's opinion in *Martinsville*.

13   *Martinsville* involved an action removed to federal court pursuant to the federal officer

14   removal statute, 28 U.S.C. § 1442. 128 F.4th at 268. The district court granted a motion to

15   remand, but the removing party filed an appeal before the district court clerk could mail that

16   remand order to the state court. *Id.* The Fourth Circuit concluded that the district court was

17   automatically stayed from mailing the remand order under *Coinbase*, reasoning as follows:

18

19

20

21

22

23

24

25

26

> Just as it did for denials of motions to compel arbitration, Congress expressly authorized interlocutory appeals when a district court finds federal-officer removal under § 1442(a) inappropriate and orders remand to the state court. 28 U.S.C. § 1447(d). Nothing in § 1447(d) overrides the background *Griggs* principle. *Cf. BP P.L.C. v. Mayor & City Council of Baltimore*, 593 U.S. 230 (2021) ("[F]or suits against federal officers or agencies removed pursuant to 28 U.S.C. § 1442 . . . Congress has deemed it appropriate to allow appellate review before a district court may remand a case to state court.") (emphasis added). And, just like a motion to compel arbitration, a remand order decides the foundational question: Which forum will hear the case? Necessarily, then, in both situations, essentially the whole case is "involved in the appeal," and the lower court loses dominion over not just the remand order but most everything else in the case besides. *Coinbase*, 599 U.S. at 740. Doing otherwise would "largely defeat[ ] the point of the appeal." *Id*. at 743 (quotation omitted).

27

28   *Id.* at 270. The Fourth Circuit explained that the district court had "misread *Coinbase*," by

limiting *Coinbase* "to orders compelling arbitration." *Id*.; *see also id*. at 271. ("While *Coinbase* was a case about arbitration, this does not mean it was only a case about arbitration. *Coinbase* also was a case about a cryptocurrency platform. But its reasoning applies beyond cryptocurrency platforms. Distinctions require meaningful differences to matter; a decision's rationale binds us even if some immaterial facts differ."). Instead, the Fourth Circuit found that the "rationale of *Coinbase*" applied in the federal officer removal context because "[i]n relying on *Griggs*, *Coinbase* did not discriminate between arbitration and other appeals. Indeed, it went out of its way to approvingly recognize that qualified immunity and double jeopardy were 'analogous contexts' where the courts of appeals have long imposed automatic stays upon appeal." *Id.* (quoting *Coinbase*, 599 U.S. at 742 & n.2). The Fourth Circuit concluded:

> Whatever part of a case is "involved in the appeal," big or small, it lies beyond the district court's reach because two courts "should not attempt to assert jurisdiction over a case simultaneously." *Griggs*, 459 U.S. at 58. So if the issue being appealed is whether the district court can send this case back, the district court cannot jump the gun before the appeal is resolved.

*Id.*

Defendants' reliance on *Martinsville*, however, is frustrated by the Ninth Circuit's subsequent opinion in *California*, which also addressed the question of whether "the Supreme Court's reasoning in *Coinbase* should be extended to automatically stay litigation during the appeals of remand orders in the federal officer removal context." 139 F.4th at 767. Because the remand order on appeal required the Ninth Circuit to address the threshold the question of whether the case may proceed in a federal court at all, the defendants in *California* "argue[d] that the entire case is essentially involved in the appeal, and therefore an automatic stay of all proceedings is warranted under *Coinbase*'s application of the *Griggs* principle." 139 F.4th at 767. The Ninth Circuit rejected that argument, reasoning that "[w]hile *Coinbase* represents a carveout to the normal discretionary stay powers in the arbitration context, the opinion does not overrule *Nken* nor render its precepts inoperable in other contexts." *Id.* at 768.[3] Specifically, the Ninth

---

[3] In so doing, the Ninth Circuit reasoned that *Martinsville* is an outlier, noting that "[a]ll other circuits where this question has been raised" declined to extend *Coinbase* beyond the arbitration context. 139 F.4th

1  Circuit explained in *California* that the *Coinbase* "automatic stay" procedure should be limited to

2  the arbitration context for several reasons. *Id.* ("*Coinbase* read in conjunction with relevant

3  Supreme Court precedent counsels in favor of limiting the *Coinbase* holding to the arbitration

4  context.").

5  First, "requiring an automatic stay in the federal officer removal context would implicate

6  federalism concerns not at issue where parties seek to compel arbitration." *Id.* at 768. The *Nken*

7  test, which allows federal courts to "weigh various factors before issuing the extraordinary

8  remedy of a stay is vital for the efficient administration of justice, especially when the case

9  involves another sovereign." *Id.* ("Improper removals based on the federal officer removal statute

10  deprive state courts of jurisdiction over cases that should rightfully be heard in their fora, in

11  violation of comity principles. Automatic stays of litigation based on those improper removals

12  pursuant to *Coinbase* would only exacerbate federal infringement on state courts' rights . . . The

13  Supreme Court has repeated 'time and time again that the normal thing to do when federal courts

14  are asked to enjoin pending proceedings in state courts is not to issue such injunctions.'")

15  (*quoting Younger v. Harris*, 401 U.S. 37, 45 (1971)).[4]

16  Second, the Ninth Circuit found that "*Coinbase*'s logic is inapposite in the federal officer

17  removal context" because "arbitration is a fundamentally different form of dispute resolution than

18  litigation." *Id.* at 769. In particular:

19  > The reason why parties may prefer to arbitrate as opposed to litigate
20  > claims is due to "efficiency, less expense, less intrusive discovery,
   > and the like." [*Coinbase*, 599 U.S. at 743.] The continuation of
21  > proceedings in the district court when stays are denied renders those
   > features "irretrievably lost." *Id.* These unique features of arbitration
22  > also help explain Coinbase's contention that a denial of a motion to
   > compel arbitration makes it so "the entire case is essentially

23  _____

24  at 767 n.2; *id.* at 773 ("[T]he Supreme Court's decision in *Coinbase* does not constitute a general
   withdrawal of the discretion that courts have exercised for centuries—rather, it merely represents a carve-
25  out in favor of arbitration." (quoting *Martinsville*, 128 F.4th at 275 (Wynn, J., dissenting) (alteration in
   original))).

26  [4] Defendants suggest that because the federalism concerns raised in *California* are not implicated in this
   case, *Coinbase* should apply "in full force." (Doc. 115 at 8.) However, though federalism was certainly
27  one of the justifications offered by the Ninth Circuit in California, it was not the only rationale.
   Accordingly, the absence of federalism-related concerns here does not justify disregarding the Ninth
28  Circuit's admonition against extending *Coinbase* beyond the arbitration context.

1    'involved in the appeal,'" necessitating an automatic stay of litigation
2    pending appeals of denials of arbitrability. *Id*. at 741.

3    *California*, 139 F.4th at 770. In contrast, the question on appeal in *California* was "a narrow

4    venue question of whether the case belongs in state or federal court," which "differs from

5    questions remaining before the state court (assuming the case gets remanded) such as whether the

6    claims have merit, whether the parties are entitled to the discovery they seek, and so on." *Id*. at

7    771.

8        Relatedly, the Ninth Circuit explained that the federal officer removal context is distinct

9    from other contexts involving interlocutory appeals, such as appeals from a denial of motion to

10   compel arbitration, as well as "[a]ppeals from denials of qualified immunity, absolute immunity,

11   sovereign immunity, and immunity under the Double Jeopardy Clause," all of which

12   "immediately divest the district court of jurisdiction over the entire case against defendants

13   because [they] represent an entitlement to avoid litigation altogether." *See id*. at 771, n.7.[5]

14       Finally, the Ninth Circuit explained that "adopting an automatic stay rule in the federal

15   officer context might encourage gamesmanship by defendants that would frustrate principles of

16   judicial economy" because "[a]ny defendant seeking to delay discovery could craft an argument

17   for federal officer removal then appeal a district court's remand order" which "could cause

18   plaintiffs languishing under mandatory stays to suffer harms in the form of lost evidence, depleted

19   funding, and diminished patience." *Id*. at 771–72. Though acknowledging that *Coinbase*

20   "instructs that courts have tools to avoid such gamesmanship in the arbitration context," *id*. at

21   772, those tools "are cumbersome for courts to impose and rarely used," so the Ninth Circuit

22   concluded that "the discretionary stay system already in place is superior for the purposes of

23   judicial economy." *Id*.

24       The Ninth Circuit's decision in *California* strongly suggests that courts should exercise

---

25   [5] Presumably nodding to this language from *California*, Defendants cite *Zabeti v. Arkin*, No. 2:14-cv-
26   00018, 2014 WL 1764358, at *3 (D. Nev., Apr. 28, 2014) (citing *Wood v. McEwen*, 644 F.2d 797, 801
     (9th Cir. 1981)), (see Doc. 123 at 6 n.3), which held that while a dispositive motion is pending that raises
27   questions of jurisdiction, a court frequently will stay discovery pending a ruling on that motion. *Zabeti*,
     however, did not apply an automatic stay of the kind at issue in *Griggs* or *Coinbase*. Rather, *Zabeti* relied
28   on *Wood*, which addressed a stay imposed under Rule 26(c)(4)'s "good cause" standard. 2014 WL
     1764358, at *3.

1   caution before extending *Coinbase* beyond the arbitration context. 139 F.4th at 768 ("*Coinbase*

2   does not abrogate *Nken v. Holder* beyond the arbitration context," but rather "represents a

3   carveout to the normal discretionary stay powers in the arbitration context."). The Ninth Circuit's

4   cautionary approach makes sense considering the "slippery slope" identified by the dissent in

5   *Coinbase*:

6           If arbitration appeals require stays of all pre-trial and trial
            proceedings, why not all appeals about forum-selection agreements?
7           And why not appeals over non-contractual disputes over the proper
            adjudicator, like venue, personal jurisdiction, forum non conveniens,
8           federal-court jurisdiction, and abstention?

9           For that matter, "virtually every right that could be enforced
            appropriately by pretrial dismissal might loosely be described as
10          conferring a 'right not to stand trial.'" *Digital Equipment Corp. v.
            Desktop Direct, Inc.*, 511 U.S. 863, 873 (1994). "Such motions can
11          be made in virtually every case." *Ibid*. Does every interlocutory
            appeal concerning a case-dispositive issue now trigger a mandatory
12          general stay of trial court proceedings?

13          Taken that broadly, the mandatory-general-stay rule the Court adopts
            today would upend federal litigation as we know it. Aware that any
14          interlocutory appeal on a dispositive issue grinds the plaintiff's case
            to a halt, defendants would presumably pursue that tactic at every
15          opportunity. This would occur, for example, in interlocutory appeals
            available as of right under 28 U.S.C. § 1292(a)(1) from orders
16          granting preliminary injunctions. Any defense lawyer worth her salt
            would invoke the right to take that appeal and throw up some
17          objection—to venue, jurisdiction, or a dispositive element of the
            merits—to trigger a mandatory stay. For plaintiffs, then, every
18          preliminary-injunction motion becomes a trap: Even if the motion is
            granted, the defendant can take that opportunity to stop the trial court
19          proceedings in their tracks.

20   599 U.S. at 760–61 (Jackson, J., dissenting). The Ninth Circuit read *Coinbase* narrowly to avoid

21   just such a problem.[6] Given California's admonition, and absent appellate guidance on the

22   specific question presented here, this Court is loath to expand *Coinbase*.

23

─────────────────────

24   [6] Notwithstanding the Ninth Circuit's broad pronouncement that "*Coinbase* represents a carveout to the
     normal discretionary stay powers in the arbitration"—but not other—contexts, Defendants argue that this
25   Court should disregard the broad language in *California* and apply *Coinbase* to the instant action because
     the Ninth Circuit's opinion in *California* narrowly addressed the question of whether *Coinbase*'s logic
26   should be extended to the federal officer removal context—and it did not focus on whether *Coinbase*
     should be extended to other situations. (*See* Doc. 123 at 7.) Though a district court is not bound by dicta
27   contained in an appellate court decision, *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551
     U.S. 701, 737 (2007), the reasoning of *California* is generally persuasive on the question of extending
28   *Coinbase* beyond the specific circumstances presented in that case.

                                                    11

1    In further support of an expansive application of *Coinbase* (and a narrow reading of

2  *California*), Defendants argue that district courts have continued to apply the underlying "*Griggs*

3  principle"—which the Supreme Court found controlling in *Coinbase*—after *California*. (Doc. 115

4  at 8.) For example, Defendants cite *Newsom v. Trump*, No. 25-cv-04870-CRB, 2025 WL 2609917

5  (N.D. Cal. Sept. 9, 2025), as an example of a post-*California* case that applied *Coinbase* outside

6  the arbitration context to stay all proceedings. (Doc. 118 at 8; Doc. 123 at 7.) There, the district

7  court granted a temporary restraining order blocking the defendants' June 7, 2025 decision to

8  federalize the California National Guard, finding that action likely violated 10 U.S.C. § 12406

9  and the Posse Comitatus Act. *Id*. at *1. The defendants appealed the § 12406 issue to the Ninth

10  Circuit, which stayed the TRO pending appeal. *Id*. On August 5, 2025, the defendants issued a

11  separate order extending the federalization through November 2025. *Id*. at *2. The plaintiffs

12  moved for a preliminary injunction to block the August 5 order arguing it also "failed to satisfy

13  the statutory requirements of 10 U.S.C. § 12406." *Id*. The plaintiffs asserted the preliminary

14  injunction request was distinct from the TRO—and thus was not barred by *Coinbase*/*Griggs*—

15  because the challenged underlying orders were different. *Id*. The district court rejected that

16  argument, concluding that it "slices the issues too finely," referencing *Coinbase's* rule that a stay

17  must be imposed if the issue on appeal implicates "the entire case." *Id*. The court therefore stayed

18  all proceedings <u>related to the preliminary injunction motion</u>, because proceeding with that motion

19  "would risk 'attempt[ing] to assert jurisdiction over a case simultaneously' with the Ninth

20  Circuit." *Id*. at *2 (quoting *Griggs*, 459 U.S. at 58) (alteration in original).

21    Plaintiffs argue that *Newsom* was a highly unusual case that involved a "uniquely complex

22  procedural situation," where the district court had to consider, among other things, the impact of

23  the Ninth Circuit's stay of an earlier TRO. (Doc. 118 at 12–13.) Defendants acknowledge those

24  procedural nuances but argue that *Newsom* does not cease to be a persuasive authority just

25  because it does not perfectly mirror the present case. (Doc. 123 at 7–8.) To be blunt, the Court

26  does not think *Newsom* provides much guidance on the question of whether *Coinbase* requires a

27  blanket stay here. Crucially, the cited opinion in *Newsom* stayed only proceedings related to the

28  motion for preliminary injunction, <u>not</u> the entire case. As a result, *Newsom* stands for the

1  unremarkable proposition that a trial court must stay all proceedings before it that are

2  "inextricably tied up with" the substance of the appeal. 2025 WL 2609917, at *2 ("The Ninth

3  Circuit is still considering the merits of Plaintiffs' arguments as to the temporary restraining

4  order, and those merits are inextricably tied up with the merits of Plaintiffs' new motion.").[7]

5        A few other cases merit some discussion because they arguably shed light on the interplay

6  between *Coinbase* and the standing/mootness issues raised in the pending interlocutory appeal. In

7  *California v. Health and Human Services*, No. 17-cv-05783-HSG, 2018 WL 11671579, at *1

8  (N.D. Cal. Dec. 13, 2018) ("*H.H.S.*"), a case discussed by both sides, the district court entered a

9  preliminary injunction barring application of two interim rules that would have exempted certain

10  entities from a federal health care mandate to provide contraceptive coverage. *See California v.*

11  *Health & Hum. Servs.*, 281 F. Supp. 3d 806, 813 (N.D. Cal. 2017), *aff'd in part, vacated in part,*

12  *remanded sub nom. California v. Azar*, 911 F.3d 558 (9th Cir. 2018). In so ruling, the district

13  court found that the State of California had Article III and statutory standing to bring the lawsuit.

14  *Id*. at 820–23. Defendants appealed, challenging, among other things, the standing determination.

15  *H.H.S.*, 2018 WL 11671579, at *1. Pursuant to the parties' stipulation, the district court stayed the

16  _____

17  [7] The Court has considered other district court cases cited by Defendants and finds them either

18  distinguishable or unhelpful. Defendants cite (Doc. 123 at 9) *Murray v. King Cnty. Ct.*, No. 24-cv-00239, 2025 WL 754524, at *2 (W.D. Wash. Mar. 10, 2025), where the district court's order hardly mentioned *Coinbase*—and ultimately grounded its decision on *Landis*. Defendants also cite (Doc. 115 at 8) *S.L. v.*

19  *Cnty. of Riverside*, No. 5:24-cv-00249-CAS-SPX, 2025 WL 2652874, at *3 (C.D. Cal. Sept. 15, 2025), where the defendants appealed the district court's denial of qualified immunity, a situation that

20  unambiguously calls for a *Coinbase*-like stay, *see California*, 139 F.4th at 771 n.7; *Coinbase*, 599 U.S. at 742 & n.4.

21       Defendants also rely on *American Encore v. Fontes* (*see* Doc. 118 at 8), which concerned facial constitutional challenges to two provisions of Arizona election law. *See* 152 F.4th 1097, 1109 (9th Cir.

22  2025). The district court found that plaintiffs had standing, denied a motion to apply *Pullman* abstention to the case, and found it was appropriate to impose a preliminary injunction. *Id*. Defendants appealed,

23  challenging whether plaintiffs had standing, whether the court should have abstained under *Pullman*, and whether an injunction was warranted. *Am. Encore v. Fontes*, No. CV-24-01673-PHX-MTL, 2025 WL

24  1839464, at *2 (D. Ariz. June 26, 2025). While the appeal was pending, the district court determined it was appropriate to impose a discretionary stay under *Landis/CMAX*. *Id*. at *1–2. Even though neither party

25  raised *Griggs/Coinbase*, the district court *sua sponte* noted that "the *Griggs* divestiture rule also supports a stay." *Id*. at *3. Citing *Griggs*, the district court noted that "most—if not all—of the substantive legal

26  issues in this case are implicated in the pending interlocutory appeal." *Id*. In other words, *Griggs* supported a broad stay because the appeal encompassed most of the remaining substantive issues in the case. Not

27  only is this reasoning arguably dicta, but it also simply serves to underscore the general rule that the scope of a *Griggs* stay is governed by the scope of the issues on appeal. In other words, aspects of the ongoing

28  case that are "inextricably tied up with" the appeal must be stayed.

1    case pending resolution of the appeal. *Id*. Later, the Ninth Circuit also ordered supplemental

2    briefing on the issue of whether the case would be mooted by the issuance of final rules. *Id*.

3    While the appeal was still pending, the plaintiffs moved to lift the stay in the district court,

4    seeking to amend their complaint to challenge the forthcoming final rulemaking. *Id*. Given "the

5    broad scope of issues currently before the Ninth Circuit," the district court concluded "that it d[id]

6    not have jurisdiction to lift the stay for the purposes articulated by Plaintiffs." *Id*.

7         At first glance, *H.H.S.* might seem to support Defendants' position about the application

8    of *Coinbase* to this case, but in *H.H.S.,* the plaintiffs' motivation for lifting the stay was at least in

9    part to address the very question (mootness) that the Ninth Circuit was actively considering on

10   appeal. As such, the district court in *H.H.S.* "d[id] not have jurisdiction to lift the stay *for the*

11   *purposes articulated by Plaintiffs*," 2018 WL 11671579, at *1 (emphasis added)—that is, to

12   address an issue that was being actively considered by the Ninth Circuit. *H.H.S.,* therefore,

13   reflects a straightforward application of *Griggs* and does not support Defendants' position that the

14   entirety of the instant case must be stayed pending appeal of the PI Order. *See also*. *BioCorRx,*

15   *Inc. v. Calista Therapeutics, Inc.*, No. 8:24-cv-00640-JVS-JDE, 2024 WL 4472376, *1–2 (C.D.

16   Cal. Aug. 14, 2024) (declining to consider under *Griggs* whether to issue a preliminary

17   injunction, reasoning that doing so would implicate merits issues intertwined with appeal from

18   anti-SLAPP ruling); *Brown v. Google, LLC*, No. 4:20-cv-03664-YGR, 2024 WL 5682633, *2–3

19   (N.D. Cal. Nov. 8, 2024) (appeal from the denial of intervention was intertwined with the district

20   court's consideration of motion to approve of the settlement agreement motion).

21        To summarize, the Court is not persuaded by Defendants' argument that *Coinbase* applies

22   whenever an appellant raises a standing or mootness argument. Defendants have not provided any

23   binding precedent that clearly abrogates the longstanding principle that an appeal of a preliminary

24   injunction does not divest the trial court of jurisdiction to proceed to the merits of the case.

25   Moreover, none of the cited district court cases persuade the Court to depart from this conclusion.

26   For these reasons, the Court finds that neither *Griggs* nor *Coinbase* requires the Court to stay this

27   case in its entirety. Whether *Griggs* strips the Court of jurisdiction to address certain aspects of

28   the pending motion to dismiss and whether the Court should impose a discretionary stay are

1    separate questions that are discussed below.

2    **B. Jurisdiction to Address Motion to Dismiss**

3    Though the parties do not parse *Griggs* on an issue-by-issue basis, the Court <u>must</u>

4    consider whether each individual issue that the parties ask this Court to rule on is "inextricably

5    bound up" with an issue that is on appeal. *See Villery v. California Dep't of Corr.*, No. 1:15-cv-

6    00987 DAD-BAM (PC), 2021 WL 4846243, at *3–4 (E.D. Cal. Sept. 23, 2021) (citation

7    omitted).[8] The motion to dismiss argues that: (1) "Plaintiffs lack standing to pursue prospective

8    equitable relief because they have not demonstrated that their isolated encounters with USBP are

9    likely to recur or that they will again be subjected to any unlawful conduct[,]" (Doc. 64 at 20); (2)

10   Plaintiff "UFW cannot establish associational standing because its members lack standing

11   themselves," (*id.* at 24); (3) Plaintiffs claims concerning stops and arrests are moot because of the

12   Musters issued by USBP, (*id.* at 27–28); (4) relatedly, Plaintiffs claims concerning voluntary

13   departure are moot because of a separate Muster issued by USBP on that subject (*id.* at 29–30);

14   (5) Plaintiffs' voluntary departure claim fails on the merits because Plaintiffs have not established

15   a liberty interest or demonstrated prejudice; and (6) the Court should dismiss Plaintiffs' entire

16   complaint because none of the three proposed classes can be certified given that (a) the

17   suspicionless stop and warrantless arrest classes are fatally overbroad; and (b) the voluntary

18   departure class facially requires individualized analysis that precludes certification. (*Id.* at 23–29.)

19   1. <u>Standing Arguments</u>

20   Those aspects of the motion to dismiss that challenge Plaintiffs' standing directly mirror

21   arguments at issue in the pending appeal. As mentioned, Defendants' opening brief on appeal

22   invokes Justice Kavanaugh's concurrence in *Perdomo* to argue that Plaintiffs cannot establish

---

[8] No party seems to suggest that the Court lacks jurisdiction to address the pending motion to enforce the preliminary injunction. *See supra* note 2; *Thakur v. Trump*, 795 F. Supp. 3d 1168, 1178 (N.D. Cal. 2025) ("The Court, of course, retains jurisdiction to enforce the Preliminary Injunction during the pending appeal. . . . Moreover, a district court has jurisdiction to clarify the meaning of its orders even while an appeal is pending."); *see also A & M Records, Inc. v. Napster, Inc.*, 284 F.3d 1091, 1099 (9th Cir. 2002) ("The district court properly exercised its power under Rule 62([d]) to continue supervision of [defendant's] compliance with the injunction."). Fed. R. Civ. P. 62(d) specifically permits this Court to "suspend, modify, restore, or grant an injunction" while an appeal of a prior injunction is pending, but any action taken pursuant thereof "may not materially alter the status of the case on appeal." *Sw. Marine Inc.*, 242 F.3d at 1166 (citation omitted).

1    standing for prospective injunctive relief because they cannot show that they would likely be

2    stopped again without reasonable suspicion or arrested again without consideration of flight risk.

3    Plaintiffs argue that that the jurisdictional issues Defendants raise on appeal are not, at this stage,

4    dispositive because they are inherently factual. (Doc. 118 at 11 ("[A] ruling from the Ninth

5    Circuit on the preliminary record about whether Plaintiffs have shown a likelihood of proving

6    future harm for standing purposes would not foreclose an alternative result on a different (and

7    further developed) record.").) Relatedly, Plaintiffs also maintain that it is unclear what "effect [] a

8    reversal of the preliminary injunction would have on this litigation." (*Id.*) These arguments do not

9    ring true. If an appellate court adopts Justice Kavanaugh's standing reasoning in *Perdomo*, that

10    will represent a fundamental shift in the applicable standing framework.

11        In *Perdomo*, the Ninth Circuit refused to stay operation of the preliminary injunction

12    issued by the district court, reiterating that under *Melendres v. Arpaio*, 695 F.3d 990, 998 (9th

13    Cir. 2012), a plaintiff can satisfy *Lyons'* requirement of a "realistic[ ] threat[ ]" of being injured

14    again by "demonstrat[ing] that the harm is part of a pattern of officially sanctioned behavior,

15    violative of the plaintiffs' federal rights." *Vasquez Perdomo v. Noem*, 148 F.4th 656, 674 (9th Cir.

16    2025). The Ninth Circuit emphasized that at the preliminary injunction stage, the *Perdomo*

17    plaintiffs demonstrated such a "a pattern of conduct," because "'a plethora of statements

18    suggest[ed] approval or authorization' of the challenged stop-and-arrest practices, including a

19    recent statement by Defendant Gregory K. Bovino, the Chief Patrol Agent for the El Centro

20    Sector of the CBP." *Id*. As was the case here (Doc. 47 at 82–84), the government "[did] not

21    meaningfully dispute these findings," which were "well supported by the record." *Vasquez*

22    *Perdomo v. Noem*, 148 F.4th at 674. Notwithstanding the above, the Supreme Court stayed the

23    operation of the preliminary injunction, with the only written explanation suggesting that at least

24    one justice is not convinced by the Ninth Circuit's reliance on *Melendres* in substantially identical

25    standing circumstances.[9]

---

[9] It is *theoretically possible* that factual developments in this case might render the *Melendres* "pattern of officially sanctioned behavior" irrelevant, such as if Plaintiffs are able to demonstrate that class members have been subjected to the challenged conduct on numerous occasions. But the present record does not suggest such a pattern is likely to develop. (*See* Def. Opening Appellate Brief at 1–2 (government

26
27
28

1    In the motion to dismiss, Defendants argue that "Plaintiffs lack standing to pursue

2    prospective equitable relief because they have not demonstrated that their isolated encounters

3    with USBP are likely to recur or that they will again be subjected to any unlawful conduct[,]"

4    (Doc. 64 at 20); and that, relatedly, Plaintiff "UFW cannot establish associational standing

5    because its members lack standing themselves," (*id*. at 24). These arguments closely track the

6    arguments in Defendants' opening brief on appeal, where they argued, among other things, that

7    "Plaintiffs cannot establish standing for prospective injunctive relief," (Def. Opening Appellate

8    Br. at 21,); and that the "standing analysis applies with no less force because of the involvement

9    of organizational Plaintiff UFW," (*id*. at 33). The Court concludes the standing issues raised on

10   appeal are inextricably intertwined with the standing issues raised in the motion to dismiss. Thus,

11   the Court is barred from considering those aspects of the motion to dismiss

12        2.   Mootness Issues

13    The motion to dismiss also argues that the Musters render Plaintiffs' entire complaint

14   moot.

15   Collectively, Plaintiffs seek relief to remedy —via declaratory and
     injunctive relief —what they perceive to be a policy, pattern or
16   practice of violating the Fourth and Fifth Amendment and § 1357.
     But USBP has already issued multiple new guidance Musters
17   affirming their commitment to following the law in precisely the
     ways Plaintiffs seek, which renders Plaintiffs' Complaint moot.
18   *Rosebrock v. Mathis*, 745 F.3d 963, 971 (9th Cir. 2014) ("A case
     becomes moot - and therefore no longer a 'Case' or 'Controversy'
19   for purposes of Article III -when the issues presented are no longer
     "live" or the parties lack a legally cognizable interest in the
20   outcome") (internal citations omitted).

21   Plaintiffs' claims I-III concerning stops and arrests are moot because,
     on April 4, 2025, USBP issued a Muster and ordered training
22   recommitting to consistent enforcement of Fourth Amendment
     protections and protections under 8 U.S.C. 1357(a)(2). *See* Exs. A,
23   D (Decl. of Sergio Guzman). This Muster discusses traffic stops and
     reasonable suspicion, factors to consider when assessing flight risk,
24   and how agents should document the facts and circumstances
     surrounding a warrantless arrest in an alien's Form I-213 as soon as
25   practicable. *See* Ex. A; *see also* Compl. at 53, ¶ 278 (stating USBP

26   appellate brief arguing "Plaintiffs' evidence underscores how any likelihood of future harm to them is
     irredeemably speculative. Plaintiffs have not identified a single instance of anyone being stopped more
27   than once by Border Patrol. Nor is there even a single instance of Border Patrol visiting the same place
     repeatedly. And in the two months between their alleged injuries and filing their complaint, Plaintiffs cited
28   no further instances of stops or arrests.").)

should provide its officers guidance on the requirement for reasonable suspicion for traffic stops in the interior, away from the border, and guidance on assessing flight risk using factors such as "family, home, or employment," that is, community ties). And USBP commits to continuing training until all agents are trained. Ex. D, (Decl. of Sergio Guzman). at ¶¶ 10-16. Moreover, on June 27, 2025, following the Court's April 29, 2025, order, USBP issued a second Muster discussing factors to consider when assessing reasonable suspicion in all contexts, not just vehicle stops; that an individual's refusal to answer questions does not, by itself, constitute reasonable suspicion; and that in areas where Hispanic individuals are common, an individual's apparent Hispanic race or ethnicity is not a relevant factor for reasonable suspicion. *See* Ex. B.

Plaintiffs' Fifth Amendment due process claim (Claim IV) is also moot. Plaintiffs allege that, during Operation Return to Sender, Border Patrol agents engaged in a pattern of processing arrested individuals for voluntary departure without obtaining a knowing and voluntary waiver of their right to removal proceedings before an immigration judge, in violation of the Fifth Amendment. *See* Compl. at 3-4, 44-45, 67-68, ¶¶ 9, 242-44, 346-50. Named Plaintiffs Espinosa and Mendez describe how Border Patrol agents presented them with a small digital device showing only a signature page, how they were not permitted to touch the digital device or see other pages of the document, and how they were not otherwise provided with physical copies of the documents that they were digitally signing. *See* Compl. at 4, 31, 34, 44, ¶¶ 11, 151-52, 176, 243; ECF No. 15-8, Espinosa Decl. at ¶¶ 17-18; ECF No. 15-6, Mendez Decl. at ¶ 19. They also claim that Border Patrol agents did not orally explain voluntary departure and its consequences to them in Spanish. ECF No. 15-8, Espinosa Decl. ¶¶ 18-21; ECF No. 15-6, Mendez Decl. at ¶¶ 19-20. These allegations form the basis of Plaintiffs' policy and practice claim.

On July 11, 2025, USBP issued a Voluntary Return Muster recommitting to consistently informing aliens of their right to a hearing before an immigration judge and the consequences of alternatively choosing to voluntarily depart, which renders Plaintiffs' Fifth Amendment claim (Claim IV) moot. The VR muster explains that Border Patrol agents must provide aliens with an opportunity to read the Notice of Rights and Advisals on the Form I-826, which advises an alien of the consequences of accepting voluntary return. *Id.* The VR Muster also states that, where an agent goes over the Form in digital format, the agent should also provide the alien with a physical copy of the Form, in both English and Spanish. *Id.* Agents should also document adherence to the proper procedures in the Form I-213 Record of Deportable/Inadmissible Alien. *Id.* The purpose of the VR Muster is to ensure the alien has made a knowing, voluntary, and intelligent waiver of their right to removal proceedings and election of voluntary return. *Id.* That is, this guidance ensures that, to the extent Plaintiffs' claims are true, they will not reoccur in the future thereby rendering Plaintiffs' claims moot. *Espinoza v. Union of Am. Physicians & Dentists*, 2023 WL 6971456, at *2 (9th Cir. Oct. 23, 2023) ("Where circumstances change after commencement of a suit such that the wrongful

1

2

3

behavior is no longer likely to recur against the plaintiff . . . 'his claims for prospective relief [become] moot . . .'") (citing *Slayman v. FedEx Ground Package Sys., Inc.*, 765 F.3d 1033, 1048 (9th Cir. 2014).

4

5

(Doc. 64 at 27-30; *see also id*. at 30–32 (arguing voluntary cessation doctrine does not preserve the court's jurisdiction).)

6

7

8

9

10

On appeal, the Defense has argued that the PI Order is rendered moot by USBP Musters addressing stops and arrests.  (Def. Opening Appellate Br. at 9-10, 35-42.) Thus, applying the *Griggs* principle, the Court concludes that it has no jurisdiction to consider the mootness arguments raised in Defendants' motion to dismiss that pertain to stops and arrests, as those same issues are presently before the Ninth Circuit.

11

12

13

However, a different result is appropriate as to the arguments in the motion to dismiss as to the whether the voluntary departure claims are moot. No such arguments are raised in the appeal. Thus, *Griggs* does not bar this Court from considering those issues.

14

3.  Remaining Motion to Dismiss Issues

15

16

17

18

19

20

21

22

23

As mentioned, Defendants also argue in the motion to dismiss that the Voluntary Departure Claim (Claim IV) fails because Plaintiffs have not established a liberty interest or demonstrated prejudice, both of which are necessary to prevail on their procedural due process claim. (Doc. 64 at 32–35.) In addition, Defendants argue that the Court should dismiss or strike the three proposed classes because the suspicionless stop and warrantless arrest classes are fatally overbroad; and the voluntary departure class facially requires individualized analysis that precludes certification.  (Doc. 64 at 36–40.) None of these issues have been directly implicated in the appeal, nor do they appear to be intertwined with the issues on appeal.  (*See generally* Def. Opening Appellate Br.)[10] As such, *Griggs* does not appear to present a jurisdictional bar to this

24

25

26

27

28

[10] Defendants contend that the Fifth Amendment claim is "involved" in the appeal because of the possibility that "Defendants' standing arguments on appeal also apply to Plaintiffs' Fifth Amendment claims seeking prospective relief." (Doc. 115 at 9 ("Specifically, Plaintiffs lack standing to seek prospective relief all together because they cannot show they are likely to be subject to the same injury again based on an isolated, completed operation that forms the basis of the complaint.").) However, standing is evaluated on a claim-by-claim basis, *TransUnion LLC v. Ramirez*, 594 U.S. 413, 430–31 (2021), and the Court has not had occasion to address Plaintiffs' standing to pursue the fourth cause of action. Moreover, that claim alleges a continuing harm and asks this Court to order Defendants to return

1   Court addressing those issues.

2      **C. Discretionary Stay**

3        In addition to arguing for a compulsory stay of the entire case, Defendants argue, in the

4   alternative, that the Court should stay the entire case as a matter of discretion. (Doc. 115 at 10–

5   12.) This Court "has broad discretion to stay proceedings as an incident to its power to control its

6   own docket." *Clinton v. Jones*, 520 U.S. 681, 706 (1997) (citing *Landis v. N. Am. Co.*, 299 U.S.

7   248, 254 (1936)). The "power to stay proceedings is incidental to the power inherent in every

8   court to control disposition of the cases on its docket with economy of time and effort for itself,

9   for counsel, and for litigants." *Landis*, 299 U.S. at 254. The exertion of this power calls for the

10  exercise of sound discretion." *CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962). The Ninth

11  Circuit's recent opinion in *In re PG&E Corp. Sec. Litig.* is particularly instructive:

12          The district court possesses "inherent authority to stay federal
13         proceedings pursuant to its docket management powers." A district
            court "may, with propriety, find it is efficient for its own docket and
14         the fairest course for the parties to enter a stay of an action before it,
            pending resolution of independent proceedings which bear upon the
15         case." The decision to stay proceedings "calls for the exercise of
            judgment, which must weigh competing interests and maintain an
16         even balance."

17         Our prior cases have "identified three non-exclusive factors courts
            must weigh when deciding whether to issue a docket management
18         stay: (1) 'the possible damage which may result from the granting of
            a stay'; (2) 'the hardship or inequity which a party may suffer in
19         being required to go forward'; and (3) 'the orderly course of justice
            measured in terms of the simplifying or complicating of issues,
20         proof, and questions of law.'" A district court's concern for the last
            factor, which courts refer to as "judicial efficiency," "standing alone
21         is not necessarily a sufficient ground to stay proceedings."

22  *In re PG&E Corp. Sec. Litig.*, 100 F.4th 1076, 1085 (9th Cir. 2024) (internal citations omitted).

23  Thus, a district court applies the *Landis* factors when considering whether to order a "docket

24  management" stay—that is, to stay "proceedings" in a particular "case." This was also explained

25  in this Court's decision in *Flores v. Bennett*, 675 F. Supp. 3d 1052, 1057 (E.D. Cal. 2023). In

26  contrast, the *Nken* factors are generally used to assess whether a district court should stay the

27

28  Plaintiffs Mendez and Espinoza to the United States. (Doc. 1 at 70.) The Court therefore does not find that
      the Fifth Amendment claim is inherently intertwined with the appeal.

1   enforcement of a particular judgment or order. *Id*.[11]

2       The "proponent of a stay bears the burden of establishing its need." *Clinton v. Jones*, 520

3   U.S. 681, 708 (1997) (citing *Landis*, 299 U.S. at 255). If there is "even a fair possibility" of harm

4   to the opposing party, the moving party "must make out a clear case of hardship or inequity in

5   being required to go forward." *Landis*, 299 U.S. at 255; *Lockyer v. Mirant Corp.*, 398 F.3d 1098,

6   1112 (9th Cir. 2005).

7           1.  <u>Possible Damage to Plaintiffs if a Stay is Granted</u>

8       "In determining whether to grant a stay, courts generally consider whether doing so would

9   cause undue prejudice or present a clear tactical disadvantage to the non-moving party." *ASCII*

10  *Corp. v. STD Ent. USA, Inc.*, 844 F. Supp. 1378, 1380 (N.D. Cal. 1994). "Courts may also

11  consider the stage in litigation, whether substantial discovery has already taken place, and

12  whether the matter has been set for trial." *Epistar Corp. v. Philips Lumileds Lighting Co., LLC*,

13  No. C 07-5194 CW, 2008 WL 913321, at *2 (N.D. Cal. Apr. 2, 2008) (citing *ASCII*, 844 F. Supp.

14  at 1380). So long as there is "even a fair possibility" of harm to the opposing party, the moving

15  party "must make out a clear case of hardship or inequity in being required to go forward."

16  *Landis*, 299 U.S. at 255.

17      Defendants first argue that there is no risk of harm to Plaintiffs, as they "are currently

18  protected by a preliminary injunction" and "the policies and practices of the agencies at issue can

19  be discovered at any time should this case proceed after the appeal." (Doc. 115 at 10.) In

20  response, Plaintiffs correctly point out that the PI does not address the voluntary departure claims

21  (fourth cause of action). (Doc. 118 at 16.) Moreover, as Plaintiffs also point out, two Plaintiffs are

22  currently located in Mexico allegedly because of Defendants' challenged conduct, and Plaintiffs

23  maintain the members of the putative Voluntary Departure Class face risk of future harm if

24  Defendants' "unlawful voluntary departure practices remain unchecked." (*Id*.)

25  _____

26  [11] As Plaintiffs point out, (Doc. 118 at 14 n.5), the Ninth Circuit's opinion in *California* discussed the
    *Nken* factors, not *Landis*/*CMAX* test. 139 F.4th at 766. Plaintiffs suggest that this is an indication that

27  *Flores* is no longer good law and that *Nken* is the appropriate test to apply here. The Court is not
    persuaded. *California* is just an example of how the *Landis-Nken* distinction that continues to be applied.

28  (*See* Doc. 123 at 9 n.5 (collecting recent cases from this Court).) Because Defendants are seeking a stay of
    all proceedings, the Court will apply the *Landis* factors.

Acknowledging that the PI does not address the Voluntary Departure claims, Defendants argue in the context of their request for a complete, automatic *Coinbase* stay that those claims "are also necessarily 'involved in the appeal' because Defendants' standing arguments on appeal also apply to Plaintiffs' Fifth Amendment claims seeking prospective relief." (Doc. 115 at 9.) Specifically, the Defense argues that "Plaintiffs lack standing to seek prospective relief all together because they cannot show they are likely to be subject to the same injury again based on an isolated, completed operation that forms the basis of the complaint." (*Id*.) But, as the Court explained above, the mere fact that standing to sue is raised in an interlocutory appeal does not automatically entitle Defendants to a stay. Though Defendants are correct that if their standing arguments prevail on appeal, such an outcome will have broad consequences for this litigation, that has nothing to do with whether Plaintiffs will be harmed by the stay.

As to the more general assertion that the PI provides Plaintiffs with adequate protection regarding detentive stops and warrantless arrests, Plaintiffs suggest the PI is insufficient because, as they argue in the pending motion to enforce, "Defendants are ***currently*** violating the PI." (Doc. 118 at 16 (emphasis in original).) Plaintiffs maintain that a complete stay will "strip [their] ability to hold Defendants to the PI." (*Id*.) To be sure, the risk of harm to Plaintiffs is reduced because the preliminary injunction remains in place during the pendency of the appeal, *Wilhoite v. Hou*, No. 3:23-CV-02333-BEN-MSB, 2024 WL 2869986, at *4 (S.D. Cal. June 6, 2024) ("With the TRO in place during the pendency of [the] appeals, Plaintiffs' concerns regarding dissipation of assets should be diminished."), it does not follow, however, that Plaintiffs will suffer *no* harm if a stay is imposed.

Rather, like all litigants, Plaintiffs have a substantial interest in obtaining a prompt adjudication of their claims. *See S.L. v. Cnty. of Riverside*, No. 5:24-cv-00249-CAS-SPx, 2025 WL 2652874, at *7 (C.D. Cal. Sept. 15, 2025) ("The Court finds that staying proceedings will moderately prejudice plaintiffs by modestly delaying resolution of their claims."). In addition, this "[C]ourt must weigh 'the length of the stay against the strength of the justification given for it.' 'If a stay is especially long or its term is indefinite, [the Court] require[s] a greater showing to justify it.'" *Peoples v. W. Ref. Retail, LLC*, No. 1:25-CV-00480-JLT-CDB, 2025 WL 2762449, at

*2 (E.D. Cal. Sept. 26, 2025) (quoting *Yong v. I.N.S.*, 208 F.3d 1116, 1119 (9th Cir. 2000)). Here, though Defendants have requested expedited treatment of their appeal, the appeal was filed on June 27, 2025, and oral argument is not likely to take place until April or May of 2026 at the earliest. As such, the Court declines to presume that a stay pending appeal would be short in duration. The Court finds this consideration to be neutral at best.

Moreover, there is a meaningful distinction between "the prejudice resulting from a stay when injunctive relief, rather than damages, are sought." *California Sea Urchin Comm'n v. Jacobson*, No. CV 13-5517-DMG (CWX), 2016 WL 11785449, at *2–3 (C.D. Cal. Nov. 3, 2016) (citing *Lockyer*, 398 F.3d at 1112). Unlike damages for past harm, *Landis* cautions against a stay where there is "a fair possibility" that the stay will permit ongoing and future harm that can be remedied by injunctive relief. *See Lockyer*, 398 F.3d at 1112.

In sum, because there is a fair possibility of some cognizable harm to Plaintiffs if a stay is entered, the Court must determine whether the government has made clear case that it will suffer hardship or inequity.

### 2.  Prejudice and Hardship to Defendants if a Stay is Denied

The second *Landis* factor considers "the hardship or inequity which a party may suffer in being required to go forward." *CMAX*, 300 F.2d at 268. Defendants argue that they will be forced to conduct discovery that may be rendered moot by the Ninth Circuit in resolving the interlocutory appeal. According to Defendants, once discovery parameters are finalized, they would have to expend at least 3,333 hours of attorney time to complete document production and review. (Doc. 115 at 10.) Defendants argue that a decision by the Ninth Circuit on the jurisdictional issues could substantially narrow or clarify the scope of the discovery. (Doc. 115 at 11.) This, according to Defendants, would conserve scarce resources and avoid wasted efforts. (Doc. 115 at 11.)

Plaintiffs respond that this is not a "clear case" of hardship (Doc. 118 at 17) and suggest that Defendants' complaints of an extreme discovery burden lacks credibility given that they "have not produced any documents to date and repeatedly delayed substantive discussions related to Plaintiffs' requests." (*Id*. at 15.)

On the one hand, "being required to defend a suit, without more, does not constitute a 'clear case of hardship or inequity' within the meaning of *Landis*.'" *Lockyer*, 398 F.3d at 1112 (quoting *Landis*, 299 U.S. at 255). On the other hand, conducting "'substantial, unrecoverable, and wasteful' discovery and pretrial motions practice on matters that could be mooted by a pending appeal may amount to hardship or inequity sufficient to justify a stay." *Finder v. Leprino Foods Co.*, No. 1:13-cv-02059-AWI-BAM, 2017 WL 1355104, at *4 (E.D. Cal. Jan. 20, 2017) (quoting *Pena v. Taylor Farms Pac., Inc.*, No. 2:13-cv-01282-KJM-AC, 2015 WL 5103157, at *4 (E.D. Cal. Aug. 31, 2015)). Overall, "[w]here a denial of stay would cause both parties to incur significant expenses on litigation that may be rendered moot, 'the potential hardship from denying the stay weighs slightly in favor of granting it.'" *See, e.g.*, *Vance v. Google LLC*, No. 5:20-cv-04696-BLF, 2021 WL 534363, at *5 (N.D. Cal. Feb. 12, 2021) (quoting *Lal v. Capital One Fin. Corp.*, No. 16-cv-00674-BLF, 2017 WL 282895 (N.D. Cal. Jan 23, 2017)). Here, the Court agrees with Plaintiffs that Defendants' concerns about the scope of class-wide discovery should be given less weight because the Government has not yet made concerted efforts to meet and confer with Plaintiffs to narrow the scope or agree to search terms. (*See* Doc. 118-1); *cf. ShoulderTap Techs., Inc. v. Fizz Soc. Corp.*, No. 25 CIV. 1487 (ALC) (SLC), 2025 WL 2371152, at *1 (S.D.N.Y. Aug. 14, 2025) (declining to stay discovery under Fed. R. Civ. P. 26(c) where parties had not yet met and confer to narrow requests).[12]

### 3. Judicial Economy and Benefits to the Court

The third and final *Landis* factor considers "the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay." *CMAX*, 300 F.2d at 268 (citing *Landis*, 299 U.S. at 254–55). As this Court noted in *Flores*, "courts typically stay cases when the outcome of another proceeding will have *preclusive effect* on the pending issues." *Flores*, 675 F.Supp.3d at 1063 (citing *Safari Club Int'l v. Bonta*, No. 22-cv-01395-DAD-JDP, 2023 WL 3505373 at *1 (E.D. Cal. May 17,

---

[12] To the extent Defendants seriously contend there is no need for discovery to proceed because "the policies and practices of the agencies at issued can be discovered at any time after the appeal" and "this case presents purely legal issues" (Doc. 115 at 10), the Court disagrees. As Magistrate Judge Baker concluded "it is inconceivable that Plaintiffs' Fourth Amendment and Fifth Amendment claims are amenable to adjudication based exclusively on an existing, administrative record." (Doc. 56 at 10.)

1   2023)) (emphasis added). Conversely, a *Landis* stay is inappropriate if another proceeding is

2   "unlikely to decide, or to contribute to the decision of, the factual and legal issues before the

3   district court." *Lockyer*, 398 F.3d at 1113.

4           Defendants argue that waiting until the appeal is done could substantially narrow the

5   jurisdictional issues (especially Article III standing and mootness), which could result in the

6   dismissal of the entire case, or a substantial part thereof. (Doc. 115 at 11.) Plaintiffs, on the other

7   hand, argue that "adopting Defendants' position" risks creating a per se rule where "virtually all

8   appeals of preliminary injunctions" on standing grounds "would result in automatic case-wide

9   stays." (*See* Doc. 118 at 12.)[13] As to this factor, Defendants have the better argument. It is

10  difficult to escape the fact that the appeal could have wide-ranging impacts on almost the entire

11  case, including the standing analysis applicable to the requests for injunctive and declaratory

12  relief.[14] That said, this is just one element in a discretionary balancing test.

13          4.  The Impact of *Perdomo*

14          Defendants argue that "because the Supreme Court's *Perdomo* stay order signals that the

15  government is likely to succeed on the merits of the appeal in that case, which invokes an

16  identical Article III standing challenge, the government is also likely to ultimately succeed on the

17  merits of its appeal on the same issue. Accordingly, the Court should stay further proceedings in

18  this case pending the outcome of the preliminary injunction appeal." (Doc. 115 at 7 (footnote

19  omitted); *see also id*. at 10–11 (suggesting this likely success is relevant to the *Landis*/*CMAX*

20  _____

21  [13] The Court notes that many district courts stayed further litigation pending the Supreme Court's decision
    in *Spokeo*, a case regarding Article III standing. *Matera v. Google Inc.*, No. 15-CV-04062-LHK, 2016 WL

22  454130, at *3 (N.D. Cal. Feb. 5, 2016) ("[R]egardless of which path the U.S. Supreme Court ultimately
    takes, *Spokeo* may provide substantial guidance as to what statutory violations (if any) confer Article III

23  standing. The Court thus finds that the *Landis* factor regarding the orderly course of justice weighs in
    favor of granting a temporary stay."); *Ramirez v. Trans Union, LLC*, No. 12-CV-00632-JSC, 2015 WL

24  6159942, at *2 (N.D. Cal. June 22, 2015) ("Given that the Supreme Court's decision in *Spokeo* may
    directly impact the Court's class certification ruling, the *Landis* factors weigh strongly in favor of staying

25  this action pending the *Spokeo* decision.").

26  [14] *Lyons* applies with equal force to requests for declaratory relief. *See Already, LLC v. Nike, Inc*., 568 U.S.
    85, 98, (2013) ("[W]e have never held that a plaintiff has standing to pursue declaratory relief merely on

27  the basis of being 'once bitten.' Quite the opposite. *See, e.g., Los Angeles v. Lyons*, 461 U.S. 95, 109
    (1983) (holding there is no justiciable controversy where plaintiff had once been subjected to a

28  chokehold).")). Plaintiffs do not seek damages here, though they do request an order returning voluntary
    departure Plaintiffs Mendez and Espinoza to the United States.

1  analysis)). However, even assuming, *arguendo*, that Justice Kavanaugh's concurrence is a

2  predictor of the ultimate outcome of the appeal from the PI Order in this case, whether

3  Defendants are "likely to ultimately succeed on the merits of its appeal" is not directly relevant to

4  the question of whether this Court should stay the matter under *Landis*. *See Kuang v. United*

5  *States Dep't of Def.*, No. 18-cv-03698-JST, 2019 WL 1597495, at \*6 (N.D. Cal. Apr. 15, 2019)

6  ("The likelihood of success on the merits is not an independent factor under *Landis*, and therefore

7  does not carry the same weight in this context." (citations omitted)).

8      5.  Balancing

9      Though concerns over wasted discovery weigh slightly in favor of a stay, the Court cannot

10  conclude on this record that discovery will be as enormously burdensome as the Defense

11  contends. Moreover, while judicial efficiency likely would be enhanced by a stay, Plaintiffs have

12  a substantial interest in obtaining a prompt adjudication of their claims. On balance, given the

13  absence of strong evidence of prejudice to the Defense, the Court finds that the justifications for a

14  stay in this case do not presently warrant a discretionary stay.

15              **III.  CONCLUSION**

16  Based upon the foregoing, the Court **ORDERS**:

17      (1)  Defendants' Motion to Stay all proceedings (Doc. 115) is **DENIED**.

18      (2)  However, the Court concludes that it has no jurisdiction to consider the following

19          arguments raised in the pending motion to dismiss:  all standing arguments and any

20          mootness arguments related to the issuance of Musters pertaining to stops and arrests.

21          The motion to dismiss will be **HELD IN ABEYANCE** as to those issues.

22      (3)  The motion to dismiss will proceed on the remaining arguments, including the

23          argument that Fourth Amendment claims must be raised in the administrative process.

24          If necessary, the Court will set a separate hearing on the remaining issues so that the

25          Court and the parties can focus on the motion to enforce on February 5, 2026 hearing.

26

27  IT IS SO ORDERED.

28  Dated:  __January 24, 2026__

UNITED STATES DISTRICT JUDGE

26