**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED FARM WORKERS, et al., | Case No. 1:25-cv-00246 JLT CDB |
| Plaintiffs, | ORDER GRANTING IN PART PLAINTIFFS' MOTION TO ENFORCE PRELIMINARY INJUCTION ORDER[*] |
| v. | |
| NOEM, et al., | (Doc. 81) |
| Defendants. | |

## I.    INTRODUCTION

In early 2025, the U.S. Border Patrol engaged in a series of immigration enforcement actions in Kern County. The plaintiffs in this case brought litigation alleging that these actions involved a pattern of unlawful conduct by Border Patrol Agents. The evidence showed that Agents stopped non-citizens and citizens alike for doing little more than having a certain skin color while conversing with others, working as a gardener, driving home from work, or stopping for gas. Agents detained these people, demanded to see their "papers" and questioned them about their immigration status all without any legal basis for doing so.

If a person could not produce proof of their legal status in this country, Agents then arrested them without considering or complying with law Congress enacted for these circumstances. Congress requires Agents to consider whether, when making warrantless arrests, the noncitizen poses a flight risk or a danger to community if released. Rather than abide by

1

*With the consent of the parties, pseudonyms have been used in place of certain names in this order.

Congress' mandate, Agents arrested everyone who could not establish citizenship. Tellingly, the government did not contest or counter any of the plaintiffs' evidence demonstrating the unlawfulness of these actions.

On this basis, Plaintiffs requested provisional class certification and preliminary injunctive relief, and the Court granted both. The Court enjoined Border Patrol Agents from conducting detentive stops in this District absent reasonable suspicion that the person stopped is a noncitizen[1] who violated immigration laws. The Court further enjoined Agents from conducting warrantless arrests without first establishing probable cause of flight risk, as required by 8 U.S.C. § 1357(a)(2). The Court required Defendants to provide additional guidance and training related to the requirements of the PI to the Agents responsible for making detentive stops and arrests. The Court also ordered Agents to submit documentation for every warrantless stop or arrest of a noncitizen made in this District. The PI Order required this documentation to contain particularized, narrative facts supporting the arresting Agent's conclusion that reasonable suspicion existed the detention and that probable cause existed to support the arrest.

Months after the Court issued the PI Order, on July 17, 2025, Border Patrol engaged in an immigration enforcement action in the parking lot of a Home Depot in the City of Sacramento. In connection with this action, Defendants produced eleven, virtually identical U.S. Department of Homeland Security Form I-213s, purporting to correspond to the people who were stopped and arrested during this action, and which they claim support the detentions and arrests.

After reviewing these documents, Plaintiffs filed a motion to enforce the PI Order. They contend that Defendants violated the PI in various ways including that Defendants failed to properly train officers, that officers unlawfully stopped without reasonable suspicion and arrested people without probable cause. They contend also that Agents failed to properly document the detentive stops and warrantless arrests made in the Sacramento action. (Doc. 94 at 5; Doc. 117 at 5.) Defendants oppose the motion on jurisdictional grounds (Doc. 112 at 11–13) and argue that the documentation produced demonstrates that they did not violate the PI. (*Id*. at 7, 13–22.)

---

[1] Consistent with other decisions addressing this area of law, *see, e.g., Lopez Benitez v. Francis*, 795 F. Supp. 3d 475, 481 (S.D.N.Y. 2025), the Court uses the term "noncitizen" interchangeably with the statutory term "alien."

2

Having carefully examined the entire record, including the recorded footage of the Sacramento action, the Court finds that Defendants have again detained people without reasonable suspicion for doing so. Even accepting as true Defendants' assertions that all those stopped and arrested engaged in unprovoked flight from Agents, such flight—standing alone—is insufficient to establish reasonable suspicion. The narratives in the I-213s fail to bridge this gap. They rely on unsupported assumptions, hunches and generalizations about the relationship between a person's apparent status as a day laborer and their immigration status. At most, the I-213s contain only assumptions that some noncitizens *may* be present in the Home Depot parking lot and no individualized assessment as to any person detained.

The Court finds also that Defendants have failed to comply with the documentation requirements of the PI Order. Each of the I-213s assert that the target engaged in unprovoked flight from Agents, though Defendants now admit that at least two of the I-213s were modified by others to reflect descriptions of the circumstances that are flatly incorrect. Also, most of the I-213s contain narratives that are so cursory that it is impossible to match the I-213 to the video footage or, indeed, to distinguish one arrest from another. The documentation also does not clearly and consistently reveal who prepared the I-213 narratives.

For all these reasons, the Court finds Defendants have not complied with the PI Order and, for the reasons set forth below, the motion to enforce the preliminary injunction is **GRANTED in PART**.

## II.    BACKGROUND

### A.    Preliminary Injunction Motion and Order

In early January 2025, U.S. Border Patrol launched "Operation Return to Sender" which targeted the Central Valley region, located within the Eastern District of California, in efforts to stop, detain, and arrest people suspected of being in the country unlawfully. (Doc. 1 at 2; Doc. 15-2 at 72.) In response, Plaintiffs initiated this action for declaratory and injunctive relief alleging violations of 8 U.S.C. § 1357(a)(2), 8 C.F.R. § 287.8(c)(2)(ii), the Fourth Amendment, and the Fifth Amendment. (Doc. 1.) Plaintiffs also filed a motion for provisional class certification, (Doc. 14), and a motion for preliminary injunction, (Doc. 15). The request for injunctive relief sought to

stop Defendants from detaining and arresting people without reasonable suspicion and without probable cause to believe they posed a flight risk. (*See* Doc. 15-1 at 2–6.)

On April 29, 2025, this Court granted Plaintiffs' motions for provisional class certification and preliminary injunction. (Doc. 47 ("PI Order").) The PI Order found that Plaintiffs' undisputed "anecdotal evidence establishes a pattern and practice of agents performing detentive stops without reasonable suspicion in this District." (*Id.* at 76.) Specifically,

> Plaintiffs and putative class members report facts indicating they were engaged in ordinary activities—such as talking with family members and others or driving home from work in vehicles that were not violating traffic laws—when Border Patrol stopped them, demanded their "papers" and questioned them about whether they were in the country legally. Collectively, Plaintiffs present evidence that is "more likely than not" Border Patrol agents engaged in a practice of performing detentive stops without knowledge of who they were stopping, and without reasonable suspicion to perform the stop. Although Defendants contend there were "various facts and circumstances concerning each detention" (Doc. 32 at 19), the circumstances identified by Defendants constitute a distinction without a difference. Whether Border Patrol agents wore uniforms or plain clothes does not change whether the agents had reasonable suspicion to perform the stops. Whether a person handed over identification while being detained does not address whether the Border Patrol agents engaged in a practice of performing stops without reasonable suspicion. Ultimately, there is no substantive conflict in the evidence regarding the alleged practice.

(Doc. 47 at 57–58.)

In addition, the evidence showed "a pattern and practice of warrantless arrests without Border Patrol Agents performing individualized flight risk assessments to have probable cause for the arrest as required." (Doc. 47 at 76.) Specifically,

> The three proposed class representatives report they were placed under arrest, without a warrant and without Border Patrol agents asking any information to assess their flight risk. (Doc. 15-9 at 3, Morales Cisneros Decl. ¶ 6; Doc. 15-10 at 2-3, Munguia Esquivel Decl. ¶¶ 6-8; Doc. 15-11 at 3, Aguilera Martinez Decl. ¶ 8.) Morales Cisneros reports the agents told his daughter that he "was detained by Border Patrol for being here illegally without documents." (Doc. 15-9 at 3, ¶ 6.) He states, "[Agents] did not ask about my ties to the community, such as my family members, my work history, or how long I have lived in the neighborhood." (*Id.*) Munguia Esquivel also asserts the Border Patrol agent did not "ask me about my community ties, such as my family, work history, or how long I have been living here." (Doc. 15-10 at 3, ¶ 8.) Likewise, Aguilera Martinez reports, "The agent never asked me about my community ties to Kern County, like how long I have lived and worked here and all the family

4

members I have who live here." (Doc. 15-11 at 3, ¶ 8.)

Elizabeth Strater reports that when UFW Members Alicia, Benjamin, and Carlos were arrested, Border Patrol agents asked for their "papers" and "did not present a warrant for arrest … [or] ask any further questions." (Doc. 15-3 at 9, Strater Decl. ¶ 28.) Strater reports, "After they had handcuffed [Alicia], the agents asked Alicia if she had family. When she told them she had children, an agent 'offered' to go pick up the children so they could all be taken to Mexico together. The men did not ask Benjamin or Carlos about their ties to the community or otherwise conduct an assessment of flight risk." (*Id.*) Strater also reports that when UFW Member Fernando was arrested, "The agents did not present a warrant for arrest or ask Fernando anything about his family, community ties, employment, or other factors related to his likelihood of flight risk." (*Id.* at 12, ¶ 41.)

The other putative class members uniformly report that Border Patrol agents arrested them without warrants and without asking any questions to assess their individual flight risk. (Doc. 15-6 at 3, Vargas Mendez Decl. ¶ 10 ["They did not show us any warrants. They never asked about my community ties to Kern County, such as how long I had lived there, my family, or my employment."]; Doc. 15-7 at 2, Perez Cruz Decl. ¶ 4 ["None of the agents asked me anything about my family, community ties, work, or life in Bakersfield. The agents did not present me with a warrant of any kind and did not appear to have any idea who I was before they demanded by ID."]; Doc. 15-8 at 3, Hernandez Espinoza Decl. ¶ 7 ["The agents never asked me questions about my community ties, such as the many years I lived here, my work history, or my children and grandson."]; Doc. 15-5 at 2, Ramirez Decl. ¶¶ 6-7 [reporting the agent did not have a warrant and "[t]he agent did not ask me any questions about my family or ties to the community. If he had asked, I would have told him I have family in Bakersfield and elsewhere in California. I would have told him my children live in California, and my son is still a minor."].)

Even when information regarding family and community ties was volunteered to Border Patrol agents following arrests of putative class members, the agents expressly disregarded it. For example, Munguia Esquivel reports that his family members spoke to Border Patrol when they came to get his truck and said Munguia Esquivel "was in the process of regularizing [his] immigration status." (Doc. 15-10 at 3, ¶ 9.) He states, "The agents did not care and said they were taking me anyway." (*Id.*) Similarly, Vargas Mendez reports what while in the Border Patrol vehicle after his arrest: "I told [an agent] I have lived in the area for 20 years; I have a wife and four kids who are all citizens; I have no criminal record." (Doc. 15-6 at 3, ¶ 11.) The agent "responded he did not care and that [Vargas Mendez] was 'going to Mexico.'" (*Id.*)

. . . . Plaintiffs do not contend Border Patrol erred in assessing flight risks; they contend that the probable cause determinations were not performed *at all*. (*See* Doc. 1 at 65-76; Doc. 37 at 7.)

(Doc. 47 at 59–61.)

The PI Order imposed a series of requirements regarding detentive stops, warrantless arrests, and training and documentation requirements. (Doc. 47 at 86–88.) First, the PI Order enjoined Border Patrol Agents from conducting detentive stops without reasonable suspicion that the person stopped is a noncitizen in violation of immigration laws:

> Border Patrol is enjoined from conducting detentive stops in this District unless, pre-stop, the detaining agent has reasonable suspicion that the person to be stopped is a noncitizen who is present within the United States in violation of U.S. immigration law, as required by the Fourth Amendment of the United States Constitution.

(Doc. 47 at 86, ¶ 4(a).) In defining "reasonable suspicion," the Court explained that Agents shall have "specific, particularized facts that support[] the agent's reasonable suspicion, which was formed in advance of the stop, that: (i) for vehicle stops, the vehicle contained a noncitizen present within the United States in violation of U.S. immigration law; and (ii) for stops on foot, the person stopped was a noncitizen within the United States in violation of U.S. immigration law." (Doc. 47 at 87, ¶ 4(c).) The Court further defined the parameters of reasonable suspicion when it explained that "refusal to answer questions does not, without more, constitute a basis for reasonable suspicion to justify a detentive stop," (Doc. 47 at 87, ¶ 4(e)), and that "[a]n officer cannot rely only upon generalizations that 'would cast suspicion on large segments of the law-abiding population.'" (Doc. 47 at 74, citing *United States v. Manzo-Jurado*, 457 F.3d 928, 935 (9th Cir. 2006).)

The PI ordered Agents to submit documentation for every detentive stop of a noncitizen made in this District, providing a narrative that details the facts and circumstances in support of the Agent's reasonable suspicion that the person has violated a U.S. immigration law.

> Any Border Patrol agent who conducts a detentive stop in this District **SHALL**, as soon as practicable, document the facts and circumstances surrounding the stop in a narrative form. This documentation **SHALL** include the specific, particularized facts that supported the agent's reasonable suspicion, which was formed in advance of the stop, that: (i) for vehicle stops, the vehicle contained a noncitizen present within the United States in violation of U.S. immigration law; and (ii) for stops on foot, the person stopped was a noncitizen within the United States in violation of U.S. immigration law. The documentation **SHALL** include the date and time that the agent completed the detentive stop and the date and time the agent completed the documentation.

(Doc. 47 at 86–87, ¶ 4(c) (emphases in original).) Finally, the PI ordered Border Patrol to issue guidance on reasonable suspicion determinations, which "shall include, among other things, that refusal to answer questions does not, without more, constitute a basis for reasonable suspicion to justify a detentive stop." (*Id*., at 87, ¶ 4(e).)

As to warrantless arrests, the PI explained that in the immigration context:

> If placing someone under arrest without a warrant, an immigration officer must have probable cause that a person is "likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(2); *Mountain High Knitting, Inc. v. Reno,* 51 F.3d 216, 218 (9th Cir. 1995). Put another way, a warrantless arrest requires an individualized assessment of the person's flight risk. *See id.*; *see also Nava*, 435 F. Supp. 3d at 891-92.

(Doc. 47 at 76.) The PI then enjoined Border Patrol Agents from conducting warrantless arrests without first establishing probable cause of flight risk:

> Border Patrol is enjoined from effecting warrantless arrests in this District unless, pre-arrest, the arresting agent has probable cause to believe that the noncitizen being arrested is likely to escape before a warrant can be obtained, as required by 8 U.S.C. § 1357(a)(2).

(Doc. 47 at 86, ¶ 4(b).) The PI defined probable cause of flight risk with reference to the DHS Broadcast Statement and 8 U.S.C. § 1357:

> Any Border Patrol agent who conducts a warrantless arrest in this District **SHALL** comply with all requirements set forth in DHS's "Broadcast Statement of Policy" on compliance with 8 U.S.C. § 1357(a)(2)[.]

(Doc. 47 at 87, ¶ 4(d).)[2] The PI also ordered Border Patrol Agents to submit documentation for every warrantless arrest of a noncitizen made in this District, with facts in support of the belief

---

[2] Section 1357(a)(2) of Title 8 states that border patrol agents "authorized under regulations prescribed by the Attorney General shall have power without warrant—to arrest any alien . . . if he has reason to believe that the alien so arrested is in violation of any such law or regulation and is likely to escape before a warrant can be obtained." 8 U.S.C. § 1357(a)(2). The DHS Broadcast Statement states that to determine flight risk, an ICE Officer must "consider the totality of the circumstances known to the officer before making the arrest." (Doc. 15-2 at 111.) "[F]actors relevant to the determination may include [(1)] the ICE Officer's ability to determine the individual's identity, [(2)] knowledge of that individual's prior escapes or evasions of immigration authorities, [(3)] attempted flight from an ICE Officer, [(4)] ties to the community (such as a family, home, or employment) or lack thereof, or [(5)] other specific circumstances that weigh in favor or against a reasonable belief that the subject is likely to abscond." (Doc. 15-2 at 111.) Additionally, "mere presence within the United States in violation of U.S. immigration law is not, by itself, sufficient to conclude that an alien is likely to escape before a warrant for arrest can be obtained." (Doc. 15-2 at 111–12.)

7

that the individual was likely to escape before a warrant could be obtained.

> Any Border Patrol agent who conducts a warrantless arrest in this District **SHALL** comply with all requirements set forth in DHS's "Broadcast Statement of Policy" on compliance with 8 U.S.C. § 1357(a)(2), including but not limited to the requirement that as soon as practicable after an arrest, agents **SHALL** document in writing "the facts and circumstances surrounding the warrantless arrest" and the "specific, particularized facts supporting the conclusion that the [individual] was likely to escape before a warrant could be obtained."

(Doc. 47 at 87, ¶ 4(d).) The DHS Broadcast Statement specifically requires the documentation to include the following information:

> After having made an arrest under 8 U.S.C. § 1357(a)(2) / INA § 287(a)(2), an ICE Officer must document the facts and circumstances surrounding that warrantless arrest in the narrative section of the alien's I-213 as soon as practicable. This documentation must include: (1) that the alien was arrested without a warrant; (2) the location of the arrest and whether this location was a place of business, residence, vehicle, or a public area; (3) whether the alien is an employee of the business, if arrested at a place of business, or whether the alien is a resident of the residence, if arrested at a residential location; (4) the alien's ties to the community, if known at the time of arrest, including family, home, or employment (**Note**: Information learned post-arrest relevant to custody determination should be documented separately from the information relevant to likelihood of escape known at the time of the warrantless arrest.); (5) the specific, particularized facts supporting the conclusion that the alien was likely to escape before a warrant could be obtained; and (6) a statement of how "at the time of arrest, the designated immigration officer [did], as soon as it [wa]s practical and safe to do so, identify himself or herself as an immigration officer who is authorized to execute an arrest; and state[d] that the person is under arrest and the reason for the arrest."

(Doc. 15-2 at 112.)

Defendants appealed the PI Order on June 26, 2025. (Doc. 59.) That appeal remains pending.[3]

## B.   Post PI-Order Musters

Defendants issued several guidance documents (referred to as "Musters") regarding the laws and policies for detentive stops and voluntary departure. (*See* Doc. 64 at 28–29.) The first

---

[3] Subsequently, Defendants moved to dismiss the action in its entirety. (Doc. 64.) Defendants also moved to stay the litigation in light of the pending appeal. (Doc. 115.) On January 24, 2026, the Court granted the motion to stay in part, finding that it lacked jurisdiction to address many of the arguments raised in the motion to dismiss because they were inextricably intertwined with issues on appeal. (Doc. 138.)

Muster, issued on April 4, 2025 (*see* Doc. 64-1), addresses warrantless arrests of noncitizens and determinations of flight risk. (Doc. 64 at 28.) El Centro Border Patrol then issued its second Muster on June 27, 2025 (*see* Doc. 64-2), in accordance with Section 4(e) of the PI Order, providing guidance on detentive stops and reasonable suspicion. (Doc. 64 at 28; Doc. 47 at 87, ¶ 4(e).) Border Patrol then issued its third Muster on July 11, 2025, (*see* Doc. 64-3), providing additional guidance on voluntary departure. (Doc. 64 at 29.)

### C.    Operation at Large

On July 17, 2025, El Centro Border Patrol engaged in another immigration action within the Eastern District, at a Home Depot in Sacramento, California (the "Sacramento Action"). (Doc. 94 at 10–11; Doc. 112 at 9–10.) This was part of "Operation at Large"[4] initiated by Immigration and Customs Enforcement with the goal to "significantly increase" the "arrests of illegal aliens." (Doc. 95 at 7.) ICE launched Operation at Large with an intent to "target[] immigration violators in Los Angeles, California." (Doc. 95 at 6.) "In May 2025, this operation commenced deploying 1,000 interagency teams daily across 25 Areas of Responsibility (AORs), operating [seven] days a week. The operation prioritize[d] regions with the highest concentrations of executable final orders, as identified by the ATrac (Alien Tracker) system."[5] (*Id.*)

On July 13, 2025, Agents "identified four individuals who were previously removed from the United States as currently living in Sacramento, CA."[6] (Doc. 95 at 8.) Thereafter, on July 15, 2025, El Centro Border Patrol conducted surveillance of a Home Depot located at 4641 Florin Road in Sacramento, California. (*Id.*) At around 7:43 a.m., agents observed "approximately [twenty] day laborers . . . gather[ed] in the parking lot." (*Id.*) Utilizing Customs and Border

---

[4] "Operation at Large" began in Los Angeles, California. (Doc. 95 at 6.) "On June 6, 2025, federal agents detained multiple day laborers outside of the Westlake Home Depot. In the following days, similar raids occurred throughout the [Central] District. Car wash workers, farm and agricultural workers, street vendors, recycling center workers, tow yard workers, and packing house workers were targeted." *See Vasquez Perdomo v. Noem*, 790 F. Supp. 3d 850, 866–67 (C.D. Cal. 2025).

[5] The actions in Los Angeles began in June 2025, which led to a lawsuit being filed in the Central District of California, where the court enjoined Border Patrol from conducting detentive stops without reasonable suspicion. *See Vasquez Perdomo*, 790 F. Supp. 3d at 868–72, 896.

[6] There is no indication that these four people lived anywhere near Florin Road or frequented the Home Depot located there.

9

Protection's databases, "agents identified an illegal alien previously convicted for 8 U.S.C. § 1325 in the group of laborers. This illegal alien was convicted and served [sixty] days in a detention facility."[7] (*Id.*) At approximately 11:15 a.m., "agents observed another illegal alien with a prior removal order in the group."[8] (*Id.*) Additionally, Agents noticed "a truck parked in the Home Depot parking lot with day laborers nearby" and identified the truck as being "registered to an illegal alien . . . residing in Sacramento [who] ha[d] been removed from the [country] on several occasions." (*Id.*) According to Border Patrol, it is "common knowledge" that "illegal aliens congregate at locations such as Home Depot to solicit cash paying labor jobs . . . [which they seek] because they lack documentation . . . to gain lawful employment . . . [and] to avoid paying taxes and . . . detection by law enforcement." (*Id.*)

Two days later, at approximately 7:25 a.m., Agents arrived at the same Home Depot to "search for the illegal aliens identified during prior surveillance operations"[9] and "engage the employees / day laborers in conversation to determine their citizenship and inquire if they had knowledge of other illegal aliens in the area." (Doc. 95 at 8.) Border Patrol Agents arrested eleven noncitizens for immigration-related violations and one U.S. citizen for causing damage to government property in violation of 18 U.S.C. § 1361.[10] (Doc. 112 at 10; Doc. 94 at 11.) Border Patrol submitted eleven I-213s for the arrest of the eleven noncitizens, (Doc. 95), but did not

---

[7] 8 U.S.C. § 1325 criminalizes entry into the United States at unauthorized places or times, eluding immigration officers or attempting to entry by using false or misleading information.

[8] It is unclear how Border Patrol identified these two undocumented individuals among the group of twenty on July 15, 2025. (*See* Doc. 95 at 8.) The I-213 fails to indicate whether Agents approached these individuals to ask them for identification, or whether Agents made these determinations from afar. (*Id.*)

[9] Again, there is no explanation in the I-213 for why Border Patrol believed that the noncitizens identified on July 15, 2025, would be present at this precise Home Depot on July 17, 2025 apart from generally stating that "[i]t is common knowledge . . . that illegal aliens congregate at locations such as Home Depot." (Doc. 95 at 8.) Though at least one Border Patrol Agent indicates that he returned to the Home Depot on July 17, 2025, to look for the four individuals previously identified by intelligence teams on July 15, 2025, (Doc. 95 at 8), nothing in the record suggests any Agent engaged surveillance on July 17 to determine whether those individuals were present and nothing in the record suggests those individuals were in fact present.

[10] Criminal charges were brought against Jose Manuel Castillo Jr., the U.S. Citizen arrested during the Sacramento Action for allegedly puncturing the tire of a U.S. Customs and Border Protection vehicle with a knife in violation of 18 U.S.C. § 1361, a Class A Misdemeanor, regarding the willful injury and depredation against any property of the United States not exceeding $1,000 in value. *See* ECF. 1 at 1–2, *USA v. Castillo*, No. 2:25-cr-00197-WBS-1 (E.D. Cal. Aug. 19, 2025).

submit an I-213 for the arrest of the U.S. citizen upon the belief that the PI did not require it. (*See* Doc. 112 at 26–27.) Defendants indicate that the I-213s submitted "reflect all immigration-related stops on July 17, 2025." (*See* Doc. 81-6 at 2.)

### 1.     Border Patrol's Initial Account of the Sacramento Action[11]

Manuel Molina Jr., the Border Patrol Agent in Charge, was present during the Sacramento Action and observed the operation unfold via live video footage that captured the Home Depot parking lot. (Doc. 112-2 at 2–4.) Agent Molina Jr. states:

> I observed groups of individuals clustered in areas of the parking lot who, based on my experience as a [Border Patrol Agent (BPA), did not appear to be customers of the store but rather individuals seeking cash employment as day laborers. There was more than one group of such individuals located in different areas of the parking lot. I watched as BPAs in unmarked vehicles entered the parking lot, exited their vehicles, and approached these groups of individuals. The BPAs were wearing agency-issued ballistic body armor with Border Patrol identifiers, badge, and clear police markings on the front and back. Agents did not surround, corral, block-in, or run towards these individuals, but rather parked a distance away and walked towards the individuals on foot. For example, in one area of the parking lot, a single agent on foot walked towards a group of about four individuals. As BPAs approached the groups, the individuals in these groups immediately ran away from the BPAs in all directions. BPAs at that point began running in order to detain these individuals for further investigation. In all, eleven aliens were arrested during the operation based on probable cause of an immigration violation. I have reviewed the I-213 reports associated with this operation. The reports are consistent with the behavior of the individuals I observed. Namely, the reports accurately describe individuals fleeing once BPAs exited their vehicles to approach them.

(Doc. 112-2 at 3–4.)

According to all the I-213s, when Border Patrol Agents arrived at the Home Depot, they parked in a public access area and observed groups of people scattered throughout the parking lot who "behaved differently than people shopping at Home Depot." (Doc. 95 at 8, 14–15, 18–19, 23, 28–29, 34, 38, 43–44, 49, 54, 59.) Specifically, "[t]hey were loitering in stationary locations and were not shoppers," which in their experience, was "indicative of day laborers and possible illegal aliens intent on working for cash." (*Id*.) Based on intelligence reports, Agents had reason to

---

[11] This section reflects materials disclosed to the Court in late September 2025 alongside Defendants' opposition to the emotion to enforce.

believe that "illegal aliens typically loiter at businesses in certain locations at certain times to find cash work." (*Id*.) None of the I-213s reference race or ethnicity.

All of the I-213 forms then indicate that as soon as Agents stepped out of their vehicles, and before speaking to anyone, the clusters of people looked furtively in their direction and ran away from them. (*Id*.) Agents assert that, in their experience, "the mere presence of a Border Patrol Agent may cause an illegal alien to flee, for fear of arrest and deportation." (*Id*.) They state that such "unprovoked flight from law enforcement led [them] to believe that these individuals were involved in an active crime or were likely present in the United States without authorization." (*Id*.)

The forms submitted for all but one arrestee make the same claims regarding the arrestees' immediate flight, with slight variations.[12] These forms indicate that Border Patrol Agents pursued the fleeing individuals to further investigate. (Doc. 95 at 15, 19, 23, 29, 34, 38–39, 44, 49, 54, 59.) These forms state that agents "verbally identified" themselves as U.S. Border Patrol Agents "while wearing official Border Patrol Agent identifiers."[13] (*Id*.) The forms indicate that Agents ordered arrestees to stop, and that arrestees ignored their commands and continued to run away. (*Id*.) Then, the forms all state that "[a]fter a short foot pursuit, [Agents were] able to catch [the arrestees], stop [them] and detain [them] in order to perform a brief immigration inspection . . . , as [agents] firmly believed [they were] illegal alien[s] at this point." (*Id*.) Afterwards, agents

[12] Specifically, the forms submitted for Filiberto De Jesus Rivera-Molina, ▮Arrested Person A▮, Selvin Osbeli Mejia-Diaz, ▮Arrested Person B▮, Isael Antonio Lopez Mazariegos, ▮Arrested Person C▮, ▮Arrested Person D▮, ▮Arrested Person E▮, ▮Arrested Person F▮, and ▮Arrested Person G▮ all generally include the same allegations regarding flight. (*See* Doc. 95 at 15, 19, 23–24, 29, 34, 38–39, 44, 49, 54, 59.) There are some slight variations, however. For instance, ▮Arrested Person G▮ form states that, "Agent ▮Agent A▮ who was on scene, overheard my commands and observed the subject's resistance. He responded to assist in gaining control of the subject." (*Id*. at 59.) ▮Arrested Person A▮ form adds that the noncitizen's "willful misrepresentation regarding his citizenship" was also a factor for concluding he was a flight risk. (*Id*. at 19.) Some forms add that the failure to register as an alien, (*id*. at 15, 44, 49, 59), or the presence of a prior order of removal, (*id*. at 29, 34), also led agents to believe these individuals were flight risks. Further, the initial I-213 submitted for ▮Arrested Person C▮ fails to indicate whether the Agent identified himself as a U.S Border Patrol and whether he was wearing official Border Patrol identifiers, as do all others. (*Compare* Doc. 95 at 15, 19, 23, 29, 34, 44, 49, 54, 59 *with* Doc. 95 at 38–39.)

[13] This Court later learned that the initial I-213 provided for Mr. ▮Arrested Person C▮ (Doc. 95 at 36–40) was the first draft, which included only an "encounter narrative template and information provided directly from Mr. ▮Arrested Person C▮ (Doc. 157 at 13, ¶ 8.) The final/ third draft of Mr. ▮Arrested Person C▮ I-213 was inadvertently omitted from the final set of documents ERO submitted to Border Patrol, (Doc. 157 at 14, ¶¶ 11, 13). The final/ third draft instead indicates that the Agent who conducted Mr. ▮Arrested Person C▮ arrest was "wearing agency issued ballistic body armor with Border Patrol identifiers, badge, and clear police markings" and that while chasing Mr. ▮Arrested Person C▮, the Agent "loudly announc[ed] 'U.S. Border Patrol.'" (Doc. 157 at 66, 68.)

12

"performed a field immigration interview" on these individuals and "determined [they were] illegally present in the United States." (*Id.*) Agents also determined that the individuals were likely to escape before a warrant could be obtained, namely due to their illegal presence in the United States, willful disregard for immigration and criminal laws, ability to disappear into the millions of people living in Sacramento County, flight from law enforcement to avoid arrest, ignoring lawful orders to stop, and agents' collective belief (based on training and experience) that they would abscond if released. (*Id.*)

The form submitted for Arrested Person H includes more specific details regarding the his flight:

> Supervisory Border Patrol Agent-Intelligence Agent A requested assistance via handheld radio for a subject continuing to flee from him. Agent Agent A pursued the man into a river bottom and the man traversed the river bottom towards a nearby neighborhood. I observed the subject from my vehicle, and I drove and parked near the location of the subject's last known direction of travel. The subject noticed me park my vehicle and he jumped a chain link fence and continued fleeing on foot. I jumped the same chain link fence to have better visual of the fleeing subject. The subject then ran a street corner leading into a residential area. I followed . . . and witnessed the subject jump into the backyard of a home. . . I didn't jump the fence into the backyard. I waited in the front yard to see if I could hear the subject jumping other back fences. I heard the subject through the front yard fence trying to tuck himself away and conceal his position. At that point, one male occupant came out the front door . . . The concerned citizen pointed to the backyard, indicating to me that the subject was on his property.

(Doc. 95 at 9.) Therefore, while most forms indicate that the individual was apprehended after a short foot pursuit starting from the Home Depot, A.P. H form indicates a prolonged foot pursuit, also starting from the Home Depot, with a traverse into a river bottom, a residential area, and someone's backyard.

Additionally, eight of the I-213s mention community ties.[14] (*See* Doc. 95 at 10, 19, 24, 29, 34, 39, 54, 59.) Seven of the I-213s, including those of Isael Lopez Mazariegos and Selvin Mejia-Diaz, state that the noncitizen "made no claims to owning a home, other assets, or having a steady and legal income," (*id.* at 10, 24, 29, 34, 39, 54, 59), and the I-213 for Arrested Person A states, "When asked, the subject stated he lived and worked in the area but was unwilling to

---

[14] The I-213s submitted for Filiberto De Jesus Rivera-Molina, Arrested Person D , and Arrested Person E do not mention community ties. (*See* Doc. 95 at 15, 44, 49.)

provide an address for either his home or work location." (*Id.* at 19.)

#### 2. Class Members' Accounts of the Sacramento Action

Plaintiffs claim that on July 17, 2025, "Border Patrol targeted Latinos in and around a Home Depot parking lot . . . based on their apparent ethnicity, apparent occupation, and presence at or near a Home Depot with no reason to believe the specific individuals they stopped were in the country unlawfully and arrested them without assessing flight risk." (Doc. 94 at 11.) Plaintiffs submit declarations for three non-citizen arrestees, (Docs. 74-8, 74-9, 81-12), along with supporting evidence. (Docs. 81-13, 81-14, 81-15, 81-9.)

#### a. *Filiberto De Jesus Rivera-Molina*

Filiberto De Jesus Rivera-Molina is 47 years old and has lived in Sacramento, California for the past eight years before he was arrested by Border Patrol. (Doc. 74-9, ¶ 1.) He is a construction worker, handyman, landscaper, and day laborer. (*Id.*) He has no criminal record. (*Id.* at ¶ 4; *see also* Doc. 95 at 13.)

Filiberto asserts that on July 17, 2025, he "arrived at the entrance of the Home Depot parking lot at around 6:00 a.m. and stood there with other day laborers as [they] waited for work." (Doc. 74-9, ¶ 2.) "Around two hours later, around [ten] unmarked vehicles showed up," which he thought were contractors because the "unmarked vehicles were like what contractors drive. They had unmarked Ford trucks with toolboxes in the bed of the truck, . . . white vans, and . . . mini-SUVs like what families drive." (*Id.*) "Suddenly, close to [twenty] agents in vests with their faces covered got out of their vehicles and swarmed [them]. [The agents] surrounded [them] and corralled [them] with their vehicles. [He] could see they had guns on their waists. [The agents] yelled at [them] in Spanish saying they were "migra" and that [they] could not move anywhere. [He] was shocked and could not run or walk away anywhere [he] did not feel free to leave." (*Id.*)

Filiberto states that agents proceeded to ask "every day laborer if they had papers." (Doc. 74-9, ¶ 2.) He claims that two or three day laborers were "allowed . . . to walk away" after showing agents their legal documents.[15] (*Id.*) Two agents then approached Filiberto and grabbed

---

[15] Based on Filiberto's declaration, Petitioners allege that Defendants failed to serve documentation "reflecting people who were detained, but not arrested." (Doc. 94 at 11.)

him. (*Id.*) "The agents asked if [he] had papers. [He] said no, so they arrested [him] and tied [his wrists." (*Id.*) Once arrested, they placed him in a white van along with other people they had arrested. (*Id.*) At that point, agents stated "they were from immigration, and . . . had orders to do raids at Home Depot stores, [] Walmart stores, and . . . could go to any [] area where there were people without papers to arrest them." (*Id.* at ¶ 3.) Once agents came back inside the van after arresting more day laborers, they told them in English and Spanish that they were border patrol agents. (*Id.*) Filiberto states that "agents never showed [him] an arrest warrant and before they arrested [him], they didn't ask [] for [his] name or [his] work history or family or about [his] time in Sacramento." (*Id.*) The only question Filiberto remembers being asked prior to his arrest was whether he had papers. (*Id.*)

He was subsequently taken to a cell in Stockton, California where he remained until nighttime. (Doc. 74-9, ¶ 4.) They took his photo and fingerprints and asked him if he wanted to sign for immediate deportation, to which he said no. (*Id.*) After several hours, he was transported to a jail in downtown, Sacramento where he remained for three days. (*Id.* at ¶ 5.) On July 20, 2025, he was transported to another detention center near San Diego, California. (*Id.* at ¶ 6.) He arrived at the Imperial Regional Detention Facility on July 21, 2025. (*Id.*) Filiberto believes he was arrested "because of racism, because [he] appear[s] Latino" and because he was "looking for work in front of Home Depot." (*Id.* at ¶ 7.)

### b.    Isael Lopez Mazariegos

Isael Lopez Mazariegos is 50 years old and has lived in Sacramento, California for the past twelve years before being arrested by Border Patrol. (Doc. 74-8, ¶ 1.) He has two adult children who live in Louisiana. (*Id.*) His son is 28 years old, and his daughter is 23 years old. (*Id.*) He is a construction worker. (*Id.* at ¶ 2.) He was convicted for a marijuana charge on October 18, 2012, and was sentenced to six months in prison. (Doc. 95 at 32.)

Isael asserts that on July 17, 2025, he was "walking towards a coffee and donut shop on Florin Road in Sacramento." (Doc. 74-8, ¶ 3.) His boss planned to pick him up at the coffee shop at around 8:30 a.m. (*Id.*) "As [he] passed by the Home Depot on Florin Road on [the] way to the coffee shop, [he] stopped to buy a champurrado from a street vendor. Then, [he] saw an

acquaintance of [his] sitting on the curb, near a group of day laborers who were waiting for work at the entrance to the Home Depot. [He] stopped to chat with him while [he] drank [his] champurrado. [He] spoke with him for about five or ten minutes." (*Id.*) Suddenly, Isael "felt a man grab [his] arm and push [him] hard trying to knock [him] down. [He] thought [he] was being assaulted. [He] looked around and saw two masked men. [He] had no idea who they were, and [he] was struggling to get away. [He] managed to keep [his] balance but then two more men grabbed [his] other arm." (*Id.*)

Isael asked the men, "What are you doing?" (Doc. 74-8, ¶ 3.) He then saw several vans parked nearby and saw more masked men grabbing day laborers. (*Id.*) The agents did not identify themselves to him, and did not state why they were grabbing him or questioning him. (*Id.*) They asked him for his identification to which Isael responded, "Why are you asking me for my ID?" (*Id.*) The agent then responded, "Well then you must be an immigrant." (*Id.*) Isael remained quiet. (*Id.*) Again, Isael asked them who they were and whether he had done something wrong. (*Id.* at ¶ 4.) The men held his arms tightly, did not explain anything to him, and never showed him an arrest warrant or a badge. (*Id.*) Eventually, they took Isael's wallet out of his pocket without his permission. (*Id.*) After doing so, they handcuffed him and moved him closer to an unmarked white van and forced him inside. (*Id.*)

Isael claims that "[t]here was no way [he] could have fled because they snuck up on [him] and grabbed [him] in a violent way." (Doc. 74-8, ¶ 4.) "The agents never asked [him] questions about [his] time living in Sacramento or [his] work history or [his] family." (*Id.*) Prior to his arrest, and while physically restrained by the agents, they asked only for his ID. (*Id.*) According to Isael, the agents grabbed him before knowing anything about him. (*Id.*) Isael says that he "saw around [twelve] different agents in civilian clothing." (*Id.* at ¶ 5.) "Some had black vests on while others wore green vests. Some only wore a T-shirt and jeans. They were all armed with handguns on the side of their vests. The vests had the word 'police' on them and each agent had their face covered." (*Id.*) He also noticed other white vans, multiple unmarked vehicles, and agents arresting other people. (*Id.*)

Once the van was full, the agents began driving away from the Home Depot and did not

tell them where they were taking them. (Doc. 74-8, ¶ 5.) They were subsequently taken to the Stockton detention center, where they took his photo and fingerprints. (*Id*. at ¶ 6.) His request to call his family was denied. (*Id*.) He was transferred to several other detention centers over the next few days and eventually put on a plane headed to a detention center in Louisiana. (*Id*.) Isael ultimately decided to sign for voluntary departure because he did not want to be in immigration detention. (*Id*.) He believes that his arrest was unjust, that his rights were violated, and that the manner of his arrest was wrong. (*Id*. at ¶ 7.)

///

### c.     *Selvin Osbeli Mejia-Diaz*

Selvin Osbeli Mejia Diaz is 18 years old and has lived in Sacramento, California for the past year with his aunt and her family. (Doc. 81-12, ¶ 1.) His aunt, Francisca Delfina Mejia Castanon, is his immigration sponsor. (*Id*.) Selvin claims that at the age of 16, on around June 2024, he fled Guatemala to seek asylum in the United States. (*Id*.) When he entered the United States, he turned himself in to border patrol. (*Id*.) He was arrested, placed in border patrol custody for two days, transferred to an Office of Refugee Resettlement Facility for minors, and eventually released to live with his aunt in Sacramento after sixty days. (*Id*.) Selvin is a high school student who just completed his junior year at Valley High School in Sacramento. (*Id*. at ¶ 2; s*ee also* Doc. 81-14.) He is not a day laborer and has never worked while living in the U.S. (Doc. 81-12, ¶ 2.) He dedicates his time to school, spending time with his family, and being active in his church. (*Id*.; *see also* Doc. 81-15.) He has no criminal record. (Doc. 81-12, ¶ 6; *see also* Doc. 95 at 21.)

Selvin asserts that on July 17, 2025, he got up early to go shopping at Ross, a clothing store located on Florin Road in Sacramento. (Doc. 81-12, ¶ 3.) The night before, he told his aunt about his plan to go shopping, and she gave him money to buy a shirt. (*Id*.) That morning, he left his home around 7:30 a.m. and set out walking towards the Ross shopping center, which is about a thirty-minute walk from his home.[16] (*Id*.) Selvin's aunt, Francisca Delfina, corroborates Selvin's testimony. (*See* Doc. 81-13, ¶ 6.) She states that on Wednesday night, July 16, 2025, Selvin asked

---

[16] As Defendants note in their opposition, (Doc. 112 at 23), judicially noticeable information indicates that the Ross Dress of Less, located on 4240 Florin Road, Sacramento, CA, opens at 9:00 a.m. some days and 9:30 a.m. other days, including on Thursday, the day the July 17, 2025, Sacramento Action occurred.

her for $40 so he could go to the store the following morning to buy a shirt for an upcoming family party, and she gave him the money. (*Id*.)

At the end of the road to get to Ross, there is a bridge that crosses a small creek, which leads to the back of the Ross shopping center. (Doc. 81-12, ¶ 3; *see also* Doc. 81-9 at 2.) As Selvin was nearing the bridge, he noticed a grey Chevrolet Silverado drive past him. (Doc. 81-12, ¶ 3.) The truck turned around and approached him. (*Id*.) "A masked man dressed like a soldier jumped out of the car and began chasing [him]." (*Id*.) Selvin claims that he "felt afraid because [he] did not know who the man was. [He] ran for about [ten] steps before the agent grabbed [him] and threw [him] to the ground. [The man] was much taller than [him] and [] used a lot of force, and he immediately handcuffed [him] while on the ground. [The man] did not identify himself and [] did not present an arrest warrant. The only thing [the man] told [Selvin] was "stop!" in Spanish." (*Id*.) Plaintiffs' counsel provides a Google Maps printout, (Doc. 81-9 at 2), with a red arrow identifying the bridge crossing into the Ross shopping center, which where Selvin was tackled and arrested. (Doc. 81-2, ¶ 12.)

Selvin claims that once handcuffed, he was placed inside the truck. (Doc. 81-12, ¶ 4.) The agent who arrested him asked for his name, date of birth, and took his photo. (*Id*.) Selvin asked if he could call his aunt, and he was told that he would have an opportunity to call her when they arrived in Stockton. (*Id*.) Selvin was taken to the Stockton ICE processing center. (*Id*.) The agents did not ask any other questions or say anything else to him during the forty-minute car ride. (*Id*.) Once they arrived at the Stockton facility, agents took his fingerprints and photo. (*Id*. at ¶ 5.) Again, Selvin asked to call his aunt, but agents denied his request. (*Id*.) Later that night, he was taken to another detention facility in downtown Sacramento. (*Id*.) After about two or three days, he was allowed to call his aunt and spoke to her for a couple of minutes. (*Id*.) After several days at the Sacramento facility, he was transferred to the Imperial Regional Detention Facility. (*Id*.) Selvin believes that the agents who arrested him did not know who he was before they arrested him. (*Id*. at ¶ 6.) He believes that they saw him and "figured they could arrest [him] because [he] looked Latino. [Agents] never identified themselves. They never showed [him] an arrest warrant. They never asked [him] about [his] family or where [he] lived. They didn't ask about [his]

18

immigration status or whether [he] was a day laborer. [He] wasn't even arrested near the Home Depot. No one ever explained why [he] was arrested." (*Id.*)

### 3.   Video Footage of the Sacramento Action

The live video referenced by Agent Molina Jr. in his declaration, (Doc. 112-2 at 3) was submitted to this Court on or before January 23, 2026. (*See* Doc. 136.) At the hearing on February 5, 2026, this Court discussed the Video Footage with the parties in detail. The parties agreed that the video may be discussed and considered in relation to the present motion. Oral Argument Tr. (Doc. 148 at 6.) The nearly 22-minute video records at least some parts of the Sacramento Action as it unfolded on July 17, 2025. The video has no audio and consists of footage overlooking the Home Depot and surrounding areas. For reference, the Court takes judicial notice of the following map of the general area:[17]

The video captures four main sequences of events: (a) the initial interaction between Border Patrol Agents and individuals at the Home Depot parking lot where many people were apprehended; (b) the pursuit of an individual who runs across the street from Home Depot and along Morrison Creek; (c) apprehension of another individual who is seen under the small bridge



---

[17] To the left (west) of the Home Depot, there is a Jack in the Box restaurant and an AM PM gas station. Across the street from Home Depot is Southgate Plaza located at 4242 Florin Road This shopping center includes McDonald's, Ross Dress for Less, WSS, Chase Bank, and other businesses. Morrison Creek is to the right of and adjacent to Home Depot and Southgate Plaza. The Creek curves around the east side of Southgate Plaza. To the southeast of Southgate Plaza, a small bridge crosses Morrison Creek leading from the back Southgate Plaza parking lot to a residential neighborhood located, in relevant part, on A Pkwy Street.

at the back-end of Southgate Plaza; and (d) the foot pursuit of another individual down A Pkwy Street, into the residential area behind Southgate Plaza.

*a.        Initial Events in the Home Depot Parking Lots*

The video begins with view of the Home Depot parking lot. At 00:05, five individuals ("Group A") are seen standing together by several trees and a light post, near the middle driveway entrance to the lot. Of these five, one man is wearing a long-sleeve yellow neon shirt. At 00:12, the video pans to the right and at 00:18, six different individuals ("Group B") are seen near the eastern driveway entrance of the parking lot, standing near a fence that runs alongside Morrison Creek. Of these six, two men with backpacks are standing off to the side. Two other men are sitting on the curb, one of whom is wearing a red and white shirt and white cap. The last two men are seen standing away from one another. One is wearing a sleeveless brown vest, and the other is wearing a grey hoodie. At 00:24, the two men with backpacks begin to walk away, leaving four men behind. The video then pans to the left back to Group A. At 1:28, the man in the yellow neon shirt walks away from Group A toward the west. At 1:35, the video pans back to the four who remain in Group B. Apart from these two groups, there are no other obvious groups of people that can be seen in frame of the Video Footage.[18]

At 1:42, an unmarked white van pulls into the east driveway entrance, near Group B. The van does not park in a designated parking space but rather stops in a driving lane just inside the east driveway entrance to the parking lot. At 1:50, an agent wearing a green ballistic body vest exits the van and walks toward Group B. From the Video Footage, it is unclear whether the agent is wearing Border Patrol identifiers, however, a video posted by Fox News that appears to reflect roughly the same time and place, shows agents near the front driveway entrance wearing bulletproof vests with the word "police" or badge identifiers displayed.[19]

---

[18] When asked about these groups at the February 5, 2026 hearing, Plaintiffs' counsel said he did not see declarants Isael Mazariegos and Filiberto Rivera-Molina in the video, but noted that they may have been out of frame or hidden by trees. *See* Hearing Tr. (Doc. 148 at 24–25.)

[19] In their opposition, (Doc. 112 at 22 n. 8), Defendants direct this Court to a video posted by Fox News. *See* Fox News, *Border Patrol agents reveal new details on Home Depot raid in Sacramento*, https://www.foxnews.com/video/6375804078112 (last visited February 16, 2026). That video at 1:04–1:18 shows a closer image of the agents and individuals apprehended near the front driveway entrance. All Agents near the front driveway are seen wearing green ballistic body vests, many with the word "police" or badge identifiers displayed.

The agent first approaches the man in the brown vest. At 1:51, the man in the brown vest sees the Agent walking towards him and takes one step north, as if beginning to move away. The Agent mirrors this movement, as if to step in front of the man's path of travel, and the man pivots and begins to run south. At 1:57, the Agent backs the man up against the fence without any physical contact. At 1:58, the two are seen having what appears to be an animated conversation. The man in the brown vest is ultimately apprehended as evidenced by the Fox News video.[20]

While this is happening, others in Group B begin to disperse. At 1:54 the man in the gray hoodie begins to run away. At 1:52–1:55, an unmarked white truck and black Chevy Tahoe pull into and stops in the east driveway entrance. Soon after, at 2:00, the man in the grey hoodie is stopped by an Agent who exits the unmarked black Chevy Tahoe. At 1:57, one man who had been sitting on the curb, begins to run away. Then, at 1:59, the other man wearing the red and white shirt and white cap begins to walk away. These two men are not seen again in the Video Footage, nor are they seen in the Fox News video.

At 2:02, the camera pans left, back toward where Group A had been. At least four men are seen fleeing from the parking lot.[21] From 2:02–2:04, at least four Agents wearing ballistic vests chase after the fleeing individuals. Though it is unclear where these Agents came from, the video at 1:53 suggests that these Agents exited parked vehicles located in the middle of the parking lot. At 2:08, four men who are fleeing reach the sidewalk. At 2:11, two of the fleeing men run into Florin Road. At 2:11, an Agent in a black shirt and ballistic vest chases one of the men into the

---

Most agents are wearing face coverings, sunglasses, and baseball caps or helmets. Some agents are wearing military-style uniforms, while others are wearing plain t-shirts and jeans.

[20] The Fox News video at 1:07–1:18 shows that four Border Patrol Agents apprehended the man in the brown vest with his hands secured behind his back. The agents are then seen escorting him towards the unmarked white van. At 1:04, Agents appear to usher the man into the same unmarked van.

[21] The man in the yellow neon shirt is not visible at this time. At 2:11, the man in the yellow shirt re-appears and an Agent in a white shirt and ballistic vest approaches him. At 2:12, there is a brief interaction between the two, but at 2:15 the Agent walks away. Later, at 3:23, the man in the yellow shirt is seen freely walking in the Home Depot parking lot, suggesting he was not arrested. When asked about this issue at the February 5, 2026 hearing, Defendants' counsel argued that the man in yellow was not subject to a detentive stop. *See* Oral Argument Tr. (Doc. 148 at 55.) Plaintiffs' counsel argued that the man in yellow was briefly detained and that the government should have submitted documentation of such stop. (Doc. 148 at 12.) Absent more information about what transpired in that interaction, the Court cannot conclude that the man in the yellow shirt was stopped, though why he would not have been stopped is not explained.

street. The pair loops back toward the Home Depot parking lot, and the pursuit ends on the sidewalk.

Over the course of the next several minutes, other pursuits are captured on the video, including one, at 2:16, in which an Agent begins chasing one individual and then switches to chase another. Some pursuits end with the Agent successfully contacting the individual, other fleeing individuals appear to depart the scene.

<em>b.    Flight Along Morrison Creek</em>

At 4:34, an Agent in a white shirt and ballistic vest is seen chasing another man across the street and down Florin Road toward Morrisson Creek. It is unclear where this man came from, but it appears he was not a part of Group A or B. At 4:37, the man crosses the street and runs toward Chase Bank. At 4:41, the man is seen wearing khaki shorts and a black hoodie with a large logo displayed on the back. At 4:49, the Agent in white follows in pursuit. At 4:54, the man jumps over the fence into Morrisson Creek on the corner where Chase Bank is located. At 5:13, the man continues to run through the riverbed of the creek directly behind Chase Bank. From 5:38–7:10, the man continues to make his way down and into the curved section of the creek behind WSS. It does not appear that the Agent in white followed him into the creek because he is not seen following him during this timeframe. At 7:45, the man makes his way under the small bridge. At 8:08, the man is seen standing under the bridge on the other (east) side of Morrison Creek. At 8:32, the camera then pans back to the Home Depot parking lot.[22]

<em>c.    Interaction Near Morrison Creek Bridge</em>

More than seven minutes later, at 15:30, the camera pans back over to the small bridge behind Southgate Plaza, which runs across Morrison Creek. At 15:33, two Agents, one in white and one in green, arrive by vehicle at the small bridge. At 15:38, the two Agents make their way into the creek area through an opening in the fence. The man with khaki shorts previously

---

[22] During this timeframe, the Video Footage at 8:35–8:42, shows a new group of people surrounding two pick-up trucks, parked in the left corner of the Home Depot parking lot near the traffic signal at Florin Road. From the vantage of the camera, it is unclear exactly what is going on. However, the Fox News video at 1:19–1:52 shows that this involved the arrest of U.S. Citizen Jose Manuel Castillo Jr. Then, the Video Footage at 10:04–10:55 shows the aftermath of his arrest. The Video Footage displays Jose's wife, who is wearing a pink shirt, recording on her cellphone and having a heated conversation with Border Patrol officials.

standing under the bridge at 8:08 of the Video Footage is no longer present. Instead, a man wearing an orange long-sleeved shirt appears from under the bridge. It also appears that an encampment of some kind is situated under the bridge. It is unclear where the man in orange came from, as this appears to be the first time he is visible in the Video Footage. At 15:58, the man in orange begins to run out from under the bridge. At 16:04, the Agent in green follows in pursuit. The Agent in green does not appear to be wearing a ballistic vest or any obvious Border Patrol or other law enforcement identifiers.[23] After a short pursuit, at 16:15, the Agent in green apprehends the man in orange. At this point, the Agent in white comes out from under the bridge. It also appears that the Agent in white is not wearing a ballistic vest. At 16:40, the man in orange is escorted back under the bridge where he and the two Agents remain for several minutes.[24]

<em>d.        Events in Neighborhood Across Morrison Creek</em>

At 19:37, a silver-grey truck is seen driving across the small bridge. At 19:45, the truck stops on the bridge. At 19:52, the truck begins to reverse and eventually turns back around onto Center Pkwy—the street which connects the residential area to the bridge. Center Pkwy runs perpendicular to A Pkwy Street. At 20:20, the truck is parked off to the left of Center Pkwy. At 20:21, an Agent wearing a ballistic vest is seen turning left on foot, running down A Pkwy Street, in pursuit of a man in a black sweater. At 20:24, the truck is seen making a left turn onto A Pkwy Street, trailing behind the Agent and the man. It is unclear who the fleeing individual is or where

---

[23] This agent resembles the agent seen at 4:24 of the Fox News video. That agent initially appears to have worn his Border Patrol ballistic vest.

[24] When asked about this issue at the February 5, 2026 hearing, Defendants' counsel agreed that the man in orange was not seen fleeing from Home Depot on video, but argued it did not rule out the possibility he fled from Home Depot and was simply not captured within frame. *See* Oral Argument Tr. (Doc. 148 at 56.) Defendants' counsel seemed to indicate that Agents provided documentation for the man in orange, that Agents reported unprovoked flight, and that Agents determined he was unlawfully present during the interview that occurred under the bridge. (Doc. 148 at 63.) In a later status report, Defendants' counsel explained that they are "investigating whether the Form I-213 at . . . 0032–0036, is a complete and accurate record of this stop." (Doc. 144.) That I-213 corresponds to arrestee ▮Arrested Person C▮. (*See* Doc. 95 at 36–40.) Notably, there are no details in this initial I-213 regarding this arrestee's apprehension under the bridge, nor any descriptors tying him to the man in orange. (*Id*.) However, as explained below, subsequent documentation—namely, the third draft of Mr. ▮Arrested Person C▮ I-213, which ERO inadvertently omitted when sending the finalized I-213s to Border Patrol (Doc. 157 at 14, ¶ 13)—at least arguably addresses Mr. ▮Arrested Person C▮ detention. (*See* Doc. 157 at 68 ("Upon my arrival, I walked into the river bottom to search for the fleeing suspect. As Agent ▮Agent A▮ and I walked down the embankment, I observed another individual begin fleeing through the waterway. . . . I gave chase while loudly announcing, 'U.S. Border Patrol'. The subject continued running through the creek before I closed distance and physically detained him.").)

23

he came from. Though it is difficult to see details, this appears to be a different individual than the one seen fleeing from Agents Morrisson Creek at 4:41 and 8:08 of the Video Footage, as no large logo is visible on his back.[25]

### 4.    Documentation Provided with March 6, 2026 Status Report

On March 6, 2026, Defendants submitted additional evidence to supplement the record: three declarations from Border Patrol Agents Agent A , Agent B , and Agent C  who were present during the Sacramento Action, (Doc. 157 at 2–9), and one declaration from ERO Deportation Officer Officer D —who was not present during the Sacramento Action—but helped create the I-213s and process arrestees for removal proceedings and deportation. (*Id.* at 10–14). Defendants also submitted a series of emails dated July 18, 2025, sent by Agent Agent A to Officer Officer D with draft narratives for all eleven arrestees for preparation of the I-213s[26] (*id.* at 15–57); an email sent by Agent Agent C to Agent Agent A on July 17, 2025, with a draft narrative for arrestee Selvin Mejia-Diaz (*id.* at 58–63); an email thread between Sacramento/Stockton ERO staff and Border Patrol regarding the preparation of and amendments to the I-213s (*id.* at 78–85); as well as the second (Doc. 157 at 71–77) and third/final draft (*id.* at 64–70) of arrestee Arrested Person C I-213.[27] (*See also id.* at 14, ¶¶ 9, 10, 11.)

---

[25] There is some dispute about whether the man running at 20:21 of the Video Footage is Selvin Mejia Diaz or A.P. H  Notably, the sequence of events is consistent with Selvin's declaration. (*See* Doc. 81-12, ¶ 3 (explaining that Selvin was walking along a road with a bridge at the end, towards Ross, when he noticed a grey Chevy Silverado turn around towards him and saw a masked man dressed like a soldier jump out in pursuit of him).) To add to the mystery, the events are also consistent with A.P. H  I-213 which states, "The subject then ran a street corner leading into a residential area. I followed the subject around the street corner, and I witnessed the subject jump into the backyard of a house. The approximate address . . . was located at 4517 A Pkwy in Sacramento, CA." (Doc. 95 at 9.) The home where A.P. H was apprehended is five parcels down from the corner where the agent is seen running in the video. When asked about this issue at the February 5, 2026 hearing, Plaintiffs' counsel could not say definitively whether this man was Selvin Mejia Diaz or Arrested Person H , but agreed that the video snippet is consistent with Selvin's declaration. *See* Oral Argument Tr. (Doc. 148 at 29–30.) Alternatively, Defendants' counsel argued that the individual is A.P. H and that the video snippet is consistent with A.P. H 's I-213. (*See* Doc. 148 at 66–68.)

[26] According to Officer Officer D , while processing the eleven arrestees, "ERO officers generated the I-213s for the aliens. [Border Patrol] provided ERO officers with an encounter narrative template (i.e., narrative related to the circumstances around the arrest) to use for the eleven aliens . . . . The encounter narrative template was provided via email." (Doc. 157 at 12, ¶ 5.) It is unclear whether this encounter template was included in the draft narratives sent by Agent Officer A on July 18, 2025, (Doc. 157 at 15–57), or in a separate email not provided to the Court. However, the record suggests that the encounter template was sent in a separate email on July 17, 2025. (*See* Doc. 157 at 13, ¶¶ 8, 9 ("Using the encounter narrative template . . . ERO Sacramento completed the I-213 on July 17, 2025 . . . . On July 18, 2025, ERO received a tailored narrative from [Border Patrol] describing Mr. Arrested Person C ] stop and arrest. ERO promptly updated the I-213 with the tailored narrative.").)

[27] According to Officer Officer D , when ERO provided the completed I-213s to Border Patrol, "the email inadvertently

24

*a.  Border Patrol Agent* Agent A *Declaration*

Supervisory Border Patrol Agent Agent A , who was present during the Sacramento Action, provides insight on the preparation of the I-213s with a recent declaration dated March 2, 2026. (Doc. 157 at 2–4.) He indicates that as a supervisor he was "responsible for collecting and reviewing all narratives" generated by the arresting Agents and "transmitting these narratives to ICE for inclusion in the Forms I-213 pertaining to each subject." (Doc. 157 at 3, ¶ 6.) Agent Agent A states that "[i]t is common practice for non-supervisory [agents] to submit arrest reports and other documents to a supervisor for input and recommendations prior to being finalized. Supervisory review typically includes ensuring that the report is easily read and understood, that relevant facts are included, and that the sequence of events is correct." (*Id.*)

However, it is unclear how many of these draft narratives Agent Agent A edited prior to his submission to ICE, except for that of arrestee Selvin Mejia-Diaz. (Doc. 157 at 4, ¶ 7.) Acting "under the impression that Mr. Mejia-Diaz had been encountered in the Home Depot parking lot, fled, and was stopped a short distance away, consistent with the other encounters" Agent Agent A edited the arresting Agent Agent C ' draft narrative "in an effort to improve its accuracy." (*Id.*) However, Agent Agent A later learned that "Mr. Mejia-Diaz was in fact stopped by [Border Patrol Agent] Agent C in a nearby neighborhood" (*id.*), and not in the vicinity of the Home Depot parking lot as his modified narrative and the final I-213 suggest. (*See* Doc. 157 at 56 ("After a short foot pursuit, I was able to catch him"); Doc. 95 at 23 (same).)

"[O]nce the narratives were finalized, [Agent Agent A ] provided each narrative to ICE via emails sent on July 17 and 18, 2025. In total, [he] reviewed and transmitted eleven narratives to ICE pertaining to the aliens arrested during the July 17, 2025 operation." (Doc. 157 at 4, ¶ 6.) However, after submitting the finalized narratives to ICE, he "subsequently contacted ICE to supplement the narrative [of arrestee Arrested Person H ] with additional information." (Doc. 157 at 4, ¶ 6.) It is unclear whether he himself provided additional information, as the Agent who initially

---

contained the First I-213 for Mr. Arrested Person C ]." (Doc. 157 at 14, ¶ 13; *compare* Doc. 95 at 36–40 *with* Doc. 157 at 64–70.) That first draft of the I-213 was completed on July 17, 2025, using Border Patrol's encounter narrative template and information provided directly from Mr. Arrested Person C , but ERO staff "was not aware the information contained in the encounter template narrative was not accurate as it related to Mr. Arrested Person C ]." (*Id.* at 13, ¶ 8.)

pursued Arrested Person H , or whether arresting Agent Agent E provided such information. (Doc. 157 at 3–4, ¶¶ 5, 6; *see also* Doc. 95 at 7.)

Agent Agent A also addressed the arrest of Arrested Person C , the man in the orange shirt who was apprehended at the small bridge behind Southgate Plaza. (*See* Video Footage at 16:16.) He states that during the Sacramento Action, he "pursued an individual later identified as Arrested Person H who fled from the Home Depot parking lot and, as [he] later learned, was eventually apprehended in a nearby neighborhood." (Doc. 157 at 3, ¶ 5.) "While in pursuit of Mr. A.P. H [he] and [Agent] Agent B ue encountered another individual later identified as Arrested Person C (*id.* at 3, ¶ 5), who was seen "fleeing through the waterway," (*id.* at 68), as Agent Agent A and Agent Agent B "walked down the embankment," (*id.* at 68), in search of the initial suspect Arrested Person H .

b.      *Border Patrol Agent* Agent B *Declaration*

Border Patrol Agent Agent B , who was also present during the Sacramento Action, also addressed the arrest of Arrested Person C with a recent declaration dated March 3, 2026. (Doc. 157 at 5–6.) He corroborates Agent Agent A testimony regarding their pursuit of "an individual who fled from the Home Depot parking lot" (Doc. 157 at 6, ¶ 5) who, as mentioned above, was later identified as Arrested Person H . (*Id.* at 3, ¶ 5.) Agent Agent B then states: "While in pursuit of this individual, I and Supervisory [Agent] Agent A encountered another individual later identified as Arrested Person C . I stopped and ultimately arrested Mr. Arrested Person C as described in a narrative of the encounter which I drafted and subsequently provided to [Agent] Agent A for transmission to ICE." (*Id.* at 6, ¶ 5.) The final/ third draft of Mr. Arrested Person C I-213 indicates that the individual's "unprovoked flight from law enforcement" in the river canal "led [Agent Agent B to believe that the man was involved in an active crime or was likely present in the United States without authorization." (Doc. 157 at 68.) The form then states, "The subject continued running through the creek before [Agent Agent B ] closed distance and physically detained him." (*Id.*)

c.      *Border Patrol Agent* Agent C *' Declaration*

Border Patrol Agent Agent C , who was also present during the Sacramento

26

Action, addressed the arrest of Selvin Mejia-Diaz in a declaration dated March 2, 2026.[28] (Doc. 157 at 7–9.) He states, "During the operation I learned that an individual had fled from the Home Depot parking lot and possibly entered a nearby neighborhood across Florin Road. I and my [Border Patrol Agent] partner drove into this neighborhood in order to assist in the pursuit of this individual." (Doc. 157 at 8, ¶ 5.) He continues:

> During our pursuit of the individual reported to have fled the Home Depot parking lot, I observed an individual running on the side of the roadway near the intersection of Center Parkway and A Parkway where a bridge crosses a canal. I suspected that this individual had fled from the Home Depot parking lot. The individual was wearing a hooded sweatshirt with the hood over his head. The individual suddenly slowed to walk in what appeared to me to be an attempt to avoid my suspicion. However, as I exited my vehicle with the intention of speaking with this individual, he took off running again and I was able to stop him after a short foot pursuit. The individual was later identified as Mr. Mejia-Diaz. Prior to handcuffing and arresting Mr. Mejia-Diaz I performed a field immigration interview. I questioned Mr. Mejia-Diaz as to his citizenship and he admitted to being a citizen and national of Guatemala and to being in the United States illegally. During my pre-arrest questioning, Mr. Mejia-Diaz claimed to have an immigration petition pending but was unable to provide any evidence for his claim. After I informed him that he was under arrest, Mr. Mejia-Diaz ignored multiple commands to turn around in order to be placed in handcuffs and physically resisted my efforts to place him into handcuffs by stiffening and tensing his body. As a result of Mr. Mejia-Diaz's resistance to my efforts to arrest him, I and my [Border Patrol Agent] partner took Mr. Mejia-Diaz to the ground in order to place him in handcuffs. I then transported Mr. Mejia-Diaz to an ICE facility for processing.

(Doc. 157, at 8–9, ¶ 6.)

Agent Agent C then indicates that on July 17, 2025, he prepared a draft narrative describing the stop and arrest of Mr. Mejia-Diaz, which he sent to Agent Agent A for his review. (*Id*. at 9, ¶ 7.) In that draft narrative, Agent Agent C stated in relevant part:

> The location of today's operation was the Home Depot, located at 4641 Florin Rd, Sacramento, California. Agents arrived at approximately 7:45 a.m. assisted with other Border Patrol Agents chasing other subjects who were running from uniformed Border Patrol. Multiple subjects ran across Florin Road into a residence area. At [a]pproximately 8:00 a.m. Agent Agent C approached and conducted a consensual encounter with one subject later identified as

---

[28] In response to this Court's inquiry (Doc. 145) regarding the identity of the man in the black sweater seen running at 20:20 of the Video Footage, Respondents submitted the declaration of Agent Agent C who arrested Selvin Mejia-Diaz. (Doc. 157 at 8, ¶¶ 3, 4.) This suggests that the man at 20:20 is Selvin Mejia-Diaz and not Arrested Person H.

MEJIA-Diaz, Selvin (DOB 06/03/2007). [Border Patrol Agent] Agent C , I identified myself to MEJIA-Diaz as U.S. Border Patrol Agent wearing multicam uniform with agency issued ballistic body armor displaying a visible badge and agency identifiers on the front and back, clearly stating my status as [a] Border Patrol Agent.

(Doc. 157 at 59 (emphasis added).)

In Agent Agent C recent declaration dated March 2, 2026, he now indicates, different from his draft narrative dated July 17, 2025 (*See* Doc. 157 at 59) that his approach was for a "consensual encounter" and that his intention was to talk with the individual. (Doc. 157 at 8, n.1.) He notes in his newly filed declaration that he was simply walking, but when the individual ran, he conducted a stop. (*Id.*) Finally, Agent Agent C indicates that he was aware of Agent Agent A modifications to his draft narrative, which was ultimately sent to ERO for preparation of the I-213s because he was sent a copy of those edits by email. (Doc. 157 at 9, ¶ 7.) He states that, "[t]he narrative at the time appeared to [him] to be accurate. Namely, the version transmitted to ICE accurately included the fact that [he] apprehended Mr. Mejia-Diaz after a short foot pursuit." (*Id.*) However, he "now see[s] that the version of the narrative transmitted to [ERO] can be read to imply that [he] encountered [Mr. Mejia-Diaz] in the vicinity of the Home Depot parking lot, when in fact [he] encountered him in a residential area across Florin Road." (*Id.*) He further acknowledges that key information included in his draft narrative—namely, that "[m]ultiple subjects ran across Florin Road into a residence area"—was omitted from the final narrative Agent Agent A provided to ERO. (*Id.*)

                    d.        *ERO Deportation Officer* Officer D *Declaration*

Deportation Officer Officer D , who was not present during the Sacramento Action, provides additional, general insight into the preparation of the I-213s in his declaration dated March 4, 2026. (Doc. 157 at 10–14.) He states, "ERO Sacramento was instructed to assist with the processing of individuals arrested" during the Sacramento Action. (*Id.* at 11, ¶ 3.) ERO was also tasked with "prepar[ing] and serv[ing] relevant documents related to [arrestees'] immigration cases. (*Id.* at 12, ¶ 4.) "During processing of [the arrestees] . . . ERO officers generated the I-213s for the aliens. [Border Patrol] provided ERO officers with an encounter narrative template (i.e.,

28

narrative related to the circumstances around the arrest) to use for the eleven aliens, including Mr. [Arrested Person C] The encounter narrative template was provided via email." (*Id*. at 12, ¶ 5.) "ERO officers copied the encounter narrative template, which had been minimally edited to reflect third-person point of view[29] and removing other templated encounter descriptions not relevant to arrests at Florin Road, into the narrative section of the I-213. ERO also adjusted the name, date of birth, and country of citizenship of the alien in the encounter narrative." (*Id*. at 12, ¶ 6.)

Officer [Officer D] also addressed the discrepancies with Mr. [Arrested Person C] I-213. He states:

> Using the encounter narrative template and information provided directly from Mr. [A.P. C], ERO Sacramento completed the I-213 on July 17, 2025 (First I-213, [Doc. 95 at 36–40]). ERO Sacramento was not aware of the circumstances surrounding Mr. [A.P. C] arrest; ERO Sacramento was not aware the information contained in the encounter template narrative was not accurate as it related to Mr. [A.P. C] on July 17, 2025.
>
> On July 18, 2025, ERO received a tailored narrative from [Border Patrol] describing Mr. [A.P. C] stop and arrest. ERO promptly updated the I-213 with the tailored narrative (Second I-213).
>
> On July 21, 2025, at 11:59 AM, ERO provided a copy of the Second I-213 to [Border Patrol]. [Doc. 157 at 71–77.]
>
> On July 21, 2025, at 4:55 PM, ERO received a second updated narrative from [Border Patrol]. ERO generated a Third I-213. [Doc. 157 at 64–70.]
>
> On July 22, 2025, [Border Patrol] requested copies of all amended I-213s for the individuals arrested on July 17, 2025.
>
> On July 24, 2025, ERO provided copies of the I-214s to [Border Patrol], however the email inadvertently contained the First I-213 for Mr. [A.P. C].

(Doc. 157 at 13–14, ¶¶ 8–13.)

> **D.    Summary of Motion**

Plaintiffs argue that Defendants "violated the Court's preliminary injunction in at least three ways." (Doc. 94 at 5.) First, Plaintiffs maintain Defendants' guidance on reasonable

---

[29] Despite this account, the finalized I-213s submitted to the Petitioners were predominantly written in the first-person and not in the third-person. (*See* Doc. 95.)

suspicion—namely, the El Centro Sector Muster issued on June 27, 2025—is "wholly deficient." (Doc. 94 at 5, 17–20.) Second, Plaintiffs argue Border Patrol Agents unlawfully stopped and arrested people *en masse* during an operation at the Sacramento Home Depot on July 17, 2025, without reasonable suspicion of an immigration violation or probable cause of flight risk. (Doc. 94 at 5, 10–11, 24–25.) Third, Plaintiffs insist that Border Patrol's inaccurate and boilerplate descriptions used in the I-213 forms fail to adequately document the articulable facts pertaining to Sacramento stops and arrests, with some documentation missing altogether. (*Id*. at 5, 11–15.)

Plaintiffs request the Court order Border Patrol to issue a new directive with the correct standard for reasonable suspicion, implement additional training for reasonable suspicion and probable cause determinations, bar Border Patrol personnel from engaging in more operations until properly trained, bar Agents from using boilerplate language when describing the factual basis for stops and arrests, require Agents document all detentive stops and arrests even those which are not based on immigration violations, and require Agents to produce documentation within four days of Plaintiff's request. (Doc. 94 at 27–29.)

Defendants argue that they complied with the PI and thus, there is nothing for this Court to enforce. (Doc. 112 at 6–7.) Defendants contend that the June 27, 2025 Muster adequately defines the standard for reasonable suspicion in compliance with the PI Order and applicable precedent. (*Id*. at 7, 13–19.) Defendants also argue that Plaintiffs' request for a narrative report as to the arrest of the U.S. Citizen "plainly falls outside the scope" of the PI and the complaint. (Doc. 112 at 26.) Third, the documentation submitted by Defendants provides sufficient factual detail to show that the Sacramento stops and arrests were justified. (Doc. 112 at 19–22.)

The Court held a hearing on the motion to enforce on February 5, 2026. (*See* Doc. 141.) The parties provided extensive oral arguments but did not call witnesses. (*See* Doc. 135 (Plaintiffs indicating election to proceed without witness testimony in the interest of expedience and requesting the opportunity for expedited discovery if the Court determines live testimony is needed).)

III.   ANALYSIS

    A.    **Jurisdiction/Authority to Address Motion to Enforce**

Given the pendency of the appeal from the PI Order, the parties dispute the extent of this Court's jurisdiction to take further action in relation to that Order. In Defendants' view, the actions Plaintiffs have requested, which include an order requiring revisions to the Muster(s) to categorically exclude certain reasonable suspicion factors; to prohibit Defendants from using boilerplate phrasing in the documentation supporting their stops and arrests; to require documentation of non-immigration related arrests and to speed up the production of those documents to Plaintiffs, are not minor changes and are "plainly beyond the scope of what this Court required in its original preliminary injunction." (Doc. 112 at 11–13.) Defendants contend that Plaintiffs' requests would impose new mandatory requirements, require Border Patrol to skew its reasonable suspicion analysis, include facts that go beyond what is necessary, provide reports of criminal arrests rather than immigration-related arrests, and provide documentation at a speed which is extremely burdensome. (*Id*.) Defendants argue that even if this Court had jurisdiction to modify the injunction, Plaintiffs fail to show changed circumstances to justify a modification to the PI. (*Id*. at 13 (citing *Chang v. Cnty. of Siskiyou*, 2025 WL 408526, at *1, *4 (E.D. Cal. 2025)).)

Plaintiffs argue that the relief sought does not materially alter the PI because Plaintiffs seek to enforce the injunction's express terms and purpose. (*See* Doc. 117 at 6.) According to Plaintiffs, that includes requiring Border Patrol to issue adequate guidance on reasonable suspicion, provide particularized facts—not boilerplate descriptions—regarding the existence of reasonable suspicion and probable cause, and provide documentation of *all* stops and arrests irrespective of being immigration-related. (*See id*.) Plaintiffs also contend that their request for the submission of documents within four days rather than seven days is a minor change which does not materially alter the PI. (*Id*. at 7.)

Generally, a trial court retains jurisdiction to enforce and supervise compliance with the terms of an injunction it entered, even during the pendency of an appeal. *See Thakur v. Trump*, 795 F. Supp. 3d 1168, 1178 (N.D. Cal. 2025) ("The Court, of course, retains jurisdiction to enforce the Preliminary Injunction during the pending appeal. . . . Moreover, a district court has jurisdiction to clarify the meaning of its orders even while an appeal is pending."). In addition,

31

Federal Rule of Civil Procedure 62(d) states that a court "may suspend, modify, restore, or grant an injunction" while the original, underlying injunction is on appeal. This provision codifies a long-standing exception to the default rule that "once a notice of appeal is filed, the district court is divested of jurisdiction over the matters being appealed." *Nat. Res. Def. Council, Inc. v. Sw. Marine Inc.*, 242 F.3d 1163, 1166 (9th Cir. 2001) (citing *Griggs v. Provident Consumer Discount Co.,* 459 U.S. 56, 58 (1982) (per curiam)). But any action taken pursuant to Rule 62(d) "may not materially alter the status of the case on appeal." *Id*. (internal citations omitted).

Finally, for the Court to modify a PI, the moving party must show that "changed or newly revealed facts or circumstances [] justify a modification of the injunction." *United States v. Washington*, 853 F.3d 946, 979 (9th Cir. 2017). As the Supreme Court once explained:

> There is also no dispute but that a sound judicial discretion may call for the modification of the terms of an injunctive decree if the circumstances, whether of law or fact, obtaining at the time of its issuance have changed, or new ones have since arisen. The source of the power to modify is of course the fact that an injunction often requires continuing supervision by the issuing court and always a continuing willingness to apply its powers and processes on behalf of the party who obtained that equitable relief.

*Sys. Fed'n No. 91, Ry. Emp. Dep't, AFL-CIO v. Wright*, 364 U.S. 642, 647 (1961); *see also United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 251 (1968) (explaining that the Court has the power and duty to modify the order if an injunction has failed to achieve its intended results). The Ninth Circuit has similarly "emphasize[d] that the flexibility inherent in equity jurisdiction allows the court, if changed or newly revealed facts or circumstances warrant, to modify its injunction accordingly." *Washington*, 853 F.3d at 979; *see also Stillaguamish Tribe of Indians v. Washington*, 102 F.4th 955, 966 (9th Cir. 2024) (Bress, J., concurring) ("Large-scale injunctions, in particular, require regular reassessment."). In the context of an injunction that is on appeal, one court helpfully summarized that "the question before the court is whether modification of the PI is required in order to fulfill its original objective, to avoid inequity to Plaintiffs, and to preserve the status quo while the Government's appeal is pending." *Invenergy Renewables LLC v. United States*, 476 F. Supp. 3d 1323, 1341–42 (Ct. Int'l Trade 2020).

Further operating in the background is the principle that "[a]n injunction must be narrowly

tailored to remedy the specific harm shown." *E. Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1029 (9th Cir. 2019) (internal quotation omitted). Because of this and considering the Supreme Court's focus on the practical issue of whether an injunction has achieved its intended results on the ground, *United Shoe*, 391 U.S. at 251, the Court finds it inappropriate to address any of Plaintiffs' requests for relief in the abstract. Instead, the Court considers them in the context of the <u>factual</u> context presented in the motion to enforce, which focuses on the Sacramento Action.

### B.      Reasonable Suspicion

The primary focus of the motion to enforce is Plaintiffs' contention that during the Sacramento Action, Defendants indiscriminately "stop[ped] people without individualized, reasonable suspicion." (Doc. 94 at 21.) Defendants respond that the following facts are sufficient to establish a reasonable basis for suspecting the individuals stopped by Border Patrol were unlawfully present in the United States: (1) the surveillance operation conducted July 15, 2025, two days before the Sacramento Action, which identified two undocumented persons in a group of 20 at the Home Depot and identified a vehicle belonging to an undocumented person; (2) that on the day of the Sacramento Action, July 17, 2025, Agents observed people loitering in the parking lot of the Home Depot "behaving differently than shoppers"; (3) that based on the Agents' "training and experience, illegal aliens tend to congregate at locations such as Home Depots to look for cash-only work[;]" and (4) on the day of the Sacramento Action, all individuals who were stopped and eventually detained immediately fled upon seeing Agents. (Doc. 112 at 20.)

The Fourth Amendment "applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." *United States v. Brignoni–Ponce,* 422 U.S. 873, 878 (1975). An investigative stop occurs when a police officer detains a person for a limited duration to ask questions. *See Terry v. Ohio*, 392 U.S. 1, 27 (1968); *Adams v. Williams*, 407 U.S. 143, 146 (1972). To make such a stop, the officer must have reasonable suspicion that the person is engaged in criminal activity. *See id.*; *see also Navarette v. California*, 572 U.S. 393, 396–97 (2014). To constitute reasonable suspicion, the officer's belief that "criminal activity is afoot" must be supported by "specific and articulable facts which, taken together with rational

inferences from those facts, reasonably warrant the intrusion." *Terry*, 392 U.S. at 21, 30; *see also Navarette*, 572 U.S. at 396 (an officer must have "a particularized and objective basis for suspecting the particular person stopped of criminal activity").

"[T]he Supreme Court has said repeatedly that [courts] must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Brown*, 996 F.3d 998, 1006 (9th Cir. 2021) (internal citation and quotation marks omitted). "Th[is] assessment must arouse a reasonable suspicion that *the particular person being stopped* has committed or is about to commit a crime." *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc) (citations omitted) (emphases in original). As a result, the officer in question "must be able to articulate more than an 'inchoate and unparticularized suspicion' or 'hunch' of criminal activity." *Illinois v. Wardlow*, 528 U.S. 119, 123–24 (2000) (quoting *Terry*, 392 U.S. at 27). "Although an officer's reliance on a mere 'hunch' is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Arvizu*, 534 U.S. 266, 274 (2002) (citing *United States v. Sokolow,* 490 U.S. 1, 7 (1989)).

Relatedly, "to establish reasonable suspicion, an officer cannot rely solely on generalizations that, if accepted, would cast suspicion on large segments of the law[-]abiding population." *United States v. Manzo-Jurado*, 457 F.3d 928, 935 (9th Cir. 2006). As this Court has previously mentioned, (*see* Doc. 47 at 74), the Supreme Court held more than 50 years ago that these requirements apply in the immigration context, when officers seek to enforce the INA. *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975) ("[T]he Fourth Amendment forbids stopping vehicles at random to inquire if they are carrying aliens who are illegally in the country, it also forbids stopping or detaining persons for questioning about their citizenship on less than a reasonable suspicion that they may be aliens.").

*Brignoni-Ponce* held that mere belief that a person is of Mexican descent, is sufficient to "justify neither a reasonable belief that they were aliens, nor a reasonable belief that the car concealed other aliens who were illegally in the country." 422 U.S. at 886. This is because

34

"[l]arge numbers of native-born and naturalized citizens have the physical characteristics identified with Mexican ancestry, and even in the border area a relatively small proportion of them are aliens" *Id*. Thus, "[t]he likelihood that any given person of Mexican ancestry is an alien is high enough to make Mexican appearance a relevant factor, but standing alone it does not justify stopping all Mexican-Americans to ask if they are aliens." *Id.* at 886–87. Relatedly, the Ninth Circuit has held for 25 years that "Hispanic appearance is of little or no use in determining which particular individuals among the vast Hispanic populace should be stopped by law enforcement officials on the lookout for illegal aliens." *Montero-Camargo*, 208 F.3d at 1134 (9th Cir. 2000).

The same applies to spoken language, *see Manzo-Jurado*, 457 F.3d at 936–37 ("That the group members spoke to each other exclusively in Spanish and did not understand English is also relevant to the reasonable suspicion inquiry. An individual's inability to speak English may support an officer's reasonable suspicion that the individual is in this country illegally. By itself, however, an individual's inability to understand English will not justify an investigatory stop because the same characteristic applies to a sizable portion of individuals lawfully present in this country."), as well as one's apparent employment, *id.* at 457 F.3d at 937 ("The group's appearance as a work crew is marginally relevant to establishing reasonable suspicion. A characteristic common to both legal and illegal immigrants does little to arouse reasonable suspicion.").

Relatedly, certain factors, such as the characteristics of the location where a stop is made, require "careful examination by the court, because such a description, unless properly limited and factually based, can easily serve as a proxy for race or ethnicity." *Montero-Camargo*, 208 F.3d at 1138 (discussing relevance of the fact that area of stop is "often used as a drop-off and pick-up point for undocumented aliens and contraband," finding this appropriate to consider because the location was in an "isolated and unpopulated spot in the middle of the desert" and "[t]hus, the likelihood of an innocent explanation for the defendants' presence and actions is far less than if the stop took place in residential or business area.").

At the same time, the Ninth Circuit has emphasized that "the nature of the totality-of-the-

circumstances analysis" precludes courts from "holding that certain factors are presumptively given no weight without considering those factors in the full context of each particular case." *United States v. Valdes-Vega*, 738 F.3d 1074, 1079 (9th Cir. 2013); *see also Vasquez Perdomo v. Noem*, 148 F.4th 656, 680 (9th Cir. 2025) (recognizing *Valdes-Vega's* conclusion that earlier decisions "holding that certain factors are per se not probative or are per se minimally probative do not now comply with Supreme Court precedent"). The caselaw does not draw perfect lines between situations in which there is enough in totality to support reasonable suspicion and circumstances that fall short of the mark. But the caselaw does suggest that specifics matter when distinguishing between characteristics that are "common to both legal and illegal immigrants" and those that are "predominantly or exclusively" made up of noncitizens without legal status. As the Ninth Circuit explained in *Vasquez Perdomo*:

> The district court found that Defendants select certain types of public places and businesses because their "past experiences" indicate that illegal immigrants are present at and seek work at those locations. Defendants, however, provide no evidence—not even a bald assertion—that any of the public places or types of businesses they are targeting are used exclusively, or even predominantly, by individuals illegally in the country. See Manzo-Jurado, 457 F.3d at 937–38 & n. 10.11 To the contrary, the evidence indicates that presence at such locations is "[a] characteristic common" to legal immigrants, illegal immigrants, and U.S. citizens alike. *See id*. at 937. Consequently, the fact that a person is present at a business (such as a carwash) or other location (such as a bus stop) "does little to arouse reasonable suspicion," even when paired with officers' knowledge that illegal immigrants have frequented or sought work at that location. *See id*.

> Like location, the type of work one does is at most "marginally relevant to establishing reasonable suspicion," even if it is work commonly performed by immigrants without legal status. See id. at 937–38. In Manzo-Jurado, we held that a group's "appearance as a work crew" was only "marginally relevant" because it was a "characteristic common to both legal and illegal immigrants"—even though officials testified they had encountered "numerous" individuals in that type of work who were present in the country illegally. Id. We have also explained that evidence that a particular employer is employing a large number of undocumented workers does not create reasonable suspicion as to each individual employee. *Perez Cruz v. Barr*, 926 F.3d 1128, 1138 (9th Cir. 2019).

148 F.4th at 683–84 (9th Cir. 2025) In sum, "[a]lthough an officer, to form a reasonable suspicion of criminality, may rely in part on factors composing a broad profile, he must also observe

36

additional information that winnows the broad profile into an objective and particularized suspicion of the person to be stopped." *Manzo-Jurado*, 457 F.3d at 939.

Consistent with the above, Counsel for Defendants conceded at oral argument that the Border Patrol Agents lacked reasonable suspicion to effectuate any stops when they pulled into the parking lot the day of the Sacramento Action. (Hearing Tr. at 42 ("When they arrived? Just pulled into the parking lot . . . reasonable suspicion did not exist at that moment yet. . . . It was when they approached the groups and then there was unprovoked flight at that point.") Thus, the Defense acknowledges that the first three factors, either on their own or in combination, are insufficient to support a stop, without flight.

Flight is indeed relevant. Though "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion," *see Illinois v. Wardlow,* 528 U.S. 119, 124 (2000), "flight is just one factor in the reasonable suspicion analysis, if an admittedly significant one." *United States v. Brown*, 925 F.3d 1150, 1155 (9th Cir. 2019). An individual is free to ignore the police and go about his business, "[b]ut unprovoked flight is simply not a mere refusal to cooperate." *Id.* at 125. Rather, "[h]eadlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Wardlow,* 528 U.S. at 124; *but see United States v. Brown*, 925 F.2d 1150, 1157 (9th Cir. 2019) (where individual is involved in "presumptively lawful" and in the absence of any other indication if criminal activity flight "did not corroborate any reliable suspicion of criminal behavior").

### 1.    Non-Flight Factors

Defendants cite the following non-flight factors: (1) the surveillance operation two days earlier, which revealed that two undocumented individuals and a vehicle registered to an undocumented individual were present in the Home Depot parking lot on July 15; (2) Agents' observations on July 17 that individuals were loitering in the parking lot of the Home Depot "behaving differently than shoppers"; and (3) Agents' assertions that "illegal aliens tend to congregate at locations such as Home Depots to look for cash-only work." (Doc. 112 at 20.)[30]

---

[30] The I-213s also provide several background statistics, including that ICE arrested numerous persons (presumably nationwide) for impeding or assaulting federal agents during their duties; that from FY 2021 to present 441 "aliens have been released to sponsors in Sacramento"; from FY 2021 to present "569 illegal aliens apprehended in the El

a.      *Border Patrol Surveillance on July 15, 2025*

As noted above, two days before the Sacramento Action, El Centro Border Patrol conducted surveillance at the Home Depot. Though Border Patrol Agents indicate they returned to the location on July 17 in part to "search for the illegal aliens identified during prior surveillance operations," (*see, e.g*., Doc. 81-7 at 25), none of the I-213s suggest that any Agent actually attempted to do so. Defendants do not suggest that any of the undocumented individuals identified as having been present on July 15 were again present on July 17.[31] Rather, the I-213s from July 17 indicate Agents returned to the location to "engage the employees / day laborers in conversation to determine their citizenship and inquire if they had knowledge of other illegal aliens in the area." (Doc. 81-7 at 25.) Thus, Defendants do not suggest the July 15 surveillance provides <u>individualized</u> information about any person present on July 17. At best, the July 15 surveillance information is offered as evidentiary support for other assertions about the location and behavior of those observed there on July 17. (*See* Doc. 112 at 25 (noting the "officers arrived at the site based on the same prior surveillance, when the individuals were all similarly clustered together, loitering, and when it is not unusual for a group of individuals without status to flee upon sight of immigration enforcement").) As is required by the totality-of-the-circumstances standard, the Court considers the surveillance information along with other information offered about the location.

b.      *Perceived Day Laborer Status*

The I-213s indicate it is "common knowledge to Border Patrol Agents that illegal aliens

Centro Sector provided destination addresses in Sacramento"; in FY23 and FY24, "San Diego Sector apprehended 1948 illegal aliens that provided a destination address in Sacramento"; and on July 13, 2025, "intelligence teams identified four individuals who were previously removed from the United States and currently living in Sacramento." (*See, e.g*., Doc. 95 at 7–8.) Defendants do not suggest that any of these facts should be considered relevant to the formulation of individualized reasonable suspicion as to the 11 individuals detained on July 17 in the Sacramento Action. This is likely because they are entirely divorced from any perspective, such as how many people reside in Sacramento overall, or how these numbers compare (either absolutely or otherwise) to other locations in the region, State, or Nation. See discussion of "high crime area" designations *infra*.

[31] Nothing in the record suggests Agents made any effort to determine whether those same noncitizens were at the Florin Road Home Depot on July 17. Even if the Agents had specific information suggesting the two noncitizens identified as present on July 15 were again present on July 17, that would not give Agents reason to suspect every person who happened to be to be loitering at the Florin Road Home Depot parking lot may be a noncitizen. *See Martinez v. Nygaard*, 831 F.2d 822, 827 (9th Cir. 1987) (explaining that individualized reasonable suspicion is required as to *each* worker).

38

congregate at locations such as Home Depot to solicit cash paying day labor jobs" and that "[i]llegal aliens work these jobs because they lack documentation allowing them to gain steady and lawful employment," to "avoid paying taxes and to avoid detection by law enforcement." (*See, e.g.*, Doc. 95 at 48.) The I-213s also state generically that "intelligence reports indicat[e] that illegal aliens typically loiter at businesses in certain locations at certain times to find cash work," but do not provide further detail about the nature of that intelligence. (*See, e.g.*, Doc. 95 at 29.)

The issue of work status evidence was addressed by the Ninth Circuit in *Manzo-Jurado*. 457 F.3d at 937-38. There, a Border Patrol Agent testified "that migrant work crews in the Havre area . . . were frequently made up of foreign nationals, and on occasion included illegal aliens." *Id*. More specifically, he testified, "[Border Patrol has] encountered numerous work crews in Havre that employ illegal aliens. In some cases, all illegal aliens. In other cases, one or two illegal aliens in the group of workers." *Id*. at 938 n.9. Another Agent testified: "Very often in the workers that we have encountered [in Havre], there's very often aliens in the group, whether illegal or not . . . until you've talked [to them], you don't know. . . ." *Id*.

However, the Ninth Circuit noted that neither officer "discussed the proportion of work crews in Havre that have illegal aliens" nor "how many work crews Border Patrol had encountered in Havre that did <u>not</u> have illegal aliens." *Id*. at 938; *see also Vasquez Perdomo*, 148 F.4th at 683–84 & n.11 (similar). The fact that one of the Agents had encountered "numerous" work crews which contained illegal immigrants, is a fact that "would apply equally to situations where Havre Border Patrol had encountered five out of six work crews which contained illegal immigrants or five out of one-thousand." *Manzo-Jurado*, 457 F.3d at 938 n.10. Thus, the officers' testimony "was too conclusory to support substantially that the stop was based on reasonable inferences rather than subjective impressions." *Id*. However, the Ninth Circuit clarified that it was <u>not</u> holding that "a group's appearance as a work crew can <u>never</u> be substantially probative of group members' illegal status within this country." *Id.* (emphasis added) (citing *Montero–Camargo*, 208 F.3d at 1131 ("[A]n officer's experience may furnish the background against which the relevant facts are to be assessed, as long as the inferences he draws are objectively

reasonable; but 'experience' does not in itself serve as an independent factor in the reasonable suspicion analysis."). Ultimately, the Ninth Circuit concluded that without "particularized information, the group's appearance as a work crew is a 'broad profile[ ]' insufficient by itself to satisfy the reasonable suspicion standard." *Id.* at 938 (citing *United States v. Rodriguez–Sanchez*, 23 F.3d 1488, 1492 (9th Cir. 1994), *overruled in part on other grounds by Montero–Camargo*, 208 F.3d at 1131–32). Evaluating that factor within the totality of the circumstance, the Ninth Circuit found that "individuals' appearance as a Hispanic work crew, inability to speak English, proximity to the border, and unsuspicious behavior," taken together, do not provide a federal immigration officer reasonable suspicion to conduct a stop. *Id.* at 932.

Here, the I-213s contain only broad, conclusory assertions "that illegal aliens typically loiter at businesses in certain locations at certain times to find cash work"; that it is "common knowledge to Border Patrol Agents that illegal aliens congregate at locations such as Home Depot to solicit cash paying day labor jobs"; and that "[i]llegal aliens work these jobs because they lack documentation allowing them to gain lawful employment," to "avoid paying taxes and to avoid detection by law enforcement." (*See, e.g.*, Doc. 95 at 8.) The record does not reveal, however, any objective information that would allow the Court to evaluate whether these are reasonable inferences based upon facts rather than purely subjective impressions.[32] Thus, like the testimony in *Manzo-Jurado*, the record about work status (which at this stage is limited to the I-213s) is insufficiently particularized to support reasonable suspicion on its own.

However, this is not the end of the inquiry. *Manzo-Jurado* suggests, by negative inference, that a broad profile based upon work status (i.e., one that is based on anecdotal and/or subjective impressions that a particular occupation tends to attract undocumented persons, as opposed to one based on particularized information) can be considered when combined with other factors. (Here,

---

[32] The I-213s mention an "intelligence bulletin" shared with Agents as support for the targeted enforcement of the Home Depot on Florin Road, (*see, e.g.*, Doc. 95 at 7), but the referenced information from the bulletin does not contain additional, objective background facts. Instead, the referenced portions of the bulletin merely indicate that past arrests have been made at locations such as "Home Depot and other businesses known to hire illegal aliens" and that from 2021 to present, "aliens have been released to sponsors in Sacramento, CA" or have "provided destination addresses in Sacramento, CA." (*Id.* at 7–8.) The referenced portions of the bulletin—which are the only portions disclosed in support of a showing of reasonably suspicion—fail to include objective facts about this particular location, let alone facts that support the work status assumptions incorporated into the I-213s.

Defendants suggest that the other factor is flight.) If so, then Border Patrol Agents may approach people engaged in occupations that Agents subjectively believe are associated with unlawful status to see if any of those people engage in flight. Cases concerning "high crime" areas, including *Manzo-Jurado*, provide relevant guidance and suggest more is required.

In the reasonable suspicion calculus, if a location is properly designated as a "high crime" area, that can serve as an independent factor that officers may consider along with other information. *See Montero-Camargo*, 208 F.3d at 1138 ("[O]fficers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation.") (quoting *Wardlow,* 528 U.S. at 124). Yet, as the Ninth Circuit explained, such designations must be approached with caution:

> The citing of an area as 'high-crime' requires careful examination by the court, because such a description, unless properly limited and factually based, can easily serve as a proxy for race or ethnicity. District courts must carefully examine the testimony of police officers in cases such as this, and make a fair and forthright evaluation of the evidence they offer, regardless of the consequences. [Courts] must be particularly careful to ensure that a "high crime" area factor is not used with respect to entire neighborhoods or communities in which members of minority groups regularly go about their daily business, but is limited to specific, circumscribed locations where particular crimes occur with unusual regularity. In this case, the "high crime" area is in an isolated and unpopulated spot in the middle of the desert. Thus, the likelihood of an innocent explanation for the defendants' presence and actions is far less than if the stop took place in a residential or business area.

*Montero-Camargo*, 208 F.3d at 1138–39 (emphasis added); *see also id*. at 1138, n.31 (citing David A. Harris, *Factors for Reasonable Suspicion: When Black and Poor Means Stopped and Frisked*, 69 Ind. L.J. 659, 677 (1994) (noting that minority groups "make up almost all of the population in most of the neighborhoods the police regard as high crime areas")). The Ninth Circuit further explained that, "[w]ith respect to populated areas, or areas in which people typically carry on legitimate activities[,] . . . [something] more than mere war stories are required to establish the existence of a high-crime area[,]" and that "courts should examine with care the specific data underlying any such assertion." *Id*. at 1139 n.32.

In determining whether an area is properly designated "high-crime," district courts have relied on statistics, including rates of arrest in the specific area, to determine if the crime-rate in

the relevant area occurred with unusual regularity. *See United States v. Conerly*, 75 F. Supp. 3d 1154, 1165 (N.D. Cal. 2014) ("Officer Lathrop's subjective impression of the character of the neighborhood is not supported by objective indicia of frequent criminal activity that one would expect to find in such an area."); *United States v. Nunn*, No. 14-cr-00636, 2015 WL 3764181, at *7 (N.D. Cal. June 16, 2015) (examining the rates of arrests in the relevant area to determine if an area was truly "high-crime"); *United States v. Roberts*, 430 F. Supp. 3d 693, 707 (D. Nev. 2019) (finding absence of evidence of relevant crimes, even though there had been numerous service calls to the block in question); *United States v. Holmes*, No. 2:21-CR-00225-GMN-NJK, 2022 WL 17716755, at *5–6 (D. Nev. Dec. 14, 2022) (giving reduced—but not zero—weight to testimony of officer familiar with a neighborhood who testified that based on his training and experience it was a high crime area where criminal street gangs sometimes operated, but where there was no objective factual information to support that subjective impression); *United States v. Harger*, 313 F. Supp. 3d 1082, 1094 (N.D. Cal. 2018) (where officer only offered a "bare-bones assertion" that he "knows" a neighborhood is a "narcotics-prone and violent crime-prone area," without any additional factual basis to support that belief, the assertion "alone or in combination with the anonymous tips" did not provide a reasonable, particularized suspicion of criminal activity); *Gutierrez v. City of Woodland*, No. CIV. S-10-1142 LKK, 2012 WL 1640509, at *9–11 (E.D. Cal. May 9, 2012) (finding testimony that particular location had been vandalized repeatedly with by gangs, nearby streets had been involved with numerous shootings were more than just "war stories"); *United States v. Abarza*, 143 F. Supp. 3d 1082, 1087 (D. Or. 2015) *decision clarified on reconsideration*, 199 F. Supp. 3d 1270 (D. Or. 2016) (examining record, including dash-cam video, for "objective evidence" to support assertion that the area was one in which crime in question occurred with "unusual regularity;" and finding statement that "[a] lot of drug transactions" occurred there "by itself does not define the regularity, the number, or the time in which the criminal activity occurred").

Analogizing to these "high crime" cases, the Court concludes it cannot simply rubber stamp the Agents' subjective assertions about the behaviors they observed in the Home Depot parking lot. Rather, it must carefully examine the record to determine if each factor is supported

42

by evidence or is, instead, merely an empty vessel.

The I-213s state: "It is common knowledge to Border Patrol Agents that illegal aliens congregate at locations such as Home Depot to solicit cash paying day labor jobs. Illegal aliens work these jobs because they lack documentation allowing them to gain steady and lawful employment. Illegal aliens also work cash paying jobs to avoid paying taxes and to avoid detection by law enforcement." (*See, e.g.*, Doc. 95 at 28.) Though it is not irrational to conclude those congregating in the location were seeking day labor jobs or that such work may attract those who are undocumented, this nonetheless fails to address what *proportion* of those seeking day labor work in this location are (or were *likely* to be) noncitizens.

The surveillance two days earlier somewhat contributes to understanding the statistical relationship, revealing that on one prior occasion, two out of a group of 20 individuals gathered in that location were noncitizens (roughly 10%). Yet, that statistic, which leaves the remaining 90% of the group unclassified, does little to dispel the concern that seeking work as a day laborer may be "[a] characteristic common to both legal and illegal immigrants." *See Manzo-Jurado*, 457 F.3d at 937. Nor does it demonstrate that the Home Depot parking lot is used "predominantly" by noncitizens seeking day labor work.[33] *See id*. at 936. Rather, the present record reveals little more than that the Home Depot parking lot is "a location . . . frequented by illegal immigrants, but also by many legal residents, [which] is not significantly probative to an assessment of reasonable suspicion." *Id.*[34] Put another way, the I-213s produced in accordance with the PI Order fail to

[33] The I-213s indicate that "Since June 7, 2025, United States Border Patrol and allied partners supporting Immigrations and Customs Enforcement (ICE) Operation at Large arrested 1278 illegal aliens . . . Arrest locations include Home Depot and other business known to hire illegal aliens." (Doc. 95 at 22) The I-213s do not indicate how many of these arrests were at Home Depots or, indeed, how many people subject to *Terry* stops at these Home Depots turned out to have legal status.

[34] The Court acknowledges that at least one court has found reasonable suspicion under somewhat similar circumstances, but only where the evidence was essentially uncontested. *Aredondo v. Lyons* involved an immigration-related habeas petition, where the petitioner argued that "he was arrested because he is Latino and was at Home Depot looking for work." No. 2:25-cv-01838-TMC, 2025 WL 3436812, at *4 (W.D. Wash. Oct. 15, 2025) (citation to the record and quotation marks omitted). Assuming without deciding that it had jurisdiction to address the petitioner's Fourth Amendment challenge to his detention, the district court noted that the ICE officer wore marked vests and that the "[p]etitioner ran from [the officer] as he exited his vehicle." *Id*. at *4 (citation to the record omitted). The officer based his decision to detain petitioner "on Petitioner's activity at Home Depot" and because "Petitioner ran from him as he exited his vehicle." *Id*. Because petitioner "d[id] not contest or address this evidence or the applicable case law," the district court declined to find petitioner was entitled to habeas relief based on his Fourth Amendment claim. *Id*. at *4. Because the record here is quite different, *Aredondo* is not particularly helpful or relevant.

43

justify the detentive stops because there is no evidence or statistics indicating that the Sacramento Home Depot on Florin Road is objectively known to attract a high proportion of illegal immigrant workers, or is an area predominantly used by illegal immigrants seeking day labor jobs

It is possible that the record could be further developed to fill in these gaps in a way that might demonstrate that the Agents had more information of this nature than is reflected in the I-213s. But such post-hoc developments would not comport with the PI Order's requirement that documentation sufficient to justify the stops be produced concurrent to the stops.

///

### 2.      Flight

Defendants maintain that the detainees engaged in unprovoked flight, as that phrase is recognized in *Wardlow*, 528 U.S. at 125, and *United States v. Smith*, 633 F.3d 889 (9th Cir. 2011). Plaintiffs argue that fear-based "flight" does not justify reasonable suspicion, citing *United States v. Brown*, 925 F.2d 1150, 1157 (9th Cir. 2019). (*See* Doc. 117 at 13.)

In *Smith,* the defendant crossed the street in front of a patrol car. 633 F.3d at 891. The officer driving that vehicle exited his patrol unit and called for Smith to stop and stand in front of the car. *Id*. After a brief verbal interaction, Smith backed away and then "turned and ran when he saw the officer reach for what Smith believed was a gun." *Id*. The officer pursued on foot and eventually caught up to smith who admitted he had a gun in his pocket, which the officer then located. *Id*. The Ninth Circuit found that Smith's flight itself—combined with the fact that this occurred in a "high crime" area—created the reasonable suspicion that justified the stop and resulting seizure:

> There may be circumstances where a person's flight has a perfectly innocent and reasonable explanation. Nevertheless, the circumstances here indicate that Smith's flight was sufficient to engender reasonable suspicion. It is undisputed that Smith was in a high-crime neighborhood during the events in question, that Officer Dominguez clearly identified himself as a police officer, and that Smith burst into headlong flight for no other reason than to evade Officer Dominguez. The officer's determination that Smith's sudden flight was suggestive of wrongdoing was reasonable under these circumstances.

*Smith,* 633 F.3d at 894.

Similarly, in *Wardlow*, a caravan of police cars "converg[ed] on an area known for heavy narcotics trafficking in order to investigate drug transactions." 528 U.S. at 121. One officer observed Wardlow standing next to a building holding an opaque bag. *Id*. at 121–22. Wardlow looked in the direction of the officers and then fled. *Id*. at 122. The Supreme Court concluded that the officers had reasonable suspicion to stop Wardlow based "solely on [his] presence in a high-crime area combined with 'headlong flight' from police." *United States v. Jones*, 673 F.3d 497, 502 (6th Cir. 2012) (quoting *Wardlow*, 528 U.S. at 124).

*Brown*, in contrast, involved a situation where the defendant, Brown, was engaged in "presumptively lawful" conduct—carrying a concealed firearm—when police approached him to investigate an anonymous tip describing a "black man '[with] a gun'" walking down the street, in an area which the government did not suggest was a "high crime" area. 925 F.3d at 1153, 1156. There was no indication that the defendant was engaged in any criminal activity, nor did the officers observe Brown holding anything or walking in a particular way that would corroborate that he might be carrying a gun. *Id*. at 1153, 1156. When police spotted Brown, "who was on foot, [they] activated their lights, and pursued him by car, going the wrong direction down a one-way street." *Id*. at 1151. Brown reacted by running for about a block before the officers stopped him at gunpoint. *Id*. The Ninth Circuit noted that although the "flight might be suggestive of wrongdoing, it did not corroborate any reliable suspicion of criminal behavior." *Id*. at 1156. The Court therefore concluded that "the totality of the circumstances" did "not add up to enough: no reliable tip, no reasonable inference of criminal behavior, no police initiative to investigate a particular crime in an identified high crime area, and flight without any previous attempt to talk to the suspect." *Id*. at 1157. Moreover, "racial dynamics in our society—along with a simple desire not to interact with police—offer[ed] an 'innocent' explanation of flight," especially where there was no indication of criminal activity that would warrant investigation. *Id*. Acknowledging that though flight is "the 'consummate act of evasion'—it is not tantamount to guilt." *Id*. (quoting *Wardlow*, 528 U.S. at 120).

a.      *Disputed Evidence Related to Flight*

Applying these legal principles to the Sacramento Action is far from straightforward

45

because there are material disputes in the record.[35] Generally, according to all the I-213s, as soon as Border Patrol Agents stepped out of their vehicles, and *before* Agents spoke to anyone, those clustered in groups in the parking lot looked furtively in their direction and ran away from them. (Doc. 95 at 8, 14–15, 18–19, 23, 28–29, 34, 38, 43–44, 49, 54, 59.) The Video Footage generally bears this out, showing that a great number of individuals indeed fled immediately at the sight of Agents, with some exceptions. (*See* Video Footage at 1:45-2:30.)

However, Mr. Mazariegos and Mr. Rivera Molina deny engaging in immediate flight as detailed above. Even still, the I-213s for Mr. Mazariegos and Mr. Rivera-Molina indicate that both individuals fled as soon as they saw Agents exiting their vehicles. (Doc. 95 at 15, 34.) Those I-213s assert that Agents did not corral or surround these individuals but rather parked in public access areas. (*Id.* at 14, 34.) The forms also indicate that Agents did not physically touch these individuals until *after* a short foot pursuit from the individuals' initial unprovoked flight, rather than Agents grabbing and pushing them *prior* to flight. (*Compare* Doc. 95 at 15, 34 *with* Doc. 74-8, ¶ 3, Doc. 74-9, ¶ 2.)[36] It is not clear whether the Video Footage depicts Mr. Mazariegos or Mr. Rivera-Molina at all. No party has directed the Court's attention to where they may appear in the video. (*See* Hearing Tr. at 24 (counsel for Plaintiff indicating they cannot be seen).)

There appear to be other material inconsistencies between the I-213s and the Video Footage, however. At 1:42 and 1:52–1:55 of the footage, for example, three unmarked vehicles clearly pull into the front driveway entrance and stop in the traffic lane near Group B. Assuming these are the Border Patrol vehicles mentioned in the I-213s, this calls into question the statement that Agents "parked in a public access area." (Doc. 95 at 8, 14–15, 18–19, 23, 28–29, 34, 38, 43–44, 49, 54, 59.) Additionally, while most individuals in Group A ran immediately after seeing Border Patrol Agents, not all men in Group B immediately ran upon seeing Agents "step[] out of

---

[35] The Court finds it unnecessary to articulate and untangle all these disputes at this time, particularly given that the parties make little attempt to do so. The disputes discussed herein are provided as illustrations to explain why further clarification of the PI Order is necessary.

[36] If declarants' descriptions are true, then these two stops took place before these individuals engaged in flight, if any. *See Torres v. Madrid*, 592 U.S. 306, 325 (2021) (Roberts, C.J.) ("We hold that the application of physical force to the body of a person with intent to restrain is a seizure even if the person does not submit and is not subdued."); see also id. at 313–14 (explaining that a "mere[]touch" constitutes a seizure under Founding Era common law). As previously mentioned, Defendants concede that pre-flight, there was no reasonable suspicion to justify any detentive stops. (Hearing Tr. at 42.)

46

[their] nearby vehicle[s]." (*See* Doc. 95 at 8, 15, 19, 23, 29, 34, 38, 43–44, 49, 54, 59.) Instead, Group B slowly dispersed *after* Agents exited their vehicles. For instance, the video at 1:51 shows that the man in the brown vest did not run "as soon as" the Agent "stepped out of [his] vehicle," but ran after the Agent had taken five or six steps towards him. Additionally, the video at 2:00 shows that the man in the red shirt sitting on the curb, slowly got up and walked away after two Agents had already walked some distance away from their vehicles.

///

#### b.      *Asserted Presumption of Reliability*

Defendants argues that these and other inconsistencies can be address by asserting that the I-213s are entitled to a "presumption of reliability" vis-à-vis Plaintiffs' declarations and that Plaintiffs have not "clearly and convincingly" overcome that presumption. (Doc. 112 at 24 (citing *Hernandez v. Garland*, 52 F.4th 757, 766 (9th Cir. 2022) ("Forms I-213 are entitled to a presumption of reliability . . . regardless of the purpose for which the form is used.").)

This argument does not fairly represent how this Court must view this kind of evidence under the present circumstances. Among other things, Defendants cite *Hernandez* out of context. There, the Ninth Circuit assessed whether the presumption of reliability—applicable to the government's initial burden of proving removability in an immigration proceeding—extended to the related, particularly-serious-crime determination. 52 F.4th at 766. The Ninth Circuit held that it did. *Id.* The Ninth Circuit explained that "Forms I-213 are entitled to a presumption of reliability because of their general characteristics as government-prepared documents" and "[n]othing in the language of the 'particularly serious crime' provisions in the INA limits the scope of permissible evidence on which the agency may rely in making its particularly-serious-crime determination." *Id.* (internal citation and quotation omitted). The Court is not convinced that this language extends to the present circumstances in the way the government suggests.

It is true that in immigration court proceedings and related appeals, I-213s are generally "presumed trustworthy because of an assumption that public officials 'perform their duties properly without motive or interest other than to submit accurate and fair reports.'" *Janjac v. I.N.S.*, 46 F.3d 1142, *2 (9th Cir. 1995) (Table); *see also Gutierrez–Berdin v. Holder*, 618 F.3d

647, 653 (7th Cir. 2010) ("Form I–213 is a presumptively reliable administrative document."). As such, "information on an authenticated immigration form is presumed to be reliable in the absence of evidence to the contrary presented by the alien." *Espinoza v. I.N.S.*, 45 F.3d 308, 310 (9th Cir. 1995), *as amended on denial of reh'g* (Jan. 12, 1995). This presumption "closely tracks" Federal Rule of Evidence 803(8), which "exempt[s] public records containing factual findings from an official investigation from the prohibition on hearsay 'unless the sources of information or other circumstances indicate lack of trustworthiness.'" *Espinoza*, 45 F.3d at 310–11. Because the Federal Rules of Evidence do not apply in immigration hearings, "[t]he sole test for admission of evidence is whether the evidence is probative and its admission is fundamentally fair," and thus admission of a Form I–213 "is fair absent evidence of coercion or that the statements are not those of the petitioner." *Id.* at 310.

Of course, the Federal Rules of Evidence control in this Court, though not strictly because the pending motion concerns a preliminary injunction. *See Flores v. Bennett*, 635 F. Supp. 3d 1020, 1030 (E.D. Cal. 2022), *aff'd*, No. 22-16762, 2023 WL 4946605 (9th Cir. Aug. 3, 2023) (citing *Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984)). In the present context, an I-213 serves a purpose analogous to a police report. When considering whether a police report is admissible, despite containing hearsay, the Ninth Circuit draws a distinction between police reports which recorded "routine, non-adversarial matters" and "the adversarial nature of the confrontation between the police and the defendant in criminal cases," finding that the latter is "not as reliable as observations by public officials in other cases." *United States v. Orozco*, 590 F.2d 789, 793 (9th Cir. 1979) (explaining that admission of reports made by law enforcement personnel must be evaluated under FRE 803(8) and that this rule specifically excludes from the hearsay exemption set forth therein "matters observed by . . . law enforcement personnel" when offered in a criminal case). Records of routine acts are admissible because they are "ministerial, objective, and nonevaluative." *United States v. Gilbert*, 774 F.2d 962, 964 (9th Cir. 1985); *see also Toliver v. Las Vegas Metro. Police Officers,* No. 2:17-CV-02612-MMD-DJA, 2021 WL 1080739, at *4 (D. Nev. Mar. 17, 2021) (applying this distinction reasoning when addressing admissibility under FRE 803 in civil case). That said, the Ninth Circuit has also held

48

more recently that "police reports are admissible under 803(8) as to the reporting officer's own observations." *Sandoval v. Cty. of San Diego*, 985 F.3d 657, 692 n.4 (9th Cir. 2021); *see also United States v. Pazsint*, 703 F.2d 420, 424 (9th Cir. 1983) ("It is well established that entries in a police report which result from the officer's own observations and knowledge may be admitted."). But admissibility does not equal infallibility. Though potentially admissible under FRE 803(8), the Court is aware of no principle under the FRE that suggests the contents of a police report describing the interaction of the arresting officer and a defendant/detainee is entitled to a presumption of correctness before the finder of fact that must be overcome with any special quantum of proof. Rather, though the evidence may be "admissible," it is evidence that may be considered and potentially countered by other evidence. In sum, the Court rejects that the disputed content of the I-213s is entitled to any form of presumption of correctness.

<i>c.      Additional Documentation Issues</i>

Even if a presumption of reliability applied, there are numerous reasons, some of them already outlined above, why the I-213s appear to be unreliable, inaccurate, and under-inclusive. Other areas of concern include the following.

i.      Detention of Mr. Mejia-Diaz

Mr. Mejia-Diaz admits to engaging in flight, but Plaintiffs contend it was reasonable, and thus not suspicious, for him to run when a masked man jumped out of an unmarked truck and started to chase him. (Doc. 94 at 23–24 (citing *Brown,* 925 F.3d at 1157).) From Mr. Mejia-Diaz's perspective, viewed in isolation, his flight very well could fall into the "provoked" category. (Doc. 81-12, ¶ 3. ("I was nearing the bridge, when I noticed a grey Chevrolet Silverado drive by me. I didn't think much of it, but then it turned around and approached me. A masked man dressed like a soldier jumped out of the car and began chasing me. Everything happened very fast, and I felt afraid because I did not know who the man was. I ran for about 10 steps before the agent grabbed me and threw me to the ground.").

The initially disclosed I-213 associated with Mr. Mejia-Diaz indicates that the Agent believed Mejia-Diaz was one of the individuals he observed fleeing from the Home Depot parking lot. (*See* Doc. 95 at 23.) According to the I-213, when the Agent stepped out of his

49

vehicle at the Home Depot, and before he spoke with anyone, the Agent "observed several people looking furtively in [his] direction" and those persons "ran away from [him] and other Border Patrol Agents." (*Id.*) The Agent then "pursued the individuals who ran to further investigate." (*Id.*) Without providing any intervening details, the I-213 moves on to describe a subsequent interaction with someone later identified as Mejia-Diaz:

> I verbally identified myself as a U.S. Border Patrol Agent while wearing official Border Patrol Agent identifiers[37] and ordered MEJIA to stop. MEJIA ignored my lawful orders to stop and continued running away from me . After a short foot pursuit, I was able to catch him, stop him and detain him in order to perform a brief immigration inspection on him, as I firmly believed that he was an illegal alien at this point.

(*Id.*)

Though Mr. Mejia-Diaz asserts that he was not arrested near the Home Depot, but rather some distance away, near a small bridge behind the Ross shopping center, (Doc. 81-12, ¶¶ 3, 6; *see also* Doc. 81-9 at 2), the initial I-213 fails to provide any relevant details. (Doc. 95 at 23.) Instead, the I-213 suggests his arrest took place *near* the Home Depot because the Agent indicates that, "[a]fter a short foot pursuit, [he] was able to catch him." (*Id.*) According to Google Maps, the walking distance from Home Depot to the small bridge is about a twelve-minute walk. If Mejia-Diaz is correct about the location of his arrest, then the I-213 indicating that he was apprehended after a "short foot pursuit" is inaccurate and underinclusive.[38] (*See* Doc. 95 at 23.)

ii.    Unexplained Additions to Mr. Mejia-Diaz's I-213

Notably, Agent Agent A modified the arresting Agent's draft narrative regarding the arrest of Selvin Mejia-Diaz. For instance, the arresting Agent Agent C indicates:

> The location of today's operation was the Home Depot, located at 4641 Florin Rd, Sacramento, California. <u>Agents arrived at</u>

---

[37] The Agent who stopped Mejia-Diaz claims to have been wearing "full Border Patrol multicam duty uniform, wearing agency issued ballistic body armor with Border Patrol identifiers, badge, and clear police markings on front and back." (Doc. 95 at 22.) Not inconsistently, Mejia-Diaz described the person who stopped him as a "masked man dressed as a soldier." (Doc. 81-12, ¶ 3.)

[38] Notably, some of the I-213s did include more detail. (*See* Doc. 95 at 9.) For instance, the I-213 submitted for arrestee Arrested Person H provides a much more detailed description of flight. The form indicates that agents pursued a man into a river bottom and saw the man traverse into a nearby neighborhood. (*Id.*) The man then jumped a chain link fence and continued fleeing on foot into a residential area. (*Id.*) Agents followed the man and ultimately arrested him in the backyard of a home located at 4517 A. Pkwy. (*Id.*)

50

approximately 7:45 a.m. [and] assisted with other Border Patrol Agents chasing other subjects who were running from uniformed Border Patrol. Multiple subjects ran across Florin Road into a residence area. At [a]pproximately 8:00 a.m. Agent Agent C approached and conducted a consensual encounter with one subject later identified as MEJIA-Diaz, Selvin (DOB 06/03/2007). [] [Agent] Agent C , I identified myself to MEJIA-DIAZ as U.S. Border Patrol Agent wearing multicam uniform with agency issued ballistic body armor displaying a visible badge and agency identifiers on the front and back, clearly stating my status as a Border Patrol Agent.

(Doc. 157 at 59 (emphasis added).) Yet, the narrative provided to ICE by Agent Agent A adds significant modification:

I arrived at the Home Depot at approximately 7:25 AM, and I parked in a public access area. I intended to search for the illegal aliens identified during prior surveillance operations. I also intended to engage the employees / day laborers in conversation to determine their citizenship and inquire if they had knowledge of other illegal aliens in the area. In doing so, I observed many people in the parking lot moving to and from the Home Depot. These individuals appeared to me to be customers intent on shopping at the store as one would expect. They moved in a relaxed manner with an identified purpose. By contrast, groups of other individuals, scattered throughout the parking lot, behaved differently than people shopping at Home Depot. They were loitering in stationary locations and were not shoppers. In my experience, as described above, this stationary loitering is indicative of day laborers and possible illegal aliens intent on working for cash. Moreover, I am aware of intelligence reports indicating that illegal aliens typically loiter at businesses in certain locations at certain times to find cash work.

As soon as I stepped out of my nearby vehicle, and prior to speaking to any individual, I observed several people looking furtively in my direction and ran away from me and other Border Patrol Agents. Their actions were far different than customers entering and exiting the store. I know from experience that the mere presence of a Border Patrol Agent can induce panic in aliens who are unlawfully present, for fear of arrest and deportation.

One of the fleeing individuals was later identified as Selvin Osbeli MEJIA-Diaz (DOB 06/03/2007). This unprovoked flight from law enforcement led me to believe that the man was involved in an active crime or was likely present in the United States without authorization. I verbally identified myself as a U.S. Border Patrol Agent while wearing official Border Patrol Agent identifiers and ordered MEJIA-Diaz to stop. MEJIA-Diaz ignored my lawful orders to stop and continued running away from me. After a short foot pursuit, I was able to catch him, stop him and detain him in order to perform a brief immigration inspection on him, as I firmly believed that he was an illegal alien at this point.

(Doc. 157 at 56 (emphasis added).)

After the above finalized narrative was submitted by Agent Agent A to ICE, the final I-213 was modified yet again. The form states:

> As soon as I stepped out of my nearby vehicle, and prior to speaking to any individual, I observed several people looking furtively in my direction and ran away from ma and other Border Patrol Agents. Their actions were far different than customers entering and exiting the store. I know from experience that aliens unlawfully present in the United States frequently abscond rather than face apprehension by Border Patrol Agents. Based on my training and experience, this unprovoked flight from law enforcement led me to believe that these individuals were involved in an active crime or were likely present in the United States without authorization. I therefore pursued the individuals who ran to further investigate.

(Doc. 95 at 23 (emphasis added).) These changes represent material, substantive modifications to the *arresting* Agent's version of events, which is inconsistent with the PI Order. (*See* Doc. 47 at 86–87, ¶¶ 4(c) ("The documentation **SHALL** include the date and time that the agent completed the detentive stop and the date and time the agent completed the documentation.").)

### iii.    Detention of Mr. Arrested Person C

The Video Footage also sheds light on certain discrepancies in the initial I-213s. For instance, at 15:58, a man in an orange long-sleeve shirt is seen running out from under the small bridge behind the Ross shopping center. At 16:04, an Agent in green—who is wearing plain clothes without BPA identifiers—follows the man in pursuit. At 16:15, the Agent apprehends the man. At 16:40, the man is taken back under the bridge where he is interviewed by two Agents. See Video Footage at 21:15. In the documentation produced March 6, 2026, Defendants suggested that the man in orange is Arrested Person C. (*See* Doc. 144; see also Doc. 95 at 36–40.) Yet, the initial I-213 submitted for Mr. Arrested Person C omits any details regarding this arrestee's apprehension under the bridge, any descriptors tying him to the man in orange, or any details regarding his flight from Home Depot to the bridge. (Doc. 95 at 36–40.)

Alternatively, the final/ third draft of Arrested Person C I-213, provides some details which tie Mr. Arrested Person C to the man in the orange shirt seen on video. (*See* Doc. 157 at 64–70; *see also id*. at 14, ¶¶ 11, 13.) The form states:

> One of the fleeing individuals became combative with Agent Agent A and was able to elude initial apprehension. The subject had fled the

> parking lot area and entered a nearby canal, concealing himself beneath a bridge. A small, unmanned aircraft (drone) guided Agent Agent A and I to the man's last known location. Upon my arrival, I walked into the river bottom to search for the fleeing suspect. As Agent Agent A and I walked down the embankment, I observed another individual begin fleeing through the waterway. This unprovoked flight from law enforcement led me to believe that the man was involved in an active crime or was likely present in the United States without authorization. Based on my training and experience, I believed the man was likely an illegal alien. I gave chase while loudly announcing, "U.S. Border Patrol". The subject continued running through the creek before I closed distance and physically detained him.

Though the finalized I-213 provides some information regarding Mr. Arrested Person C flight and his presence under the bridge, the form does not mention Mr. Arrested Person C alleged flight from Home Depot to the bridge. Instead, Agents were initially pursuing Arrested Person H into the river canal, (*see* Doc. 157 at 3, ¶ 5), and when they arrived at the small bridge to apprehend A.P. H, who was no longer there, "another individual later identified as Arrested Person C" was found. (Doc. 157 at 3, ¶ 5.) Further, although the finalized I-213 indicates that the arresting agents "were both wearing agency issued ballistic body armor with Border Patrol identifiers," (Doc. 157 at 66), the Video Footage at 16:04 and 16:30 shows that the arresting agents were not wearing any such body armor. This shows that even the finalized I-213 is at the very least materially incomplete.

More important, this modified statement fails to detail any reasonable suspicion to support the detention. There is no evidence that this location, under a bridge and a 12-minute walk away from the Florin Road Home Depot, was a location that agents had surveilled previously or that they had any indication that people living or staying under the bridge were typically illegal aliens. Indeed, this revised statement suggests that Agents are trained that if they are involved in an action to arrest illegal aliens, while they are engaged in this effort, they are entitled to detain anyone they please, no matter where the people are encountered in relation to the target location. This is not the law.

#### iv.    Other Authorship/Timing Issues

Though Defendants contend that the I-213s were "prepared contemporaneously to the stops and arrests," (Doc. 112 at 24), it is unclear whether arresting Agents themselves completed the forms in temporal proximity to when the arrests occurred. The I-213 forms were signed by

nine Deportation Officers and four Examining Officers.[39] (*See* Doc. 95.) However, the forms reference at least ten named Border Patrol Agents as conducting the detentive stops and arrests.[40] (*Id*.) These Agents are different from those who signed the forms. (*Id*.) It is unclear why the Agents referenced in the forms did not sign the I-213s themselves, or whether the involved Agents completed the forms themselves (e.g., documented the facts and circumstances surrounding the stops and arrests) as required by the PI.[41] (*See* Doc. 47 at 86–87, ¶¶ 4(c), (d).)

The March 6, 2026 submissions shed some light on this issue. (Doc. 157 at 78–85.) In an email thread between the Sacramento/ Stockton ERO staff and Border Patrol regarding the production of the I-213s, Border Patrol Agent Agent F requested that the I-213s be amended. (*Id*. at 84.) However, to make such amendments, Border Patrol would need to "update print sign and email" those amendments to ERO. (*Id*. at 83.) Border Patrol sent the amended narratives to ERO

---

[39] Specifically, Deportation Officer Officer G and Examining Officer Officer H both signed the I-213 for arrestee Arrested Person H (Doc. 95 at 5.) Deportation Officer Officer I and Examining Officer Officer D both signed three I-213s for arrestees Filiberto Rivera-Molina, Arrested Person A, and Selvin O. Mejia-Diaz. (*Id*. at 12, 16, 20.) Deportation Officer Officer J and Examining Officer Officer K both signed the I-213 for arrestee Arrested Person B (*Id*. at 25.) Deportation Officer Officer L and Examining Officer Officer H both signed the I-213 for arrestee Isael A. Lopez Mazariegos. (*Id*. at 31.) Though Deportation Officer Officer M and Examining Officer Officer K signed the initial draft I-213 for arrestee Arrested Person C (*id*. at 36), Officers Officer I and Officer D signed the final draft of Arrested Person C I-213. (Doc. 157 at 64.) Deportation Officer Officer N and Examining Officer Officer O both signed the I-213 for arrestee Arrested Person D. (Doc. 95 at 41.) Deportation Officer Officer P and Examining Officer Officer H both signed the I-213 for arrestee Arrested Person E. (*Id*. at 46.) Deportation Officer Officer Q and Examining Officer Officer O both signed the I-213 for arrestee Arrested Person F (*Id*. at 51.) Finally, Deportation Officer Officer R and Examining Officer Officer H both signed the I-213 for arrestee Arrested Person G. (*Id*. at 56.)

[40] The narrative description of all I-213s identify a specific Agent as the person who conducted the Sacramento Home Depot immigration enforcement on July 17, 2025, and who pursued/ arrested the specific arrestee identified on each respective form. Yet, none of these Agents signed the I-213s themselves. Specifically, Agent Agent E conducted the stop and arrest of Arrested Person H. (Doc. 95 at 7.) Agent Agent S (first name omitted) conducted the stop and arrest of Filiberto Rivera-Molina. (*Id*. at 14.) Agent Agent T conducted the stop and arrest of Arrested Person A (*Id*. at 17.) Agent Agent C conducted the stop and arrest of Selvin O. Mejia-Diaz. (*Id*. at 22.) Agent Agent U conducted the stop and arrest of Arrested Person B. (*Id*. at 27.) Agent Agent V conducted the stop and arrest of Isael A. Lopez Mazariegos. (*Id*. at 33.) Though the initial I-213 submitted for Arrested Person C did not identify an arresting Agent, (*id*. at 36), the final/ third draft submitted to this Court on March 6, 2026 identified Agent Agent B as the arresting agent. (Doc. 157 at 66.) Agent Agent W conducted the stop and arrest of Arrested Person D. (Doc. 95 at 42.) Agent Agent X conducted the stop and arrest of Arrested Person E. (*Id*. at 47.) Agent Agent Y conducted the stop and arrest of Arrested Person F (*Id*. at 52.) Finally, Agent Agent B conducted the stop and arrest of Arrested Person G (*Id*. at 57.)

[41] When asked about this issue at the February 5, 2026 hearing, Defendants' counsel did not have an answer for why the Agents failed to sign the I-213s, but conveyed that the Agents on the scene completed the forms themselves—either by typing the facts themselves or dictating the facts to someone else who recorded it for them—and that the forms reflect the Agent's specific encounter. (*See* Hearing Tr. at 51–53.)

and requested "copies of the signed amended I-213s for all 11 arrestees." (*Id.* at 82.) The Stockton ERO then indicated that because of Border Patrol's restricted "timeline" in producing the I-213s, ERO Officer Officer H "signed all the I-213s for the reviewing official and had one of [his] [Deportation Officers] sign for the author." (*Id.* at 78.) Stockton ERO further indicated that they would "need more time to get the individual officers who authored the I-213s to sign." (*Id.*) This further sheds light on the unreliability of the I-213s contrary to the requirement of the PI Order.

**C.     Probable Cause as to Flight Risk**

Plaintiffs also assert that Defendants violated 8 U.S.C. § 1357(a)(2) during the Sacramento Action by failing to make "the necessary individualized analysis" that the Individual Plaintiffs were "likely to escape before a warrant [could] be obtained" for their arrests. (Doc. 94 at 24.) 8 U.S.C. § 1357(a)(2) provides that an immigration officer has the power, without a warrant:

> to arrest any alien who in his presence or view is entering or attempting to enter the United States in violation of any law or regulation made in pursuance of law regulating the admission, exclusion, expulsion, or removal of aliens, or to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest….

Similarly, 8 C.F.R. § 287.8(c)(2)(ii) indicates that an immigration officer "shall" obtain a warrant of arrest "except when the designated immigration officer has reason to believe that the person is likely to escape before a warrant can be obtained." As one district court recently summarized:

> To meet the first prong, an ICE officer must have "reason to believe," based on that officer's individualized assessment, that an individual "is in the United States in violation of any .. law or regulation." *See* 8 U.S.C. § 1357(a)(2); 8 C.F.R. § 287.8(c)(2)(i)–(ii). . . .
>
> To meet the second prong, an ICE officer must have "reason to believe," based on that officer's individualized assessment, that an individual is a flight or an escape risk. *See* 8 U.S.C. § 1357(a)(2); 8 C.F.R. § 287.8(c)(2)(i)–(ii). "[T]hat an immigration officer must have probable cause of flight risk 'is not mere verbiage.' " *Ramirez Ovando v. Noem*, ____ F. Supp. 3d.___, No. 1:25-cv-03183-RBJ, 2025 WL 3293467, at *2 (D. Colo. Nov. 25, 2025) (quoting *United States v. Pacheco-Alvarez*, 227 F. Supp. 3d 863, 889 (S.D. Ohio 2016), and citing *Arizona*, 567 U.S. at 394.) "Nor can it be the case that, simply by being potentially removable, an alien must be deemed to be likely to evade detention by ICE. Such a reading would render the limitations on warrantless arrest created by . . . § 1357(a)(2)

meaningless." *Escobar Molina*, 2025 WL 3465518, at *14 (quoting *Moreno v. Napolitano*, 213 F. Supp. 3d 999, 1007 (N.D. Ill. 2016)). "Indeed, such a conflation . . . would run counter to the Supreme Court's instruction that the likelihood-of-escape requirement be seriously applied to cabin 'officers [to a] more limited authority' where 'no federal warrant has been issued.' " *Id.* (quoting *Arizona*, 567 U.S. at 408).

Under the INA, "ICE officers must make a 'particularized inquiry' that the subject is likely to abscond." *Ramirez Ovando*, 2025 WL 3293467, at *2 (quoting *Moreno*, 213 F. Supp. 3d at 1007–08). "Courts have . . . made the self-evident finding that the likelihood of escape is lower when the individual has resided in the country for a lengthy period of time and has strong community ties." *Escobar Molina*, 2025 WL 3465518, at *13. *See, e.g., United States v. Kahn*, 324 F. Supp. 2d 1177, 1186–87 (D. Colo. 2004) (no flight risk where noncitizen worked two jobs, owned a vehicle, paid rent, and never experienced legal trouble before his immigration arrest); *Pacheco-Alvarez*, 227 F. Supp. 3d at 890 (no flight risk where noncitizen had a stable job, lived with his fiancé, and helped pay her rent and raise her two children); *United States v. Bautista-Ramos*, No. 18-CR-4066-LTS, 2018 WL 5726236, at *7 (N.D. Iowa Oct. 15, 2018) (no flight risk where ICE encountered noncitizen at his place of employment, "a place he routinely visited," as opposed to anywhere near the border or heading in that direction).

*A.B.D. v. Wamsley* No. 6:25-CV-02014-AA, 2026 WL 178306, at *11–12 (D. Or. Jan. 22, 2026) (summarizing relevant legal standards).

Plaintiffs contend that the Border Patrol Agents acted unlawfully by not affirmatively asking any of the detained persons about their community ties, and, relatedly, that the boilerplate nature of the I-213s suggest that individualized assessment of flight risk did not occur. (Doc. 94 at 24-25.) Defendants respond that flight, "on its own, sufficiently indicates that [an] individual is likely to abscond before a warrant can be obtained." (Doc. 112 at 21 (citations omitted)). Defendants also maintain that six of the eleven I-213s expressly noted that the detainee did not have community ties, which suggests that the question was indeed asked. (Doc. 112 at 21-22 & n.6.).

Intuitively, when a suspect *actually flees* at the sight of a law enforcement officer, the latter may reasonably believe that there is at least "a fair probability" that said person will abscond for purposes of 8 U.S.C. § 1357(a)(2). *See Kaley v. United States*, 571 U.S. 320, 338 (2014) ("Probable cause, we have often told litigants, is not a high bar: It requires only the kind of fair probability on which reasonable and prudent people not legal technicians, act." (citations and

quotation marks omitted) (alteration adopted)). The Court recognizes Plaintiffs' argument that flight risk should be assessed considering the totality of circumstance, in which actual flight is only one factor to be considered. (Doc. 117 at 13–14.) However, the essential problem demonstrated on the present record remains that the circumstances motivating the stops are insufficiently documented in the I-213s. Thus, that is the circumstance that merits a remedy at this time.

///

**D.      Remedies**

For the reasons set forth above, the Court finds certain clarifications to the PI Order are required to address facts and circumstances revealed because of the present record concerning the Sacramento Action. The Court finds it jurisdiction to issue these clarifications, *see Thakur*, 795 F. Supp. 3d at 1178 (N.D. Cal. 2025) ("The Court, of course, retains jurisdiction to enforce the Preliminary Injunction during the pending appeal . . . Moreover, a district court has jurisdiction to clarify the meaning of its orders even while an appeal is pending."), and that they will not materially alter the issues on appeal. See Fed R. Civ. P. 62(d); *Sw. Marine Inc*., 242 F.3d at 1166. Further, the Court has narrowly tailored its clarifications to address only the specific violations identified above.

1.      Clarification of Documentation Requirement

The PI Order includes the following documentation requirement:

> Any Border Patrol agent who conducts a detentive stop in this District SHALL, as soon as practicable, document the facts and circumstances surrounding the stop in a narrative form. This documentation **SHALL** include the specific, particularized facts that supported the agent's reasonable suspicion, which was formed in advance of the stop, that: (i) for vehicle stops, the vehicle contained a noncitizen present within the United States in violation of U.S. immigration law; and (ii) for stops on foot, the person stopped was a noncitizen within the United States in violation of U.S. immigration law. The documentation **SHALL** include the date and time that the agent completed the detentive stop and the date and time the agent completed the documentation.

(Doc. 47 at 87.)

For the reasons articulated above, it is apparent that clarification of this requirement is

57

needed. Accordingly, the Court clarifies the above documentation requirement as follows:

> Any Border Patrol agent who conducts a detentive stop in this District **SHALL**, as soon as practicable, <u>personally</u> document the facts and circumstances surrounding the stop <u>that agent</u> conducted in a narrative form. This documentation **SHALL** include the specific, particularized facts that supported the agent's reasonable suspicion, which was formed in advance of the stop, that: (i) for vehicle stops, the vehicle contained a noncitizen present within the United States in violation of U.S. immigration law; and (ii) for stops on foot, the person stopped was a noncitizen within the United States in violation of U.S. immigration law.
>
> The documentation **SHALL** explain any background factors relied upon by the agent in sufficient detail to permit an examination of the factual justifications for those assertions. If background information is collected from multiple sources, the sources **SHALL** be disclosed. The documentation **SHALL** include the date and time that the agent completed the detentive stop and the date and time the agent completed the documentation. To the extent the required documentation is incorporated into an agency document that addresses other matters, the agent or agents who authored the detentive stop justification **SHALL** sign and date the final version of that part of the document—attesting that the narrative is true and correct—in accordance with the above instructions.

The Court declines to preclude Defendants from using "boilerplate" when documenting stops and/or arrests pursuant to the PI Order and this clarification. However, Defendants are cautioned that copy and paste language may give rise to an inference that an individualized assessment was not made. *See Escobar Molina v. U.S. Dep't of Homeland Sec.*, No. CV 25-3417 (BAH), 2025 WL 3465518, at *20 (D.D.C. Dec. 2, 2025) ("In describing the individualized assessment of escape risk in the documentation ordered above, specific details as to the person being arrested must be provided such that the use of boilerplate language may be deemed indicative of noncompliance[.]"). Boilerplate may not be used to describe the particulars of each detention and arrest. Thus, any background facts reflected across multiple narratives must be sufficiently linked to the stopped individual through an individualized narrative, as appropriate to the situation.

> 2.      Training Related to Revised Documentation Requirement

The above clarification would be without meaning if not properly disseminated to Border Patrol Agents in the field. However, the Court declines to determine how the Agents gain knowledge of this Order. Instead, Defendants are obligated to see that they do. The Court expects

immediate compliance with its orders.[42] The Court does not currently find justification to grant Plaintiffs' more generic request for additional training regarding reasonable suspicion and warrantless arrest. (*See* Doc. 94 at 28.)

### 3.   All other Requests

#### a.   *Requests Related to the Musters*

Plaintiffs make numerous requests related to the text of the Musters(s):

> [T]he Court should order Border Patrol to issue a new Muster or directive providing adequate guidance on the standard for reasonable suspicion. That Muster should correct the deficiencies identified above, including by providing guidance that (1) characteristics, profiles, or generalizations that are shared with a substantial number of people who are lawfully in the country have minimal probative value and are insufficient alone or in combination to create reasonable suspicion; (2) the reasonable suspicion analysis differs between the border and the Eastern District, including by removing a "reasonable Border Patrol agent" as the standard for formation of reasonable suspicion, and explaining that many factors are relevant only at or near the border and, in fact, weigh against a finding of reasonable suspicion in this District; (3) "flight" is not a relevant reasonable suspicion factor based on current Border Patrol tactics and exercising the right to walk away from agents is never a relevant factor; (4) detail the analysis for when an interaction is a detentive stop, that is, when "a reasonable person would have believed that he was not free to leave"; and (5) explain the limitations on the "violations" Border Patrol agents are allowed to enforce and how they limit the development of reasonable suspicion, and expressly state the standard for reasonable suspicion for civil immigration stops. Plaintiffs respectfully request that the Court order Defendants to serve the new Muster or directive on Plaintiffs within 14 days of the Court's order, for the parties to meet and confer, and for objections to be raised and resolved, as necessary, within 21 days of service of the Muster or directive.

(Doc. 94 at 27.) These requests are either legally unjustified or are not narrowly tailored to match the factual scenario presented in the motion to enforce. To provide a non-exhaustive example, Plaintiffs complain that the Muster provides no guidance regarding how reasonable suspicion factors apply in the Eastern District of California versus the border region. (Doc. 117 at 8.) Consequently, they ask the Court to direct Defendants to issue a new Muster explaining how "the reasonable suspicion analysis differs between the border and the Eastern District, including by

---

[42] The Court does not find specific justification for Plaintiffs' additional demand (*see* Doc. 95 at 28) that the specific officers involved in the Sacramento Action be barred from participating in any operation in this District unless and until they received the additional training called for herein.

removing a 'reasonable Border Patrol agent' as the standard for formation of reasonable suspicion, and explaining that many factors are relevant only at or near the border and, in fact, weigh against a finding of reasonable suspicion in this District[.]" (Doc. 94 at 27.) But there is no indication on the present record that, after the PI Order issued, Agents have engaged in unlawful conduct because they were confused by the Fourth Amendment law regarding roving vehicle stops at the border and foot stops in a major city.

### b.    Documentation for Non-Immigration-Related Arrests

Plaintiffs' assert that Defendants failed to submit "any record reflecting people who were detained but not arrested" and any record of the U.S. citizen that was arrested that day. (Doc. 94 at 11, n.4.) When Plaintiffs' counsel asked about these discrepancies, Defendants' counsel stated that the submitted documents "reflect all immigration-related stops and warrantless arrests" and that the arrest of the U.S. citizen "did not involve a stop or an arrest for an immigration violation"; therefore, in Defendants' view, the PI Order did not require documentation of such arrest. (*See* Doc. 81-6 at 2, 3.)

The Court will not belabor this point because it did not intend for its PI order to encompass non-immigration related stops or arrests. *See Steinberger v. Ocwen Loan Servicing, LLC*, 739 F. App'x 881, 884 (9th Cir. 2018) (district court interpretation of its own orders entitled to deference). The PI Order directed Border Patrol Agents operating in this District to "as soon as practicable, document the facts and circumstances surrounding the stop in a narrative form." (Doc. 47 at 86–87.) This documentation must "include the specific, particularized facts that supported the agent's reasonable suspicion, which was formed in advance of the stop, that . . . for stops on foot, the person stopped was a noncitizen within the United States in violation of U.S. immigration law." (*Id*. at 87.)

The PI Order requires, among other things, "[a]ny Border Patrol agent who conducts a warrantless arrest in this District [to] comply with all requirements set forth in DHS's 'Broadcast Statement of Policy' on compliance with 8 U.S.C. § 1357(a)(2)," (Doc. 47 at 87); and § 1357(a)(2) permits immigration officers "to arrest any alien who in his presence or view is entering or attempting to enter the United States in violation of any law or regulation made in

pursuance of law regulating the admission, exclusion, expulsion, or removal of aliens, or to arrest <u>any alien</u> in the United States, if he has reason to believe that <u>the alien so arrested</u> is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest," 8 U.S.C. § 1357(a)(2) (emphases added). The PI Order did not encompass arrests of U.S. citizens, as they do not fall within the scope of § 1357(a)(2).

Plaintiffs also point to an incident described in their motion for preliminary injunction where a U.S. citizen was arrested for allegedly pretextual reasons. (Doc. 94 at 26.) But that incident occurred before the PI Order was issued, which cannot constitute a "changed circumstance" that warrants a modification of the PI. With respect to the U.S. citizen that was arrested during the Sacramento Action, he was arraigned by a magistrate judge and his criminal proceeding has just started. *See United States v. Castillo*, No. 2:25-cr-00197-WBS-1 (E.D. Cal. Aug. 20, 2025), Docket No. 6. Nothing in the present record suggests injunctive relief in this case is necessary to protect the rights of Mr. Castillo or others in his circumstances.

*c.*    *Timing of I-213 Productions*

Finally, the preliminary injunction currently requires Defendants to serve documentation of stops and warrantless arrests within 7 days of a request by Plaintiffs. (Doc. 47 at 87.) Plaintiffs now request service within 4 days of a request. (Doc. 94 at 29.) Plaintiffs argue that "by the time Plaintiffs received the I-213s from Defendants and were able to investigate the facts, Plaintiffs could not locate most of the people arrested (8 out of 11 people) because they were not in immigration custody and presumably had already been deported." (*Id.*) The Court will deny this request without prejudice for the simple reason that it believes speeding up the process further will be counterproductive to addressing what the Court has identified herein as the primary issue, namely, that the documentation is insufficiently detailed.

### IV.    CONCLUSION AND ORDER

For the reasons set forth above:

1.    Plaintiffs' motion to enforce (Doc. 81) is GRANTED IN PART. The action taken by Defendants on July 17, 2025 at the Florin Road Home Dept in Sacramento, California failed to comply with this Court' preliminary injunction.

61

2.   Defendants are ordered to:

Any Border Patrol agent who conducts a detentive stop in this District **SHALL**, as soon as practicable, personally document the facts and circumstances surrounding the stop that agent conducted in a narrative form. This documentation **SHALL** include the specific, particularized facts that supported the agent's reasonable suspicion, which was formed in advance of the stop, that: (i) for vehicle stops, the vehicle contained a noncitizen present within the United States in violation of U.S. immigration law; and (ii) for stops on foot, the person stopped was a noncitizen within the United States in violation of U.S. immigration law.

The documentation **SHALL** explain any background factors relied upon by the agent in sufficient detail to permit an examination of the factual justifications for those assertions. If background information is collected from multiple sources, the sources **SHALL** be disclosed. The documentation **SHALL** include the date and time that the agent completed the detentive stop and the date and time the agent completed the documentation. To the extent the required documentation is incorporated into an agency document that addresses other matters, the agent or agents who authored the detentive stop justification **SHALL** sign and date the final version of that part of the document—attesting that the narrative is true and correct—in accordance with the above instructions.

3.   The Clerk of Court is directed to **<u>temporarily</u>** docket this order **UNDER SEAL**.

4.   **<u>Within 14 days</u>** of the date of this order, the parties are directed to meet and confer in a good faith effort to agree on any necessary redactions to this Order and **SHALL** submit a proposed redacted version of the order to the Court in .pdf format (without any ECF header) to jltorders@caed.uscourts.gov. If the parties are unable to agree on redactions, they **SHALL** submit a joint document with the redactions upon which agree, and a list of additional redactions requested by each side.

5.   In addition, the Court finds Plaintiffs' lodged objections to the sealing order (Doc. 155) may be well taken as to all information sealed except for personally identifying information and the "law enforcement sensitive" categories. Thus, **<u>within 14 days</u>** of the date of this order, the parties are directed to meet and confer in a good faith effort to agree on any necessary redactions to the sealed documents (Doc. 157[43]) and **SHALL** submit a proposed redacted version of the exhibits to the

---

[43] Document 158 was sealed in error, but it has now been unsealed.

62

Court in .pdf format to jltorders@caed.uscourts.gov. If the parties are unable to agree on the redactions, they **SHALL** submit a joint document with the redactions upon which agree, and a list of additional redactions requested by each side.

IT IS SO ORDERED.

Dated:    **March 11, 2026**

UNITED STATES DISTRICT JUDGE